UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JULIE A. UTTER,

                                        Plaintiff,

v.                                                                    6:21-cv-1207
                                                                      (TWD)

CHERRY VALLEY-SPRINGFIELD CENTRAL
SCHOOL DISTRICT,
                                        Defendant.
_____

APPEARANCES:                              OF COUNSEL:

JULIE A. UTTER
Plaintiff, *pro se*
103 State Hwy 165
Roseboom, NY 13450

JOHNSON & LAWS, LLC                       GREGG TYLER JOHNSON, ESQ.
Attorneys for Defendant
646 Plank Road, Suite 205
Clifton Park, NY 12065

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**MEMORANDUM-DECISION AND ORDER**</u>

## I.    INTRODUCTION

Plaintiff Julie A. Utter ("Plaintiff" or "Utter") brings this action against Defendant Cherry

Valley-Springfield Central School District ("Defendant", "District", or "CVSCSD"), asserting

claims under the Americans with Disabilities Act ("ADA") and the New York State Human

Rights Law ("NYSHRL").[1]  *See* Dkt. No. 1.  Currently before the Court are the parties' cross-

motions for summary judgment, Dkt. Nos. 57, 60, and Defendant's motion to strike, Dkt. No. 82.

---

[1]  The parties consented to the jurisdiction of a Magistrate Judge.  *See* Dkt. No. 19.

The parties have filed other submissions in opposition to and in further support of the pending motions, Dkt. Nos. 65, 77, 80, 85. For the following reasons, Plaintiff's motion for summary judgment is denied, Defendant's motion for summary judgment is granted, and Defendant's motion to strike is denied as moot.

## II. BACKGROUND [2,3]

On September 8, 2017, Plaintiff applied for a full-time probationary position with the CVSCSD as a special education teacher. Dkt. No. 57-26 at ¶ 1. On September 15, 2017, CVSCSD's Director of Special Education, Bonnie Georgi ("Dir. Georgi"), recommended to the CVSCSD Superintendent of Schools, TheriJo Snyder ("Superintendent Snyder") that Plaintiff be hired as a special education teacher.[4] *Id*. at ¶ 2. In turn, on September 21, 2017, Superintendent Snyder recommended to the CVSCSD Board of Education ("BOE") that Plaintiff receive a four-year probationary appointment as a special education teacher, which the BOE approved. *Id*. at ¶ 3.

Plaintiff's four-year probationary appointment began on September 18, 2017, and was to conclude on August 17, 2021. *Id*. at ¶ 4. During her probationary term, Plaintiff was aware that her fourth year was her "tenure year" during which she would find out whether or not she would

---

[2] The facts have been drawn from Plaintiff's verified complaint, Dkt. No. 1, Defendant's statement of material facts, Dkt. No. 57-26, Plaintiff's response and counterstatement of material facts, Dkt. No. 77-31, and the parties' attached exhibits and declarations, *see generally* Dkt. Nos. 65, 77, 80, 85. These facts are undisputed unless otherwise noted. The Court construes the facts relevant to each party's motion in the light most favorable to the non-moving party.

[3] Citations to docket entries will refer to the pagination generated by CM/ECF, the Court's electronic filing system. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs. Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

[4] Superintendent Snyder was previously known as TheriJo Climenhaga. Dkt. No. 57-26 at ¶ 2. Because all parties refer to TheriJo Climenhaga as Superintendent Snyder, for ease of reference, the Court will do the same.

be awarded tenure by the District.  *Id*. at ¶ 5.  It is undisputed that at the time of Plaintiff's hiring, she did not inform the District that she was diagnosed with a learning disability.  *Id*. at ¶ 8.

One of the responsibilities of special education teachers employed by the District, including Plaintiff, was to prepare draft Individualized Education Plans ("IEP") for each classified student assigned to them.  *Id*. at ¶ 10.  During Plaintiff's first probationary year, she was aware that her production of draft IEPs for her classified students was an important responsibility.  *Id*. at ¶ 12.  She was also aware that her production of draft IEPs for her classified students was important for the Committee on Special Education ("CSE") to complete its work and was one of her central goals as a special education teacher.  *Id*. at ¶¶ 13, 14.

Plaintiff failed to meet the Spring 2018 deadline for submitting draft IEPs for the classified students assigned to her during the 2017-18 school year.  *Id*. at ¶ 16-19.  On June 13, 2018, Dir. Georgi issued Plaintiff a formal counseling memo, summarizing prior email correspondence and conversations, which states:

> On March 9, 2018, I met with the Special Education teaching staff to review the expectations for the timely submission of draft IEPs. At this meeting, it was noted that all draft IEPs were to be completed one week prior to student CSE meetings.  It was further noted that staff would have an additional week to update the draft document following the meeting in order to accommodate any changes that were needed.  The special education staff were encouraged to sign up with their mentors for IEP writing days that were made available with substitute coverage.  You did avail yourself of this opportunity on March 19th.
>
> On May 12th I emailed you requesting that your IEPs be completed by May 18th.  You failed to complete these by the deadline.  I emailed you again on May 23rd and generously offered to extend the deadline to June 1st and once again this deadline was not met.  As of today, June 5th, I have reviewed the draft IEPs in the Cleartack system and have discovered that you have failed to complete drafts for three of the five students in your classroom.  This is unacceptable being that you were given advance notice of the expectations and additional deadline dates.

>You have been given ample time to complete your IEPs prior to today. I expect without exception that you will have all of the outstanding IEPs completed no later than Monday, June 11th. If your IEPs are not completed by this deadline, you will jeopardize your continued employment with the District.
>
>As noted in email correspondence to Ms. Margaret Bouck, your IEPs were not completed on Monday, June 11th as agreed to in our meeting on Thursday, June 7th. When checked again at the close of business on Tuesday, June 12th the IEPs remained incomplete. As per our agreement, this counseling memo will be placed in your personnel file.

*Id*. at ¶ 21.[5]

At the conclusion of the 2017-18 school year, Plaintiff had concerns about whether or not she would be called back for a second year of teaching by the District. *Id*. at ¶ 24.

During Plaintiff's second probationary year, Plaintiff failed to meet the Spring 2019 deadline for submitting draft IEPs for the classified students assigned to her during the 2018-19 school year. *Id*. at ¶ 26. On June 10, 2019, Plaintiff received an email from Dir. Georgi about the missed IEP deadline. *Id*. Plaintiff testified that although she missed the Spring 2019 deadline, at that time she did not consider it to "be a big deal" and it was "honestly the last thing on her mind" because she was focused on the "personal problems" she was having with her mother, partner, and children. *Id*. at ¶ 27. Superintendent Snyder also met with Plaintiff to address her use of her personal cellphone in class. Dkt. No. 57-26 at ¶ 25.[6] At the end of

---

[5] The parties agree all of the statements contained in the June 13, 2018, counseling letter are true and accurate. Dkt. No. 57-26 at ¶ 22.

[6] Plaintiff believes this meeting occurred during her third probationary year, not her second. Dkt. No. 77-3 at ¶ 25. Plaintiff states the meeting was prompted because Plaintiff complained that an aide was using her cellphone during the class, and thereafter, the aide complained to Superintendent Snyder that Plaintiff was using her cellphone when she was not. *Id*. Superintendent Snyder states that during the meeting Plaintiff "did not deny using her personal cell phone during class but rather expressed confusion about the rules around cell phone use." Dkt. No. 57-4 at ¶ 10.

Plaintiff's second probationary year, she considered requesting a leave of absence to address her family issues but never made that request nor talked to anyone at the District about such a leave. *Id*. at ¶ 28.

During her third probationary year, Plaintiff was "behind" on her IEPs for the classified students assigned to her during the 2019-20 school year. *Id*. at ¶ 29.[7]  On June 3, 2020, Plaintiff wrote an email message to Dir. Georgi apologizing for her failure to timely submit draft IEPs for the classified student assigned to her during the 2019-20 school year. *Id*. at ¶ 32.  Plaintiff informed Dir. Georgi she was "dealing with something very personal" but she did not disclose what the "something" was. *Id*. at ¶ 33.  In a June 17, 2020, email, Plaintiff apologized for failing to timely submit report cards for the students assigned to her during the 2019-20 school year.[8] *Id*. at ¶ 34.

According to Superintendent Snyder, before the end of the 2019-20 school year, she told Dir. Georgi that she was not going to recommend Plaintiff for tenure.  Dkt. No. 57-4 at ¶ 12.  Dir. Georgi agreed with Superintendent Snyder's decision. *Id*.  Thus, in June 2020, "the only remaining question regarding Ms. Utter was **when** her probationary employment should be terminated." *Id*. (emphasis in original).  After discussing the timing for the termination of Plaintiff's probationary employment with Dir. Georgi, Superintendent Snyder decided not to terminate Plaintiff during the summer of 2020 but to defer that termination action until August 2021 at the conclusion of Plaintiff's four-year probationary term. *Id*.  Superintendent Snyder

---

[7]  Plaintiff testified it was a very hectic time due to the COVID-19 pandemic and that she also informed Dir. Georgi she did not have home internet access.  Dkt. No. 77-3 at ¶ 29.

[8]  Plaintiff contends she was only required to submit progress notes, not report cards for her students.  Dkt. No. 77-3 at ¶ 34.  Nevertheless, Plaintiff took the initiative to implement her personally designed report cards, so that her students would feel included along with the rest of the students in school by getting their own report cards. *Id*.

states the reasons for delaying the termination action included, *inter alia*, Plaintiff's existing relationship with the special education students assigned to her class and parents involved with remote learning (so her presence provided some level of continuity for students and parents); concerns about Plaintiff's inability to secure a new teaching job in the middle of the pandemic; and the uncertainty of what the pandemic would mean for the District during the 2020-21 school year in terms of modes of teaching and recruitment opportunities. *Id*.

While the District returned to in-person learning for the 2020-21 school year, two of the five classified students assigned to Plaintiff obtained health waivers exempting them from in-person instruction which left Plaintiff with only three students physically in her District classroom. Dkt. No. 57-26 at ¶ 37. According to Superintendent Snyder and Dir. Georgi, rather than "abolishing Plaintiff's position, the District assigned Plaintiff supplemental instructional duties for non-classified elementary students so that Plaintiff would have a full-time workload during her fourth probationary year (*i.e.*, the 2020-21 school year). *Id*. at ¶ 38. In contrast, Plaintiff maintains she always had a "full workload" because she was still responsible for teaching the two remote classified students even though they were not physically in her classroom. Dkt. No. 77-31 at ¶ 37.

Superintendent Snyder states Dir. Georgi and Elementary School Principal Jim Brophy engaged with Plaintiff and her union president to arrange for Plaintiff to provide "remote supplemental education (e.g., tutoring) to two small groups of general education students (since Ms. Utter was also certified to teach general education elementary students)." Dkt. No. 57-4 at ¶ 13. The parties dispute the nature and responsibilities of Plaintiff's "supplemental instruction duties for the non-classified students." *See* Dkt. No. 57-3 at ¶ 18; Dkt. No. 57-4 at ¶ 13; Dkt. No. 77-1 at ¶¶ 31, 36. Plaintiff states the District failed to communicate with her and her colleagues

about what Plaintiff's role and responsibilities were pertaining to these mutually shared students, resulting in much confusion. Dkt. No. 77-31 at ¶ 142. For example, Plaintiff and Chris Kilmartin, a fellow District elementary teacher and union member, received conflicting information about who was responsible for printing and copying the remote students' lessons and daily worksheets for the mutually shared, non-classified students. *See id.* at ¶¶ 144, 145.

On September 24, 2020, Plaintiff failed to appear for a scheduled meeting with Dir. Georgi and Principal Brophy. Dkt. No. 57-26 at ¶ 39. On September 25, 2020, Plaintiff failed to appear for the re-scheduled meeting. *Id*. at ¶ 40.

In October of 2020, a parent of one of the students assigned to Plaintiff expressed concerns about their child's educational services provided remotely. *Id*. at ¶ 41. On October 22, 2020, Plaintiff and Chris Kilmartin had a meeting during which both teachers expressed frustration regarding Plaintiff's role and responsibilities regarding their mutually shared students. *Id*. at ¶ 42. In his declaration, Chris Kilmartin states Plaintiff made several insulting and unprofessional comments to him. Dkt. No. 57-5 at ¶ 3. In an email to her union president, Plaintiff acknowledged that she "was very short with [Chris Kilmartin] and sarcastic, and he probably was upset with that." Dkt. No. 57-26 at ¶ 43.

Following the October 22, 2020, meeting, Plaintiff felt it was time for her to leave the District. *Id*. at ¶ 44. By email sent at 10:56a.m. on October 22, 2020, Plaintiff emailed her union president stating "my gut tells me this is the time. Please help me write a letter of resignation." *Id*. at ¶ 45.

At 12:08p.m. on October 23, 2020, Plaintiff sent an email to Dir. Georgi, Principal Brophy, and her two-union representatives, and copied Superintendent Snyder, stating:

> May I ask why I am continuously being segregated from these meetings, in which I should be present if they pertain to me and our

mutual students?  I think we could all agree that it would be beneficial for everyone involved to be on the same page so that there are no more communication issues.  This is just a continuation from last year with the first grade team when it involved a particular non-identified gen. ed. student receiving his instruction from me without an IEP.  I wasn't invited to attend any of those meetings but was met with separately, after the fact.  I would like you to know that I feel as though I am being treated differently than my work colleagues and as a result, I am then being treated differently by my work colleagues.  I think it's imperative at this point in time that all of you know that I have a documented learning disability.  I have decided for the benefit of continuing my career path that I seek support through a disability advocate to assist me with the communications with my administrative team, just to make sure that I am comprehending all the communications that are transpiring around the building.  I appreciate your patience with me over the past three years and I look forward to working with all of you for many years to come.

Dkt. No. 57-20 at 2.  Later that afternoon, at 2:11p.m., Plaintiff emailed Dir. Georgi, stating in part: "I just made myself completely vulnerable by informing my employer of my Disability. . . . I get the impression from you that you would like me to leave.  I've felt like this for a while and that you no longer appreciate my efforts."  Dkt. No. 57-26 at ¶ 48.

By letter dated December 4, 2020, Superintendent Snyder informed Plaintiff that she would not be recommending Plaintiff for tenure and intended to recommend to the BOE that Plaintiff's probationary employment be terminated.  *Id*. at ¶ 51.  On December 10, 2020, Plaintiff submitted a medical note excusing Plaintiff from work.  *Id*. at ¶ 53.  Plaintiff did not perform any teaching services for the District after December 10, 2020.[9]  *Id*. at ¶ 52.  On December 16, 2020, as requested by Plaintiff, Superintendent Snyder provided Plaintiff with a letter summarizing the

---

[9]  The parties use the date December 10, 2021.  Dkt. No. 57-26 at ¶ 52.  However, the Court assumes based on the context that Defendant meant December 10, 2020.  *See, e.g.*, Dkt. No. 57-3 at ¶ 25 ("As of December 21, 2021, just days after receiving Superintendent's 'no tenure' notice, Ms. Utter stopped coming to work and began submitting generic medical excuses taking leaves of absences."); Dkt. No. 57-4 at ¶ 19 (same).

reasons for recommending termination of Plaintiff's probationary employment rather than awarding tenure. *Id*. at ¶ 55.

On January 7, 2021, Dir. Georgi wrote Plaintiff an email expressing concern about the absence of lesson plans for Plaintiff's students. *Id*. at ¶ 54. On January 8, 2021, Plaintiff submitted another medical note excusing Plaintiff from work. *Id*. at ¶ 53.

By letter dated January 29, 2021, Plaintiff was informed that the BOE voted to terminate her probationary employment effective February 20, 2021. *Id*. at ¶ 57.

## III.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). "Conclusory

allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."

*Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence

of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys*, 426 F.3d at 554

(alteration and emphasis in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "a

nonmoving party must offer some hard evidence showing that [her] version of the events is not

wholly fanciful." *Id.* (internal punctuation and citation omitted). Accordingly, statements "that

are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly

supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d

Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party. *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "Where, as here, there

are cross-motions for summary judgment, 'each party's motion must be examined on its own

merits, and in each case all reasonable inferences must be drawn against the party whose motion

is under consideration.'" *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628

F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir.

2001)). In applying the summary judgment standard, the court should not weigh evidence or

assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d

Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility

and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.").

Where a party seeks summary judgment against a *pro se* litigant, or a *pro se* litigant moves for summary judgment, the Court affords the *pro se* litigant special solicitude.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (per curiam).  Despite this liberal approach, allegations unsupported by admissible evidence "do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## IV.    DISCUSSION

### A.    Plaintiff's Motion for Summary Judgment

On August 31, 2023, Plaintiff submitted an unsigned one-paragraph letter described as her "best attempt at a dispositive motion."  Dkt. No. 60.  The Court is mindful that *pro se* litigants are entitled to special solicitude.  *See Triestman*, 470 F.3d at 477 (citations omitted). However, "[a]s has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules."  *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 425-26 (N.D.N.Y. 2009); *see also Jackson v. Broome Cnty. Corr. Facility*, 194 F.R.D. 436, 436 (N.D.N.Y. 2000) ("Our District's requirements are not empty formalities.").

In this case, Plaintiff failed to submit a statement of material facts as required under Local Rule 56.1, which provides in part, "[a]ny motion for summary judgment shall contain a separate Statement of Material Facts. . . . Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."  L.R. 56.1(a) (emphasis is original).  Courts in this District have denied a *pro se* plaintiff's summary judgment

motion when the *pro se* plaintiff failed to comply with Local Rule 56.1(a).[10]  *See A'Gard v. Locke*, No. 9:14-CV-0613 (GTS/DEP), 2016 WL 5137273, at *3 (N.D.N.Y. Sep. 21, 2016); *Reed v. McGrath*, No. 9:19-CV-1203 (GTS/TWD), 2021 WL 6750625, at *4 (N.D.N.Y. Dec. 22, 2021), *report and recommendation adopted*, 2022 WL 252170 (N.D.N.Y. Jan. 27, 2022); *see also Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 451 (N.D.N.Y. 2013) ("The failure of a moving party to file a properly supported Local Rule [56.1(a)] Statement of Material Facts is fatal to a summary judgment motion.").

Furthermore, Plaintiff's motion for summary judgment does not comply with Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure.  In particular, Plaintiff does not include an argument section in her motion (or reference any statute or relevant case law), and fails to cite "to particular parts of materials in the record" to support her "assertions" of employment discrimination and retaliation.  *See generally* Dkt. No. 60.  In fact, Plaintiff has not submitted *any* materials to support her allegations.[11]  *Id*.  While Plaintiff's submissions as a *pro se* litigant "must be read to raise the strongest arguments that they *suggest* . . . arguments that the submissions themselves do not 'suggest'" cannot be made on behalf of Plaintiff.  *Triestman*, 470 F.3d at 477.  Here, Plaintiff plainly does not make any arguments in her motion for summary judgment.

---

[10]  The Court notes Plaintiff's submission also lacks a Notice of Motion, Memorandum of Law, and proof of service in violation of Local Rule 7.1(b).  Additionally, Plaintiff's motion does not comply with Rule 56(a) of the Federal Rules of Civil Procedure, because Plaintiff has not "[identified] each claim . . . on which summary judgment is sought."  *See generally* Dkt. No. 60.

[11]  Instead, Plaintiff's submission includes: (1) a copy of 2004 decision issued by the Second Circuit in the case of *Shaul v. Cherry Valley-Springfield Central School District*, 363 F.3d 177 (2d Cir. 2004); (2) a copy of the 2015 administrative decision the NYS Commissioner of Education issued in the appeal of *Nelson v. Cherry Valley-Springfield Central School District*, Decision No. 16,845 (2015); and (3) a copy of what appears to be an online post (www.coopercrier.com) from January 30, 2012, describing charges two former employees of the CVSCSD filed against the District.  *See* Dkt. No. 1 at 2-19.

Although the Court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted), and "is ordinarily obligated to afford a special solicitude to *pro se* litigants . . . particularly where motions for summary judgment are concerned," *Sheindlin v. Brady*, 597 F. Supp. 3d 607, 623 (S.D.N.Y. 2022) (cleaned up), the Court finds that when considering all of foregoing procedural deficiencies, Plaintiff fails to demonstrate she is entitled to summary judgment as a matter of law. *See also* Dkt. No. 65. As a result, the Court denies Plaintiff's motion for summary judgment.

**B.    Defendant's Motion for Summary Judgment**

Defendant also moves for summary judgment seeking dismissal of Plaintiff's complaint in its entirety. *See generally* Dkt. No. 57. In moving for summary judgment, Defendant argues: (1) Plaintiff cannot make out a prima facie case of disability discrimination or retaliation under the ADA; (2) even if she did, Defendant has advanced legitimate, non-discriminatory and non-retaliatory reasons for the no tenure and termination decision; and (3) Plaintiff can offer no evidence of pretext. *Id*. at 18-30. Plaintiff opposes Defendant's motion, arguing there is evidence from which a jury could conclude that Plaintiff was discriminated against because of her disability, and there are multiple disputed material issues of fact that preclude summary judgment. *See generally* Dkt. No. 77-30. In reply, Defendant contends, *inter alia*, Plaintiff's opposition "consists of the (partly sham) Affidavit her ghost counsel prepared for her which includes false information" and "presents opinions, innuendo, denials, suspicion, and speculation which, as a matter of law, are insufficient to survive Defendant's motion for summary judgment." Dkt. No. 80 at 5-6. Relatedly, Defendant moves to strike the portions of Plaintiff's

opposition submission that violate the Local Rules and the "Sham Affidavit Doctrine."  Dkt. No. 82.  Plaintiff submitted a response in opposition to Defendant's motion to strike.  Dkt. No. 85.

### 1.    Special Solicitude

As noted, *pro se* litigants are afforded special solicitude on motions for summary judgment.  *Triestman*, 470 F.3d at 477; *see also Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).  The policy of "liberally construing *pro se* submissions is to protect *pro se* litigants from inadvertent forfeiture of rights due to their lack of legal training."  *Knox v. Cnty. of Ulster*, No. 1:11-CV-0112 (GTS/CFH), 2013 WL 286282, at *1 n.1 (N.D.N.Y. Jan. 24, 2013).

Here, although Plaintiff is proceeding *pro se*, Plaintiff "received legal assistance" with her memorandum of law, Dkt. No. 77-30 at 7 n.1, and Local Rule 56.1 Counterstatement, Dkt, 77-31 at 1 n.1.[12]  It is obvious to the Court these documents were "ghostwritten by a lawyer or someone with a degree of legal know-how that would make applying *pro se* deference to the opposition inappropriate."  *Zoulas v. New York City Dep't of Educ.*, No. 1:18-CV-2718, 2021 WL 3932055, at *9 (S.D.N.Y. Sept. 1, 2021) ("Indeed, its use of legal terminology alone shows that it is not the work of a *pro se* plaintiff whose inexperience with the law merits special solicitude.").[13]  For instance, Plaintiff's twenty-eight-page memorandum of law is organized by

---

[12]  Plaintiff also "received legal assistance" with her response in opposition to Defendant's motion to strike.  Dkt. No. 85 at 4 n.1.

[13]  Despite being "ghostwritten" by an undisclosed attorney, Plaintiff's opposition submission still fails to comply with the Local Rules.  *See generally*, Dkt. No. 77.  For example, Plaintiff's memorandum of law exceeds twenty-five pages in length in violation of L.R. 7.1(b)(1).  Dkt. No. 77-30 at 7-34.  Moreover, to comply with L.R. 56.1(b), the non-movant's response "must (1) mirror the movant's Statement of Material Facts by (2) admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs with (3) a specific citation to the record where the factual issue arises."  *Crawley v. City of Syracuse*, 496 F. Supp. 3d 718, 724, (N.D.N.Y. 2020).  As Defendant points out, there are numerous instances within Plaintiff's 56.1 response wherein Plaintiff declares the listed statement "undisputed," and then attempts to provide so-called "clarification" of the undisputed statement (e.g., Dkt. No. 77-

headings and subheadings, and includes a caption, a table of contents, and a four-page table of authorities in Bluebook format. *See* Dkt. No. 77-30. Plaintiff's Rule 56.1 Counterstatement responds to Defendant's Statement of Material Facts, *see* Dkt. No. 77-31 at ¶¶ 1-85, and includes an additional ninety-three paragraphs of "undisputed facts," *see id.* at ¶¶ 86-178. Plaintiff's submission also includes an affidavit, Dkt. No. 77, a declaration, Dkt. No. 77-1, and multiple exhibits, Dkt. No. 77-2 through Dkt. No. 77-29. In total, Plaintiff's opposition submission, which was received by the Court via MFT, consists of 436 pages.

In short, Plaintiff's opposition submission bears no resemblance to that of Plaintiff's motion for summary judgment, discussed above, or her previous correspondence with the Court. *See* Dkt. Nos. 8, 24, 27, 53, 60. "Where, as here, *pro se* submissions are 'ghostwritten' by an attorney, such liberal construction may create unfairness toward the opposing party." *Knox*, 2013 WL 286282, at *1 n.1 (declining to afford *pro se* litigant special solicitude where submissions were "ghostwritten" by an attorney). Indeed, "[t]o afford [Plaintiff] the special solicitude generally afforded *pro se* litigants in this case would allow [her] the benefit of legal counsel while also subjecting [her] to a less stringent standard reserved for those litigants who are truly unrepresented." *Askins v. Metro. Transit Auth.*, No. 1:19-CV-4927, 2020 WL 1082423, at *4 (S.D.N.Y. Mar. 5, 2020).

Accordingly, Plaintiff's response in opposition to Defendant's motion for summary judgment will not be afforded special solicitude.[14] The Court has, however, reviewed Plaintiff's opposition submission in its entirety.

---

31 at ¶¶ 9, 17, 20, 21, 23, 25, 27, 29-34, 36-49, 53-54, 57-61, 68, 72-74, 77-84). Dkt. No. 82-1 at 10-12.

[14] Even if the Court afforded Plaintiff *pro se* deference in her opposition submission, it would not change the outcome of this Memorandum-Decision and Order.

### 2.    ADA Discrimination

Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In general, a plaintiff can allege disability discrimination under one of three theories: (1) intentional discrimination; (2) disparate impact; and (3) failure to make a reasonable accommodation.  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).  In the case at bar, Plaintiff proceeds under a theory of intentional discrimination.  *See generally* Dkt. No. 1.

Claims alleging intentional discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  First, the plaintiff must establish a prima facie case of discrimination under the ADA.  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  Second, if an employee establishes a prima facie case, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and [third] the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Id*.  In addition, to survive summary judgment, the plaintiff must show a genuine issue of fact that her disability was the but-for cause of the adverse action.  *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019) ("the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action").

a.    **Prima Facie Case**

In order to establish a prima facie case of intentional discrimination under the ADA,

Plaintiff must show: (1) Defendant is subject to the ADA; (2) she suffers from a disability within

the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of

the job, with or without reasonable accommodation; and (4) she suffered an adverse employment

action because of her disability. *McMillan*, 711 F.3d at 125 (citing *Sista*, 445 F.3d at 169).

Plaintiff's burden at the prima facie stage is *de minimis*. *Treglia v. Town of Manlius*, 313 F.3d

713, 719 (2d Cir. 2002). For purposes of this motion, Defendant does not contest the first or

third elements of the prima facie case. Dkt. No. 57-25 at 13.

Defendant argues it is entitled to summary judgment because there is no basis from which

a reasonable jury could find Plaintiff was disabled or regarded as disabled under the ADA. Dkt.

No. 57-25 at 16-18. The Court agrees.

Under the ADA, a "disability" includes "a physical or mental impairment that

substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[M]ajor life

activities include, but are not limited to, caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working." *Id*. § 12102(2)(A). "An

impairment is a disability . . . if it substantially limits the ability of an individual to perform a

major life activity as compared to most people in the general population." 29 C.F.R. §

1630.2(j)(1)(ii). In considering whether a major life activity is substantially limited by an

impairment, courts consider "the nature and severity of the impairment; its duration or expected

duration; and the existence of any actual or expected permanent or long term impact." *Mazzeo v.*

*Mnuchin*, 751 F. App'x 13, 15 (2d Cir. 2018) (quoting *Capobianco v. City of New York*, 422 F.3d

47, 57 (2d Cir. 2005)).  A plaintiff must show that her impairments do not simply cause some

difficulty with a major life activity, but that they substantially limit that activity.  *See Price v.*

*Mount Sinai Hosp.*, 458 F. App'x 49, 51 (2d Cir. 2012) (affirming a district court's finding that,

while the plaintiff's symptoms of work-related stress and depression caused her some difficulty

sleeping and eating, "no evidence showed that [her] impairments were *substantially* limiting"

(emphasis in the original)).

Here, Plaintiff alleges she is disabled based upon her learning disability and submitted a

Psychological Report prepared by M.L. Denburgy, Ph.D., dated July 20, 2007, which diagnosed

Plaintiff as follows:

> Two outstanding comparative deficits are weakness in auditory
> memory or auditory distractibility; and repetitive psycho-motor
> speed and attention.  With addition of low frustration tolerance we
> have evidence of:
>> Attention Deficit Hyperactivity Disorder, combined type
>> #314.01 DSM IV.
>> Depressive Disorder NOS #311 DSM IV.
>> Learning Disorder NOS #315.9 DSM IV.

Dkt. No. 1-2 at 3.  However, "that Plaintiff has been diagnosed with [a] condition, without more,

[is] insufficient" to show that Plaintiff was disabled within the meaning of the ADA.  *Zuckerman*

*v. GW Acquisition LLC*, No. 20-cv-08742, 2021 WL 4267815, *11 (S.D.N.Y. Sept. 20, 2021);

*Ibela v. Allied Universal*, No. 21-01995-CV, 2022 WL 1418886, at *2 (2d Cir. May 5, 2022) ("A

diagnosis alone is insufficient to establish disability under the statute."); *see also Ramirez v. New*

*York City Bd. of Educ.*, 481 F. Supp. 2d 209, 218 (E.D.N.Y. 2007) ("Merely having an

impairment does not make one disabled for purposes of the ADA.").  "The need to identify a

major life activity that is affected by the plaintiff's impairment plays an important role in

ensuring that only significant impairments will enjoy the protection of the ADA."  *Reeves v.*

*Johnson Controls World Servs.*, 140 F.3d 144, 152 (2d Cir. 1998).

In opposition to Defendant's motion for summary judgment, Plaintiff submitted a declaration stating her "ADHD symptoms include inattention, overwhelm, anxiety, frustration, and memory lapses.  I need to rely heavily on consistency and clarification, as well as taking notes during meetings in case there is something I do not understand and can ask questions." Dkt. No. 77-1 at ¶ 6.  Plaintiff also states, "[w]hile I have a separate diagnosis of anxiety disorder, which was exacerbated by my ADHD, my anxiety is also a symptom of my ADHD. For example, I have trouble focusing and get distracted easily, and if I do not know something that people/colleagues are talking about, I get nervous, sweaty, hot, panicky, red then light headed, and feel like my head is in clouds."  *Id.* at ¶ 7.  But "simply providing conclusory statements that Plaintiff is affected by her [learning disability/ADHD] is not enough to support a finding that she is disabled within the meaning of the ADA activities."  *Philbert v. New York City Dep't of Educ.*, No. 1:21-cv-03119, 2024 WL 756362, at *6 (S.D.N.Y. Feb. 23, 2024) (internal punctuation and citation omitted); *see also Villanti v. Cold Spring Harbor Cent. Sch. Dist.*, 733 F. Supp. 2d 371, 381 (E.D.N.Y. 2020) ("plaintiff's own description of her limitations is insufficient to establish that she is significantly restricted in any major life activity").

Although Plaintiff testified that she was diagnosed with a learning disability in 2000, and was reassessed in 2007 with a processing delay along with her ADHD diagnosis, Dkt. No. 77-31 at ¶¶ 88, 89, "[a] plaintiff must show that her impairments do not simply cause some difficulty with a major life activity, but that they substantially limit that activity."  *Barone v. Judicial Branch of Conn.*, No. 3:17-cv-644, 2019 WL 7283383, at *13 (D. Conn. Dec. 27, 2019) (citing *Price*, 458 F. App'x at 51).  Other than the July 2007, Psychological Report, Dkt. No. 1-1, Plaintiff has not provided any medical records demonstrating the severity of her learning disability or ADHD and she has not offered any evidence as to how her learning disability or

ADHD affect a major life activity as compared to the general population.  *See Barone*, 2019 WL 7283383, at *13 (granting summary judgment to defendant where plaintiff provided "no such evidence" that she was "substantially limited [by her ADHD] in [her] ability to concentrate in comparison to the general population" (internal quotation marks omitted)); *see also Choleva v. New England Stair Co., Inc.*, No. 3:18-cv-756, 2020 WL 3976969, at *7 (D. Conn. 2020) (granting summary judgment to defendant because plaintiff had not demonstrated how his learning disability substantially limited a major life activity including learning, concentrating, or thinking); *see DeMar v. Car-Freshner Corp.*, 49 F. Supp. 2d 84, 91 (N.D.N.Y. 1999) (granting summary judgment where "absent from Plaintiff's allegations are specific facts or evidence demonstrating that Plaintiff is substantially limited in his ability to concentrate in comparison to the general population.").

As a result, a reasonable jury could not find Plaintiff's learning disability or ADHD substantially limited Plaintiff's ability to perform a major life activity "in comparison to the general population."  *Barone*, 2019 WL 7283383, at *13; *see, e.g., Fitzgerald v. We Co.*, No. 20-cv-05260, 2022 WL 952963, at *8 (S.D.N.Y. Mar. 30, 2022) (plaintiff's statement that she was disabled in her sleeping and cognitive function, "supported by nothing more than her own affidavit," was "too vague, conclusory, and self-serving to create a triable issue of fact as to whether her anxiety disorder cause[d] substantial limitations in any major life activities" (internal punctuation and citation omitted)); *Philbert*, 2024 WL 756362, at *6 ("[S]imply providing conclusory statements that Plaintiff is affected by her migraines is not enough to support a finding that she is disabled within the meaning of the ADA activities." (internal punctuation and citation omitted)); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is insufficient to preclude [summary judgment].");

*D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

In the alternative, Plaintiff asserts there are disputed material issues of fact as to whether Plaintiff communicated her learning disability to the District and whether she was regarded as disabled.  Dkt. No. 77-30 at 12-14.  "A plaintiff is also disabled within the meaning of the ADA if [s]he is 'regarded' by h[er] employer as having a physical or mental impairment that substantially limits a major life activity."  *Capobianco*, 422 F.3d at 57 (citing 42 U.S.C. § 12102(2)).  A "regarded as" claim turns on the employer's perception of the employee.  *Id*.  For such a claim, the employer "must regard the employee as disabled within the meaning of the ADA, *i.e.*, having an impairment that substantially limits a major life activity."  *Id*. (internal punctuation and citation omitted).

Here, Plaintiff cites to no evidence that supports an inference that her employer "regarded" her as having a mental impairment that substantially limits a major life activity.  In her declaration, Plaintiff avers that "during the 2019-20 school year, I had a verbal conversation with my direct supervisor, Bonnie Georgi, during an informal one-on-one meeting, where I discussed my ADHD and my depression.  While I do not remember the date of this meeting, it was probably sometime before the COVID-19 pandemic."  Dkt. No. 77-1 at ¶ 9.  Plaintiff also emailed Dir. Georgi, Superintendent Snyder, Principal Brophy, and two union representatives October 23, 2020, stating in part, "I have a documented learning disability" and would seek support through a "disability advocate."  *Id*. at ¶ 10; *see also* Dkt. No. 57-20 at 2.

However, none of these statements from Plaintiff supports the inference that her employer regarded Plaintiff as having an impairment that substantially limits a major life

activity.  Rather, at most, the statements support the inference that the employer was aware that Plaintiff had ADHD, depression, and a learning disability.  "But an awareness . . . is not the same as regarding Plaintiff as having an impairment that substantially limits a major life activity." *Philbert*, 2024 WL 756362, at *7 ("Many people suffer from migraines and are not substantially impaired, and many persons receive periodic or ongoing treatment for medical conditions and are not substantially impaired."); *see also Weldran v. Dejoy*, 839 F. App'x 577, 580 (2d Cir. 2020) (summary order) (perceived disability claim failed on summary judgment because although plaintiff's supervisors knew he had a physical injury, there was no evidence that supported the inference that his employers believed he was substantially limited by that injury).

Because Plaintiff has failed to demonstrate that she is disabled within the meaning of the ADA, she has not made a prima facie case of discrimination.  Defendant is thus entitled to summary judgment and Defendant's motion is granted.  *See, e.g.*, *Wright-Jackson v. HIP Health Plan*, No. 07 Civ. 1819, 2010 WL 624993, at *17 (S.D.N.Y. Feb. 19, 2010) (unnecessary to discuss remaining elements of prima facie discrimination case where plaintiff failed to establish one element).

### b.    Legitimate Non-Discriminatory Reason

Even if Plaintiff had established a prima facie case of disability discrimination, Defendant has proffered legitimate non-discriminatory reasons for the no tenure and termination decision including (1) Plaintiff failed to timely submit draft IEPs for her students during the 2017-18 school year and was issued a formal counseling letter on June 13, 2018, Dkt. No. 57-26 at ¶¶ 16-22; (2) Plaintiff failed to timely submit draft IEPs for her students during the 2018-19 school year, *id*. at ¶¶ 26-27; (3) Plaintiff failed to timely submit draft IEPs for some of her students during the 2019-20 school year, *id*. at ¶¶ 29-33; (4) Plaintiff missed meetings with her

administrative supervisors, *id*. at ¶¶ 39-40; (5) Plaintiff was counseled about unprofessional

behavior, i.e., personal cell phone use, *id*. at ¶ 25, and (6) Plaintiff failed to timely submit report

cards for her students, *id*. at ¶¶ 34, 35.

As Defendant points out, Dkt. No. 57-25 at 21, this burden is "light" and the "employer

must simply articulate an explanation that, if true, would connote lawful behavior." *Mace v.

Marcus Whitman Cent. Sch. Dist.*, No. 11-cv-6574, 2015 WL 5682665, at *7 (W.D.N.Y. Sept.

25, 2015); *see also Mattera v. JP Morgan Chase Corp.*, 740 F. Supp. 2d 561, 574 (S.D.N.Y.

2010) ("Defendants' burden at this stage is not to prove nondiscrimination.  Instead, defendants

must introduce evidence which, *taken as true*, would *permit* the conclusion that there was a

nondiscriminatory reason for the adverse action.") (emphasis in original) (internal punctuation

omitted).  This evidence meets the District's burden of production to articulate legitimate

nondiscriminatory reasons for the no tenure and termination decision.  *See Canales-Jacobs v.

N.Y. State Office of Court Admin.*, 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009) ("[O]n-the job

misconduct and poor work performance always constitute legitimate and nondiscriminatory

reasons" for terminating employment.) (citing *Raytheon v. Hernandez*, 540 U.S. 44, 54 n. 6

(2003))).

### c.    Pretext and Causation

Finally, Plaintiff cannot raise a triable issue of fact as to whether Defendant's proffered

reasons were in fact "pretext for discrimination." *Iverson v. Verizon Commc'ns*, No. 08 Civ.

8873, 2009 WL 3334796, at *4 (S.D.N.Y. Oct. 13, 2009).  Plaintiff does not dispute that

Defendant's concerns over her performance began before the District was aware of Plaintiff's

diagnosed learning disability.  While Plaintiff argues, *inter alia*, she had received positive

evaluations of her performance prior the October 23, 2020, email, *see* Dkt. No. 77-30 at 22-31,

"[t]he mere fact of past satisfactory performance, followed by negative feedback, is not suggestive of impermissible animus." *Missick v. City of New York*, 707 F. Supp. 2d 336, 350 (E.D.N.Y. 2010); *see also Hines v. Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 315-16 (W.D.N.Y. 1999) ("[P]rior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual.  To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality.") (internal punctuation and citation omitted).

After careful review of the record, the Court finds Plaintiff has also failed to meet her burden at the third step of the *McDonnell Douglas* analysis.  Although the temporal proximity between Plaintiff's October 23, 2020, email and termination provides an inference of potential discrimination, it is not enough on its own to overcome Defendant's well-documented non-discriminatory reasons for the employment decision in this case.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932-33 (2d Cir. 2010) (stating that "temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext"); *see also Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) ("Temporal proximity may be sufficient to show a prima facie case, but it is insufficient to demonstrate pretext.").  Aside from temporal proximity, Plaintiff has not presented any evidence to connect her alleged disability to the decision to deny tenure or terminate her employment.

In sum, Plaintiff has failed to adduce evidence that reasonably supports a finding of discriminatory intent based on her alleged disability.  Defendant's explanation that Plaintiff was terminated because of her performance issues and misconduct is consistent throughout the record and supported by sworn statements from District employees.  *See generally* Dkt. Nos. 57-3, 57-4, 57-5, 15-6, 80-1, 80-2.  Additionally, Defendant has submitted evidence that Superintendent Snyder has made a similar "no tenure" decision regarding five other District teachers, who were

not disabled, nor perceived to be disabled.  Dkt. No. 57-4 at ¶ 23.  Moreover, in January 2021, Superintendent Snyder made an affirmative recommendation to award tenure to Kathleen Urban, a special education teacher with a learning disability, which the BOE approved on January 6, 2021.  *Id*. at ¶ 22.  Lastly, the teacher assigned by the District to teach the self-contained special education class Plaintiff taught before her departure suffers from medical conditions and daily symptoms, which were known to the District.  Dkt. No. 80-1 at ¶ 2.

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Defendant's reasons were pretextual and that Plaintiff's alleged disability was the but-for cause of her termination.  *See El Sayed*, 627 F.3d at 932-33 (affirming the dismissal of the plaintiff's discrimination claim where "[the plaintiff] produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual").

Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA discrimination claim.  *See Graham v. Three Village C. Sch. Dist.*, No. 11-cv-5182, 2013 WL 5445736, at *26 (E.D.N.Y. Sept. 30, 2013) (granting summary judgment on discriminatory discharge claim where the plaintiff "point[ed] to nothing in the record from which a rational jury could find her termination was 'because of' her hip impairment, or that the District's underlying motive to terminate her was attributable to a discriminatory intent, and not to her job performance," and there was "uncontroverted evidence that plaintiff was not the only employee who was denied tenure at the conclusion of her probationary period."); *see also Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("[Plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his [protected status].") (internal punctuation omitted); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-cv-8812, 2015 WL 1499618, at *42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say, "I

belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class.") (internal punctuation omitted), *aff'd*, 693 F. App'x 41 (2d Cir. 2017) (summary order).

### 3.     ADA Retaliation Claim

The ADA makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter."  42 U.S.C. § 12203(b).  The ADA further renders it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  *Id*. § 12203(a).

To establish a retaliation claim under the ADA, a plaintiff must show that: (1) she engaged in protected activity; (2) the defendant was aware of this activity; (3) the defendant took an adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action.  *See Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002).  A retaliation claim is analyzed under the same three-part *McDonnell Douglas* burden shifting framework as discrimination claims.  *Emmons v. Broome Cnty.*, No. 3:16-cv-1114 (DNH), 2018 WL 2364286, at *7 (N.D.N.Y. May 24, 2018); *Prindle v. City of Norwich*, No. 15-CV-1481 (GTS), 2018 WL 1582429, at *8 (N.D.N.Y. Mar. 27, 2018).

Protected activity is "action taken to protest or oppose statutorily prohibited discrimination."  *Natofsky*, 921 F.3d at 354 (citation omitted).  The "underlying conduct about which the plaintiff complains need not actually be unlawful so long as plaintiff possessed a good faith, reasonable belief that the challenged action violated the law."  *Frantti v. New York*, 414 F.

Supp. 3d 257, 290-91 (N.D.N.Y. 2019) (citation omitted), *aff'd*, 850 F. App'x 17 (2d Cir. 2021).

To constitute protected activity, a plaintiff's complaint "must be sufficiently pointed to be

reasonably understood as a complaint of discrimination." *Cain v. Mandl Coll. of Allied Health*,

No. 14-cv-1729, 2015 WL 3457143, at *6 (S.D.N.Y. May 29, 2015) (citation omitted).  "The

burden is on the employee to make clear to the employer "that [she] is complaining of unfair

treatment due to [her] membership in a protected class and that [she] is not complaining merely

of unfair treatment generally." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09

(S.D.N.Y. 2009).

Here, Plaintiff points to the October 23, 2020, email she sent to Dir. Georgi, Principal

Brophy, and Superintendent Snyder as protected activity.  Dkt. No. 77-30 at 23.  In this email, as

set forth above, Plaintiff inquired "why" she was being "segregated" from meetings.  Dkt. No.

57-20 at 2.  She also stated, "I think it's imperative at this point in time that all of you know that

I have a documented learning disability.  I have decided for the benefit of continuing my career

path that I seek support through a disability advocate to assist me with the communications with

my administrative team, just to make sure that I am comprehending all the communications that

are transpiring around the building."  *Id.*

Plaintiff's email fails to qualify as protected activity as a matter of law because the

complaints contained in the email are not "opposing" or "complaining about unlawful

discrimination."  Dkt. No. 80 at 13-14; *see also* Dkt. No. 57-25 at 23-30; *see, e.g.*, *Frantti*, 850 F.

App'x at 21 (concluding an email plaintiff sent to the defendant did not constitute a protected

activity "because Frantti neither complains of discrimination nor seeks an accommodation.");

*Fattoruso v. Hilton Grand Vacations Co.*, LLC, 525 F. App'x 26, 28 (2d Cir. 2013) (finding

general complaints were not protected activity and plaintiff's "belief that he was being treated

'unfairly' [does not] transform his complaints . . . into charges over unlawful discrimination"). There is simply no evidence from which a reasonable jury could conclude that Plaintiff's email amounted to a complaint about unlawful discrimination as opposed to general complaints about staffing matters. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012).

In any event, even if Plaintiff could make out a prima facie claim of retaliation, for reasons discussed above, Defendant's proffered reason for terminating Plaintiff's employment, poor work performance and job misconduct, is well-documented, legitimate, and non-retaliatory. Moreover, Plaintiff's retaliation claim also fails at step three of the *McDonnel Douglas* analysis, for the same reasons discussed above.  In particular, the record shows that the no tenure decision was made before her alleged protected activity, and Plaintiff has presented no evidence, aside from temporal proximity, to draw a connection between her October 23, 2023, email, and Defendant's decision to terminate her employment.  Contrary to Plaintiff's assertion, Dkt. No. 77-30 at 32-33, at the pretext stage, temporal proximity is not enough to rebut Defendant's well-documented reasons for the decision to terminate her probationary employment. *See El Sayed*, 627 F.3d at 932-33; *Trent*, 966 F. Supp. 2d at 206.

Viewing the evidence in the light most favorable to Plaintiff, a jury could not reasonably find that Defendant's stated reasons for the adverse action were a pretext for unlawful retaliation. Although Plaintiff disputes some of the performance complaints, resolving those disputed facts in her favor would not permit a reasonable jury to conclude that a retaliatory motive was the but-for cause of this adverse employment action. *See, e.g.*, *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 799 (S.D.N.Y. 2020) (explaining that the ultimate burden of persuasion remains on the plaintiff to prove that the desire to retaliate was the cause of the employer's allegedly wrongful action).

Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA retaliation

claim. *See Widomski v. State Univ. of New York*, 933 F. Supp. 2d 534, 553 (S.D.N.Y. 2013)

(granting summary judgment to defendant on the plaintiff's ADA retaliation claim where her

claim relied solely on temporal proximity and the plaintiff otherwise failed to rebut the

defendant's legitimate, non-discriminatory justification for the plaintiff's termination); *Gray v.*

*Onondaga-Cortland-Madison BOCES*, No. 5:16-cv-973 (NAM/TWD), 2020 WL 1029022, at

*11 (N.D.N.Y. Mar. 3, 2020) (same).

### 4.    NYSHRL Claims

Defendant argues to the extent Plaintiff has attempted to advance NYSHRL claims, such

claims must be dismissed as a matter of law. *See* Dkt. No. 57-25 at 30. Having dismissed

Plaintiff's ADA claims, the Court declines, in its discretion, to retain supplemental jurisdiction

over Plaintiff's NYSHRL claims. *See* 28 U.S.C. § 1367(c)(3). When deciding whether to

exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience,

fairness, and comity." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117-18

(2d Cir. 2013) (citation omitted). "[I]n the usual case in which all federal-law claims are

eliminated before trial, the balance of factors to be considered under the pendent jurisdiction

doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law

claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Courts "commonly

decline to exercise supplemental jurisdiction after awarding defendants summary judgment on

plaintiffs' federal claims." *Martin v. Sprint United Mgmt. Co.*, No. 15-cv-5237, 2017 WL

5028621, at *3 (S.D.N.Y. Oct. 31, 2017) (collecting cases); *Sotak v. Bertoni*, 501 F. Supp. 3d 59,

86 (N.D.N.Y. 2020) ("Because summary judgment will be granted as to the [federal] claims, the

continued exercise of supplemental jurisdiction over [the plaintiff's] state law claims will be

declined.").  Because this is a "usual case in which all federal-law claims are eliminated before trial" that presents no exceptional circumstances, *Cohill*, 484 U.S. at 350 n.7, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims and dismisses those claims without prejudice.

### C.    Defendant's Motion to Strike

Having granted Defendant's motion for summary judgment, Defendant's motion to strike is denied as moot.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment, Dkt. No. 60, is **DENIED**; and it is further

**ORDERED** that Defendant's motion for summary judgment, Dkt. No. 57, is **GRANTED**; and it is further

**ORDERED** that Plaintiff's ADA discrimination and retaliation claims against Defendant are **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that Plaintiff's NYSHRL claims against Defendant are **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that Defendant's motion to strike, Dkt. No. 82, is **DENIED AS MOOT**; and it is further

**ORDERED** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**IT IS SO ORDERED.**

Dated:  October 25, 2024
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

2016 WL 5137273
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenith A'GARD, Plaintiff,

v.

N. LOCKE, Corr. Officer a/k/a N. Lock; John
Doe 1, Corr. Officer, Upstate Corr. Facility; John
Doe 2, Corr. Officer, Upstate Corr. Facility; John
Doe, Corr. Sergeant, Upstate Corr. Facility; John
Doe, Lieutenant, Upstate Corr. Facility; and Jane
Doe, Nurse, Upstate Corr. Facility, Defendants.

9:14-CV-0613 (GTS/DEP)
|
Signed 09/20/2016
|
Filed 09/21/2016

**Attorneys and Law Firms**

KENITH A'GARD, 10-A-3008, Sullivan Correctional
Facility, Box 116, Fallsburg, New York 12733, Plaintiff, Pro
Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for
the State of New York, The Capitol, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant Attorney
General, Albany, New York 12224, Counsel for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Kenith A'Gard ("Plaintiff")
against the six above-captioned employees of the New
York State Department of Corrections and Community
Supervision at Upstate Correctional Facility ("Defendants")
are the following: (1) Defendant Locke's motion for summary
judgment pursuant to Fed. R. Civ. P. 56; (2) Plaintiff's cross-
motion for summary judgment; (3) United States Magistrate
David E. Peebles' Report-Recommendation recommending
that Defendant Locke's motion be granted, that Plaintiff's
cross-motion be denied, and that Plaintiff's claims against
Defendants Corrections Officer John Doe 1, Corrections
Officer John Doe 2, and Nurse Jane Doe be *sua sponte*
dismissed without prejudice based on Plaintiff's failure to

prosecute those claims and/or failure to comply with a Court
Order to take reasonable steps to identify those Defendants
pursuant to Fed. R. Civ. P. 41(b); (4) Plaintiff's Objections to
the Report-Recommendation; (5) Magistrate Judge Peebles'
Supplemental Report-Recommendation recommending that
Plaintiff's claims against Defendants Sergeant John Doe
and Lieutenant John Doe also be *sua sponte* dismissed
without prejudice based on Plaintiff's failure to prosecute
those claims and/or failure to comply with a Court Order to
take reasonable steps to identify those Defendants pursuant
to Fed. R. Civ. P. 41(b); (6) Plaintiff's Objection to the
Supplemental Report-Recommendation; and (7) Plaintiff's
motion to amend his Complaint. (Dkt. Nos. 53, 63, 71,
73, 78, 81, 82.) For the reasons set forth below, the Court
accepts and adopts both the Report-Recommendation and the
Supplemental Report-Recommendation for the reasons stated
therein; Defendant's Locke's motion for summary judgment
is granted and Plaintiff's claims against Defendant Locke are
dismissed; Plaintiff's cross-motion for summary judgment is
denied; his motion to amend his Complaint is denied; and his
claims against Defendants Corrections Officer John Doe 1,
Corrections Officer John Doe 2, Nurse Jane Doe, Sergeant
John Doe and Lieutenant John Doe are dismissed without
prejudice.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Peebles' Report-
Recommendation**

Generally, in his Report-Recommendation, Magistrate Judge
Peebles rendered the following three recommendations: (1)
that Plaintiff's claims against Defendant Locke be dismissed
based on the doctrine of qualified immunity, especially in
light of Plaintiff's willful failure to submit a response to
Defendant Locke's Statement of Material Facts, as required
by Local Rule 7.1(a)(3) of the Local Rules of Practice for
this Court; (2) that Plaintiff's claims against Defendants
Corrections Officers John Doe 1, John Doe 2, and Nurse
Jane Doe be *sua sponte* dismissed due to Plaintiff's failure to
prosecute those claims and/or failure to comply with a Court
Order to take reasonable steps to identify those Defendants;
and (3) that Plaintiff's cross-motion for summary judgment be
denied due to his willful failure to comply with Local Rule
7.1(a)(2),(3) of the Local Rules of Practice for this Court.
(Dkt. No. 71, Part III.)

**B. Plaintiff's Objections to the Report-
Recommendation**

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 33 of 321

2016 WL 5137273

**\*2** Generally, in his Objections to the Report-Recommendation, Plaintiff argues that the Court should reject the Report-Recommendation for the following three reasons: (1) Magistrate Judge Peebles erred in recommending that the factual assertions contained in Defendant Locke's Statement of Material Facts be deemed admitted due to Plaintiff's failure to properly respond to them under Local Rule 7.1(a)(3), because Defendant Locke never met his threshold burden of citing admissible record evidence to establish the facts asserted; (2) Magistrate Judge Peebles erred in recommending that the Court penalize Plaintiff for failing to comply with Local Rule 7.1(a), because that failure was due to his lack of understanding of that rule as a *pro se* litigant, which was due to the Court's prior denial of Plaintiff's request for the appointment of counsel; and (3) Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because a finding that it was objectively reasonable for Locke to believe he was not violating Plaintiff's rights is inconsistent with (a) the record evidence that Locke spoke with his supervisor about placing Plaintiff into a cell with Inmate James Health (thus demonstrating that Locke knew that the placement violated Plaintiff's rights), (b) the point of law that Defendant Locke cannot escape liability based on the defense that he was "just following orders," and (c) Magistrate Judge Peebles' prior finding that a genuine dispute of material fact exists regarding the merits of Plaintiff's claims against Defendant Locke. (Dkt. No. 73.)

### C. Magistrate Judge Peebles' Supplemental Report-Recommendation

Generally, in his Supplemental Report-Recommendation, Magistrate Judge Peebles recommended that Plaintiff's claims against Defendants Sergeant John Doe and Lieutenant John Doe be *sua sponte* dismissed due to Plaintiff's failure to prosecute those claims and/or failure to comply with a Court Order to take reasonable steps to identify those Defendants. (Dkt. No. 78.) In doing so, Magistrate Judge Peebles found that, in response to having been ordered to produce to Plaintiff the true identities of the Defendants named in the Complaint as Sergeant John Doe and Lieutenant John Doe, defense counsel filed a letter on August 4, 2016, representing to the Court (as an officer of it) that, although defense counsel conferred with Defendant Locke regarding the identity of these two Defendants, Defendant Locke cannot recall the names of either Defendant, despite having reviewed the 11-Building console log book from the date of the incident. (*Id.*)

### D. Plaintiff's Objection to the Supplemental Report-Recommendation

Generally, in his Objection to the Supplemental Report-Recommendation, Plaintiff asserts two arguments: (1) while he does not know the name of Defendant Lieutenant John Doe, he does know the name of Defendant Sergeant John Doe, which is Sergeant "Smith"; and (2) because he can identify Defendant Sergeant John Doe, the Court should not dismiss his claims against that Defendant but permit him to amend his Complaint (so as to identify that Defendant as "Sergeant Smith" and voluntarily discontinue his claims against Defendant Lieutenant John Doe). (Dkt. No. 81.)

### E. Plaintiff's Motion to Amend His Complaint

Generally, in his motion to amend his Complaint, Plaintiff requests leave to do the following: (1) discontinue his claims against Defendant Lieutenant John Doe; (2) discontinuing his claims against Defendant Locke; and (3) identifying Defendant Sergeant John Doe as Defendant Sergeant "Smith"; and (3) adding claims against Defendant James C. Heath. (Dkt. No. 82.)

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1]  When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2]  Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate judge but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

[1]    See also *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2]    See *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*3** When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P.

72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[4]

[3]    See *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at \*1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at \*3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at \*4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

[4]    See also *Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 35 of 321

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Peebles' thorough Report-Recommendation and Supplemental Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation and Supplemental Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation and Supplemental Report-Recommendation: Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, both the Report-Recommendation and Supplemental Report-Recommendation are accepted and adopted in their entirety for the reasons stated therein. To those reasons, the Court adds the following five points.

As to the first ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), Plaintiff is incorrect that Defendant Locke never met his threshold burden of citing admissible record evidence to establish the facts he asserted in his Statement of Material Facts; Locke did so. (*See* Dkt. No. 53, Attach 4 [Def. Locke's Rule 7.1 Statement, supporting factual assertions with accurate citations to admissible record evidence].) Indeed, the lack of merit of Plaintiff's claims against Defendant Locke is apparent from Plaintiff's attempt to abandon his claims against Locke in his proposed Amended Complaint. (Dkt. No. 82.)

**\*4** As to the second ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), Plaintiff is incorrect that imposing the consequences of violating Local Rule 7.1(a)(3) on a *pro se* litigant who has been specifically advised of those consequences and nonetheless violated that rule effectively "penaliz[es]" that litigant for his *pro se* status. As Magistrate Judge Peebles' correctly stated in his Report-Recommendation, even *pro se* litigants must obey a district court's procedural rules. (*See* Dkt. No. 71, at 9 [Report-Recommendation, citing cases].) *See also Cusamano v. Sobek*, 604 F. Supp.2d 416, 426-27 & n.4 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

The Court notes that Plaintiff was sufficiently and repeatedly advised of the consequences of failing to submit such a proper response through his receipt of, and/or access to, the following documents: (1) the courtesy copies of Local Rule 7.1(b)(3) of the District's Local Rules of Practice and pages 39 and 40 of the District's *Pro Se* Handbook, which were on file at his Correctional Facility during the time in question; and (2) the Notice of Consequences of Failing to Respond that was provided to Plaintiff by Defendants with their motion papers (Dkt. No. 53, page 2); and (3) a Notice from the Court advising Plaintiff of the motion response deadline, including a Notice of Consequences of Failing to Respond (Dkt. No. 54, at 1-2).

As to the third ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), as an initial matter, this Objection gives rise to only a clear-error review, because it is simply a reiteration of an argument asserted in his opposition memorandum of law. (*Compare* Dkt. No. 73, at Paragraphs 3-5 [Obj.] *with* Dkt. No. 63, at Points 1-3 [Opp'n Memo. of Law].) In any event, Plaintiff is incorrect that Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because of the record evidence that Locke spoke with his supervisor about placing Plaintiff into a cell with Inmate James Health: that evidence does not demonstrate that Locke knew that the placement violated Plaintiff's rights. In addition, Plaintiff is incorrect that Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because Defendant Locke cannot escape liability based on the defense that he was "just following orders," and he had previously found a genuine dispute of material fact regarding the merits of Plaintiff's claims against Defendant Locke: as Magistrate Judge Peebles stated, qualified immunity is an immunity from suit rather than a mere defense to liability. (Dkt. No. 71, at 18 [Report-Recommendation].)

As to Plaintiff's Objection to the Supplemental Report-Recommendation (summarized above in Part I.D. of this Decision and Order), the Court rejects that Objection on each of two alternative grounds: (1) the Objection is untimely in that it is dated September 9, 2016, and the deadline for objections was September 6, 2016 (Dkt. No. 81); and (2) in any event, the Objection presents no specific challenge to any portion of the Supplemental Report-Recommendation, but merely an argument that Plaintiff "can amend [his] Complaint." (*compare* Dkt. No. 81 *with* Dkt. No. 78.) With regard to this second ground, the Court notes that a district court will ordinarily refuse to consider evidentiary material and arguments that could have been, but were not, presented

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

to the magistrate judge in the first instance. *See, supra,* Part II of this Decision and Order.

**\*5**  As for Plaintiff's motion to amend his Complaint, that motion is in fact Plaintiff's second such motion, the first such motion having been filed on November 30, 2015, and denied on December 1, 2015. (Dkt. No. 47; Text Order filed Dec. 1, 2015.) Plaintiff's second motion is denied on each of six alternative grounds: (1) it is untimely (the motion filing deadline having expired on August 2, 2015) and Plaintiff has not shown good cause for an extension of the deadline (*compare* Dkt. No. 24, at 5 *with* Dkt. No. 82);[5] (2) it is barred by the law of the case doctrine, given that it is based on the same unsuccessful ground that supported his first such motion (*compare* Dkt. No. 47 *with* Dkt. No. 82 *and* Text Order filed Dec. 1, 2015); (3) it does not identify the amendments in the proposed pleading through the redline/strikeout method or other equivalent means, as required by Local Rule 7.1(a) (4) of the Local Rules of Practice for this Court (Dkt. No. 82, Attach. 1);[6] (4) it is unsupported by a memorandum of law, in violation of Local Rule 7.1(a)(1); (5) it is unsupported by an affidavit, in violation of Local Rule 7.1(a)(2); and (6) it is unsupported by a showing of cause (e.g., the lack of undue delay, the lack of bad faith or dilatory motive on the part of Plaintiff, the lack of undue prejudice to Defendants by virtue of allowance of the amendment, the lack of futility of the amendment).[7]

[5]  *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."); Fed. R. Civ. P. 16(b)(4), (f)(C) ("A schedule may be modified only for good cause and with the judge's consent.... On motion or its own, the court may issue any just orders ... if a party or its attorney ... fails to obey a scheduling or other pretrial order.").

[6]  The Court notes that the underlined portions of Plaintiff's proposed Amended Complaint do not signify additions (or deletions) of language, but apparently merely portions of text that Plaintiff deems particularly relevant–a practice in which

he engaged while drafting his original Complaint. (Compare Dkt. No. 1 with Dkt. No. 82, Attach. 1.)

[7]  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that permissible grounds upon which to base the denial of a motion for leave to file an amended complaint include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

**ACCORDINGLY**, it is

**ORDERED** that both Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 71) and his Supplemental Report-Recommendation (Dkt. No. 78) are **ACCEPTED** and **ADOPTED** in their entirety; and it is further

**ORDERED** that Defendant Locke's motion for summary judgment (Dkt. No. 53) is **GRANTED**, and Plaintiff's claims against Defendant Locke are **DISMISSED** from this action; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 63) is **DENIED**; and it is further

**ORDERED** that Plaintiff's motion to amend his Complaint (Dkt. No. 82) is **DENIED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants Corrections Officer John Doe 1, Corrections Officer John Doe 2, Nurse Jane Doe, Sergeant John Doe and Lieutenant John Doe are *sua sponte* **DISMISSED without prejudice** based on Plaintiff's failure to prosecute those claims and/or failure to comply with a Court Order to take reasonable steps to identify those Defendants pursuant to Fed. R. Civ. P. 41(b).

The Court certifies, for purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken from this Decision and Order would not be taken in good faith.

Dated: September 20, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5137273

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

2021 WL 6750625
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert REED, Plaintiff,

v.

R. MCGRATH, et al., Defendants.

9:19-CV-1203 (GTS/TWD)

|

Signed 12/22/2021

**Attorneys and Law Firms**

ROBERT REED, Plaintiff, pro se, 93-B-1119, Bare Hill
Correctional Facility, Caller Box 20, Malone, NY 12953.

LETITIA JAMES, Attorney General of the State of New
York, OF COUNSEL: LAUREN ROSE EVERSLEY, ESQ.,
Assistant Attorney General, Counsel for Defendants, The
Capitol, Albany, NY 12224.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

*1 Robert Reed ("Plaintiff"), an inmate in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS"), commenced this *pro
se* action pursuant to 42 U.S.C. § 1983, asserting his
constitutional rights were violated at Franklin Correctional
Facility ("Franklin"). (Dkt. No. 1.) The claims remaining
are Eighth Amendment excessive force, Eighth Amendment
failure to protect, and Fourteenth Amendment equal protect
claims against R. McGrath, G. Dupra, [1] D. Healey, D. Yelle,
G. Smythe, Titus, Sr., K. Compo, and K. Bedore (collectively,
"Defendants"). (Dkt. No. 8.)

[1]     This defendant's name is spelled "Dupro" in the
        caption. Defendant spells his surname "Dupra"
        according to the declaration he filed with the Court.
        (Dkt. No. 53-8.) The Clerk is directed to amend the
        caption to reflect the correct spelling of Dupra.

Plaintiff now moves for summary judgment. (Dkt. No. 49.)
Defendants filed a response and cross-moved for partial

summary judgment. (Dkt. No. 53.) Plaintiff responded to
Defendants' motion. (Dkt. No. 54.)

The parties' cross-motions have been referred for a Report-
Recommendation by the Honorable Glenn T. Suddaby, Chief
United States District Judge, pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.3(c). For the reasons that follow, the
Court recommends Plaintiff's motion for summary judgment
be denied and Defendants' cross-motion for partial summary
judgment be granted in part and denied in part.

**II. RELEVANT BACKGROUND**

The verified complaint alleges that on October 24, 2016,
at 1:16 p.m. in the E-2 dormitory entryway of Franklin,
Plaintiff was "repeatedly kicked and punched" by corrections
officers McGrath, Dupra, Healey, Yelle, Smythe, Titus, Sr.,
and corrections sergeants Compo and Bedore. (Dkt. No. 1 at
4. [2]) Plaintiff was also called a racial slur during the assault.
*Id.* "Some of the officers attempted to break [Plaintiff's]
legs and one attempted to pull [his] eye out of the socket."
*Id.* As a result of the assault, Plaintiff suffered abrasions
to his knee, wrist, and lip, redness and bruising on his left
shoulder, two black eyes, a "large lump near [his] testicles[,]"
a "lasting back injury[,]" chest pains, "convulsions[,] and
severe headaches." *Id.* Plaintiff also lost a tooth. *Id.*

[2]     Page references to documents identified by docket
        number are to the page numbers assigned by
        the CM/ECF docketing system maintained by
        the Clerk's Office. Paragraph numbers are used
        where documents identified by the CM/ECF
        docket number contain consecutively numbered
        paragraphs.

Plaintiff seeks summary judgment because "there is not
enough evidence to dispute [his] claim that Sergeant Compo
used force on [him] and there is not enough evidence to
dispute [his] claim that Sergeant Compo used excessive
force." (Dkt. No. 49 at 1.) Defendants oppose Plaintiff's
motion and Titus, Sr. and Bedore cross-move for summary
judgment for lack of personal involvement. (Dkt. Nos. 53,
53-1.)

It is undisputed that a documented use of force incident
occurred on October 24, 2016. (Dkt. No. 53-2 at ¶ 5.)
According to Defendants, Compo, McGrath, Dupra, Healey,
Smythe, and Yelle reported to the E-2 dormitory in response
to a "red dot" alarm wherein a non-party officer alleged that
Plaintiff had become "very irate and caused a scene in front

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 38 of 321

2021 WL 6750625

of approximately 55 other inmates." *Id.* at ¶ 4. Compo avers that he ordered Plaintiff to "assume the pat-frisk position," but Plaintiff "came off the wall" and punched Compo. (Dkt. No. 53-3 at ¶¶ 5, 6.) At approximately 1:10 p.m., a documented use of force occurred. (Dkt. No. 53-2 at ¶ 5.)

**\*2** Titus, Sr. and Bedore seek summary judgment because they were not personally involved in the incident at issue. (Dkt. No. 53-1 at 5-11.) To that end, Defendants submit evidence that Titus, Sr. was not present at the facility on October 24, 2016, as it was his regularly scheduled day off. (Dkt. No. 51-2 at ¶¶ 6, 7.) Defendants submit evidence that Bedore arrived at the E-2 dormitory *after* the use of force had ceased and "[h]is only involvement—if it could be described as such—was that, at the request of [Compo], he documented the use of force in the necessary logbook." (Dkt. No. 53-1 at 9-11, Dkt. No. 53-2 at ¶¶ 8-10.) Neither Titus, Sr. nor Bedore are listed on the Use of Force Report. *Id.* at ¶ 11.

In response to Defendants' cross-motion, Plaintiff requests that "Officer Titus be removed from this matter[.]" (Dkt. No. 54 at 1.) However, Plaintiff argues "there is legally sufficient evidence to conclude that Sergeant Bedore was present" and participated in the alleged constitutional violations and, therefore, Bedore should be denied summary judgment. *Id.* at 3.

### III. MOTIONS FOR SUMMARY JUDGMENT

#### A. Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

**\*3** In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up). "In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other." *Id.*; *see also Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 39 of 321

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

deserves judgment as a matter of law on facts that are not in dispute.").

"Moreover, the district court considering a summary judgment motion must be mindful of the underlying standards and burden of proof." *Larkins v. Cayuga Cty.*, No. 9:13-CV-219 (NAM/ATB), 2014 WL 4760064, at *4 (N.D.N.Y. Sept. 24, 2014) (quotation marks and alternations omitted). Accordingly, with respect to Plaintiff's motion, "he bears a much greater initial burden; he must show that the evidence supporting his claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id.*

### B. Deficiencies in Plaintiff's Motion

Local Rule 56.1(a) requires a party moving for summary judgment to file and serve a Statement of Material Facts. *See* L.R. 56.1(a) ("Any motion for summary judgment shall contain a separate Statement of Material Facts." (emphasis added)). "The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." *Id.* "Each fact listed shall set forth a specific citation to the record where the fact is established." *Id.* "Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." *Id.* (emphasis in the original).

The Local Rules are not "empty formalities," and courts within this District have denied a *pro se* party's motion for summary judgment based on their failure to file a Statement of Material Facts. *See, e.g., A'Gard v. Locke*, No. 9:14-CV-0613 (GTS/DEP), 2016 WL 8735653, at *4 (N.D.N.Y. June 24, 2016) (denying summary judgment motion because the *pro se* plaintiff did not comply with the applicable local rules governing motion practice by including a Statement of Material Facts) (citing *Riley v. Town of Bethlehem*, 5 F. Supp. 2d 92, 93 (N.D.N.Y. 1998) (dismissing summary judgment motion based on moving party's failure to file a properly supported Statement of Material Facts as required under the Local Rules)), *report-recommendation adopted*, 2016 WL 5137273 (N.D.N.Y. Sept. 21, 2016); *Diaz v. Smith*, No. 9:19-CV-1438 (LEK), ECF No. 73 (same); *see also Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426-27 & n.4 (N.D.N.Y. 2009) (Suddaby, J.) ("As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.") (collecting cases).

**\*4** Here, Plaintiff filed a single document entitled "Summary Judgment Motion FRCP Rule 56" that blends a

notice of motion with a memorandum of law. (Dkt. No. 49.) Plaintiff did not include a separate Statement of Material Facts as required under Local Rule 56(1)(a). Because Plaintiff has not complied with the Local Rules governing motion practice by including the required Statement of Material Facts, the Court recommends denying Plaintiff's motion for summary judgment.

Additionally, even were the Court to overlook Plaintiff's failure to comply with the Local Rules, the undersigned agrees with Defendants that Plaintiff's motion demonstrates there are genuine disputes of material facts in this case. (*See* Dkt. No. 53-1 at 11-14.)

As stated above, the crux of Plaintiff's motion for summary judgment is that "there is not enough evidence to dispute [his] claim that Sergeant Compo used forced on [him] and there is not enough evidence to dispute [his] claim that Sergeant Compo used excessive force on [him]." (Dkt. No. 49 at 1.) Plaintiff seems to suggest that because a documented use of force occurred on October 24, 2016, the evidence establishes that Defendants, and especially Compo, subjected him to excessive force. *Id.* at 2-4. Plaintiff is incorrect.

To establish an excessive force claim, the inmate must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotation marks omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

In his declaration, Compo avers that he responded to a "red dot" alarm to interview Plaintiff regarding the alleged disturbance he caused in in the E-2 dormitory. (Dkt. No. 53-7 at ¶ 5.) After Plaintiff was escorted to the foyer area of the dormitory, Compo instructed Plaintiff to "assume the pat-frisk position." *Id.* at ¶ 6. However, Plaintiff "turned off of the wall" and punched Compo in the face. *Id.* Compo's account of the incident is corroborated by the Use of Force Report. (Dkt. No. 53-3 at 85-87.) Additionally, Dupra, Healey, McGrath, Smythe, and Yelle each declare that they responded to the "red dot" alarm and although they were present for the documented use of force on October 24, 2016, they did

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

not assault Plaintiff or witness any other officer, including Compo, assault Plaintiff. (Dkt. Nos. 53-8 at ¶ 8, 53-9 at ¶ 8, 53-10 at ¶ 8, 53-11 at ¶ 8, 53-12 at ¶ 8.)

Conversely, Plaintiff testified that, while his hands were against the wall, "as soon as Sergeant Compo came out of the door -- came through the door, he punched me. And that's -- that's how this – this all started." (Dkt. No. 53-3 at 23.) Plaintiff further testified that Bedore, Dupra, Healey, McGrath, Smythe, and Yelle proceeded to assault him by beating, punching, and kicking him. *Id.* Plaintiff was forced to the ground; they tried to break his leg and used a racial slur. *Id.*

Here, the competing evidence rests on the credibility of Plaintiff on one hand and Defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the nonmoving party requires the Court to credit Defendants' version of the events for purposes of Plaintiff's motion for summary judgment. *Coleman v. Racette*, No. 9:18-CV-0390 (MAD/CFH), 2021 WL 4312392, at *8 (N.D.N.Y. May 27, 2021), *report-recommendation adopted*, 2021 WL 3508342 (N.D.N.Y. Aug. 10, 2021); *In re Dana Corp.*, 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases). As such, Defendants have raised a material issue of fact as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

 **\*5** In sum, even if the Court were to overlook Plaintiff's failure to submit a Statement of Material Facts as required by Local Rule 56(1)(a), such conflicting allegations represent a genuine dispute of a material fact in this case that also precludes granting summary judgment to Plaintiff.[3] Accordingly, the Court recommends that Plaintiff's motion for summary judgment be denied.

[3]     The Court agrees with Defendants that any concerns or allegations regarding the falsification of documents or party testimony are issues for trial as it would require the "type of credibility assessment that had been explicitly reserved for the finder of fact, be it the trial judge or a jury." (Dkt. No. 53-1 at 13 (quoting *Wilson v. Deluca*, No.

9:11-CV-00030 (MAD), 2014 WL 991862, at *9 (N.D.N.Y. Mar. 12, 2014)).)

### C. Deficiencies in Plaintiff's Opposition

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' cross-motion for partial summary judgment motion, Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under Local Rule 56.1(b).[4] (Dkt. No. 54.) "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.' " *Cao-Bossa v. New York State Dep't of Lab.*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021).

[4]     Local Rule 56.1(b) requires the opposing party to file a Response to the movant's Statement of Material Facts. Under the rule, the Response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 56.1(b).

Where, as in this case, a party has failed to respond to the movant's Statement of Material Facts in the manner required under Local Rule 56.1(b), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[5] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

[5]     Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. (Dkt. No. 53 at 3.)

Accordingly, the facts set forth in Defendants' Statement of Material Facts (Dkt. No. 53-2) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified complaint and opposition

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 41 of 321

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

submission will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts ... supplemented by Plaintiff's verified complaint ... as true."). As to any facts not contained in Defendants' Statement of Material Facts, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

### D. Personal Involvement

**\*6**  Titus, Sr. and Bedore cross-move for summary judgment arguing they were not personally involved in the alleged constitutional violations. (Dkt. No. 53-1 at 5-11.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Recently, the Second Circuit concluded that "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). To avoid summary judgment, a plaintiff must establish that the defendant violated the constitution by his or her "own conduct, not by reason of [the defendant's] supervision of others who committed the violation" and cannot "rely on a separate test of liability specific to supervisors." *Id.* The "factors" necessary to plead and establish a Section 1983 violation " 'will vary with the constitutional provision at issue' because the elements of

different constitutional violations vary." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

As set forth above, to establish a prima facie Eighth Amendment excessive force claim, a plaintiff must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden*, 186 F.3d at 262-63. Further, in order to establish an Eighth Amendment failure to protect claim, a plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. With respect to a Fourteenth Amendment equal protection claim, "[c]ourts in this circuit and elsewhere have held that officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." *Ali v. Connick*, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015).

A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016) (quotation omitted), *report-recommendation adopted*, 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016), *rev'd on other grounds sub nom. Brandon v. Kinter*, 938 F.3d 21 (2d Cir. 2019). A plaintiff's verified complaint and deposition testimony constitutes such evidence and "[a]ny discrepancies or inconsistencies in [the] plaintiff's testimony are for a jury to assess." *Latouche v. Tompkins*, No. 9:09-CV-308 (NAM/RFT), 2011 WL 1103045, at *5 (N.D.N.Y. Mar. 23, 2011).

**\*7**  "Personal involvement is generally a question of fact and summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law." *Guarneri v. Hazzard*, No. 9:06-CV-985 (NAM/DRH), 2010 WL 1064330, at *23 (N.D.N.Y. Mar. 22, 2010) (quoting

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 42 of 321

*Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citing Fed. R. Civ. P. 56(c) and cases)).

### 1. Titus, Sr.

The undisputed record evidence demonstrates Titus, Sr. was not present at Franklin on October 24, 2016. (Dkt. No. 53-2 at ¶ 7.) At his deposition, Plaintiff testified that Titus, Sr. "wasn't the guy that I was thinking he was" and that "another guy identified [Titus, Sr.]" as one of the officers involved in the use of force. (Dkt. No. 53-3 at 29-30.) Moreover, in his response to Defendants' motion, Plaintiff "request[s] that Officer Titus be removed from this matter[.]" (Dkt. No. 54 at 1.)

Accordingly, the Court recommends granting Defendants' cross-motion for summary judgment as to Titus, Sr. on this ground.

### 2. Bedore

The Court reaches a different result, however, as to Bedore. To be sure, Defendants have marshalled evidence indicating Bedore was not personally involved in the alleged constitutional violations. (Dkt. No. 53-2 at ¶¶ 8, 12.) For one, Bedore flatly denies being present during the documented use of force and further declares that he never used excessive force on Plaintiff on the date at issue or at any other time. (Dkt. No. 53-4 at ¶¶ 5, 10.) Bedore declares that when he arrived in the E-2 dormitory on October 24, 2016, the use of force had ceased, and Plaintiff had been placed in mechanical restraints and was being transported to the infirmary. *Id.* at ¶ 6. For his part, Bedore states he only documented the use of force in the logbook. *Id.* at ¶ 7.

As pointed out by Defendants, these facts are consistent with the memorandum Bedore authored on November 9, 2016, as part of the investigation into Plaintiff's grievance concerning the October 24, 2016 use of force, as well as the declarations of Compo, Dupra, Yelle, Healey, McGrath, and Smythe and the Use of Force Report, all of which state that Bedore was not present at or involved in the use of force. (Dkt. No. 51-1 at 9; Dkt. Nos. 53-4 at ¶ 9, 54-7 at ¶¶ 4, 9; 54-8 at ¶¶ 4, 7; 54-9 at ¶¶ 4, 7; 54-10 at ¶¶ 4, 7; 54-11 at ¶¶ 4, 7; 54-12 at ¶¶ 4, 7; 54-3 at 85-87.)

Conversely, according to Plaintiff's verified amended complaint and deposition testimony, Bedore was not only present during the October 24, 2016, assault, but Bedore was one of the officers that subjected Plaintiff to the excessive force. (Dkt. No. 1 at 4, Dkt. No. 53-3 at 29, 44-47.) To that end, Plaintiff testified:

> Q: Now you mention Sergeant -- Sergeant Bedore, where was he during this?
>
> A: He was -- he was on the left side of me, close to the door, he was closest to the door.
>
> Q: And what are your basis for your claims against him, what was he doing during this incident?
>
> A: He was hitting me. He was punching me, kicking me.

(Dkt. No. 53-3 at 29.) Defendants have acknowledged as much in their memorandum of law:

> With respect to defendant Bedore, contrary to plaintiff's testimony at his deposition, *see* Eversley Decl. ¶ 3, Exhibit "A" at p. 26, defendant Bedore did not witness nor did he participate in the use of force. *See* Bedore Decl. ¶ 5.

**\*8** (Dkt. No. 53-1 at 9.) Nevertheless, Defendants contend summary judgment is warranted because Bedore proffers "persuasive documentary evidence to corroborate [his] sworn affidavit that" he did not participate or witness the alleged constitutional violation. (Dkt. No. 53-1 at 9-10.)

But as this Court has held, "the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact." *Cirio v. Lamora*, No. 08-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), *report-recommendation adopted*, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010). "And while it is true that the only piece of evidence [Plaintiff] offers on this score is his own self-serving testimony, that 'can establish a genuine dispute of fact so long as [it] does not contradict the witness's prior testimony.' " *Waters v. Prack*, No. 9:13-CV-1437 (LEK/DEP), 2017 WL 1187871, at *1 (N.D.N.Y. Mar. 30, 2017) (quoting *Dye v. Kopiec*, No. 16-CV-2952, 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) (collecting cases)).

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

In sum, while Plaintiff and Defendants provide different accounts of the events that transpired on October 24, 2016, there are genuine material issues of fact concerning Bedore's personal involvement in the alleged constitutional violations. [6]

[6]    The Court has carefully considered the cases relied upon by Defendants in their memorandum of law wherein this Court has granted summary judgment for lack of personal involvement where the defendant proffers "persuasive documentary evidence to corroborate [his or her] sworn affidavit that" he or she did not participate in the alleged constitutional violation and finds them factually and procedurally distinguishable. (Dkt. No. 53-1 at 9-10.)

Accordingly, the Court recommends denying Defendants' cross-motion for summary judgment as to Bedore on this ground.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 49) be **DENIED**; and it is further

**RECOMMENDED** that Defendants' cross-motion for partial summary judgment (Dkt. No. 53) be **GRANTED** insofar as it seeks dismissal of Plaintiff's claims against Titus, Sr., and **DENIED** insofar as it seeks dismissal of Plaintiff's claims against Bedore, and it is further

**RECOMMENDED** that Titus, Sr. be **DISMISSED** from this action with prejudice; and it further

**ORDERED** that the Clerk amend the docket to reflect the correct spelling of Dupra; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the

foregoing report. [7] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[7]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**\*9   IT IS SO ORDERED.**

Attachment

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

MIGUEL DIAZ, Plaintiff,

-against-

ERIC J. SMITH, *et al.*, Defendants.

9:19-CV-1438 (LEK/TWD)

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Miguel Diaz, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this pro se action pursuant to 42 U.S.C. § 1983, asserting constitutional claims arising from his incarceration at Upstate Correctional Facility ("Upstate"). Dkt. No. 1 ("Complaint"). This Court reviewed the complaint in accordance with 28 U.S.C. § 1915 and found Plaintiff's (1) Eighth Amendment excessive force claims against Correction Officer Adam Gallagher, Correction Officer Robert Lamica, Superintendent Donald Uhler, Sergeant Trevor Dunning, Lieutenant Gary Gettman, Correction Officer Domonic,

2021 WL 6750625

Correction Officer Eric Smith, Correction Officer Joshua Tulip, Correction Officer James Trombley, Correction Officer Bryan Leclair, and Nurse Geraldine Wilson; (2) Eighth Amendment sexual abuse claim against Smith; and (3) Eighth Amendment medical indifference claim against Wilson survived initial review and required a response. Dkt. No. 6.

In addition to answering Plaintiff's Complaint, several Defendants moved for partial summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies. Dkt. No. 46 ("Motion for Partial Summary Judgment"); 46-1 ("Defendants' Memorandum of Law"); 46-2 ("Defendants' Statement of Material Facts" or "Defendants' SMF"). Specifically, Defendants seek dismissal of Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Wilson and Eighth Amendment excessive force and failure-to-intervene claims against Gallagher, Lamica, Uhler, Dunning, Gettmann, and Dominic as they pertain to an incident on February 22, 2019. Defs.' Mem. of Law at 3. [1]

[1]     Citations to filings on the docket refer to the pagination CM/ECF automatically generates.

Plaintiff responded, asserting that Defendants' arguments are meritless, and cross-moved for summary judgment on the merits of his claims. Dkt. No. 51 ("Plaintiff's Opposition").

**\*10**  For the reasons that follow, the Court denies Defendants' Motion for Partial Summary Judgment and Plaintiff's cross-motion for summary judgment.

## II. BACKGROUND

Plaintiff was incarcerated at Upstate from about January 14, 2019 through February 26, 2019. Defs.' SMF ¶ 5. On February 26, 2019, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"). Id. ¶ 6.

On February 11, 2019, Plaintiff filed inmate grievance No. UST-64656-19. Id. at ¶ 12. This grievance generally accused Defendant Smith of sexual harassment and discussed Plaintiff's concerns that the facility was not enforcing a protective order. Dkt. No. 46-3 at 11–13. The factual allegations contained in this grievance are not directly relevant to this action. However, Plaintiff contends that these factual allegations are the basis for Smith's later retaliation. See Compl.

On March 11, 2019, while housed at Clinton, Plaintiff filed inmate grievance No. CL-7565361-19, dated March 1, 2019. Defs.' SMF ¶ 16. This grievance reported that supervisors at Upstate had ignored his complaints that Smith sexually harassed Plaintiff on February 2, 2019. Dkt. No. 46-4 at 10. Plaintiff further alleged Smith spit in his food in retaliation for Plaintiff's filing complaints regarding the harassment. Id. Relevant to the current motion, Plaintiff asserted that, on February 22, 2019, he asked Dunning for new food and help with Smith. Id. Rather than help, however, Dunning ordered a cell extraction. Id. at 10. According to Plaintiff, several officers—including Gallagher, Lamica, Uhler, Dunning, Gettmann, and Domini—used excessive force during the cell extraction or failed to intervene to stop Plaintiff from being beaten. Id. at 10–11. Plaintiff was then taken for a nurse check with Wilson, but she stood five feet away from him and did nothing to help or care for his injuries and failed to discover a severe cut on Plaintiff's eyelid. Id. at 11. [2]

[2]     This grievance includes allegations about an additional incident of force that occurred later that same day and involved an alleged sexual assault. Id. at 11–12. Defendants are not moving for summary judgment with respect to Plaintiff's claims regarding the second incident on February 22, 2019.

On May 29, 2019, the Upstate Superintendent denied grievance No. UST-64656-19, finding that Plaintiff's allegations were unsubstantiated. Defs.' SMF ¶ 17. At this time, Plaintiff was housed at Great Meadow Correctional Facility. Id. ¶ 18. On June 14, 2019, the Clinton Superintendent denied grievance No. CL-7565361-19, stating, in pertinent part, that "[a]n investigation has revealed that that [sic] the allegations concerning Upstate CF have been addressed in UST-64656-19." Id. ¶ 22.

Plaintiff appealed grievance No. UST-64656-19 by signing an Appeal Statement on June 18, 2019. Id. ¶ 19. Plaintiff did not appeal the Clinton Superintendent's decision with respect to grievance No. CL-7565361-19. Id. ¶ 23. However, in his appeal statement to grievance No. UST-64656-19, Plaintiff referenced reports in his medical file related to injuries he purportedly suffered during the February 22, 2019 incident. Dkt. No. 46-3 at 15.

**\*11**  The Central Office Review Committee ("CORC") had not issued a response to grievance No. UST-64656-19 before

2021 WL 6750625

Plaintiff filed his complaint in this action. Defs.' SMF ¶¶ 20–21.

Defendants now move for partial summary judgment to dismiss the claims in this action regarding the incident of excessive force mentioned above in grievance No. CL-7565361-19. See Mot. for Partial Summ. J. Generally, Defendants argue the undisputed evidence establishes Plaintiff failed to appeal grievance No. CL-7565361-19 to CORC and therefore failed to properly exhaust his administrative remedies. Defs.' Mem. of Law at 9. Moreover, Defendants contend that, assuming the Court construes grievance No. UST-64656-19 as encompassing the claims in this action, Plaintiff still failed to exhaust his administrative remedies, because he filed this action prior to receiving CORC's decision on his appeal. Id. at 13.

Plaintiff responded, asserting that he appealed to CORC and that Defendants arguments are, therefore, meritless. Pl.'s Opp'n at 3. Plaintiff further filed a "Notice of Motion" purporting to move for summary judgment on the merits of his claim. Id. at 1. In his papers, Plaintiff included several medical records and photographs of his injuries attempting to establish he was injured on February 22, 2019 and still suffers to this day. Dkt. No. 51-1.

### III. LEGAL STANDARD

#### A. Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Salahuddin v. Gourd, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v.

Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has established that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." Id. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999).

*12 In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obligated to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

### IV. DISCUSSION

#### A. Plaintiff's Failure to Comply with Local Rule 7.1 [3]

[3]    The Local Rules were amended effective January 1, 2021. In the currently operative version of the Local Rules, L.R. 56.1 deals with summary judgment motions. However, because these motions were filed in 2020, the Court refers to the Local Rules as they existed at that time.

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3). [4] While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve [a pro se] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003).

[4]     Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.Y.N.D. L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. [5] See Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).

[5]     Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. See Mot. for Partial Summ. J. at 4.

Accordingly, the facts set forth in Defendants' Statement of Material Facts that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's complaint and verified opposition submissions will be accepted as true. See McAllister v. Call, No. 10-CV-610, 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); Douglas v. Perrara, No. 11-CV-1353, 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) ... supplemented by Plaintiff's verified complaint ... as true."). As to any facts not contained in Defendants' Statement of Material Facts, in light of the procedural posture of this case, the Court is

"required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. Terry, 336 F.3d at 137.

**\*13** Moreover, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's pro se status, the Court has reviewed the entire record.

With respect to Plaintiff's own cross-motion for summary judgment, however, the Court cannot overlook Plaintiff's failure to comply with the Local Rules. Here, Plaintiff did not submit a Statement of Material Facts, Memorandum of Law or any supporting affidavits. Importantly, the Local Rules provide that "[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts *shall* result in a denial of the motion." L.R. 7.1(3) (emphasis added). Without the aid of a statement of material facts, the Court is unable to consider the motion. Furthermore, though Plaintiff has presented evidence that tends to support his allegation that he was *injured* in the alleged assaults, he has not offered any evidence besides his own unsupported assertions that he was assaulted without justification. Accordingly, the Court denies Plaintiff's cross-motion for summary judgment.

### B. Exhaustion

As noted above, Defendants make two arguments with respect to exhaustion. First, they assert Plaintiff's failure to appeal grievance CL-7565361-19 is fatal to his claims. Moreover, anticipating the argument that grievance No. UST-64656-19 could be construed as encompassing the claims in this action, Defendants argue he failed to exhaust that grievance, because he filed suit in this action before receiving a final disposition from CORC.

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege

2021 WL 6750625

excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined and do so properly. Jones v. Bock, 549 U.S. 199, 218 (2007) (citing Woodford v. Ngo, 548 U.S. 81, 88 (2006)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211. In New York state prisons, DOCCS has a well-established three-step Inmate Grievance Procedure ("IGP"). N.Y. Comp. Codes R. & Regs. tit. 7 ("NYCRR"), § 701.5 (2013).

Generally, the IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. § 701.5(a). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance and issues a written decision within two working days of the conclusion of the hearing. § 701.5(b)(3).

 **\*14** Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. § 701.5(d)(3)(ii).

Complaints of harassment are handled by an expedited procedure which provides that such a grievance, once it is given a number and recorded by the IGP clerk, is forwarded directly to the superintendent of the facility, after which the inmate may appeal any negative determination to CORC. §§ 701.8(h), (i).

Generally, a plaintiff must properly appeal through all the relevant levels of the IGP before seeking relief in a federal court under § 1983. See Ruggiero v. Cty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006).

Finally, while the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." Ross v. Blake, 136 S. Ct. 1850, 1858 (2016). More specifically, § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); see also Ross, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (internal quotation marks and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." Ross, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The Ross Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. Id. at 1859–60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

As an affirmative defense, the defendant bears the burden of showing the plaintiff failed to satisfy the exhaustion requirements. See Jones, 549 U.S. at 216; Johnson v. Testman, 380 F.3d 691, 695 (2d Cir. 2004).

As noted above, on March 11, 2019, while housed at Clinton, Plaintiff filed inmate grievance No. CL-7565361-19, dated March 1, 2019. Defs.' SMF ¶ 16. This grievance included the relevant facts regarding the alleged February 22, 2019 assault that is the subject of this motion. Dkt. No. 46-4 at 10–11. Clinton's Superintendent denied this grievance on June 14, 2019. Defs.' SMF ¶ 22. The record evidence establishes that Plaintiff did not appeal the Superintendent's decision related to grievance No. CL-7565361-19. Id. ¶ 23.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 48 of 321

Reed v. McGrath, Not Reported in Fed. Supp. (2021)

2021 WL 6750625

**\*15** Under normal circumstances, Plaintiff's failure to appeal grievance No. CL-7565361-19 would be fatal to his claim. See Ruggiero, 467 F.3d at 176. However, the Superintendent's denial of grievance No. CL-7565361-19 contained a material misstatement regarding the investigation into the events on February 22, 2019. To that end, the Clinton Superintendent stated, in pertinent part, that "[a]n investigation has revealed that that [sic.] the allegations concerning Upstate CF have been addressed in UST-64656-19." Defs.' SMF ¶ 22.

Here, the Court concludes that the Superintendent's misstatement is an example of the type of misinformation that would have interfered with Plaintiff's pursuit of relief. See Ross, 136 S. Ct. at 1860 (noting that "interference with an inmate's pursuit of relief renders the administrative process unavailable."). Viewing the evidence in light most favorable to Plaintiff, the Superintendent's affirmative representation that the investigation of the February 22, 2019, incident was being handled by a separate grievance [6] lead Plaintiff to abandon grievance No. CL-7565361-19 and instead appeal grievance UST-64656-19. Indeed, Plaintiff's appeal statement regarding grievance UST-64656-19—filed *after* receiving the Superintendent's denial of grievance No. CL-7565361-19—included allegations related to the February 22, 2019 incident. Dkt. No. 46-3 at 15. Accordingly, the Superintendent's misrepresentation thwarted him "from taking advantage of the grievance process," rendering his remedies unavailable. See Ross, 136 S. Ct. at 1860; see also Perez v. Arnone, No. 12-CV-1591, 2018 WL 3596747, at *8 (D. Conn. July 26, 2018) (concluding administrative remedies were unavailable because a prison official provided misinformation to the plaintiff about the grievance process).

[6]    Defendants' submissions establish the Superintendent's statement was false. (Dkt. No. 46-3 ¶¶ 30–31.) To that end, Sherri Debyah, the IGP Supervisor at Upstate, indicated that the investigation regarding grievance UST-64656-19 *did not* consider any of the events that took place on February 22, 2019. Id. at ¶ 31. Thus, it appears, from Defendants' own submissions, that *no internal investigation* took place to consider the serious allegations included in grievance No. CL-7565361-19 as they related to Upstate.

Additionally, Defendants' contention that Plaintiff was able to successfully navigate the IGP as to other matters, see

Defs.' Mem. of Law at 15, does not necessarily weaken Plaintiff's unavailability argument. Rather, his history of filing grievances could also suggest that, absent interference, he was capable of complying with the IGP. See Burrell v. Zurek, No. 17-CV-0906, 2019 WL 4051596, at *3 (N.D.N.Y. Aug. 28, 2019).

Defendants further argue, in the alternative, that, if the Court finds Plaintiff adequately exhausted his administrative remedies through his pursuit of grievance UST-64656-19, his claim should still be dismissed because he filed this action before receiving a response from CORC. However, during the pendency of this motion the Second Circuit issued a decision that squarely rejects Defendants' arguments. To that end, the Court held that "an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to respond within the 30 days it is allocated under the regulations." Hayes v. Dahlke, 976 F.3d 259, 270 (2d Cir. 2020). Here, it is undisputed that CORC failed to issue a decision within 30 days after receiving Plaintiff's appeal; and Plaintiff commenced this action only after the relevant timeframe. Defendants acknowledge that Hayes controls the relevant issues and rightfully abandoned this argument with respect to exhaustion. Dkt. No. 59.

**\*16** Thus, the Court concludes Defendants have failed to meet their burden to establish they are entitled to summary judgement with respect to Plaintiff's claims related to the first incident on February 22, 2019, on exhaustion grounds. Accordingly, the Court denies Defendants' motion.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 46), is **DENIED**; and it is further

**ORDERED**, that Plaintiff's cross-motion for summary judgment (Dkt. No. 51), is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: March 26, 2021
Albany, New York

Senior U.S. District Judge

/s/ Lawrence E. Kahn

Lawrence E. Kahn

**All Citations**

Not Reported in Fed. Supp., 2021 WL 6750625

---

**End of Document**                                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 50 of 321

Reed v. McGrath, Not Reported in Fed. Supp. (2022)

2022 WL 252170

2022 WL 252170
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert I. REED, Plaintiff,

v.

R. MCGRATH, Corr. Offcr., Franklin Corr. Fac.;
G. Dupra, f/k/a G. Dupro; D. Healey, Corr. Offcr.,
Franklin Corr. Fac.; D. Yelle, Corr. Offcr., Franklin
Corr. Fac.; G. Smythe, Corr. Offcr., Franklin Corr. Fac.;
Titus, Sr., Corr. Offcr., Franklin Corr. Fac.; K. Compo,
Sgt./Corr. Offcr., Franklin Corr. Fac., and K. Bedore,
Sgt./Corr. Offcr., Franklin Corr. Fac., Defendants.

9:19-CV-1203 (GTS/TWD)
|
Signed 01/27/2022

**Attorneys and Law Firms**

ROBERT I. REED, 93-B-1119, Plaintiff, Pro Se, Bare Hill
Correctional Facility, Caller Box 20, Malone, New York
12953.

OF COUNSEL: LAUREN ROSE EVERSLEY, ESQ.,
Assistant Attorney General, HON. LETITIA A. JAMES,
Attorney General for the State of New York, Counsel for
Defendants The Capitol, Albany, New York 12224.

---

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner civil
rights action filed by Robert I. Reed ("Plaintiff") against
the eight above-captioned employees of the New York
State Department of Corrections and Community Supervision
("Defendants") pursuant to 42 U.S.C. § 1983, are (1)
Plaintiff's motion for summary judgment, (2) Defendants'
cross-motion for partial summary judgment, and (2) United
States Magistrate Judge Thérèse Wiley Dancks' Report-
Recommendation recommending that Plaintiff's motion
be denied, that Defendants' cross-motion be granted as
to Plaintiff's claims against Defendant Titus, and that
Defendants' cross-motion be otherwise denied (i.e., as to
Plaintiff's claims against Defendant Bedore). (Dkt. Nos. 49,
53, 57.) Neither party has filed an objection to the Report-

Recommendation, and the deadline by which to do so has
expired. (*See generally* Docket Sheet.)

After carefully reviewing the relevant papers
herein, including Magistrate Judge Dancks' Report-
Recommendation, the Court can find no clear-error in
the thorough Report-Recommendation:[1] Magistrate Judge
Dancks employed the proper standards, accurately recited the
facts, and reasonably applied the law to those facts. As a
result, the Report-Recommendation is accepted and adopted
in its entirety for the reasons set forth therein.

[1]     When no objection is made to a report-
        recommendation, the Court subjects that report-
        recommendation to only a clear error review. Fed.
        R. Civ. P. 72(b), Advisory Committee Notes: 1983
        Addition. When performing such a "clear error"
        review, "the court need only satisfy itself that there
        is no clear error on the face of the record in order to
        accept the recommendation." *Id.*; *see also Batista
        v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1
        (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am
        permitted to adopt those sections of [a magistrate
        judge's] report to which no specific objection is
        made, so long as those sections are not facially
        erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Dancks' Report-
Recommendation (Dkt. No. 57) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's motion for summary judgment
(Dkt. No. 49) is **DENIED**; and it is further

**ORDERED** that Defendants' cross-motion for partial
summary judgment (Dkt. No. 53) is **GRANTED** as to
Plaintiff's claims against Defendant Titus, and otherwise
**DENIED** (i.e., as to Plaintiff's claims against Defendant
Bedore); and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE**
Titus, Sr., as a Defendant in this action.

The Court certifies that an appeal from this Decision and
Order would not be taken in good faith.

**Reed v. McGrath, Not Reported in Fed. Supp. (2022)**

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 51 of 321

2022 WL 252170

**All Citations**

Not Reported in Fed. Supp., 2022 WL 252170

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 286282
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Erinn KNOX, Plaintiff,
v.
CNTY. OF ULSTER; Ulster Cnty. Sheriff's
Dep't; Ulster Cnty Dist. Attorney's Office; Det./
Lt. Ronald L. Dreiser; Dep. Sgt. Wallace Fulford;
Dist. Attorney Holley Carnright; and Asst. Dist.
Attorney William J. Weishaput, Defendants.

No. 1:11–CV–0112 (GTS/CFH).
|
Jan. 24, 2013.

**Attorneys and Law Firms**

Erinn Knox, Kingston, NY, pro se.

Roemer Wallens Gold & Mineaux LLP, Earl T. Redding, Esq., of Counsel, Albany, NY, for Defendants.

***MEMORANDUM–DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Erinn Knox ("Plaintiff") against the seven above-captioned government entities and individuals ("Defendants"), is Defendants' motion to dismiss Plaintiff's Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 9.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint
Plaintiff's Complaint asserts the following four claims against all Defendants: (1) malicious prosecution, (2) abuse of process, (3) denial of due process, and (4) slander. The Complaint cites New York common law as well as federal civil rights statutory law as grounds for these claims. (*See id.,* at ¶¶ 6,7.) In addition, Plaintiff asserts a § 1983 claim for failure to train or supervise against defendant, County

of Ulster ("the County"). (*See generally* Dkt. No. 1 [Pl.'s Compl.].) [1]

[1]   Although Plaintiff appears in this action *pro se,* he avers to submit his Complaint "by his attorney, David Brickman, Esq." (Dkt. No. 1, at 1 [Compl.].) Accordingly, the Court will not afford the allegations in the Complaint the special solicitude typically afforded to *pro se* pleadings. *See Spira v. J.P. Morgan Chase & Co.,* 466 F. App'x 20, 22 (2d Cir.2012). Moreover, the Court strongly suspects that Plaintiff has also been aided by an attorney in the drafting of his papers opposing the current motion, which are organized, typewritten, and contain citations to dozens of instructive legal authorities in proper BlueBook format. Further, the style of Plaintiff's memorandum of law mirrors that of his Complaint, which Plaintiff admits was submitted through his attorney. Bearing in mind that the policy of liberally construing *pro se* submissions is to protect *pro se* litigants from inadvertent forfeiture of rights due to their lack of legal training, *see Iwachiw v. N.Y. City Bd. of Educ.,* No. 00–CV–2341, 2007 WL 433401, at \*4 (E.D.N.Y. Feb. 5, 2007) (citing *Trisetman v. Federal Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir.2006)), where, as here, those submissions are "ghostwritten" by an attorney, such liberal construction may create unfairness toward the opposing party, *see* John C. Rothermich, "Ethical and Procedural Implications of 'Ghostwriting' for Pro Se Litigants: Toward Increased Access to Civil Justice," 67 *Fordham L.Rev.* 2687, 2697 (Apr.1999). Accordingly, the Court will not afford the arguments in Plaintiff's opposition memorandum of law the special solicitude afforded to arguments made by *pro se* litigants.

Generally, in support of his claims, Plaintiff sets forth the following factual allegations in his Complaint, which are accepted by the Court as true for purposes of deciding the current motion. Plaintiff, an African American corrections officer employed by defendant, Ulster County Sheriff's Department ("UCSD"), was escorting an inmate on July 26, 2009, when an incident occurred whereby the inmate was injured. Thereafter, defendant, Detective Ronald L. Dreiser ("Dreiser"), investigated Plaintiff's role in the incident, and subsequently reported the incident to defendant, District Attorney Holly Carnright ("Carnright"). Plaintiff was placed

on restrictive duty from August 1 through 27, 2009, at which time he was placed on administrative leave. On September 9, 2009, Plaintiff was arrested and charged with assault in the third degree. Three days later, Plaintiff was served with disciplinary charges. Plaintiff was subsequently suspended without pay for thirty days, and thereafter placed on paid administrative leave. Eventually, Plaintiff was found not guilty on the assault charge after a four-day trial.

At some point, UCSD or its agent informed Plaintiff's part-time employers, the Towns of Shandaken and Woodstock, of false information regarding the alleged incident, as a result of which Plaintiff was fired from his employment with said Towns.

A Caucasian corrections officer at UCSD was treated differently than Plaintiff after being accused of striking an inmate, such that he was suspended without pay for thirty days, but was not arrested.

On January 1, 2010, New York State Police responded to a "road rage" incident, alleged by complaining witness, Odelle Gordon. Defendant, Deputy Sergeant Wallace Fulford ("Fulford") responded to the scene, upon learning that Plaintiff's name was involved in the incident. Although Mr. Gordon told investigators and Defendants from the Ulster County District Attorney's Office ("UCDAO") that Plaintiff was not the individual about whom he complained, Plaintiff was still charged with Criminal Mischief. Eventually, a bench trial was held, after which Plaintiff was found not guilty.

**\*2** Familiarity with the remaining factual allegations supporting Plaintiff's claims is assumed in this Decision and Order, which is intended primarily for review by the parties. (*See generally* Dkt. No. 1.)

### B. Defendants' Motion

Generally, in support of their motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief may be granted, Defendants assert the following five arguments: (1) the Complaint generally fails to allege facts plausibly suggesting the elements of the claims asserted; (2) UCSD and UCDAO do not have the legal capacity to be sued; (3) based on Plaintiff's factual allegations, Defendants Carnright and Assistant District Attorney William J. Weishaput ("Weishaput") are protected from liability as a matter of law by the doctrine of absolute prosecutorial immunity; (4) based on Plaintiff's factual allegations, Defendants Dreiser and Fulford are protected from liability as a matter of law by

the doctrine of qualified immunity; and (5) Plaintiff's claims under New York law must be dismissed because Plaintiff failed to file a Notice of Claim. (*See generally* Dkt. No. 9–2.)

Generally, in response to Defendants' motion to dismiss, Plaintiff asserts the following four arguments: (1) Plaintiff has satisfied the pleading requirements under Fed.R.Civ.P. 8(a); (2) Defendants Carnright and Weishaput are not entitled to absolute immunity; (3) Defendants Dreiser and Fulford are not entitled to qualified immunity; and (4) Plaintiff's claims under New York law against Defendants named in their individual capacities should not be dismissed because a Notice of Claim is not required where, as here, the County is not obligated to indemnify those Defendants. (*See generally* Dkt. No. 11.)

Generally, in reply to Plaintiff's response, Defendants assert the following arguments: (1) based on Plaintiff's factual allegations that Defendants Carnright and Weishaput acted as advocates in the initiation of prosecution of Plaintiff, they are entitled to absolute immunity; (2) based on Plaintiff's factual allegations that the Defendants Carnright, Weishaput, Dreiser and Fulford acted within the scope of their employment, Plaintiff's New York law claims against them must be dismissed due to his failure to file a Notice of Claim; and (3) Plaintiff fails to allege facts plausibly suggesting the elements of the claims asserted.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim upon which relief can be granted on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty., 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008)* (McAvoy, J., adopting Report–Recommendation on *de novo* review).

**\*3** Because such motions are often based on the first ground, a few words on that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the

heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F.Supp.2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 677–83, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 550 U.S. at 561, 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 556–70, 127 S.Ct. at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean the

pleading must contain at least "some factual allegation[s]." *Id.* at 555, 127 S.Ct. at 1965, n. 3. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 554, 127 S.Ct. at1965. [2]

[2]  It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a pro se pleading) the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough facts set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**\*4** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 679, 129 S.Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant

has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.,* at 678, 129 S.Ct. at 1949.

**B. Legal Standards Governing Plaintiff's Claims**

**1. 42 U.S.C. § 1983**

In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

**2. Malicious Prosecution**

To state a claim for malicious prosecution under either § 1983 or New York common law, a plaintiff must allege the (1) commencement of a criminal proceeding against him, (2) termination of the proceeding in plaintiff's favor, (3) lack of probable cause, and (4) institution of the proceedings by defendants with actual malice. *See Swartz v. Insogna,* No. 11–2846–CV, 2013 WL 28364, at *5 (2d Cir. Jan.13, 2013). Moreover, because a malicious prosecution claim under § 1983 is grounded in the Fourth Amendment right to be free from unreasonable seizures, a plaintiff must also allege a post-arraignment seizure. *See Swartz,* 2013 WL 28364, at *5. The Court of Appeals for the Second Circuit has "consistently held that a post-arraignment defendant who is obligated to appear in court in connection with criminal

charges whenever his attendance is required suffers a Fourth Amendment deprivation of liberty." *Id.* (citations omitted).

**3. Abuse of Process**

**\*5** To state a claim for abuse of process under either § 1983 or New York common law, a plaintiff must allege that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Hoffman v. Town of Southampton,* No. No. 11–CV–3690, 2012 WL 4465779, at *8 (E.D.N.Y. Sept.28, 2012) (citing *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir .2003)). By definition, the malicious abuse of process is a denial of procedural due process. *See Hoffman,* 2012 WL 4465779, at *8 (citing *Sullivan v. LaPlante,* 03–CV–359, 2005 WL 1972555, at *3 (N.D.N.Y. Aug.16, 2005); *Dickerson v. Monroe Cnty. Sheriff's Dep't,* 114 F.Supp.2d 187, 192 (W.D.N.Y.2000)).

Regarding the third element of a claim for abuse of process, a plaintiff must allege that defendants had an improper *purpose* in instigating the action—an improper *motive* will not suffice. *See Hoffman,* 2012 WL 4465779, at *9 (citing *Savino,* 331 F.3d at 77). Where a defendant's objective in initiating an arrest is to prevail on a criminal prosecution, the plaintiff will not prevail on a claim for abuse of process. *See id.,* at *10 (citing *Savino,* 331 F.3d at 77).

**4. Violation of Right to Due Process**

A claim for violation of one's due process rights, "brought for injury to one's reputation ... coupled with the deprivation of some tangible interest or property right ..., without adequate process[ ]" is commonly referred to as a "stigma plus" claim. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). In order to state a "stigma plus" due process claim, a plaintiff must allege "(1) the utterance of a statement about h[im] that is injurious to h[is] reputation, that is capable of being proved false, and that he [ ] claims is false, and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement." *Jackson v. New York City Dept. of Educ.,* No. 10–CV–9193, 2011 WL 2652577, at *3 (S.D.N.Y. Jul.7, 2011) (quoting *Velez,* 401 F.3d at 87).

"[T]he Supreme Court [has] recognized that while damage to reputation alone is insufficient to establish a claim for harm to a liberty interest, a cognizable claim will lie if a plaintiff can show loss of reputation plus some serious additional harm,

2013 WL 286282

such as loss of employment, as a result of defamatory remarks by a government official." *Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities,* 64 F.3d 810, 817 (2d Cir.1995) (citing *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976)).

There is no requirement that both the "stigma" and the "plus" originate from the same government actor as long as they are alleged to be sufficiently proximate. *See Velez,* 401 F.3d at 89. The sufficient proximity requirement "will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected-for example, due to their order of occurrence ... and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." *Id.* However, where the party responsible for the defamatory remarks (the stigma) does not have the authority to terminate the plaintiff's employment (the plus), that party cannot be liable to the plaintiff on his stigma plus claim. *See Anemone v. Metropolitan Transp. Authority,* 410 F.Supp.2d 255, 270–71 (S.D.N.Y.2006) (citing *Velez,* 401 F.3d at 89–93).

### 5. Slander

**\*6** To state a claim for slander under New York common law, a plaintiff must allege "(1) an oral defamatory statement of fact; (2) about the plaintiff; (3) the statement's publication to a third party; and (4) injury to the plaintiff." *Mobile Data Shred, Inc. v. United Bank of Switzerland,* No. 99–CV–10315, 2000 WL 351516, at *6 (S.D.N.Y. Apr.5, 2000) (citing *Weldy v. Piedmont Airlines, Inc .,* 985 F.2d 57, 61 (2d Cir.1993); *Ives v. Guilford Mills, Inc.,* 3 F.Supp.2d 191, 199 (N.D.N.Y.1998)). "In evaluating the sufficiency of claims of slander, the courts in this Circuit have required that the complaint adequately identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Mobil DataShred, Inc.,* 2000 WL 351516, at *6 (citing *Ives,* 3 F.Supp.2d at 199; *Broome v. Biondi,* No. 96–CV–0805, 1997 WL 83295, at *2 (S.D.N.Y. Feb. 10, 1997); *Reeves v. Continental Equities Corp. of Am.,* 767 F.Supp. 469, 473 (S.D.N.Y.1991)). "[S]lander[ ] is not actionable under § 1983 unless it implicates a liberty interest." *Davis–Payne v. Galie,* No. 09–CV–6363, 2012 WL 4959445, at *5 (W.D.N.Y. Oct.16, 2012) (citing *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 630–31 (2d Cir.1996)).

### 6. Failure to Train or Supervise

It is well established that "[a] municipality may not be held liable in a Section 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior.* "[3] "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy."[4] "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."[5]

[3]     *Powell v. Bucci,* 04–CV–1192, 2005 WL 3244193, at *5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior.* ").

[4]     *Powell,* 2005 WL 3244193, at *5; *Monell,* 436 U.S. at 690–691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal] defendants in an action under § 1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[5]     *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. Cnty. of Tompkins,* 90–CV–0841, 1995 WL 105993, at *12 (N.D.N.Y. March 2, 1995)

(McCurn, J.), *Keyes v. Cnty. of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...." [6]

[6]   *Dorset–Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. Cnty. of Saratoga,* 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

With regard to the second element (causation), a plaintiff must show "a direct causal link" or "an affirmative link" between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the "moving force" behind the deprivation). [7]

[7]   *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("The fact that municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell′* s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue."); *Monell,* 436 U.S. at 694 ("[I]t is when

execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation [at issue] ... we must reverse the judgment below."); *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that ... an official policy or custom [was] the cause of the deprivation of constitutional rights.... [T]he plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights.") [internal quotation marks and citation omitted]; *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City."); *Powell,* 2005 WL 3244193, at *5 ("Ultimately, the plaintiff must demonstrate a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation.") [internal quotation marks and citation omitted].

### 7. Conspiracy to Violate Plaintiff's Rights

**\*7**  To state a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff muse allege: (1) some racial or other class-based discriminatory animus underlying the defendant's actions; and (2) that the conspiracy was aimed at interfering with plaintiff's protected rights. *See Brito v. Arthur,* 403 F. App'x 620, 621 (2d Cir.2010) (citing *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993)). [8]  Vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a claim under § 1985(3). *See Kiryas Joel Alliance v. Village of Kiryas Joel,* No. 12–217–CV, 2012 WL 3892744, at *5 (2d Cir. Sept.10, 2012) (citing *Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999)); *Emmerling v. Town of Richmond,* 434 F. App'x 10, 12 (2d Cir.2011). Instead, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Kiryas Joel Alliance,* 2012 WL 3892744, at *5 (quoting *Webb v. Goord,* 340 F.3d 105, 110–11 (2d Cir.2003)). In addition, a plaintiff may only state a claim under § 1985(3) where he alleges a conspiracy "motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory

animus." *Harrison v. Lutheran Med. Cent.,* 468 F. App'x 33, 37 (2d Cir.2012) (quoting *United Bd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)).

8    Plaintiff's Complaint states that he brings his action under, among other laws, 42 U.S.C. § 1985(1). However, his opposition memorandum of law cites the standard for pleading a claim pursuant to § 1985(3). Because the allegations in the Complaint do not comport with the requirements of § 1985(1), which prohibits conspiracies to prevent federal officials from performing their duties, the Court addresses Plaintiff's claim under § 1985(3).

**C. Legal Standards Governing Defendants' Defenses**

**1. Defense of Lack of Separate Identity**

Pursuant to Fed.R.Civ.P. 17, New York law governs the capacity of an administrative arm of a municipality to sue or be sued. Under New York law, an administrative arm of a municipality, such as UCSD or UCDAO, does not have a legal identity separate and apart from the municipality, and, therefore, cannot sue or be sued. *See Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002). Accordingly, Defendants' motion to dismiss all claims against Defendants UCSD and UCDAO is granted.

**2. Defense of Qualified Immunity**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated "clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) [citations omitted].

\*8  In determining the second issue (i.e., whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted), courts in this Circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], cert. denied, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [9] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted]. [10] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [11] As the Supreme Court has explained,

9    *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

10    *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly

established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights are clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

11    *See also Malsh v. Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. 12

12    *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

**3. Defense of Absolute Prosecutorial Immunity**
"Prosecutors are generally immune from liability ... for conduct in furtherance of prosecutorial functions that are intimately associated with initiating or presenting the State's case ." *Flagler v. Trainor,* 663 F.3d 543, 546 (2d Cir.2011). The doctrine of absolute prosecutorial immunity applies to shield liability in both federal civil rights and state common law tort actions. *See Flagler,* 663 F.3d at 546. "The key to whether a prosecutor should be afforded absolute immunity is the degree to which the specific conduct at issue is 'intimately associated with the judicial phase of the criminal process.' " *DiBlasio,* 344 F.3d at 300 (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430 [1976] ). "In assessing whether absolute immunity should attach to a prosecutor, ... [courts should] ... focus[ ] on the timing of the conduct at issue, drawing a distinction between the investigative and prosecutorial functions, ... and the authority of the individual claiming immunity to make the decision to initiate a prosecution."

*DiBlasio,* 344 F.3d at 300–01. Thus, as the Supreme Court has stated, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley v. Fitzsimmons,* 509 U.S. 259, 274, 113 S.Ct. 2606, 2616, 125 L.Ed.2d 209 (1993). Accordingly, where, as in *Buckley,* a plaintiff claimed that the prosecutor conspired to manufacture false evidence that would link the plaintiff to a crime during the time that the prosecutor was working hand in hand with police to investigate the crime, the prosecutor was not entitled to absolute immunity. *See Buckley,* 509 U.S. at 272–274.

**4. Defense of Failure to File a Notice of Claim**
**\*9**  New York law requires the filing of a Notice of Claim as a condition precedent to the commencement of any tort action against a municipality or any of their officers, agents or employees. *See* N.Y. GEN. MUN. LAW § 50–e (McKinney 2012). "This notice-of-claim requirement is 'construed strictly by New York state courts,' and '[f]ailure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action.' " *Berry v. Village of Millbrook,* 815 F.Supp.2d 711, 724 (S.D.N.Y.2011) (quoting *Hardy v. N.Y.C. Health & Hosps. Corp.,* 164 F.3d 789, 793–94 (2d Cir.1999)).

Section 52 of the New York County Law requires the service of a notice of claim "in accordance with section fifty-e of the general municipal law" for "[a]ny claim ... against a county for damage, injury or death, or for invasion of personal or property rights, of every name and nature," as well as "any other claim for damages ... alleged to have been caused or sustained in whole or in part because of any misfeasance, omission of duty, negligent or wrongful act on the part of the county, its officers, agents, servants or employees." N.Y. COUNTY LAW § 52(1) (McKinney 2012).

Regarding claims filed against county employees in their individual capacities, "service of a notice of claim is not a condition precedent to the commencement of an action against a county's employees or agents unless the county is required to indemnify the individual defendants." *Costabile v. County of Westchester,* 485 F.Supp.2d 424, 432 (S.D.N.Y.2007) (citing N.Y. GEN. MUN. LAW § 50–e(1) (b)). Where the employees were acting within the scope of their employment in committing the alleged tortious acts, the county is obligated to indemnify them. *See Olsen v. County of Nassau,* No. CV–05–3623, 2008 WL 4838705, at \*4 (E.D.N.Y. Nov. 4, 2008). Where, according to a plaintiff's complaint, the defendant county employees were

acting outside the scope of their employment, i.e., by the commission of intentional torts, the filing of a notice of claim is unnecessary. *See Olsen,* 2008 WL 4838705, at *4 (citing *Grasso v. Schenectady County Pub. Library,* 817 N.Y.S.2d 186, 190, 30 A.D.3d 814 (N.Y.App.Div.2006).

## III. ANALYSIS

### A. Whether Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted

### 1. Whether the Ulster County Sheriff's Department and the Ulster County District Attorney's Office Should Be Dismissed as Defendants

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 9–2, at 12.) The Court would only add the following two points.

First, the Court notes that Plaintiff has failed to respond to this argument for dismissal. At the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond. In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at * 1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

 **\*10** Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. As indicated above in Part II.C.1. of this Decision and Order, under New York State law, administrative arms of a municipality, like UCSD and UCDAO, do not have a legal identity separate from the municipality and may not sue or be sued. *See Davis,* 224 F.Supp.2d at 477.

For these reasons, UCSD and UCDAO are dismissed as Defendants.

### 2. Whether Plaintiff's § 1983 Claim Against the County is Barred by the Doctrine of Collateral Estoppel

After carefully considering the matter, the Court answers this question in the negative generally for the reasons stated by Plaintiff in his memorandum of law. (Dkt. No. 11, at 9–10.) Because the parties' briefing on this issue is sparse, the Court adds the following analysis.

By way of background, Plaintiff filed a verified complaint against the County with the New York State Division of Human Rights ("DHR") on February 11, 2010, wherein Plaintiff alleges that the County unlawfully discriminated against him based on his race relating to his employment in violation of New York Human Rights Law. Specifically, Plaintiff alleged that, because of his race, an incident involving alleged inmate abuse was investigated differently than a similar incident of inmate abuse involving a Caucasian corrections officer. Plaintiff further alleged that, despite being cleared of criminal charges in the alleged assault, the Sheriff's Department was involved in Plaintiff being harassed and arrested at his home regarding an unrelated road rage incident. The DHR issued its determination that there is no probable cause to believe that the County engaged in the unlawful discriminatory practice of which Plaintiff complained. Defendants now argue that Plaintiff is collaterally estopped from re-litigating this issue in support of his § 1983 claim against the County.

To be sure, Plaintiff does not reference the DHR's determination in his Complaint. However, Defendants submit the determination as an attachment to its attorney affidavit in support of their current motion. (Dkt. No. 9–1, at 15.) Notably, Plaintiff does not object to Defendants' reliance on the document in support of their motion to dismiss his Complaint. In any event, because the DHR's determination is a public record of which the Court may take judicial notice, the Court may properly consider it when deciding Defendants' motion. *See Johnson v. County of Nassau,* 411 F.Supp.2d 171, 178 (E.D.N.Y.2006).

The doctrine of collateral estoppel, otherwise known as issue preclusion, applies when

> (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and the resolution of the issue was necessary to support a valid and final judgment on the merits.

**\*11** *Finch v. New York,* No. 10–CV–9691, 2012 WL 2866253, at \*6 (S.D.N.Y. May 30, 2012) (citing *Boguslavsky v. Kaplan,* 159 F.3d 715, 719–20 (2d Cir.1998). In some circumstances, collateral estoppel may apply to preclude litigation of a § 1983 claim that has been previously decided in a state administrative proceeding. However, the Court of Appeals for the Second Circuit has held that in order for collateral estoppel to apply to preclude federal claims due to a prior state administrative determination, the plaintiff must have been "fully aware of the nature and ramifications of the state administrative process, ha[d] the opportunity to present evidence and testimony, and [was] able to develop the evidentiary record fully." *Finch,* 2012 WL 2866253, at \*6 (citing *Kosakow v. New Rochelle Radiology Assocs., P.C.,* 274 F.3d 706, 735–36 (2d Cir.2001)).

> In determining whether plaintiff had a full and fair opportunity to litigate her claims, the Court considers "the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation."

*Id.* (quoting *Schwartz v. Public Adm'r of Cnty. of Bronx,* 246 N.E.2d 725, 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955 (1969)). *See also Jeter v. New York City Dep't of Educ.,* 549 F.Supp.2d 295, 305 (E.D.N.Y.2008).

Courts in this Circuit that have declined to dismiss § 1983 claims in the employment discrimination context based on the asserted collateral estoppel effect of previous decisions from the DHR have done so predominantly due to the plaintiff's *pro se* status before the DHR as well as the absence of any record reflecting that discovery was conducted or that a hearing was held in that forum. *See Finch,* 2012 WL 2866253, at \*6–7; *Jeter,* 549 F.Supp.2d at 305 at 305; *Lloyd v. New York*

*Botanical Garden,* No. 03–CV–7557, 2004 WL 2093468, at \*3–4 (S.D.N.Y. Sept.14, 2004). Consequently, those courts decided that, because the plaintiff did not have a full and fair opportunity to litigate the issues before the DHR, collateral estoppel did not preclude adjudication of the § 1983 claims in federal court. Here, as in *Finch, Jeter* and *Lloyd,* Plaintiff appeared before the DHR *pro se.* Moreover, as in those cases, here the DHR's determination reflects only that a decision was made on submitted papers, not after a hearing, and that no confrontation of opposing witnesses occurred. Conversely, courts that have found a plaintiff's § 1983 claims to be precluded by a DHR determination have considered that the plaintiff, unlike Plaintiff here, was represented by counsel and that, unlike here, the DHR's decision was appealed to State court and the DHR's decision was made after more formal and comprehensive proceedings. *See Lloyd,* 2004 WL 2093468, at \*4 (citing cases).

**\*12** Accordingly, considering Plaintiff's *pro se* status before the DHR, his inability to confront witnesses or appear at a hearing, and the generally informal nature of proceedings before the DHR, the Court concludes that Plaintiff's § 1983 claims are not precluded by the DHR's determination.

### 3. Whether Plaintiff's Claims Against the County Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Municipal Liability

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 9–2, at 8.) The Court would add only the following brief point.

As indicated above in Part II.B.6. of this Decision and Order, Plaintiff must allege facts plausibly suggesting that the municipality "has adopted a 'custom' or 'policy' which is the 'moving force' behind [the violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (Scullin, J.) (citing, *inter alia, Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 689 [1978] ). Further, a "failure to train or supervise" employees constitutes a policy or custom where it amounts to deliberate indifference to the rights of those with whom the employee comes in contact. In order to successfully plead such a claim, a plaintiff must allege that "the need for more or better supervision was obvious but that the defendant made no meaningful attempt to prevent the constitutional violation." *Missel v. County of Monroe,* 351 F. App'x 543, 546 (2d Cir.2009). A " 'simple recitation that there was a failure to train municipal employees,' does not sufficiently allege a claim that would give rise to municipal liability." *Bliven*

*v. Hunt,* 478 F.Supp.2d 332, 339 (E.D.N.Y.2007) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)).

Here, Plaintiff has alleged that the County was deliberately indifferent to his rights by failing to properly train and supervise its employees to prevent the unlawful investigation and prosecution of African Americans. However, Plaintiff fails to identify any other occurrences of similar conduct which would have alerted the County to the need for training or supervision. *See Missel v. County of Monroe,* No. 07–CV–5482, 2008 WL 2357637, at *5–6 (W.D.N.Y. June 4, 2008) (aff'd, 351 F. App'x 543, 546 (2d Cir.2009)). Accordingly, Plaintiff has not alleged enough facts to support a plausible inference that his alleged unlawful investigation and prosecution occurred pursuant to a formal course of action officially promulgated by the County. *See Missel,* 351 F. App'x at 555.

For this reason, Plaintiff's § 1983 claim against the County for failure to train or supervise is dismissed.

### 4. Whether Plaintiff's New York Common Law Claims Against the Individually Named Defendants Must Be Dismissed for Failure to File a Notice of Claim

After carefully considering the matter, the Court answers this question in the negative, generally for the reasons stated by Plaintiff in his memorandum of law. (Dkt. 11, at 11–12.) The Court would add only the following brief point.

**\*13** As indicated above in Part II.C.4. of this Decision and Order, the filing of a Notice of Claim is not a condition precedent to the commencement of an action against County employees unless the County is required to indemnify them. Where, as here, the employees are alleged to have committed intentional torts, the County is not required to indemnify them because such actions are considered outside the scope of their employment.

For this reason, Defendants' motion to dismiss Plaintiff's New York common law claims of slander, malicious prosecution and abuse of process against Defendants Dreiser, Fulford, Carnright and Weishaput on the ground that those claims are barred by Plaintiff's failure to file a Notice of Claim is denied.

### 5. Whether Plaintiff's Malicious Prosecution Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated by

Plaintiff in his memorandum of law. (Dkt. No. 11, at 4–7.) The Court would further add the following brief points.

Defendants argue that Plaintiff's malicious prosecution claim should be dismissed because he fails to plead facts plausibly suggesting malice and a lack of probable cause for both the assault and criminal mischief prosecutions. Plaintiff has failed to respond to this argument regarding the assault prosecution. Moreover, a liberal reading of the Complaint reveals that Plaintiff has failed to allege facts plausibly suggesting that there was no probable cause for his assault arrest and prosecution. Accordingly, to the extent Plaintiff purports to state a claim for malicious prosecution regarding his assault arrest, Defendants' motion to dismiss that claim is granted.

Regarding Plaintiff's arrest for criminal mischief, the Complaint alleges that the complaining witness informed "investigators and the Defendants from the District Attorney's Office that Plaintiff was not the individual about whom he complained." (Compl.¶ 32, Dkt. No. 1.) Plaintiff alleges that nonetheless, he was charged with criminal mischief. Plaintiff further alleges that he was exonerated, and that Defendants acted with malice. (*Id.,* ¶¶ 34, 36.) Moreover, as indicated above in Part II.B.2., a post arraignment defendant who is obligated to appear in court suffers the requisite Fourth Amendment deprivation of liberty to state a malicious prosecution claim under § 1983. Accordingly, Plaintiff has stated a claim of malicious prosecution regarding his arrest for criminal mischief under both New York common law and § 1983.

To be sure, although Plaintiff alleges that Defendant Fulford responded to the complainant's road rage report "upon realizing Plaintiff's name was involved in the incident[,]" the Complaint is devoid of any allegations that Fulford was involved in the arrest or prosecution of Plaintiff regarding the criminal mischief charge, or that he was involved in any of the incidents giving rise to Plaintiff's claims. Moreover, Plaintiff fails to allege that Defendant Dreiser was at all involved in Plaintiff's arrest or prosecution for criminal mischief. Accordingly, Defendants' motion to dismiss is granted insofar as Plaintiff purports to state a malicious prosecution claim against Fulford or Dreiser.

**\*14** For these reasons, Defendants' motion to dismiss Plaintiff's malicious prosecution claim is granted to the extent Plaintiff purports to base his claim on his assault arrest or to the extent he seeks to assert his claim

against Fulford or Dreiser. Defendants' motion to dismiss Plaintiff's malicious prosecution claim against Carnright and Weishaput, pursuant to § 1983 and New York common law, is denied. Consequently, Defendants' motion to dismiss Plaintiff's New York common law claim for malicious prosecution against the County for the conduct of Carnright and Weishaput under a respondeat superior theory is also denied.

### 5. Whether Plaintiff's Abuse of Process Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, generally for the reasons stated by Defendants in their reply memorandum of law. (Dkt. No. 12, at 3–4.) The Court would add only the following point.

As indicated above in Part II.B.3. of this Decision and Order, in order to state a claim for abuse of process, a plaintiff must allege that defendants had an improper purpose in instigating legal action, as opposed to an improper motive, which will not suffice. "A malicious motive alone ... does not give rise to a cause of action for abuse of process." *Savino,* 331 F.3d at 77 (quoting *Curiano v. Suozzi,* 469 N.E.2d 1324, 63 N.Y.2d 113, 117, 480 N.Y.S.2d 466, 468–69 (N.Y.1984)). Instead, to state a claim for, as here, abuse of criminal process, a plaintiff must claim that defendants "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino,* 331 F.3d at 77. Here, Plaintiff alleges only that Defendants' conduct was racially motivated. The Complaint is devoid of any allegations of an improper purpose for the criminal prosecution of Plaintiff beyond the alleged racial discrimination. For this reason, Defendants' motion to dismiss Plaintiff's abuse of process claim is granted.

### 6. Whether Plaintiff's Due Process Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, generally for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 9–2, at 7.) The Court would add only the following points.

Plaintiff alleges that UCSD or one of its agents informed Plaintiff's part time employers, the Towns of Shandaken and Woodstock, of false information regarding the alleged incident of assault, and that as a result, Plaintiff was fired from his positions with the Towns. (Compl.¶¶ 19–20, Dkt. No. 1.) Neither of the Towns are defendants to this action, and Plaintiff does not allege that the County or any agent

thereof had the authority to terminate his employment with the Towns. As indicated above in Part II.B.4. of this Decision and Order, where the party responsible for the defamatory remarks does not have the authority to terminate the plaintiff's employment, that party cannot be liable to the plaintiff on his stigma plus claim. *See Anemone,* 410 F.Supp.2d at 270–71 (citing *Velez,* 401 F.3d at 89–93). Accordingly, to the extent Plaintiff asserts a stigma plus claim against the County for the loss of his part time employment with the Towns, Defendants' motion to dismiss that claim is granted.

**\*15** To the extent Plaintiff asserts a stigma plus claim against Defendants, the claim is also dismissed because Plaintiff does not allege that he was terminated from his employment with the County, only that he was subject to disciplinary suspension without pay for thirty days. (*Id.,* ¶¶ 17–18.) Further, Plaintiff's stigma plus claim must be dismissed in this regard because a disciplinary hearing provides all the process that is due. *See Miller v. City of Ithaca,* No. 10–CV–597, 2010 WL 3809842, at *11–12 (N.D.N.Y. Sept. 22, 2010) (citing *DiBlasio,* 344 F.3d at 302). For these reasons, Defendants' motion to dismiss Plaintiff's due process claim is granted.

### 7. Whether Plaintiff's Slander Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, generally for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 9–2, at 7–8.) The Court would add only the following point.

As indicated above in Part II.B.5. of this Decision and Order, in order to state a claim for slander, a plaintiff must identify the alleged defamatory statements, the person who made the statements, when the statements were made, and to whom. Where, for example, a complaint "fail[ed] to allege any of the specific words forming the claim of slander[,] fail[ed] to set out when and where any of the statements were made[, and where, a]lthough two people to whom the statements were allegedly made [we]re identified, [but] others [we]re simply identified as 'colleagues[,]' " a slander claim was dismissed. *Laine v. Pride,* 926 N.Y.S.2d 344, 30 Misc.3d 1233(A) (N.Y.Sup.Ct.2011). *See also Monsanto v. Elec. Data Sys. Corp.,* 529 N.Y.S.2d 512, 515, 141 A.D.2d 514, 516 (N.Y.App.Div.1988) ("mandating dismissal" of a claim for defamation where plaintiff failed to plead the "particular words complained of" or "the particular person to whom the allegedly defamatory comments were made").

Here, Plaintiff alleges only that "Defendant, Ulster County Sheriff's Department, or an agent thereof, informed Plaintiff's part-time employers, the Town of Shandaken and the Town of Woodstock[,] false information regarding" the incident of alleged assault. (Compl.¶ 19, Dkt. No. 1.) Plaintiff fails to specifically identify who made the statement, to whom the statement was made or when it was made. Further, Plaintiff's allegation that "false information" was conveyed regarding the incident of alleged assault is too vague to satisfy the standard for a slander claim in New York.

For these reasons, Defendants' motion to dismiss Plaintiff's claim for slander is granted.

### 8. Whether Plaintiff's § 1985 Conspiracy Claim Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative, partly for the reasons stated in Defendants' memorandum of law. (Dkt. No. 9–2, at 9–10.) The Court would only add the following points.

As indicated above in Point II.B.7. of this Decision and Order, vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a claim under § 1985(3), without some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end. Here, Plaintiff fails to meet this requirement, instead alleging only that "Defendants acted in concert" and with malice. (Compl.¶¶ 36, 53, Dkt. No. 1.) For this reason alone, Plaintiff's § 1985 claim fails.

 **\*16** In addition, because only Carnright and Weishaput, both employees of the Ulster County District Attorney's Office, remain as defendants, Plaintiff's § 1985 claim fails under the intracorporate conspiracy doctrine, which provides that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Hartline v. Gallo,* 546 F.3d 95, 99, n. 3 (2d Cir.2008) (affirming district court's dismissal of a claim against multiple employees of a police department on this ground).

For these reasons, Defendants' motion to dismiss Plaintiff's § 1985 claim is granted.

### 9. Whether, in the Alternative, Plaintiff's Claims Against Defendants Dreiser and Fulford Should Be Dismissed Because, Based on the Factual Allegations

of the Complaint, Defendants Dreiser and Fulford Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity

All of Plaintiff's claims against Defendants Dreiser and Fulford are dismissed for failure to state a claim. For this reason, the Court need not, and does not, address Defendants' alternative argument that Defendants Dreiser and Fulford are entitled to qualified immunity.

### 10. Whether, in the Alternative, Plaintiff's Claims Against Defendants Carnright and Weishaput Should Be Dismissed Because, Based on the Factual Allegations of the Complaint, Defendants Carnright and Weishaput Are Protected from Liability as a Matter of Law by the Doctrine of Absolute Prosecutorial Immunity

After carefully considering the matter, the Court answers this question in the negative, generally for the reasons stated by Plaintiff in his memorandum of law. (Dkt. No. 11, at 10–11.) The Court would add only the following point.

As indicated above in Point II.C.4. of this Decision and Order, absolute immunity will not protect a prosecutor from liability where his or her conduct giving rise to plaintiff's claim occurred outside the prosecutor's role as an advocate. "The line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." *Zahrey v. Coffey,* 221 F.3d 342, 347 (2d Cir.2000). Here, Plaintiff alleges that the complaining witness told investigators and Defendants from the District Attorney's office that Plaintiff was not the individual about whom he alleged caused damage to his vehicle. (Compl.¶¶ 31–32, Dkt. No. 1.) Plaintiff next alleges that he "was nevertheless charged with Criminal Mischief as a result of the incident." (*Id.,* at ¶ 32.) It is unclear from these allegations whether the complaining witness told Carnright and Weishaput that Plaintiff was not the individual about whom he complained (1) prior to the point at which authorities had probable cause to arrest Plaintiff, during which time absolute immunity would not attach or (2) after probable cause to arrest, during a time when Carnright and Weishaput were deciding whether or not to begin a criminal prosecution, and absolute immunity would attach. *See Best v. City of New York,* No. 11–CV–4475, 2012 WL 5458054, at \*6 (S.D.N.Y. Nov.8, 2012).[13] Where, as here, it may not be gleaned from the allegations in the complaint whether a defendant prosecutor was acting in his or her role as an investigator or as an advocate, the availability of absolute immunity cannot be decided as a matter of law on a motion to dismiss. *See*

*id.* (citing *Hill v. City of New York,* 45 F.3d 653, 663 (2d Cir.1995)).

13      Of course, Defendants are free to seek an order from the magistrate judge narrowing the scope of discovery to address this issue, and/or to fie a motion for summary judgment before this Court upon completion of sufficient discovery.

 **\*17**  For this reason, Defendants' motion to dismiss the remaining claim for malicious prosecution against Carnright and Weishaput under the doctrine of absolute prosecutorial immunity is denied. However, after sufficient discovery of the facts in this case, dismissal of this sole remaining cause of action on the ground of absolute prosecutorial immunity may be appropriate.

### B. Whether the Court Should Give Plaintiff an Opportunity to File an Amended Complaint Before Dismissing This Action

Generally, when a district court dismisses a *pro se* action, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). To be sure, as explained above in Part I.A. of this Decision and Order, this Court does not afford Plaintiff the special solicitude typically afforded to *pro se* plaintiffs because, as Plaintiff admits, his Complaint is submitted by an attorney.

In any event, an opportunity to amend is not required where, as here, the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted).

Moreover, this rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at \*1. While the special leniency afforded to *pro se* civil rights litigants loosens somewhat the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8; rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8 are procedural rules that even *pro se* civil rights plaintiffs must follow.

For these reasons, Plaintiff will not be given leave to amend his Complaint. Plaintiff's claims, other than the surviving claim for malicious prosecution against Defendants Carnright, Weishaput and the County, are denied with prejudice.

 **\*18  ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 9) is **GRANTED in part** and **DENIED in part;** and it is further

**ORDERED** that Defendants' motion to dismiss Plaintiff's § 1983 and New York common law claim of malicious prosecution against Defendants Carnright and Weishaput; and Defendants' motion to dismiss Plaintiff's New York common law claim of malicious prosecution against the County of Ulster under the doctrine of respondeat superior are **DENIED;** and it is further

**ORDERED** that Defendants' motion to dismiss the remainder of Plaintiff's claims is **GRANTED,** and those claims are **DISMISSED** with prejudice. The clerk is directed to terminate this case against Defendants Ulster County Sheriff's Department, Ulster County District Attorney's Office, Ronald L. Dreiser, and Wallace Fulford; and it is further

**ORDERED** that Defendants Carnright and Weishaput shall file and serve an answer to Plaintiff's complaint pursuant to F.R.C.P. Rule 12(a)(4). This matter is referred back to Magistrate Hummel for a Rule 16 conference.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 286282

2013 WL 286282

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 67 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

2021 WL 3932055
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Peggy ZOULAS, Plaintiff,
v.
NEW YORK CITY DEPARTMENT
OF EDUCATION, Defendant.

1:18-cv-2718-GHW
|
Signed 09/01/2021

**Attorneys and Law Firms**

Peggy Zoulas, Brooklyn, NY, Pro Se.

Amanda Blair, New York City Law Depart. Office of the Corporation Counsel, Laura Christine Williams, New York, NY, for Defendant.

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge

**\*1** This case arises out of a soured relationship between a teacher and her principal. Plaintiff Peggy Zoulas is an elementary school teacher in New York City. She alleges that, shortly after she turned 55, the principal at her school began to treat her unfairly. According to Zoulas, that principal began to call her "old" and a "veteran teacher," and to discriminate against her by giving her negative performance reviews. She says that when she complained to the New York State Division of Human Rights (the "SDHR"), she received further negative performance reviews and was the victim of a series of subtle administrative slights. Those performance reviews and slights, Zoulas argues, amounted to retaliation and, coupled with other conduct, created a hostile work environment.

Zoulas alleged facts in her complaint that plausibly entitled her to relief under the Age Discrimination and Employment Act (the "ADEA"). On summary judgment, however, she has failed to point to evidence in the record that would permit a reasonable jury to find in her favor. She has failed to demonstrate that she suffered an adverse employment action within the ADEA's limitations period, which renders her discrimination claim time-barred. To support her retaliation and hostile work environment claims, she has come forward with evidence of conduct that, while subjectively distressing to Zoulas, falls short of the objective standards applied to such claims. Although Zoulas has presented many complaints about her supervisors and students, as well as evidence about her, "it is not the province of the Court to sit as a super-human resources department." *Lewis v. Two's Co.*, No. 7:06-cv-4775 (WWE), 2008 WL 6192169, at \*5 (S.D.N.Y. Mar. 16, 2008). The ADEA does not burden federal courts with resolving run-of-the-mill workplace conflicts or punishing employers for bureaucratic inefficiency. Because Zoulas's arguments in opposition to this motion rest on conduct that no reasonable jury could find sufficiently retaliatory or abusive to support a claim under the ADEA, the defendant, the New York City Department of Education (the "NYCDOE"), is entitled to summary judgment on Zoulas's retaliation and hostile work environment claims. Accordingly, the NYCDOE's motion for summary judgment on all three of Zoulas's claims is GRANTED.

## I. BACKGROUND

### A. Facts [1]

[1]
    On summary judgment, the Court views the facts in the light most favorable to the non-moving party. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Because this is the NYCDOE's motion, the following summary is based on undisputed facts, where they exist, and on Zoulas's version of events where the facts are disputed. The Court has identified the disputed facts.

#### 1. Zoulas and Her Colleagues

Plaintiff Peggy Zoulas is an elementary school teacher employed by the New York City Department of Education. Dkt. No. 121, Pl.'s Rule 56.1 Resps. ("Pl.'s 56.1 Stmt.") ¶ 8. Zoulas was born in 1961. *Id.* ¶ 7. She has worked at P.S. 34 Oliver H. Perry since February 2000. *Id.* ¶ 8.

**\*2** From the summer of 2012 until approximately January 2021, P.S. 34's principal was Carmen Asselta. *Id.* ¶ 9; Dkt. No. 122, Decl. of Peggy Zoulas ("Pl.'s Decl.") ¶ 2. Asselta was born in 1966. Pl.'s 56.1 Stmt. ¶ 9.

From approximately 2002 until after the 2017–18 school year, P.S. 34's assistant principal was Maria LoRe-Dioguardi. Dkt.

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 68 of 321

No. 111-04, LoRe-Dioguardi Dep. 19:22–24; Pl.'s 56.1 Stmt. ¶ 10. LoRe-Dioguardi was born in 1961. Pl.'s 56.1 Stmt. ¶ 10.

## 2. Ageism

On "many occasions" after Zoulas turned 55, Asselta referred to Zoulas a "veteran teacher" and said that Zoulas was "getting up there and should just retire." Pl.'s Decl. ¶ 111; *see also* Dkt. No. 111-05 ("Pl. Dep.") at 59:8–13 (testifying that Asselta called her a "veteran teacher ... quite often"). [2] On at least one occasion, Asselta told Zoulas that she was "getting up there," "should know better," and had "been teaching for a long, long time." Pl. Dep. 59:11–13. Zoulas had never heard Asselta refer to any other teacher as a "veteran teacher." *Id.* at 59:19–20. At faculty conferences, Zoulas overheard Asselta make positive comments about the appearance and energy of younger members of the faculty. Pl.'s Decl. ¶ 112.

[2]    This is disputed. Asselta testified that she never told Zoulas that she was "getting up there," a "veteran teacher," "too old for this job," or that "she should just retire." Dkt. No. 111-6, Asselta Dep. at 114:14–116:7.

At one faculty conference in June 2018, Asselta discussed the school's budget. *Id.* ¶ 107. Zoulas felt that by discussing the school budget, Asselta was harassing older members of the faculty, "because there is an implication that older, higher-salaried teachers were partially to blame" for the school's expenses. *Id.* If the school needed to cut jobs, "[o]nly newly-hired or least senior teachers" were at risk, so Zoulas did not feel that it was necessary for Asselta to discuss the school's budget with more senior faculty members such as herself. *Id.*

On several occasions, LoRe-Dioguardi asked Zoulas when she graduated from high school and what materials she used in grade school. Dkt. No. 111-5 at 58:17–19. She said that Zoulas "must remember the books about Dick and Jane from the 70s." *Id.* at 58:19–20. Zoulas did not respond to those comments. *Id.* at 58:22.

## 3. Performance Ratings and Improvement Plan

Under New York State law, public school teachers are required receive annual performance ratings. *Id.* ¶¶ 13–14. Those ratings are computed according to what is known as the "Advance" teacher development and evaluation system. *Id.*

*See generally* Dkt. No. 111-09, Advance Guide for Educators ("Advance Guide"). The ratings are numerical but correspond to one of four ranges on a "High effective, Effective, Developing, or Ineffective"—or "HEDI"—scale. Pl.'s 56.1 Stmt. ¶ 14. The highest ratings fall in the "high effective" range; lower ratings, into the "effective" range; still lower ratings, into the "developing" range; and the lowest ratings, into the "ineffective" range. *Id.* A teacher who receives an overall rating in the "developing" or "ineffective" ranges will be placed on a teacher-improvement plan ("TIP") the following year. *Id.* ¶ 24.

A teacher's overall annual rating is a weighted average of three sub-ratings: the Measures of Teacher Practice ("MOTP") rating and the two Measures of Student Learning ("MOSL") ratings. *Id.* ¶ 15. The MOTP rating accounts for sixty percent of a teacher's overall rating and is based on observations of the teacher's classroom. *Id.* ¶ 16. The MOSL ratings account for forty percent of a teacher's overall rating and are based on a comparison of students' performance on certain assessments at the beginning of the school year with their performance on those assessments at the end of the school year. *Id.* ¶ 17; Advance Guide at 12. The Advance guidelines for the 2015–16 school year stated that teachers should receive their MOTP ratings by June 28 and their MOSL ratings (and, hence, their overall ratings) by September 1. Advance Guide at 19.

**\*3** The MOTP rating, like the overall rating, is a numerical rating that corresponds to one of four ranges on a "HEDI" scale. *See, e.g.,* Dkt. No. 111-12 at 13. The MOTP rating is a weighted average of scores assigned in several categories, over the course of several classroom observations. *See* Pl.'s 56.1 Stmt. ¶ 16; Advance Guide at 6–7. After each observation, the administrator who conducted the observation must provide feedback to the teacher she observed. Advance Guide at 9. That feedback must align with the categories for which the administrator has provided ratings. *Id.* The purpose of the feedback is to "establish[ ] the link between evaluation and development." *Id.*

The MOSL ratings, like the MOTP rating and the overall rating, are numerical ratings that correspond to four ranges on a "HEDI" scale. *See, e.g.,* Dkt. No. 111-12 at 13. The MOSL ratings ordinarily comprise the "State Measures" and the "Local Measures," each making up twenty percent of a teacher's overall rating. Advance Guide at 12. The State Measures "include state-determined measures (e.g., state tests), and for some grades and subjects, a list of

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 69 of 321

allowable assessments (which are selected by principal when available)." *Id.* The Local Measures "include options chosen from a state-approved list by the school's Local Measures Committee and submitted to the principal, who may accept the recommendation or opt for the Local Measures default (school-wide) measure." *Id.*

During the 2013–14 school year, Zoulas's teaching observations were conducted by Asselta. Pl.'s 56.1 Stmt. ¶ 25. Zoulas's ratings in each category over the course of four evaluations produced an MOTP rating of forty-eight out of sixty, which fell in the "effective" range. Dkt. No. 111-11 at 13. Her State Measures rating was thirteen out of twenty, which fell in the "developing" range. *Id.* at 14. Her Local Measures rating was seventeen out of twenty, which fell in the "effective" range. *Id.* Combined, her MOTP and MOSL ratings produced an overall rating of seventy-eight out of one hundred, which fell in the "effective" range. *Id.*

During the 2014–15 school year, Zoulas's teaching observations were again conducted by Asselta. Pl.'s 56.1 Stmt. ¶ 26. Zoulas's ratings in each category over the course of four evaluations produced an MOTP rating of forty-seven out of sixty. *Id.* Her State Measures rating was seventeen out of twenty, and her Local Measures rating was thirteen out of twenty. *Id.* All three of these ratings fell in the "effective" range. *Id.* Combined, they produced an overall rating of seventy-nine out of one hundred, which fell in the "effective" range. *Id.*

During the 2015–16 school year, Zoulas's teaching observations were again conducted by Asselta. *Id.* ¶ 29. Asselta observed Zoulas's teaching on February 29, 2016, April 8, 2016, May 31, 2016, and June 2, 2016. Dkt. No. 111-14 at 2, 4, 6, 8. Zoulas's ratings in each category over the course of those evaluations produced an MOTP rating of forty-five out of sixty, a two-point drop from the year prior but still within the "effective" range. *Id.* at 14. Her Local Measures rating was fourteen out of twenty. *Id.* at 13. She did not receive a State Measures rating because all State Measures ratings were dropped that year "due to transition rules," which stated that "any measure based 50% or more on 3–8 math and/or ELA state assessments is excluded" from teachers' overall ratings. *Id.* Her overall rating was fifty-nine out of eighty points, or seventy-four out of one hundred points, which fell in the "developing" range. *Id.*

Under DOE rules, a teacher who receives an overall rating in the "ineffective" or "developing" ranges is placed on a

TIP. Pl.'s 56.1 Stmt. ¶ 24. Because Zoulas received an overall rating in the "developing" range for the 2015–16 school year, she was placed on a TIP during the 2016–17 school year. *See id.* ¶ 48; Dkt. No. 111-22 at 1. According to the Advance Guide, a TIP "identifies specific improvement areas as well as a timeline and plan for assessing improvement." Advance Guide at 24.

**\*4** During the 2016–17 school year, Zoulas's teaching observations were again conducted by Asselta. *See* Dkt. No. 111-22 at 5. Asselta observed Zoulas's teaching on March 17, 2017, April 28, 2017, May 17, 2017, and June 1, 2017. *See id.* at 6, 9, 12, 16. When Asselta conducted the June 1, 2017, observation, Asselta "appeared upset and sad." Pl.'s Decl. ¶ 81. That was because Asselta's mother was ill at the time; her mother died the next day. *Id.* Asselta sent an email to Zoulas three weeks later in which she thanked Zoulas for being patient while she dealt with her mother's death and provided expanded feedback on the lesson she had observed; Zoulas replied the next day that "the feedback timeline for this lesson has already expired" and that Asselta's delay was part of "a pattern of being unhelpful" to her. *See* Dkt. No. 111-22 at 18. Zoulas's ratings in each category over the course of the four evaluations produced an MOTP rating of 1.82, which fell in the "developing" range. *Id.* at 21. Zoulas's overall rating, however, was in the "effective" range. Pl.'s 56.1 Stmt. ¶ 116; *see also* Dkt. No. 111-7 at 3.

### 4. Per-Session Work

On June 29, 2016, Zoulas applied for a per-session position as part of the "Leader in Me" training program. Pl.'s 56.1 Stmt. ¶ 36. Asselta approved this request. *Id.* At another point after the 2015–16 school year, Zoulas applied but was not selected for a position with the "Green STEM" program, which was an afterschool program at P.S. 34. *Id.* ¶¶ 37, 175.

On January 14, 2017, Zoulas applied for a per-session position grading state English and Math tests. *Id.* ¶ 73. That position was open to teachers who had received "effective" or "highly effective" overall ratings for the 2015–16 school year. *Id.* Because Zoulas had received a "developing" overall rating for the 2015–16 school year, she was not eligible for the position. Zoulas was not selected. *Id.*

### 5. Professional Development

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

Several teachers at P.S. 34 brought professional development opportunities to Asselta's attention and asked her for permission to attend. *Id.* ¶ 167. Zoulas did not bring such opportunities to Asselta's attention and did not know that other teachers were doing so. *Id.*; *see also* Pl.'s Decl. ¶¶ 115–17.

In June 2016, Zoulas asked Asselta if she could participate in a three-day technology training workshop at the Apple Institute. Pl.'s 56.1 Stmt. ¶ 35. Asselta agreed, noting with some hesitation that she had to allow Zoulas to attend. *Id.* Zoulas attended the workshop with Asselta, LoRe-Dioguardi, and several teachers. *Id.*

Asselta sent Zoulas to attend several professional development opportunities during the 2016–17 school year. *See* Pl.'s 56.1 Stmt. ¶¶ 71, 72; Pl.'s Decl. ¶ 115 (stating that she was sent to three trainings during that year). Zoulas states that she was sent to attend those professional development opportunities because she was on a TIP. *See* Pl.'s Decl. ¶ 115.

### 6. SDHR Complaint

Zoulas filed a complaint with New York State Division of Human Rights on May 18, 2017, alleging that Asselta had discriminated against her because of her age by providing her with negative observation ratings on May 5, 2017, and May 18, 2017. Pl.'s 56.1 Stmt. ¶ 103; Dkt. No. 111-32 at 2–3. She cross-filed the complaint with the EEOC. Pl.'s 56.1 Stmt. ¶ 103. Asselta learned of this complaint on May 18, 2017, the day it was filed. *Id.* ¶ 105. In a determination dated November 7, 2017, SDHR Regional Director William LaMot found that "[t]here is a lack of evidence in support of [Zoulas's] allegations of age discrimination" and dismissed the complaint. *Id.* ¶ 119; Dkt. No. 111-32 at 9.

### 7. Investigations

Zoulas was the subject of several investigations into complaints made against her by her students, their parents, and other teachers.

On March 9, 2016, Zoulas yelled out to a student who she saw running towards the street during dismissal. Pl.'s 56.1 Stmt. ¶ 30. Assistant Principal LoRe-Dioguardi directed two school employees who witnessed the incident to write that Zoulas had yelled angrily at a student during dismissal and

that LoRe-Dioguardi had intervened to allow the student to go home. *See id.* ¶¶ 30–32; Pl.'s Decl. ¶¶ 9, 11–14; Dkt. No. 111-15 at 2–3.[3] Asselta met with Zoulas on March 17, 2016, to discuss the claims made by the employees in their written statements. Dkt. No. 111-15 at 1. On March 31, 2016, Asselta wrote a letter to file in which she wrote that she had concluded that Zoulas "did loudly reprimand [her] student during dismissal" and "did not follow Assistant Principal LoRe-Dioguardi's instructions and spoke to her in an inappropriate and unprofessional manner." *Id.* Zoulas maintains that she had to yell in order for the student to hear her, and that she "did not reprimand the student ... loudly." Pl.'s Decl. ¶ 9.

[3]     The NYCDOE does not concede that LoRe-Dioguardi pressured the employees in writing these statements. *See* Pl.'s 56.1 Stmt. ¶ 30. Zoulas's counsel did not ask LoRe-Dioguardi about the written statements during her deposition. *See* Dkt. No. 111-3 at 263–85.

**\*5** On or around September 22, 2016, four parents of students in Zoulas's class reported to Asselta that Zoulas had yelled at their children. Dkt. No. 111-21 at 1; Dkt. No. 111-6, Asselta Dep. at 122:7–12. Asselta submitted an incident report to the NYCDOE. *See* Dkt. No. 111-21 at 1. Asselta then conducted an investigation into the complaints. *See* Asselta Dep. at 123–27. Between October 6, 2016, and October 26, 2016, Asselta collected written statements from four students who claimed that they had been mistreated by Zoulas. *See id.*; Dkt. No. 111-21 at 7–10. On November 8, 2016, Asselta met with Zoulas to discuss the claims. Asselta Dep. at 144:17–20; *see also* Dkt. No. 111-21 at 11–12. On December 19, 2016, Asselta wrote a letter to Zoulas's file concluding on the basis of Zoulas's statements and the statements submitted by others that "on September 21, 2016, [Zoulas] did verbally abuse [her] class by repeatedly yelling at them. In addition, one of [Zoulas's] students cried because [Zoulas] yelled at him in front of the class for not getting his test signed." Dkt. No. 111-21 at 12. Zoulas confirmed that she had received that letter on December 21, 2016. *Id.* Zoulas maintains that she "does not scream at children" but "uses a loud teacher voice on occasion." Pl.'s 56.1 Stmt. ¶ 67; Pl.'s Decl. ¶ 53.

On October 6, 2016, Asselta overheard Zoulas speaking at a high volume to her class from Asselta's office, which was located under Zoulas's classroom. Asselta Dep. at 166:10–15. Asselta and LoRe-Dioguardi went to Zoulas's classroom to investigate. *Id.* at 166:15–17. One of Zoulas's students had

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 71 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

tripped and knocked over a projector stand. Pl.'s Decl. ¶ 36. Neither Asselta nor LoRe-Dioguardi "spoke to the child," nor did either of them speak to Zoulas "to offer support or assistance." *Id.* ¶ 37. Asselta met with Zoulas to discuss the incident on October 13, 2016. Dkt. No. 111-24 at 1; Asselta Dep. at 168:15–18. After meeting with Zoulas, Asselta wrote a letter to Zoulas's file dated January 6, 2017, in which she noted that Zoulas had told her that she was merely "speaking loudly" but nonetheless found that Zoulas had "engag[ed] in unprofessional conduct by screaming at [her] class." *See* Dkt. No. 111-24 at 1.

On October 20, 2016, Zoulas entered the lunchroom to find that her students were "screaming at the top of their lungs." Pl.'s Decl. ¶ 42. Zoulas tried to quiet them down, but "they were unable to hear her." *Id.* Zoulas used a microphone to amplify her voice so as to be heard. *Id.* At the end of the school day, LoRe-Dioguardi entered Zoulas's classroom and found that she had written a "Reflection Assignment" on the board. *Id.* ¶ 43. LoRe-Dioguardi told Zoulas that she considered the assignment a punishment for the students' behavior in the lunchroom and therefore inappropriate. *Id.* Zoulas asked the parent of one of her students to tell the other parents that the assignment had been canceled. Asselta Dep. at 183:12–17; *see also* Dkt. No. 111-25 at 19 ("I would like to pass a quick message from Ms. Zoulas ... the kid[s] don't have to write a paragraph about them screaming in school during lunch."). That night, Teri Mascioli, a teacher who was on lunch duty when Zoulas came to collect her class, emailed to LoRe-Dioguardi and Asselta a brief account of the incident that had occurred that day in the lunchroom. *See* Dkt. No. 111-26 at 1. According to Mascioli, Zoulas "scream[ed] at the children and told them they would all have a writing assignment when they went upstairs" to their classroom. *Id.* On October 24, 2016, Asselta submitted an intake form to the NYCDOE Office of Special Investigations in which she reported what Mascioli and LoRe-Dioguardi had told her. *See id.* at 2. In a letter dated January 20, 2017, Asselta wrote that "[a]fter reviewing the allegations made against [Zoulas], the witnesses' statements and [Zoulas's] explanation, I conclude that on October 20, 2016, [Zoulas] did engage in verbal abuse and corporal punishment of [her] class by screaming at them in the lunchroom and by assigning them a written punishment for homework." *Id.* at 5. Zoulas maintains that "Asselta's comments are her opinion" and that the "assignment was appropriate" given the students' misbehavior. Pl.'s Decl. ¶ 60.

**\*6** On October 27, 2016, a parent of one of Zoulas's students reported to Asselta that Zoulas had forced the student

to sit in the corner of the classroom and to complete his assignment on his lap as a punishment for talking during class. Pl.'s 56.1 Stmt. ¶ 59. Asselta investigated the incident as a case of alleged corporal punishment. *See* Dkt. No. 111-27. [4] Asselta concluded, "[a]fter reviewing the allegations made against [Zoulas], the witnesses' statements and [Zoulas's] explanation," that Zoulas "did engage in verbal abuse and corporal punishment." *Id.* Zoulas maintains that the student and his parent exaggerated the incident, and that she had simply moved the student to a desk in the last row of her classroom. Pl.'s 56.1 Stmt. ¶ 59.

[4]     Zoulas testified at her deposition that she had heard from the student's mother that the student had told her that Asselta had told him that she "want[ed] to get rid of Ms. Zoulas and she want[ed] him to help." Pl. Dep. at 211:6–15. This testimony would be inadmissible as evidence of Asselta's statement to the student. *See* Fed. R. Evid. 801–02. The Court therefore disregards it.

### 8. Other Conduct

#### a) Field Trip Request

On November 3, 2017, Zoulas submitted a request to LoRe-Dioguardi to approve a field trip to Brooklyn Bridge Park in May 2018. *Id.* ¶ 121. Although LoRe-Dioguardi usually handled trip requests, she instead passed the request to Asselta, who did not immediately grant it. *Id.* Asselta later explained that she had been waiting to approve the trip until she could be sure that it did not conflict with other school events and that sufficient chaperones would be available. *Id.* Two weeks later, Zoulas filed a formal grievance to request that her trip be approved. *Id.* However, the grievance process did not result in approval for the trip. *See* Dkt. No. 111-28, Ex. AA at 33 ("Whether or not to approve a trip request is within the sole discretion of the administration and is not a grievable issue."). Asselta voluntarily approved the trip after Zoulas's grievance was dismissed, over four months before it was to be held. Pl.'s 56.1 Stmt. ¶ 121.

#### b) Staff Directory

On October 13, 2017, Zoulas sent an email to Asselta in which she complained that the phone directory that had been

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

distributed to staff at P.S. 34 was missing her name.[5] *Id.* ¶ 53. She noted that she had told Asselta that she found the omission "upsetting" and that she was "deeply offended" by it. *Id.* Asselta told Zoulas that the directories would be collected. *Id.*

[5]    Zoulas states in her Local Rule 56.1 responses and her declaration in connection with this motion that the erroneous directory was prepared by "a school paraprofessional" who had been instructed by LoRe-Dioguardi to omit Zoulas's name and instead type a row of stars. *See* Def.'s 56.1 Stmt. ¶ 54; Pl.'s Decl. ¶ 41. The Court cannot consider that statement. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Zoulas does not indicate her basis for believing that the directory had been prepared by that paraprofessional, nor does she indicate her basis for believing that LoRe-Dioguardi had instructed the paraprofessional to omit her name. There is no evidence in the record from which the Court can infer that Zoulas would have personal knowledge of a conversation between LoRe-Dioguardi and another member of the staff. Accordingly, the Court disregards Zoulas's statement about the manner in which the directory was prepared.

Three days later, Zoulas filed a formal grievance "requesting that all erroneous directories be collected and discarded" and "that all staff members [be] made aware that they were given an incorrect copy ... immediately." Dkt. No. 111-28 at 27; *see also* Pl.'s 56.1 Stmt. ¶ 53. Zoulas later appealed that grievance in a hearing scheduled for November 30, 2017. *See* Dkt. No. 111-28 at 28. On December 1, 2017, Zoulas filed a further grievance requesting that Asselta "immediately" notify "all staff members ... that they received a staff directory with a major error" and that she instruct them "to destroy and discard <u>all</u> erroneous directories." *Id.* at 34. Asselta did not collect the old directories, nor did she direct the staff to discard them. Pl.'s Decl. ¶ 41. In mid-December, however, new directories were printed that corrected the error. *Id.*

### c) Notes from the School Secretary

**\*7**  When Zoulas and Asselta met at the end of the 2017–18 school year for a "summative conference," Zoulas learned that there were "handwritten note[s] ... secretly written" on her January 31 and March 28, 2018, observation reports. Pl.'s Decl. ¶¶ 99, 102–03; *see also* Pl.'s 56.1 Stmt. ¶ 152. The first note, on the January 31 observation report, is dated March 23, 2018, and signed by the school secretary, Ms. Panek. *See* Dkt. No. 111-33 at 1. It reads: "Ms. Zoulas refused to sign. This is in dispute, she sent letter to principal & union" and "in front of Mrs. M. LoRe." *Id.* The second note, on the March 28 observation report, is dated May 8 and signed by Panek. *Id.* at 10. It reads: "Mrs. Zoulas refused to sign this documents [sic]. She got upset and very unpleasant. She said that she will sign on [sic] the end of month, that she can review online." *Id.*

### B. Procedural History

Plaintiff Peggy Zoulas initiated this action on March 27, 2018. Dkt. No. 1. She filed an amended complaint, the operative complaint in this action, on September 27, 2018. Dkt. No. 31. The amended complaint named as defendants the NYCDOE, P.S. 34 Principal Carmen Asselta, and P.S. 34 Assistant Principal Marie LoRe-Dioguardi. *Id.* Those defendants moved to dismiss the amended complaint on December 7, 2018. Dkt. No. 43. After receiving briefing on that motion to dismiss, the Court granted it in part and denied it in part on August 29, 2019. *See* Dkt. No. 52. Of the claims the Court understood Zoulas to have raised in her amended complaint, only her ADEA discrimination, retaliation, and hostile work environment claims survived the motion to motion to dismiss. *See id.* at 43. Because the ADEA does not permit claims against individuals, the Court also dismissed Zoulas's claims against Asselta and LoRe-Dioguardi, leaving the NYCDOE as the sole defendant in this action. *See id.* at 25 n.3.

On December 11, 2020, the NYCDOE filed a motion for summary judgment on all three of Zoulas's claims. Dkt. No. 110. The NYCDOE also filed a brief in support of that motion, Dkt. No. 112 ("Def.'s Br."); a Local Rule 56.1 statement of undisputed facts, Dkt. No. 111-1 ("Def.'s 56.1 Stmt."); and a raft of exhibits referenced in its brief and statement of undisputed facts, Dkt. Nos. 111-2 through -35. On March 21, 2021, after the Court granted her several extensions so that she could seek legal assistance in drafting her brief, Zoulas filed a brief in opposition to the NYCDOE's motion for summary judgment, Dkt. No. 120 ("Pl.'s Opp'n"), as well as a raft of her own exhibits, Dkt. Nos. 120-1 through -32. The following day, on March 22, Zoulas filed a document labeled "Plaintiff's Opposition to Defendant's Motion for Summary Judgment"

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 73 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

that contains the substance of the NYCDOE's Local Rule 56.1 statement of undisputed facts and Zoulas's responses to each paragraph of that statement. Dkt. No. 121 ("Pl.'s 56.1 Stmt."). Finally, on May 6, 2021, the NYCDOE filed a brief in reply to Zoulas's brief in opposition. Dkt. No. 125 ("Def.'s Reply").

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (quoting former Fed. R. Civ. P. 56(c)). The movant must "identify[ ] each claim or defense—or the part of each claim or defense—on which" it seeks summary judgment. Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id.

**\*8** The movant bears the initial burden of showing "the absence of a genuine issue of material fact." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (citing Celotex, 477 U.S. at 323). If the movant carries that burden, the burden shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." Id. (citing Celotex, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. And the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. At summary judgment, the non-movant "may not rely on conclusory allegations or unsubstantiated speculation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

On a motion for summary judgment, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson, 680 F.3d at 236 (quotation omitted). The court cannot "weigh the evidence or resolve issues of fact." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

### B. Pro Se Deference

It is well established that courts have an obligation to afford a special solicitude to pro se litigants. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006). The underlying rationale for this rule "is that a pro se litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection." Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010). The special solicitude extended to pro se litigants takes a variety of forms and includes the liberal reading of pleadings and a relaxation of the limits on the amendment of pleadings. Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007); see also Holmes v. Goldin, 615 F.2d 83, 85 (2d Cir. 1980).

However, it is not appropriate to afford pro se litigants special solicitude where a licensed attorney assisted in drafting their briefs, motions, or other court documents. See, e.g., Knox v. City of Ulster, No. 1:11-CV-0112 GTS/CFH, 2013 WL 286282, at \*1 n.1 (N.D.N.Y. Jan. 24, 2013) (denying pro se plaintiff "special solicitude" because "the Court strongly suspects that Plaintiff has ... been aided by an attorney in the drafting of his papers opposing the current motion, which are organized, typewritten, and contain citations to dozens of instructive legal authorities in proper BlueBook format"); Spira v. J.P. Morgan Chase & Co., 466 F. App'x 20, 22 n.1 (2d Cir. 2012) (summary order) (denying pro se plaintiff "special consideration" because "he was represented by his wife, a licensed attorney, in the district court, and ... she is responsible for ghostwriting his appellate briefs"). The policy of "liberally construing pro se submissions is to protect pro se litigants from inadvertent forfeiture of rights due to their lack of legal training." Knox, 2013 WL 286282, at \*1 n.1. "[W]here, as here, those submissions are 'ghostwritten' by an attorney, such liberal construction may create unfairness

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 74 of 321

toward the opposing party." *Id.; see also Askins v. Metro. Transit Auth.*, No. 1:19-CV-4927-GHW, 2020 WL 1082423, at *3 n.2 (S.D.N.Y. Mar. 5, 2020).

**\*9** Although nominally *pro se*, Zoulas has obtained extensive assistance from counsel throughout these proceedings, including in opposing this motion. Three attorneys from the Seton Hall University School of Law Conflict Management Program appeared on Zoulas's behalf to represent her in mediation. Dkt. No. 13. Two attorneys from the New York Legal Assistance Group ("NYLAG") assisted her in preparing her first amended complaint, *see* Dkt. No. 29, and she received further assistance from NYLAG in responding to the motion to dismiss, *see* Dkt. No. 37. Four attorneys from Cravath, Swaine & Moore appeared on Zoulas's behalf to represent her during the discovery period. *See* Dkt. Nos. 66, 74, 86, 89. She has told the Court that she has relied on assistance from NYLAG in opposing this motion for summary judgment. *See* Dkt. Nos. 116, 118; Pl.'s Opp'n at 1 n.1 ("Portions of this document were prepared with assistance of the NYLAG Legal Clinic for Pro Se Litigants in the SDNY.").

It is obvious to the Court that most or all of Zoulas's opposition brief was ghostwritten by a lawyer or someone with a degree of legal know-how that would make applying *pro se* deference to the brief inappropriate. It cites numerous cases in correct Bluebook format, including one unreported case available only on Westlaw. *See, e.g.,* Pl.'s Opp'n at 8. Its style bears no resemblance to that of Zoulas's initial complaint or her correspondence with this Court. Indeed, its use of legal terminology alone shows that it is not the work of a *pro se* plaintiff whose inexperience with the law merits special solicitude. *Compare, e.g., id.* at 10 ("To the extent that Defendants are taking the position that Ms. Zoulas was denied session work because she was on an improvement plan, which had been put in place due to a poor performance rating before the limitations period, she responds that the performance rating was an adverse work event due to her age, and that it is not time barred."), *with* Dkt. No. 29, Ltr. from Zoulas ("I was also not aware until a receptionist at SDHR informed me this morning, that they have on their records that I rebutted a response from the defendant, however, I have no knowledge of this either."). The Court therefore accords Zoulas's opposition brief no *pro se* deference, just as if it had been signed by the attorney who ghostwrote it.

## III. DISCUSSION

### A. Age Discrimination (ADEA)

#### 1. Legal Standard

Claims for age discrimination under the ADEA are analyzed under the *McDonnell Douglas* burden-shifting framework. *Gorzynski v. JetBlue Airways Corp.*, 596 F. 3d 93, 106 (2d Cir. 2010). First, a plaintiff must establish a *prima facie* case of age discrimination. To do so, a plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Id.* at 107 (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000)). If the plaintiff makes a *prima facie* showing, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Id.* at 106. If "such a reason is provided, the plaintiff can no longer rely on the *prima facie* case but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.* (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)) A plaintiff can survive summary judgment only if "the facts, taken in [her] favor, suffice to meet her burden of showing a triable issue as to whether her age was a 'but for' cause of the adverse employment action. *Id.*

Claims for age discrimination under the ADEA are subject to an administrative exhaustion requirement. Before a plaintiff may assert claims the ADEA in federal court, she must present the claims forming the basis of such a suit in a complaint to the EEOC. *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006). "[G]enerally if the plaintiff has filed an administrative claim in a state whose laws prohibit [employment] discrimination, the limitations period for filling an action is 300 days after the alleged unlawful practice." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019). "Where the plaintiff complains of discrete discriminatory or retaliatory acts such as 'termination, failure to promote, denial of transfer, or refusal to hire,' such claims are not actionable if they occurred prior to the 300-day period even though they may be 'related to' acts that occurred within the permissible 300-day period." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).

**\*10** A claim of employment discrimination under the ADEA accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 75 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)
2021 WL 3932055

*See Dickens v. Hudson Sheraton Corp.*, 167 F. Supp. 3d 499, 514 (S.D.N.Y. 2016) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)). When assessing whether a claim of discrimination is time-barred, "the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (citing *Ricks*, 449 U.S. at 258). "Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief." *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (discussing the limitations period for § 1983 actions).

## 2. Application

Zoulas's discrimination claim is time-barred. Zoulas argues that she suffered discrimination when she was "prevented from taking on extra session work during the 2016–2017 school year." Pl.'s Opp'n at 10. But Zoulas herself has said that she was ineligible for that extra session work because had received a "developing" overall rating for the 2015–16 school year. *See* Pl.'s 56.1 Stmt. ¶ 73; Pl.'s Opp'n at 4 ("Plaintiff was denied session-work in September 2016 and January 2017 due to her rating."). She has not adduced any evidence that the NYCDOE engaged in discrimination when it denied her per-session work. The NYCDOE simply followed its age-neutral policy of limiting per-session work to teachers who had received adequate performance ratings the year prior. *See id.*

Furthermore, although Zoulas received her overall rating around September 22, 2016, approximately 238 days before filing her SDHR complaint, *see* Dkt. No. 111-14 at 13, she has adduced no evidence that the NYCDOE engaged in discrimination when it calculated that rating. [6] Instead, the evidence in the record shows that Zoulas's 2015–16 overall rating was merely a weighted average of her 2015–16 MOTP and Local Measures ratings. *See id.* Of those two ratings, only the MOTP rating was particular to Zoulas: the Local Measures rating for the 2015-2016 school year was computed by "combin[ing] the scores of all teachers at the school for NYS ELA and Math tests and then attribut[ing] those scores to all the teachers at the school." Pl.'s 56.1 Stmt. ¶ 28. As a result, "[a]ll teachers [at P.S. 34] received a Developing MOSL rating that year [2015–16]." *Id.* ¶ 42. And Zoulas was aware of her MOTP rating no later than June 28, 2016, which is 324 days before she filed her SDHR complaint. *See* Dkt.

No. 111-14 at 10. Since June 28, 2016, falls outside of the 300-day limitations period, Zoulas's claim is time-barred. Indeed, even if she had received her MOTP rating within the 300-day limitations period, her claim would still be time-barred because the MOTP rating, like the overall rating, is merely an average of other scores—the ratings Asselta assigned her after each of her four observations—of which Zoulas was already aware. *See* Dkt. No. 111-14 at 14.

[6]      Indeed, this claim survived the NYCDOE's motion to dismiss only because Zoulas alleged that her 2015–16 overall rating was not merely the product of earlier observations but outright "falsified" by the NYCDOE—i.e., that the NYCDOE calculated Zoulas's rating differently from other teachers' or simply made it up. *See* Dkt. No. 52, Aug. 29 Order at 31 n.6. She has not presented the Court with any evidence of such a plot.

Zoulas argues that "her performance rating for the 2015-2016 school year ... was not a discrete discriminatory act, because it had ongoing ramifications during the next school year, including causing her to be ineligible for extra session work." Pl.'s Opp'n at 10. If every action with future ramifications amounted to a continuing violation, hardly any action would be time-barred. Adverse employment actions may ripple throughout an employee's career; that does not mean that an employee can sue for them so long as he can point to a ripple within the past 300 days. The allegedly discriminatory acts in this case are the four performance reviews conducted by Asselta towards the end of the 2015–16 school year. [7] Those reviews determined, by a transparent and purely mathematical process, Zoulas's 2015–16 MOTP rating. That MOTP rating, in turn, along with the Local Measures score attributed to every teacher at P.S. 34, determined Zoulas's 2015–16 overall rating. The NYCDOE did not somehow commit fresh discrimination every time it reported an average of Zoulas's allegedly discriminatory performance reviews or took non-discriminatory actions based on them.

[7]      As discussed above, Zoulas has not adduced any evidence that the ratings themselves were anything more sinister than weighted averages of the scores Asselta assigned her after each observation.

**\*11** Instructive here is the Second Circuit's decision in *Washington v. County of Rockland*, 373 F.3d 310 (2d Cir. 2004). In *Washington*, the Second Circuit considered whether an employee's claim that his employer filed discriminatory disciplinary charges against him was time-barred even though

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 76 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

the employer had subsequently prosecuted the charges within the limitations period. The Court held that filing the charges was a "discrete event" that could be separated from the employer's subsequent prosecution of those charges. *Id.* at 317–18. Here, as in *Washington*, Zoulas has not presented any evidence that her employer did anything more than fail to walk back its prior discriminatory act. Many negative employment actions have recurring consequences. That does not mean that a plaintiff's claim is renewed every time "the consequences of the act[s] become painful." See *Chardon*, 454 U.S. at 8.

Zoulas details at length her objections to the manner in which teachers in New York were evaluated in 2015–16. *See, e.g.,* Pl.'s 56.1 Stmt. ¶¶ 28, 40–41. Those objections are irrelevant to this discrimination lawsuit. To be a victim of discrimination, a person must be treated worse than others. Zoulas complains that the NYCDOE treated *all* teachers poorly by evaluating them using a "convoluted and complex" process that judges them based on other teachers' performance. *Id.* ¶ 28. Therefore, whatever the merits of Zoulas's grievances, they do nothing to advance her claim that she was treated worse because of her age.

Zoulas has failed to point to evidence that she was subjected to an adverse employment action because of her age within the 300 days preceding her NYSDHR complaint. She has therefore failed to show that her ADEA discrimination claim falls within the statutory period. Accordingly, the NYCDOE's motion for summary judgment on this claim is GRANTED.

### B. Retaliation (ADEA)

#### 1. Legal Standard

"The ADEA ... prohibits 'employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.' " *Davis-Garett*, 921 F.3d at 42-43 (quoting *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Specifically, the ADEA provides that "[i]t shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). First, the plaintiff must establish a *prima facie* case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute*, 420 F.3d at 173 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001)). The plaintiff's burden in this regard is "*de minimis*," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id.* (internal quotation marks omitted).

If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id.* The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

**\*12** *Hicks v. Baines*, 593 F.3d 159, 164–65 (2d Cir. 2010).

With respect to the third element, materially adverse actions, "the proper question for a retaliation claim is whether the [alleged adverse action] to which [the plaintiff] was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Davis-Garett*, 921 F.3d at 44 (internal citation and quotation marks omitted). "The Supreme Court and Second Circuit have defined 'adverse action' for the purposes of [an ADEA] retaliation claim broadly." *Cerni v. J.P. Morgan Sec. LLC*, 208 F.Supp.3d 533, 539 (S.D.N.Y. 2016). A plaintiff need only "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 539.

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 77 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

"[T]he broadness of this definition means that 'the scope of [the] anti-retaliation provision is broader than that of its discriminatory action provision." *Id.* at 539 (quoting *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007)).

" '[P]etty slights or minor annoyances that often take place at work and that all employees experience' do not constitute actionable retaliation." *Hicks*, 593 F.3d at 165 (quoting *Burlington Northern*, 548 U.S. at 68). "Thus, '[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.' " *Id.* (quoting *Burlington Northern*, 548 U.S. at 67). Although the standard is objective, "[c]ontext matters." *Id.*

> "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *White* at 69, 126 S. Ct. 2405 (quoting *Oncale*, 523 U.S. at 81–82). Therefore, "an act that would be immaterial in some situations is material in others." *Id.* at 69 (internal quotation marks omitted). For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.* And of course context can diminish as well as enlarge material effect.

*Id.* "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (quoting *Zelnik v. Fashion Inst. Of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

## 2. Application

Zoulas has not adduced evidence from which a reasonable jury could infer that she experienced actionable retaliation for filing a complaint with the SDHR in 2017. Although she has shown that she engaged in protected conduct and that her principal was aware of it, she has, at most, adduced evidence that she continued to experience the same middling performance reviews that prompted her SDHR complaint and suffered a string of sporadic annoyances of the sort often encountered in the workplace. Neither of those types of evidence, taken in context, suggests that she suffered an adverse employment action because of her protected activity. She has therefore failed to meet her burden of pointing to

evidence from which a reasonable jury could conclude that she had suffered conduct that would discourage a reasonable person from making or supporting a claim of discrimination.

### a) Protected Conduct and Awareness

**\*13** Zoulas has easily satisfied the first two elements of a *prima facie* retaliation claim. *See Jute*, 420 F.3d at 173 ("(1) participation in a protected activity; (2) that the defendant knew of the protected activity ...."). The only protected activity at issue is Zoulas's May 18, 2017, SDHR complaint. *See* Pl.'s Opp'n at 12; Pl.'s 56.1 Stmt. ¶ 103. The NYCDOE does not contest that filing the SDHR complaint constituted protected conduct. *See* Def.'s Br. at 13; *see also* Dkt. No. 52, Aug. Opinion at 35 (finding that the complaint constituted protected conduct). Nor does the NYCDOE contest that Asselta was aware of the complaint when it was filed. *See* Def.'s Br. at 13; Def.'s 56.1 Stmt. ¶¶ 104–05 (noting that "Asselta testified that she [ ] became aware of [Zoulas's] age discrimination claim when [Zoulas] filed her SDHR complaint").

### b) Performance Reviews

"If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory." *Wright v. N.YC. Off-Track Betting Corp.*, No. 05 Civ. 9790 (WHP), 2008 WL 762196, at \*5 (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94–95 (2d Cir. 2001)). A negative performance review shortly after protected conduct may give rise to an inference of retaliation, but not when similarly negative performance reviews preceded that protected conduct. *Compare Smith v. N.YC. Dep't of Educ.*, No. 18 Civ. 8545 (PGG), 2019 WL 6307471, at \*12 (S.D.N.Y. Nov. 25, 2019) (inference of causation arises where teacher "was given his first negative performance review ... and was denied a qualified co-teacher" the month after filing the lawsuit), *with Floyd v. S. Westchester BOCES*, No. 14 CV 5842 VB, 2015 WL 5459992, at \*9 (S.D.N.Y. July 31, 2015) ("Because plaintiff alleges defendant discriminated against him in several ways, including by giving him a negative evaluation ... *before* he filed charges with the EEOC, the Court cannot conclude plaintiff's negative performance evaluation [after he filed charges] ... give[s] rise to a plausible inference of retaliation."), *and Rodriguez v. Glen Cove City Sch. Dist.*, No. 14-CV-3815 (JS) (ARL), 2016 WL 951524, at \*6 (E.D.N.Y. Mar. 8, 2016) (no inference of causation

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 78 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

arises where teacher "received her first negative performance evaluation ... before filing her EEOC complaint" and then later received both positive and negative evaluations).

In her brief in opposition to this motion, Zoulas argues that she suffered retaliation when Asselta conducted her regular classroom observations on June 1, 2017, and January 31, 2018. *See* Pl.'s Opp'n at 12–13. Zoulas has adduced no evidence showing that these classroom observations were retaliatory. The record shows that the observation reports contained scores in line with or better than the scores Zoulas had received before engaging in her protected conduct.

Zoulas's complaints that the comments in Asselta's June 2017 report were "not factual," that "[n]one of Plaintiff's questions and no student responses were cited," and that "Plaintiff did not receive feedback until June 22, 2017," *id.* at 12, do nothing to show that Asselta conducted the observation in a manner materially different from the manner in which she conducted performance reviews before Zoulas lodged her complaint with the SDHR. To the contrary, as the NYCDOE notes, the scores Asselta gave Zoulas on her June 1, 2017, performance review are in line with or better than the scores Asselta gave Zoulas on the three performance reviews before Zoulas lodged her complaint. *See* Def.'s Br. at 16; Dkt No. 111-22 at 6–17.[8] Nor can Zoulas argue that she was harmed by the lack of detail in Asselta's written feedback, given that the record shows that when Asselta provided her with more detailed written feedback and proposed meeting with her to provide still more feedback, Zoulas refused, noting that "the feedback timeline for this lesson has already expired." *See* Dkt. No. 111-22 at 18.

[8]   On her March 17, 2017, observation report, Zoulas received scores of "Developing" in seven categories and "Ineffective" in one category. Dkt. No. 111-22 at 6–8. On her April 28, 2017, observation report, Zoulas received scores of "Developing" in one category and "Ineffective" in five categories. *Id.* at 9–11. On her May 17, 2017, observation report, Zoulas received scores of "Developing" in eight categories and "Effective" in two categories. *Id.* at 12–14. On her June 1, 2017, observation report, Zoulas received scores of "Developing" in six categories and "Ineffective" in two categories. *Id.* at 16–17. The only negative outlier is the April report, which was based on an

observation that occurred before Zoulas engaged in protected conduct by filing her SDHR complaint.

**\*14**  Zoulas's complaints about her January 31, 2018, observation report fail for the largely same reasons as her complaints about her June 1, 2017, observation report. The scores Asselta gave Zoulas on that report are in line with or better than the scores she gave Zoulas before Zoulas filed her complaint with the SDHR. *See* Dkt. No. 111-33 at 1–3.[9] Even if the comments Asselta gave on that report were "vague," Pl.'s Opp'n at 13, receiving vague comments on an objectively positive observation report would not deter a reasonable person from complaining of discrimination.

[9]   On her January 31, 2018, observation report, Zoulas received scores of "Effective" in three categories, "Developing" in three categories, and "Ineffective" in two categories. Dkt. No. 111-33 at 1–3. The average of those scores is approximately the same as the average of the scores Zoulas received on her May 17, 2017, observation report, which was the best observation report she received that year. *See* Dkt. No. 111-22 at 12–14.

### c) Other Conduct

The rest of Zoulas's evidence relates to incidents that vary from trivial to puzzling. Because Zoulas has referenced several incidents in her brief in opposition, *see* Pl.'s Opp'n at 12–14, the Court will take up each in turn:

a. Zoulas testified that when she emailed Asselta examples of her students' work, Asselta was confused and asked her why she had done so. *See* Pl.'s 56.1 Stmt. ¶ 111; Pl.'s Decl. ¶ 83. Zoulas does not explain how it caused her to feel that she was the victim of retaliation. The Court is at a loss to supply an explanation. This is not conduct that a reasonable jury would find to be an adverse action supporting a claim for retaliation.

b. Zoulas received a "developing" MOTP rating for the 2016–17 school year. Pl.'s Opp'n at 12; Pl.'s 56.1 Stmt. ¶ 114. Zoulas's MOTP rating was simply an average of ratings from the four observations conducted over the previous school year, three of which predate Zoulas's SDHR complaint. Even if that final rating were retaliatory—and, as discussed above, the record does not support the conclusion that it was—averaging them still would not be.

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

c. The internal staff directory printed in October 2017 omitted Zoulas's name, and a new directory was not distributed for two months. Pl.'s Opp'n at 13; Pl.'s 56.1 Stmt. ¶¶ 53–54. Zoulas has not shown that this omission was any more than an error, nor that it would rise above the level of a petty slight. Moreover, this event happened five months after Zoulas filed her SDHR complaint, and she has not presented additional facts to support the conclusion that the omission was provoked by her complaint. Therefore, even if Zoulas had shown that the omission was intentional and objectively serious, the evidence would still not permit a reasonable jury to infer that it was made for a retaliatory purpose. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (noting that a court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases"); *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009) ("[W]here the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established.").

d. Zoulas did not receive approval from Asselta for a class trip to Brooklyn Bridge Park until four months before it was to be held. Pl.'s Opp'n at 13; Pl.'s 56.1 Stmt. ¶ 121. Asselta explained that she was unable to immediately grant approval for the trip because she was not yet sure whether another activity would interfere with the trip and because Zoulas did not tell her whether sufficient chaperones would be available at the requested time. Pl.'s 56.1 Stmt. ¶ 121. Zoulas claims that these explanations are pretextual because the trip was to take place in the morning and she did not request any chaperones. *See id.* Even if Zoulas's statements amount to evidence of pretext, no reasonably jury could find that a bureaucratic delay of this sort would deter a reasonable person from filing a complaint of discrimination. *See Nunez v. Lima*, 762 F. App'x 65, 70 (2d Cir. 2019) (summary order) (holding that initial refusals to approve time sheets and other processing delays did not constitute material adverse action because the time sheets were ultimately approved, making the initial refusals "at most a minor annoyance," and processing delays did not risk disciplinary consequences). The only obviously onerous part of the whole episode was Zoulas's futile effort to prosecute a grievance against Asselta for refusing to approve the trip immediately. [10]

A mere delay in processing a request that is ultimately granted falls squarely into the category of "minor annoyances that often take place at work and that all employees experience." *Hicks*, 593 F.3d at 165. It does not amount to retaliation.

**\*15** e. Zoulas argues that she suffered retaliation in January 2018 when she "reported a disruption in her classroom ... but was not provided the help she requested." *See* Pl's Opp'n at 13. As evidence, she cites paragraph 125 of the parties' undisputed facts. *See id.* That paragraph, however, only reports that Zoulas described the incident to Asselta by email, and it cites only to two emails and Zoulas's amended complaint. *See* Pl.'s 56.1 Stmt. ¶ 125. Zoulas cannot rely on allegations in her unverified complaint as evidence at summary judgment. *See Fitzgerald v. Henderson*, 251 F.3d 345, 360–61 (2d Cir. 2001). [11] Furthermore, even assuming that the emails are admissible as evidence of the conduct they describe, [12] that conduct is objectively benign. Zoulas "called downstairs to have [the student] removed." Dkt. No. 111-25 at 9. LoRe-Dioguardi and Peluso came to Zoulas's classroom and, instead of removing the student, argued with him. *Id.* Before they took Zoulas's statement of what had happened before they arrived, they asked one of the student's friends for his statement. *Id.* at 10. Zoulas felt unhappy that they had not asked her first and that they did not remove the student from the classroom as she had requested. *Id.* The former is at most a minor slight; the latter, a difference of professional opinion. Neither would permit a reasonable jury to conclude that Zoulas had suffered conduct that would deter a reasonable person from making or supporting a claim of retaliation.

f. On March 23, 2018, Panek and LoRe-Dioguardi approached Zoulas while she was leaving work for the day and asked her to sign an observation report to indicate that she had received it. Pl.'s Decl. ¶ 98. According to Zoulas, she refused to sign the report because Panek and LoRe-Dioguardi has not used "the appropriate protocol for delivering an observations report." *Id.* No reasonable jury could find that being asked to sign a document on one's way out of work is so harmful that it would dissuade a reasonable person from complaining of discrimination. Even if Panek did, as Zoulas contends, "literally shove[ ] the document towards [her]," *id.*, such a gesture by the school's secretary is far too ambiguous and trivial to support

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 80 of 321

a retaliation claim, even if it could be understood as retaliation for a complaint filed against the school's principal ten months beforehand. [13]

g. Zoulas argues that she suffered retaliation when Panek's notes on two of her observation reports that she had refused to sign them did not appear on the versions of her reports that were uploaded to the system for her review. *See* Pl.'s Opp'n at 14. Zoulas's argument is not entirely clear, but neither the existence of these notes nor the fact that Asselta did not show them to Zoulas until asked for physical copies of the reports can possibly constitute retaliation. The notes are too benign to constitute an adverse employment action and too late in time to permit an inference of causation. The notes did not relate to Zoulas's performance or otherwise affect her ratings; they merely reported—accurately—that Panek had been unable to obtain signatures from Zoulas. [14] Zoulas has not articulated any way in which the notes (or not being shown them) caused her harm. *See* Pl.'s Opp'n at 13–14. The only reasonable conclusions a jury could draw from the evidence Zoulas has presented is that Panek tried and failed twice to get Zoulas to sign her observation reports and that she noted that fact on the hard-copy reports to explain why they were unsigned. Furthermore, the notes are dated March 23 and May 18, 2018. As discussed above, those dates are too far after the November 2017 dismissal of Zoulas's SDHR complaint to permit an inference of causation on the basis of timing alone. *See Stoddard*, 309 F. App'x at 480.

10    Zoulas also testified that Asselta and LoRe-Dioguardi "behaved in an extremely hostile manner towards Plaintiff with regards to this school trip" and that she was "harassed for two months ... in order to get approval for this school trip." Pl.'s 56.1 Stmt. ¶ 121; Pl.'s Decl. ¶ 86. "[M]ere conclusory allegations ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Zoulas's testimony would permit a reasonable jury to conclude that Zoulas subjectively felt that Asselta and LoRe-Dioguardi behaved in a hostile manner and subjectively felt that she was suffering harassment in the course of seeking approval for the trip. However, that testimony does not contain any factual statements from which a reasonable jury could assess for itself whether Zoulas faced

conduct that would *objectively* discourage a reasonable person from making or supporting a charge of discrimination. The testimony therefore does not affect the Court's conclusion that Zoulas has failed to point to evidence that would permit a reasonable jury to conclude that she had suffered retaliation under the ADEA.

11    The attorney or attorneys Zoulas consulted in connection with this motion was surely aware that allegations in an unverified complaint cannot stand in place of "[a]n affidavit or declaration ... made on personal knowledge." *See* Fed. R. Civ. P. 56(c)(4); *Fitzgerald*, 251 F.3d at 360–61 (2d Cir. 2001).

12    The Court notes that accepting the emails as evidence of the events they describe may present a hearsay issue under Fed. R. Evid. 802. However, the Court does not reach the hearsay issue because the conduct described in the emails is not sufficiently serious to support Zoulas's retaliation claim.

13    As the Court held in its order on the NYCDOE's motion to dismiss, a jury could infer that conduct closely following the SDHR's November 7, 2017, dismissal of Zoulas's discrimination complaint was done with retaliatory motive, on the theory that Asselta "purposefully deferred retaliating against [Zoulas] until the SDHR had completed its investigation." Dkt. No. 52 at 38; *see also White v. City of Middletown*, F.Supp.3d 195, 219 (D. Conn. 2014) ("Where there are longer gaps in time between protected activity and adverse employment action, the inference of causation may be inferred from the fact that the employer was waiting for the opportune time to retaliate."). This conduct, however, took place more than four months after the SDHR had concluded its investigation. That is too long, absent other evidence of retaliatory motive, to permit a reasonable jury to infer that the conduct was caused by Zoulas's protected activity. *See Stoddard*, 309 F. App'x at 480.

14    The evidence presented by Zoulas herself largely substantiates the notes. Zoulas argues that she did not so much "refuse" to sign the observation reports as was "unable" to do so because she was teaching or leaving work for the day. Pl.'s Opp'n at 13.

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)
2021 WL 3932055

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 81 of 321

That Zoulas would have used a different word to characterize her declining Panek's request for a signature does not make Panek's characterization false. To the contrary, Zoulas's account of her interaction with Panek is mostly compatible with Panek's. *Compare* Pl.'s Decl. ¶ 98 ("I explained to her that I had already signed out for the day and that I could sign for the report on Monday."), *and id.* ¶ 103 ("Plaintiff did not speak to Ms. Panek, but instead used hand gestures to say 'no' and waved her hand for her to leave. Plaintiff[ ] then turned around to avoid any further distraction ...."), *with* Dkt. No. 111-33 at 1 ("Ms. Zoulas refused to sign."), *and id.* at 10 ("Mrs. Zoulas refused to sign this documents [sic].").

### d) Unsubstantiated Allegations

**\*16** Zoulas's opposition brief contains two references to allegedly retaliatory events of which Zoulas has not proffered any admissible evidence. The Court must therefore disregard them. *See* Fed. R. Civ. P. 56(c)(2).

First, Zoulas argues that she suffered retaliation when she "overheard Asselta telling SAPIS counselor Peluso that she was not allowed to speak to [Zoulas]." Pl.'s Opp'n at 12. As evidence, she cites only paragraph 117 of the parties' undisputed facts. That paragraph, which Zoulas did not dispute, merely states that Zoulas alleged in her amended complaint that she had overheard Asselta making this statement "on an unspecified date in September 2017." Pl.'s 56.1 Stmt. ¶ 117. Zoulas did not testify to this alleged event in her deposition, nor did she mention it in her declaration. *See* Pl. Dep.; Pl.'s Decl. She is therefore unable to rely on it in opposing this motion.[15]

[15]    The Court notes that even if Zoulas had presented admissible evidence that this incident occurred, it is doubtful that Zoulas would be able to satisfy her burden of showing that the incident was causally connected to her SDHR complaint. She had filed the complaint approximately four months before this incident allegedly occurred, making it difficult for her to rely on timing alone to create an inference of retaliation. Such an inference is still more difficult to make if, as Zoulas has suggested, Asselta waited until the complaint was dismissed as baseless in November to retaliate against her.

Second, Zoulas argues that she suffered retaliation when, "[b]etween January and March 2018, Peluso accused [Zoulas's] class of making noise as they walked through the building." Pl.'s Opp'n at 13. As evidence, she cites paragraph 102 of the parties' undisputed facts. That paragraph is not germane to Zoulas's argument, so the Court understands her citation to refer to paragraph 120 of the parties' undisputed facts. *See id.* That paragraph, however, states only that Zoulas *alleged* that Peluso made accusations against Zoulas's class, and it cites only to Zoulas's amended complaint. *See* Pl.'s 56.1 Stmt. ¶ 120. Zoulas did not testify to these alleged accusations by Peluso, nor did she mention them in her declaration. *See* Pl. Dep.; Pl.'s Decl. She has therefore failed to meet her burden of presenting admissible evidence to support the allegations she made about Peluso in her complaint.

### e) Cumulative Conduct

Even taken collectively, the incidents of alleged retaliation that occurred close in time to Zoulas's protected conduct and for which Zoulas has adduced evidence are insufficient to permit a rational jury to find that Zoulas was subject to actionable retaliation. If anything, the alleged incidents seem even more trivial in the aggregate than they do in isolation. Over the course of nearly a year, Zoulas was asked to explain an email, received a rating that averaged scores from observation reports she had already received, had her name omitted from an internal directory for two months, had to wait two months to receive approval for a field trip four months before it took place, was not deferred to on a question of student discipline, was asked to sign an observation report on her way out of work, and learned that the school's secretary had quietly noted that she had refused to sign two of her observation reports. No reasonable jury could conclude that, under all the circumstances, such workaday nuisances would discourage a reasonable person from complaining of discrimination. The NYCDOE's motion for summary judgment on this claim is therefore GRANTED.

### C. Hostile Work Environment (ADEA)

#### 1. Legal Standard

**\*17** Hostile work environment claims brought under the ADEA are assessed under the same standard as hostile work environment claims brought under Title VII. *Terry v.*

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 82 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

*Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citing *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).

In order to establish a hostile work environment claim under [the ADEA], a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotation marks omitted). A plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). Generally, unless an incident of harassment is sufficiently severe, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). Accordingly, to analyze a hostile work environment claim, we are required to look to the record as a whole and assess the totality of the circumstances, *see Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001), considering a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). We must also consider the extent to which the conduct occurred because of the plaintiff's [age]. *See Alfano*, 294 F.3d at 374.

*Gorzynski*, 596 F.3d at 102.

Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.

*Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

Summary judgment is appropriate when a plaintiff fails to adduce evidence that "rise[s] to the level of severity or pervasiveness needed to support a hostile work environment claim." *Smith v. New Venture Gear, Inc.* 319 F. App'x 52, 56 (2d Cir. 2009). In other words, a case presents no triable issue of fact when the incidents of supposed hostility for which plaintiff has adduced admissible evidence are so trivial, infrequent, or disconnected from the plaintiff's protected status that no reasonable jury could find that the plaintiff was subjected to a hostile work environment on account of her membership in a protected class. As the authorities quoted above make clear, a claim for hostile work environment requires evidence of conduct that could be characterized as intimidation, ridicule, insult, hostility, abuse, or humiliation. The conduct must be so severe and constant that a reasonable person in the plaintiff's position would find not just the conduct but *the work environment itself* abusive. *See Demoret*, 451 F.3d at 149.

### 2. Application

**\*18** This is not such a case. Although Zoulas has in her opposition papers recited a laundry list of grievances, they neither individually nor collectively come close to establishing that Zoulas was subjected to a hostile work environment because of her age. They establish instead that Zoulas was, over the course of several years, subjected to the kind of bureaucratic headaches and professional disagreements that beset employees of all stripes. That does not suffice to create a genuine issue of material fact regarding whether the NYCDOE has violated federal law.

### a) Professional Development

Zoulas argues that she was subjected to a hostile work environment when less-experienced teachers attended more professional development opportunities and exchanged more emails with Asselta about those opportunities than she did. *See* Pl.'s Opp'n at 16. There is nothing hostile or abusive about that. Zoulas has proffered no evidence that she was ever prevented from attending a training event. [16] Merely not being solicited to attend professional development opportunities that other employees sought out their own is insufficient to suggest a hostile work environment. Hostility or abuse may in some cases deny employees access to professional development opportunities, but that does not mean that being denied such access is itself hostile or abusive.

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 83 of 321

2021 WL 3932055

The plaintiff must adduce evidence of conduct that "alter[ed] the conditions of the victim's employment *and* create[d] an abusive working environment." *Demoret*, 451 F.3d at 149 (emphasis added). Here, if Zoulas has established anything, it is that Asselta did not make Zoulas aware that she could request to attend workshops and only encouraged her to attend workshops when Zoulas was on a TIP. *See* Pl.'s Decl. ¶ 115. Even inferring that Asselta made these omissions because of Zoulas's age, they constitute, at most, mild neglect. Even if that neglect were severe and pervasive, it would still not constitute a hostile work environment, because Zoulas did not even learn of it until she received Asselta's emails in discovery. *See id.* ¶ 116.

16      As the NYCDOE notes, the only time Zoulas ever requested to attend a training event, Asselta agreed, albeit with momentary hesitation, noting that she was required to allow Zoulas to come. Zoulas's attempt to cast Asselta's supposedly begrudging approval as hostile is unavailing: a hostile denial of professional development requires far more than momentary reluctance.

### b) October 2016 Corporal Punishment Investigation

Zoulas argues that she suffered a hostile work environment when Asselta investigated allegations by a student and his parent that Zoulas had forced the student to sit in the corner of her classroom as punishment. Pl.'s Opp'n at 16. She argues that "Asselta manufactured [the] situation to try to cause [Zoulas] to be disciplined" and that "Asselta did not follow standard procedure in investigating the incident." *Id.* Those arguments misrepresent the evidence in the record and are otherwise unavailing. Zoulas has presented no admissible evidence that Asselta "manufactured" the allegations. To the contrary, Zoulas has testified that the "parent and child fabricated this incident." Pl.'s Decl. ¶ 46. And although Zoulas states that the parent of the child told her that Asselta told the child that she wanted his help getting rid of Zoulas, such secondhand testimony is inadmissible hearsay. *See* Fed. R. Evid. 802. The Court therefore disregards it. *See* Fed. R. Civ. P. 56(c)(2).

Zoulas's argument about Asselta's supposed deviation from "standard procedure" in her investigation of the student's allegation likewise overstates the evidence. The only supposed deviation of which Zoulas has adduced any admissible evidence is that Asselta interviewed witnesses

about the accusation over two weeks instead of over a shorter period of time. *See* Pl.'s 56.1 Stmt. ¶ 59; Pl.'s Decl. ¶ 48. The NYCDOE guidelines Zoulas cites merely require that written statements be taken "as quickly as practicable." Dkt. No. 120-11 at 7. Zoulas has presented no evidence that Asselta did not take the statements as quickly as practicable, nor that taking the statements over two weeks amounted to hostility.

 **\*19**  Indeed, the only supposed hostility Zoulas suffered in connection with this investigation came from the children in Zoulas's class. Zoulas testified that she once overheard her students mocking her about the allegations during lunch. Pl.'s Decl. ¶ 48. Even accepting Zoulas's account of the incident, it is too trivial and too disconnected from evidence of discriminatory animus to support a hostile work environment claim under the ADEA. A reasonable teacher would understand that the lunchroom chatter of a group nine-year-olds is an unreliable source of information about the world, and that she should accordingly take it with more than a grain of salt.

Even if there were evidence in the record that the children in Zoulas's class had treated her with the kind of continuous and concerted harassment required to constitute a hostile work environment, Zoulas has not proffered any evidence that her students' conduct was the product of age-related animus on the part of the defendant. The only evidence of age-related animus Zoulas has adduced relates to Asselta and LoRe-Dioguardi. Even assuming *arguendo* that the evidence in the record could permit a reasonable jury to find that Asselta or LoRe-Dioguardi possessed age-related animus in their dealings with Zoulas, Zoulas has not presented any plausible reason why her students' lunchroom speculation should be attributed to either administrator. A parent alleged that Zoulas had engaged in corporal punishment. Asselta investigated the allegation, as she was required to do. In the course of that investigation, she naturally interviewed students who may have witnessed the corporal punishment. And those students —being children—spoke indelicately about the investigation during lunch. None of that gives rise to a plausible inference that Asselta or LoRe-Dioguardi—or their supposed animus towards fellow over-55s—is to blame for the comments Zoulas overheard.

### c) Teacher Observations

Zoulas argues that she suffered a hostile work environment because of the manner in which Asselta conducted

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 84 of 321

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

observations of Zoulas's teaching on June 1, 2017, January 31, 2018, March 28, 2018, and June 1, 2018. *See* Pl.'s Decl. at 16–18. None of those observations involved the type, let alone severity, of conduct required to establish a hostile work environment claim.

First, Zoulas notes that Asselta observed her for twenty minutes on June 1, 2017, and fifteen minutes on January 31, 2018. *See* Pl.'s Decl. at 16–17. She seems to imply that Asselta spent too little time in her classroom during these informal observations. That is not the case. The forms Asselta filled out when she conducted the observations clearly state that an informal observation can be conducted in only fifteen minutes. *See* Dkt. No. 111-33 at 1, 10. Even if there were something hostile or abusive about scrutinizing an employee's performance for too little time, Zoulas has not shown that Asselta did so.

Second, Zoulas complains that Asselta's comments on the observation reports were vague and omitted or mischaracterized certain details of her teaching style. *See* Pl.'s Opp'n at 16–17; Pl.'s Decl. ¶¶ 88–92, 100–01. Because of those defects, Zoulas successfully challenged the inclusion of two of the observation reports in her file, and neither of those observations was included in her 2017–18 MOTP rating. Pl.'s 56.1 Stmt. ¶¶ 126, 141. Those defects constitute neither hostility, harassment, nor abuse. Scrutiny, even if excessive, is not itself hostility. *See, e.g., Trachtenberg v. Dep't of Educ. of City of N.Y.*, 937 F.Supp.2d 460, 472–73 (S.D.N.Y. 2013); *Spaulding v. N.Y.C. Dep't of Educ.*, 12 Civ. 3041 (KAM) (VMS), 2015 WL 12645530, at *58 (E.D.N.Y. Feb. 19, 2015). Asselta's failures to sufficiently evidence the basis for her performance ratings therefore do nothing to advance Zoulas's hostile work environment claim.

**\*20**  Third, Zoulas complains that Asselta did not provide her with expanded feedback on her June 1, 2017, performance review until June 22, 2017, one week later than required. Pl.'s Opp'n at 16. Even assuming that Asselta took an extra week to provide Zoulas with comments because of age-related animus rather than because her mother died the day after the observation, a minor delay in performing a routine task cannot rationally be characterized as an act of abuse.

Fourth, Zoulas complains that Asselta made a "final revision" of Zoulas's June 1, 2018, observation report nine days after she was made aware that Zoulas had filed this lawsuit. Pl.'s Opp'n at 18; *see also* Dkt. No. 111-33 at 26. What is missing here is any evidence—or even argument—that Asselta's

revision harassed or abused Zoulas. Rather, the observation report shows that Asselta rated Zoulas "Effective" in all categories. *See* Dkt. No. 111-33 at 26.

In sum, the four teacher observations Zoulas points to as evidence of a hostile work environment do nothing to support her claim. They show only that Asselta occasionally put too little effort into the reports and occasionally disagreed with Zoulas on issues of pedagogy. Mere critique of the type presented by the evidence in this case, articulated without insult, would not permit a reasonable jury to find that Zoulas was the subject of hostility and abuse.

### d) Student Reflections Email and Meeting

Zoulas argues that she suffered a hostile work environment when, after she sent Asselta an email with "numerous examples of student assessments and reflections ... Asselta called [Zoulas] into her office and said she did not understand why [Zoulas] sent her these examples." Pl.'s Opp'n at 16. This incident is even less availing as an example of hostility than of retaliation. Zoulas does not contend that Asselta insulted, berated, or humiliated her for sending her the email—merely that Asselta asked her to explain why she had sent her the email. Being asked to explain an email is a textbook example of a modern workplace nuisance of the most minor variety. It does nothing to support Zoulas's claim that she was subjected to a hostile work environment because of her age.

### e) 2016–17 MOTP Rating

Zoulas argues that she suffered a hostile work environment because she received a "Developing" MOTP rating in June 2017. Pl.'s Opp'n at 16. As discussed above, Zoulas has presented no evidence that her MOTP ratings were ever computed differently from other teachers', nor that Asselta was involved with their computation. The rating guide states that the MOTP ratings are nothing more than weighted averages of the scores given during teachers' observations. The NYCDOE did not harass or abuse Zoulas in a way recognized by the law by performing the calculation for her, even if she was unhappy with the final figure. Moreover, the Court notes that Zoulas's overall rating—the only rating that Zoulas has shown to have had any effect on her employment—was still "Effective" that year. *See* Dkt. No. 111-7 at 3.

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)
2021 WL 3932055

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 85 of 321

#### f) Staff Directory

Zoulas argues that she suffered a hostile work environment when her name was omitted from an internal directory of staff phone numbers in October 2017 and was not included until the directory was reprinted two months later. *See* Pl.'s Opp'n at 17. Even if the omission were intentional, and even if it could be attributed not to the person who prepared the directory but to Asselta or LoRe-Dioguardi, no reasonable jury could find that such a minor and temporary slight—indistinguishable from a typographical error—was harassment or abuse. Zoulas has not pointed to any evidence that the omission harmed her in any way other than by causing her to feel "deeply offended." *See* Pl.'s 56.1 Stmt. ¶ 53. Because the standard for finding a hostile work environment is an objective one, the fact that Zoulas perceived her two-month absence from the directory as a serious personal attack does not advance her case. No reasonable jury would find that this slight was sufficient to give rise to a hostile work environment.

#### g) Delayed Approval of Field Trip

**\*21** Zoulas argues that she suffered a hostile work environment when Asselta waited two months to approve her request to take her class on a field trip. *See* Pl.'s Opp'n at 17. As discussed above in relation to Zoulas's retaliation claim, that delay was at most a minor annoyance. Although Zoulas argues that she "was forced to go through a grievance process to get the trip approved" and that "no basis was given for the lack of approval," Pl.'s Opp'n at 17, it is undisputed that Asselta voluntarily approved the trip after Zoulas's grievance was denied as a misuse of the grievance process, and that, as part of that process, Asselta provided two reasons for her delay, *see* Pl.'s 56.1 Stmt. ¶ 121.

Furthermore, as discussed above, Zoulas's conclusory statements that Asselta and LoRe-Dioguardi "behaved in an extremely hostile manner towards Plaintiff with regards to this school trip" and that she was "harassed for two months ... in order to get approval for this school trip," Pl.'s Decl. ¶ 86, "cannot by themselves create a genuine issue of material fact where none would otherwise exist," *Fletcher*, 68 F.3d at 1456. Those statements would not permit a jury to assess for itself whether Zoulas faced objectively hostile and abusive conduct. They therefore do not affect the Court's conclusion that Zoulas has failed to point to evidence that would permit a reasonable jury to conclude that she had suffered a hostile work environment.

#### h) Peluso Allegations

Zoulas argues that she suffered a hostile work environment when she overheard Asselta telling the school's substance abuse counsellor not to speak to Zoulas and when that counsellor proceeded to accuse Zoulas's class of making noise as it walked through the building. Pl.'s Opp'n at 17. Setting aside the obvious contradiction between those arguments, Zoulas has not cited any evidence to support them besides the allegations in her complaint. Her opposition brief cites only the parties' 56.1 Statements, which agree only on the fact that Zoulas made the allegations in her complaint. *See* Pl.'s 56.1 Stmt. ¶¶ 117, 120, 136. Those paragraphs of the parties' 56.1 Statements point to no admissible evidence that Asselta told the counsellor not to speak to Zoulas, nor that the counsellor complained about Zoulas's class making noise as it walked through the building. *See id.* The Court therefore disregards those allegations.

#### i) Unruly Student

Zoulas argues that she was subjected to a hostile work environment when she asked to have an unruly student removed from her classroom, but LoRe-Dioguardi and Peluso instead spoke with the student rather than immediately removing him and took a statement from one of the student's friends before asking Zoulas for hers. *See* Pl.'s Opp'n at 17; Pl.'s 56.1 Stmt. ¶ 125. That conduct, Zoulas argues, diminished her authority "in front of her students and her colleague." Pl.'s Opp'n at 17. Setting aside the hearsay issues discussed above in connection with Zoulas's attempt to characterize this incident as retaliation, the conduct Zoulas describes here is too minor to constitute a hostile work environment. The record shows that Zoulas felt troubled by the fact that LoRe-Dioguardi and Peluso did not defer to her on how to handle the student and did not ask for her version of events before asking for one of the other students'. *See* Dkt. No. 111-25 at 10 ("I find this to be very troubling .... And it also shows malice towards me."). That evidence would not, however, permit a reasonable jury to find that LoRe-Dioguardi and Peluso engaged in such objectively severe abuse that they created a hostile work environment.

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)

2021 WL 3932055

**j) Referral to Another Teacher**

Zoulas argues that she was subjected to a hostile work environment when Asselta suggested that she "speak to the fourth grade special education teacher ... for advice on implementing Asselta's observations." Pl.'s Opp'n at 17. Zoulas suggests that Asselta should have directed her instead to another special education teacher with more experience. *Id.* Even reading Asselta's comment as a veiled insult to Zoulas's competence, it was a far cry from the level of insult required to establish a hostile work environment.

**k) Letters to File, Observation Reports,
Negative Ratings, and Improvement Plan**

**\*22** Zoulas states that she was subjected to a hostile work environment when she "received numerous unwarranted letters to file, negative observation reports, negative ratings and a TIP." Pl.'s Opp'n at 18. She does not elaborate. As evidence, she points only to a paragraph of her declaration in which she paraphrases the same allegation. *See* Pl.'s Decl. ¶ 33. Such vague and conclusory statements are insufficient to support the conclusion that Zoulas suffered the level of hostile and abuse conduct required to establish a hostile work environment.

**l) Cumulative Conduct**

The conduct Zoulas cites comes no closer to establishing a hostile work environment in the aggregate than in isolation. Courts in the Second Circuit have dismissed hostile work environment claims where the plaintiff has alleged or pointed to evidence of conduct far more severe than Zoulas has. *See, e.g., Trachtenberg*, 937 F.Supp.2d at 472–73 (granting motion to dismiss where plaintiff teacher alleged that principal subjected her to "excessive scrutiny," intimidating stares, negative performance evaluations and letters containing "scurrilous charges," an undesirable office, and denial of training opportunities); *Todoverto v. McDonald*, 2016 WL 3826281, at *13 (S.D.N.Y. July 7, 2016) (granting summary judgment when plaintiffs received letters reprimanding them and "satisfactory" annual evaluation ratings, were denied vacation time, and were assigned thirty times over six months to an undesirable location); *Waters v. Gen. Bd. of Glob. Ministries*, 769 F.Supp.2d 545, 553–56 (S.D.N.Y. 2011) (granting summary judgment where plaintiff was subjected

to menial cleaning and filing tasks, arbitrary cancellation of vacation requests, punishment for missing meetings, and a performance improvement plan); *Leung v. N.Y. Univ.*, No. 08-cv-5150 (GBD), 2010 WL 1372541, at *7 (S.D.N.Y. Mar. 29, 2010) (granting motion to dismiss where plaintiffs alleged "unfair scrutiny," undesirable work assignments, and baseless sexual harassment investigations), *vacated on other grounds*, 580 F. App'x 38 (2d Cir. 2014). In opposing this motion for summary judgment, Zoulas was required to point to evidence in the record showing that she had been subjected to hostile conduct so severe and pervasive that it rendered her work environment abusive. *See Demoret*, 451 F.3d at 149. Instead, she has pointed to evidence that, over approximately two years, she encountered middling performance reviews and a handful of annoyances, many of them with no obvious connection to her age. Those performance reviews and annoyances made Zoulas unhappy at work, but they do not objectively rise to the level required to establish a hostile work environment under the ADEA. The NYCDOE's motion for summary judgment on this claim is therefore GRANTED.

**IV. CONCLUSION**

Because Zoulas has failed to adduce evidence that she suffered an adverse employment action within the 300 days prior to when she filed her SDHR complaint, her ADEA discrimination claim is time-barred. Because Zoulas has failed to adduce evidence from which a reasonable jury could conclude that, after filing her SDHR complaint, she began to experience conduct that would discourage a reasonable person from filing such a complaint, she has not shown a genuine issue of material fact with respect to her ADEA retaliation claim. Finally, because Zoulas has filed to adduce evidence from which a reasonable jury could conclude that she was subjected to such hostile and pervasive abuse and harassment on account of her age that the terms of her employment were changed, she has failed to demonstrate a genuine issue of material fact with respect to her ADEA hostile work environment claim. For those reasons, the NYCDOE's motion for summary judgment on all three of Zoulas's claims is GRANTED.

**\*23** The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court directs that Corporation Counsel mail a copy of this order to the plaintiff and that Corporation Counsel provide

Zoulas v. New York City Department of Education, Not Reported in Fed. Supp. (2021)
2021 WL 3932055

the plaintiff with copies of any unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 110, to enter judgment for the defendant, to close the case, and to mail a copy of this order to the plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3932055

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1082423

KeyCite Yellow Flag - Negative Treatment

Distinguished by Segal v. Metropolitan Council, D.Minn., November 30, 2020

2020 WL 1082423

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Delroy ASKINS, Plaintiff,

v.

METROPOLITAN TRANSIT AUTHORITY,

New York City Transit Authority, Richard Roman,

and John Doe Bus Drivers #1-7, Defendants.

1:19-cv-4927-GHW

|

Signed 03/05/2020

**Attorneys and Law Firms**

Mark Garibyan, Schulte Roth & Zabel LLP, New York, NY, for Plaintiff.

Kristen Mary Nolan, NYC Transportation Authority, Brooklyn, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

**\*1** Plaintiff Delroy Askins is confined to a wheelchair. Mr. Askins filed this action *pro se*, alleging disability discrimination because he was unable to board New York City Transit Authority ("NYCTA") and Metropolitan Transportation Authority ("MTA") buses. Mr. Askins alleges that bus drivers refused to allow him to board and, when they stopped for him, refused to lower a wheelchair ramp on the bus directly onto the sidewalk, making it more difficult for him to board. Because Mr. Askins has plausibly alleged a failure by the NYCTA and MTA buses to accommodate him, he has adequately pleaded a claim for disability discrimination under federal, state, and city law. However, Mr. Askins' federal claims against the individual bus operators in their individual capacities are not viable because neither the Americans with Disabilities Act ("ADA") nor the Rehabilitation Act permits suits against them in their individual capacity. Accordingly, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

# I. BACKGROUND

## A. Facts [1]

[1] These facts are drawn from Mr. Askins' Second Amended Complaint ("SAC"), Dkt No. 22 and are accepted as true for the purposes of this motion to dismiss. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Mr. Askins is a paraplegic who is confined to a wheelchair. SAC at 15. To travel around New York City, Mr. Askins relies primarily on the New York City bus system. *Id.* Mr. Askins alleges that bus drivers generally pull up close to the curb and lower a mechanical ramp directly onto the sidewalk to enable wheelchair-bound passengers to board. *Id.* "The process potentially adds several minutes to the bus route," but accommodates wheelchair-bound patrons. *Id.*

The SAC alleges that "Mr. Askins rides NYC buses approximately 8-12 times per week." *Id.* The SAC further alleges "that bus drivers fail to lower the wheelchair ramp onto the sidewalk for him at least six times per week, requiring him to drop off the sidewalk curb in his wheelchair, wheel over [the] gutter and pavement to the bus, then strain to lift himself onto the bus." *Id.* Additionally, Mr. Askins alleges that "the bus drivers leave him behind altogether at least three times per week" and asserts that he "experiences difficulties boarding at least half the time he attempts to do so." *Id.* at 17. Mr. Askins alleges that bus drivers fail to stop for him even though he waves his arms to attract the bus driver's attention "[a]lmost every time he attempts to board a bus." *Id.*

The SAC alleges eight specific instances in which the bus drivers allegedly failed to stop or impaired Mr. Askins ability to board by not lowering the ramp onto the sidewalk. *Id.* at 17, 21. The first alleged incident occurred on September 16, 2016 at approximately 11:05 a.m. when Mr. Askins attempted to board the Bx15 at the 125th St. and Lexington Avenue bus stop. *Id.* at 17. The bus driver allegedly saw Mr. Askins but continued on his route without stopping. *Id.* The second incident allegedly occurred on February 25, 2018 at approximately 11:45 a.m. when Mr. Askins attempted to board the Bx15 at the 125th St. and Park Avenue stop. *Id.* The bus driver, Richard Roman, allegedly allowed "non-

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 89 of 321

Askins v. Metropolitan Transit Authority, Not Reported in Fed. Supp. (2020)

2020 WL 1082423

wheelchair-bound passengers to board, but quickly pulled away before Mr. Askins could board despite Mr. Askins being there at the same time as the other passengers and there being space on the bus for [him]." *Id.*

**\*2** The third incident occurred on June 5, 2018 at approximately 8:23 p.m. *Id.* at 19. While attempting to board the Bx15 bus with identification number 5961, Mr. Askins allegedly asked the bus driver to pull up closer to the curb. *Id.* The bus driver allegedly refused to accommodate Mr. Askins and instead lowered the ramp directly onto the street. *Id.* The bus driver also purportedly did not provide Mr. Askins any help in getting onto the bus and, thus, Mr. Askins was allegedly forced to strain himself to get on board. *Id.* Mr. Askins allegedly has video evidence substantiating this incident. *Id.*

The fourth alleged incident took place on July 25, 2018 at approximately 5:43 p.m., when the M1 bus did not pull up to the curb at the 101st Street and Madison stop. *Id.* The bus had identification numbers 3887 and 222. *Id.* Mr. Askins allegedly asked the bus driver to pull up to the curb, but he ignored Mr. Askins despite allegedly making eye contact with him. *Id.* Instead, the bus driver allegedly lowered the ramp directly onto the street and made no effort to assist Mr. Askins onto the bus notwithstanding the steeper incline. *Id.* Mr. Askins alleges that he was forced to wheel over a gutter and some pavement to the bus and then strain to wheel himself onto the bus. *Id.* Mr. Askins allegedly has video evidence substantiating this incident. *Id.*

The fifth alleged incident took place on March 30, 2019 at approximately 2:04 p.m., while Mr. Askins waited for the Bx15 bus at the Lexington and 125th street bus station. *Id.* Mr. Askins asked a teenage boy, who was in front of him in line, to inform the bus driver that Mr. Askins would be boarding. *Id.* The bus had identification numbers 108 and 5326. *Id.* at 19-21. After the boy informed the bus driver, the driver allegedly closed the door on the teenager's arm and pulled away, leaving Mr. Askins behind. *Id.* at 21. Mr. Askins allegedly has photographic evidence of this incident. *Id.*

The sixth alleged incident took place on May 1, 2019 at around 9:28 a.m. when Mr. Askins was returning from a medical appointment in the Bronx. *Id.* Mr. Askins allegedly attempted to board the Bx39 bus at the 233rd Street station but the driver took off without him. *Id.* The bus identification number was 5384. *Id.* Mr. Askins allegedly has photographic evidence of this incident. *Id.*

The seventh alleged incident took place on June 21, 2019 at approximately 1:33 p.m. *Id.* Mr. Askins alleges that although the M101 bus driver saw him, the bus driver did not pull up to the curb. *Id.* Instead, Mr. Askins was allegedly forced to wheel over a gutter and some pavement to the bus and then strain to get on board. *Id.* The bus had identification numbers X44 and 5910. *Id.*

The eighth alleged incident took place on July 16, 2019 at approximately 10:56 a.m. and involved the M60 bus at the 125th and Lexington stop. *Id.* Although the bus driver allegedly saw Mr. Askins, the bus did not pull to the curb and Mr. Askins was again forced to wheel himself onto the street to get on board. *Id.*

### B. Procedural History

On May 24, 2019, Mr. Askins filed his initial complaint in this action. Dkt No. 2. Mr. Askins subsequently filed an amended complaint on August 9, 2019, Dkt No. 17, and filed the SAC on September 30, 2019. Dkt No. 22. The SAC names NYCTA and the MTA as defendants. SAC at 1. The SAC also names Richard Roman and "John Doe Bus Drivers #1-7" (collectively, the "Individual Defendants") as defendants. *Id.* The SAC asserts claims for relief under the ADA and the Rehabilitation Act (the "Federal Claims"). *Id.* at 3. The SAC also asserts a claim under the New York State Human Rights Law ("NYSHRL"). *Id.* Because Mr. Askins is proceeding *pro se*, the Court also construes the SAC as asserting a claim under the New York City Human Rights Law ("NYCHRL").

**\*3** On October 18, 2019, defendants filed a motion to dismiss the SAC. Motion to Dismiss ("MTD"), Dkt No. 23. On December 17, 2019, Mr. Askins filed a memorandum of law in opposition to the defendants' motion to dismiss. Opposition to Motion to Dismiss ("Opp."), Dkt No. 32. Defendants submitted a reply to the memorandum in opposition on January 17, 2020. Dkt No. 33.

## II. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court must "accept[ ] all factual allegations [in the complaint] as true and draw[ ]

Askins v. Metropolitan Transit Authority, Not Reported in Fed. Supp. (2020)

2020 WL 1082423

all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). To avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action, devoid of supporting facts, does not suffice. *Id.* To satisfy the "plausibility" requirement, the plaintiff must plead facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). When ruling on a motion to dismiss, "a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013).

It is well established that courts have an obligation to afford a special solicitude to *pro se* litigants. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006). The underlying rationale for this rule "is that a *pro se* litigant generally lacks both legal training and experience and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). The special solicitude extended to *pro se* litigants takes a variety of forms and includes a liberal reading of pleadings and a relaxation of the limits on the amendment of pleadings. *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007); *see also Holmes v. Goldin*, 615 F.2d 83, 85 (2d Cir. 1980).

However, it is not appropriate to afford *pro se* litigants special solicitude where a licensed attorney assisted in drafting their briefs, motions or other court documents. *See, e.g., Knox v. Cty. of Ulster*, No. 1:11-CV-0112 GTS/CFH, 2013 WL 286282, at *1 n.1 (N.D.N.Y. Jan. 24, 2013) ("[T]he Court strongly suspects that Plaintiff has also been aided by an attorney in the drafting of his papers opposing the current motion, which are organized, typewritten, and contain citations to dozens of instructive legal authorities in proper BlueBook format.... Accordingly, the Court will not afford the arguments in Plaintiff's opposition memorandum of law the special solicitude afforded to arguments made by *pro se* litigants."); *Spira v. J.P. Morgan Chase & Co.*, 466 F. App'x 20, 22 n.1 (2d Cir. 2012) (summary order) ("Although Spira purports to act *pro se* in this appeal, he

was represented by his wife, a licensed attorney, in the district court, and Spira has not contested Chase's assertion that she is responsible for ghostwriting his appellate briefs. Under these circumstances, Spira is not entitled to claim the special consideration which the courts customarily grant to *pro se* parties.") (quotation omitted). The policy of "liberally construing *pro se* submissions is to protect *pro se* litigants from inadvertent forfeiture of rights due to their lack of legal training." *Knox*, 2013 WL 286282, at *1 n.1. However, "where, as here, those submissions are 'ghostwritten' by an attorney, such liberal construction may create unfairness toward the opposing party." *Id.* [2]

[2]
> Several courts and commentators have noted ethical questions that can be raised when attorneys ghost-write a litigant's submissions. *See, e.g., Duran v. Carris*, 238 F.3d 1268, 1271-72 (10th Cir. 2001) ("[An attorney's] actions in providing substantial legal assistance to [a party] without entering an appearance in this case not only affords [the party] the benefit of this court's liberal construction of pro se pleadings but also inappropriately shields [the attorney] from responsibility and accountability for his actions and counsel."); *Mejia v. Robinson*, No. 1:16-CV-9706-GHW, 2018 WL 3821625, at *4 (S.D.N.Y. Aug. 10, 2018) ("When an attorney ghostwrites a plaintiff's opposition memorandum, it is the plaintiff, and not the attorney, who is subject to Rule 11's obligations in connection with that memorandum.... [B]y not signing her work, Plaintiff's ghost counsel remains free to introduce unsupported, conclusory facts without the threat of personal sanctions. This practice is of concern to the Court.") (citing Fed. R. Civ. P. 11(a)); *see also Ellis v. Maine*, 448 F.2d 1325, 1328 (1st Cir. 1971) (holding that a brief "prepared in any substantial part by a member of the bar" must be signed by the attorney); *Ellingson v. Monroe (In re Ellingson)*, 230 B.R. 426, 435 (Bankr. D. Mont. 1999) (holding that "ghost writing" was a violation of court rules and ABA ethics); *Wesley v. Don Stein Buick, Inc.*, 987 F. Supp. 884, 885-86 (D. Kan. 1997) (expressing legal and ethical concerns regarding the ghost writing of pleadings by attorneys); *Laremont-Lopez v. Se. Tidewater Opportunity Center*, 968 F. Supp. 1075, 1077 (E.D. Va. 1997) (holding that it is "improper for lawyers to draft or assist in drafting complaints or other documents

2020 WL 1082423

submitted to the Court on behalf of litigants designated as *pro se*"); *United States v. Eleven Vehicles*, 966 F. Supp. 361, 367 (E.D. Pa. 1997) (holding that ghost writing by an attorney for a *pro se* litigant implicates an attorney's duty of candor to the court, interferes with the court's ability to supervise the litigation, and misrepresents the litigant's right to more liberal construction as a *pro se* litigant). *See generally* John C. Rothermich, *Ethical and Procedural Implications of "Ghostwriting" for Pro Se Litigants: Toward Increased Access to Civil Justice*, 67 Fordham L. Rev. 2687 (1999) (discussing the ethical concerns of attorney ghost-writing for *pro se* litigants). *But see Mejia*, 2018 WL 3821625, at *3 ("The Court recognizes that, unlike sister circuits that condemn attorney ghostwriting on behalf of *pro se* litigants, the Second Circuit has yet to conclude that ghostwriting is necessarily an ethical violation.") (citing *In re Fengling Liu*, 664 F.3d 367, 369-72 (2d Cir. 2011)) (discussing other circuits' approaches and concluding that, in light of a 2007 ethics opinion issued by the American Bar Association, an attorney's ghostwriting did not violate her ethical obligations).

This case raises some of the concerns noted by these courts and commentators. The opposition submitted on behalf of Mr. Askins raises novel legal arguments in support of Mr. Askins' claims—in particular the *Ex parte Young* argument described below. But the argument is not fully developed in Mr. Askins' briefing. And, while Mr. Askins signed the opposition, the Court questions whether Mr. Askins will be able to engage in the kind of supplemental argument or briefing on his own that would be helpful to the Court's analysis of the issue.

**\*4** Mr. Askins' SAC and his opposition to this motion to dismiss were drafted with the substantial assistance of an attorney. *See* SAC at 15 n.1 ("This document was prepared with the assistance of the New York Legal Assistance Group's Clinic for Pro Se Litigants in the S.D.N.Y."); Opp. at 1 n.1 (same). In particular, the typewritten "Statement of Facts" in the SAC is identified as having been prepared with the assistance of NYLAG. However, the remainder of the form complaint used by Mr. Askins in preparing the SAC does not specifically note the involvement of an attorney. Mr. Askins' opposition to the defendant's motion to dismiss was also drafted with the assistance of a licensed attorney. Opp. at 1 n.1. But Mr. Askins alone signed the document.

To afford Mr. Askins the special solicitude generally afforded *pro se* litigants in this case would allow him the benefit of legal counsel while also subjecting him to a less stringent standard reserved for those litigants who are truly unrepresented. Accordingly, the Court will not afford the statement of facts in Mr. Askins' SAC or his opposition the special solicitude usually afforded to *pro se* litigants. [3] However, the Court will construe the portions of his complaint which were not clearly drafted with the substantial assistance from an attorney—principally his claims for relief—liberally.

[3]    The Court notes that Mr. Askins is not wholly unfamiliar with litigation: Mr. Askins has sued various city agencies—often repeatedly—including the Department of Corrections, NYPD, and NYCTA, as well as privately owned companies. *See, e.g.*, *Askins v. New York City Transit* (*Askins I*), No. 11 CIV. 6371 PGG, 2013 WL 142007 (S.D.N.Y. Jan. 8, 2013); *Askins v. City of New York*, No. 10 CIV. 2230 (CM), 2012 WL 12884363 (S.D.N.Y. Feb. 14, 2012), *aff'd in part, vacated in part, remanded sub nom.*, *Askins v. Doe No. 1*, 727 F.3d 248 (2d Cir. 2013); *Askins v. City of New York*, 2011 WL 1334838 (S.D.N.Y. Mar. 25, 2011); *Askins v. Weinberg, et al.*, (19-cv-08793)(ALC); *Askins v. Prestige Management*, 101386/2018 (N.Y. Sup. Ct. 2019); *Askins v. City of New York, et al.*, (09-cv-02273) (AKH); *Askins v. D.O.C., et al.*, (98-cv-09003) (DC).

## III. DISCUSSION

### A. Claims against the MTA and NYCTA

In the SAC, Mr. Askins alleges violations of the ADA, the Rehabilitation Act, and the NYSHRL. SAC at 3. The Court construes the SAC as stating claims under Title II of the ADA, Section 504 of the Rehabilitation Act, and analogous provisions of the NYSHRL. Because Mr. Askins is acting *pro se*, the Court also construes the SAC as raising a claim for relief under the NYCHRL. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act states that "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 92 of 321

Askins v. Metropolitan Transit Authority, Not Reported in Fed. Supp. (2020)

2020 WL 1082423

of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

"To state a claim under Title II of the ADA, the plaintiff must allege 'that (1) he or she is a qualified individual with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of plaintiff's disabilities.'" Shomo, 579 F.3d at 185 (quoting Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)) (brackets omitted). The Second Circuit has held that "§ 504 of the Rehabilitation Act and Title II of the ADA offer essentially the same protections for people with disabilities." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 114 (2d Cir. 2001) (citations omitted). [4] Similarly, "New York State disability discrimination claims are governed by the same legal standards as federal ADA claims." Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004); see also Cave v. East Meadow Union Free Sch. Dist., 480 F. Supp. 2d 610, 643 (E.D.N.Y. Mar. 19, 2007). Accordingly, the Court applies the same framework to Mr. Askins' federal law and NYSHRL claims.

> [4]    Although there is an "additional requirement that defendants must receive federal funding" for a plaintiff to state a claim for a violation of the Rehabilitation Act, Defendants do not contest this element. Shomo, 579 F.3d at 185 (citing Henrietta D., 331 F.3d at 272) (citation omitted).

**\*5** In this case, the first two elements of Mr. Askins' Title II claim are undisputed. Defendants do not dispute that as a wheelchair-user, Mr. Askins qualifies as an individual with a disability, or that the NYCTA and MTA are public entities subject to the ADA. MTD at 3. Defendants contend, however, that Mr. Askins was not denied any benefit or discriminated against by reason of his disability. Id. at 2-3. Specifically, defendants argue that "eight instances of alleged unsatisfactory service over the past four years do not establish a failure to provide accessible bus service in violation of any law." Id. at 2.

The SAC plausibly alleges a claim for disability discrimination. Mr. Askins alleges that he has been denied bus service numerous times and has specifically described four incidents in which he was prevented from boarding New York city buses entirely. SAC at 17-21. Mr. Askins has presented

the dates, times, locations and the identifying numbers of the buses involved, and also claims to have photographic and video evidence of some of the incidents. Id. at 19, 21. Mr. Askins' allegations are sufficient to plausibly plead a claim for disability discrimination.

Defendants argue that the SAC must be dismissed because "[t]he ADA and its implementing regulations do not contemplate perfect service for wheelchair-using bus customers." MTD at 3 (quoting Stauber v. NYC Transit Auth., 781 N.Y.S.2d 26, 28 (1st Dep't 2004)); see also id. (arguing that "[o]ccasional problems, without more, do not constitute a violation of the ADA.") (quoting Midgett v. Tri-County Metro Transp. Dist., 254 F.3d 846, 849 (9th Cir. 2001) and citing Jones v. Nat'l R.R. Passenger Corp., No. 15-CV-02726-TSH, 2019 WL 5087594, at *9 (N.D. Cal. Oct. 10, 2019); Dorsett v. Se. Pennsylvania Transp. Auth., No. CIV.A. 04-5968, 2005 WL 2077252, at *5 (E.D. Pa. Aug. 29, 2005)). However, Stauber, Midgett, Jones, and Dorsett were decided on summary judgment. [5] They do not provide the pleading standard for a disability discrimination claim. The appropriate standard at this phase of the litigation is whether Mr. Askins has plausibly alleged that he was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." Shomo, 579 F.3d at 185 (citation omitted) (brackets omitted). Mr. Askins has alleged, with specificity, at least four incidents in which he was denied access to New York City bus services. That is sufficient to meet the pleading standard on this motion to dismiss.

> [5]    Defendants also cite Carroll v. Suffolk Bus Corp., 2014 NY Slip Op 33352(U), ¶ 8 (N.Y. Sup. Ct. 2014). That case was also decided on summary judgment.

In 2013, Mr. Askins filed a similar case against NYCTA alleging disability discrimination. Askins I, 2013 WL 142007, at *1. Specifically, Mr. Askins alleged that between 2008 and 2011 he was "denied access to NYCTA buses on twenty separate occasions and his complaint set forth specific times and locations for fourteen of these incidents." Id. In response, the defendants "moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c)." Id. at *2. In that case, the court determined that Mr. Askins had adequately alleged a claim for "disability discrimination under Title II of the ADA." Id. at *3-4. The court found that the Complaint went "far beyond conclusory accusations" because

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 93 of 321
Askins v. Metropolitan Transit Authority, Not Reported in Fed. Supp. (2020)
2020 WL 1082423

Mr. Askins presented "dates, times, and locations at which the alleged discrimination took place[.]" *Id.* at *3. The same is true here.

Defendants attempt to distinguish *Askins I* by arguing, that in that case, "[t]he number of successful rides was not pled [sic]." MTD at 4 n.4. Defendants seize on the SAC's allegation that "Mr. Askins rides NYC buses approximately 8-12 times per week," SAC at 15, to argue that Mr. Askins "has ridden the buses approximately 2,080 times over the last four years[.]" MTD at 1.

**\*6** This attempt to distinguish *Askins I* is unconvincing. That case involved twenty instances over a four-year period, *Askins I*, 2013 WL 142007, at *1, and the *Askins I* court did not base its holding on the percentage of rides on which Mr. Askins was denied service. The court's persuasive analysis in *Askins I* is equally applicable to Mr. Askins' allegations in this case. Accordingly, Defendants' motion to dismiss Mr. Askins' federal law and NYSHRL claims against MTA and the NYCTA is denied.

The SAC also plausibly pleads a cause of action under the NYCHRL. Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted). The Restoration Act established two new rules of construction for the NYCHRL: (1) "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's Human Rights law cannot fall' "; and (2) a requirement that the NYCHRL provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act §§ 1, 7) (emphasis omitted). The Second Circuit has clarified that these amendments to the Restoration Act require courts to analyze NYCHRL claims "separately and independently from any federal and state law claims." *See id.* The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio v. City of New York*, 16

N.Y.3d 472, 477-78 (2011)). Because the Court has declined to dismiss Mr. Askins' federal and NYSHRL claims, it likewise declines to dismiss Mr. Askins' claims under the more plaintiff-friendly NYCHRL standard.

**B. Claims Against the Individual Defendants**
The Court must dismiss Mr. Askins' federal claims against the Individual Defendants in their individual capacities. The SAC does not specify whether the claims against the Individual Defendants are pleaded against them in their official or individual capacities. Thus, the Court construes the SAC to raise claims against the Individual Defendants both in their individual and their official capacities. *See Frank v. Relin*, 1 F.3d 1317, 1326 (2d Cir. 1993) ("[A] plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other."). "Insofar as" Mr. Askins "is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia*, 280 F.3d at 107 (citations omitted). Accordingly, to the extent that Mr. Askins has pleaded claims against the Individual Defendants in their individual capacities, those claims are dismissed. The Court denies Mr. Askins leave to replead these claims because any attempt to replead would be futile. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile).

**\*7** The Court does not dismiss the SAC's federal claims against the Individual Defendants in their official capacities, however. Fundamentally, counsel for the Individual Defendants does not address the distinction between an action against the Individual Defendants in their official capacity, as opposed to their individual capacity, at all in either their initial four-page "letter" brief, or in their two-page reply. In particular, counsel for the Individual Defendants failed to engage with Mr. Askins' argument that the case can proceed against the Individual Defendants in their official capacities under the doctrine of *Ex parte Young*, because Mr. Askins is seeking injunctive relief. In his opposition, Mr. Askins argues that a "[s]tate officer sued in her official capacity under the doctrine of *Ex parte Young* was a 'public entity' subject to liability under Americans with Disabilities Act." Opp. at 6 (citing *Henrietta D.*, 331 F.3d at 288). The Court observes that there is a substantial question whether bus drivers such as Mr. Roman and the other John Doe bus drivers are appropriate defendants under *Ex parte Young*. (The plaintiffs in *Henrietta*

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 94 of 321
Askins v. Metropolitan Transit Authority, Not Reported in Fed. Supp. (2020)
2020 WL 1082423

*D.* named as defendants Michael Bloomberg, then the mayor of New York, and other high-level government officials, not line workers implementing their policies.) But Defendants do not address this issue at all in their two-page reply brief. Lacking substantive briefing from the Individual Defendants on this issue, the Court declines to dismiss the federal claims against the Individual Defendants in their official capacity at this time.

Defendants have only asked the Court to dismiss Mr. Askins' federal claims against the Individual Defendants. *See* MTD at 4 (arguing that "Plaintiff's *federal* claims against the individually named bus operator must be dismissed") (capitalization altered) (emphasis added). Accordingly, the any claims against the Individual Defendants under the NYSHRL or the NYCHRL survive this motion.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion to dismiss Mr. Askins' claims against the MTA and the NYCTA under federal, state, and city law is denied. Defendants' motion to dismiss Mr. Askins' federal claims against Mr. Roman and the John Doe bus drivers in their individual capacities is granted without leave to replead. All other claims against the Individual Defendants, however, survive this motion—including claims against them under federal law in their official capacities.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1082423

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 95 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

KeyCite Yellow Flag - Negative Treatment

Distinguished by *Patterson v. EmblemHealth Inc.,* S.D.N.Y., September 1, 2023

2021 WL 4267815
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ariel ZUCKERMAN, Plaintiff,

v.

GW ACQUISITION LLC d/b/a G&W Industries,
Michael Marinoff, in His Individual and Professional
Capacities, and Albert Maleh, in His Individual
and Professional Capacities, Defendants.

20-CV-8742 (VEC)
|
Signed 09/19/2021
|
Filed 09/20/2021

**Attorneys and Law Firms**

Alex Jeffrey Hartzband, Camilo Malcolm X. Burr Di Mauro, Innessa Melamed Huot, Faruqi & Faruqi, LLP, New York, NY, for Plaintiff.

Rashmee Sinha, Monique Robotham, Solomon Abramov, Kaufman Dolowich & Voluck, LLP, Woodbury, NY, for Defendants.

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

**\*1** Plaintiff Ariel Zuckerman sued her former employer, GW Acquisition LLC, and its two owners, Michael Marinoff and Albert Maleh (collectively "Defendants"), for violations of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Americans with Disability Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), the New York State Human Rights Law, N.Y. Exec. L. §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"), and the New York Labor Law, N.Y. Lab. Law §§ 1 *et seq.* ("NYLL"). Defendants moved to dismiss the complaint for failure to state a claim. For the

reasons discussed below, Defendants' motion is GRANTED in part and DENIED in part.

BACKGROUND [1]

[1]    The Court accepts all non-conclusory allegations in the First Amended Complaint ("FAC") as true for the purposes of this motion. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014).

In June 2013, Plaintiff began working as an Account Executive at GW Acquisition LLC, a company that manufactures and sells children's apparel. First Amended Complaint ("FAC"), Dkt. 30 ¶ 35. After her first year on the job, Defendants increased Plaintiff's base salary to $75,000 and added commissions. *Id.* ¶¶ 37–41. Plaintiff contends that pursuant to her agreement with Defendants, her commissions were to be paid twice each year. *Id.* ¶¶ 42–46.

In late October 2018, Plaintiff informed Defendants that she was pregnant. *Id.* ¶ 48. Plaintiff alleges that Defendants initially denied her request to take maternity leave but ultimately granted her a three-month maternity leave. *Id.* ¶ 53. She gave birth on April 29, 2019. *Id.* ¶ 61. While she was pregnant and during her maternity leave, Plaintiff alleges that she notified Defendants of her intention to breastfeed her child and of her need for an appropriate place at the office to pump breastmilk during the workday. *Id.* ¶¶ 49–51, 66–69. When she returned to work after her maternity leave, Plaintiff discovered that Defendants had not established an appropriate lactation space; Plaintiff alleges that she "was forced to pump in a cramped and dusty closet." *Id.* ¶ 71. After Plaintiff complained about the lack of suitable accommodations, Defendants allowed her to install a privacy curtain in the office. *Id.* ¶ 78.

**\*2** Plaintiff also contends that Maleh and Marinoff made a series of offensive comments about her decision to breastfeed and to pump breastmilk at the office. For example, Plaintiff alleges that soon after she returned from maternity leave, Marinoff asked Plaintiff if he could "have some milk in [his] coffee" and whether she could "just squirt it in there." *Id.* ¶¶ 87–88. Plaintiff also claims that Maleh frequently yelled "pump station" or "pumper" when he would pass the designated pumping area in the office. *Id.* ¶¶ 94–97. Plaintiff further alleges that she suffers from "generalized anxiety disorder" and that her condition has been "severely

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 96 of 321
**Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)**
2021 WL 4267815

exacerbated" by "Defendants' pervasive harassment." *Id.* ¶¶ 104–105.

On March 19, 2020, Plaintiff was furloughed due to the COVID-19 pandemic. *Id.* ¶ 111. She was put back on the payroll in May 2020 and was told that she would have to report back to the office for in-person work on July 6, 2020. *Id.* ¶¶ 115–116. In advance of the return date, Plaintiff requested that she be allowed to work from home for four to six additional months as a reasonable accommodation for her mental health condition. *Id.* ¶¶ 120–121. Plaintiff contends that Defendants initially agreed to allow her to work from home until September 7, 2020, but when they realized that her claimed anxiety was related to their alleged harassment, not to the pandemic, Defendants reneged on their work-from-home agreement. *Id.* ¶¶ 132–136. Defendants ultimately agreed that Plaintiff could work from home through September 7, 2020, but for two-thirds of her salary; Plaintiff alleges that she agreed to that arrangement because she felt she had "no other choice." *Id.* ¶¶ 137–139. Notwithstanding that agreement, Defendants terminated Plaintiff's employment on August 10, 2020. *Id.* ¶ 156.

With respect to commissions, Plaintiff contends that Defendants repeatedly delayed paying her what she was due. Plaintiff alleges that she received commissions based on sales during the first half of 2019 in October and November of that year, three months later than what was agreed to in the terms of her employment. *Id.* ¶¶ 43, 63, 79, 81. She also claims that she received commissions for sales made in the second half of 2019 in June and July 2020, five months later than the allegedly agreed-upon payment date. *Id.* ¶¶ 45, 112–113, 124, 126–128. Plaintiff also alleges that she is owed at least $27,327.19 in commissions that have yet to be paid by Defendants. *Id.* ¶¶ 129–131.

On June 30, 2020, prior to her discharge, Plaintiff, through counsel, claimed that Defendants had discriminated against her based on her pregnancy and her disability. *Id.* ¶ 140. On July 22, 2020, Plaintiff asked Maleh and Marinoff to put in place "certain safeguards," including a lactation room, prior to her return to work at the office. *Id.* ¶¶ 141–142. On the same day, Plaintiff, through counsel, sent Defendants three recordings: two that included allegedly harassing comments of Marinoff and Maleh, and one that included Maleh's alleged agreement to allow Plaintiff to work from home until September 7, 2020. *Id.* ¶¶ 146, 152. On July 27, 2020, Defendants told Plaintiff that they were unwilling to take

the requested actions, and they requested documentation regarding Plaintiff's alleged disability. *Id.* ¶¶ 147–148.

On August 10, 2020, before Plaintiff provided documentation of her alleged disability, Defendants terminated her employment. *Id.* ¶ 156. Defendants claimed that they fired Plaintiff because she had "surreptitiously recorded meetings with G&W's managers and buyers on company premises without the parties' knowledge or consent." *Id.* ¶ 157. Plaintiff alleges that she was wrongfully terminated, as none of the recordings contains discussions of business matters, and that Defendants' proffered reason for her termination was pretext for discrimination. *Id.* ¶¶ 160–162.

**\*3** The Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue on September 30, 2020, *see* FAC ¶ 18, and Plaintiff commenced this lawsuit on October 20, 2020, *see* Compl., Dkt. 1. On January 8, 2021, Plaintiff amended her complaint. FAC, Dkt. 30. On January 29, 2021, Defendants moved to dismiss the FAC for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Notice of Mot., Dkt. 41. Plaintiff opposed the motion. Resp., Dkt. 47. [2]

[2]    Rule 4(B) of the undersigned's Individual Practices in Civil Cases requires that all memoranda of law be double spaced. Plaintiff's brief in opposition to the motion to dismiss used 1.81 spacing and not Microsoft Word's standard double-spacing setting. When proper double spacing is applied, Plaintiff's brief exceeds the page limits set by the Court. *See* Endorsement, Dkt. 40 (extending Plaintiff's response brief page limit to 30 pages).

To address Plaintiff's failure to comply with the Court's rules and orders, the Court ordered Plaintiff to show cause why its response brief should not be stricken from the record, counsel sanctioned, or both. *See* Order to Show Cause, Dkt. 69. In response, Plaintiff's counsel asserted that they had interpreted the Court's double-spacing requirement to allow 24-point spacing (double the required 12-point font) and not that the parties must use Microsoft Word's standard double-spacing setting. *See* Show Cause Resp., Dkt. 70 at 1–2. The Court finds it hard to credit that explanation, especially as Plaintiff's counsel have properly double-spaced their filings in many of their other cases in the Southern District of New York. *See, e.g.,* Mem. of Law, 18-CV-3028, Dkt. 32 (S.D.N.Y.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 97 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

July 27, 2018) (using Microsoft Word's standard double-spacing setting); Resp., 19-CV-972, Dkt. 32 (S.D.N.Y. May 20, 2019) (same); Mem. of Law, 20-CV-2481, Dkt. 44 (S.D.N.Y. Sept. 8, 2020) (same).

Upon due consideration, the Court will not sanction Plaintiff's counsel. The Court accepts the sincerity of Plaintiff's counsel's apology and its commitment to applying court rules "without exception going forward." *See* Show Cause Resp. at 1, 3; *see also* Internal Email, Dkt. 70-1 (informing Plaintiff's firm about double-spacing requirements in light of the Court's order). Moreover, the Court finds that its consideration of sanctions is a sufficient consequence that will — hopefully — ensure that similar misconduct does not reoccur.

### STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted). When considering a Rule 12(b)(6) motion to dismiss, the Court draws all reasonable inferences in the light most favorable to the plaintiff. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013) (citation omitted). But even though courts are required to accept all of the factual allegations in the complaint as true, courts " ' are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

### DISCUSSION

### I. Defendants' Motion to Dismiss Is Denied as to Plaintiff's Claims of Sex Discrimination

### A. Applicable Law

**\*4** Pursuant to Title VII, it is unlawful for an employer to discriminate against a person because of the person's sex. 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act amended Title VII to clarify that sex discrimination includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

Discrimination claims brought pursuant to Title VII are analyzed using "the familiar burden-shifting framework" articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination; it is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions; the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014) (citation omitted); *see also Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015). To establish a *prima facie* case of discrimination, a plaintiff must show: (1) that she is a member of a protected class; (2) that she was qualified for the position that she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citing *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

To "survive a motion to dismiss, a plaintiff need only establish a *prima facie* case of sex discrimination ...." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (cleaned up). "[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (cleaned up). The elements of a *prima facie* case are "an outline of what is necessary to render [a plaintiff's employment discrimination] claims for relief plausible." *Yan v. Ziba Mode Inc.*, No. 09-CV-3000, 2016 WL 1276456, at \*3 (S.D.N.Y. Mar. 29, 2016) (cleaned up).

2021 WL 4267815

Accordingly, "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. The alleged facts "need only give plausible support to a minimal inference of discriminatory motivation." *Id.* Nonetheless, a complaint is properly dismissed if the plaintiff fails "to plead any facts that would create an inference that any adverse action taken by any defendant was based upon [a protected characteristic of the plaintiff]." *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (per curiam) (internal quotation marks omitted).

### B. Plaintiff Has Adequately Alleged a *Prima Facie* Case of Sex Discrimination Pursuant to Title VII

**\*5** Defendants do not dispute that Plaintiff, a breastfeeding mother, has satisfied the first two elements of her *prima facie* case. Mem. of Law, Dkt. 42 at 14. [3] For the reasons discussed below, Plaintiff has adequately alleged the remaining two elements: that she suffered adverse employment actions and that such actions occurred under circumstances giving rise to an inference of discriminatory intent.

[3]     Defendants state that their motion is directed solely at the inadequacy of the complaint vis-à-vis the fourth element of the *prima facie* case, that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Mem. of Law, Dkt. 42 at 14. But Defendants also contest whether certain conduct constituted an adverse employment action, *id.* at 5–6, 14–15, which implicates the third element of the *prima facie* case. Accordingly, the Court considers whether Plaintiff has adequately alleged both the third and fourth elements of a *prima facie* case.

### 1. Plaintiff Has Adequately Alleged that She Suffered Adverse Employment Actions

In states like New York that have local administrative mechanisms for pursuing discrimination claims, Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 300 days after the alleged unlawful employment practice occurred. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" each "constitutes a separate actionable 'unlawful employment practice.' " *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

Here, Plaintiff filed a charge of discrimination with the EEOC on September 10, 2020. FAC ¶ 17. Accordingly, any discrete acts of discrimination that occurred before November 15, 2019, 300 days before her EEOC filing, are time-barred. Upon careful review of the FAC, Plaintiff has adequately alleged three discrete acts of discrimination that occurred after November 15, 2019: (1) commissions that should have been paid in or about February 2020 were paid late, *id.* ¶¶ 109, 112–113, 124–128; (2) commissions due when her employment was terminated were not paid, *id.* ¶¶ 129–130; [4] and (3) her employment was terminated on August 10, 2020, *id.* ¶¶ 156–157. Accordingly, Plaintiff has sufficiently pled the third element of a *prima facie* case, that she suffered adverse employment actions.

[4]     Defendants argue that Plaintiff has not adequately alleged that she is owed commissions because she did "not allege with any specificity how [she] arrived at the calculation of the alleged balance owed to her." Mem. of Law 14. Although Plaintiff must give the Court "some reason to believe that any damage has occurred at all," she is not required to "calculate damages at the pleading stage." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018). Accordingly, Plaintiff's non-conclusory allegations regarding the terms of the employment agreement with respect to commissions, FAC, Dkt. 30 ¶¶ 38–46, and her detailed allegations that she is still owed commissions, *id.* ¶¶ 47, 129, 131, are sufficient at this stage of the proceedings.

### 2. Plaintiff Has Adequately Alleged Facts from Which the Court Can Infer Discriminatory Intent

Plaintiff has also adequately alleged a claim that the adverse actions occurred under circumstances giving rise to an inference of discriminatory intent. Plaintiff's allegations regarding numerous offensive comments made by Marinoff and Maleh regarding her decision to breastfeed her child

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 99 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

and to pump breastmilk at work are adequate to support an inference of discriminatory intent. Such comments include that Plaintiff could put a milk company out of business, FAC ¶ 93, that the company is "turning into a regular dairy farm," *id.* ¶ 102, and calling Plaintiff "pumper" in front of others, *id.* ¶¶ 94, 96. [5] Such comments are more than enough, at this stage of the proceedings, for the Court to infer a discriminatory intent on the part of Defendants.

[5]    For a full list of comments, see FAC ¶¶ 51, 68, 78, 83, 84, 87, 88, 89–90, 93, 94–98, 102–103; *see also* Resp., Dkt. 47 at 14–15 (listing the 23 comments found in the FAC).

**\*6** Defendants do not dispute that Plaintiff has timely raised claims of discrimination based on the failure to pay commissions and the termination of her employment, Mem. of Law at 14, but they argue that most of the offensive comments cannot be considered because they were allegedly made before November 15, 2019, the date marking 300 days before she filed her EEOC charge, and are therefore time-barred. Mem. of Law at 6, 14, 15. But for purposes of Plaintiff's claim of sex discrimination, [6] Plaintiff is not arguing that the temporally distant comments are discrete acts of discrimination; rather, Plaintiff is arguing that the comments serve as "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. *See also Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) (considering acts that fall outside the limitations period as relevant background evidence to support timely claims). The Court agrees that the more historical comments are evidence that the adverse actions occurred under circumstances giving rise to an inference of discriminatory intent.

[6]    The Court discusses Plaintiff's hostile work environment claim in the next section.

Defendants further argue that the alleged offensive comments were "merely 'stray remarks,' " which "generally 'do not constitute sufficient evidence to support a case of employment discrimination.' " Mem. of Law at 15 (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)). [7] Courts consider four factors, none of which is dispositive, to determine whether a comment is a stray remark or is probative of discrimination: "(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the

context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010).

[7]
        Plaintiff argues that considering whether comments are stray remarks is "inappropriate at the pleading stage." Resp. at 15. But "[c]ourts in the Second Circuit routinely dismiss discrimination claims where the only allegations made in support are stray remarks by non-decisionmakers wholly unconnected to the adverse employment action underlying the claim." *Ahmad v. White Plains City Sch. Dist.*, No. 18-CV-3416, 2019 WL 3202747, at \*5 (S.D.N.Y. July 16, 2019) (collecting employment discrimination decisions granting motions to dismiss on the basis that a plaintiff's claims were predicated on stray remarks).

Plaintiff has adequately alleged that the comments at issue are probative of discriminatory intent and were not mere stray remarks. With respect to the first factor, Plaintiff contends that all of the remarks were made by Marinoff and Maleh, the two men who own the company and who supervised Plaintiff. *See* FAC ¶¶ 27, 32. With respect to the third factor, although Defendants begrudgingly concede that the comments were "arguably offensive," *see* Mem. of Law at 16, the Court has no doubt that, as alleged, a reasonable juror would view the remarks as exceedingly juvenile, obviously offensive, and evidence of discriminatory intent.

Additionally, as alleged, many of the remarks were temporally proximate to the alleged adverse actions. With respect to commissions, Plaintiff contends that commissions that should have been paid in or around February 2020 were delayed by five months. FAC ¶¶ 45, 112–113, 124, 126–128. Plaintiff also alleges that many of Defendants' comments were made around February 2020. For example, Plaintiff claims that "in or around January 2020, Marinoff joked to Plaintiff's colleagues and G&W buyers that Plaintiff produced so much breast milk that she could single handedly put the Borden Milk Company out of business." *Id.* ¶ 93. Additionally, Plaintiff alleges that when she left a February 2020 meeting to pump, Marinoff walked past the designated pumping area and yelled, "Hey pumper, are you done?" *Id.* ¶ 96. *See also id.* ¶¶ 99, 102 (alleging that in March 2020, Marinoff turned to a group of women employees, including Plaintiff, and commented that the company was "turning into a regular dairy farm").

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 100 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

**\*7** With respect to Plaintiff's August 2020 termination, Defendants are correct that the last alleged offensive comment was made in March 2020, five months before Plaintiff was terminated. Mem. of Law at 16. But in evaluating temporal proximity, courts must consider whether there is "any aspect of the facts alleged which could explain such a delay." *Hurd v. N.Y. Health & Hosps. Corp.*, No. 04-CV-998, 2007 WL 678403, at \*6 (S.D.N.Y. Mar. 5, 2007), *aff'd sub nom. Hurd v. N.Y.C. Health & Hosps. Corp.*, No. 07-CV-1250, 2008 WL 5120624 (2d Cir. Dec. 8, 2008). Here, the COVID-19 pandemic could explain the respite in comments. Plaintiff alleges that Defendants made the offensive comments up until she was furloughed in March 2020 and that she was only placed back on the payroll in May. FAC ¶¶ 109, 111, 115. From May through the date she was terminated, Plaintiff worked from home, which meant that she was no longer pumping at the office. Accordingly, the lull in comments could be explained by the change in circumstances brought about by the pandemic, as opposed to a change of attitude by Defendants.

Although Plaintiff does not allege that the comments were made in the context of the Defendants taking adverse employment actions against her, the circumstances of the adverse actions further support an inference of discriminatory intent. With respect to the delayed payment of commissions that were due in February, Plaintiff alleges that in a single conversation, Plaintiff complained that Defendants' harassment based on her pumping at the office was exacerbating her anxiety, *see* FAC ¶ 133, and Defendants told Plaintiff that they intended to continue to withhold the commissions that had been due in February, *id.* ¶ 138. Additionally, Plaintiff alleges that she was terminated soon after she requested that safeguards be put in place to address the alleged harassment. *Id.* ¶¶ 141, 147, 152, 156. In short, both the alleged litany of offensive comments and the circumstances surrounding the adverse employment actions support an inference of discriminatory intent on the part of Defendants.

Because Plaintiff has adequately alleged a *prima facie* case of sex discrimination pursuant to Title VII, Defendants' motion to dismiss that claim is denied.

### C. Plaintiff Has Adequately Alleged Sex Discrimination Claims Pursuant to NYSHRL and NYCHRL

Plaintiff has also adequately alleged sex discrimination claims under the NYSHRL and NYCHRL. [8] While NYSHRL discrimination claims are reviewed according to the same standards as Title VII discrimination claims, *see Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n. 2 (2d Cir. 2010), NYCHRL claims are reviewed "more liberally" than their federal and state counterparts, *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). Accordingly, because Plaintiff has stated a Title VII claim, she has necessarily stated sex discrimination claims pursuant to NYSHRL and NYCHRL. [9] Defendants' motion to dismiss those claims is therefore denied.

[8] Although pregnancy discrimination is not expressly mentioned in NYSHRL or NYCHRL, it is actionable under those statutes as a type of sex discrimination. *See Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 357 (S.D.N.Y. 2012) (collecting cases); *see also Ivanov v. Builderdome, Inc.*, No. 19-CV-3422 (LJL), 2021 WL 2554620, at \*15 (S.D.N.Y. June 22, 2021) ("Though neither the NYSHRL nor the NYCHRL explicitly names pregnancy as a type of actionable discrimination, courts have deemed pregnancy discrimination actionable under both laws." (citation omitted)).

[9] Unlike Title VII, which excludes discrete discriminatory acts that occurred more than 300 days before the filing of an EEOC charge, NYSHRL and NYCHRL each has a three-year statute of limitations period. *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016); *Volpe v. Nassau Cty.*, 915 F. Supp. 2d 284, 292 (E.D.N.Y. 2013). Because Plaintiff has stated a claim pursuant to NYSHRL and NYCHRL as to alleged adverse employment actions that occurred within 300 days of the EEOC filing, the Court need not consider whether Plaintiff has also stated a claim with respect to allegedly earlier occurring adverse actions.

### II. Defendants' Motion to Dismiss Is Denied as to Plaintiff's Hostile Work Environment Claims

**\*8** Plaintiff also alleges that Defendants created a hostile work environment in violation of Title VII, NYSHRL, and NYCHRL. FAC ¶¶ 166, 197, 220. To state a claim for hostile work environment pursuant to Title VII, a plaintiff must plead facts that would allow the Court to infer that the complained

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

of conduct: (1) was objectively severe or pervasive in that it created an environment that a reasonable person would find hostile or abusive; (2) created an environment that was subjectively perceived by the plaintiff as hostile or abusive; and (3) created such an environment because of the plaintiff's sex. *Patane*, 508 F.3d at 113; *see also Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015). "[T]o avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse ....'" *Patane*, 508 F.3d at 113 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)). The Second Circuit has "repeatedly cautioned against setting the bar too high." *Id.*

As discussed above, for purposes of Plaintiff's Title VII claim, the Court may only consider alleged "unlawful employment practices" that occurred after November 15, 2019. *See Vega*, 801 F.3d at 78–79. Hostile work environment claims are different than discrete acts of discrimination, however, because a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' " *Morgan*, 536 U.S. at 117. Accordingly, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105. *See also Petrosino*, 385 F.3d at 220 ("[I]n the case of a hostile work environment claim, the statute of limitations requires that only one sexually harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider the entire time period of the hostile environment in determining liability." (cleaned up)).

Here, Plaintiff has adequately alleged that offensive remarks about breastfeeding and pumping, which contributed to the hostile environment, occurred after November 15, 2019. Because those acts occurred within the time limit, the Court may consider earlier acts which form part of the same hostile work environment claim. *See Morgan*, 536 U.S. at 120. Accordingly, to assess Plaintiff's hostile work environment claims, the Court considers each of the allegedly discriminatory acts in the FAC that relate to breastfeeding and pumping. [10]

[10]    Plaintiff alleged that Defendants initially refused to allow her to take her full maternity leave and

that they pressured her to return early from her maternity leave. *See* FAC, Dkt. 30 ¶¶ 52–59, 62–65. The Court finds that those acts are sufficiently different from her lactation-related claims as to not form "part of the same actionable hostile work environment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002). Because those acts occurred outside the 300-day limitations period, the Court does not consider them.

The Court finds that Plaintiff has pled sufficient facts to indicate that the three elements of a hostile work environment claim have been met. The many comments that Plaintiff alleges Defendants made are enough on their own to support a finding that a reasonable person could deem the environment hostile or abusive. The comments were "more than episodic" and were "sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (cleaned up). Plaintiff has also pled adequately that she subjectively perceived the comments as hostile or abusive. *See, e.g.*, FAC ¶¶ 92, 105, 120, 133.

**\*9** Additionally, Plaintiff has adequately alleged that the hostile work environment was created because of Plaintiff's decision to pump at work. Defendants' alleged comments are all facially related to her protected status, which differentiates Plaintiff's case from many others where the lack of connection warranted the dismissal of the alleged hostile work environment claims. *See, e.g.*, *Littlejohn*, 795 F.3d at 321 (no hostile work environment when supervisor made negative statements about plaintiff, was impatient and used a harsh tone of voice, refused to meet with plaintiff, replaced plaintiff at meetings, wrongly reprimanded plaintiff, increased plaintiff's workload, and made sarcastic comments); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (no hostile work environment when "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"). Here, all of the purportedly offensive comments were directly related to Plaintiff's choice to breastfeed and to pump at the office. Accordingly, Plaintiff has pled that the hostile environment was created because of her sex. In short, Plaintiff has stated a hostile work environment claim pursuant to Title VII.

Hostile work environment claims under Title VII and the NYSHRL are governed by the same standards of liability. *Summa v. Hofstra*, 708 F.3d 115, 123–24 (2d Cir. 2013).

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 102 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

Accordingly, because Plaintiff has stated a hostile work environment claim under Title VII, she has necessarily stated a claim under NYSHRL. Under the NYCHRL, unlike under Title VII and the NYSHRL, there is no distinction between a claim premised on the creation of a hostile work environment and one premised on unlawful discrimination: the former is subsumed into the latter, and a plaintiff need only prove that "she has been treated less well than other employees because of a protected trait." *Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Sotomayor v. N.Y.C.*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims." (internal citation omitted)). Here, with respect to NYCHRL, Plaintiff's hostile work environment claim reinforces her discrimination claim. Because she has adequately alleged that she was treated less well than others because of her choice to breastfeed and to pump, she has stated a claim for discrimination pursuant to the NYCHRL.

For all of these reasons, Defendants' motion to dismiss Plaintiff's hostile work environment claims is denied.

### III. Defendants' Motion to Dismiss Is Granted as to Plaintiff's Disability Claims

#### A. Applicable Law

Plaintiff also alleges that Defendants discriminated against her based on her mental health disability and that they failed to accommodate that disability in violation of the ADA, NYSHRL, and NYCHRL. FAC ¶¶ 178–185; 201–208; 224–231. Like Title VII discrimination claims, disability discrimination and failure to accommodate claims are analyzed using the burden-shifting framework articulated in *McDonnell Douglas*. *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). And, like discrimination claims, to state a claim for disability discrimination or failure to accommodate, a plaintiff need only plead facts necessary to establish a *prima facie* case. *See Robles v. Medisys Health Network, Inc.*, No. 19-CV-6651, 2020 WL 3403191, at *5 (E.D.N.Y. June 19, 2020) (disability discrimination); *Limauro v. Consol. Edison Co. of New York, Inc.*, No. 20-CV-03558, 2021 WL 466952, at *7 (S.D.N.Y. Feb. 9, 2021) (failure to accommodate). [11]

[11] Defendants argue that in the ADA context, the *McDonnell Douglas* burden-shifting framework "although largely developed in the context of the summary judgment stage, applies with equal force to motions to dismiss." Mem. of Law at 7. Any implication that a plaintiff must establish her claims pursuant to the *McDonnell Douglas* framework at the motion to dismiss stage is wrong as a matter of law. To support their proposition, Defendants cite *O'Hara v. Bd. of Coop. Educ. Servs., S. Westchester*, which noted that *McDonnell Douglas* provides the overarching framework for ADA discrimination claims. Mem. of Law at 7 (citing *O'Hara v. Bd. of Coop. Educ. Servs., S. Westchester*, No. 18-CV-8502, 2020 WL 1244474, at *12 (S.D.N.Y. Mar. 16, 2020)). But the *O'Hara* court also recognized that at the motion to dismiss stage, plaintiff has a "reduced pleading burden." *O'Hara*, 2020 WL 1244474, at *12. Defendants' reliance on *Dooley v. JetBlue Airways Corp.* is similarly misplaced. *See* Mem. of Law at 7 (citing *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015)). In that case, the Second Circuit recognized that the burden at the motion to dismiss stage in ADA discrimination claims is much less than what is required at summary judgment or trial. *See Dooley*, 636 F. App'x at 21 (finding that a plaintiff "need only give plausible support to a minimal inference of discriminatory motivation at the pleading stage" (internal citation omitted)). Accordingly, the Court considers only whether Plaintiff has adequately pled a *prima facie* case; the remaining steps in the *McDonnell Douglas* test are appropriately left to later stages of the proceedings.

*10   To allege a *prima facie* case of disability discrimination, "a plaintiff must allege that: (1) the defendant is covered by the [applicable statute]; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the [statute]; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of [plaintiff's] disability or perceived disability." *Caskey v. County of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014) (cleaned up) (ADA claims); *see also Kendall v. Fisse*, 149 F. App'x 19, 21 (2d Cir. 2005) (applying the same standard to NYSHRL and NYCHRL disability discrimination claims).

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 103 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

To allege a *prima facie* case of failure to accommodate a disability, a plaintiff must allege that (1) plaintiff is a person with a disability within the meaning of the relevant statute; (2) plaintiff's employer is covered by the statute and had notice of the plaintiff's disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job; and (4) the employer refused to make such accommodations. *Tse v. New York Univ.*, No. 10-CV-7207, 2013 WL 5288848, at *10 (S.D.N.Y. Sept. 19, 2013) (finding that the same standard applies to ADA, NYSHRL, and NYCHRL claims). There is some overlap among the elements of the two types of claims; first and foremost, both require the plaintiff to allege adequately that she has a qualifying disability under the applicable statute.

## B. Plaintiff Has Not Adequately Alleged that She Suffers from a Disability Within the Meaning of the ADA

Defendants' motion to dismiss Plaintiff's ADA disability discrimination and failure to accommodate claims is granted because she has not adequately pled that she suffers from a disability within the meaning of the ADA. To plead an ADA-qualifying mental disability, a plaintiff must allege that: (1) she suffers from mental impairment; (2) the mental impairment affects a major life activity; and (3) the impairment substantially limits the major life activity. *See Potter v. Xerox Corp.*, 1 F. App'x 34, 36–37 (2d Cir. 2001) (citing *Bartlett v. New York State Bd. of Law Exam'rs*, 226 F.3d 69, 79 (2d Cir. 2000)); *see also* 42 U.S.C. § 12102(1)(A) (defining disability as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual").

The EEOC has promulgated regulations that expand upon the ADA's definition of a "disability." With respect to a mental impairment, EEOC regulations make clear that "[a]ny mental or psychological disorder," including an "emotional or mental illness," qualifies as a covered impairment. *See* 29 C.F.R. § 1630.2(h)(2). Here, Plaintiff alleges that she suffers from "generalized anxiety disorder." FAC ¶ 104. Accordingly, Plaintiff has adequately pled the first element of an ADA-qualifying disability: she suffers from an impairment.

At issue is whether Plaintiff has adequately pled that her impairment substantially limits a major life activity. The EEOC has explained that major life activities include, but are not limited to, "[c]aring for oneself, performing manual tasks, ... sleeping, ... concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). Additionally, EEOC regulations note that an impairment "is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

**\*11** Plaintiff alleges that she was diagnosed with "generalized anxiety disorder" in 2011 and that she has continued to receive psychiatric treatment since then for her condition. *See* FAC ¶¶ 104, 117–118. But a diagnosis, standing alone, establishes only that Plaintiff has an impairment; it does not establish that any major life activity is limited by that impairment. The EEOC gives some weight to certain mental health diagnoses, which likely qualify as disabilities under the ADA because they will "virtually always be found to impose a substantial limitation on a major life activity." *See* 29 C.F.R. § 1630.2(j)(3)(ii). For example, EEOC regulations note that "major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function," and likely qualify as disabilities under the ADA. *See* 29 C.F. R. § 1630.2(j)(3)(iii). *See also Robles v. Medisys Health Network, Inc.*, No. 19-CV-6651, 2020 WL 3403191, at *7 (E.D.N.Y. June 19, 2020) (finding that a plaintiff had plausibly pled that his bipolar disorder, which required him to be hospitalized three times, qualified as a disability under the ADA). Plaintiff's alleged mental health condition, generalized anxiety disorder, is not on the list of EEOC conditions likely to qualify as a disability by its very nature. Accordingly, allegations that Plaintiff has been diagnosed with the condition, without more, are insufficient to plead that Plaintiff suffered from an ADA-qualifying disability.

In addition to her diagnosis, Plaintiff also asserts that her anxiety "substantially interferes with her ability to sleep, concentrate, think, and interact with others," *see* FAC ¶ 104, and that Defendants' "pervasive harassment severely exacerbated Plaintiff's anxiety and the substantial limitations on Plaintiff's major life functions associated therewith," *id.* ¶ 105. Plaintiff's allegations in those two paragraphs are conclusory. [12] Paragraph 104 is a formulaic recitation of a few major life activities taken from EEOC's list. *Compare* FAC ¶ 104 *with* 29 C.F.R. § 1630.2(i)(1)(i); *see also Cain v. Mandl Coll. Of Allied Health*, No. 14-CV-1729, 2017 WL 2709743, at *4 (S.D.N.Y. June 22, 2017) (finding that Plaintiff's allegations "merely track the language of the statute" and that "[v]ague, conclusory assertions

2021 WL 4267815

without details on how her condition actually affects a major life activity are insufficient" on a motion to dismiss). Paragraph 105 simply states that Defendants' actions made her impairment worse; it does not add any factual allegations to support the conclusion that her impairment substantially limited major life activities. *See Laface v. E. Suffolk BOCES, No. 18-CV-1314, 2020 WL 2489774, at \*11 (E.D.N.Y. May 14, 2020)* (holding that Plaintiff failed to plead that his condition substantially limited major life activities because his "numerous conclusory statements regarding his disability do not expand on how the disability affects ... major life activities"). Accordingly, the allegations in paragraphs 104 and 105 do not adequately allege that Plaintiff suffered from a disability within the meaning of the ADA.

12      Although "a complaint does not need to contain detailed or elaborate factual allegations," *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014), "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Plaintiff also alleges "[b]y way of example only, [that] from the disclosure of her pregnancy through her termination, Plaintiff suffered from increased difficulty sleeping and concentrating as a result of Defendants' harassment." FAC ¶ 106. But that allegation also fails to state a claim because she includes no facts from which the Court can infer the frequency, duration, or severity of her difficulties sleeping and concentrating. Because difficulties with sleep and concentration are widespread, for the Court to infer that there is a substantial limitation of those major life activities, Plaintiff must allege facts from which the Court can infer that her difficulties were substantial "as compared to most people in the general population." 29 C.F.R. § 1630.2(j) (1)(ii). Plaintiff alleges no facts from which the Court can deduce whether, and, if so to what extent, Plaintiff's anxiety limits her ability to sleep and to concentrate as compared to others in the general population. [13] "Conclusory statements regarding sleep difficulties are ... insufficient to adequately allege a substantial limitation." *Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 393–94 (E.D.N.Y. 2016) (collecting cases where sleep-related claims were dismissed because the plaintiffs had only made bare allegations that their conditions limited their ability to sleep). The same reasoning holds true for concentration; bare and vague allegations that a plaintiff has trouble concentrating are insufficient to allege

a substantial impairment of a major life activity. Accordingly, the allegations in paragraph 106 are insufficient to plead a qualifying disability within the meaning of the ADA.

13      To qualify as a disability under the ADA, the impairment — and not some other cause — must substantially limit the major life activity in question. Plaintiff has not alleged facts from which the Court can plausibly infer that it was her anxiety that limited her ability to sleep and concentrate. That absence is particularly problematic in this case where there are plausible alternative explanations — like being pregnant or the parent of a new baby — that could easily explain difficulties sleeping and concentrating. *See* Mem. of Law at 9. Plaintiff contends that such arguments are more appropriate at later stages of the proceeding. *See* Resp. at 7 (citing *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (finding that a court's task on a motion to dismiss "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence ...." (internal citation omitted)). Because the Court has concluded that Plaintiff has not adequately pled that her ability to sleep and concentrate were substantially limited, the Court declines to reach the question of whether the cause of her purported sleep and concentration problems was her alleged disability or something else.

**\*12** The last pertinent allegation in the FAC is that Plaintiff "became even more anxious interacting with her colleagues, limiting [interactions] to the extent practicable, as Defendants had made a spectacle of her before the entire office based on her decision to breast feed." FAC ¶ 107. The Court construes that allegation as intended support for Plaintiff's contention that her anxiety substantially limits her ability to "interact with others." *Id.* ¶ 104 (naming Plaintiff's ability "to sleep, concentrate, think, and interact with others" as the major life activities affected by her anxiety). As an initial matter, here too, Plaintiff has failed to plead that her ability to interact with others is any more limited than that of the general population. [14] More specifically, though, Plaintiff has not pled that her anxiety has created a sufficiently significant impediment to her ability to interact with others to constitute a disability within the meaning of the ADA. The Second Circuit has explained that a person's ability to interact with others is substantially limited within the meaning of the ADA when the person's "impairment severely limits [his] ability to connect with others, *i.e.*, to initiate contact with other people

2021 WL 4267815

and respond to them, or to go among other people — the most basic level of these activities." *Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 203 (2d Cir. 2004). [15] Plaintiff alleges that she purposefully avoided interactions at work, not that she was unable to initiate contact or respond to others. Additionally, Plaintiff's allegations are entirely limited to the work setting; she does not allege that her anxiety impeded her ability to interact with others more generally, including outside the office. Accordingly, Plaintiff has not adequately alleged that her anxiety substantially limited her ability to interact with others.

[14]    The Court takes judicial notice of the fact that many employees are anxious when interacting with their bosses and that many people find certain social settings to be stressful and awkward.

[15]    The Court recognizes that *Jacques v. DiMarzio, Inc.* involved an appeal from a judgment following a jury trial, which required the plaintiff to meet a more stringent burden of proof than simply plausibly alleging a cause of action. *Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 195 (2d Cir. 2004). But *Jacques* is still helpful because it discusses what constitutes a substantial limitation on a plaintiff's ability to interact with others; the Court has applied the liberal pleading standard to that analysis.

Because Plaintiff has not adequately pled that her generalized anxiety disorder substantially limited any major life activity, she has not plausibly alleged that she suffered from a disability within the meaning of the ADA, a necessary element of the claim. [16] Accordingly, Defendants' motion to dismiss Plaintiff's ADA claims for disability discrimination and for failure to accommodate is granted. [17]

[16]    With respect to her failure to accommodate claim, even if Plaintiff had adequately alleged that she suffered from an ADA-qualifying disability, the Court questions whether she adequately alleged that she could perform the essential functions of the job at issue with a reasonable accommodation. *Limauro v. Consol. Edison Co. of New York, Inc.,* No. 20-CV-3558, 2021 WL 466952, at *7 (S.D.N.Y. Feb. 9, 2021). There is no doubt that Plaintiff was initially qualified for her position. Plaintiff alleges that she worked for Defendants for seven years, *id.* ¶ 36, and that for years she had

performed her duties "admirably and successfully," *id.* ¶ 108. "Courts have consistently held that a plaintiff's ability to hold a job for an extended period of time raises the inference that he was qualified for the job." *Limauro,* 2021 WL 466952, at *6.

But Plaintiff alleges no facts to support the conclusion that she continued to be qualified after her generalized anxiety disorder was purportedly "exacerbated" by "Defendants' pervasive harassment." FAC ¶ 108; *see also id.* ¶¶ 6, 117, 118, 133. Plaintiff's proposed reasonable accommodation was that she be allowed to work from home for four to six months. *Id.* ¶ 121. Plaintiff claims that she "would be able to perform the essential functions of her job with this proposed reasonable accommodation, as she was capable of carrying out her job duties remotely." *Id.* ¶ 122. But that allegation is conclusory; she provides no facts to support the contention that she could, in fact, carry out her essential job functions from home. *See Madonia v. S 37 Mgmt., Inc.,* No. 14-CV-628, 2014 WL 4057430, at *2 (N.D. Ill. Aug. 14, 2014) (dismissing a complaint because it had "no specific allegation that [plaintiff] would have been able to perform the essential functions of her job" with "the four-day week accommodation").

Plaintiff's argument that her work from home proposal was reasonable because "Defendants afforded her the precise accommodation she requested before rescinding it," *see* Resp. at 9, is not persuasive. Plaintiff, like millions of other employees, was initially allowed to work from home because of the COVID-19 pandemic; Plaintiff alleges no facts from which the Court could infer that she could perform the essential functions of her job from home after her colleagues and other work contacts returned to their offices. *See* FAC ¶¶ 6, 109–110, 135, 137. Even given the liberal pleading standard, and even viewing the facts in the light most favorable to Plaintiff, Plaintiff has not adequately alleged the elements of a failure to accommodate claim.

[17]    The Court considers Plaintiff's claim of retaliation pursuant to the ADA in section V below.

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

## C. The Court Denies Plaintiff
## Leave to Amend Her ADA Claims

**\*13**  Plaintiff requests leave to amend her pleading "in the event that the Court dismisses some or all of Plaintiff's claims." Resp. at 30. [18]  But a "plaintiff need not be given leave to amend if [she] fails to specify ... how amendment would cure the pleading deficiencies in [her] complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014). Plaintiff has given no indication what allegations she would add to her pleadings or how they would overcome the obvious deficiencies in the FAC.

[18]      In support of her request for leave to amend the complaint, Plaintiff cites *Williams v. Citigroup Inc.*, for the proposition that courts should not dismiss claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects of those claims." *See* Resp. at 30 (citing *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011)). Although it has no bearing on the Court's decision to deny leave to amend, the Court notes that the *Williams* decision is devoid of such a holding and does not contain the phrases "the benefit of a ruling" or "precise defects of those claims." The Court encourages Plaintiff's counsel to refrain from misquoting caselaw.

Additionally, Plaintiff has already had the opportunity to amend her pleadings once in response to Defendant's first motion to dismiss. *See* Letter, Dkt. 29; FAC, Dkt. 30. In its initial memorandum of law, Defendants previewed many of their arguments regarding the shortcomings of the allegations in the complaint vis-à-vis whether Plaintiff is disabled within the meaning of the ADA. *See* Orig. Mem. of Law, Dkt. 27 at 15–18. Because Plaintiff already has had the opportunity to amend on just those issues and because the arguments made in response to the current motion to dismiss give no indication that the FAC's defects are curable, Plaintiff is denied leave to amend her ADA discrimination and failure to accommodate claims, and those claims are dismissed with prejudice.

## D. The Court Declines to Exercise Supplemental
## Jurisdiction over Plaintiff's Disability-Related Claims
## Brought Pursuant to NYSHRL and NYCHRL

NYSHRL and NYCHRL define disability more broadly than the ADA. Plaintiff may well have adequately stated causes of action for disability discrimination and failure to accommodate under NYSHRL and NYCHRL. Be that as it may, the Court declines to exercise supplemental jurisdiction over those claims.

A federal court may exercise supplemental jurisdiction over state law claims only if they are so related to a claim over which the Court has original jurisdiction "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Disputes are part of the same case or controversy if they "derive from a common nucleus of operative fact." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (citation omitted).

Here, the Court has dismissed Plaintiff's ADA discrimination and failure to accommodate claims without leave to amend. Plaintiff's NYSHRL and NYCHRL disability-related claims do not have a common nucleus of operative fact with Plaintiff's remaining federal claims. The NYSHRL and NYCHRL disability-related claims require considering, *inter alia*, whether Plaintiff has a disability; whether she suffered adverse employment actions because of the disability; whether she was qualified for her position with or without a reasonable accommodation; whether Plaintiff's proposed accommodation was reasonable; and whether Defendants refused to make reasonable accommodations. The operative facts that the Court would have to consider in making those determinations are unique to the disability context and do not overlap with Plaintiff's Title VII claims, which are the only remaining federal claims in this action. Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state and municipal disability claims, and they are dismissed without prejudice.

## IV. Defendants' Motion to Dismiss Is Granted in Part
## and Denied in Part as to Plaintiff's New York Labor
## Law Claims

**\*14**  Plaintiff brings three causes of action pursuant to NYLL §§ 191(1)(c), 191(3), 193, and 191-c: failure to pay all wages owed; failure to pay final wages; and failure to timely pay wages. *See* FAC ¶¶ 240–281. Instead of analyzing Plaintiff's claims by cause of action, [19] the Court considers Plaintiff's claims pursuant to each statutory provision. [20]

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

19 Defendants contend that count 11, failure to pay all wages owed, and count 12, failure to pay final wages, should be dismissed because they are duplicative. *See* Mem. of Law at 26–27 (noting that under both claims, Plaintiff seeks to recover $27,327.19 in unpaid commissions). But a plaintiff is entitled to plead in the alternative. *See DirecTV, Inc. v. Meinhart*, 158 F. App'x 309, 311 (2d Cir. 2005); *Int'l Elecs., Inc. v. Media Syndication Global, Inc.*, No. 02-CV-4274, 2002 WL 1897661, at *1 (S.D.N.Y. Aug. 17, 2002). And, as Plaintiff acknowledges, she is not seeking to recover duplicative damages. Resp. at 28. Were this case to proceed to trial, any risk of duplicative damages would be cured by an appropriate instruction to the jury. *Id.* (quoting *Malmsteen v. Cleopatra Records, Inc.*, No. 09-CV-9056, 2011 WL 13340070, at *10 (S.D.N.Y. Mar. 21, 2011)).

20 The Court has supplemental jurisdiction over Plaintiff's New York Labor Law claims. Plaintiff alleges that she was not paid the commissions she was owed in a timely manner and that Defendants still owe her some of her commissions, in violation of NYLL. The purported delay in payment and the failure to pay commissions are also alleged as adverse employment actions as part of Plaintiff's sex discrimination claims. Accordingly, Plaintiff's state law labor claims have a common nucleus of operative fact with Plaintiff's Title VII claims. *See* 28 U.S.C. § 1367(a).

### A. Defendants' Motion to Dismiss Plaintiff's Claims Brought Pursuant to NYLL § 191(1)(c) Is Denied

Section 191(1)(c) of New York Labor Law provides in relevant part:

> A commission salesperson shall be paid the ... commissions ... earned or payable in accordance with the agreed terms of employment, ... if monthly or more frequent payment of wages, salary, ... or commissions are substantial, then additional compensation earned ... may be paid less frequently than once in each month, but in no event later than the time provided in the employment agreement or compensation plan.

NYLL § 191(1)(c). Plaintiff argues that Defendants violated this provision in two ways: by failing to pay her the full amount of commissions owed, FAC ¶ 248, and by failing to pay her in a timely manner, *id.* ¶¶ 258, 268.

Defendants contend that the provision does not apply to Plaintiff because she has not alleged adequately that she is a commissioned salesperson as defined by NYLL. Mem. of Law at 26. NYLL defines a "commission salesperson" as "any employee whose principal activity is the selling of any goods, wares, [or] merchandise ... and whose earnings are based in whole or in part on commissions." NYLL § 190(6). Plaintiff has pled adequately that she qualifies as a commission salesperson. She alleges that she was an "Account Executive," and that her job description included building new accounts and improving relationships with existing vendors. FAC ¶¶ 35–36. When viewed in the light most favorable to Plaintiff, the Court finds that Plaintiff has nudged her claim that she is a "commission salesperson" from the conceivable to the plausible.

**\*15** With respect to Defendants' alleged failure to pay Plaintiff her full commissions, a section 191(1)(c) claim hinges on whether Plaintiff is owed commissions "earned ... in accordance with the agreed terms of employment." NYLL § 191(1)(c). Accordingly, a claim under section 191(1)(c) "rises and falls with plaintiff's claim for breach of contract, and [any] failure to establish a contractual right to wages necessarily precludes a statutory claim under New York's labor law." *Williams v. Preeminent Protective Servs.*, Inc., No. 14-CV-5333, 2017 WL 1592556, at *4 (E.D.N.Y. Apr. 28, 2017) (cleaned up); *see also Holick v. Cellular Sales of New York, LLC*, No. 12-CV-584, 2019 WL 3253941, at *6 (N.D.N.Y. July 19, 2019) ("Indeed, courts applying Section 191 focus on a strict application of contractual rights as they apply to a party's claim for unpaid wages." (collecting cases)). Defendants argue that Plaintiff has not pled specific facts from which the Court can infer the terms of the agreement. *See* Mem. of Law at 25–26. The Court disagrees. Plaintiff has alleged the specific terms of her employment, the commission structure, and the formula for calculating her commission. *See* FAC ¶¶ 39–46 (alleging that commissions were calculated based on percentages tied to particular gross profit margins, defining when commissions are considered

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

earned, and describing other aspects of the commissions formula). Accordingly, Plaintiff has stated a claim for unpaid wages pursuant to NYLL § 191(1)(c). [21]

> [21]   Defendants further argue that Plaintiff has not pled facts to establish that the amount of unpaid commission is $27,327.19 — the amount referenced in the complaint. *See* Mem. of Law at 25–26. But as discussed above, *see* note 4 *supra*, Plaintiff is not required to plead the exact amount of damages or how that amount was determined.

Plaintiff has also stated a claim that Defendants have failed to pay Plaintiff in a timely manner in violation of NYLL § 191(1)(c). Section 191(1)(c) provides that if the salary or commissions of a commission salesperson are "substantial," then commissions may be paid less frequently than once a month but "in no event later than the time provide in the employment agreement." NYLL § 191(1)(c). The parties agree that Plaintiff's pay was "substantial" within the meaning of the statute. *See* Mem. of Law at 27–28; Resp. at 27–28.[22] Plaintiff has adequately stated a claim that she was not paid commissions in accordance with the terms of her employment. Plaintiff alleges that Defendants were obligated to pay Plaintiff "in or around August" for commissions earned during the first half of the year, FAC ¶ 43, and "in or around February" of the following year for commissions earned during the second half of a year, *id.* ¶ 45. She then alleges that she received commissions for work completed in the first half of 2019 in October and November of that year, two or three months after they were due, *id.* ¶¶ 63, 79, 81, and received commissions for work completed in the second half of 2019 in June and July 2020, three to five months after they were due, *id.* ¶¶ 112–113, 124, 126–128.[23] Accordingly, when viewed in the light most favorable to Plaintiff, she had alleged adequately that Defendants failed to pay her in a timely manner in violation of NYLL § 191(1)(c).

> [22]   Plaintiff alleges in the FAC that Defendants violated NYLL when they failed to pay Plaintiff her commissions on a monthly basis. *See* FAC ¶¶ 265, 268. But Plaintiff appears to have abandoned those claims in her response to the motion to dismiss. *See* Resp. at 27–28 (admitting that Plaintiff's commissions were substantial and contending that Defendants failed to pay Plaintiff within the timeline purportedly agreed upon by the parties). To the extent that Plaintiff is alleging

that Defendants violated NYLL by not paying commissions on a monthly basis, Defendants' motion to dismiss that portion of her claim is granted.

> [23]   According to the Plaintiff, commissions were due "in or around" August and February. That leaves room for argument about what the actual agreement was (*i.e.*, is October "around" August?). The Court presumes that there are either writings or a course of dealing that will clarify with better precision the exact parameters of the agreement. For purposes of a motion to dismiss, however, the allegations are sufficient.

**\*16**  Because Plaintiff has stated claims for relief pursuant to NYLL § 191(1)(c), Defendants' motion to dismiss claims brought pursuant to that provision is denied.

### B. Defendants' Motion to Dismiss Plaintiff's Claims Brought Pursuant to NYLL § 191(3) Is Denied

Plaintiff also alleges that Defendants failed to pay what she was owed upon termination. FAC ¶¶ 248, 258. Section 191(3) of NYLL provides: "If employment is terminated, the employer shall pay the wages not later than the regular pay day for the pay period during which the termination occurred, as established in accordance with the provisions of this section." NYLL § 191(3). Plaintiff was terminated on August 10, 2020. FAC ¶ 156. She alleges that she was not paid commissions that were owed to her when she was terminated. *Id.* ¶¶ 129, 131, 247, 257. Such allegations are sufficient to state a claim for relief pursuant to NYLL § 191(3). *See Testa v. Carefusion*, No. 14-CV-5202, 2016 WL 4099113, at *6 (E.D.N.Y. Aug. 2, 2016) (declining to dismiss a section 191(3) claim because the Plaintiff had averred that he was owed commissions but was not paid upon his termination); *id.* (collecting cases with the same holding). In short, Defendants' motion to dismiss Plaintiff's claims brought pursuant to NYLL § 191(3) is denied.

### C. Defendants' Motion to Dismiss Plaintiff's Claims Brought Pursuant to NYLL § 193 Is Granted

Plaintiff also alleges that Defendants violated section 193 of New York Labor Law. FAC ¶ 248. Pursuant to NYLL § 193(1)(b), "[n]o employer shall make any deduction from the wages of an employee, except deductions which ... are

2021 WL 4267815

expressly authorized in writing by the employee and are for the benefit of the employee." NYLL § 193(1)(b). "In order to state a claim for a violation of NYLL § 193, a plaintiff must allege a specific deduction from wages and not merely a failure to pay wages." *Goldberg v. Jacquet*, 667 F. App'x 313, 314 (2d Cir. 2016) (citing *Kletter v. Fleming*, 32 A.D.3d 566, 567 (3 Dep't 2006)). More specifically, section 193 "was intended to place the risk of loss for such things as damaged or spoiled merchandise on the employer rather than the employee." *Komlossy v. Faruqi & Faruqi, LLP*, No. 15-CV-9316, 2017 WL 722033, at *14 (S.D.N.Y. Feb. 23, 2017), *aff'd*, 714 F. App'x 11 (2d Cir. 2017) (cleaned up).

Here, Plaintiff has not alleged any facts about any specific deductions she claims were wrongfully taken from her pay. Her own characterization of nonpayment suggests that she is alleging a "failure to pay" claim, not a wrongful deduction claim. Her factual allegations focus on the withholding of commissions or being paid late, *see* FAC ¶¶ 47, 63, 79, 81, 124, 126–129, 138; she alleges no facts regarding deductions from her salary or commissions. Her only allegation pertinent to deductions, that "Defendants unlawfully deducted from [her] total commissions," *see* FAC ¶ 130, is incomprehensible. Because section 193 "has nothing to do with failure to pay," and instead governs "the specific subject of making deductions from wages," *see Heap v. CenturyLink, Inc.*, No. 18-CV-1220, 2020 WL 1489801, at *15 (S.D.N.Y. Mar. 27, 2020) (citation omitted), the absence of facts regarding particular deductions is fatal to her claim.[24] Accordingly, Defendants' motion to dismiss Plaintiff's claims brought under NYLL § 193 is granted.

[24] Section 193 prohibits certain types of deductions from the "wages" of an employee. NYLL § 193. Defendants contend that Plaintiff's commissions do not qualify as wages because they are dependent on Defendants' financial success and profits. *See* Reply, Dkt. 54 at 12–13. Defendants are correct that "profit-sharing arrangements" that are dependent on the financial success of the business are not considered wages under section 193. *See Truelove v. Ne. Cap. & Advisory, Inc.*, 95 N.Y.2d 220, 223–24 (2000). But Plaintiff has adequately pled that her commission arrangement is distinct from the overall profitability of the company and is instead linked to the profits that her own sales created. *See* FAC ¶¶ 39–40 (noting that her commissions are based on a percentage of the sales she generated). Accordingly, Defendants' argument that Plaintiff's

commissions are not wages carries little weight. Ultimately, though, it is Plaintiff's failure to plead facts from which the Court can infer that Defendants took deductions from her pay that dooms her section 193 claims.

## D. Defendants' Motion to Dismiss Plaintiff's Claims Brought Pursuant to NYLL § 191-c Is Granted

**\*17** Plaintiff also contends that Defendants violated section 191-c of New York Labor Law. *See* FAC ¶¶ 248, 258. Section 191-c requires that "sales representatives" be paid "all earned commissions" within five business days of termination. NYLL § 191-c(1). Defendants argue that "sales representatives," as the term is used in NYLL § 191-c, is limited to independent contractors and does not apply to employees. *See* Mem. of Law at 26 (citing *Goldberg v. Select Indus., Inc.*, 202 A.D.2d 312, 315 (1st Dep't 1994) (noting that § 191-c applies "only to sales representatives who are independent contractors rather than employees")). In response, Plaintiff appears to have abandoned her claims pursuant to section 191-c and instead argues that Plaintiff's causes of action should survive because they are also brought pursuant to sections 191(1)(c) and 193, which are not limited to independent contractors. Resp. at 27 n.8; *see also* FAC ¶ 21 (alleging that Plaintiff "was employed" by Defendants). The Court construes Plaintiff's response as a concession that section 191-c does not apply to her. Accordingly, the Court dismisses Plaintiff's section 191-c claims.

## E. The Court Denies Plaintiff Leave to Amend Her NYLL Claims

Plaintiff's request for leave to amend her dismissed NYLL claims, *see* Resp. at 30, is denied. With respect to claims brought pursuant to NYLL § 193, Plaintiff has provided no indication that she could allege any facts tending to show that Defendants took deductions from her pay. And because Plaintiff contends that she was an employee and not an independent contractor, her claims pursuant to NYLL § 191-c fail as a matter of law; no amendment could cure the deficiency. In short, Plaintiff's request for leave to amend her NYLL claims is denied, and Plaintiff's claims, to the extent they are brought pursuant to NYLL §§ 193 or 191-c, are dismissed with prejudice.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 110 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

## V. Defendants' Motion to Dismiss Is Denied as to Plaintiff's Retaliation Claims

### A. Applicable Law

Plaintiff brings retaliation claims pursuant to five statutes: Title VII, ADA, NYSHRL, NYCHRL, and NYLL. *See* FAC ¶¶ 170–177 (Title VII); *id.* ¶¶ 186–193 (ADA); *id.* ¶¶ 209–216 (NYSHRL); *id.* ¶¶ 232–239 (NYCHRL); *id.* ¶¶ 272–281 (NYLL). Except for NYCHRL, the elements of a *prima facie* case of retaliation are essentially the same across the other four statutes. Specifically, Plaintiff must allege that (1) she engaged in protected activity, (2) her employer was aware of her protected activity, (3) her employer took an adverse employment action against her, and (4) a causal connection exists between the adverse action and the protected activity. *Owens v. N.Y.C. Dep't of Educ.*, No. 17-CV-519, 2021 WL 3862974, at *15 (S.D.N.Y. Aug. 30, 2021); *see also Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (Title VII and NYSHRL); *Caskey v. Cty. of Ontario*, 560 F. App'x 57, 58 (2d Cir. 2014) (ADA); *Williams v. AAA S. New England*, No. 13-CV-855, 2015 WL 864891, at *5 (S.D.N.Y. Mar. 2, 2015) (NYLL). Under the NYCHRL, the plaintiff need not plead or prove an adverse employment action; instead, the plaintiff need only plead and prove that something happened that would be reasonably likely to deter a person from engaging in protected activity. All of the other elements are essentially the same. *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 446 (S.D.N.Y. 2011).

Defendants argue that Plaintiff has not adequately alleged the fourth element of the *prima facie* case, which requires that Plaintiff plead a causal connection between an alleged adverse action and a protected activity. Mem. of Law at 21–22. Proof of causation can be either "(1) indirect[ ], by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) direct[ ], through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (alteration omitted)). With respect to indirect proof of causation, temporal proximity is enough to plead a *prima facie* case of retaliation if the proximity is "very close." *Dhar v. City of New York*, 655 F. App'x 864, 865–66 (2d Cir. 2016) (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)). Courts in this

District generally find two or three months to be the outer limit for alleging the existence of causation based on temporal proximity. *See, e.g.*, *Lambert v. Trump Int'l Hotel & Tower*, No. 15-CV-582, 2018 WL 1633765, at *11 (S.D.N.Y. Mar. 31, 2018) ("[T]he passage of about two months between the protected activity and the adverse action appears to be the approximate dividing line." (citations omitted)); *Percy v. New York (Hudson Valley DDSO)*, 264 F. Supp. 3d 574, 586 (S.D.N.Y. 2017) ("Generally, three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation." (cleaned up)). Thus, Plaintiff's retaliation claims can survive a motion to dismiss if she has alleged that the protected activities in which she engaged occurred within two to three months of the alleged retaliatory adverse employment action.

**\*18** Defendants further contend that because "Plaintiff has pleaded a legitimate, non-discriminatory business reason for her termination, her claims for retaliation must be dismissed." Mem. of Law at 22. Defendants appear to be referring to the fact that Plaintiff "surreptitiously recorded meetings with G&W's managers and buyers on company premises without the parties' knowledge or consent." FAC ¶ 157. But Defendants' proffer of a legitimate non-discriminatory reason for the allegedly retaliatory adverse employment action cannot be considered on a motion to dismiss. *See Menaker*, 935 F.3d at 30 ("If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer at the summary judgment stage to articulate some legitimate, nondiscriminatory reason for the adverse employment action." (cleaned up)); *Littlejohn*, 795 F.3d at 311 ("The plaintiff cannot reasonably be required to allege more facts in the complaint than the plaintiff would need to defeat a motion for summary judgment made prior to the defendant's furnishing of a non-discriminatory justification."); *Levy v. Leg. Aid Soc'y*, 408 F. Supp. 3d 209, 216 (E.D.N.Y. 2019) ("[A]ny inquiry into any non-discriminatory reasons for a defendant's conduct is reserved for summary judgment or trial."). Tellingly, the eight cases that Defendants cite to support their contention that a proffered legitimate reason may defeat causation at the motion to dismiss stage are all summary judgment decisions. *See* Mem. of Law at 21–23 (citing eight summary judgment cases). Accordingly, at this stage of the litigation, the Court does not consider what role, if any, Plaintiff's recordings played in precipitating the adverse employment actions she claims to have experienced. [25] All the Court considers at the motion to dismiss stage is whether Plaintiff has made out a *prima facie* case of retaliation under the five statutes.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 111 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

25    Plaintiff makes a lot of hay out of the supposed difference between her covert recording of certain conversations and her submission of those recordings to Defendants. Resp. at 24–25. She contends that although "Plaintiff's recording of conversations was not itself protected," her "submission of those recordings through counsel to support her claims undoubtedly was." *Id.* at 25. The Court declines to engage in the semantic gymnastics required to differentiate between the recordings themselves and the submissions of those same recordings.

### B. Plaintiff Has Adequately Alleged a *Prima Facie* Case of Retaliation Pursuant to Title VII, NYSHRL, and NYCHRL

Plaintiff has adequately alleged a *prima facie* case of retaliation pursuant to Title VII, NYSHRL, and NYCHRL based on Plaintiff's protected activities vis-à-vis alleged sex discrimination. Defendants only contest the fourth element of Plaintiff's *prima facie* case; they contend that Plaintiff has not sufficiently pled a causal connection between an alleged adverse action and alleged protected activity. Mem. of Law at 22–23. [26] The Court disagrees. Plaintiff has adequately alleged that she engaged in protected activities that were followed closely by discriminatory treatment, and she has pled sufficient facts from which the Court can infer retaliatory animus.

26    Although Defendants do not dispute that Plaintiff has adequately alleged the third element of the *prima facie* case of retaliation (an adverse action), many of the adverse actions alleged by Plaintiff are clearly untimely. For purposes of Plaintiff's Title VII retaliation claims, the Court may only consider alleged "unlawful employment practices" that occurred within the statutory time-period, *i.e.*, from November 15, 2019 onwards. *See Morgan,* 536 U.S. at 105 (2002) (holding that the same statutory time-period applies to discrimination and retaliation claims). To the extent Plaintiff relies on alleged adverse actions that occurred before November 15, 2019, including those that purportedly occurred before she returned from her maternity leave and on the day she returned from leave, *see* FAC ¶¶ 50–51, 56–60, 63–65,

66–69, 70–84, those alleged adverse employment actions may not be considered as part of her Title VII retaliation claims. For the purposes of NYSHRL and NYCHRL retaliation claims, those earlier occurring alleged adverse actions may be considered because they fall within the three-year statute of limitations applicable to both statutes. *Taylor,* 207 F. Supp. 3d at 302; *Volpe,* 915 F. Supp. 2d at 292. But because Plaintiff has stated a claim as to alleged adverse employment actions that occurred within 300 days of the EEOC filing, the Court need not consider here whether Plaintiff has also stated a claim under NYSHRL and NYCHRL with respect to allegedly earlier occurring adverse actions.

With respect to temporal proximity, Plaintiff adequately alleged that her complaints of sex discrimination (protected activities) [27] were followed closely by the withholding of her commissions and her termination (adverse employment actions). For example, Plaintiff alleges that "on or around June 15, 2020," Plaintiff complained to Maleh about "Defendants' harassment of her for pumping at work." FAC ¶ 120. Plaintiff further alleges that in that same conversation, Maleh told Plaintiff that "Defendants would continue to withhold her long overdue earned commissions." *Id.* ¶ 124. Given that Maleh informed Plaintiff of the adverse employment action during the same conversation that Plaintiff engaged in a protected activity, there is no question that the two were temporally proximate to one another. Additionally, Plaintiff alleges that on June 30, 2020, she "asserted claims against Defendants" for pregnancy discrimination by sending Defendants a letter through counsel. *Id.* ¶ 140. She also alleges that she was terminated a little over one month later, on August 10, 2020. *Id.* ¶ 156. The temporal proximity between the written complaint (protected activity) and the termination (adverse action) is sufficient to support an inference of causation at this stage of the proceedings. *See Kassel v. City of Middletown,* 272 F. Supp. 3d 516, 538 (S.D.N.Y. 2017) ("The interview took place less than two months after the discussion with Amodio, an amount of time that the Second Circuit has found to be sufficient for the purpose of establishing temporal proximity." (citations omitted)).

27    There is no dispute that Plaintiff's alleged complaints to her supervisors constitute protected activities. *See Giscombe v. N.Y.C. Dep't of Educ.,* 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) ("Informal

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 112 of 321

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

complaints to supervisors, instituting litigation, or filing a formal complaint are protected activities under Title VII." (cleaned up)).

**\*19** Moreover, Plaintiff has also alleged direct evidence of retaliatory animus. Defendants' many remarks disparaging Plaintiff for her decision to breastfeed and to pump, *see* FAC ¶¶ 51, 68, 78, 83, 84, 87, 88, 89–90, 93, 94–98, 102–103; *see also* Resp. at 14–15 (listing the 23 comments found in the FAC), support an inference that the requisite causation existed. Defendants only argument in response is that Plaintiff cannot establish causation on that basis for the same reasons they argue Plaintiff could not show an inference of discrimination as part of her sex discrimination claims. *See id.* at 23 (cross-referencing the sections of Defendants' brief discussing Plaintiff's *prima facie* case of sex discrimination). But for the same reasons that the Court finds that Plaintiff adequately pled that the adverse employment actions occurred under circumstances giving rise to an inference of discriminatory intent, the Court finds that Plaintiff has adequately pled that a causal connection exists between the alleged adverse actions and the protected activity.

### C. Plaintiff Has Adequately Alleged a *Prima Facie* Case of Retaliation Pursuant to the ADA, NYSHRL, and NYCHRL

Defendants do not make any arguments specific to Plaintiff's retaliation claims based on her protected activity associated with her claimed disability; they simply argue that Plaintiff has not made out the fourth element of a *prima facie* case as to any of Plaintiff's retaliation claims. Mem. of Law at 21–23. But here too Plaintiff has sufficiently pled a causal connection between her alleged protected activities connected to her claimed disability and Defendants' purported adverse employment actions by alleging temporal proximity between the two. Plaintiff alleges that in the same conversation that she requested a reasonable accommodation for her generalized anxiety, which is a protected activity under the ADA,[28] Maleh advised her that Defendants would continue to withhold her commissions, which is an adverse employment action. FAC ¶¶ 121, 124. Additionally, Plaintiff alleges that she asserted claims of disability discrimination by sending Defendants a letter through counsel (a protected activity) and was terminated about a month later (an adverse employment action). *Id.* ¶¶ 140–141, 156.[29] Given the temporal proximity between the alleged protected activities and the adverse actions, for purposes of her retaliation claims

associated with her claimed disability, Plaintiff has adequately alleged a causal connection.

[28]    *See Gorbea v. Verizon New York, Inc.*, No. 11-CV-3758, 2014 WL 917198, at \*11 (E.D.N.Y. Mar. 10, 2014) ("Requests for disability accommodation and complaints, whether formal or informal, about working conditions related to one's alleged disability are protected activities."); *see also Limauro*, 2021 WL 466952, at \*10; *Goonan v. Fed. Res. Bank of N.Y.*, 916 F. Supp. 2d 470, 485 (S.D.N.Y. 2013).

[29]    Plaintiff also alleges that her termination occurred during a reasonable accommodation interactive process. *See* FAC ¶¶ 11, 147–149, 153–156. "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. New York State Dep't of Lab.*, 205 F.3d 562, 566 (2d Cir. 2000). *See also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). Neither party discussed whether participation in a reasonable accommodation interactive process constitutes a protected activity for the purposes of an ADA, NYSHRL, or NYCHRL retaliation claim. Because Plaintiff has stated a claim for disability retaliation based on other alleged protected activities, the Court declines to consider whether participation in an interactive process is a protected activity.

### D. Plaintiff Has Adequately Alleged a *Prima Facie* Case of Retaliation Pursuant to NYLL

**\*20** Plaintiff alleges that she complained to Defendants that failing to pay her commissions violated the terms of her employment. FAC ¶¶ 124–125. Such complaints are protected activities under NYLL § 215. *See Williams*, 2017 WL 1592556, at \*6 ("The employee's complaint need not cite a specific provision of the N.Y.L.L. alleged to be violated, but the employee must reasonably believe that the employer

Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)

2021 WL 4267815

is violating the Labor Law, and must have stated a complaint about conduct that violates the Labor Law." (cleaned up)). For the reasons discussed in the previous section, Plaintiff's complaint regarding failure to pay commissions constitutes a complaint about conduct that violated the NYLL.

Plaintiff has alleged the requisite nexus between her complaints about her commissions and Defendants' alleged adverse employment actions. Plaintiff alleges that she complained about Defendants' failure to pay commissions on or about June 15, 2020. FAC ¶¶ 124–125. Plaintiff further contends that she was terminated on August 10, 2020, *id.* ¶ 156, and that upon termination, she was not paid the remaining amount of commissions owed to her, *id.* ¶ 129. Both of those alleged adverse employment actions are temporally proximate to her June 15, 2020 complaint. Accordingly, Plaintiff has stated a claim of NYLL retaliation. [30]

[30]     The statute of limitations for NYLL claims is six years. *See* NYLL § 663(3). Plaintiff alleges that Defendants retaliated against her by withholding her commissions and by failing to pay her for work completed on her first day back from maternity leave because she complained about Defendants' failure to provide her with a reasonable lactation space, purportedly in violation of NYLL § 206-c. *See* FAC ¶¶ 66–84, 277. Those claims allegedly occurred within the six-year limit, and accordingly, may be actionable retaliation under NYLL. But because Plaintiff has stated a claim for NYLL retaliation as to other protected activities, the Court need not consider that contention for purposes of deciding the motion to dismiss.

In short, when viewed in the light most favorable to Plaintiff, she has stated a claim for retaliation pursuant to Title VII, ADA, NYSHRL, NYCHRL, and NYLL. Defendants' motion to dismiss those claims is therefore denied.

## CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss the FAC is granted in part and denied in part. The Court orders the following:

1. Defendants' motion to dismiss Plaintiff's Title VII, NYSHRL, and NYCHRL claims of sex discrimination is DENIED.

2. Defendants' motion to dismiss Plaintiff's Title VII, NYSHRL, and NYCHRL claims of hostile work environment is DENIED.

3. Defendants' motion to dismiss Plaintiff's disability discrimination and failure to accommodate claims brought pursuant to the ADA, NYSHRL, and NYCHRL is GRANTED. Plaintiff's ADA discrimination and failure to accommodate claims are dismissed with prejudice, and Plaintiff's NYSHRL and NYCHRL disability discrimination and failure to accommodate claims are dismissed without prejudice.

4. Defendants' motion to dismiss Plaintiff's New York Labor Law claims are GRANTED in part and DENIED in part. Defendants' motion to dismiss Plaintiff's claims brought pursuant to NYLL § 191(1)(c) and § 191(3) is denied. To the extent that Plaintiff's claims are brought pursuant to NYLL § 193 and § 191-c, those claims are dismissed with prejudice.

5. Defendants' motion to dismiss Plaintiff's retaliation claims brought pursuant to Title VII, ADA, NYSHRL, NYCHRL, and NYLL is DENIED.

The parties are directed to meet and confer about revising their Electronically Stored Information ("ESI") protocol and their discovery schedule in light of this opinion. If the parties are unable to agree on an ESI protocol (including the distribution of costs associated with ESI discovery), the Court will refer the dispute to the assigned Magistrate Judge for resolution. The parties must submit a joint letter by **October 8, 2021**, with an agreed-upon discovery schedule or, if the parties are unable to agree, with each party's proposed schedule, and a statement whether the parties were able to reach an agreement regarding an ESI protocol and associated costs.

**\*21**  The Clerk of Court is respectfully directed to close the open motion at docket entry 41.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4267815

**Zuckerman v. GW Acquisition LLC, Not Reported in Fed. Supp. (2021)**

2021 WL 4267815

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 115 of 321

Ibela v. Allied Universal, Not Reported in Fed. Rptr. (2022)

2022 WL 1418886

2022 WL 1418886
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Othman IBELA, Plaintiff-Appellant,

v.

ALLIED UNIVERSAL, Defendant-Appellee.

21-1995-cv
|
May 5, 2022

Appeal from an order and judgment of the United States District Court for the Southern District of New York (Andrew L. Carter, *Judge*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order and judgment of the District Court be and hereby are **AFFIRMED IN PART AND VACATED AND REMANDED IN PART**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Othman Ibela, pro se, Jamaica, NY.

FOR DEFENDANT-APPELLEE: Evan S. Weiss, Martenson, Hasbrouck & Simon LLP, Atlanta, GA.

PRESENT: José A. Cabranes, Joseph F. Bianco, Eunice C. Lee, Circuit Judges.

### SUMMARY ORDER

**\*1** Appellant Othman Ibela, *pro se*, sued his former employer, Allied Universal ("Allied"), for employment discrimination and retaliation under the Americans with Disabilities Act ("ADA") and hostile work environment under Title VII of the Civil Rights Act of 1964, [1] as well as for claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). He alleged that his coworker was hostile to him based on his national origin and that his supervisor denied him work when he requested a reasonable accommodation for his bipolar disorder. The District Court dismissed the federal claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and declined to exercise supplemental jurisdiction over the NYSHRL and NYCHRL claims. We assume the parties'

familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

[1]     When he amended his complaint, Ibela removed his Title VII claim.

### DISCUSSION

"We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *Pro se* submissions are reviewed with "special solicitude," and "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (internal quotation marks and emphasis omitted).

As a threshold matter, we agree with the district court that Ibela abandoned his Title VII hostile work environment and retaliation claims by failing to re-assert them in his amended complaint and, thus, those claims are not properly before us on appeal. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)). Therefore, we proceed to review his ADA claims.

### I. ADA Disability Discrimination Claim

The District Court properly dismissed Ibela's ADA discrimination claim. To establish a *prima facie* case of discrimination under the ADA, a plaintiff must plead that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020). A person has a "disability" under the ADA if he has: (a) "a physical or mental impairment that substantially limits one or more [of his] major

Ibela v. Allied Universal, Not Reported in Fed. Rptr. (2022)

2022 WL 1418886

life activities," (b) "a record of such an impairment," or (c) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating ... and working." 42 U.S.C. § 12102(2). To determine whether a major life activity is substantially limited by an impairment, we consider, among other factors, "the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)).

**\*2** Ibela did not sufficiently allege that he suffered from a disability within the meaning of the ADA. A diagnosis alone is insufficient to establish disability under the statute. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S 184, 198 (2002) ("It is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of an impairment."), *overturned on other grounds by ADA Amendments Act of 2008*, Pub. L 110-325, 122 Stat. 3553 (Jan. 1, 2009). Because Ibela did not allege any facts showing that his bipolar disorder impacted, let alone substantially limited, a major life activity, he failed to state a claim for disability discrimination.

## II. ADA Retaliation Claim

However, we vacate the District Court's order of dismissal insofar as Ibela alleged retaliation under the ADA for requesting a reasonable accommodation. The District Court concluded that it could not consider the merits of Ibela's ADA retaliation claim because he had not established that he suffered from a disability within the meaning of the ADA. But there is no requirement that the plaintiff be disabled in order to be protected from retaliation under the ADA. A "plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999) (internal quotation marks omitted). As long as a plaintiff has a good faith belief that he was disabled and requested a reasonable accommodation, he can state a claim for ADA retaliation. *See Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) ("[E]ven if Weissman has failed to prove that there was a violation of the ADA, the defendant may still have retaliated against Weissman for engaging in protected conduct.").

To state an ADA retaliation claim, an employee "must show that he engaged in a protected activity, that he suffered an adverse employment action, and that a causal connection exists between that protected activity and the adverse employment action." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72–73 (2d Cir. 2019). Seeking a reasonable accommodation constitutes protected activity under the ADA. *Weixel v. Bd. of Educ. of N.Y.C.*, 287 F.3d 138, 149 (2d Cir. 2002). Ibela alleged that Nicholas began denying him work, reducing his hours, and denying him overtime after he requested a reasonable accommodation due to his bipolar disorder. These adverse actions occurred within two months of Ibela's June 2019 reasonable accommodation request. *See Gorman-Bakos v. Cornell Co-Op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) ("[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (internal quotation marks and alteration omitted)).

Ibela's amended complaint and opposition brief plausibly allege a reasonable belief on his part that he was engaging in protected conduct, and satisfy the elements of an ADA retaliation claim. Therefore, the District Court erred by refusing to consider the merits of that claim.

Further, because we vacate the dismissal in part, we also vacate the dismissal of the NYSHRL and NYCHRL claims specifically relating to retaliation based on Ibela's request for reasonable disability accommodations. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 27 (2d Cir. 2014) (vacating dismissal of state law claims where this Court partially vacated the dismissal of federal law claims).

## CONCLUSION

**\*3** We have considered all of Ibela's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the order and judgment of the District Court in part with respect to the ADA discrimination and Title VII hostile work environment and retaliation claims. We **VACATE and REMAND** the order and judgment with respect to the ADA retaliation claim, and with respect to the NYSHRL and NYCHRL claims, insofar as those state law claims are related to Ibela's ADA retaliation claim.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 1418886

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 118 of 321
Philbert v. New York City Department of Education, Slip Copy (2024)
2024 WL 756362

KeyCite Blue Flag – Appeal Notification

Appeal Filed by Philbert v. New York City Department of Education, 2nd Cir., March 29, 2024

2024 WL 756362
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Shakema PHILBERT, Plaintiff,

v.

NEW YORK CITY DEPARTMENT
OF EDUCATION, Defendant.

Case No. 1:21-cv-03119 (JLR)
|
Signed February 23, 2024

**Attorneys and Law Firms**

Richard St. Paul, Law Office of Richard St. Paul Esq., PLLC, White Plains, NY, for Plaintiff.

Alison Sue Mitchell, New York City Law Department, New York, NY, Rachel Michelle DiBenedetto, Epstein Becker Green, New York, NY, Lauren Fae Silver, New York, NY, for Defendant.

## ORDER AND OPINION

JENNIFER L. ROCHON, United States District Judge:

*1 This case involves a retaliation claim brought by a former New York City elementary-school teacher, Shakema Philbert ("Plaintiff" or "Philbert"), who worked for the New York City Department of Education (the "DOE" or "Defendant") between 2011 and 2019. Philbert initially bought numerous claims against the DOE and other defendants, most of which were dismissed for failure to state a claim. *Philbert v. City of New York*, No. 21-cv-03119 (PAE), 2022 WL 94574 (S.D.N.Y. Jan. 7, 2022) ("MTD Op."). The only remaining claim is Philbert's claim against the DOE for retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"). Defendant now moves for summary judgment on that claim. For the reasons stated below, Defendant's motion for summary judgment is GRANTED.

## BACKGROUND

### I. Factual Background

Philbert joined the DOE as a special-education teacher in September 2011 and began working at PS 206. ECF No. 80 ("Opp. SOF") ¶¶ 1-2. In November 2014, Philbert informed Camille Forbes, the principal of PS 206, that she had migraines and that they caused her certain issues. ECF No. 81 ("Philbert Decl.") ¶ 7. Philbert requested leave from the DOE in February 2015, and "underwent an angiogram and endovascular treatments of the right transverse sigmoid junction and coiling of the diverticula" at Mount Sinai Hospital. *Id.* ¶¶ 9-10. She was cleared to return to work on March 4, 2015. *Id.* ¶ 11.

Philbert's attendance record during this period was spotty. Philbert was absent 14 days, 3 hours, and 10 minutes during the 2016-2017 school year and 24 days, 12 hours, and 16 minutes during the 2017-2018 school year. Opp. SOF ¶¶ 8-9. Additionally, Philbert did not attain tenure status; instead, her probationary employment period with DOE was repeatedly extended, including most recently through October 5, 2019. *Id.* ¶¶ 3-4, 7, 10; ECF No. 76-10 at 2-3.

During the summer of 2018, Plaintiff requested to transfer from PS 206 to another DOE school. Opp. SOF ¶ 10. She was subsequently assigned to PS 194, *id.* ¶ 11, where her principal was Kerianne Harrison, ECF No. 81-1 ("Philbert Tr.") at 19:13-14.

In October 2018, Philbert met with Harrison and discussed her migraines; Philbert states that she informed Harrison that she "needed a reasonable accommodation to mitigate [her] migraines," specifically the "use of the air conditioner in [her] classroom." Philbert Decl. ¶ 6; *see also* Philbert Tr. at 36:16-37:5. Philbert requested the use of the air conditioner "in person" rather than over email or via a formal "reasonable accommodation" form. Philbert Tr. at 36:16-37:7.

Throughout the 2018-2019 school year, Philbert had consistent disputes with a paraprofessional in her classroom. Philbert Decl. ¶ 30. The parties dispute whether Philbert received significant negative written feedback following observations during the same school year. *Id.* ¶¶ 58-62; Opp. SOF ¶¶ 21-24, 27-28. Defendant says Plaintiff received such written negative feedback following observations, *see, e.g.*, ECF No. 74 ¶¶ 21-24, but Plaintiff declares that certain of the records pointed to by the DOE are fraudulent

or otherwise inaccurate, *see* Philbert Decl. ¶¶ 58, 61. As an example, Plaintiff states that the records list "multiple different coaching observation for the same date," that many of the "alleged coaching observations have no identified name to whom the record is written," and that "several of these alleged coaching observations occurred on a Sunday" and/or a date when Plaintiff was absent from work. *Id.* ¶ 61.

**\*2** The parties also dispute whether Plaintiff received "Ineffective" and "Developing" ratings at her annual review in April 2019. Defendant says so, but the cited testimony and exhibits do not support that assertion. For example, Defendant cites to ECF No. 76-14 as Plaintiff's "Annual Professional Performance Review" dated April 11, 2019, and as showing a combination of "Ineffective" and "Developing" ratings. Opp. SOF ¶ 29. However, ECF No. 76-14 is actually Plaintiff's "Annual Professional Performance Review (APPR) Teacher Observation Report" dated October 26, 2018, and reflects a combination of "Effective" and "Developing" ratings. ECF No. 76-14 at 2-3 (further capitalization omitted). Defendant also cites to Plaintiff's deposition to support this assertion, but the cited pages contain testimony from Plaintiff explaining only that in January she received mostly "effective" ratings and that she had an additional observation in April. Philbert Tr. at 55:25-56:2. [1]

[1]   The Court notes that Plaintiff also made several citation errors in her opposition materials, which caused the Court (and presumably Defendant) to unnecessarily spend additional time parsing through Plaintiff's materials. Most prominently, Plaintiff's supporting exhibits were submitted to the Court in a different order than they are described in her declaration. Federal Rule of Civil Procedure 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). It is instead the parties' responsibility to "point out" contested facts for the Court, and to "clarify the elements of the substantive law which remain at issue because they turn on contested facts." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citation omitted); *see* Local Civ. R. 56.1(d) (statements controverting any statement of material fact must be followed by citation to admissible evidence).

On June 10, 2019, at 2:11 p.m., Philbert emailed Harrison and stated that she would be leaving school 20 minutes early to attend a doctor's appointment. Opp. SOF ¶ 37. Harrison responded to the email and stated that "this is less than 24 hours' notice, and that is quite simply unacceptable. Additionally, it is usually customary to ask for permission to leave early." *Id.* ¶ 38.

Philbert continued to have consistent interpersonal issues with the paraprofessional regarding the use of the air conditioner in her classroom. Philbert Decl. ¶ 40. Based on this conflict, Harrison instructed the school custodian to disconnect the air conditioner on June 17, 2019. *Id.* ¶¶ 40-41. On June 24, 2019, Philbert texted Harrison asking that she have the custodian restore power to the air conditioner. *Id.* ¶ 42.

On June 25, 2019, at 6:48 a.m., Philbert emailed Harrison that she had to "nurse a headache yesterday evening on account of being in a hot classroom. When I texted you during lunch yesterday asking you to please have the custodian turn the AC back on the temperature had already reached 81° and continued to climb. I know I shared with you that I suffer from migraines and previously shared the fact that I had neurosurgery ... [and] that heat is a trigger for me.... I had an aneurysm so getting a headache or migraine continues to be a frightening experience." Opp. SOF ¶ 41. On the same day, at 8:41 a.m., Harrison responded that she was "sorry to hear that you are suffering in this fashion" and that "[w]hen you texted yesterday, the AC was turned back on. You may have to use the wall switch. As you know I was out of the building yesterday, but communicated with the custodian at 12:50p when I checked my phone and saw your message. As you may know, the AC was only turned off after 4 unprofessional disputes by the adults in the classroom." *Id.* ¶ 42.

By letter dated June 24, 2019, but apparently received at a later date, [2] the DOE terminated Plaintiff's probationary employment. *Id.* ¶ 40; ECF No. 76-23.

[2]   While the letter discontinuing Plaintiff's probationary employment is dated June 24, 2019, DOE stated in its opening brief that it "assumes that plaintiff received the [letter] ... after she claims she texted Principal Harrison concerning the air conditioner" "based on a plain reading of an email dated June 25, 2019." Br. at 8 n.2. The Court is not entirely sure of the "email dated June 25, 2019" to which the DOE is referring, but notes that,

according to the exhibits submitted by the DOE, Philbert had exchanges with Harrison regarding her ongoing employment at least as late as June 25, 2019. *See, e.g.*, ECF Nos. 76-24, 76-25. Therefore, the Court presumes that Philbert was terminated on or after June 25, 2019.

## II. Procedural History

**\*3**  On April 11, 2021, Philbert filed her original complaint. ECF No. 1. The next day, she filed her first amended complaint, asserting claims against the City of New York, the DOE, and two individuals associated with the DOE (collectively, the "Initial Defendants"). ECF No. 4. The Initial Defendants moved to dismiss the first amended complaint on August 20, 2021. ECF No. 16.

In response to the motion to dismiss, on October 8, 2021, Philbert filed the operative complaint. ECF No. 22 (the "Second Amended Complaint" or "SAC"). The Second Amended Complaint asserted claims against the Initial Defendants under the ADA, Title VII of the Civil Rights Act of 1964, 42 § 2000e *et seq.*, the New York State Human Rights Law, New York Exec. L. § 290 *et seq.*, the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.*, and New York common law. SAC; *see also* MTD Op. at \*7.

On October 29, 2021, the Initial Defendants filed a motion to dismiss the Second Amended Complaint. ECF No. 24. The Court granted the motion in part and dismissed all claims asserted in the Second Amended Complaint except for an ADA retaliation claim asserted against the DOE based on Philbert's termination. MTD Op. at \*23. The Court subsequently entered a case-management plan and discovery commenced. ECF No. 43. The case was reassigned to the undersigned on September 19, 2022. ECF No. 44.

Following discovery, on May 23, 2023, the DOE moved for summary judgment on the remaining claim. ECF No. 77 ("Br."). Philbert opposed the motion on June 13, 2023. ECF No. 82 ("Opp."). The DOE replied in further support of its motion on June 20, 2023. ECF No. 83 ("Reply").

## LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 56, a moving party is entitled to summary judgment if, on any claim or defense, that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute is one in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Id.*

At summary judgment, the Court's task is simply to "discern[ ] whether there are any genuine issues of material fact to be tried, not to decid[e] them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Therefore, "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997); *accord Rupp v. City of Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024). The Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Est. of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). In deciding a motion for summary judgment, the Court considers "all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (citation and ellipses omitted).

## DISCUSSION

**\*4**  The sole claim that remains in this case is an ADA retaliation claim based on the allegations that on June 24, 2019, Philbert asked Harrison to have the custodian restore power to the air conditioner because she suffered from migraine headaches, which she asserts is a request for a reasonable accommodation constituting a protected activity. MTD Op. at \*21; Opp. at 1. Shortly thereafter, on or about June 25, 2019, Philbert's probationary employment was terminated, which "is a quintessential adverse [employment] action." MTD Op. at \*22 (citing, among other things, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). The Court therefore now examines the sole remaining claim in light of the evidence presented on summary judgment, with all inferences drawn in favor of Plaintiff as the non-moving party.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 121 of 321
Philbert v. New York City Department of Education, Slip Copy (2024)

2024 WL 756362

Defendant argues that summary judgment should be granted in its favor on the retaliation claim because (1) Plaintiff has not established that she is disabled under the ADA, and (2) the DOE had a legitimate, non-retaliatory reason for terminating Plaintiff's employment. Br. at 6. The Court begins by analyzing the first of these two arguments.

## I. ADA Retaliation Legal Standard

The familiar burden-shifting framework described by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to retaliation claims under the ADA, *see Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023). The elements of a *prima facie* case of retaliation under the ADA are: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (quoting *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

A request for a reasonable accommodation for a disability may constitute protected activity. *Weixel*, 287 F.3d at 149 (2d Cir. 2002); MTD Op. at *21. Under the ADA, a "disability" is "a physical or mental impairment that substantially limits one or more major life activities" or "being regarded as having such an impairment." 42 U.S.C. § 12102(1).

If a plaintiff establishes a *prima facie* case of retaliation, then the burden shifts to the defendant to proffer a legitimate, nonretaliatory justification for the adverse action. If the defendant establishes such a reason, the burden shifts back to the plaintiff to show that the stated reasons were merely pretext for unlawful retaliation. *See Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 267 (S.D.N.Y. 2020) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002)).

## II. Disability Under the ADA

Defendant argues that it is entitled to judgment as a matter of law on Plaintiff's retaliation claim because there is no basis from which a reasonable jury could find that she was disabled or regarded as disabled under the ADA.

As noted, under the ADA, a "disability" includes "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself,

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). "An impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

"[A]n employee's inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020) (per curiam) (quotation marks and citation omitted). An employee alleging a disability that causes a substantial limitation on her ability to work "must show that the limitation affects the ability to perform a class or broad range of jobs" rather than just that she is "precluded only from doing [her] specific job." *Id.* (emphasis, ellipsis, quotation marks, and citation omitted); *see also id.* at 95 ("[E]very Circuit that has addressed this question ... also has held that ... a plaintiff alleging a work-related disability must show that [her] condition precludes [her] from working in a *class or broad range of jobs*." (citation omitted)). "The existence of a disability must be determined on a case-by-case basis." *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) (quotation marks and citation omitted).

**\*5** In this case, the Court previously explained that "[t]here is adverse case law on whether migraines ... qualify as" a disability. MTD Op. at *16. The Court further cautioned that Philbert must "establish concrete facts particular to her migraine condition" to establish that she has a disability within the meaning of the ADA. *Id.* Additionally, the Court explained that to survive summary judgment, Philbert must "develop factually how her migraines substantially affected her major life activities." *Id.* at *17. The Court further advised that a "plaintiff-specific showing will be necessary because, as the EEOC regulations note, a cognizable disability limits an individual's ability to perform a major life activity '*as compared to most people* in the general population.' " *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(ii)). Philbert has failed to establish such facts.

"Periodic migraine headaches do not amount to a disability under the ADA unless the plaintiff demonstrates that they result in a substantial limitation to a major life activity." *Woolf v. Bloomberg, L.P.*, 16-cv-06953 (PKC), 2019 WL 1046656, at *10 (S.D.N.Y. Mar. 5, 2019), *aff'd sub nom. Woolf v. Strada*, 949 F.3d 89. Work is a major life activity within the meaning of the ADA. *Id.* However, Plaintiff seems to argue only

that her condition leaves her unable to perform one "single, specific job" of working in a particular classroom, rather than being impaired from her major life activity of working. *Id.* The evidence shows only that Plaintiff suffers from migraines that prohibit her from working in a particular classroom that does not have consistent access to air conditioning year-round. When asked during her deposition why she requested to use the air conditioner without restriction, Plaintiff testified that she made the request because "extreme temperatures ... trigger[ed] migraines for [her] and that room was very hot. That room sat on the side of the building that ... absorbed a lot of heat ... from the ... sunbeams. And also, that room had a very large heating apparatus throughout the whole ... side of ... [the] classroom." Philbert Tr. at 38:3-13.

This case is akin to *Muller v. Costello*, 187 F.3d 298 (2d Cir. 1999). There, the plaintiff claimed he was unable to work as a corrections officer due to the presence of cigarette smoke and other environmental irritants at the correctional facility that had employed him. *Id.* at 313. The Second Circuit held that the plaintiff did not suffer from a substantial limitation on the major life activity of working because he would be capable of working in numerous similar, smoke-free jobs, including by working as a security guard in an office building or as a guard at the smoke-free county jail. *Id.*

Here, as in *Muller*, a reasonable jury could not find that Plaintiff suffers from a substantial limitation on the major activity of working, because she is capable of working in numerous similar jobs. Plaintiff's deposition testimony establishes that she could work as a teacher in any classroom that has consistent access to an air conditioner, or in any classroom on the opposite side of the building from where she worked, or in a classroom that shades drawn or was set to a lower temperature. Indeed, Plaintiff's testimony establishes that she could have continued to work in her same classroom, so long as the paraprofessional with whom she had interpersonal disputes was not also present in the same classroom. *See* Philbert Tr. at 36:16-37:15 (explaining that she requested access to the air conditioner because "there was a situation with a para[professional], like, constantly turning off the air conditioner"). An individual who is capable of performing identical work duties but in a different classroom, or in the same classroom but without a specific colleague, is not substantially impaired from the major life activity of working.

**\*6** The Court acknowledges that Plaintiff underwent surgery in 2015, but a single surgery resulting in approved days off

from work, years in the past, does not on its own render Plaintiff disabled within the meaning of the ADA. *See, e.g., Alvarez v. N.Y.C. Dep't of Educ.*, No. 20-cv-00255 (VSB), 2021 WL 1424851, at *6 (dismissing claim where plaintiff showed that he had surgery and was forced to miss work for 26 days to recover from surgery, but failed to allege how the alleged impairment continued to impact his major life activities); *Fagan v. United Int'l Ins. Co.*, 128 F. Supp. 2d 182, 185-86 (S.D.N.Y. 2001) (holding on summary judgment that plaintiff was not disabled within the meaning of the ADA because, despite surgery, Plaintiff failed to show that he was substantially limited in a major life activity). Further, "that Plaintiff has been diagnosed with [a] condition, without more, [is] insufficient" to show that Plaintiff was disabled within the meaning of the ADA. *Zuckerman v. GW Acquisition LLC*, No. 20-cv-08742 (VEC), 2021 WL 4267815, *11 (S.D.N.Y. Sept. 20, 2021).

In opposition to Defendant's motion for summary judgment, Plaintiff submitted a declaration stating that her migraines cause "visual and speech impairments, difficulty hearing, difficulty sleeping, concentration issues," and more, and that they "affect [her] in all aspects of [her] daily life and prevent [her] from living a full, fruitful life free from pain." Philbert Decl. ¶ 3. Plaintiff also states that she "constantly need[s] to be inside away from bright lights" and that she has "trouble reading." *Id.* It is true that sleeping, learning, reading, concentrating, and thinking are major life activities. 42 U.S.C. § 12102(2)(A). However, Philbert's conclusory statements are devoid of detail and do not create a genuine issue of material fact in this case. *See Woolf*, 2019 WL 1046656, at *12 (summary judgment granted in favor of defendant where plaintiff stated that his migraines caused him to suffer loss of sight, speech, and concentration, but did not direct the Court to evidence of how and to what extent his sight, speech, and concentration were affected); *see also Fitzgerald v. We Co.*, No. 20-cv-05260 (AT), 2022 WL 952963, at *8 (S.D.N.Y. Mar. 30, 2022) (plaintiff's statement that she was disabled in her sleeping and cognitive function, "supported by nothing more than her own affidavit," was "too vague, conclusory, and self-serving to create a triable issue of fact as to whether her anxiety disorder cause[d] substantial limitations in any major life activities" (quotation marks, citations, and brackets omitted)). In *Zuckerman*, the court held that plaintiff's allegations that her anxiety disorder "substantially interfere[d] with her ability to sleep, concentrate, think, and interact with others" were insufficient to allege a substantial impairment of a major life activity. 2021 WL 4267815, at *11. Here, as in *Zuckerman*, simply providing conclusory

2024 WL 756362

statements that Plaintiff is affected by her migraines is not enough to support a finding that she is disabled within the meaning of the ADA. Plaintiff has not cited to any contrary authority. Moreover, Plaintiff was also explicitly warned that to "survive summary judgment" she would need to "develop factually how her migraines substantially affected her major life activities," but she failed to do so. *See* MTD Op. at *17. Accordingly, there is no genuine issue of material fact as to whether Plaintiff's migraines constitute a disability within the meaning of the ADA.

In the alternative, Plaintiff asserts that the DOE knew she had migraines, and that she was therefore "regarded" as having a disability. Opp. at 14-15. "A plaintiff is also disabled within the meaning of the ADA if [s]he is 'regarded' by h[er] employer as having a physical or mental impairment that substantially limits a major life activity." *Capobianco*, 422 F.3d at 57 (citing 42 U.S.C. § 12102(2)). A "regarded as" claim turns on the employer's perception of the employee. *Id.* For such a claim, the employer "must regard the employee as disabled within the meaning of the ADA, *i.e.*, having an impairment that substantially limits a major life activity." *Id.* (quotation marks and citation omitted).

**\*7** Here, Plaintiff cites to no evidence that supports an inference that her employer "regarded" her as having a physical or mental impairment that substantially limits a major life activity. Plaintiff declares that she "informed Principal Forbes about [her] migraines and the problems that they caused" in November 2014, Philbert Decl. ¶ 7, and that in May 2017, she informed Forbes that she "would not be able to return to work because of migraines, back and hand pain," *id.* ¶ 16. Plaintiff further declares that in October 2018, Harrison became aware of her "disabilities," and cites an email chain to support that assertion. *Id.* ¶ 24 (citing ECF No. 81-17). However, the cited email chain does not specifically refer to a "disability" of Plaintiff's, but rather refers only to the fact that Plaintiff's request for leave was denied and that she was unable to pay for her diabetes medication. *See generally* ECF No. 81-17. Plaintiff also states that Harrison was aware of her migraines generally and that she requested consistent use of the air conditioner in her classroom to alleviate those migraines. Philbert Decl. ¶¶ 26-27.

None of these statements from Plaintiff supports the inference that her employer regarded Plaintiff as having an impairment that substantially limits a major life activity. Rather, these statements support the inference that her employer was aware that Plaintiff had migraines and received treatment

for those migraines. But an awareness that the Plaintiff had migraines and received treatment is not the same as regarding Plaintiff as having an impairment that substantially limits a major life activity. Many people suffer from migraines and are not substantially impaired, and many persons receive periodic or ongoing treatment for medical conditions and are not substantially impaired. *See, e.g.*, *Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 832-835 (10th Cir. 2011) (migraine condition did not qualify as disability); *Strada*, 949 F.3d at 95 (same). Thus, showing simply that Philbert's employers were aware that Plaintiff had migraines and had periodic treatment for those migraines is not sufficient to show that DOE regarded Plaintiff as disabled within the meaning of the ADA. *See, e.g.*, *Weldran v. Dejoy*, 839 F. App'x 577, 580 (2d Cir. 2020) (summary order) (perceived-disability claim failed on summary judgment because although plaintiff's supervisors knew he had a physical injury, there was no evidence that supported the inference that his employers believed he was substantially limited by that injury).

Plaintiff also points to statements from her supervisors, including that Harrison said she was "empathetic" regarding Plaintiff's migraines and asked whether she could help "support" her. Philbert Decl. ¶ 2. A reasonable juror would not conclude that, simply because Philbert's supervisor was "empathetic" and offered support, the supervisor regarded Philbert as having an impairment that substantially limited a major life activity. *See, e.g.*, *Bruzzese v. Sessions*, 725 F. App'x 68, 72 (2d Cir. 2018) (summary order) (affirming summary judgment where district court held that employer did not regard plaintiff as disabled, despite statement that the employer was "worried about" the plaintiff). Without more, statements such as these also do not support the inference that Harrison or the DOE regarded Philbert as substantially limited in a major life activity.

In sum, there is no genuine issue of material fact as to whether Plaintiff had a disability, or was regarded as having a disability, within the meaning of the ADA. Therefore, summary judgment is granted in favor of Defendant.

### III. Other Arguments

Because the Court grants summary judgment in favor of Defendant because Plaintiff is not disabled within the meaning of the ADA, the Court need not analyze the other potential grounds for summary judgment.

2024 WL 756362

### CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to close the motion pending at ECF No. 73 and CLOSE the case.

**All Citations**

Slip Copy, 2024 WL 756362

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 125 of 321

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Chiaravallo v. Middletown Transit District,    D.Conn.,
September 22, 2021

2019 WL 7283383
United States District Court, D. Connecticut.

Anne Marie BARONE, Plaintiff,
v.

JUDICIAL BRANCH OF the State of CONNECTICUT,
Gloria Albert, and Linda Coon, Defendants.

No. 3:17-cv-644 (VAB)
|
Signed 12/27/2019

**Attorneys and Law Firms**

Kevin Murray Smith, Norman A. Pattis, The Pattis Law Firm,
LLC, New Haven, CT, for Plaintiff.

Erik Thebin Lohr, Nancy A. Brouillet, Office of the Attorney
General, State of CT, Hartford, CT, for Defendants.

## RULING AND ORDER ON MOTION
## FOR SUMMARY JUDGMENT

VICTOR A. BOLDEN, UNITED STATES DISTRICT
JUDGE

*1 Anne Marie Barone ("Plaintiff") has sued the Judicial
Branch for the State of Connecticut ("Judicial Branch") and
two Judicial Branch supervisors, Gloria Albert and Linda
Coon (collectively "Defendants"), alleging discrimination in
violation of the Rehabilitation Act, and the First Amendment
of the U.S. Constitution.

Defendants have moved for summary judgment.

For the following reasons, Defendants' motion for summary
judgment is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background [1]

[1]     As explained in the discussion section below,
to the extent that Ms. Barone's Rule 56(a)2

Statement of Material Facts fails to comply with
Local Rule 56(a)2 and (a)3 and fails to point
to evidence in the record, this Court deems the
corresponding facts in the Defendant's Local Rule
56(a)1 Statement to be admitted for purposes of this
motion, where those asserted facts are supported
by admissible evidence: paragraphs 1, 7, 9, 11-42,
45-98, 100-104, 106-107, and 109-110. The Court
will not rely on assertions that are unsupported by
admissible evidence in the record.

In the year 2000, Ms. Barone started working for the Judicial
Branch of the State of Connecticut as a court monitor, Defs.'
Statement of Material Facts ¶ 6, ECF No. 57-2 (Mar. 1,
2019) ("Defs.' SOMF"); Pl.'s Statement of Material Facts
¶ 6, ECF No. 60 (Mar. 15, 2019) ("Pl.'s SOMF"), at the
Danbury Superior Court. Defs.' SOMF Ex. A, ECF No. 57-4
at 15 (Barone Dep. at 49:6-13) ("Barone Dep."). Ms. Albert
supervised Ms. Barone until 2014. Defs.' SOMF ¶ 10; Pl.'s
SOMF ¶ 10.

In June 2014, Ms. Coon began to supervise Ms. Barone.
Defs.' SOMF ¶ 11; Barone Dep. at 45:5-8. Ms. Coon worked
with Ms. Barone from June 2014 until October of that same
year. Defs.' SOMF ¶ 11-16; Defs.' SOMF Ex. E, ECF No.
57-8 at 5, 12 (Coon Dep. at 16:19-21, 68:5-10) ("Coon Dep.").

During her employment with the Judicial Branch, Ms.
Barone allegedly "developed a physical disability, ulcerative
colitis, and was diagnosed as suffering from a mental
and learning disability, Attention-Deficit/Hyperactivity
Disorder" ("ADHD"). Pl.'s SOMF ¶ 20; Defs.' SOMF ¶ 20;
Third Am. Compl. ¶ 9, ECF No. 39 (Apr. 3, 2018).

### 1. Requests for leave and accommodation,
### and the first EEOC Complaint

In June or July of 2012, Ms. Barone sought medical leave
from the Judicial Branch. Defs.' SOMF ¶ 21. After examining
Ms. Barone on June 28, 2012, a physician indicated that she
would be able to return to regular work on July 5, 2012.
Barone Dep. Ex. 18, ECF No. 59 (Judicial Branch Medical
Certificate (July 5, 2012)) (submitted under seal).

In late 2013 or early 2014, Ms. Barone sought an
accommodation from the Judicial Branch. Defs.' SOMF Ex.
C, ECF No. 57-6 at 24 (Albert Dep. at 62:15-25) ("Albert
Dep."). Ms. Barone did not disclose to Ms. Albert what
accommodation she had requested or the reason for the

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 126 of 321

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

request but told Ms. Albert that "she felt if she filed [the accommodation request, the Judicial Branch would "have to give her her own office," and that "it would help her do her job better." *Id.* at 62:21-25, 64:1-65:15).

**\*2** By early 2014, Ms. Albert had been transferred to the Hartford Superior Court. Defs.' SOMF Ex. B, ECF No. 57-5 at 2 (Barone Dep. Ex. 1, EEOC Intake Questionnaire (Feb. 25, 2014) (Ms. Barone naming Gloria Albert as her immediate supervisor and noting that she had "just transferred to Hartford") ("EEOC Intake Questionnaire"); Barone Dep. at 49:17-22.

On February 25, 2014, Ms. Barone claimed to have been discriminated against because of her disability of ADHD. EEOC Intake Questionnaire. The questionnaire refers to e-mails describing discriminatory actions, but these underlying e-mails have not been included in this record. *Id.* at 3-4. Ms. Barone claims to have requested her own office on November 15, 2013 and claims to have been "[d]enied an accommodation request" on January 16, 2014, "based on [her] position and not [her] special needs condition." *Id.* at 3-4. The questionnaire quotes an allegedly attached e-mail stating that "[t]he position of a Court Recording Monitor does not require this level of privacy." *Id.* Ms. Barone testified about having worked in a cubicle with walls but stated that she did not have privacy from noise. Barone Dep. at 111:1-112:15.

On March 27, 2014, the EEOC informed Ms. Barone that she needed to complete and return an enclosed Charge of Discrimination form in order for it to take further action. Defs.' SOMF Ex. B, ECF No. 57-5 at 17 (Barone Dep. Ex. 1, EEOC Letter (Mar. 27, 2014)). The EEOC further informed her that the Charge of Discrimination form also would be sent to the Connecticut Commission on Human Rights and Opportunities ("CHRO") to investigate "under their statute" as well. *Id.*

On May 6, 2014, the EEOC received Ms. Barone's completed Charge of Discrimination form. Defs.' SOMF Ex. B, ECF No. 57-5 at 11 (Barone Dep. Ex. 1, EEOC Charge of Discrimination Form (notarized May 2, 2014; EEOC receipt stamp May 6, 2014)). Then, on May 22, 2014, the EEOC confirmed that her charge of employment discrimination had been received and informed her of the procedures going forward. Defs.' SOMF Ex. B, ECF No. 57-5 at 14-15 (Barone Dep. Ex. 1, EEOC Letter (May 22, 2014)). On the same day, an EEOC Mediator sent a letter addressed to both Ms. Barone and a Human Resources representative of the Judicial

Branch inviting both parties to participate in mediation. Defs.' SOMF Ex. B, ECF No. 57-5 at 13 (Barone Dep. Ex. 1, EEOC Invitation to Mediate (May 22, 2014)).

On June 23, 2014, the EEOC Mediator sent another letter to both Ms. Barone and the Judicial Branch human resources representative stating that Ms. Barone's charge was "no longer eligible for mediation through the EOC's Mediation Program" because the "[r]espondent failed to respond by the due date." Defs.' SOMF Ex. B, ECF No. 57-5 at 12 (Barone Dep. Ex. 1, EEOC Letter (June 23, 2014)).

Ms. Barone was on approved medical leave for the time periods of August 18 through September 1, 2014, and September 2 through September 9, 2014. Defs.' SOMF Ex. B, ECF No. 57-5 at 52-53 (Barone Dep. Exs. 20-21, Dr. Jessica Chaudhary Letters recommending medical leave for Patient Anne Marie Barone (Aug. 18, 2014 and Aug. 27, 2014)). On September 9, 2014, Ms. Barone submitted another form, signed by Dr. Jessica Chaudhary, indicating that due to "ADHD [and] derivative symptoms," Ms. Barone could "work regular h[ou]rs if she has a quiet work environment —can focus in court room during trial, but has difficulty [at] duty station with numerous distractions." Barone Dep. Ex. 24, ECF No. 59-1 (Judicial Branch Medical Certificate (Sept. 9, 2014)) (submitted under seal).

**\*3** On September 23, 2014, the Judicial Branch approved leave for Ms. Barone under the Family Medical Leave Act (FMLA) for September 11 through September 25, 2014. Defs.' SOMF Ex. B, ECF No. 57-5 at 54-56 (Barone Dep. Ex. 22, Judicial Branch Response to Employee Request for FMLA Leave (Sept. 23, 2014)). When she returned to work on September 26, 2014, Ms. Barone had to be at her assigned duty station. Barone Dep. at 113:11-13.

Ms. Barone testified that when she requested medical leave time, the Judicial Branch granted her requests. Barone Dep. at 145:8-20.

On January 29, 2015, the EEOC sent a letter to Ms. Barone dismissing her charge of discrimination. Defs.' SOMF Ex. B, ECF No. 57-5 at 6 (Barone Dep. Ex. 1, EEOC Letter (Sept. 23, 2014)). The letter stated, in part, as follows:

[W]e have examined your charge based upon the information and evidence you submitted. You allege you were subjected to employment discrimination because of disability in violation of the Americans with Disabilities Act of 1990 ... Respondent's position statement has been

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

previously shared with you. You were provided with an opportunity to submit a rebuttal to this position state [sic] but none was received.

Based upon a review of the documents received, the Commission is unable to conclude that the information establishes a violation of Federal law on the part of Respondent. This does not certify that Respondent is in compliance with the statute.

*Id.*

### 2. Workplace Issues

On July 31, 2014, Ms. Barone received a written reprimand for leaving work on July 3, 2014. Defs.' SOMF Ex. B, ECF No. 57-5 at 24 (Barone Dep. Ex. 5, Judicial Branch Written Reprimand (July 31, 2014)).

On October 17, 2014, Ms. Barone stated "screw you too" to a coworker. Barone Dep. at 91:13-92:10 (testifying that she did say "screw you" to a coworker on the date indicated); Defs.' SOMF Ex. B, ECF No. 57-5 at 28-29 (Barone Dep. Ex. 7, Judicial Branch Disciplinary Letter (Mar. 13, 2015)).

On November 17, 2014, Ms. Barone told a co-worker that "you can't play the invalid card anymore." Barone Dep. at 88:9-15.

The next day, Ms. Barone told her Judicial Branch co-workers that "they can both go fuck themselves." Barone Dep. at 90:3-8; Defs.' SOMF Ex. B, ECF No. 57-5 at 26-27 (Barone Dep. Ex. 6, Judicial Branch Disciplinary Letter (Mar. 9, 2015)).

On November 20, 2014, Ms. Barone sprayed an aerosol substance in the office despite an e-mail having been sent to employees asking them not to spray substances in the office due to another employee's sensitivities. Barone Dep. at 90:12-17; Defs.' SOMF Ex. B, ECF No. 57-5 at 26-27 (Barone Dep. Ex. 6, Judicial Branch Disciplinary Letter (Mar. 9, 2015)).

On March 9, 2015, the Executive Director of Operations for the Judicial Branch suspended Ms. Barone for two days without pay because of the incidents in November of 2014. Defs.' SOMF Ex. B, ECF No. 57-5 at 26-27 (Barone Dep. Ex. 6, Judicial Branch Disciplinary Letter (Mar. 9, 2015)). The corresponding letter states, in part:

On November 17, 2014 at the end of the work day, you referred to a co-worker as an "invalid." On November 18, 2014, upon arriving at work, you began to argue with this same co-worker. When another employee attempted to diffuse this argument, you told everyone in the office to "go f*** themselves." Also, despite an email to all staff requesting that employees refrain from using perfumes, colognes, or aerosol sprays due to an employee's sensitivity to them, on November 20, 2014 you sprayed a deodorant type spray in the office.

*4 At a predisciplinary meeting you stated that you were frustrated with your co-worker because she used her health issue to "manipulate" getting out of a work assignment. You stated that you do not always express your frustration in the proper way. Regarding the directive not to use perfumes, colognes, or aerosol sprays, you stated that you were out of the office on FMLA and did not receive this email.

Ms. Barone, despite being disciplined [previously] you continue to display a pattern of unacceptable behavior. Your conduct at work continues to be disruptive and unprofessional and creates a hostile work environment. Your actions are in violation of Judicial Branch Policies 101 – Judicial Branch Mission and 614 – Non-Discrimination in the Workplace....

You are again reminded that you are expected to act in a courteous, respectful manner at all times while at work. Any future violations of a similar nature will result in more serious discipline up to and including termination.

*Id.*

On March 13, 2015, the Executive Director of Operations for the Judicial Branch suspended Ms. Barone again for one day without pay based on the incident in October of 2014. Defs.' SOMF Ex. B, ECF No. 57-5 at 28-29 (Barone Dep. Ex. 7, Judicial Branch Disciplinary Letter (Mar. 13, 2015)). The letter states, in part:

An investigation was conducted by Human Resource Management and it was substantiated that you again engaged in inappropriate conduct at work. Specifically, on October 17, 2014 while addressing co-workers you said, "screw you too" in an intimidating manner.

At a predisciplinary meeting you stated that you blurt things out and cannot guarantee that you will not do it

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 128 of 321

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

again. You stated that you only want to do your job, "tried to avoid all of this" and apologized for being this way.

Ms. Barone, Judicial Branch Policy 101 – Judicial Branch Mission, states in part that, "Each Judicial Branch employee should be provided a fair and equitable working environment characterized by amicable understanding, cooperation and harmony." Your actions created a hostile work environment and caused your co-workers to feel uncomfortable and intimidated. This behavior will not be tolerated....

Your actions are in violation of Judicial Branch Policy 101 – Judicial Branch Mission....

... Be advised that any future violations of policy will be subject to further disciplinary action, up to and including termination.

*Id.*

On July 21, 2015, Jon Lucas, the Court Planner for the Judicial Branch, notified Ms. Barone of a pre-disciplinary meeting to be held on July 23, 2015, "to determine if just cause exists to impose discipline upon you for violating Judicial Branch policies 501-Absences, 502-Reporting Attendance, and 518-Unauthorized Leave" as a "result of an unauthorized absence on June 18, 2015." Defs.' SOMF Ex. B, ECF No. 57-5 at 30 (Barone Dep. Ex. 8, Judicial Branch Letter (July 21, 2015)); Barone Dep. at 92:16-93:9.

On August 3, 2015, the Executive Director of Operations for the Judicial Branch sent Ms. Barone another disciplinary letter suspending her for one day without pay based on her absence from work on June 18, 2015. Defs.' SOMF Ex. B, ECF No. 57-5 at 31 (Barone Dep. Ex. 9, Judicial Branch Disciplinary Letter (Aug. 3, 2015)); Barone Dep. at 93:11-94:9. The letter states, in part, as follows:

> On July 31, 2014 you received a Written Reprimand for an unauthorized absence which was the result of failing to follow procedure for requesting time off. On October 24, 2014 you signed a stipulated agreement which stated, "*The grievant's next incident of any LU unauthorized time will result in a one (1) day suspension.*" One June 18, 2015 you did not report to work at your scheduled start time ...

> **\*5** At a pre-disciplinary meeting you stated that you were late because you had an emergency with your dog and "texted the girls" to inform them of your situation. Despite texting co-workers, you failed to follow the proper call out

procedure and did not inform your designated supervisors of your situation.

> Ms. Barone, this absence is in violation of Judicial Branch policies 501 – Absences, and 502 – reporting Attendance.... Any future unauthorized leave or other violations of policy will be subject to further disciplinary action, up to and including termination.

Def.'s SOMF Ex. B, ECF No. 57-5 at 31 (Barone Dep. Ex. 9, Judicial Branch Disciplinary Letter (Aug. 3, 2015)) (emphasis in the original).

On October 7, 2015, Mr. Lucas notified Ms. Barone of an investigatory meeting to be held on October 14, 2015, "regarding allegations of theft of time and falsification of Judicial Branch attendance records." Defs.' SOMF Ex. B, ECF No. 57-5 at 36 (Barone Dep. Ex. 11, Judicial Branch Letter (Oct. 7, 2015)); Barone Dep. at 103:19-104:24. The corresponding letter informed "[Ms. Barone] of [her] right to union representation." Defs.' SOMF Ex. B, ECF No. 57-5 at 36 (Barone Dep. Ex. 11, Judicial Branch Letter (Oct. 7, 2015)).

Ms. Barone sought medical leave again for October 12 through October 23, 2015. Defs.' SOMF Ex. B, ECF No. 57-5 at 57 (Barone Dep. Exs. 23, Dr. Jessica Chaudhary Letter recommending medical leave for Patient Anne Marie Barone (Oct. 19, 2015)).

In October 2015, Ms. Barone wrote a letter to Administrative Judge Shaban stating that she would "be returning to work on October 26, 2015, after being out for the past two weeks," and indicating that she expected to be fired soon after returning. Defs.' SOMF Ex. B, ECF No. 57-5 at 38-46 (Barone Dep. Ex. 13, Barone Letter to Judge Shaban); Barone Dep. at 105:21-106:25 (Ms. Barone answering "yes" to the question, "Would it be fair to say that this letter was written in or around October of 2015?"). The letter states, in part:

> I'm sure it comes as no surprise, to you, that I am ADHD, but this has been both a gift and a curse, for me. And what has transpired, in the last couple of years, has become the latter.

> I owned what I was responsible for. I always will. But I now realize where this is going ... my termination.

> The following is a synopsis of what has transpired on my end.

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 129 of 321

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

Defs.' SOMF Ex. B, ECF No. 57-5 at 38-39 (Barone Dep. Ex. 13, Barone Letter to Judge Shaban). The letter describes, from Ms. Barone's perspective in October 2015, what had occurred since June 2013 relating to Ms. Barone's disability, requests for medical leave, EEOC complaint, and disciplinary actions against her. *Id.* at 39-46.

On October 26, 2015, Mr. Lucas notified Ms. Barone of another investigatory meeting to be held on October 28, 2015, "regarding allegations of theft of time and falsification of Judicial Branch attendance records." Defs.' SOMF Ex. B, ECF No. 57-5 at 37 (Barone Dep. Ex. 12, Judicial Branch Letter (Oct. 26, 2015)); Barone Dep. at 105:1-17. The letter again informed "[Ms. Barone] of [her] right to union representation." Defs.' SOMF Ex. B, ECF No. 57-5 at 37 (Barone Dep. Ex. 12, Judicial Branch Letter (Oct. 26, 2015)).

On October 29, 2015, Mr. Lucas reported on the results of an investigation into allegations of "Theft of Time" and "Falsifying Judicial Branch Attendance Records" against Ms. Barone. Defs.' SOMF Ex. B, ECF No. 57-5 at 32-35 (Barone Dep. Ex. 10, Report of Investigation (Oct. 27, 2015)); Barone Dep. at 95:1-21 (Ms. Barone confirming that she received the report).

**\*6** Based on a review of Ms. Barone's time sheets and card access reports for the period of May 1 through October 1, 2015, communications with Ms. Albert, and the October 28, 2015 interview with Ms. Barone (at which the letter states Ms. Barone's union representative was present), the report concluded that Ms. "Barone falsified Judicial Branch attendance documents, stole time, and engaged in excessive tardiness without charging time." Defs.' SOMF Ex. B, ECF No. 57-5 at 32-35 (Barone Dep. Ex. 10, Report of Investigation (Oct. 27, 2015)). "As such Barone violated Judicial Branch Policy 501 – Absences, and 502 – Reporting Attendance." *Id.* at 35. Specifically, the report determined that Ms. Barone "regularly misrepresented the hours she worked on her time sheets;" "falsely recorded her arrival times on her time sheet on a regular basis;" inaccurately claimed that she was allowed to use flex time on a regular basis; lacked evidence that she worked beyond her scheduled work time on days when she had sought overtime; lacked credible explanations for why the card access report indicated that she arrived late on a regular basis; and "failed to account for 18.75 hours of time during this period." *Id.* at 34-35.

On November 12, 2015, Mr. Lucas notified Ms. Barone of a pre-disciplinary meeting to be held on November 19, 2015,

"to determine if just cause exists to impose discipline upon you for violating Judicial Branch Policy 501 – Absences, and 501 – Reporting Attendance." Defs.' SOMF Ex. B, ECF No. 57-5 at 47 (Barone Dep. Ex. 14, Judicial Branch Letter (Nov. 12, 2015)); Barone Dep. at 115:11-20. The corresponding letter stated that "[t]hese violations stem from an investigation that substantiated that you arrive late to work on a regular basis and do not charge time; and you falsely recorded your time on Judicial Branch attendance records" and also references "an unauthorized absence on October 28, 2015." Defs.' SOMF Ex. B, ECF No. 57-5 at 47 (Barone Dep. Ex. 14, Judicial Branch Letter (Nov. 12, 2015)). The letter also "notified [Ms. Barone] of [her] right to union representation." *Id.*

On December 8, 2015, an Administrative Assistant for Human Resources for the Judicial Branch sent Ms. Barone a letter denying a request for FMLA leave because Ms. Barone had not returned a "request for leave form" or medical certificate that had been sent to her on October 9, 2015, which were required for FMLA leave requests. Defs.' SOMF Ex. B, ECF No. 57-5 at 59 (Barone Dep. Ex. 25, Judicial Branch HR Letter (Dec. 8, 2015)).

On December 9, 2015, Mr. Lucas notified Ms. Barone of a pre-disciplinary meeting on December 11, 2015, "to determine if just cause exists to impose discipline upon you for violating Judicial Branch policies 501-Absences, 502-Reporting Attendance, 513-Leaves of Absence Without Pay, and 518-Unauthorized Leave." Defs.' SOMF Ex. B, ECF No. 57-5 at 48 (Barone Dep. Ex. 15, Judicial Branch Letter (Dec. 9, 2015)); Barone Dep. at 116:21-117:5. The letter states that the "violations are a result of unauthorized absences on October 20, 21, 22, 23, 2015 and November 24, 2015. Each occurrence of unauthorized leave will be considered independently and handled separately in the disciplinary process." Defs.' SOMF Ex. B, ECF No. 57-5 at 48 (Barone Dep. Ex. 15, Judicial Branch Letter (Dec. 9, 2015)). The letter also "notified [Ms. Barone] of [her] right to union representation." *Id.*

On January 26, 2016, Ms. Barone filed a complaint with the CHRO, claiming discrimination by the Judicial Branch based on her disability and on her prior complaints about discriminatory conduct in violation of federal and state law. Defs.' SOMF Ex. D, ECF No. 57-7 (Albert Dep. Ex. D, Affidavit of Illegal Discriminatory Practice, Conn. Comm'n on Human Rights and Opportunities (notarized Jan. 26, 2016)). Specifically, Ms. Barone claimed that she was

"docketed pay beginning in the Fall of 2015," "given a poor evaluation [in] April 2015," "denied a raise [in] April 2015," "retaliated against after EEOC filing," and "denied reasonable accommodations from November 2013 through present." *Id.*

On February 22, 2016, the Executive Director for Court Operations at the Judicial Branch notified Ms. Barone of the imposition of discipline for violations of Judicial Branch Policies 501 – Absences, 502 – Reporting Attendance, 513 – Leaves of Absence Without Pay, and 518 – Unauthorized Leave, stemming from unauthorized leave on October 20, 21, 22, 23, 28, and November 24, 2015. Defs.' SOMF Ex. B, ECF No. 57-5 at 49 (Barone Dep. Ex. 16, Judicial Branch Letter (Feb. 22, 2016)); Barone Dep. at 117:17-118:7. The Judicial Branch also terminated Ms. Barone's employment that same day. *Id.*

**\*7** The next day, February 23, 2016, Ms. Barone filed a Notice of Charge of Discrimination against the Judicial Branch with both the EEOC and the CHRO. Defs.' SOMF Ex. B, ECF No. 57-5 at 7 (Barone Dep. Ex. 1, EEOC Notice of Charge of Discrimination (Feb. 23, 2016)). Ms. Barone originally claimed disability discrimination and retaliation under the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act. *Id.*

### B. Procedural History

On April 18, 2017, Ms. Barone filed this lawsuit against the Judicial Branch, Ms. Albert, and Ms. Coon. Compl., ECF No. 1 (Apr. 18, 2017).

Over the course of the next several months, the parties filed various motions to amend the Complaint, to dismiss Amended Complaints, and for extensions of time to respond to each other's motions. *See* ECF Nos. 2-36.

On February 21, 2018, the Court held a hearing on several of these motions. Minute Entry, ECF No. 35 (Feb. 21, 2018).

On March 16, 2018, the Court granted in part and denied in part the Defendants' motion to dismiss the Second Amended Complaint. Order, ECF No. 37 (Mar. 16, 2018). The Court also granted the Plaintiff's most recent motion to amend/ correct the Second Amended Complaint. *Id.*

On April 3, 2018, Plaintiff filed a Third Amended Complaint bringing claims only under the Rehabilitation Act and the First and Fourteenth Amendments. Third Am. Compl., ECF No. 39 (Apr. 3, 2018). [2] She seeks damages against the Judicial Branch and against Ms. Albert and Ms. Coon in their individual capacities and "[s]uch other relief as this Court deems fair and equitable." *Id.* The Third Amended Complaint forms the basis for this motion for summary judgment.

[2]    The Plaintiff filed two identical Amended Complaints on April 3, 2018, docketed as ECF No. 38 and ECF No. 39. The Court cites to the Complaint docketed at ECF No. 39 because the Defendants' motion to dismiss cites to that document, but since the two documents are identical, this Ruling and Order is addressed to both.

On May 8, 2018, Defendants filed an Answer and Affirmative Defenses to the Third Amended Complaint. Answer, ECF No. 42 (May 8, 2018).

On March 1, 2019, Defendants filed a motion for summary judgment. Defs.' Mot. Summ. J., ECF No. 57 (Mar. 1, 2019). In support of their motion, Defendants filed a memorandum of law, a statement of material facts, and six exhibits which consisted of depositions of Ms. Barone, Ms. Albert, and Ms. Coon. Defs.' Mem. Summ. J., ECF No. 57-1 (Mar. 1, 2019) ("Defs.' Mem."); Defs.' SOMF, ECF No. 57-2 (Mar. 1, 2019); Defs.' Mot. Summ. J. Ex. Index, ECF No. 57-3 (Mar. 1, 2019).

On March 15, 2019, Plaintiff opposed the motion for summary judgment. Pl.'s Opp., ECF No. 60 (Mar. 15, 2019). In support of her opposition, Plaintiff submitted a memorandum of law, a statement of material facts, and several evidentiary documents within the same file, including medical records, affidavits from Ms. Barone, and journal entries from Ms. Barone. *Id.*

On March 22, 2019, Defendants filed their reply. Defs.' Reply, ECF No. 61 (Mar. 22, 2019).

On July 24, 2019, Defendants filed a notice of controlling authority in support of motion for summary judgment. Notice of Contr. Auth., ECF No. 67 (July 24, 2019) ("Defs.' First Notice Contr. Auth."). Plaintiff objected to the Defendants' claim of controlling authority on July 27, 2019. Reply to Response to Mot. for Summ. J., ECF No. 68 (July 27, 2019) ("Pl.'s Obj. to First Notice Contr. Auth.").

**\*8** On August 13, 2019, Defendants submitted another notice of controlling authority in support of motion for

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

summary judgment. Notice of Contr. Auth., ECF No. 69 (Aug. 13, 2019) ("Defs.' Second Notice Contr. Auth.").

On August 27, 2019, Defendants submitted a notice of supplemental authority in support of motion for summary judgment. Notice of Supp. Auth., ECF No. 70 (Aug. 27, 2019) ("Defs.' Notice Supp. Auth.").

On November 25, 2019, the Court held a hearing on Defendant's motion for summary judgment. Minute Entry, ECF No. 79 (Nov. 25, 2019).

## II. STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.") (citing *Anderson*, 477 U.S. at 248).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and

"demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'") (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

**\*9** Any inferences drawn from the facts must be done in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if a court finds that no reasonable trier of fact could find in the non-movant's favor and the moving party is entitled to judgment as a matter of law, a court will grant the summary judgment motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III. DISCUSSION

### A. The Rehabilitation Act Claim Against the Judicial Branch

Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with
> a disability in the United States,

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a). Courts evaluate employment discrimination claims under the Rehabilitation Act by applying the same standards applied to employment discrimination claims under the Americans with Disabilities Act of 1990. *Natofsky v. City of New York*, 921 F.3d 337, 345 (2d Cir. 2019), *petition for cert. filed*, No. 19-372 (Dec. 10, 2019) ("The standards used to determine whether [Section 504 of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination ... shall be the standards applied under title I of the Americans with Disabilities Act of 1990.") (quoting 29 U.S.C. § 794(d)).

Claims alleging disability discrimination in violation of the Rehabilitation Act are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, (1973). *Petrone v. Hampton Bays Union Free Sch. Dist.*, 568 F. App'x 5, 7 (2d Cir. 2014) ("The elements of a discrimination claim under the ADA and section 504 of the Rehabilitation Act are identical and are analyzed under the same burden-shifting framework.") (citing *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995)); *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (applying the *McDonnell Douglas* analysis to an ADA employment discrimination claim).

Under this burden-shifting framework, the "plaintiff must establish a prima facie case [of discrimination]; the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixix N.A., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Prog.*, 198 F.3d 68, 72 (2d Cir. 1999)).

Ms. Barone claims that the Judicial Branch discriminated against her based on her disability in violation of Section 504

of the Rehabilitation Act, 29 U.S.C. § 794. Third Am. Compl. ¶ 1-2.

Defendants argue that Ms. Barone has failed to make a prima facie case of discrimination under the Rehabilitation Act because she has not established that she faced adverse employment actions due to a disability within the meaning of the ADA and because she was not otherwise qualified for her position. Defs.' Mem. at 6.

**\*10** Even if Ms. Barone could establish a prima facie case, Defendants argue that her Rehabilitation Act must fail under the *McDonnell Douglas* burden-shifting framework because Ms. Barone has failed to meet her burden of persuasion to show that the Defendants' proffered legitimate nondiscriminatory reasons for actions taken against Ms. Barone were pretext. *Id.* at 14-16.

The Court addresses each of these issues in turn.

### 1. The Alleged Prima Facie Case of Discrimination

To establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must show:

> (1) that the plaintiff is handicapped within the meaning of the Act; (2) that the plaintiff is otherwise qualified to perform the job; (3) that the plaintiff was discharged because of his or her handicap; and (4) that the employer is a recipient of federal financial assistance.

*Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003). Additionally, "[t]he standards used to determine whether [Section 504 of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination ... shall be the standards applied under Title I of the Americans with Disabilities Act of 1990." *Natofsky,* 921 F.3d at 345 (quoting the Rehabilitation Act, 29 U.S.C. § 794(d)); *see also Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (setting forth elements of a prima facie case under the ADA: "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 133 of 321

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability" (internal alterations omitted)).

Defendants concede that Ms. Barone is subject to the Rehabilitation Act and that Ms. Barone suffered adverse employment actions "with progressive discipline resulting in suspensions and eventual termination." Defs.' Mem. at 6. Defendants argue, however, that (a) Ms. Barone cannot establish that she was disabled within the meaning of the Rehabilitation Act; (b) the adverse actions Ms. Barone suffered were not imposed because of a disability; and (c) the Rehabilitation Act only protects individuals who are otherwise qualified for their job, and Ms. Barone was unqualified for her position of court monitor because she had committed various acts of misconduct, including threatening other employees. *Id.*

As discussed further below, the evidence in this record fails to provide a genuine issue of material fact as to Ms. Barone's prima facie case. The Court also determines that, even if she had established a prima facie case, she cannot meet her burden of creating a genuine issue of material fact on her Rehabilitation Act claim sufficient to prevent its dismissal.

District courts have "considerable latitude in fashioning rules that will assist them in determining whether summary judgment is appropriate." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 471 (2d Cir. 2002). "Because nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations." *Id.* at 470–71 (citing Fed. R. Civ. P. 83(b) (allowing district courts to regulate motion practice in any manner consistent with federal law and the federal rules)).

**\*11** The District of Connecticut's Local Rule 56(a) requires that a non-moving party's Statement of Material Facts in Opposition to Summary Judgment "shall include ... a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c)."[3] D. Conn. L. Civ. R. 56(a)2(i). Furthermore, "[e]ach denial ... must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." *Id.* 56(a)3.

3    *See* Fed. R. Civ. P. 56(c) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.")

The "specific citation" obligation of this Local Rule requires parties to cite to specific paragraphs when citing to affidavits or responses to discovery requests and to cite to specific pages when citing to depositions or other transcripts or to documents longer than a single page in length. *Id.* "When a party fails to appropriately deny material facts set forth in the movant's Rule 56(a)(1) statement, those facts are deemed admitted." *SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004); D. Conn. L. Civ. R. 56(a)3 (providing that if a non-moving party fails to provide specific citations to evidence in the record, the Court may "deem[ ] admitted certain facts [in the movant's Statement of Material Facts] that are supported by the evidence in accordance with Local Rule 56(a)1").

In her Local Rule 56(a)2 Statement of Material Facts, Ms. Barone responds to many paragraphs from the Defendants' 56(a)1 Statement by claiming that she "is not in a position to admit or deny the paragraph, as stated." *See* Pl.'s SOMF ¶¶ 1, 7, 9, 11-19, 21-29, 38, 46-49, 56, 58-60, 62-74, 76, 85-88, 102-103. These responses fail to meet the requirements of Rule 56(a)2 to "respond to each paragraph admitting or denying the fact and/or objecting to the fact" as based on inadmissible evidence, because they neither agree with or deny the statements made by the moving party.

As a result, paragraphs 1, 7, 9, 11-19, 21-29, 38, 46-49, 56, 58-60, 62-74, 76, 85-88, and 102-103 of the Defendants' Local Rule 56(a)1 statement are deemed admitted. *See Buell v. Hughes*, 568 F. Supp. 2d 235, 237 (D. Conn. 2008) (finding that a plaintiff's responses did not comply with Local Rule 56(a)2 where they stated that "Plaintiffs lack sufficient information to agree or disagree," and accordingly deeming those paragraphs admitted); *Henton v. City of New London*, 3:06-cv-2035 (EBB), 2008 WL 2185933 at \*4 (D. Conn. May 23, 2008) (same); *Knight v. Hartford Police Dep't*, No. 3:04-cv-969 (PCD), 2006 WL 1438649, at \*4 (D. Conn. May 22, 2006) (deeming admitted defendant's undisputed facts where plaintiff responded that he "ha[d] no knowledge" of or "disagree[d] with" the statements and where he offered no evidence in dispute); *Walton v. State of Conn., Dep't of Soc. Servs.*, No. 3:03-cv-2262 (JBA), 2006 WL 533793 (D. Conn. Mar. 2, 2006) (deeming admitted defendant's material facts where plaintiff claimed insufficient knowledge to respond and offered no evidence to dispute facts).

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

Ms. Barone responds to many other paragraphs in Defendants' 56(a)1 Statement by denying them "as stated," *id.* ¶¶ 20, 34, 42, 51-53, 55, 61, 75, 77-84, 90-96, 98, 106, or by admitting "only that this is [the litigant's] testimony at deposition," but not admitting or denying the fact asserted in the statement. *See id.* ¶¶ 16-17, 30, 33, 35-37, 45, 50, 54, 57, 89, 95, 97, 101, 104, 107, 109-110. These responses also fail to comply with Local Rule 56(a)2 because they do not respond to the fact itself. As a result, paragraphs 16-17, 20, 30, 33-37, 42, 45, 50-55, 57, 61, 75, 77-84, 89, 90-98, 101, 104, 106-107, and 109-110 are also deemed admitted. *See Buell, 568 F. Supp. 2d at 238* (deeming paragraphs admitted where non-movants "objected to the phrasing of the statement, and stated so in their response rather than stating whether they agreed or disagreed with the statement put forth," and where non-movants "objected to the formatting and the inclusion of the statement, rather than answering the fact as required by Local Rule 56(a)2").

**\*12** Where Ms. Barone denies paragraphs from Defendants' 56(a)1 Statement, she fails to provide a specific citation to admissible evidence in the record. *Id.* ¶ 20, 31-32, 34, 42, 51-53, 55, 61, 75, 77-84, 90-96, 98, 100, 106. These statements do not comply with the Local Rule's "specific citation" requirement. D. Conn. L. Civ. P. 56(a)3. The Court has already deemed admitted all paragraphs which Ms. Barone denied "as stated." The Court may deem as admitted any other paragraph that is not properly denied with a specific citation to admissible evidence. *Reynolds v. Town of Suffield*, No. 3:10-cv-1528 (JBA), 2012 WL 3135896, at *1 (D. Conn. July 31, 2012) (deeming admitted, under Local Rule 56(a)3, all facts which plaintiffs failed to deny with proper specific citations to admissible evidence in the record); *see also Amnesty*, 288 F. 3d at 471 ("[D]istrict courts are entitled to order litigants to provide specific record citations."). Accordingly, the Court also deems admitted paragraphs which Ms. Barone disputes without providing citations to the record to support her denials: paragraphs 31-32 and 100.

Ms. Barone responds to a few paragraphs by "admit[ting] only that" the accommodation was "suggested" or "explored." *Id.* ¶ 39-41. She also asserts without any reference to admissible evidence—let alone a specific citation—that she informed the Defendants that the explored accommodations were insufficient for her. *Id.* These responses are insufficient under Local Rule 56(a) both because they fail to admit or deny the fact asserts, *see Buell*, 568 F. Supp. 2d at 238; and

because they fail to deny facts with a specific citation to admissible evidence, *see Reynolds*, 2012 WL 3135896, at *1. Accordingly, the Court also deems admitted paragraphs 39-41.

Indeed, Ms. Barone does not provide a single citation throughout her 56(a)2 statement. Pl.'s SOMF. Instead, she makes conclusory assertions, references materials that are not presented in the record, and repeatedly asserts that "the defendant employer has records available to confirm" particular paragraphs "which should be produced." *See* Pl.'s SOMF ¶¶ 7, 9, 11-19, 21-28, 30-38, 42, 46-60, 62-72, 74, 76-77, 88, 96, 101-103. Additionally, Ms. Barone does not include a separately titled section of "Additional Material Facts" which could "establish genuine issues of material fact precluding judgment in favor of the moving party" as required by Local Rule 56(a)2(ii). [4] Instead, she sets out a section titled "Rule 56(a)(2) Statement of Material Facts in Dispute," which consists of seven conclusory statements and not a single citation to evidence in the record. Pl.'s SOMF, ECF No. 60 at 20.

[4]     Local Rule 56(a)2(ii) requires that a non-moving party "must also include a separate section entitled 'Additional Material Facts' setting forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 any additional facts, not previously set forth in responding to the movant's Local Rule 56(a)1 Statement, that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party."

At this stage, Ms. Barone must provide more than "conclusory allegations or unsubstantiated speculation." *Robinson*, 781 F.3d at 44 (citation omitted). She "must present concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Alteri v. Gen. Motors Corp.*, 919 F. Supp. 92, 94-95 (N.D.N.Y. 1996), *aff'd*, 116 F.3d 465 (2d Cir. 1997) (internal quotations omitted); *see also Celotex Corp.*, 477 U.S. at 324 (holding that Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "). "Where a statement is not supported by the record, the Court either notes such or does not rely on the purported fact in its determination." *Johnson v. Conn. Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013), *aff'd*, 588 F. App'x 71 (2d Cir. 2015).

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 135 of 321

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)
2019 WL 7283383, 2019 A.D. Cases 494,840

Additionally, a District Court is not obligated to "perform an independent review of the record to find proof of a factual dispute. A district court is obligated only to consider the materials cited to it by the parties." *Morales v. N.Y. State Dep't of Labor*, 530 Fed. App'x. 13, 14 (2d Cir. 2013) (internal quotation marks and citation omitted).

**\*13**  As a result, to the extent that Ms. Barone's Rule 56(a)2 Statement of Material Facts fails to comply with Local Rule 56(a)2 and (a)3 and fails to point to concrete evidence in the record, the corresponding facts in the Defendant's Local Rule 56(a)1 Statement shall be deemed admitted for purposes of this motion, where those asserted facts are supported by admissible evidence: paragraphs 1, 7, 9, 11-42, 45-98, 100, 101-104, 106-107, and 109-110. The Court will not rely on any assertions that are unsupported by admissible evidence in the record.

More specifically, without any elaboration or citations to the record, Ms. Barone argues that "[t]here is credible evidence in the record from multiple sources that the [P]laintiff suffered from ulcerative colitis, Attention Deficit Disorder and depression," Pl.'s Mem. at 5, three distinct medical conditions. But beyond conclusory assertions, Ms. Barone does not provide record evidence that ulcerative colitis substantially limited major life activities or provide any basis from which a jury could conclude that the Defendants discriminated against her based on this medical condition.

Her reference to depression is even more problematic. "It is well established that a party cannot assert a claim for the first time in its motion papers." *Mignault v. Ledyard Pub. Sch.*, 792 F. Supp. 2d 289, 301 (D. Conn. 2011) (quoting *Global Crossing Bandwidth, Inc. v. Locus Telecommunication, Inc.*, 632 F. Supp. 2d 224, 245 (W.D.N.Y. 2009)); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Allah v. Poole*, 506 F. Supp. 2d 174, 193 (W.D.N.Y. 2007) ("a memorandum of law or other motion papers are not proper vehicles by which to raise claims that are not asserted in the complaint"). But Ms. Barone for the first time in her opposition to summary judgment refers to a medical diagnosis of depression. Pl.'s Mem. at 5. In any event, there is no record evidence that Ms. Barone faced adverse actions at work because of her alleged depression.

As to Ms. Barone's claims of discrimination based on ADHD, "a plaintiff diagnosed with ADHD may have a mental impairment within the meaning of the [Americans with Disabilities Act, [5] ][b]ut that impairment must also limit a major life activity to a substantial degree." *Robinson v. Our Lady of Lourdes Mem'l Hosp., Inc.*, No. 3:14-cv-0308 (MAD/DEP), 2014 WL 5149221, at \*7 (N.D.N.Y. Oct. 14, 2014) (quoting *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 155 (1st Cir. 1998)). In considering whether a major life activity is substantially limited by an impairment, courts consider "the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Mazzeo v. Mnuchin*, 751 F. App'x 13, 15 (2d Cir. 2018) (quoting *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005)). A plaintiff must show that her impairments do not simply cause some difficulty with a major life activity, but that they *substantially* limit that activity. *See Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 51 (2d Cir. 2012) (affirming a district court's finding that, while the plaintiff's symptoms of work-related stress and depression caused her some difficulty sleeping and eating, "no evidence showed that [her] impairments were *substantially* limiting" (emphasis in the original)).

[5]     While Ms. Barone does not bring claims under the Americans with Disabilities Act, the Rehabilitation Act "defines 'disability' in virtually the same terms as" the ADA. *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998); *see also Beason v. United Techs. Corp.*, 337 F.3d 271, 277 (2d Cir. 2003) ("[The ADA] definition of disability borrows heavily from a definition contained in the Rehabilitation Act, which" defines a person with a disability "as a person who has 'a physical or mental impairment which substantially limits one or more of such person's major life activities.' " (internal citations omitted)).

**\*14**  Ms. Barone argues that she had requested her own private office because her ADHD "at times affects [her] job performance because [she is] unable to focus," EEOC Intake Questionnaire; and a physician opined that, due to "ADHD [and] derivative symptoms," Ms. Barone could "work regular h[ou]rs if she has a quiet work environment – can focus in court room during trial, but has difficulty [at] duty station with numerous distractions." Barone Dep. Ex. 24, ECF No. 59-1 (Judicial Branch Medical Certificate (Sept. 9, 2014)) (submitted under seal).

But a plaintiff must "offer[ ] evidence that the extent of the limitation in terms of [his] own experience ... is substantial."

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 136 of 321

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

*Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999). This evidence also must demonstrate that the employee is "substantially limited in [one's] ability to concentrate in comparison to the general population." *DeMar v. Car-Freshner Corp.*, 49 F. Supp. 2d 84, 91 (N.D.N.Y. 1999); *see also Kohn v. AT & T Corp.*, 58 F. Supp. 2d 393, 416 (D.N.J. 1999). There is no such evidence in this record. As a result, a reasonable jury could not find that ADHD substantially limited Ms. Barone's ability to work or to concentrate, particularly "in comparison to the general population." *DeMar*, 49 F. Supp. 2d at 91.

Accordingly, the Court finds that no genuine issue of material fact exists as to whether Ms. Barone was disabled within the meaning of the Rehabilitation Act and thus, could grant summary judgment because of a failure to establish a prima facie case.

But even if Ms. Barone could establish a prima facie case of discrimination under the Rehabilitation Act, as discussed below, this record contains legitimate non-discriminatory reasons for Ms. Barone's termination, thus requiring her to "produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista*, 445 F.3d at 169.

### 2. Defendants' Legitimate Non-Discriminatory Reasons for Termination and Plaintiff's Ultimate Burden

"[W]orkplace misconduct is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability." *McElwee v. Cty. of Orange*, 700 F.3d 635, 639, 641 (2d Cir. 2012) (internal citation omitted) (granting summary judgment to a defendant employer because the defendant provided evidence that the plaintiff was terminated due to sexually harassing and other "disturbing" behaviors, even if those behaviors were related to the plaintiff's autism spectrum disorder); *see also Krasner v. City of New York*, 580 F. App'x 1, 3 (2d Cir. 2014) (affirming a district court's grant of summary judgment to an employer where "[t]he evidence was undisputed that [the plaintiff, who had Asperger's Syndrome,] repeatedly engaged in serious misconduct, as evidenced by his extensive disciplinary history, which included instances of insubordination, use of profane language, and threats to co-workers of serious physical harm," even though the plaintiff's behavior may have been related to his Asperger's Syndrome); *Mancini v. Accredo Health Grp., Inc.*, No. 3:17-CV-01625-MPS, 2019 WL 4192168, at *8 (D. Conn. Sept. 4, 2019) ("conclud[ing] that no reasonable jury could find that [the defendant employer's] proffered reasons—the serious misconduct complained of by [plaintiff employee's] patients, some of which [the plaintiff] herself admits—were pretext for disability discrimination.").

**\*15** Defendants argue that the actions taken against Ms. Barone were not due to her disability but rather due to her misconduct. Defs.' Mem. at 12.

Ms. Barone argues that she has "specifically pled detailed pattern of harassment, pre-textual discipline and ultimately dismissal." Pl.'s Mem. at 6.

The Court disagrees.

As Defendants rightly note, anti-discrimination statutes protecting those with disabilities do not "immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace." *Sista*, 445 F.3d at 169 (quoting *Krasner v. City of New York*, 2013 WL 5338558, at *12 (S.D.N.Y. Sept. 23, 2013) *aff'd*, 580 F. App'x 1 (2d Cir. 2014)). The Judicial Branch has put forth a legitimate non-discriminatory reason for workplace discipline directed at and the termination of Ms. Barone: workplace misconduct. After several written reprimands warning Ms. Barone that future misconduct would result in more serious discipline, the Judicial Branch suspended Ms. Barone on at least three separate occasions both for her alleged behavior at work and her alleged unauthorized failure to show up to work. Defs.' SOMF Ex. B, ECF No. 57-5 at 26-27 (Barone Dep. Ex. 6, Judicial Branch Disciplinary Letter (Mar. 9, 2015) ("In the past you have received a written reprimand and a one-day suspension for engaging in inappropriate conduct at work ... [and as a result of telling] everyone in the office to 'go f*** themselves' [and] spraying a deodorant type spray [despite an email requesting that employees refrain from using such sprays] ... you are being suspended from work without pay for a period of two (2) days."); Defs.' SOMF Ex. B, ECF No. 57-5 at 31 (Barone Dep. Ex. 9, Judicial Branch Disciplinary Letter (Aug. 3, 2015) ("As a result of [violations of Absences and Reporting Attendance policies] you are being suspended from work without pay for one (1) day."); Defs.' SOMF Ex. B, ECF No. 57-5 at 49 (Barone Dep. Ex. 16, Judicial Branch Letter (Feb. 22, 2016) (suspending Ms. Barone for multiple violations of attendance and leave policies).

The Judicial Branch subsequently terminated Ms. Barone because of her continuing unauthorized failures to show

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

up to work in spite of multiple warnings and prior discipline, and for the falsification of time records. Defs.' SOMF Ex. B, ECF No. 57-5 at 49 (Barone Dep. Ex. 16, Judicial Branch Letter (Feb. 22, 2016) (imposing multiple suspensions as well as termination of employment "given [Ms. Barone's] demonstrated unwillingness to comply with the basic requirement of [her] position, which is adherence to attendance expectations, and for violating Judicial Branch policies [regarding absences, reporting attendance, and taking leave], in accordance with the progressive disciplinary actions imposed for each occurrence of unauthorized leave"). There is nothing in this record that creates a genuine issue of material fact that these reasons were a pretext for discrimination against Ms. Barone, because of her alleged disabilities.

Indeed, Ms. Barone ultimately admits engaging in the conduct for which she was disciplined and ultimately fired—stating "screw you," Barone Dep. at 91:17-92:10, and "go fuck yourselves," *id.* at 90:1-8, to coworkers in the workplace; spraying an aerosol spray despite an email having circulated asking employees not to do so, *id.* at 90:12-18; telling a coworker that "you can't play the invalid card anymore," *id.* at 20:14-15; and missing work without permission or proper procedures, *id.* at 103:12-16, 104:17-20, 106:19-22. In October of 2015, she also admitted that: "I owned what I was responsible for, I always will, but I now realize where this is going ... my termination." Defs.' SOMF Ex. B, ECF No. 57-5 at 38-39 (Barone Dep. Ex. 13, Barone Letter to Judge Shaban). Finally, when asked in this case, whether she had been investigated and disciplined because of her ADHD diagnosis, Ms. Barone responded: "I have no facts." Barone Dep. at 96:10-14.

**\*16** Ms. Barone argues—and at oral argument, her counsel urged the Court to consider—entries in her diary regarding her belief as to the Defendants' discriminatory conduct. *See* Pl.'s Opp. Ex., ECF No. 60 at 51, 55, 58, 60-61 (Barone Journal Entries dated Aug. 8, 2015 through Jan. 10, 2016).

The Court disagrees.

Ms. Barone's diary alone cannot create genuine issues of material fact sufficient to warrant a trial on her claims of discrimination under the Rehabilitation Act. While Ms. Barone's state of mind is probative of her view of the alleged underlying discrimination, the Rehabilitation Act, just like the ADA, "requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action." *Natofsky*, 921 F.3d

at 348. [6] A " 'but-for' causation [in the Second Circuit] does not require proof that discrimination was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the discriminatory motive." *Wellner v. Montefiore Med. Ctr.*, No. 17 CIV. 3479 (KPF), 2019 WL 4081898, at *8 (S.D.N.Y. Aug. 29, 2019) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (internal alterations omitted)).

6    Ms. Barone argues that the *Natofsky* decision should not affect the outcome of this case and cites other decisions for this Court's consideration —cases, in this Court's view, inapposite to this one. *See Gagliardi v. Sacred Heart Univ., Inc.*, No. 3:17-cv-857 (VAB), 2019 WL 3202742 (D. Conn. July 16, 2019) (providing no guidance because it involves claims of gender discrimination under Title VII and Title IX, while *Natofsky* explicitly "determined that the ADA does not incorporate Title VII's mixed-motive standard." 921 F.3d at 349); *Brown v. District of Columbia*, 928 F.3d 1070, 1100 (D.C. Cir. 2019) (providing no guidance because (1) its holding applies narrowly to *Olmstead* claims under Title II of the ADA, while *Natofsky* applies to employment discrimination claims under Title I of the ADA, and (2) it is a non-binding decision from outside the Second Circuit); *Smith v. N.Y. State Office of Temp. & Disability Assistance*, No. 119-cv-112 (DNH) (CFH), 2019 WL 3472491 (N.D.N.Y. Apr. 29, 2019), *report and recommendation adopted sub nom. Smith v. NYS Office of Temp. & Disability Assistance*, No. 119-cv-112 (DNH) (CFH), 2019 WL 3454098 (N.D.N.Y. July 31, 2019) (providing no guidance because it does not discuss the causation standard required under Title I of the ADA at all).

In other words, there must be evidence in this record that but-for Ms. Barone's disability the Defendants would not have disciplined or terminated her. *See, e.g., Lareau v. Nw. Med. Ctr.*, No. 2:17-cv-81, 2019 WL 4963057, at *2 (D. Vt. Oct. 8, 2019) (denying summary judgment where "prior to her seizures [plaintiff] received positive performance reviews and pay raises based on merit," but "[o]nce her seizures began and she alerted her supervisors about possible periods of medical leave, she was faced with attendance-related questions and placed on a punitive performance plan;" and that she "was terminated shortly after the plan's conclusion."); *Murphy v. N.Y. State Pub. Emps. Fed'n*, No. 117-cv-628

**Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)**

2019 WL 7283383, 2019 A.D. Cases 494,840

(TJM) (TWD), 2019 WL 4257261, at *12 (N.D.N.Y. Sept. 9, 2019) (denying summary judgment where the Defendant commented that "he did not like people with disabilities" and referenced the plaintiff's "need for physical therapy during a 'counseling session' that immediately preceded [plaintiff's] termination."); *Wellner*, 2019 WL 4081898, at *8 (denying summary judgment where defendant's "shifting position between February and July" of 2016, during which time the plaintiff requested an accommodation based on disability, could lead a reasonable jury to conclude that the accommodation request precipitated her termination in July of 2016 rather than a prior event unrelated to her disability).

**\*17** Ms. Barone, however, relies only "on conclusory allegations or unsubstantiated speculation." *Robinson*, 781 F.3d at 44 (citation omitted). There is nothing in this record from which a reasonable jury could conclude that Ms. Barone's disability played a role in her discipline or termination.

Accordingly, the Court will dismiss Ms. Barone's Rehabilitation Act claim against the Judicial Branch.

### B. The First Amendment Claim against Ms. Albert and Ms. Coon

The First Amendment protects public employees' speech from adverse employment actions when the public employees speak (1) as a private citizen rather than as an employee, (2) on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). A public employee plaintiff claiming retaliation in violation of her First Amendment rights "must allege that their employer interfered with their right to speak as a citizen on a matter of public concern. Whether the employee engaged in such speech is the threshold inquiry under the Court's precedents governing whether a public employer violated the First Amendment rights of its employees. *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1420 (2016) (citing *Garcetti*, 547 U.S. at 418). "If the employee has not engaged in what can be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for [the court] to scrutinize the reasons for her discharge." *Id.* at 1417 (internal citation and quotation marks omitted).

Ms. Barone brings claims under 42 U.S.C. § 1983 against Ms. Coon and Ms. Albert in their individual capacities for violations of her First Amendment rights, specifically that Ms. Coon and Ms. Alberted retaliated against her when she petitioned for the redress of grievances. Third Am. Compl. ¶ 1-2. Ms. Barone claims that she was harassed and intimidated, given unfavorable employment evaluations, denied a reasonable accommodation request, and was ultimately fired in retaliation for filing disability discrimination complaints to the EEOC and the CHRO. *Id.* ¶ 7-20.

Because Ms. Barone's EEOC and the CHRO complaints addressed her personal grievances with the Defendants, they do not constitute speech made on matters of public concern and therefore cannot form the basis of a First Amendment retaliation claim. *See Miller v. City of Ithaca, N.Y.*, 758 F. App'x 101, 105 (2d Cir. 2018) (affirming a district court's dismissal of a police officer's First Amendment retaliation claims because his "speech was made primarily to redress his personal grievances and was not made 'as a citizen on a matter of public concern.' ") (quoting *Garcetti*, 547 U.S. at 418).

Ms. Barone did not bring a claim of retaliation under the Rehabilitation Act, which protects employees from retaliation for making complaints under those statutes. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("The ADA makes it unlawful for an employer to 'discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.' ... The Rehabilitation Act ... contain[s] similar provisions against retaliation and are governed in this respect by the same standards as the ADA." (quoting 42 U.S.C. § 12203(a)); *Weixel v. Board of Educ. of the City of New York*, 287 F.3d 138, 148–49 (2d Cir. 2002) (elements of a retaliation claim under Rehabilitation Act are the same as under the ADA)).

**\*18** In any event, such claims would fail even if she had brought them.

In order to make out a prima facie case of retaliation under the Rehabilitation Act (just as with the ADA), a plaintiff must show that "(1) the employee was engaged in an activity protected by the [statute], (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999); *see also Sista*, 445 F.3d at 177 (applying the same test and finding that a plaintiff failed to present evidence that would allow a reasonable jury to find that the defendant "terminated him on account of his decision to exercise his rights under the ADA").

Barone v. Judicial Branch of Connecticut, Not Reported in Fed. Supp. (2019)

2019 WL 7283383, 2019 A.D. Cases 494,840

Retaliation claims under the Rehabilitation Act are subject to the same burden shifting framework as other claims under that law. *See Equal Emp't Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 199 (D. Conn. 2017) (citing *Shepheard v. N.Y.C. Corr. Dep't,* 360 F. App'x 249, 251 (2d Cir. 2010)). Therefore, a retaliation claim under the Rehabilitation Act here would fail for the same reasons that Ms. Barone's main Rehabilitation Act claim failed. As discussed *supra*, Defendants have presented substantial evidence that Ms. Barone received unfavorable employment evaluations and was ultimately fired because she engaged in misconduct in the workplace, not because she filed complaints of discrimination.

Moreover, the element of a "causal connection[ ] requires that a plaintiff show that a retaliatory motive played a part in the adverse employment action." *Sista*, 445 F.3d at 177. The Second Circuit recently held further that a plaintiff must show that the retaliatory motive was the but-for cause of the adverse action. *Natofsky*, 921 F.3d at 353.

Ms. Albert and Ms. Coon argue that neither of them was aware of Ms. Barone's 2014 complaint or her 2016 complaints before her termination.

Ms. Barone has not pointed to any evidence which could establish a genuine issue of material fact as to Ms. Coon's or Ms. Albert's knowledge of Ms. Barone's complaints, much less that a retaliatory motive played a part in any adverse employment actions.

Although an EEOC Mediator sent a letter addressed to both Ms. Barone and a Human Resources representative of the Judicial Branch inviting both parties to mediation, that letter was addressed to Mark Ciarciello and neither addressed nor copied Ms. Coon or Ms. Albert. Defs.' SOMF Ex. B, ECF No. 57-5 at 13 (Barone Dep. Ex. 1, EEOC Invitation to Mediate (May 22, 2014)). Ms. Barone does not point to any evidence suggesting that Ms. Coon or Ms. Albert knew about this invitation to mediate. Ms. Albert testified that she was never aware of Ms. Barone's complaints while she was still employed at the Judicial Branch, and that she only became aware of Ms. Barone's CCHRO complaint in May 2016, after Mr. Barone's termination. Albert Dep. at 57:15-59:9. Ms. Coon testified that she was not aware of any of Ms. Barone's filings until she received notice of the lawsuit now before the Court. Coon Dep. at 67:6-69:5.

**\*19** Additionally, Ms. Barone testified that she lacked specific knowledge that Ms. Albert or Ms. Coon ever knew of her complaints. Rather, she answered deposition questions of whether she believed Ms. Albert or Ms. Coon were retaliating against her based on her EEOC or CCHRO filings by stating "I don't know," and "don't care." *See* Barone Dep. at 27:7-10, 29:20-23, 31:18-22, 33:2-14, 157:22-158:9, 188:7-25. At one point, when asked whether she believed she had been investigated and disciplined because of her ADHD diagnosis or her EEOC or CHRO filings, Ms. Barone responded: "I have no facts." Barone Dep. at 96:10-14.

Even if evidence showed that Ms. Coon and Ms. Albert knew about Ms. Barone's complaints, there is no record evidence that a causal connection existed between that knowledge and Ms. Barone's adverse employment actions.

A plaintiff can show a causal connection in retaliation claims either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.' " *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

There is no direct evidence showing that a retaliatory motive played any part in Ms. Barone's termination. Ms. Barone appears to rely on temporal proximity between her EEOC complaint, filed in February 2014, *see* Defs.' SOMF Ex. B, ECF No. 57-5 at 2 (Barone Dep. Ex. 1, EEOC Intake Questionnaire (Feb. 25, 2014)); and the various employment actions she alleges the Defendants took in retaliation for her filing those complaints, which began in the summer and fall of 2014, ramped up over the course of 2015, and culminated in her termination in January 2016, *see* Defs.' SOMF Ex. B, ECF No. 57-5 (multiple exhibits documenting disciplinary actions taken against Ms. Barone); to support her claim that the Defendants' actions were retaliatory.

While the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation[,]" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010), "it is well settled that when mere temporal proximity is offered to demonstrate causation, the protected activity and the adverse action must

occur very close together," *Kouakou v. Fideliscare N.Y.*, 920 F. Supp. 2d 391, 401 (S.D.N.Y. 2012) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)) (internal quotation marks omitted) (dismissing a retaliation claim where four months elapsed between the complaint and the adverse action). "[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases); *see also Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (The time lapses between [the plaintiff's] protected activities and the alleged retaliatory acts—ranging from two months to several years—were simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive absent other supporting factual allegations).

Furthermore, even where a plaintiff can establish a prima facie case based on temporal proximity alone, a plaintiff must show more than proximity in order to overcome a defendant's proffered nondiscriminatory reasons for adverse employment actions. *See, e.g.*, *Maynard v. Stonington Cmty. Ctr.*, No. 3:15-cv-483 (RNC), 2018 WL 1633709, at *8 (D. Conn. Mar. 31, 2018) (finding that although a plaintiff established a prima facie case of retaliation because she was terminated just eleven days after making a complaint of harassment, "the temporal proximity between her protected activity and discharge, standing alone, [wa]s insufficient to establish that defendant's reasons are pretextual").

**\*20** Based on the record, the earliest adverse action Ms. Barone could allege she experienced as retaliation occurred on July 31, 2014, Defs.' SOMF Ex. B, ECF No. 57-5 at 24 (Barone Dep. Ex. 5, Judicial Branch Written Reprimand (July 31, 2014)); five months after she filed her first EEOC complaint, Defs.' SOMF Ex. B, ECF No. 57-5 at 2 (Barone Dep. Ex. 1, EEOC Intake Questionnaire (Feb. 25, 2014)). She

was discharged almost exactly two years later. Defs.' SOMF Ex. B, ECF No. 57-5 at 49 (Barone Dep. Ex. 16, Judicial Branch Letter (Feb. 22, 2016)). On this record, the temporal relationship between Ms. Barone's EEOC complaint and the adverse actions she experienced is simply too attenuated to demonstrate that retaliatory motive played any part in those adverse actions at all, and certainly too attenuated to show that retaliatory motive was a but-for cause.

Ms. Barone cannot rely on her repeated conclusory assertions that Ms. Albert and Ms. Coon retaliated against her based on her EEOC complaint without any record evidence to support her assertions. *Alteri*, 919 F. Supp. at 94-95 (non-moving party may not simply rest on the pleadings, or on conclusory or speculative accusations or arguments, but "must present concrete evidence from which a reasonable juror could return a verdict in his favor" (internal quotations omitted)).

No reasonable jury therefore could find that Ms. Barone was retaliated against for filing complaints with the EEOC or CHRO, under the First Amendment, or the Rehabilitation Act.

Accordingly, Ms. Barone's retaliation claim will be dismissed.

### IV. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED.**

The Clerk of Court is respectfully requested to close this case.

SO ORDERED at Bridgeport, Connecticut, this 27th day of December, 2019.

### All Citations

Not Reported in Fed. Supp., 2019 WL 7283383, 2019 A.D. Cases 494,840

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3976969, 2020 A.D. Cases 261,635

2020 WL 3976969
United States District Court, D. Connecticut.

Kyle CHOLEVA, Plaintiff,
v.
NEW ENGLAND STAIR COMPANY, INC., Defendant.

Civil No. 3:18-cv-756 (JBA)
|
Signed 07/14/2020

**Attorneys and Law Firms**

Deborah L. McKenna, Michael T. Petela, Jr., Hayber, McKenna & Dinsmore, LLC, New Haven, CT, Richard Eugene Hayber, Hayber, McKenna & Dinsmore, LLC, Hartford, CT, for Plaintiff.

Andrew L. Houlding, Updike, Kelly & Spellacy, P.C., New Haven, CT, Chelsea Castiglioni, Updike, Kelly & Spellacy, PC, Hartford, CT, for Defendant.

**RULING ON DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Janet Bond Arterton, U.S.D.J.

 **\*1** Defendant New England Stair Company, Inc., moves for summary judgment on two claims raised by Plaintiff Kyle Choleva in this employment discrimination action. ([Doc. # 53].) Specifically, Defendant asserts that it is entitled to summary judgment on Plaintiff's claim of disability discrimination on the basis of Plaintiff's HIV-positive status (Count Two) and Plaintiff's claim of disability discrimination on the basis of his learning disability (Count Three). [1] Plaintiff opposes Defendant's motion.

1    Defendant does not move for summary judgment on Count One, which asserts a claim of employment discrimination on the basis of Plaintiff's sexual orientation. (*See* Am. Compl. [Doc. # 15] ¶¶ 62-66.)

For the reasons that follow, the Court denies summary judgment on Count Two but grants summary judgment to Defendant on Count Three.

**I. Background**

Plaintiff Kyle Choleva is a gay man, who was diagnosed as HIV-positive in January 2015 and who was diagnosed as having Attention-Deficit Hyperactivity Disorder ("ADHD") sometime in his youth. (Parties' L.R. Stmts. [Docs. ## 54, 66] ¶¶ 9-11.) Both his HIV and ADHD are managed through medication. (*Id.* ¶¶ 14, 15.) Plaintiff's HIV is "controlled by the anti-viral drugs that he is required to take," and he "does not have outward signs of being infected with the HIV-virus." (Pl.'s L.R. Stmt. ¶ 15.) Plaintiff's ADHD is "effectively controlled by taking prescribed medication," which has "enabled him to perform his work ... without his ADHD interfering." (*Id.* ¶ 14.) Plaintiff has a background as a consultant for architectural companies. (Ex. 1 (Pl.'s Excerpts of Choleva Dep.) to Pl.'s L.R. Stmt. [Doc. #66-1] at 6.) [2]

2    Because some of Plaintiff's excerpts of his deposition lack page numbering, the Court will identify the relevant pages of this exhibit according to the numbering of the ECF filing.

Defendant New England Stair Company, Inc., ("NESCO") is a business based in Shelton, Connecticut. (Parties' L.R. Stmts. ¶ 1.) William Sylvia was NESCO's owner and president until January 27, 2017. (Pl.'s L.R. Stmt. Additional Material Facts ("AMF") ¶ 1.) NESCO is now owned and operated by Matthew and Jennifer Sylvia, who are the children of William Sylvia and who held management roles in the company in 2015. (*Id.* AMF ¶¶ 5, 34.)

Plaintiff was hired by NESCO on April 15, 2015, and was given the title of "Lead Designer." (Parties' L.R. Stmts. ¶¶ 1-2.) His compensation was a weekly salary of $1,400, "plus commissions of .33% of billings." (Ex. A (NESCO Employment Offer) to Def.'s L.R. Stmt. [Doc. # 54-1] at 1.) In June 2015, Plaintiff was given the title of Vice President of Sales and Design. (Parties' L.R. Stmts. ¶ 2.) In both roles, Plaintiff reported directly to Mr. Sylvia. (*Id.* ¶ 3.) Plaintiff's employment at NESCO lasted approximately four months, with his termination occurring on August 10, 2015. (*Id.* ¶ 1.)

Over the course of his employment, Plaintiff submitted multiple requests for time off from work. (*See* Ex. D (Time-Off Requests) to Def.'s L.R. Stmt. [Doc. # 54-4].) For example, on April 22, 2015, Plaintiff made a time-off request for a doctor's visit scheduled for May 19, 2015, asking that he be permitted to come in three hours late. (*Id.* at 2.) On May 26, 2015, Plaintiff requested three hours off work for a May 29, 2015 doctor appointment involving a medical procedure. (*Id.* at 5.) On June 5, 2015, Plaintiff made a request

Choleva v. New England Stair Company, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 3976969, 2020 A.D. Cases 261,635

to leave work a half-hour early "to pick up [his] uncle from the airport." (*Id.* at 9.) On June 8, 2015, Plaintiff went home from work early because he was "not feeling well" and had "stomach issues." (*Id.* at 6-7.) On June 23, 2015, Plaintiff submitted a request to leave work two hours early for a doctor's visit to address an ear infection, and he provided a note from his medical provider confirming the existence of the appointment, (*Id.* at 10-11.) Each of these requests were signed and approved.

**\*2** While employed at NESCO, Plaintiff "disclosed to Defendant that he had a 'partner' whose name was David." (Parties' L.R. Stmts. ¶ 8.) "At some point during his employment," Plaintiff also disclosed "that the reason he needed to take time off for doctors' visits and for tests had to do with an unspecified 'life threatening illness.' " (*Id.* ¶ 16.) Plaintiff separately "disclosed to Defendant that he took Ritalin." (*Id.* ¶ 12.) However, Plaintiff has admitted that he never specifically disclosed that he was gay, that he was HIV-positive, or that he had been diagnosed with ADHD. (Parties' L.R. Stmts. ¶¶ 9, 13, 17; *see also* Ex. B (Def.'s Excerpts of Choleva Dep.) to Def.'s L.R. Stmt. [Doc. # 54-2] at 2-3.)

Plaintiff has testified that, during his employment at NESCO, then-President William Sylvia often "berated" him, "repeatedly calling [him] a 'faggot' and 'cock sucker' and, you know, 'brain dead mother fucker,' " (Pl.'s Excerpts of Choleva Dep. at 42), and yelled at him to "stop crying like a little girl," (*id.* at 58). Plaintiff also testified that Mr. Sylvia told him that "he would never have hired [him]" if he knew that [Plaintiff was] taking Ritalin." (Pl.'s Excerpts of Choleva Dep. at 26-27; *see also* Def.'s Excerpts of Choleva Dep. at 85, 87.) [3]

[3] In his Local Rule 56(a)2 Statement of Facts in Opposition, Plaintiff relies on this portion of his deposition for the factual proposition that "William Sylvia told [Plaintiff] that he would never have hired him if he'd known he was sick." (Pl.'s L.R. Stmt. AMF ¶ 15.) However, that proposition does not accurately reflect Plaintiff's testimony that Mr. Sylvia told him that "he would never have hired [him] if he knew that [Plaintiff was] taking Ritalin." (Pl.'s Excerpts of Choleva Dep. at 26 (emphasis added).)

Plaintiff has also offered testimony from Matthew and Jennifer Sylvia—who are William Sylvia's children and who served as NESCO's Operations Manager and Controller,

respectively, during Plaintiff's period of employment—describing their father's use of derogatory language. Matthew Sylvia testified that he had heard William use the words "queer" and "cocksucker" and that he had "probably" heard William use the term "queer" in the workplace. (Ex. 3 (Matthew Sylvia Dep.) to Pl.'s L.R. Stmt. [Doc. # 66-3] at 49-50, 52.) Jennifer Sylvia also testified that William "used the term 'queer' referring to gay people" and that he had also used the term "cocksucker." (Ex. 2 (Jennifer Sylvia Dep.) to Pl.'s L.R. Stmt. [Doc. # 66-2] at 95.) Jennifer Sylvia also testified that she understood that, in 2015, "dad was worse than ever" and that he "was pissed off and yelling more" and made the work environment negative and hostile "at times." (*Id.* at 136-37.) [4]

[4] Plaintiff has also submitted an exhibit purported to be the testimony of Mark Demmerle, a former NESCO employee, before the Connecticut Commission on Human Rights and Opportunities ("CHRO") taken December 22, 2016. (*See* Ex. 12 (Demmerle Transcript) to Pl.'s L.R. Stmt. [Doc. # 66-12].) As indicated by that transcript, Mr. Demmerle stated that William Sylvia "verbally harasses people in the office from the moment they step in to the minute they leave," that he had heard Mr. Sylvia use slurs such as "faggot" in the workplace, and that he had heard Mr. Sylvia belittle Plaintiff. (*Id.* at 6-7, 9.) Mr. Demmerle also testified that he was aware of Plaintiff's sexual orientation and that he was aware that Plaintiff had a life-threatening disease. (*Id.* at 4, 7.)

Without specifically objecting to its consideration, Defendant asserts that this exhibit "is not an official transcript, is not authenticated or certified, and bears no indicia of reliability." (Def.'s Reply [Doc. # 68] at 5.)

The Court has reviewed the Demmerle transcript and determined that it may consider the information contained therein for the purposes of this summary judgment motion. Although the transcript provided is not an official one, Mr. Demmerle's testimony could be "presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2); *see also* 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.) ("[A]lthough the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, the material may be presented in a form that would not, in itself, be admissible at trial.").

Choleva v. New England Stair Company, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 3976969, 2020 A.D. Cases 261,635

The transcript indicates that Mr. Demmerle's testimony before the CHRO was taken under oath, (*see* Demmerle Transcript at 1), and that this testimony was "based on [his] personal knowledge," and thus the content of his "statements would generally be admissible at trial." *Brunette v. City of Burlington*, No. 2:15-CV-00061, 2018 WL 4146598, at *22 (D. Vt. Aug. 30, 2018) (denying motion to strike unofficial interview transcripts).

 **\*3**  In the final month of his employment, Plaintiff made three leave requests for medical reasons. On July 24, 2015, Plaintiff submitted a request to leave work an hour early to visit his doctor's office for the purpose of "pick[ing] up paper work for testing." (Time-Off Requests at 13.) On July 25, 2015, Plaintiff requested the full day off work for "blood work," as required by his doctor. (*Id.* at 14.) That same week, Plaintiff also submitted an advance request to take the afternoon off work for a doctor's appointment scheduled August 10, 2015. (*Id.* at 15.)

On August 1, 2015, William Sylvia sent an e-mail to Plaintiff addressing his "requested time off" and announcing changes to his compensation schedule. (Ex. 8 (Sylvia Aug. 1, 2015 E-mail) to Pl.'s L.R. Stmt. [Doc. # 66-8] at 1.) The e-mail instructed Plaintiff that he would be paid "in increments of the work day" and that "[t]o keep the company's cost down as associated with doing the partial day calculations, [NESCO is] going to utilize full day, half day, and quarter day[ ] as options for you to work on those days when you need time away from the workplace." (*Id.*) The e-mail also announced that there would "be no commission paid during any work week where the employee has worked other than the required full time shift and from the shift starting time to the shift ending time at a minimum." (*Id.*)

On August 10, 2015, "a day that had been pre-authorized for Plaintiff to leave work for a medical appointment," Mr. Sylvia "informed Plaintiff that he must choose between keeping his medical appointment that day or making up the time that Plaintiff would miss by coming to work on the following Saturday." (Parties L.R. Stmts. ¶¶ 21, 22.) Plaintiff has testified that Mr. Sylvia "started yelling" and telling him that he "had to come in on the weekend to make up the time," even though Mr. Sylvia had "already docked [his] pay for leaving early." (Pl.'s Excerpts of Choleva Dep. at 72.) Plaintiff recalled that he responded by explaining that he was not "able to come in [that] weekend because [he] was going away, but ... would make up the hours ... either next week or throughout the week." (*Id.* at 72-73.) Plaintiff further testified that, "at

that point," Mr. Sylvia began "yell[ing] down the hall" that the organization need to "find a replacement for [him]." (*Id.* at 73.)

On September 11, 2015, Plaintiff filed both a state claim with the Connecticut Commission on Human Rights and Opportunities and a Charge of Discrimination with the Equal Employment Opportunities Commission ("EEOC"). (Am. Compl. ¶ 6.) The CHRO issued its Release of Jurisdiction on April 17, 2017, and the EEOC issued a Notice of Right to Sue regarding Plaintiff's pending federal claims on August 4, 2017. (*Id.* ¶¶ 12, 13.)

Plaintiff brought this employment discrimination action on May 4, 2018. (*See* Compl. [Doc. # 1].)[5] At Count One, Plaintiff has alleged that NESCO had discriminated against him on the basis of his sexual orientation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (*See* Am. Compl. ¶¶ 62-66.) At Count Two, Plaintiff has alleged that NESCO discriminated against him on the basis of his HIV status, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (*See id.* ¶¶ 68-72.) At Count Three, Plaintiff has asserted that Defendant also violated the ADA by discriminating against him because of his ADHD, a learning disability. (*See id.* ¶¶ 73-77.)

[5]     Plaintiff is also pursuing related intentional infliction of emotional distress claims against NESCO and William Sylvia in Connecticut Superior Court. *See Choleva v. New England Stair Co.*, No. AAN-CV18-6025867-S (Conn. Super. Ct. Jan. 3, 2018).

 **\*4**  On September 30, 2019, Defendant moved for summary judgment on the ADA claims raised in Counts Two and Three.

## II. Summary Judgment Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will

2020 WL 3976969, 2020 A.D. Cases 261,635

identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272-73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

### III. Discussion

Plaintiff asserts that Defendant violated the Americans with Disabilities Act by discriminating against him because of his HIV-positive status (Count Two) and because of his Attention-Deficit Hyperactivity Disorder (Count Three). Defendant moves for summary judgment on each of these ADA claims on the grounds that Plaintiff has failed to establish a *prima facie* case of discrimination.

The ADA prohibits a covered entity from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). "To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

**\*5** The Court will address Plaintiff's HIV-discrimination claim and his ADHD-discrimination claim in turn.

### A. Count Two: Discrimination on the Basis of HIV-Positive Status

Defendant seeks summary judgment on Count Two on the grounds that Plaintiff cannot demonstrate that he suffered an adverse employment action as a result of his HIV-positive status. [6]

6    Defendant acknowledges that it is an employer subject to the ADA's requirements and that Plaintiff's HIV-positive status qualifies as a disability under *Bragdon v. Abbott*, 524 U.S. 624, 647 (1998). (*See* Def.'s Mem. in Supp. Partial Summ. J. [Doc. # 53-1] at 7.) Additionally, Defendant has not, at this stage, disputed that Plaintiff was otherwise qualified for his position.

Defendant contends that Plaintiff's claim at Count Two "must fail because there is no evidence" that NESCO "was aware" of Plaintiff's HIV-positive status. (Def.'s Mem. at 7.) Defendant elaborates that Plaintiff's testimony establishes that he "alluded only to an unspecified 'life threatening illness,' " but never actually "gave notice to NESCO of his HIV-positive status." (*Id.* at 8.) Defendant further asserts that Plaintiff showed no outward signs of having HIV, and that he "never affirmatively disclosed his sexual orientation to Bill Sylvia, who indisputably is identified as the Defendant's decision-maker." (*Id.* at 9.) Defendant thus argues that Plaintiff's claim is based only on the "assum[ption] that, because NESCO knew he had a partner named David and had disclosed that he had a life threatening illness, that NESCO would assume he had HIV," but that these facts on their own did not give NESCO sufficient notice of Plaintiff's disability. (*Id.* at 10.)

Plaintiff responds that he is "is not required to show that Defendant had specific knowledge of [his] HIV infection," and that he needs only "show that Defendant was aware that he suffered from a life-threatening illness" and that Defendant thus "perceived him to be disabled." (Pl.'s Opp. to Def.'s Mem. [Doc. # 67] at 17.) Plaintiff points to evidence that Mr. Sylvia "decided to change [Plaintiff's] compensation" plan in a punitive manner "after he had missed work due to doctor's appointments and told his co-workers that he suffered from a 'life threatening condition.' " (*Id.* at 18.) Plaintiff asserts that that Mr. Sylvia's comment "on the fact that [Plaintiff] 'had a lot of doctor's appointments' " amounts to "direct evidence of discriminatory animus." (*Id.* at 19.) Plaintiff contends that a "jury could certainly conclude from these acts that William Sylvia at a minimum regarded [Plaintiff] as being disabled, was angry with [Plaintiff] for missing work due to his doctor's appointments and took adverse job action towards him as a result of these facts." (*Id.*)

For a plaintiff to establish that he suffered adverse employment action because of his disability, "[t]he employer's decision makers must have notice of the disability for the employer to be held liable under ADA; otherwise, discrimination cannot be 'because' of a disability." *Alleva v. Crown Linen Serv., Inc.*, No. 3:14-CV-1971 (MPS), 2016 WL 4717758, at *6 (D. Conn. Sept. 8, 2016); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 ("If [an employer] were truly unaware that ... a disability existed, it would be impossible for [its employment action] to have been based, even in part, on [plaintiff's] disability."); *Watson v. Arts & Entm't Television Network*, No. 04 CIV. 1932 (HBP), 2008 WL 793596, at *14 (S.D.N.Y. Mar. 26, 2008) (explaining that "there can be no liability" where "there is no evidence that defendant had notice of the disability"), *aff'd*, 352 F. App'x 475 (2d Cir. 2009). "To satisfy the notice requirement, a plaintiff must demonstrate that the defendant was aware that the plaintiff was 'disabled' within the meaning of the ADA." *Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 305 (S.D.N.Y. 2014) (internal quotation marks omitted). Such awareness may be actual or constructive. *See Grunberg v. Quest Diagnostics, Inc.*, No. CIV.A. 3:05-CV-1201V, 2008 WL 323940, at *4–*5 (D. Conn. Feb. 5, 2008) (assessing whether defendant had "actual or constructive knowledge" of plaintiff's depression). When assessing a speaker's meaning for discriminatory animus, courts are to consider "various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam).

**\*6** Here, Plaintiff has offered at least minimally sufficient evidence to allow a reasonable jury to infer that Defendant had notice that Plaintiff was HIV-positive. The parties in this case do not dispute that Plaintiff disclosed to Defendant that "he had a 'partner' whose name was David," (Parties' L.R. Stmts. ¶ 8), and "that the reason he needed to take time off for doctors' visits and for tests had to do with an unspecified 'life threatening illness,' " (*id.* ¶ 16). It is also "undisputed that Bill Sylvia was unhappy about Plaintiff's frequent absences," which were, with one exception, for medical reasons. (Def.'s Reply at 2.) Additionally, Plaintiff has testified that William Sylvia repeatedly called him pejoratives like "faggot" and "cock sucker," (Pl.'s Excerpts of Choleva Dep. at 42), and Matthew and Jennifer Sylvia have each admitted under oath that they have heard their father "use[ ] the term 'queer' referring to gay people" and that he had also used the term "cocksucker," (Jennifer Sylvia Dep. at 95; *see also* Matthew Sylvia Dep. at 49-50, 52). From these facts, a jury could infer that William Sylvia knew that Plaintiff was gay and that he perceived that Plaintiff's frequent doctors' appointments for a "life-threatening illness" were for the purpose of treating HIV, particularly given the virus's "inseparabl[e] associat[ion] with the gay community because of HIV's initial emergence in, and its devastating impact on, gay men." Andrew J. Gordon, *End Around: HIV Discrimination in the Post-Amendments Act Workplace*, 36 BERKELEY J. EMP. & LAB. L. 215, 219 (2015); *see also Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1278 (M.D. Ala. 2012) (explaining, in the context of an ADA claim brought by HIV-positive prisoners, that "social perceptions of HIV have yet to catch up with the modern realities of the illness," which has been "most frequently found among historically marginalized populations: particularly, gay men").

Accordingly, summary judgment is denied on Count Two.

### B. Count Three: Discrimination on the Basis of Learning Disability

Defendant also moves for summary judgment on Count Three on the grounds that Plaintiff's learning disability does not qualify as a "disability" within the meaning of the ADA and that, again, Defendant lacked notice of this asserted disability.

Defendant asserts that Attention-Deficit Hyperactivity Disorder "does not present a *per se* disability." (Def.'s Mem. at 7.) Defendant observes that Plaintiff was on Ritalin for

Choleva v. New England Stair Company, Inc., Not Reported in Fed. Supp. (2020)

2020 WL 3976969, 2020 A.D. Cases 261,635

his ADHD, and this medication allowed him "to perform all of the duties of his position." (*Id.*) Defendant contends that "[i]n the absence of a showing that Plaintiff's ADHD affected his ability to work, the condition—at least when controlled, as here, by prescribed medication—does not qualify as a disability." (*Id.*)

In the alternative, Defendant argues that even if Plaintiff's ADHD qualifies as a disability, Plaintiff has failed to make a *prima facie* case at Count Three because "Plaintiff never disclosed to anyone at NESCO that he was diagnosed with ADHD or any learning disability," leaving the Defendant without notice. (*Id.* at 11.)

Plaintiff asserts, without further elaboration, that, as someone diagnosed with ADHD, he is "protected under the ADA because his learning disability affected his major life activity of learning, concentrating and thinking." (Pl.'s Opp. at 2.) Plaintiff adds that Defendant knew "he took Ritalin[,] a commonly prescribed drug for ADHD." (*Id.* at 21.) Plaintiff has also testified that Mr. Sylvia called him a "brain dead mother fucker,' " (Pl.'s Excerpts of Choleva Dep. at 42), and told him that "he would never have hired [him] if he knew that [Plaintiff was] taking Ritalin," (*id.* at 26-27; *see also* Def.'s Excerpts of Choleva Dep. at 85, 87). Plaintiff argues that a jury could infer that from these facts that "Defendant perceived [Plaintiff] as having a learning disability." (Pl.'s Opp. at 21.)

"To be considered disabled, a plaintiff must have a 'physical or mental impairment that substantially limits one or more major life activities ... or be[ ] regarded as having such impairment.' " *Kopchik v. Town of E. Fishkill*, 759 F. App'x 31, 37 (2d Cir. 2018) (quoting 42 U.S.C. § 12102(1)). "A plaintiff diagnosed with ADHD may have a mental impairment within the meaning of the Americans with Disabilities Act, but that impairment must also limit a major life activity to a substantial degree." *Barone v. Judicial Branch of Conn.*, No. 3:17-CV-644 (VAB), 2019 WL 7283383, at *13 (D. Conn. Dec. 27, 2019) (internal alterations and footnote omitted); *see also Weaving v. City of Hillsboro*, 763 F.3d 1106, 1114 (9th Cir. 2014) (requiring Plaintiff to show that his ADHD "substantially limit[ed] either his ability to work or to interact with others"); *Johnson v. Sedgwick Cty. Sheriff's Dep't*, 461 F. App'x 756, 759 (10th Cir. 2012) ("For [Plaintiff's] ADHD to have been a disability under the ADA, it must have substantially limited one or more of [his] major life activities." (internal quotation marks and alteration omitted)). "A plaintiff must show that [his] impairments do

not simply cause some difficulty with a major life activity, but that they substantially limit that activity." *Barone*, 2019 WL 7283383, at *13 (citing *Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 51 (2d Cir. 2012) (affirming district court's finding that, while the plaintiff's symptoms of stress and depression affected her sleep and appetite, "no evidence showed that [her] impairments were *substantially* limiting" (emphasis in the original))).

**\*7** Although Plaintiff has testified that he has ADHD, he has not made specific allegations that this learning disability has substantially limited any of his major life activities. Plaintiff has not provided any medical records as to the severity of his ADHD, and his testimony as to his symptoms is limited to statements that he becomes "distracted easily" and is not "able to focus." (Def.'s Excerpts of Choleva Dep. at 190.) He has not offered any evidence as to how his ADHD affects his ability to learn or concentrate as compared to the general population. *See Barone*, 2019 WL 7283383, at *14 (D. Conn. Dec. 27, 2019) (granting summary judgment to defendant where plaintiff provided "no such evidence" that she was "substantially limited in [her] ability to concentrate in comparison to the general population" (internal quotation marks omitted)). To the contrary, Plaintiff has admitted that his "ADHD is effectively controlled by taking prescribed medication," and that this medication "enabled him to perform his work at NESCO without his ADHD interfering." (Parties' L.R. Stmts. ¶ 14.) Accordingly, "a reasonable jury could not find that ADHD substantially limited [Plaintiff's] ability to work or to concentrate." *Barone*, 2019 WL 7283383, at n4.

Because Plaintiff has failed to demonstrate that he is disabled within the meaning of the ADA, he has not made a *prima facie* case of discrimination. Defendant is thus entitled to summary judgment on Count Three, and the Court need not consider Defendant's alternative argument that it lacked notice of Plaintiff's ADHD.

### IV. Conclusion

Accordingly, Defendant's Motion for Partial Summary Judgment [Doc. # 50] is DENIED in part and GRANTED in part. The Court denies Defendant's motion as to Count Two, but grants summary judgment as to Count Three.

IT IS SO ORDERED.

2020 WL 3976969, 2020 A.D. Cases 261,635

**All Citations**

Not Reported in Fed. Supp., 2020 WL 3976969, 2020 A.D. Cases 261,635

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 148 of 321

Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)
2022 WL 952963

2022 WL 952963
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Alexandria FITZGERALD, Plaintiff,

v.

The WE COMPANY d/b/a WeWork and David Stiles, in
their Individual and professional capacities, Defendants.

20 Civ. 5260 (AT)
|
Signed 03/30/2022

**Attorneys and Law Firms**

Valdi Licul, Lindsay Michelle Goldbrum, Wigdor LLP, New
York, NY, Parisis G. Filippatos, Filippatos PLLC Wigdor
LLP, Pleasantville, NY, for Plaintiff.

David Wayne Garland, Matthew Savage Aibel, Epstein
Becker & Green, New York, NY, for Defendants The We
Company, David Stiles.

**ORDER**

ANALISA TORRES, United States District Judge:

 **\*1** Plaintiff, Alexandria Fitzgerald, brings this action against
Defendants We Work Management LLC [1] ("WeWork"), and
its employee, David Stiles, [2] alleging that they discriminated
and retaliated against her on the basis of gender and disability,
in violation of Title VII of the Civil Rights Act of 1964
("Title VII"), 42 U.S.C. § 2000e, et seq., the Americans with
Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq., the
New York State Human Rights Law (the "NYSHRL"), N.Y.
Exec. L. § 290 et seq., and the New York City Human Rights
Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-107 et seq.
Am. Compl. ¶ 2, ECF No. 23. Fitzgerald also alleges that
WeWork's termination of her employment violated the Family
and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601 et
seq. Id. ¶¶ 2, 295–303.

[1]   The caption incorrectly refers to Fitzgerald's
employer as the "The We Company d/b/a
WeWork." See Am. Compl., ECF No. 23. The
correct name is "We Work Management LLC."
Defs. Mem. at 1, 2 n.1, ECF No. 42.

[2]   Fitzgerald also initially named Danny Duong as
a defendant in this action. However, Fitzgerald
withdrew her claims against him, "agree[ing] that
there is insufficient proof" that Duong was a
participant in the alleged harassment or termination
decisions, Pl. Opp'n. at 31 n.17, ECF No. 50, and
subsequently dismissed with prejudice her claims
against Duong by stipulation, ECF No. 56.

Defendants move for summary judgment. Defs. Mot.,
ECF No. 41. For the reasons stated below, the motion
is GRANTED as to Fitzgerald's claims under Title
VII, the ADA, and the FMLA. The Court declines
to exercise supplemental jurisdiction over Fitzgerald's
remaining NYSHRL and NYCHRL claims, and those claims
are, accordingly, DISMISSED without prejudice to renewal
in state court.

**BACKGROUND** [3]

[3]   The facts in this section are taken from the parties'
56.1 statements, unless otherwise noted. Citations
to a paragraph in the Rule 56.1 statement also
include the other party's response. The Court
considers admitted for purposes of the motion
any paragraph that is not specifically controverted
by a correspondingly numbered paragraph in the
statement required to be served by the opposing
party. Local Civ. R. 56.1(c). Where there are
no citations, or where the cited materials do not
support the factual assertions in the statements,
the Court may disregard the assertion. Holtz v.
Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001).

WeWork provides office space for companies worldwide.
Defs. 56.1 ¶ 1, ECF No. 43. Alexandria Fitzgerald began
working for WeWork on March 25, 2019, as a Senior Lead
Program Manager in the Program Management Organization
("PMO"). Id. ¶ 2.

I. Stiles
From May 10–11, 2019, Fitzgerald traveled to Kansas City,
Missouri, to check on issues at a client's project site. Id. ¶ 72.
Akash Agarwal, a Regional Head in the department, asked
David Stiles, another Senior Lead, to accompany Fitzgerald
on the trip. Id. ¶¶ 19, 73–74.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 149 of 321

Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)

2022 WL 952963

On May 13, 2019, when Fitzgerald returned from the trip, she informed her supervisor, Nicole Rodriguez, that she had an "uncomfortable" situation with Stiles in Kansas City. *Id.* ¶ 78. Rodriguez escalated Fitzgerald's complaint to Agarwal, who in turn, brought in WeWork's People team (akin to a human resources department). *Id.* ¶¶ 80–83. The next day, the People team began an investigation into the matter, led by Maria Cox, a People Partner, and Alissa Horn, WeWork's Director of Investigations and Employee Relations. Defs. 56.1 ¶¶ 90–91, 108. On May 15, 2019, Cox interviewed Fitzgerald. *Id.* ¶ 96. According to Cox's contemporaneous interview notes, Fitzgerald told Cox that during dinner in Kansas City, Stiles asked her whether she had a boyfriend, and in response to her stating that she "wanted to settle down," he told her to "bang a few out before [she] get[s] into a relationship." *Id.* ¶ 98. Stiles also wiped barbecue sauce off Fitzgerald's face with a napkin. *Id.* ¶ 104. After dinner, Stiles returned to his hotel room, and Fitzgerald went out for a drink. *Id.* ¶ 100. Fitzgerald initiated a text conversation with Stiles, during which Stiles texted her "lol, want to cuddle." *Id.* ¶ 101. Fitzgerald responded, but did not address the request. ECF No. 49-16 at 11. Stiles later texted "I still did not get an answer on the cuddling" with a tongue emoji. *Id.* at 12. Fitzgerald responded later that evening "Phone died while I was out. No cuddling for me[.]" *Id.* at 13.

**\*2** On May 17, 2019, Horn interviewed Stiles, who admitted to the behavior Fitzgerald described. Defs. 56.1 ¶¶ 112–16. Horn issued a report, finding that Stiles' comments were "inappropriate, unprofessional[,] and in violation of [WeWork's] Workplace Violence & Harassment Policy," and recommended he receive a "final written warning." ECF No. 52-21 at 1, 5. On May 22, 2019, Cox and Agarwal met with Stiles to deliver the warning, which, among other things, directed Stiles to fully comply with applicable WeWork policies on workplace harassment, and warned that any further violations "will result in [his] immediate separation from WeWork." Defs. 56.1 ¶¶ 129–32. Following the issuance of the warning, Stiles did not engage in any further inappropriate behavior towards Fitzgerald. *Id.* ¶ 149; *see also* Fitzgerald Tr. at 186, ECF No. 49-3. And, for the duration of Fitzgerald's employment, Stiles remained in a different "pod" of the department, reporting to a different supervisor. Defs. 56.1 ¶ 27. Fitzgerald contends, however, that Stiles continued to "[make] inappropriate comments at team meetings as jokes," Fitzgerald Tr. at 186–87; and that he exhibited inappropriate behavior, including touching a female colleague's breast, *id.* at 187–88; "hit[ting] on" a client during a business meeting by asking for her relationship status, *id.*

at 187, 191–92, and referring to a female colleague as a "stripper," *id.* at 188.

## II. Fitzgerald's Therapy Sessions

In June 2019, Fitzgerald began attending therapy appointments for her anxiety, typically between 3:00 and 5:00 p.m. on weekdays. *Id.* at 110–11, 231; Defs. 56.1 ¶ 150. She did not seek permission to attend her therapy appointments; rather, she generally would tell a supervisor that she was leaving for the appointment and would return to the office afterwards. Defs. 56.1 ¶ 151; *see also* Fitzgerald Tr. at 111. For instance, on November 1, 2019, Fitzgerald informed Duong, her supervisor at the time, *see* Fitzgerald Tr. at 34, that she had a therapist appointment she could not move, but she explained that she could "come back right after" and asked Duong to "help play defense for [her] if any meetings pop up" while she was gone, ECF No. 49-18 at 27. Similarly, Fitzgerald told Agarwal, Rodriguez, and another supervisor, Catie Delay, that she would put a "block in [her] calendar" and silence her phone for therapy appointments, and that she would return to the office when they were completed. Fitzgerald Tr. at 111–14. Agarwal responded that Fitzgerald should "take care of whatever [she] need[ed] to do." *Id.* at 113. And, Rodriguez told Fitzgerald she was "proud of [Fitzgerald] for getting help." *Id.* at 111–12.

Fitzgerald could not recall any instances in which Rodriguez, Agarwal, or Delay prevented her from attending a scheduled therapy appointment or made disparaging comments about her attending therapy. *Id.* at 114–15. And, although Fitzgerald believes there were times when Duong requested that she move her therapy appointments if possible, she did not recall any specific occasions when she had been required to cancel her appointment at Duong's request. *See id.* at 106–10.

## III. WeWork's Reduction-in-Force and Fitzgerald's Termination

Beginning in 2019, following a failed IPO attempt and changes in senior leadership, WeWork went through multiple reorganizations and reductions-in-force ("RIFs"). *See* Defs. 56.1 ¶¶ 21, 23, 29, 31, 69–71. In the summer of 2019, Fitzgerald's PMO group was combined with the Client Services group to form a new "Enterprise Services" ("ES") department. Defs. 56.1 ¶ 6. Prior to the merger, Client Services focused on the pre-deal, sales phase of projects, and PMO focused on post-deal project execution for clients. Defs. 56.1 ¶¶ 8–9. Fitzgerald, like every other employee in the new ES department, received a title change—in her

case, to Associate Project Executive, and she gained some additional responsibilities. *Id.* ¶¶ 14–17. Her job level and compensation, however, remained unchanged. *Id.* ¶ 16. In November 2019, WeWork conducted an RIF that led to the elimination of 2,400 positions, or roughly 20% of their workforce, including employees in Fitzgerald's role. *Id.* ¶¶ 21, 23–24.

In early 2020, Ivan Kondili, the co-head of ES, was told to start planning for additional layoffs (the "April 2020 RIF"). *Id.* ¶ 30. In light of changing organizational priorities within ES, Kondili sought to retain employees with "deeper, hands-on experience in budgeting, contracting, and construction," and expertise in technical areas like construction methodology, to ensure that remaining employees "were equipped, with fewer resources than before, to handle the end-to-end client experience." Kondili Decl. ¶¶ 16–18, ECF No. 47; *see also* Kondili Tr. at 74–75, ECF No. 49-1. Kondili did not base layoff decisions on a "performance assessment," but instead asked his direct reports—including Agarwal—to identify employees in their reporting lines who lacked the "caliber and skill sets" employees would need to demonstrate moving forward. Defs. 56.1 ¶¶ 38–41; Kondili Tr. at 68–69, 74–75.

**\*3** As part of his assessment of his team's abilities, Agarwal reviewed employees' resumes to assess whether their experience and skills were sufficient. *See* Agarwal Tr. at 59–60, ECF No. 49-5. He then recommended seven employees, ranked from least to most likely to be successful in the new, leaner organization given their background and expertise, for inclusion in the April 2020 RIF. The three candidates ranked "least likely to succeed" including Fitzgerald, were all Associate Project Executives who had formerly been in the PMO side of ES. Agarwal Tr. at 168–69. Agarwal concluded that these employees' skills were largely in project execution, and that they lacked the technical and contracting skills needed to manage a client in the pre-deal stages of a project. *Id.* at 59–60, 168–72; Defs. 56.1 ¶ 53, Agarwal Decl. ¶ 6, ECF No. 44.

Kondili then chose five of the seven employees on Agarwal's list for layoffs, based on both Agarwal's input and Kondili's own experience with each employee. Defs. 56.1 ¶ 56; Kondili Tr. at 71–73. He decided to fire all three remaining U.S.-based Associate Project Executives—including Fitzgerald. Defs. 56.1 ¶ 57; *see also* Kondili Tr. at 96–100. Based on Kondili's eighteen years of construction experience and the conversations he had with Fitzgerald, he determined that

Fitzgerald lacked "the construction technical knowledge that she needed" to be successful moving forward. Kondili Tr. at 70–73. Kondili also laid off Kim Koo, a female Proposal Manager, and Pierce Reynoldson, a male Project Executive, ranked fifth and sixth least likely to succeed, respectively. Defs. 56.1 ¶ 56. Kondili retained Hayley Whitfield, a female Project Executive, and Jacob Riedel, a male Pod Director, ranked fourth and seventh least likely to succeed, respectively. *See id.* ¶¶ 47, 51, 56.

In total, WeWork eliminated 300 employees, including eleven positions in ES. Defs. 56.1 ¶ 65. The April 2020 RIF eliminated Fitzgerald's role entirely, and WeWork has not had any Associate Project Executives in ES since then. *Id.* ¶ 58. WeWork went through at least two more RIFs, in June and October 2020. *Id.* ¶¶ 69–70. As a result, ES shrunk from 250 employees at its peak to approximately twenty employees today. *Id.* ¶ 71.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. The moving party initially bears the burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro*, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the ultimate burden of proof on specific issues at trial, the movant may also satisfy its own summary judgment burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex*, 477 U.S. at 322–23; *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a triable issue of fact. *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo*, 315 F.3d at 105. In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citation

2022 WL 952963

omitted), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). In deciding the motion, the Court views the record in the light most favorable to the non-moving party. *Koch*, 287 F.3d at 165.

**\*4** The Court must be "cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," and must "carefully scrutinize[ ]" the non-movant's affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quotation marks and citation omitted). That said, summary judgment is warranted if the opposing party "relies on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Figueroa v. N.Y. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 228 (S.D.N.Y. 2007) (quotation marks and citation omitted). To defeat summary judgment, the opposing party must set forth "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256.

## II. <u>Gender Discrimination</u>

Fitzgerald raises claims of gender-based discrimination, retaliation, and a hostile work environment under Title VII, the NYSHRL, and the NYCHRL, citing the sexual harassment she experienced from Stiles and her termination. *See, e.g.*, Am. Compl. ¶¶ 267, 272, 310. The Court addresses each claim separately.

### A. Hostile Work Environment

Under Title VII, sexual harassment is cognizable as gender discrimination, and may be analyzed as a hostile work environment claim. *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 403 (S.D.N.Y. 2012). To state a hostile work environment claim under Title VII, a plaintiff must put forth evidence showing that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quotation marks and citations omitted). She must also show that the complained-of conduct creates such an environment because of her gender. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). Defendants argue that Fitzgerald has failed to establish a *prima facie* case of a hostile work

environment based on Stiles' inappropriate—but limited— conduct towards her. Defs. Mem. at 12–13. The Court agrees.

Isolated incidents "usually will not suffice to establish a hostile work environment, although ... even a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd v. New York Div. of Parole*, 678 F.3d 166, 175–76 (2d Cir. 2012) (quotation marks omitted). A plaintiff must, therefore, demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation omitted). For instance, courts have found that a single instance of sexual assault qualifies as "extraordinarily severe" for purposes of establishing a hostile work environment claim. *See Domingues v. Barton Chevrolet Cadillac*, No. 18 Civ. 7772, 2021 WL 637016, at \*4–5 (S.D.N.Y. Feb. 17, 2021) (collecting cases).

Here, Fitzgerald describes an isolated instance in which, over the span of an evening, Stiles made comments about her relationship status, including encouraging her to "bang a few out," and "have a bunch of one-night stands," briefly touched her face, and, during a text exchange, twice asked her to "cuddle" in his hotel room, punctuated with a tongue emoji— a sexually suggestive image. Defs. 56.1 ¶¶ 98, 100–01, 104; *see also* ECF No. 49-16 at 12. Although Stiles' comments could be construed as vulgar and inappropriate, the Court does not find that these comments and propositions, standing alone, are sufficiently "severe and pervasive" as to establish a hostile work environment claim. *Compare Howley*, 217 F.3d at 154 (single instance of verbal abuse created hostile work environment where offender went on a "tirade" about female plaintiff being promoted for performing fellatio, "at length" and "loudly" in front of large group of male subordinates), *with Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58– 59 (2d Cir. 2004) (two instances of supervisor propositioning employee for sex in one month did not establish hostile work environment claim).

**\*5** Moreover, Fitzgerald does not adduce admissible evidence that Stiles' behavior following the trip was sufficiently "continuous and concerted [as] to have altered the conditions of her working environment." *Howley*, 217 F.3d at 153. Fitzgerald concedes that, after Stiles was reprimanded, he did not direct any further inappropriate behavior towards her. Fitzgerald Tr. at 186. And, although Fitzgerald levels more serious allegations at Stiles—including that he touched

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 152 of 321

Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)

2022 WL 952963

a co-worker's breast and made advances on a client, *id.* at 186–92—she offers only inadmissible hearsay in support of these claims, which does not establish a triable issue of fact, *see Weinstock*, 224 F.3d at 44. At best, Fitzgerald adduces admissible evidence that Stiles occasionally made inappropriate, isolated jokes in group settings. Fitzgerald Tr. at 187–88. But, this does not rise to the level of severe and pervasive conduct necessary to establish a hostile work environment claim. Stiles' actions, accordingly, "are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [Fitzgerald's] work environment." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998). Accordingly, Defendants' motion for summary judgment on Fitzgerald's Title VII hostile work environment claim is GRANTED. [4]

[4]     The Court notes, however, that under the more liberal provisions of the NYCHRL, conduct that does not qualify as "severe or pervasive" may still support a hostile work environment claim because "questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st. Dept. 2009) (citation omitted). Indeed, "[w]hether a statement or incident is isolated is irrelevant under the NYCHRL." *Holohan v. Newmark & Co. Real Estate Inc.*, No. 18 Civ. 6275, 2019 WL 4743883, at *4 (S.D.N.Y. Sept. 16, 2019) (quotation marks and citation omitted). Although Fitzgerald has not met the threshold to prevail on her federal hostile work environment claim under Title VII, she might prevail on a parallel cause of action under the NYCHRL. The Court, however, declines to exercise supplemental jurisdiction over Fitzgerald's NYCHRL claim, *see infra* at 23–24, and, accordingly, does not address the merits of this cause of action here.

**B. Discriminatory Discharge**

Fitzgerald argues that WeWork "discriminated against [her] on the basis of her gender ... by subjecting her to disparate treatment, including ... terminating her employment." Am. Compl. ¶ 305. Discriminatory discharge claims under Title VII are subject to the three-part burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). To establish a *prima facie* case, a plaintiff must show that "(1) she is a member of a protected class; (2)

she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock*, 224 F.3d at 42 (citing *McDonnell Douglas*, 411 U.S. at 802). The burden then shifts to the defendant to demonstrate a "legitimate, non-discriminatory reason" for the employment action. *Tex. Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). Such a proffer causes the "presumption of discrimination arising with the establishment of the *prima facie* case [to] drop[ ] from the picture." *Weinstock*, 224 F.3d at 42. The plaintiff must then adduce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (citation omitted).

Defendants argue that Fitzgerald "cannot show that WeWork discharged her under circumstances giving rise to an inference of gender discrimination." Defs. Mem. at 22. The Court agrees. In the absence of direct evidence of discrimination—which Fitzgerald does not adduce [5]—she may raise an inference of discrimination by demonstrating disparate treatment, that is that she was treated "less favorably than a similarly situated employee outside [her] protected group." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (citation omitted). To make such a showing, Fitzgerald must allege that she was "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quotation marks and citations omitted); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001). She may also raise an inference of discrimination by demonstrating a disparate impact through statistical evidence showing that "male employees were more likely to survive [the April 2020] RIF." *Vuona v. Merrill Lynch & Co., Inc.*, 919 F. Supp. 2d 359, 371–72 (S.D.N.Y. 2013).

[5]     Stiles had no involvement or input in the decision to include Fitzgerald in the RIF, and, thus, his actions do not provide a basis to infer discriminatory intent in WeWork's decision to terminate her. *See Suri v. Grey Global Grp., Inc.*, 83 N.Y.S.3d 9, 6 (N.Y. App. Div. 2018) (where plaintiff was eliminated through RIF, and her employer's decision to terminate her "was not made by [alleged harasser], nor was it made in consultation with him," his actions did

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 153 of 321

Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)

2022 WL 952963

not constitute evidence that "her termination was motivated by discrimination.")

**\*6** Fitzgerald has failed to show disparate treatment and impact. As to disparate treatment, Fitzgerald does not identify a male comparator who was similarly situated to her in all material respects. The single male employee who survived the RIF—Riedel—was a "manager" in a more senior role, *see* Pl. Opp'n at 7, 23; Defs. 56.1 ¶ 51 (identifying Riedel as a "pod director"). Fitzgerald does not demonstrate that Riedel—or any other male employee not terminated in the RIF—was subject to the same performance or evaluation standards as Fitzgerald, that they shared a supervisor, or that their positions were "sufficiently similar ... to support at least a minimal inference that the difference in treatment may be attributable to discrimination." *McGuinness*, 263 F.3d at 54; *see also Brown*, 756 F.3d at 230 (finding employees similarly situated where they worked in the same group, reported to the same supervisor, and were subject to the same performance evaluation standards). And, the April 2020 RIF eliminated *all* U.S.-based employees in Fitzgerald's role and department, Defs. 56.1 ¶ 58—which does not support the existence of a male comparator who received more favorable treatment.

Similarly, Fitzgerald's statistical evidence is insufficient to demonstrate disparate impact. Seven employees—five women and two men—were considered for termination in the RIF, of which four women and one man were ultimately let go. Defs. 56.1 ¶¶ 43–51, 55–56. The "small sample size" at issue "renders this statistical evidence practically meaningless," particularly when Fitzgerald has not adduced any evidence as to ES's demographics as a whole, or the percentages of men and women laid off in the RIF. *Coleman v. Prudential Relocation*, 975 F. Supp. 234, 240 (W.D.N.Y. 1997) (collecting cases). Because Fitzgerald has not established an inference of discriminatory intent in connection with her inclusion in the April 2020 RIF, she has not made a *prima facie* case for her discriminatory discharge claim.

Even assuming Fitzgerald established a *prima facie* case, Defendants have put forth legitimate, non-discriminatory business reasons for her termination. The April 2020 RIF eliminated hundreds of positions, including all remaining U.S.-based employees in Fitzgerald's role and department. Defs. 56.1 ¶¶ 58, 65; Kondili Decl. ¶ 26. "A[n] RIF can indeed provide a legitimate, non-discriminatory reason for a termination," *Vuona*, 919 F. Supp. 2d at 373, particularly when all employees in the plaintiff's role are let go. *Garcia v. Barclays Capital, Inc.*, 281 F. Supp. 3d 365, 379–80

(S.D.N.Y. 2017). Kondili prioritized retaining employees with substantive experience in "budgeting, contracting, and construction," specific technical skills in construction management, and the ability to manage a client through both the pre-deal and execution stages of a project. Defs. 56.1 ¶¶ 30–33; Kondili Decl. ¶¶ 16–18. He chose to fire Fitzgerald—and the two remaining ES employees in the same "junior-level role," Fitzgerald Tr. at 221—because he determined they lacked these skills. Defs. 56.1 ¶¶ 53, 56–57. Defendants are entitled to "discharge an employee on the basis of subjective business judgments, for any reason that is not discriminatory," and it is not the Court's role to second-guess such business decisions. *Risco v. McHugh*, 868 F. Supp. 2d 75, 105 (S.D.N.Y. 2012).

Fitzgerald offers no evidence of pretext to rebut Defendants' non-discriminatory rationale for her termination. She "vehemently disagrees with Defendants' assessment of [her] performance and the decision to select [her] as one of the ... weakest employees of the group, [but] this does not show pretext." *Pearson v. Lynch*, No. 10 Civ. 5119, 2012 WL 983546, at \*10–11 (S.D.N.Y. Mar. 22, 2012). Accordingly, Defendants' motion for summary judgment on Fitzgerald's Title VII gender-based discriminatory discharge claim is GRANTED.

### C. Retaliation

Fitzgerald alleges that she was fired in retaliation for her complaints about Stiles, in violation of Title VII. Am. Compl. ¶¶ 310. As with discriminatory discharge claims, Title VII retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework. To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) her employer was aware of that activity; (3) she suffered a materially adverse employment action;[6] and (4) there was a causal connection between the protected activity and the adverse employment action. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). The burden then shifts to the employer to show that the "adverse employment actions were taken for a legitimate, non-retaliatory reason." *Giscombe v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (quotation marks, citation, and alterations omitted). If the employer makes such a showing, the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). That is, Fitzgerald must show that "the adverse action

2022 WL 952963

would not have occurred in the absence of the retaliatory motive." *Vega v. Hempstead U. Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (citation omitted).

6    In addition to citing her termination, Fitzgerald argues that she was "demoted" in August 2019, three months after her complaint. Pl. Opp'n at 7–8, 25; Fitzgerald Tr. at 220–23. It is undisputed that, at that time, Fitzgerald's group was reorganized, and she—like every other employee in the new group—received a title change. Fitzgerald Tr. at 220–23; Defs. 56.1 ¶¶ 14–15. But, Fitzgerald has not shown that she experienced any "materially adverse changes" as a result of this reorganization, such as a salary decrease, a material loss of benefits, or diminished responsibilities. *Chung v. City Univ. of New York*, 605 F. App'x 20, 22 (2d Cir. 2015); *see also* Defs. 56.1 ¶¶ 16–17. "The law does not support a claim that a title change, with no change in salary or benefits, is considered an adverse employment action." *White v. Fuji Photo Film USA, Inc.*, 434 F. Supp. 2d 144, 152–53 (S.D.N.Y. 2006). Accordingly, the alleged "demotion" does not constitute an adverse employment action for purposes of Fitzgerald's retaliation claim.

**\*7** Even assuming that Fitzgerald establishes the first three elements of a *prima facie* case of retaliation, the Court finds that Fitzgerald has not shown a causal connection between her complaint about Stiles and her firing. A causal connection can be established by showing either "that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus." *Uddin v. City of New York*, 427 F. Supp. 2d 414, 432 (S.D.N.Y. 2006). Fitzgerald has failed to adduce the requisite direct proof, arguing merely that it is "uncontested" that she was "fired less than a year" after complaining about Stiles' sexual harassment, and that this sequence of events establishes causality. Pl. Opp'n at 25. The Court disagrees.

Although the Second Circuit has not set forth a specific time period "between protected activity and adverse employment action that defeats an inference of causation," *Burkybile v. Bd. of Educ. of Hastings–On–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005), courts in this Circuit have generally concluded that a gap of more than three months between the protected activity and the retaliatory action "is insufficient, standing alone," to establish a causal connection, *see*, *e.g.*, *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457–

58 (S.D.N.Y. 2012) (collecting cases); *Vuona*, 919 F. Supp. 2d at 383 (finding nine-month gap between internal complaint and RIF "outside the time frame traditionally considered to allow for an inference of causation.").

Fitzgerald also claims that she reiterated her concerns about Stiles to Duong around "late December or early January"— roughly four months before she was discharged. Fitzgerald Tr. at 89–91. Even assuming both that this constitutes a "protected activity," and that it was sufficiently temporally proximate to Fitzgerald's termination to establish causality, her claim still fails. Defendants have adduced a legitimate, non-discriminatory reason for Fitzgerald's termination— namely, an RIF that eliminated every employee in her role. Defs. 56.1 ¶¶ 58, 65. In response, Fitzgerald offers no evidence to suggest her complaint was the "but-for" cause of her termination. And, although temporal proximity may be sufficient on its own to establish a *prima facie* case of retaliation, it does not establish pretext at the summary judgment stage. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Fitzgerald cannot, therefore, prevail on a retaliation claim under Title VII, and Defendants' motion for summary judgment on this claim is, accordingly, GRANTED.

### III. Disability Discrimination

Fitzgerald argues that WeWork discriminated against her on the basis of her disability by terminating her employment after she sought an accommodation—time off to attend therapy sessions for her anxiety. *E.g.*, Am. Compl. ¶ 315. She brings claims for discriminatory discharge, retaliation, and hostile work environment on the basis of disability under the ADA. *Id.*

Fulfilling the ADA's statutory definition of a disability is a "significant threshold for seeking redress under the ADA." *Felix v. New York City Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003). Defendants argue that Fitzgerald's ADA claims should be dismissed, because she has not established that she has a "disability" within the meaning of the ADA. Defs. Mem. at 26–27. The Court agrees.

A plaintiff claiming disability under the ADA must (1) show that she suffers from a physical or mental impairment; (2) identify the activity claimed to be impaired, and establish that it constitutes a major life activity; and (3) show that her impairment "substantially limits" the major life activity in question. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (citation omitted).

Case 6:21-cv-01207-TWD Document 86 Filed 10/25/24 Page 155 of 321

Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)

2022 WL 952963

**\*8** Fitzgerald states that she is "disabled in her sleeping and cognitive functions" because of anxiety. Fitzgerald Decl. ¶ 2, ECF No. 53. Although generalized anxiety disorder has been "recognized as constituting [an] impairment[ ] under the ADA," *Cody v. Cty. of Nassau*, 577 F. Supp. 2d 623, 640 (E.D.N.Y. 2008), *aff'd* 345 F. App'x 717 (2d Cir. 2009), the "mere allegation that plaintiff had difficulty sleeping is not sufficient to show a substantial limitation in [a] major life activity," *Baker v. CSX Transp., Inc.*, 546 F. Supp. 2d 90, 98 (W.D.N.Y. 2008) (citation omitted); *cf. Felix v. New York City Transit Auth.*, 154 F. Supp. 2d 640, 654 (S.D.N.Y. 2001). Fitzgerald makes "no showing that [her] affliction is any worse than is suffered by a large portion of the nation's adult population." *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998). Similarly, Fitzgerald's statement that she is "disabled in ... cognitive functions," Fitzgerald Decl. ¶ 2, supported by nothing more than her own affidavit, is too "[v]ague, conclusory, and self-serving" to create a triable issue of fact as to whether her anxiety causes "substantial limitations" in any major life activities, *Baker*, 546 F. Supp. 2d at 98.

Fitzgerald has not established that she is "disabled" within the meaning of the ADA, and cannot, therefore, seek redress under its provisions. Accordingly, Defendants' motion for summary judgment on Fitzgerald's claims of disability-related discrimination, retaliation, and hostile work environment under the ADA is GRANTED.

### IV. FMLA

Under the FMLA, eligible employees are entitled to twelve weeks per year of unpaid leave because of a "serious health condition that makes the employee unable to perform the functions of the position of such employee." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006); *see also* 29 U.S.C. § 2612(a)(1)(D). The Second Circuit recognizes separate claims of interference and retaliation under the FMLA. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Id.* And, an employee may bring a retaliation claim based on "actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Id.* Fitzgerald asserts both claims here. Am. Compl. ¶¶ 295–303.

#### A. FMLA Interference

Fitzgerald claims that she was "eligible for, and on a regimen of, intermittent medical leave" under the FMLA by "taking time off work weekly to attend her psychotherapy appointments." *Id.* ¶ 256. She alleges that WeWork interfered with her FMLA rights by "unlawfully terminating her employment." *Id.* ¶ 302. She also alleges that "[d]uring [her] employment at WeWork, [she] needed to miss, postpone and cancel multiple therapy appointments." Fitzgerald Supp. Decl. ¶ 26, ECF No. 54.

An employer violates the FMLA's interference clause where it has "denied or otherwise interfered with a benefit to which [an eligible employee] was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). To establish a *prima facie* case of FMLA interference, a plaintiff must demonstrate: "(1) that she is an eligible employee under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA." *Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 351 (S.D.N.Y. 2007) (quotation marks and citations omitted). Defendants argue that Fitzgerald has failed to establish this *prima facie* case. Defs. Mem. at 32–33. The Court agrees.

**\*9** Fitzgerald did not qualify as an "eligible employee" for FMLA purposes until March 25, 2020, twelve months after her start date. [7] *See* Defs. 56.1 ¶ 2. And, once Fitzgerald was entitled to FMLA leave, she "was obligated to provide [WeWork] with ... at least thirty days' notice for leave that is foreseeable." *Bowman v. CSX Transp., Inc.*, 22 F. Supp. 3d 181, 189 (N.D.N.Y. May 22, 2014). As Fitzgerald continued attending a standing therapy appointment—as she had done since June 2019—her need for leave was clearly foreseeable. Fitzgerald Tr. at 231. But, the record does not establish that Fitzgerald "provide[d] enough information to put [WeWork] on notice that [she] may be in need of FMLA leave." *Bowman*, 22 F. Supp. 3d at 189 (citing *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1036–37 (8th Cir. 2010)).

---

[7]     "To be eligible for FMLA leave, an employee must have been employed for at least twelve months by the employer from whom she is requesting leave," and work for at least 1,250 hours in that twelve-month period. *Arroyo-Horne v. City of New York*, 831 F. App'x 536, 539 (2d Cir. 2020). There

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 156 of 321

Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)

2022 WL 952963

is "no claim under the FMLA, however, when an employee is ineligible at both the time the employee provides notice of her intent to take leave, and the time the leave is to be taken." *Condon v. Dormitory Auth. of New York*, No. 17 Civ. 1381, 2019 WL 1259569, at *4 (N.D.N.Y. Mar. 19, 2019). To the extent Fitzgerald's FMLA interference claim is predicated on requests for leave prior to March 25, 2020, accordingly, "whether granted or denied, [they] are not actionable because they occurred before the 12-month mark." *Daniel v. T&M Protection Resources LLC*, 87 F. Supp. 3d 621, 648 (S.D.N.Y. 2015), *vacated and remanded on other grounds*, 689 F. App'x 1 (2017).

There is no evidence that Fitzgerald actually requested time off, or took "leave"—such as vacation or sick time—to attend therapy appointments. She merely informed supervisors that she would be unavailable during "blocks" on her calendar for therapy, and would resume working thereafter. Fitzgerald Tr. at 111–14. This assertion merely shows that Fitzgerald availed herself of an accommodation—"flexibility with respect to in-office time"—to attend appointments during the workday, and not that she requested "any form of leave," such as a reduced schedule, to do so. *See Macropoulos v. Metropolitan Life Ins. Co.*, No. 15 Civ. 6096, 2018 WL 1508564, at *13 (S.D.N.Y. Mar. 26, 2018) ("Although FMLA regulations do not require an employee to mention the FMLA specifically, they do require an employee to request leave, not just an accommodation."). And, although "an employee's statements may give rise to a duty on the part of the employer to inquire into the nature of the employee's need for leave, the employer is not required to be clairvoyant." *Slaughter v. Am. Bldg. Maintenance Co. of New York*, 64 F. Supp. 2d 319, 326 (S.D.N.Y. 1999) (quotation marks and citation omitted). There is no basis to find that Fitzgerald's desire to "maintain her [workday] flexibility put [WeWork] on notice that she desired FMLA leave" after she became eligible for it. *Macropoulos*, 2018 WL 1508564, at *13.

Moreover, FMLA "interference" claims are an *ex ante* remedy to be used where an employer "has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Greenberg v. State Univ. Hosp.–Downstate Med. Ctr.*, 838 F. App'x 603, 605 (2d Cir. 2020) (citing *Woods*, 864 F.3d at 166). There is no evidence suggesting that Fitzgerald's supervisors ever discouraged or prevented her from attending therapy, or otherwise impeded her ability to exercise FMLA rights. *See* Fitzgerald Tr. at 111–14. Indeed, Fitzgerald attended all her scheduled therapy appointments after March

25, 2020. *See* Defs. 56.1 ¶ 165. At best, Fitzgerald states that she was occasionally asked to reschedule appointments, Fitzgerald Tr. at 106–07—which does not establish a FMLA interference claim, *see Anderson v. New Orleans Jazz & Heritage Festival & Found., Inc.*, 464 F. Supp. 2d 562, 568 (E.D. La. 2006).[8] Accordingly, Defendants' motion for summary judgment on Fitzgerald's FMLA interference claim is GRANTED.

[8]
> The Court also notes that in *Greenberg*, the Second Circuit cast doubt on whether a FMLA interference claim can even be raised based on "allegations concerning [an] *ex post* adverse employment action[ ]," such as termination of employment, because such claims are "appropriately aimed at allegations concerning [an] *ex ante* denial of [a] request for FMLA leave." 838 F. App'x at 606.

**B. FMLA Retaliation**

**\*10** The FMLA "protects an employee from discharge or demotion ... if that action is motivated by the employee's taking leave pursuant to the FMLA." *Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000). Fitzgerald argues that WeWork terminated her "shortly after she began requesting time off to attend therapy appointments." Pl. Opp'n at 27. Retaliation claims brought pursuant to the FMLA are subject to the *McDonnell Douglas* burden-shifting test. *Alexander v. Bd. of Educ. of City of New York*, 648 F. App'x 118, 121 (2d Cir. 2016). A plaintiff must first establish a *prima facie* case of retaliation by showing "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). Such an inference may be established through either direct evidence of retaliatory animus, or circumstantial evidence, such as showing that "the protected activity was followed closely by discriminatory treatment," or "disparate treatment of fellow employees who engaged in similar conduct." *Smith v. North Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 514 (E.D.N.Y. 2018) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307, 319 (2d Cir. 2015)). A defendant may rebut this *prima facie* case with a "legitimate, non-discriminatory reason for its actions." *Graziadio*, 817 F.3d at 429. The plaintiff must then show that the defendant's proffered explanation is pretextual. *Id.*

**Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)**

2022 WL 952963

As discussed, the record does not establish that Fitzgerald "exercised rights protected under FMLA," because her testimony does not support that she requested "leave"—rather than merely flexible working hours—to attend her therapy appointments. *See supra* at 20–21. Fitzgerald similarly has not established an inference of retaliatory intent motivating her inclusion in the RIF—she points to "no document or testimony suggesting that ... any [WeWork] decision-maker considered her alleged need for FMLA leave as a negative factor in [their] decision to terminate [her]." [9] *Lievre v. JRM Construction Mgmt., LLC*, No. 17 Civ. 4439, 2019 WL 4572777, at *19 (S.D.N.Y. Sept. 19, 2019). Indeed, Fitzgerald "has not pointed to a single instance" where she was forced to miss or cancel a therapy appointment, or even that anyone at WeWork "tried to make it difficult for her" to attend her appointments, which casts doubt on her assertion that she was terminated for doing so. *Coleman v. Prudential Relocation*, 975 F. Supp. 234, 246 (W.D.N.Y. 1997).

[9]     Fitzgerald alleges that, during the RIF, Agarwal and Kondili explicitly considered a male employee's upcoming paternity leave in recommending him for inclusion in the RIF. Pl. Opp'n at 27. Defendants dispute this characterization. *See* Kondili Tr. at 110–11. But, although treatment of another employee in similar circumstances may provide circumstantial evidence of an employer's retaliatory intent, *Lulo v. OTG Mgmt., LLC*, No. 19 Civ. 3776, 2022 WL 409224, at *6 (S.D.N.Y. Feb. 10, 2022), because the Court finds that Fitzgerald has failed to establish the *prima facie* requirement that *she* exercised rights protected under FMLA, this allegation, even if true, is insufficient to create a triable issue of fact that would defeat summary judgment.

Finally Defendants have provided a legitimate, non-discriminatory reason for Fitzgerald's termination—a RIF that eliminated all US-based employees in her role. Defs. Mem. at 36; *see also Lulo*, 2022 WL 409224, at *6. Fitzgerald argues that "Defendants' incoherent explanation for terminating [her] employment [was] wholly pretextual," but as explained, her subjective disagreement with Kondili and Agarwal's assessment of her skills and expertise— even if that assessment was wrong—does not, without more, establish pretext. *Kwan*, 737 F.3d at 852 (Parker, J., concurring in part). Fitzgerald has failed, accordingly, to establish a *prima facie* case of FMLA retaliation, and

therefore, Defendants' motion for summary judgment on this claim is GRANTED.

## V. NYSHRL and NYCHRL Claims

A district court has discretion to "decline to exercise supplemental jurisdiction" where, as here, "it has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Where all federal-law claims are eliminated before trial, "the balance of factors to be considered under the pendent jurisdiction doctrine ... point toward [a federal court] declining to exercise jurisdiction over the remaining state [and city] law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)*; see also Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017). The Court has eliminated all of Fitzgerald's federal law claims. And, the NYSHRL and NYCHRL employ a different, more liberal substantive standard in resolving both gender- and disability-based discrimination, retaliation, and hostile work environment claims. *See, e.g., Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 572–73 (S.D.N.Y. 2014); *Mihalik v. Credit Agricole Cheuvreux North Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). [10] Accordingly, the Court declines to exercise supplemental jurisdiction over Fitzgerald's remaining NYSHRL and NYCHRL claims.

[10]     Although previously the "substantive standards for liability under the NYSHRL and Title VII" were considered to be "coextensive," *see, e.g., Vuona*, 919 F. Supp. 2d at 393, recent amendments to the NYSHRL now provide that its provisions "should be construed liberally, 'regardless of whether federal civil rights law, including those laws with provisions worded comparably to the provisions of this article, have been so construed.' " *Deveaux v. Sketchers USA, Inc.*, No. 19 Civ. 9734, 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting NY Legis. 160 (2019), 2019 Sess. Law News of N.Y. Ch. 160 (A. 8421)). These amendments "effectively rendered the [NYSHRL] standard ... closer to that of the [NYCHRL]." *Livingston v. Roosevelt Union Free Sch. Dist.*, No. 17 Civ. 4189, 2020 WL 1172642, at *11 (E.D.N.Y. Jan. 15, 2020), *report and recommendation adopted*, 2020 WL 1166450 (E.D.N.Y. Mar. 11, 2020). The amendments do not apply retroactively, however. *Id.* As Fitzgerald's claims accrue after 2019, her NYSHRL claims

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 158 of 321

Fitzgerald v. We Company, Not Reported in Fed. Supp. (2022)
2022 WL 952963

are analogous to the substantive standards of the NYCHRL, rather than Title VII.

## CONCLUSION

**\*11**  For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Fitzgerald's Title VII, ADA, and FMLA claims, and those claims are DISMISSED with prejudice. The Court declines to exercise supplemental jurisdiction over Fitzgerald's NYSHRL and NYCHRL claims, and accordingly, those claims are DISMISSED without prejudice to renewal.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 952963

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 624993
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Maureen WRIGHT–JACKSON, Plaintiff,

v.

HIP HEALTH PLAN, Defendant.

No. 07 Civ. 1819(DFE).
|
Feb. 19, 2010.

West KeySummary

**1**    **Civil Rights** 🔑 Requesting and Choosing Accommodations; Interactive Process; Cooperation

Employee who failed to establish that she gave her employer the required notice of a request for an accommodation failed to establish a prima facie case of disability discrimination. The employee alleged that her employer was notified of her required accommodation because she was treated by doctors and nurses who were part of her employer's healthcare network. The employer did not maintain or have access to employees' private medical records, even when they used the employer's healthcare network. The document provided to the employer which put them on notice of the employee's need for accommodation was dated two days after the employee was terminated. Americans with Disabilities Act of 1990, § 102(a), 42 U.S.C.A. § 12112(a).

OPINION AND ORDER

DOUGLAS F. EATON, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Maureen Wright–Jackson brings this lawsuit against her former employer HIP Health Plan ("HIP"), which terminated her employment on December 6, 2004. She alleges that HIP discriminated against her on the basis of her race (African–American), color (black), and national origin (Jamaican) in violation of Title VII of the Civil Rights Act of 1964 ("TitleVII"), as amended, 42 U.S.C.A. § 2000e, *et seq.* She also alleges disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq* .

HIP has moved for summary judgment. For the following reasons, I hereby grant HIP' motion.

FACTUAL AND PROCEDURAL BACKGROUND

On December 8, 2004, Plaintiff filed a verified complaint with the New York State Division of Human Rights ("NYSDHR"), which dismissed it and made a finding of no probable cause on July 31, 2006. (Doc # 24, Exhs. 18, 20.) The U.S. Equal Employment Opportunity Comission adopted the findings of the NYSDHR and issued a Dismissal and Notice of Rights on October 10, 2006. On January 10, 2007, our Court's Pro Se Office received Plaintiff's Complaint. On the form at ¶ 7, she did not check "national origin," but she annexed a copy of her 9/16/04 memo to HIP in which she accused a superior of an "offensive comment about my accent."

On September 25, 2009, after a lengthy discovery period, HIP's attorney Seema A. Misra of the firm of Stroock & Stroock & Lavan, LLP, served and filed HIP's Notice of Motion for Summary Judgment (Doc # 21), accompanied by the following:

Doc # 22: HIP's Memorandum of Law;

Doc # 23: Declaration of Plaintiff's supervisor June Hutchinson with Exhibits 1–2;

Doc # 24: Declaration of Diane McGuire with Exhibits 1–20;

Doc # 25: Declaration of Seema A. Misra with Exhibits 1–3;

Doc # 26: HIP's Rule 56.1 Statement of Undisputed Facts;

Doc # 27: Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment (This attached copies of Rule 56 of the Federal Rules of Civil Procedure, and of Local Civil Rule 56.1, and of seven unpublished cases cited by HIP).

In opposition to the motion, Plaintiff submitted the following documents (which I docketed belatedly):

Doc # 33: a 17–page document titled "Plaintiff's Submission;"

Doc # 34: a 59–page document titled "Plaintiff's Response to Defendant's Statement of Undisputed Facts;"

Doc # 35: a 26–page document titled "Plaintiff's Response to Diane McGuire ['s] Declaration for Summary Judgment;"

Doc # 36: an 11–page document titled "Plaintiff's Response to June Hutchinson's Declaration for Summary Judgment;"

Doc # 37: an Errata Sheet (pp. 308–21) for the 307–page transcript of her 7/10/08 deposition (the transcript is at Doc # 25, Exh. 2);

Doc # 38: a bound volume of Plaintiff's Exhibits, numbered 1–57 (with some gaps).

On November 23, 2009, Ms. Misra filed the following:

Doc # 30: HIP's Memorandum of Law in Further Support;

**\*2** Doc # 31: Reply Declaration of Diane McGuire;

Doc # 32: HIP's Reply Rule 56.1 Statement of Undisputed Facts (This is the one document which sets out each of the 68 Facts listed by HIP in Doc # 26, and then sets out each response or non-response by Plaintiff from Doc # 34).

Maureen Wright–Jackson was born in 1961 and grew up in the nation of Jamaica. She was educated there and worked in business and education before she moved to New York in 1995. On September 9, 2001, she received a B.Tech. degree in Computer Systems from Globe Institute of Technology. (Doc # 38, Pl. Exh. 4.) On January 15, 2003, she received an M.S. degree in Information Systems from Pace University. (Doc # 38, Pl. Exh. 2.)

She started working at HIP on October 20, 1997. She was in the Medicare Marketing Department until March 2003, and was in the Government Assisted Programs ("GAP") Department from April 1, 2003 until December 6, 2004. In Doc # 33, at page 8, she states:

I was a great asset to HIP, and I was happy with my employment until John Kennedy took over as Vice President of the [Medicare Marketing] Department in November 2000.

Plaintiff complains about a four-year period from November 2000 to December 6, 2004. However, as I will explain later at Point II, the statute of limitations extends back only to February 12, 2004. Any events prior to that date may be considered only as background, or potentially on the claim of hostile work environment (discussed at Point III).

Plaintiff complains at length about Mr. Kennedy and Robert Cronin. But her employment in their Department (the Medicare Marketing Department) ended in March 2003.

FACT 27 (uncontroverted by Plaintiff) states:

In March 2003, after submitting an application and interviewing with Allie Hag[e]n, (a white female) [,] Plaintiff was transferred to the GAP Department with the title Assistant Manager, Contract Compliance. McGuire Dec. at ¶ 10.

(Doc # 32, p. 27.)

June Hutchinson's Declaration states:

2. I have been employed by HIP (or Emblem Health) for over 17 years. I began my employment with HIP in 1992, and have worked in the GAP department since April of 2003. I joined GAP with the title of Manager, Contract Compliance. Effective January 5, 2004, I was promoted to become the Assistant Director, Contract Compliance in the GAP department, a position formerly held by Colette Choute. In our role as Assistant Directors, both Ms. Choute and I reported to Allie Hagen, the Director of Contract Compliance & Operations. On February 6, 2009, Ms. Hagen left HIP, and I am submitting this statement to explain some of the actions jointly t[aken] by Ms.

Hagen and myself, in relation to Plaintiff Maureen Wright–Jackson.

3. I am currently responsible for day-to-day supervision of 10 employees in the GAP department. When I became the Assistant Director [on January 5, 2004], I became the direct supervisor of Ms. Wright–Jackson (who had been reporting to Ms. Hagen after Ms. Choute moved to a different department). Both Ms. Wright–Jackson and I are African–American females of Caribbean/Jamaican background.

**\*3**  (Doc # 23, ¶¶ 2–3.) Accordingly, in Doc # 26 HIP lists FACT 38:

> In January, 2004, Hag[e]n promoted June Hutchinson, an African–American female of Jamaican/Caribbean background, to the position of Assistant Director, Contract Compliance. Plaintiff reported to Hutchinson, and Hutchinson reported to Hagen. Hutchinson Dec. at ¶ 2.

Plaintiff submits no evidence to controvert any aspect of FACT 38 and therefore it is deemed to be true pursuant to Local Civil Rule 56.1, which cannot be evaded by Plaintiff's Response ("I disagree with this paragraph. I cannot agree that Ms. Hutchinson was promoted January 2004. I cannot agree that Ms. Hutchinson is of a Caribbean/Jamaican background. I was co-supervised by Ms. Hutchinson and Ms. Hagen."). (Doc # 34, p. 15.)

From January 5, 2004 until she was fired on December 6, 2004, Plaintiff's direct supervisor was Ms. Hutchinson. Ms. Hutchinson's Declaration explains in detail why she, and her superior Allie Hagen, and the head of the GAP Department Larry Minard, all decided to fire Plaintiff. (Doc # 23, ¶¶ 4–9, 11–15.)

Plaintiff concedes that Ms. Hutchinson repeatedly told her that her performance was deficient. She says that Ms. Hutchinson made unreasonable demands and misguided criticisms. (Doc # 34, pp. 15–27, 40, 42–44, 49–50.) But she makes no claim that Ms. Hutchinson was motivated by any intent to discriminate against Plaintiff's race, color, or national origin.

FACT 46 (undisputed, see Doc # 32, p. 52) states:

> In late April and May 2004, Hutchinson, Hagen and Minard contacted HR about Plaintiff's inability to improve her performance and requested to start the termination process.

Throughout 2004, Diane McGuire was Assistant Director of Employee Relations in the HR Department; her Declaration states: "In May of 2004, Ms. Hagen and Ms. Hutchinson consulted with me about terminating Mr. Wright-Jackson's employment because of work performance deficiencies. We agreed that the GAP Department would generate a written, formal warning, creating a probationary period and requiring immediate improvement." (Doc # 24, ¶ 15.)

Ms. Hutchinson's Declaration, at ¶ 11, states: "We issued a formal warning on May 27, 2004, a true and correct copy of which is attached as Exhibit 2. .... Immediately upon receiving the formal warning, Ms. Wright–Jackson went out on disability leave. The [GAP] department was not informed of the details of her disability, either at that time or later [until after her termination on 12/6/04]." (Doc # 23, ¶ 11.) The Formal Warning (Doc # 23, Exh. 2) told Plaintiff: "Enrollment Statistics Report .... You must fully document the process and submit both a hard copy and electronic copy to Ms. Hutchinson no later than May 28th, 2004. .... Failure to immediately correct your unsatisfactory work performance and sustain that correction will result in further disciplinary action, up to and including termination of your employment." (Doc # 23, Exh. 2, pp. 1, 2, 3.)

**\*4**  FACT 52: "The day she received this formal warning, Plaintiff went out on leave until November 1, 2004." Plaintiff does not controvert this, although her Response says: "I did not just go out on leave; I was taken out of the hostile environment by my mental health and physician health care professionals." (Doc # 32, p. 70; Doc # 34, p. 43.)

FACT 53 (uncontroverted by Plaintiff): "Because Plaintiff had received the May 27, 2004 formal warning, she was on probation when she returned on November 1, 2004."

Regarding Plaintiff's 11/1/04 return to work, her supervisor Ms. Hutchinson states:

When Ms. Wright–Jackson returned to work Ms. Hagen and I did everything we could to ease her back into her work responsibilities. We ordered a computer for her, and gave her access to a computer terminal and available workspace, while we determined her permanent station. On November 3, 2004, Ms. Hagen and I both met with her, and together created specific due dates for projects during November. We told her that she remained on probation, and had to timely and accurately complete the assignments given to her. She was given a lighter workload than she would normally be responsible for, and each due-date gave ample time for completion of the projects. I had generated some of these reports myself during Ms. Wright–Jackson's absence, and in some instances Ms. Wright–Jackson took a full day to complete a project that I knew from direct experience could be completed in two to three hours.

(Hutchinson Decl., Doc # 23 at ¶ 14; see also Doc # 25, Exh. 1 at p. 00855 (a calendar for November 2004 listing the "due dates" referred to in the passage just quoted).)

Ms. McGuire's Declaration (Doc # 24) states at ¶ 20:

20. On December 6, 2004, HIP terminated Ms. Wright–Jackson's employment. Attached hereto as Exhibit 16 is a true and correct copy of the December 6, 2004 letter informing Ms. Wright–Jackson of the terms of the termination. ....

Exhibit 16 to the McGuire Declaration is a memorandum to Plaintiff from Mr. Minard, Ms. Hagen and Ms. Hutchinson,

with the subject line "Termination of Employment," dated December 6, 2004. It said, in part:

You returned to work from an approved leave of absence on November 1, 2004 and on November 3, 2004 met with June [Hutchison] and me [Allie Hagen]. Together we developed a calendar that clearly defined the specific projects you would be working on beginning November 3, 2004 through November 9, 2004. The calendar also specified each project due date mutually agreed to. Prior to your leave of absence, you were on a [5/27/04] formal warning for unsatisfactory work performance. You were reminded that the formal warning remained in effect upon your return. Following a formal warning, it is generally HIP's practice to provide an employee with a two week period to demonstrate correction; an uncorrected performance would result in termination of employment. During the meeting on November 3, 2004, I also reiterated the reasons for the Formal Warning in May and advised it was necessary for you to be able to complete projects accurately and on time and that you needed to follow the agreed upon calendar. However, since you just returned from leave we did not hold you as strictly accountable for the agreed upon deadlines for the first week of your return.

 *5 (Doc # 24, Exh. 16, p. 1.) The memorandum then discusses Plaintiff's work on six specified projects, of which two were completed late and two were never completed. The next to last paragraph said:

You continue to not follow directions or communicate clearly in a timely manner when you can not meet established deadlines. The work you

have submitted has not been accurate or has not been in the form requested. You have failed to correct your unsatisfactory work performance and as a result, the decision has been made to terminate your employment with HIP Health Plan of New York effective today, December 6, 2004.

(*Id.,* p. 3.)

### LEGAL DISCUSSION

*The Standards for Summary Judgment*

Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c).*

> This form of relief is appropriate when, after discovery, the party—here plaintiff—against whom summary judgment is sought, has not shown that evidence of an essential element of [his] case—one on which [he] has the burden of proof—exists. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This form of remedy is inappropriate when the issue to be resolved is both genuine and related to a disputed material fact. An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment. See *Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

*Powell v. National Board of Medical Examiners,* 364 F.3d 79, 84 (2d Cir.2004). As to materiality, the substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2508, 91 L.Ed.2d 202 (1986).

.... In deciding the [summary judgment] motion, the trial court must first resolve all ambiguities and draw all inferences in favor of the non-moving party, and then determine whether a rational jury could find for that party.

At the same time, the non-moving party must offer such proof as would allow a reasonable juror to return a verdict in his favor, see *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and only when that proof is slight is summary judgment appropriate, see *Dister v. Continental Group, Inc. .,* 859 F.2d 1108, 1114 (2d Cir.1988). The trial court's function at this stage is to identify issues to be tried, not decide them.

*Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000). In short, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2508, 91 L.Ed.2d 202 (1986).

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence [presented by the non-moving party] is merely colorable, or not significantly probative, summary judgment may be granted.

**\*6** *Anderson,* 106 S.Ct. at 2511 (internal quotation marks and citations omitted).

The Second Circuit has often cautioned that in employment discrimination cases where intent of the employer is a central factual issue, courts should be "chary" in granting summary judgment. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 71 (2d Cir.2000), citing *Chertkova v. Connecticut Gen. Life Ins.,* 92 F.3d 81, 87 (2d Cir.1996). See also, *Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). "[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs.*

Wright-Jackson v. HIP Health Plan, Not Reported in F.Supp.2d (2010)

2010 WL 624993

*Corp.,* 43 F.3d 29, 40 (2d Cir.1994). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001.)

Plaintiff is *pro se,* and she obviously spent many days preparing her voluminous papers, which I must interpret "to raise the strongest arguments that they suggest." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). It is natural to sympathize with a person suffering from depression and from loss of a job. Nonetheless, the law is clear that *pro se* status does not relieve a litigant from the usual requirements of summary judgment. *Fitzpatrick v. New York Cornell Hosp.,* 2003 WL 102853, *5 (S.D.N.Y. Jan.9, 2003).

Accordingly, the plaintiff must provide "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pr. 56(e). Our court must grant HIP's motion for summary judgment unless Ms. Wright–Jackson shows that there is a "genuine" dispute for a trial—*i.e.,* "there is sufficient evidence favoring [her] for a jury to return a verdict for [her]." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This she has not done.

*HIP's Motion for Summary Judgment*

In its Memorandum of Law in Further Support (Doc # 30), HIP starts with a new point and then repeats the six points previously made in its initial Memorandum (Doc # 22):

Point I. Plaintiff's Opposition consists entirely of inadmissible assertions that should be disregarded, and the material facts submitted by HIP should be deemed admitted.

Point II. Plaintiff's claims relating to allegedly discriminatory acts during her time in the [Medicare] Marketing Department are time barred.

Point III. Plaintiff does not meet the standard to prove a hostile work environment.

Point IV. Plaintiff[ ] cannot make a prima facie case of race/national origin discrimination.

Point V. Plaintiff has not made a prima facie case for failure to accommodate.

**\*7** Point VI. HIP has shown a legitimate reason for plaintiff's formal warning and termination that is not pretextual.

Point VII. Plaintiff's retaliation claim should be dismissed.

For the most part, HIP's arguments are persuasive, and plaintiff's arguments are not. I will address each point in turn.

*Point I. Plaintiff's response to HIP's Rule 56.1 statement of undisputed facts.*

HIP's motion papers included the Notice to *Pro Se* Litigants as required by Local Civil Rule 56.2; the Notice explained to Plaintiff what she was required to do to oppose the motion for summary judgment. Fed.R.Civ.Pr. 56(e)(2) provides:

> ***Opposing Party's Obligation to Respond.*** When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must— by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

The Local Civil Rule 56.2 Notice reiterated the substance of Rule 56(e) and explained to Plaintiff:

> [Y]ou must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising material issues of fact for trial. Any witness statement must be in the form of affidavits. You may submit your own affidavit and/or the affidavits of others.....

> If you do not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the material facts asserted by the defendants, the court may accept defendant's factual assertions as true. Judgment may then be entered in defendant's favor without a trial.

The Notice also directed Plaintiff's attention to Local Civil Rule 56.1 (and attached a copy of that Rule). Subdivision (d) of that Rule instructs:

> (d) Each statement by the movant or opponent pursuant to Rule 56 .1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be

admissible, set forth as required by
Federal Rule of Civil Procedure 56(e).

In almost all respects, Plaintiff has failed to comply with those instructions.

HIP's 56.1 Statement (Doc # 26) was 12 pages long, and contained 68 numbered paragraphs. Each paragraph set forth a material fact, followed by a citation to a document or an affidavit that tends to prove that the asserted fact is true. Plaintiff's Response (Doc # 34) is 59 pages long. I am willing to overlook that she does not specifically say that she is declaring these statements under penalty of perjury. But I cannot overlook that her Response consists mostly of her conclusory and argumentative assertions, and it often fails to give citations to admissible evidence (documents or affidavits that tend to prove that an asserted fact is true).

As was her right, she made no response or opposition to 20 of HIP's paragraphs. [1] As to the remaining 48 paragraphs, she did at least stay in numerical order. As to 41 of those paragraphs, [2] she made some response but did not adequately controvert them. She raised a genuine factual issue as to only 7 paragraphs. [3]

[1]    Paragraphs 1, 2, 4, 5, 7–9, 12–14, 19, 26, 28, 33, 37, 46, 53, 55, 58, 68.

[2]    Paragraphs 3, 6, 10–11, 15–18, 20–25, 27, 29–32, 34–36, 38, 39, 41, 42, 45, 47–48, 50–52, 54, 56, 57, 59, 62–65, 67.

[3]    Paragraphs 40, 43, 44, 49, 60–61, 66.

 *8  Among the 41 paragraphs in the middle category, two of them concern HIP's FACTS 35 and 36. HIP's FACT 35 said: "In July 2003, [Colette] Choute issued a Midpoint Probation Evaluation. This evaluation identified several issues, including that Plaintiff had to pay more attention to detail when completing assigned projects, [and that] Plaintiff often repeated the same mistakes when asked to correct work, .... McGuire Dec, Ex. 8." (Doc # 26, ¶ 35.) Exhibit 8 was produced in discovery as page 0000097; it contains the exact criticisms set forth in FACT 35, and it shows the 7/8/03 signatures of Plaintiff and of her then supervisor Colette Choute. Nevertheless, Plaintiff's Response to FACT 35 says:

> This document is in question. I ask the court[']s permission for a view [of] the original signed copy of this document. There was a portion that mentions errors that was insisted to be included by Ms. Hagen, but not all these other statements. Anyway, these errors were inherited from Pamela Hinds['s] incorrect file that was used to generate the initial reports. Despite the fact, Ms. Hagen insisted that these errors appear on my review. ....

(Doc # 34, p. 14.)

The next evaluation is in evidence as Exh. 9 to the McGuire Declaration. (Doc # 24, Exh. 9, consisting of pages 0000002 through 0000009.) Pages 0000006 and 0000007 contain even more serious criticisms of Plaintiff; the front page (0000002) shows that Ms. Choute signed on 12/11/03 as Manager, and Ms. Hagen signed on 12/11/03 as Director, and Plaintiff signed on 12/12/03 as Employee. HIP's FACT 36 cited this document and fairly summarized it. Plaintiff now responds with an unsubstantiated and unlikely assertion: "Neither Ms. Choute nor I saw the evaluation content [pages 0000003 through 0000009]. All we saw was the front sheet [page 0000002, when we signed it]. It was after I sign [ed] ... that Ms. Hagen printed out the evaluation [pages 0000003 through 0000009] from her computer and gave it to me." (Doc # 32, p. 33.)

Plaintiff's attempts to controvert FACTS 35 and 36 would not help her case in any way. Any rational jury would conclude from these documents and Plaintiff's responses that Plaintiff's performance was criticized by her 2003 supervisor Ms. Choute, even though Plaintiff makes no claim that Ms. Choute was motivated to discriminate against Plaintiff's race, color, or national origin, and even though Plaintiff makes no claim that she was disabled in 2003.

FACTS 35 and 36 pre-date February 12, 2004; as will be discussed in Point II, they may be considered only as background, or potentially on the claim of hostile work environment (discussed at Point III).

*Point II. The 300–day statute of limitations.*

Title VII and the ADA have the same threshold requirement: the employee must initially file a "charge of discrimination" with either the EEOC or an equivalent local agency (such as the NYSDHR). The statute of limitations reaches back from the date when the plaintiff filed the administrative charge. Plaintiff filed her administrative charge with the NYSDHR on December 8, 2004. In some states the statute of limitations is 180 days; in New York it is 300 days, which means that Plaintiff's lawsuit can reach back to conduct that occurred on or after February 12, 2004.

**\*9** *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), said in its first paragraph: "We consider whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside this statutory period." 536 U.S. at 105. Several circuits, including the Second Circuit, had created a "continuing violation" exception to the 300–day rule. The Morgan decision narrowed that exception. The unanimous portion of the opinion reversed the Ninth Circuit and said:

> .... First, discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred.

\* \* \*

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice."

536 U.S. at 113–14, 122 S.Ct. at 2072–73.

On the other hand, Part II–B of the *Morgan* opinion (by a vote of 5–4) did allow one exception, limited to claims of hostile work environment. The majority wrote that, when such a claim is presented:

> .... A court's task is to determine whether the acts about which an employee complains are **part** of the **same** actionable hostile work environment practice, and if so, whether any act falls within the statutory [300 day] time period.

With respect to Morgan's hostile environment claim, the Court of Appeals concluded that "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated **by the same managers."** .... On this point, we affirm.

536 U.S. at 120–21, 122 S.Ct. at 2076 (emphasis added).

Ms. Wright–Jackson's Submission (Doc # 33, p. 15) cites page 120 of *Morgan* and paraphrases the words I have quoted above. At page 16, she argues that, on her hostile work environment claim, I ought to determine that Mr. Kennedy's acts were part of the same practice as Ms. Hagen's acts. I disagree. Those two managers were in different Departments. Plaintiff transferred to a different work environment when she transferred to Ms. Hagen's Department on April 1, 2003, long before the 2/12/04 cutoff posed by the 300–day rule. Plaintiff alleges that Mr. Kennedy and Ms. Hagen were friends, and that Mr. Kennedy visited the GAP Department and, on one such visit in 2003, remarked: "The only reason Colette Choute likes Maureen [Plaintiff] is because Colette is just like Shirley Atwood." (Doc # 33, p. 9.) Plaintiff further alleges that the point of the remark was that all three women were black, and that the remark was "suggesting that because I was black, I could only get along with and [be] highly rated by other black employees." (Doc # 33, p. 12.) Even assuming the truth of Plaintiff's allegations, I find that Plaintiff has failed to show that Mr. Kennedy's acts in the Medicare Marketing Department were part of the same practice as Ms. Hagen's acts in the GAP Department. When discussing the hostile environment claim, I will go back earlier than February 12, 2004, back to April 1, 2003, when Plaintiff began working in the GAP Department, but I will not consider any acts when she was working in the Medicare Marketing Department. When discussing all of the other claims, I will not consider anybody's pre–2/12/04 acts except as background.

*POINT III. The hostile work environment claim*

**\*10** The Second Circuit has written:

> To survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

*Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 3670, 126 L.Ed.2d 295, —— (1993). Plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive. *Demoret v. Zegarelli,* 451 F.3d 140 (2d Cir.2006).

Moreover, a "hostile environment" claim under Title VII requires a showing that the conduct occurred because of plaintiff's membership in a protected class. See *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999). Abusive conduct in the workplace, if not based on a protected class, is not actionable under Title VII. *See Oncale v. Sundowner Offshore Services,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Title VII "does not set forth 'a general civility code for the American workplace,' " *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), quoting *Oncale,* 523 U.S. at 8. In *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002), the Second Circuit emphasized this point:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

To analyze a hostile work environment claim, we look to the record as a whole and assess the totality of the circumstances, see *Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir.2001). Courts are to consider a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

Isolated incidents typically do not rise to the level of a hostile work environment. *Patterson v. County of Oneida,* 375 F.3d 206, 227 (2d Cir.2004). Generally, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano,* 294 F.3d at 374. In short, a plaintiff alleging a hostile work environment "must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Cruz,* 202 F.3d at 570 (citations omitted).

**\*11** Starting on April 1, 2003, Ms. Wright–Jackson worked in the GAP Department. At pages 12–13 of her Submission, she attempts to show that the GAP Department was a discriminatorily hostile work environment. Her attempt clearly fails to meet the legal requirements, even if we assume that her Submission does not exaggerate the evidence in the record:

> Mr. Kennedy's treatment was so pervasive that I suffered even when I transferred to the GAP department. Mr. Kennedy would go to the GAP department and further ridicule me. He humiliated me in front of other employees by suggesting [in 2003] that because I was black, I could only get along with and [be] highly rated by other black employees. ....
>
> In addition, Ms. Hagen often teased me about her [my] Caribbean accent. On one occasion she taunted me about my pronunciation of another co-worker's name. This taunting was so offensive that another coworker, Debra Huntley, had to tell Ms. Hagen to stop. Ms. Hagen also made comments to me about my formal tone orally and in written documents. She made comments that this was "Caribbean culture" and instructed me to "Go back to the Caribbean." On yet another occasion Ms. Hagen said, specifically referring to those with accents, that "These people come here and don't even know how to talk, she went on to comment on the h's and a's." These comments were extremely humiliating and painful for me. I consistently feared going to work and experiencing this attack on my cultural identity.

(Doc # 33, pp. 12–13.) This fails to show the severe or pervasive conduct required to constitute a hostile work environment. Moreover, the evidence shows that Ms. Hagen was the person who interviewed Plaintiff and essentially "hired" her into the Department, that Plaintiff's supervisor from April 2003 through October 2003 was Colette Choute

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 168 of 321
Wright-Jackson v. HIP Health Plan, Not Reported in F.Supp.2d (2010)
2010 WL 624993

(an African–American), that Plaintiff's supervisor from January 2004 to December 2004 was June Hutchinson (an African–American of Caribbean background), and that, throughout 2003 and 2004, the GAP Department had a large number of African–American employees and was headed by an African–American, Larry Minard. (Doc # 24, ¶¶ 11–12, Exh. 10, Exh. 20, p. 3.)

Plaintiff has failed to submit evidence that would enable any rational jury to find HIP liable on the claim of a discriminatorily hostile work environment.

*THE LEGAL FRAMEWORK FOR POINTS IV, V AND VI.*

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that an "adverse employment action" was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. See *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Fields v. N.Y. State Office of Mental Retardation & Dev. Disabilities,* 115 F.3d 116, 119 (2d Cir.1997). Where a discrimination claim is based on indirect or circumstantial evidence rather than on "direct evidence," courts apply the "burden-shifting" formula enunciated by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In order to withstand a motion for summary judgment, the plaintiff must submit evidence that would make out a "prima facie case." If so, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination or other "adverse employment action." If the defendant does this, then the burden shifts back to the plaintiff to show that the evidence as a whole would justify a reasonable trier of fact in finding "that the defendant intentionally discriminated against the plaintiff." *Morisseau v. DLA Piper,* 532 F.Supp.2d 595, 610 (S.D.N.Y.2008)) (citing cases).

 **\*12** The required elements for the "prima facie case" are different for a Title VII claim and for an ADA claim. In the case at bar, it is very clear that Plaintiff has failed to make a prima facie case for her ADA claim. Therefore, I will jump ahead to discuss Point V and then come back to Point IV.

*POINT V. Plaintiff has not made a prima facie case for her ADA claim (failure to accommodate a disability).*
The Americans with Disabilities Act ("ADA") provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Claims alleging disability discrimination in violation of the ADA are subject to the *McDonnell Douglas* burden-shifting analysis. *McBride v. BIC Consumer Prod. Mfg. Co., Inc.,* 585 F.3d 92, 96 (2d Cir.2009). "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006).

Plaintiff alleges denial of a reasonable accommodation. To establish a prima facie case, Plaintiff must show "(1) that [s]he is an individual who has a disability within the meaning of the [ADA], (2) that an employer covered by the statute had notice of h[er] disability, (3) that with reasonable accommodation, [s]he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." *Stone v. City of Mount Vernon,* 118 F.3d 92, 96–97 (2d Cir.1997) (citation omitted).

The employee must give the employer notice and time. "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated. .... First, 'the plaintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions.' " *Jackan v. New York State Dept. of Labor,* 205 F.3d 562, 566 (2d Cir.2000).

Plaintiff alleges that she requested HIP to accommodate a disability on two occasions. *First.* Following a slip and fall

Wright-Jackson v. HIP Health Plan, Not Reported in F.Supp.2d (2010)
Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 169 of 321
2010 WL 624993

on 4/13/04, she returned to work on 4/19/04 and presented a note requesting an accommodation of "no heavy lifting [or] long periods of sitting." But the evidence shows that HIP granted that accommodation. *Second.* Following a leave of absence from 5/27/04 to 11/1/04 for mental stress, her doctor wrote "avoid stressful situations and close or very tight work quarters." But the evidence shows that the doctor's note was not faxed to HIP until 12/8/04, two days after plaintiff was fired.

### 1. The time period from April 13 to May 27, 2004

**\*13** On April 13, 2004 (a Tuesday), plaintiff slipped and fell in a Walgreens store on her lunch hour. She went on leave for the rest of the week. She returned to work on Monday April 19 and presented a Disability Certificate on April 19 or 20. A copy of this Disability Certificate is at Doc # 24, Exh. 11. It is dated 4/16/04 and is the size of a doctor's prescription pad. It is imprinted with "Downtown Physical Medicine & Rehabilitation, P.C., 19 Beekman Street, New York, New York 10036." It says that Maureen Wright is "partially incapacitated from 4/16/04 to 4/30/04." The remainder is a handwritten note saying:

> The above named patient is under my care. Patient is partially disabled and she can work light duty with no heavy lifting and [no] long periods of sitting.

The note does not describe the injury, but Plaintiff says she had hurt her back and arm. Also at Doc # 24 is Exh. 12, an e-mail exchange between Brenda Kane (a nurse at HIP's on-site wellness center) and Allie Hagen. On 4/20/04 at 4:29 PM Nurse Kane wrote:

Subject: Maureen Wright

Because of her recent accident her doctor has recommended avoiding long periods of sitting. I just spoke to her [Plaintiff] and she tells me that she spoke to you and that you are aware of her getting up from her chair when necessary. This is helping her to recover. Please respond to this e-mail letting me know if you can or cannot accept Ms. Wright's accommodation.

On 4/22/04 at 5:57 PM, Ms. Hagen responded (with a copy to Ms. Hutchinson): "This is not a problem."

HIP argues that plaintiff was accommodated because she was allowed to stand and move around when she wanted to, and that her job did not require her any heavy lifting. Plaintiff admits that HIP did not require her to do any heavy lifting or any long periods of sitting without standing. However, she complains that Ms. Hutchinson forced her to return to work on April 19. Plaintiff writes to me: ***"Please note. According to my doctor's order, my sick leave was in effect until April 30, 2004."*** (Doc # 34, p. 20, emphasis by Plaintiff.) To put it mildly, Plaintiff is mistaken.

Plaintiff also writes:

> Ms. Hutchinson claimed that my position did not require heavy lifting, whether with files or other materials. This is a matter of playing with words. .... The mere fact that the Dr. stated that I can do ***light work with no heavy lifting*** means that there should be no pressure on my arm. ....

Doc # 34, p. 27, emphasis by Plaintiff.)

There is no evidence that Plaintiff gave HIP notice of this unusual interpretation of the doctor's note. Nurse Kane's e-mail certainly shows no such interpretation. Plaintiff worked from April 19 to 30, and then on May 3 she went home "on sick/Family Medical [leave] for the rest of the week." (Doc # 34, p. 24.)

As far as I can see, there is no other evidence of any notice to Ms. Hutchinson or higher managers concerning any request for accommodation from April 13 to May 27, 2004. As to that time period, Plaintiff's evidence fails to establish a prima facie case under the ADA.

### 2. The time period from November 1 to December 6, 2004

**\*14** Ms. Hutchinson's Declaration states:

11. .... [O]n May 27, 2004, .... [i]mmediately upon receiving the formal warning, Ms. Wright–Jackson went out on disability leave. The [GAP] department was not informed of the details of her disability, either at time or later [until after her termination on 12/6/04].

12. Ms. Hagen and I learned that Ms. Wright–Jackson was returning from leave, the Thursday or Friday before her Monday November 1, 2004 return. We did not receive notice of any accommodations Ms. Wright–Jackson may require after her November 1, 2004 return, either at that time, or later [until after her termination on 12/6/04].

(Doc # 23, ¶¶ 11–12.)

The second time period covered the final five weeks of Plaintiff's employment at HIP, November 1 to December 6, 2004. As to this time period, Plaintiff alleges a different type of disability, namely "mental stress / occupational depression." (Complaint, p. 3.)

On December 8, 2004, two days after being fired, she filed her administrative complaint with NYSDHR. (Doc # 24, Exh. 18.) At ¶ 4, she wrote that in April 2004 "I presented medical documentation that stated I could not do any heavy lifting or sit for long periods of time." At ¶ 6, she wrote: "On May 27, 2004, .... I had a nervous breakdown and was out until November 1, 2004." Interestingly, however, her complaint to the NYSDHR did not assert that she had presented any request for accommodation as to her emotional condition.

Plaintiff's October 2009 Submission (Doc # 33) asserts at page 14 (with my emphasis added):

In a failure to accommodate case, the plaintiff must show that the employer should have reasonably accommodated the employee's disability and failed to. *HIP doctor[ ]s provided a required accommodation for me not to be subjected to stressful situations. HR and my supervisors were notified of this accommodation.* Despite this request, when I returned to work [Hutchinson?] and Hagen subjected me to increased stress and harassment and numerous adverse employment actions.

*Ms. Hagen failed to reasonably accommodate my disability per HIP's own doctors' instructions.* .... During this period I began to feel the symptoms of anxiety and depression again. ....

The evidence fails to support the assertions I have underlined.

When Plaintiff talks about "HIP's own doctors," she is referring to the fact that she was treated by doctors and nurses who were part of the HIP healthcare network. Plaintiff's bound volume of Exhibits 1–57 includes a number of records from such doctors and nurses. But this is not proof of notice

to HIP in HIP's role as her employer. Ms. McGuire's Reply Declaration makes that obvious point:

2. Ms. Wright–Jackson incorrectly suggests that[,] as her employer, HIP had knowledge of her medical treatment, based on her seeking treatment from HIP medical facilities and providers. It its role as employer, HIP did not maintain or have access to an employee's private medical records, even if the HIP employee used the HIP healthcare network. An individual's healthcare records are private files relating to a doctor-patient relationship, and HIP, the employer, cannot access them, except with HIPAA waivers.

 **\*15** 3. Ms. Wright–Jackson also incorrectly suggests that HR had knowledge of treatment administered by the Employee Health Coordinators (nurses). During the time of Ms. Wright–Jackson's employment, HIP employees could visit the Employee Heath Coordinators (such as nurse Brenda Kane) during the workday. The Employee Health Coordinator maintained a file, which is a private medical record, and cannot be released to HR without a HIPAA medical authorization. Thus, HR was unaware of the private medical information in the Employee Health Coordinator file. In this litigation, after receiving Ms. Wright–Jackson's HIPAA authorizations, HIP requested the file so that it could produce it in discovery.

(Doc # 31, ¶¶ 2–3.)

In Doc # 35 at pages 21–22, Plaintiff makes the following allegations (I add my comments in brackets):

.... Please note: [On May 27, 2004,] I was triaged in the Nurses' station at 34th Street with Nurse Soroka on duty. The same day I met with HR with Allyson in attendance of the meeting. [Presumably this HR employee recorded the undisputed fact that Plaintiff's status was being changed to medical leave.]

The mental health team contacted Nurse who is a part of HR [there is no evidence to support that any Nurse "is a part of HR."] [T]he initial letter was faxed to HR. Ex 40[.] [In Pl. Exh. 40, p. 1, dated 5/27/04, Aquilla Frederick, CSW, of Manhattan Mental Health Service, 240 East 59th Street, wrote: "To Whom It May Concern: Ms. Maureen Wright–Jackson was seen as an emergency case at this Mental Health Center for acute stress associated with occupational problems. [She] is unable to perform her job function at this time and it is recommended that she be on medical leave until June 11, 2004. She will be reevaluated at that time to assess her progress.....]

\* \* \*

Nearing October 2004, ... I communicated with nurse regarding my fear in returning to the same traumatic department and [I] sought verbal accommodation for a better working environment and nurse advised me to write a report to HIP and detail the incident. Please see Ex ? ? [sic] letter to Ms Smith VP. [Plaintiff is referring to the last part of Pl. Exh. 40, which includes her 6–page memo to Ms. Smith, VP of Human Resources, dated September 16, 2004 and entitled "Constant Harassment—Allie Hagen— GAP Dept." See Doc # 24, Exh. 13 and undisputed FACT 55. In Pl. Exh. 40, Plaintiff now adds pages 8–20, which allege that accommodation was requested for the 4/13/04 slip and fall, but not for any emotional disability.]

On October 29, 2004 Allyson called me to remind me of the procedure to do clearance with nurse before I enter my department. On that occasion I verbally asked Allyson for accommodation.

On November 1, 2004, Dr. Sue [DeCotiis] provided HIP with a Dr's Order that clearly stated the type of environment I can tolerate. ....

(Doc. # 35, pp. 21–22.)

However, Plaintiff is referring to a document signed by Dr. Sue G. DeCotiis on **December 8, 2004,** two days after Plaintiff was fired. This document was produced in discovery as page 0000372 and was included in HIP's motion papers at Doc # 24, Exh. 17. It appears in Plaintiff's opposition papers as page 1 of Plaintiff's two-page Exhibit 36; page 2 of that exhibit is a facsimile transmittal from Brenda Kane RN to Dr. DeCotiis. **I am annexing both exhibits at the end of today's Opinion and Order;** they show as follows.

 **\*16**  On November 1, 2004, at 12:39 PM, Nurse Kane faxed to Dr. DeCotiis (a) a blank HIP form entitled "Clearance–Return to Work" and (b) a facsimile transmittal sheet that told Dr. DeCotiis:

> Ms. Maureen Wright–Jackson returned to work today. Please complete the *Clearance Return to Work* for her and fax it back to me at 877 372 9818. If you have any

questions you can reach me at 646 447 5853.

Dr. DeCotiis received the blank form on November 1, 2004, but until December 8, 2004 she did not fill it out (or at least she did not fill out the part Plaintiff now relies on). One part of the pre-printed HIP form said: "Modified Duty / Special Accommodation: YES/NO." Dr. DeCotiis circled the YES and then wrote: "Avoid stressful situations and close or very tight work quarters as needed 2–3 mos." She signed her name and wrote "12/8/04" on the line calling for the date. She faxed the completed form back to Nurse Kane on "12/08/2004 11:30" as shown by the fax machine transmission line on the top of Doc # 24, Exh. 17. This is corroborated by the stamp near the bottom of page 2 of Pl. Exh. 36; the stamp was apparently affixed by Dr. DeCotiis's office; the stamp consists of the word "FAXED" and a rectangle, and inside the rectangle someone wrote "12/8/04."

In desperation, Plaintiff asserts that the date on "the Dr's order was switched to reflect an out of range date." (Doc # 34, p. 46, retyped by HIP at Doc # 32, p. 77.) However, Plaintiff does not support this assertion with any evidence from Dr. DeCotiis or anyone else.

The details are as follows. HIP's FACT 59 stated:

> Upon her return to work on November 1, 2004, and during the remainder of her employment [through December 6, 2004], Plaintiff did not present HIP with any accommodation requests. McGuire Dec. at ¶ 14.

Plaintiff's Response to FACT 59 is at Doc # 34, pp. 45–46. She makes the following arguments (I add my comments in brackets):

a. To refute this, please see Ex ? ? [sic] Nurse's note confirming the completion of of my return to work documentations[.] [Plaintiff is referring to Pl. Exhs. 32 and 34 which are duplicates of a single page of the Progress Notes of Nurse Brenda Kane. The entry for 11/1/04 consists of four lines: "9AM. MH. RTW today. Affect good. Appears willing to return to her department. MD note in file." The "MD note" appears to refer to **Pl. Exh. 54, which**

Wright-Jackson v. HIP Health Plan, Not Reported in F.Supp.2d (2010)

2010 WL 624993

**I am annexing to today's Opinion.** It is a one-page form signed by Dr. DeCotiis on 10/7/04; ¶ 5 asked "Able to Return to Work On:" and the doctor filled in "11/01/04." ¶ 5 also had a line for "Remarks," but Dr. DeCotiis left the line blank. Pl. Exh. 54 contains no request for any accommodation.]

* * *

d. Around lunch break, nurse physically brought up copies of the doctor[']s order to Ms. Hagen and other department heads. Nurse then came over to me at Priscilla's desk with a copy of the doctor's order. .... [Plaintiff submits no evidence of any doctor's "order" or request for accommodation bearing any date after May 27, 2004 or before December 8, 2004—no copy from her voluminous records, and no copy from her doctor, and no evidence from Nurse Kane.]

**\*17** Moreover, it is very telling that the last documents annexed to the Complaint are 40 pages of e-mails from 11/4/04 to 12/2/04 from Plaintiff to Ms. Hutchinson and Ms. Hagen, and vice versa—and that none of those e-mails mentions any disability or any request for accommodation.

In sum, with respect to the period from November 1, 2004 through December 6, 2004, Plaintiff has failed to establish that she gave her employer the required notice, namely a request for an accommodation to her alleged mental and emotional disability. This means that she has failed to establish a prima facie case of disability discrimination.

It is unnecessary to consider whether Plaintiff's evidence is sufficient to establish the other elements of a prima facie case, for example, whether she had a disability within the strict meaning of the ADA, or whether Dr. DeCotiis's belated handwritten note to "avoid stressful situations" was a request for a "reasonable" accommodation. I now jump back to Point IV.

*POINT IV. Plaintiff's evidence barely makes out a prima facie case on her Title VII claim.*
To establish a prima facie case under Title VII,

plaintiff first must adduce evidence that would permit a reasonable trier of fact to find that (1) she was a member of a protected class, (2) her job performance was satisfactory,

(3) an adverse employment action occurred, and (4) the action occurred in circumstances giving rise to an inference of discrimination.

*Morisseau v. DLA Piper,* 532 F.Supp.2d 595, 610 (S.D.N.Y.2008) (Kaplan, J.) (citations omitted). In *St. Mary's,* the Supreme Court characterized the plaintiff's initial burden (the four elements of a prima facie case) as "minimal." 123 S.Ct. at 2746–47. Nonetheless, a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37–38 (2d Cir.1994).

The decision to impose the Final Warning and the decision to fire Plaintiff were both made by the same three persons: by her supervisor Ms. Hutchinson, and by Ms. Hutchinson's superior Ms. Hagen, and by the head of the GAP Department Mr. Minard. Plaintiff does not claim that Ms. Hutchinson or Mr. Minard were motivated to discriminate against her race, color, or national origin. She does make this claim against Ms. Hagen. Her Complaint alleged that Ms. Hagen made a single remark about her Caribbean accent; her deposition alleged that Ms. Hagen also made a comment about her Caribbean style; in opposing summary judgment she now alleges: "Ms. Hagen also made comments to me about my formal tone orally and in written documents. She made comments that this was 'Caribbean culture' and instructed me to 'Go back to the Caribbean.' On yet another occasion Ms. Hagen said, specifically referring to those with accents, that 'These people come here and don't even know how to talk, she went on to comment on the h's and a's.' " (Doc # 33, p. 13.)

**\*18** These allegations are very thin. However, viewing them in the context of all the evidence, including the pre–2/12/04 background evidence, I conclude that Plaintiff's evidence does barely make out a prima facie case on her Title VII claim. I now jump ahead to HIP's Point VI.

*POINT VI. HIP has shown a legitimate reason for plaintiff's Formal Warning and termination, and Plaintiff has failed to show that the reason was a pretext for discrimination.*
Plaintiff has failed to make a prima facie case on her ADA claim, but has made a prima facie case on her Title VII claim. Therefore, as to the Title VII claim, "the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the termination." *Demoret v.*

*Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006). The employer's burden is simply "one of production, not persuasion." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). HIP has met that burden through Ms. Hutchinson's Declaration (Doc # 23), particularly ¶¶ 7–9, 11, and 14–15.

Therefore, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *McPherson v. New York City Dept. of Educ.,* 457 F.3d 211, 216 (2d Cir.2006). To demonstrate pretext and avoid summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision," but she is required to show "that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir.2008) (internal quotation marks omitted).

"Merely disagreeing with a supervisor's assessment of work performance, however, 'is insufficient to raise a triable issue of fact regarding pretext.' " *Iverson v. Verizon Communications,* 2009 WL 3334796, *5 (S.D.N.Y. Oct.13, 2009) (Scheindlin, J., citing cases). In the case at bar, Plaintiff submits Doc # 36, eleven single-spaced pages entitled "Plaintiff's Response to June Hutchinson's Declaration." It fails to show that HIP's stated reasons were not the only reasons for her termination; it also fails to show that her race, color, or national origin were a motivating factor in her termination.

Plaintiff does not dispute that from April 1, 2003 through October 31, 2003, she was supervised by Ms. Choute (an AfricanAmerican) and her superior Ms. Hagen (a Caucasian). (Doc # 32, p. 28.) Plaintiff does not dispute that from January 5, 2004 through December 6, 2004, she was supervised by Ms. Hutchinson and her superior Ms. Hagen. Of those three key women, Plaintiff alleges that only one was motivated by any intent to discriminate against Plaintiff's race, color, or national origin, namely Ms. Hagen; to support this allegation, Plaintiff does not submit any evidence beyond what was discussed in Point IV above.

 *19 Ms. Hutchinson states: "Both Ms. Wright–Jackson and I are African–American females of Caribbean/Jamaican background." (Doc # 23, ¶ 3.) Plaintiff responds: "Also Ms. Hutchinson chose to highlight that we basically share the same gender, ethnicity, and culture. I do not agree with this

argument, for anyone can claim that they are from any country of their choice, until it is proven. .... Even if HIP hires a thousand Jamaican female[s], that does not relieve them from the facts of my case." (Doc # 36, p. 1.)

Ms. Hutchinson states: "At the beginning of 2004, when I became Ms. Wright–Jackson's supervisor, Ms. Hagen and I met with Ms. Wright–Jackson to discuss her December 2003 evaluation [Doc # 28, Exh. 8, signed by Ms. Choute]. We told her that she needed to work independently, and complete projects accurately. ...." (Doc # 23, ¶ 7.) Plaintiff responds: "Ms. Hutchinson['s] period started January 5, 2004, which does not give her the right to participate in my evaluation that I received in December. .... I should be [should have been] started with a clean slate. There should be no mental model set forth as the building block of my performance. So this in itself is wrong and unfair to the worker." (Doc # 36, p. 3.)

Ms. Hutchinson states: "In early 2004, I sat down with Ms. Wright Jackson individually, on multiple occasions, to explain the errors in her work, and give her detailed instructions on how to correct the errors (which she would not write down and also did not appear to follow)." (Doc # 23, ¶ 8.) Plaintiff responds: "... I don't feel that I was exempt from making an error here or there for[,] like I said before[,] I am a human. What does not sit well with me is the ploy behind the error findings to find something to terminate me as it is clear that they were setting me up for termination." (Doc # 36, pp. 6–7.)

At pages 6–9 of today's Opinion (the last part of the section titled "Factual and Procedural Background"), I discussed HIP's extensive documentation of the reasons for the Formal Warning and the termination, and I quoted all of ¶ 14 of Ms. Hutchinson's Declaration. That ¶ 14 began: "When Ms. Wright–Jackson returned to work [after her disability leave from 5/27/04 to 11/1/04] Ms. Hagen and I did everything we could to ease her back into her work responsibilities." Plaintiff responds:

> How Ms. Hutchinson could claimed that she did everything possible to ease me back into the department. This is blatantly untruthful[; I say:]
>
> • HIP deprive me of my equipped office
>
> • HIP deprive me of other necessary resources
>
> • Set up unattainable goal and were not willing to revisit.
>
> • Set overload schedule and was not willing to reprioritize.

- They gave new tasks with insufficient instructions and were not willing to address despite the many appeals for revisit.

(Doc # 36, p. 11.)

Plaintiff does not dispute that she received each of the communications regarding her performance deficiencies. She does not dispute that she missed deadlines. Her excuse is that the deadlines were "unrealistic" and that the tasks were "overwhelming," at least in view of her depression. (Doc # 34, p. 49.) But this excuse is not supported by the extensive e-mails annexed at the end of her Complaint.

**\*20** I have reviewed the evidence submitted by Plaintiff. It fails to show that HIP's stated reasons were not the only reasons for her termination; it also fails to show that her race, color, or national origin were a motivating factor in her termination. No reasonable jury could find in Plaintiff's favor on her Title VII claim of discrimination.

*POINT VII. Plaintiff's evidence fails to make out a prima facie case on her retaliation claim.*
Plaintiff claims that, within the 300–day period commencing February 12, 2004, HIP violated 42 U.S.C. § 2000e–3(a) and § 12203(a), by taking adverse actions against her in retaliation for her complaints that she had been discriminated against because of race, color, national origin, and/or disability.

The Second Circuit has written:

> In order to present a prima facie case of retaliation under Title VII or the ADEA [or the ADA], a plaintiff must adduce
>
> > evidence sufficient to permit a rational trier of fact to find [1] that [s]he engaged in protected participation or opposition under Title VII [or the ADA], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e. that a retaliatory motive played a part in the adverse employment action.

*Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 205–06 (2d Cir.2006) (citations omitted).

After reviewing Plaintiff's evidence, I find that no rational trier of fact could find the fourth essential element, namely, a causal connection.

Prior to April 2003, Plaintiff made complaints about John Kennedy and Robert Cronin. She made a formal written complaint about them in a one-page memorandum dated January 13, 2002 to Terrylynn Smith, vice president of Human Resources ("HR"). (Doc # 24, Exh. 4.) It did not refer to race, color, national origin, or disability, but it did allege "constant harassment, discrimination, humiliation and unfair treatment." It also said: "With your assistance, I am therefore seeking a way out of this department at the earliest chance." Diane McGuire of HR met with Plaintiff and eventually sent her a one-page response dated March 7, 2002. (Doc # 24, Exh. 5.) Plaintiff continued to have conflicts in the Medicare Marketing Department, and in February 2003 she met with Ms. McGuire and again requested a transfer. After that meeting, and after an application process and an interview with Ms. Hagen, Plaintiff was transferred to the GAP Department. (Doc # 24, ¶ 10.)

No rational jury could find a causal connection between Plaintiff's complaints about Mr. Kennedy, Mr. Cronin, and their Medicare Marketing Department, which she left in March 2003, and any adverse actions that occurred more than ten months later, on or after the key date of February 12, 2004.

A crucial adverse action occurred on May 27, 2004. FACT 46 (undisputed, see Doc # 32, p. 52) states:

> **\*21** In late April and May 2004, Hutchinson, Hagen and Minard contacted HR about Plaintiff's inability to improve her performance and requested to start the termination process.

Throughout 2004, Ms. McGuire was Assistant Director of Employee Relations in the HR Department; her Declaration states: "In May of 2004, Ms. Hagen and Ms. Hutchinson consulted with me about terminating Mr. Wright–Jackson's employment because of work performance deficiencies. We agreed that the GAP Department would generate a written, formal warning, creating a probationary period and requiring immediate improvement." (Doc # 24, ¶ 15.) Ms. Hutchinson's Declaration, at ¶ 11, states: "We issued a formal warning

on May 27, 2004, a true and correct copy of which is attached as Exhibit 2." (Doc # 23, ¶ 11.) The Formal Warning (Doc # 23, Exh. 2) told Plaintiff, among other things: "Enrollment Statistics Report ... You must fully document the process and submit both a hard copy and electronic copy to Ms. Hutchinson no later than May 28th, 2004. .... Failure to immediately correct your unsatisfactory work performance and sustain that correction will result in further disciplinary action, up to and including termination of your employment." (Doc # 23, Exh. 2, pp. 1, 2, 3.)

Plaintiff did not meet the deadline of May 28, 2004. She received this Formal Warning on May 27 and she went out on leave from May 27, 2004 until November 1, 2004. (Doc # 32, pp. 68–70; Doc # 34, p. 42–43.)

On September 16, 2004 (during her 5/17/04 to 11/1/04 leave) Plaintiff wrote another formal complaint to Ms. Smith in HR. This is a six-page memorandum with the subject line "Constant Harassment—Allie Hagen—GAP Dept." (Doc # 24, Exh. 13; see also FACT 55, undisputed, Doc # 32, p. 72.) At pages 3–5, Plaintiff wrote ten "bullet points." Seven of the ten bullet points gave details that did not involve race, color, national origin, or disability, even though five of those bullet points began with the word "Bias." On the other hand, the sixth bullet point said:

> Offensive Comment about my Accent and Cultural Differences Ms. Hagen insultingly made derisive statements about my accent in [a] public forum.

And the ninth bullet point said:

> Unnecessary pressure during partial disability (slip and fall accident)
>
> These pressures were instilled by June Hutchinson with the instructions of Ms. Hagen. [Plaintiff then listed five examples, but did not mention any request for accommodation.]

The tenth bullet point was the longest; it complained about the "Brutal undeserved formal reprimand" of 5/27/04 and said: "Ms. Hagen['s] statements surround[ ] the period I was partially disabled and was unable to comply with the extra tasks ...." (Doc # 24, Exh. 13, p. 5.)

In sum, Plaintiff's 9/16/04 Memorandum did contain a few references to her accent and her disability. I find this evidence sufficient to permit a rational jury to find (1) that on 9/16/04 she engaged in protected opposition under Title VII and the ADA, and (2) that the employer was aware of this activity. But this belated complaint about Ms. Hagen came almost four months after the 5/27/04 Formal Warning, which placed Plaintiff on probation and warned her: "Failure to immediately correct your unsatisfactory work performance and sustain that correction will result in further disciplinary action, up to and including termination of your employment." (Doc # 23, Exh. 2, p. 3.)

**\*22** On October 7, 2004, Plaintiff's doctor sent Human Resources a form saying that Plaintiff was able to return to work on November 1, 2004. (Pl.Exh. 54.) FACT 53 (undisputed): "Because Plaintiff had received the May 27, 2004 formal warning, she was on probation when she returned November 1, 2004." (Doc # 32, pp. 70–71.) FACT 48: "HIP's general practice was to provide an employee with a two-week period to demonstrate improved performance after a formal warning; uncorrected performance would result in termination of employment. McGuire Dec. at ¶ 18." Plaintiff's response fails to controvert the Declaration of Ms. McGuire of Human Resources; Plaintiff merely says: "This statement was just word of mouth by Ms. McGuire. I have no proof to it. And even if this was true, it was not done in good faith. ...." (Doc # 32, p. 53.) The two-week period had been noted in the 12/6/04 termination memo to Plaintiff. (Doc # 24, Exh. 16, p. 1.)

The McGuire Declaration at ¶ 18 also stated that, during the two-week period beginning on November 1, 2004, "Ms. Hagen and Ms. Hutchinson thus monitored her performance, which HR learned did not improve. I, along with Mr. Minard, Ms. Hagen and Ms. Hutchinson, decided to complete the termination process begun in May 2004 ...." Their decision flowed naturally from the decision made in May 2004 by these same three persons and approved by Ms. McGuire and Ms. Smith. (See undisputed FACT 46, quoted at page 43 of today's Opinion.)

Plaintiff does not dispute that Ms. Hutchinson and Ms. Hagen made the same types of criticisms of her performance in November that they had previously made from January to May. She does not allege that her performance was better in November; indeed, it seems clear that she is saying that in November she was suffering from depression which,

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 176 of 321
Wright-Jackson v. HIP Health Plan, Not Reported in F.Supp.2d (2010)
2010 WL 624993

relatively speaking, had been in remission during the period from February 12, 2004 until May 27, 2004.

On November 24, 2004, at 11:57 AM, Plaintiff sent an e-mail to Ms. Smith and said, in part: "This is my third week back .... While I was out sick I wrote to you [on 9/16/04, Doc # 24, Exh. 13] .... I read your reply [dated 10/29/04, Doc # 24, Exh. 14] .... I still believe that you are fair and capable of revist [ing] this case .... I am also willing to give up my legal rights and sign off to assure you that I will exclude litigation. .... I have to go back to see my doctor and therapist. If this continues I will be put out again." (Doc # 24, Exh. 15.) A few hours later, Nurse Kane wrote: "11/24/04 2:20 pm [Plaintiff] Arrived at EHS crying. Perceived unfairness in her department. Unable to cope. .... Appt. [with] Dr. DeCotiis 1:15 pm Mon. 11/29/04. Advised appt. [with] MH['s] professional Dr. Frederick ASAP. Sent home 3 pm." (Pl.Exh.32.)

Concerning Plaintiff's 11/24/04 e-mail to Ms. Smith, Ms. McGuire's Declaration, at ¶ 19, states: "... HIP had already decided to terminate Ms. Wright–Jackson, [but] we [at HR] investigated her allegations again. We met with Mr. Minard, Ms. Hagen, and Ms. Hutchinson, as well as with Ms. Wright–Jackson, and found the allegations unsubstantiated." Plaintiff confirms that on 12/1/04 "I attended a 2pm meeting with HR VP Ms. Smith and Asst. Director Ms. Diane McGuire. The meeting lasted for 2 hours." (Pl.Exh.57, p. 16.) The formal termination memo was handed to Plaintiff on Monday, December 6, 2004. (Doc # 24, Exh. 16.)

*23  Plaintiff has never alleged that Ms. Smith, or Ms. McGuire, or Mr. Minard, or Ms. Hutchinson was motivated by any intent to discriminate against Plaintiff's race, color, national origin, or perceived disability. Plaintiff has alleged, albeit on thin evidence, that Ms. Hagen was motivated to discriminate against Plaintiff's national origin. No rational jury could conclude that HIP's 12/6/04 action, in which five persons followed through on their May 2004 decision to "start the termination process" (undisputed FACT 46), was motivated in part by a desire to retaliate against Plaintiff for writing her 9/16/04 memorandum and asking Ms. Smith to investigate Ms. Hagen for "harassment." Ms. Smith responded by conducting an investigation (see Doc # 24, Exh. 14) and then HIP gave Plaintiff a second chance to improve her performance.

Accordingly, Plaintiff's evidence fails to make out a prima facie case on her retaliation claim.

*CONCLUSION*

For the reasons stated above, I hereby grant Defendant HIP'S motion for summary judgment (Doc # 21). I direct the Clerk of the Court to enter judgment dismissing the Complaint in its entirety.



Pl. Exh. 54

Wright-Jackson v. HIP Health Plan, Not Reported in F.Supp.2d (2010)
Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 177 of 321

2010 WL 624993



**All Citations**

Not Reported in F.Supp.2d, 2010 WL 624993

Mace v. Marcus Whitman Cent. School Dist., Not Reported in F.Supp.3d (2015)

2015 WL 5682665

2015 WL 5682665
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Rebecca MACE, Plaintiff,
v.
MARCUS WHITMAN CENTRAL SCHOOL
DISTRICT; The Board of Education of the
Marcus Whitman Central School District; and
Michael Chirco, Superintentdent, Defendants.

No. 11–CV–6574–FPG.
|
Signed Sept. 25, 2015.

**Attorneys and Law Firms**

Ryan Charles Woodworth, The Woodworth Law Firm,
Rochester, NY, for Plaintiff.

Frank W. Miller, James Ryan Hatch, John A. Sickinger,
The Law Firm of Frank W. Miller, East Syracuse, NY, for
Defendants.


DECISION AND ORDER

FRANK P. GERACI, JR., Chief Judge.


*INTRODUCTION*

**\*1** Plaintiff Rebecca Mace ("Plaintiff") commenced this
action alleging discrimination under the Age Discrimination
in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and
the New York State Human Rights Law ("NYHRL"), § 290 *et
seq.* ECF No. 1. In her Amended Complaint ("Am.Compl."),
Plaintiff alleges that she was denied tenure by the Marcus
Whitman Central School District, its Board of Education,
and Superintendent Michael Chirco (collectively referred to
herein as "Defendants") on the basis of her age. Am. Compl.,
ECF No. 5 ¶¶ 54–65.

Currently pending before the Court is the Defendants' Motion
to Dismiss and/or for summary judgment. ECF No. 18. For the
following reasons, Defendants' Motion is GRANTED, and
this case is dismissed with prejudice.

*BACKGROUND* [1]

[1]    The following facts are undisputed unless
       otherwise noted, and are viewed in the light most
       favorable to Plaintiff as the non-moving party.

Plaintiff Rebecca Mace was born in 1963, and began her
employment as a Special Education teacher at Marcus
Whitman School in January 2008 when she was 44 years old.

The Marcus Whitman School District ("the District") requires
that, in order to obtain tenure, teachers must be placed on
a three-year probationary period. During the probationary
period, teachers are evaluated by the school principals
and, upon good performance, are able to obtain tenure
by their fourth year of teaching. If, at the conclusion of
the probationary term, the superintendent and principal are
unsatisfied with a teacher's performance, no recommendation
for tenure would be made and the teacher would be
discharged.

Plaintiffs probationary period was set to expire in January
2011, and she was to be reviewed for tenure during the 2010–
11 school year.

In the 2008–09 school year, a dispute arose between Plaintiff
and a parent, resulting in the removal of that student from
her class. Def. Stmt. ¶ l. [2] Plaintiff testified that the parents
of a Special Education student felt that his needs were not
being met in her classroom, and that student was eventually
moved into mainstream classes. She could not recall if a
formal complaint had ever been made by the parent. Mace
Dep. at 53–62. [3]

[2]    References to "Def. Stmt." refer to ECF No. 18–1,
       Defendants' Rule 56 Statement of Material Facts.

[3]    References to "Mace Dep." refer to ECF No. 23–4,
       Deposition Testimony of Rebecca Mace.

During that time Plaintiff also encountered difficulties with
two of her teaching assistants, one of whom was re-assigned
to another classroom. Def. Stmt. ¶ 2. Plaintiff stated at her
deposition that she had to correct the behavior of certain
support staff due to cell phone use in the workplace, however,
she had never written up any documentation to that effect.
Mace Dep. at 154.

2015 WL 5682665

Between 2008 and 2010, Plaintiff underwent six performance evaluations by administrators and principals. The parties dispute whether Plaintiffs evaluations were historically "positive." Pl.Ex. A; Cole Aff. ¶ 8. [4]

[4]    References to "Pl.Ex." refer to ECF No. 23–5, Plaintiff's Exhibits, submitted in connection with her Opposition to Summary Judgment. "Cole Aff." refers to ECF No. 18–4, the Affidavit of Principal Clayton Cole in support of Defendants' Motion for Summary Judgment.

In March of 2008, Principal Alan DeGroote initially noted that Plaintiff "work [ed] collaboratively with staff both in and out of the classroom" and "has been proactive in identifying and working to meet the needs of her students." The evaluator made suggestions for potential objectives in future lessons, and his comments were generally positive. Pl.Ex. A (3/14/2008) [5] .

[5]    Exhibit A contains multiple pages, and individual pages are referenced by the date on the document.

**\*2** On May 15, 2008, Plaintiff was noted by Principal DeGroote to "use [ ] the paraprofessionals in the room appropriately," and was "willing to work collaboratively with staff." Her lesson, however, was noted to be "a little confusing," and Plaintiff was "rushing to get the information in, rather than making sure [the students] understand it." *Id.* (5/15/2008).

Plaintiff's October 29, 2008 observation, completed by Principal Cole ("Prin.Cole"), contained positive comments and some criticism. Although pleased with Plaintiff's changes in the 2008 school year, he noted that he would discuss with her "the use of TAs in the classroom, differentiating instruction, and monitoring students." Prin. Cole observed that Plaintiff's use of "SmartBoard" technology could have been extended to the students, and that it appeared that the teaching assistant had not received directions for a lesson in advance. *Id.* (10/29/2008).

In March 2009, Prin. Cole noted that the level of vocabulary used in the lesson was sometimes beyond the students' capabilities, and repeated his comments from the previous evaluation regarding Plaintiffs use of teaching assistants, differentiating instruction, and monitoring students. Overall, he felt that Plaintiff had "grown as a teacher over the past year." *Id.* (3/31/2009).

During the next observation, Prin. Cole stated that Plaintiff's teaching assistant was "well prepared," Plaintiff had improved in her utilization of teaching assistants after the previous year's observations, and that she continued to grow as a teacher. *Id.* (11/19/2009).

Prin. Cole's final evaluation noted that the teaching assistant in Plaintiff's room was "well utilized," but noted Plaintiff's "novice" ability at using a SmartBoard and felt that some aspects of Plaintiff's lesson were confusing for some students. He commented that although she was a "good fit for the ACCESS Classroom due to her patience and enthusiasm," he did not see "the same level of preparation and kinetic student participation [and] immersion in the learning" as in previous observations. *Id.* (3/9/2010).

On July 12, 2010, Superintendent Michael Chirco ("Supt.Chirco") and Prin. Cole recommended to the Board of Education that Plaintiff be granted tenure during an Executive Session of the School Board. The Board was presented with a Tenure Review Packet, which identified Plaintiffs credentials, positive attributes, and areas of concern as noted in her performance evaluations. The Packet indicated some "reservations" about Plaintiff's abilities to teach in another environment. Chirco Aff, Ex. A. [6]

[6]    References to "Chirco Aff." refer to ECF No. 18–3, Affidavit of Supt. Chirco in support of Defendants' Motion for Summary Judgment.

Upon review, the Board voiced its concerns about the comments made by Prin. Cole relating to Plaintiff's disputes with a parent and her teaching assistants. Def. Stmt. ¶ 11. Board members also inquired about Plaintiffs ability to teach more complicated materials and/or teach in a different environment. *Id.* One Board member, Mary Evans, abstained from voting on Plaintiff's tenure due to her personal knowledge of the incidents described by Prin. Cole and her

**\*3** "feelings" about Plaintiff. Evans Aff. ¶ 11. [7] Board member affidavits indicate that, despite some positive items in the Tenure Review Packet, Plaintiff's overall recommendation was not as strong as others in light of Plaintiff's past friction with a parent and teaching assistants, as well as issues with planning lessons effectively and her flexibility as a teacher. Bd. Mem. Affs. 12–lb. [8] The consensus was that Plaintiff was not ready for tenure at that

Mace v. Marcus Whitman Cent. School Dist., Not Reported in F.Supp.3d (2015)

2015 WL 5682665

time, but no vote was taken at the July 12, 2010 Board meeting. *Id.,* ¶¶ 17–20.

7    References to "Evans Aff." refer to ECF No. 18–5, Affidavit of Board Member Mary Evans in support of Defendants' Motion for Summary Judgment.

8    References to "Bd. Mem. Affs." refer to ECF No. 18–5, Affidavits of the eight voting members of the Board of Education in support of Defendants' Motion for Summary Judgment.

Approximately two weeks later, Supt. Chirco notified the Board that he would propose that it terminate Plaintiff's probationary period in September 2010, rather than recommend her for tenure. Had Plaintiff's tenure recommendation been denied by the Board at that time, her probationary period would have ended in January 2011, requiring a mid-year replacement. Supt. Chirco believed that a mid-year replacement in Special Education would be detrimental to the students in Plaintiff's class, and sought to avoid that scenario. Chirco Aff. ¶¶ 18–25; Def. Stmt. ¶¶ 13–15. Thus, despite proposing that he make the recommendation to terminate Plaintiff, Supt. Chirco never actually made that recommendation to the Board. Chirco Aff. ¶¶ 28.

In the meantime, Supt. Chirco met with Plaintiff's union representative, Tom Barden:

> [Barden] requested that [the Board] consider offering [Plaintiff] a *Juul* agreement [9] extending her appointment because the notice that we would terminate her appointment would not come until the end of July, giving her no opportunity to look for another position for September. She realizes that she will not be offered tenure, even at the end of the *Juul* Agreement. In fairness, I am considering this request, but would extend her appointment only on the understanding that she will tender her resignation effective June 30, 2011.

9    A *"Juul* Agreement" is a contract between an educator and an appointing authority which

extends the educator's probationary period rather than terminate the educator at the end of his or her probationary period for not completing her probationary period satisfactorily. *See Matter of Juul v. Board of Educ. of Hempstead School Dist. No. 1,* 76 A.D.2d 837, 428 N.Y.S.2d 319 (2d Dep't 1980).

Woodworth Aff., Ex. E (Board Update Notes 7/16/2010). [10]

10    References to "Woodworth Aff." refer to ECF No. 18–2, Affidavit of Attorney Ryan Woodworth in support of Defendants' Motion for Summary Judgment.

These negotiations resulted in Plaintiff agreeing to resign from the District at the end of the 2010–2011 school year, which would provide her with additional time to secure employment for the following school year. On August 3, 2010, Plaintiff signed a resignation letter, and was then assigned to her regular class for the 2010–2011 school year.

Shortly after Plaintiff submitted her letter of resignation, she requested documents relating to her tenure review through the Freedom of Information Law ("FOIL"). On August 18, 2010, Plaintiff received the Board of Education notes from the July 23, 2010 meeting, in which Supt. Chirco wrote:

> I spent a great deal of time considering what to do about the special education teacher who will be up for tenure next year. We gave considerable thought to offering her a *Juul* Agreement to extend her appointment for a year and reassigning her to a position in the High School to get a better picture of her range of abilities. However, when we looked at the pool of candidates in special education, it was clear that *there are a number of fine young teachers available.*

**\*4** Pl.Ex. D (emphasis added). [11] After reviewing the Board notes, Plaintiff informed Supt. Chirco on September 10, 2010, that she wished to rescind her resignation and have the Board vote on her tenure.

Mace v. Marcus Whitman Cent. School Dist., Not Reported in F.Supp.3d (2015)

2015 WL 5682665

11    This remark is the only age-related comment in the record. Plaintiff testified that neither Supt. Chirco nor Prin. Cole had ever made any verbal remarks or comments to her about her age. Mace Dep. at 76, 82.

At the September 13, 2010 Board meeting, Supt. Chirco again recommended that Plaintiff be granted tenure. The Board considered the recommendation, and all eight of the participating members voted not to accept Supt. Chirco's recommendation, with Mary Evans again abstaining from the vote. The following day, Supt. Chirco sent a letter to Plaintiff indicating the results of the vote and stating that the vote was advisory, with a final decision to be made on her tenure on October 18, 2010.

On September 20, 2010, Plaintiff requested the reasons for the Board's decision as well as a hearing before the Board to discuss her tenure with them. The District responded to Plaintiff on September 24, identifying four reasons why the Board did not approve Supt. Chirco's recommendation for Plaintiff's tenure: "(1) inability to consistently plan effective lessons and activities results in confusion in the classroom; (2) ineffective in working with the teaching assistants; (3) inability to communicate effectively with colleagues and teaching assistants; and (4) inability to work effectively with parents, resulting in an alternative placement for a student." Pl.Ex. I. According to the Board members, they did not know of or consider Plaintiff's age in making the decision to disapprove Supt. Chirco's recommendation for tenure. Bd. Mem. Affs. ¶¶ 3–4.

On October 8, 2010, Plaintiff submitted to Supt. Chirco and the Board of Education a written response contesting the Board's reasons, citing observations by principals and her Special Education mentor. Additionally, she explained that her problematic interactions with teaching assistants were due to their unprofessional conduct in the classroom. She also addressed the conflict with the parent, and noted that it was not indicative of her relationship with parents overall. Finally, Plaintiff requested a Teacher Improvement Plan before the Board made its final vote on her tenure. Pl.Ex. J.

Plaintiff appeared with her union representative at the Board hearing on October 18, 2011. There, her union representative requested that the Board not make a final decision on Plaintiff's tenure until she had a chance to complete a Teacher Improvement Plan to address the issues identified by the Board. The Board approved Plaintiff's request and tabled its decision on her tenure status.

On November 17, 2010, Plaintiff entered into a Teacher Improvement Plan and *Juul* Agreement. The Agreement provided that Plaintiff would continue to provide services for an additional year, thereby extending her probationary period. At the conclusion of the fourth year, the Board would again consider her appointment to tenure. Chirco. Aff., Ex. G. The Agreement, which incorporated the Teacher Improvement Plan, identified the four problem areas that Plaintiff would be expected to improve upon and required regular evaluations of Plaintiff. *Id.*

**\*5**  Shortly after the execution of the *Juul* Agreement, Plaintiff went out on medical leave until January 2011. On January 13, 2011, Plaintiff was evaluated by Supt. Chirco and Prin. Cole under the terms of the *Juul* Agreement. Those evaluations included statements of Plaintiff's strengths and weaknesses, and would be the first in a series of observations to be conducted of Plaintiff so that the Board could vote on her tenure. The evaluations contained some positive comments, but both criticized Plaintiff's lack of preparation. Specifically, the administrators took issue with her not reading an entire book before presenting parts of it to her class, resulting in, among other things, Plaintiff mispronouncing words from the text. Supt. Chirco assessed the lesson as "unacceptable," and stated that he expected more. Pl.Ex. R. Plaintiff submitted a written response to the administrators' comments noting her disagreement, and pointing out that it was common practice to present an excerpt of a book, rather than an entire book, to a class. Pl.Ex. P.

On January 31, 2011, Plaintiff filed a complaint with the Equal Opportunity Employment Commission ("EEOC") for unlawful discrimination in violation of the ADEA. The EEOC found no evidence that Plaintiff was treated less favorably than similarly-situated individuals not in the protected age group, and that the District articulated legitimate, nondiscriminatory reasons for its action. The EEOC dismissed Plaintiff's complaint and issued a Right to Sue letter on August 21, 2011. ECF No. 18–2, Ex. D.

In April 2011, Plaintiff received her second set of evaluations by administrators Paul Lahue and Susan Wissick. 12 Both found positive and negative attributes to Plaintiff's teaching and noted them in the observation reports. Recommended areas for growth included more engaging use of teaching assistants, improving student engagement/excitement, and better utilization of time. Pl.Ex. V.

12    Neither administrator had any role in the prior decisions regarding Plaintiff's tenure.

Thereafter, Plaintiff went on medical leave beginning April 26, 2011 and did not return to complete the Teacher Improvement Plan.

On October 3, 2011, Supt. Chirco proposed an extension of the probationary period until the end of the 2011–12 school year, to provide additional time for Plaintiff to complete the Teacher Improvement Plan and for the administration to complete its observations of Plaintiff's teaching.

The Board unanimously agreed to extend Plaintiff's probationary appointment until the end of the 2011–12 school year. Plaintiff, however, never returned to work and was not terminated from employment with the District.

## DISCUSSION

### I. Standard of Review

Defendants move to dismiss the Complaint for failure to state a claim, cite to Fed.R.Civ.P. 12(c)-which deals with judgment on the pleadings-or alternatively move for summary judgment pursuant to Fed.R.Civ.P. 56. ECF No. 18. Since both parties have submitted affidavits and exhibits in support of their positions, making clear that both parties have treated this as a motion for summary judgment, the Court will consider those matters submitted outside the pleadings, and will treat the motion as one for summary judgment. *See* Fed.R.Civ.P. 12(d).

**\*6** Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Regarding materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. More importantly, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, the Court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id* . at 249. When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250.

As the Second Circuit observed in *Duse v. Int'l Business Machines Corp.,* 252 F.3d 151, 158 (2d Cir.2001), "[i]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." 252 F.3d 151, 158 (citing *e.g., Anderson,* 477 U.S. at 255). However, "[i]f the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment." *Duse,* 252 F.3d at 158 (citing *e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986) (the existence of a factual issue will not suffice to defeat a motion for summary judgment where that issue is not material to the ground of the motion).

### II. McDonnell Douglas Framework

"In both ADEA and NYHRL discrimination cases where, as here, there is no direct evidence of discriminatory conduct, the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is applied to determine whether summary judgment is appropriate." *Randall v. Kaleida Health,* No. 08–CY–925S, 2012 WL 400780, at \*4 (W.D.N.Y. Feb.7, 2012). First, a plaintiff must establish a *prima facie* case of age discrimination by showing: (1) plaintiff was at least 40 years of age at the relevant time; (2) plaintiff's job performance was satisfactory; (3) plaintiff suffered an adverse employment action such as termination; and (4) the circumstances of that adverse employment action give rise to an inference of age discrimination. *Grady v. Affiated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997); *see also Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000) (describing a plaintiff's initial burden as minimal).

**\*7** Once the *prima facie* case is established, the burden shifts to the defendant to give a "legitimate, nondiscriminatory"

2015 WL 5682665

reason for the conduct. *Ben–Levy v. Bloomberg, L.P.,* 518 F. App'x 17, 19–20 (2d Cir.2013) (citing *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000)). This burden is light, and the employer "must simply articulate an explanation that, if true, would connote lawful behavior." *Penberg v. HealthBridge Mgmt.,* 823 F.Supp.2d 166, 176 (E.D.N.Y.2011) (quoting *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998)). If the defendant offers such a reason, the presumption of discrimination resulting from the *prima facie* case is eliminated and the burden shifts back to the plaintiff to provide evidence that the defendant's legitimate, nondiscriminatory reason is "a mere pretext" for discrimination. *Ben–Levy,* 518 F. App'x at 19–20. To prevail on a claim of discrimination under the ADEA, a plaintiff must show that "but for" her age the adverse employment action would not have been taken. *Id.* at 19, n. 1.

### III. State Law Claim (Count II)

As an initial matter, Plaintiff has agreed to withdraw her claim under NYHRL, as it is duplicative of her ADEA claim. Pl. Mem. (ECF No. 26) at 20. Accordingly, Plaintiff's Second Cause of Action of the Amended Complaint is dismissed on this motion. *See* Am. Compl. 59–65.

### IV. ADEA Discrimination Claim (Count I)

#### A. *Prima Facie* Case

With regard to Plaintiff's *prima facie* case, it is undisputed that she was over 40 years-old at the time of the alleged adverse employment action. Defendants do not challenge Plaintiff's *prima facie* case on the basis of her qualification, and she has therefore established that prong as well. *See Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir.2001) (qualification element which is necessary for employee alleging ADEA claim to shift the burden to employer for an explanation of the adverse job action is minimal; employee must show only that she possesses the basic skills necessary for performance of the job.)

Defendants contest that Plaintiff suffered an adverse employment action, arguing that the Superintendent only "attempted" to terminate Plaintiff, the Board never made a final determination regarding Plaintiff's tenure, and to date, Plaintiff has remained employed by the District. Def. Mem. (ECF No. 18–6) at 2–7. Plaintiff, on the other hand, asserts that the Board members' advisory vote against the Superintendent's recommendation constitutes an adverse

employment action for purposes of her *prima facie* case. Pl. Mem. at 13.

An adverse employment action is "a materially adverse change in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Sanders v. N.Y.C. Human Res. Admin.,* 361 F.3d 749, 755 (2d Cir.2004).

**\*8** Defendants cite to case law from within this Circuit holding that a recommendation to terminate a plaintiff's employment does not constitute an adverse employment action. *See Weisbecker v. Sayville Union Free Sch. Dist.,* 890 F.Supp.2d 215, 233–34 (E.D.N.Y.2012) ("Threats of termination do not, by themselves, constitute an adverse employment action as a matter of law"); *see also Honey v. Cnty. of Rockland,* 200 F.Supp.2d 311, 320–21 (S.D.N.Y.2002) ( "Courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results."); *but see Nagle v. Marron,* 663 F.3d 100, 106 (2d Cir.2011) (noting, in *dicta,* that a decision to recommend termination and not to recommend tenure was an adverse employment action where defendants conceded that the plaintiff had suffered an adverse employment action).

In *Weisbecker,* upon which Defendants principally rely, the district court found that a Superintendent's recommendation that the plaintiff be terminated as a probationary teacher was not an adverse employment action where: (1) the Superintendent was not the final decision maker, but only recommended termination; (2) the plaintiff was notified of the recommendation of termination prior to the Board's meeting, and (3) the plaintiff was afforded extensive process under New York Education Law § 3031 to request the reasons for the recommendation and provide a responsive statement to the Board. *Weisbecker,* 890 F.Supp.2d at 234. The plaintiff in *Weisbecker* voluntarily resigned before the threatened termination took effect and declined to invoke her due process rights under Education Law § 3031 to contest the recommendation. The record in that case also did not support her argument that her termination was a "foregone conclusion." *Id.* at 234, n. 19.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 184 of 321

Mace v. Marcus Whitman Cent. School Dist., Not Reported in F.Supp.3d (2015)

2015 WL 5682665

In the present matter, Supt. Chirco did not simply threaten to end Plaintiff's employment. He made an initial recommendation to the Board to *approve* Plaintiff for tenure, and after discussing the matter with the Board, changed his recommendation to terminating Plaintiff's probationary employment. By letter, he advised both Plaintiff and the Board of his proposed recommendation, which never went before the Board. Chirco Aff. ¶¶ 8, 25, 72. The Superintendent changed course again after speaking with Plaintiff's union representative, next proposing that Plaintiff resign in lieu of termination, which Plaintiff initially did-but later rescinded. *Id.,* ¶ 28–30, 36. Following Plaintiff's rescission of resignation, Supt. Chirco again recommended Plaintiff for tenure (this time at her own request), which the Board unanimously denied in an advisory vote. *Id.,* ¶ 37. Upon invoking her right to an explanation and a hearing as to the Board's vote, she was offered an extension of her probationary period subject to a Teacher Improvement Plan. In the meantime, the Board "tabled" its final decision on Plaintiff's tenure recommendation and Plaintiff returned to work for an additional year in probationary status. *Id.,* ¶¶ 38, 40–43, 48–51. The record also indicates that Plaintiff's denial of tenure, upon the initial advisory vote or following the completion of the *Juul* Agreement, was inevitable. *See, e.g.,* Woodworth Aff., Ex. E. As such, *Weisbecker* is distinguishable from the facts of this case.

 **\*9** Defendants make much of the fact that a final vote by the Board was "tabled," and therefore no material change to the terms and conditions of Plaintiff's employment ultimately took place. Def. Mem. at 4. Their argument overlooks the fact that the Board voted against tenure, which resulted in Plaintiff's placement on a Teacher Improvement Plan and *Juul* Agreement, which in turn extended her probationary term for an additional year. The Second Circuit has recently held, in the context of a racial discrimination claim, that such circumstances amount to an adverse employment action for purposes of a *prima facie* case:

> Extending an employment relationship by one year by itself may not qualify as an adverse employment action. But when coupled with the denial of tenure, it is assuredly an adverse employment action. During the fourth year of probationary employment, a teacher can be fired at any time for any lawful reason. N.Y. Educ.

> Law § 2573(*l*) (a). But if granted tenure, the teacher may be fired only for cause. *Id.* §§ 2573(5)(a), 3020–a. The denial of tenure after three years, when a teacher was otherwise eligible for tenure, does not become any less an adverse action because the teacher is provided with another year of probationary employment.

*Tolbert v. Smith,* 790 F.3d 427, 436 (2d Cir.2015).

Here, Plaintiff was denied tenure by an advisory vote of the Board. Though the extension of the probationary period adjourned the Board's final vote, and Plaintiff remained in the same probationary status, the Second Circuit has made clear that the denial of tenure is a denial of "a material improvement in the conditions of a plaintiff's employment." *Tolbert,* 790 F.3d at 436. Accordingly, Plaintiff has established that she suffered an adverse employment action.

Defendants next contend that Plaintiff's *prima facie* case fails on the basis that Supt. Chirco's memoramdum to the Board regarding "fine young teachers" was a stray remark, insufficient to establish an inference of discriminatory intent. Def. Mem. at 13–16.

The "stray remark" doctrine acknowledges that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.,* 478 F.3d 111, 115 (2d Cir.2007), abrogated on other grounds by *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). In determining whether a comment is a non-probative "stray remark," courts should consider the following factors:

> (1) who made the remark, i.e., a decision maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e.,

2015 WL 5682665

whether it was related to the decision making process.

*Schreiber v. Worldco, LLC,* 324 F.Supp.2d 512, 519 (S.D.N.Y.2004).

**\*10** In this case, the comment about young teachers was made by the Superintendent, who was the Plaintiff's supervisor and the key decision-maker with respect to her performance evaluations and whether she would be recommended to the Board for a tenured position. It was directly related to the employment decision at issue, namely, whether Plaintiff should be granted tenure, and also directly related to the decision-making process as it was communicated to the Board of Education. A reasonable jury could view the phrase "there are a number of fine young teachers available," in the context of an applicant pool, as discriminatory. *See Schreiber,* 324 F.Supp.2d at 519. ("[W]hen remarks are made by decision makers in connection with a decision ... to promote 'young blood,' a reasonable juror could find the remark to be discriminatory.") Accordingly, the stray remark doctrine does not apply under these facts.

Defendants also urge the Court to find that the "same actor" inference defense supports their motion for summary judgment. Def. Mem. at 13, 16–17.

Employment discrimination case law recognizes that when the same employer hires a person within the protected class, and then fires that same person within a relatively short time, a "strong inference" arises that discrimination was not a motivating factor in the employment decision. *Kazukiewicz v. Kaleida Health,* No. 08–CV–341–JTC, 2010 WL 2998671, at \*5 (W.D.N.Y. July 26, 2010) (quoting *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 137 (2d Cir.2000)). In *Kazukiewicz,* Judge Curtin found that the same actor who was responsible for hiring the plaintiff also discharged him three and a half months later, giving rise to a strong inference of nondiscriminatory motivation, and that "[t]o avoid summary judgment at the *prima facie* stage, plaintiff must come forward with at least some showing of proof to support 'the strong case of bias necessary to overcome this inference.' " *Id.* (quoting *Coghlan v. American Seafoods Co. LLC,* 413 F.3d 1090, 1098 (9th Cir.2005)).

Simply put, the same actor inference does not apply here. The inference arises from the rationale that "when the person

who made the [adverse decision] was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Central, Inc.,* 130 F.3d 553, 560 (2d Cir.1997). There is no evidence on this record that the individual seeking to deny Plaintiff tenure was the same person that hired her, and the adverse tenure decision occurred approximately three years after Plaintiff was initially hired at the District. *See* Mace Dep. at 23–24.

On these facts, I find that the Plaintiff has established her *prima facie* case.

B. Reason for the Board's Decision

Next, the Defendants advance a legitimate, nondiscriminatory reason for their actions: job performance.

The Board opposed Supt. Chirco's tenure recommendation in an 8–0 advisory vote based on concerns regarding Plaintiff's communication skills with parents, students, and teaching assistants, as well as her planning and classroom abilities. Bd. Mem. Affs., Ex. B. There is no dispute that Plaintiff was aware of these issues, as she acknowledged copies of the evaluations containing the relevant comments. Performance concerns have long been held to be a legitimate, nondiscriminatory reason to deny tenure. *See Whitting v. Locust Valley Cent. School Dist.,* No. 10–CV–0742, 2012 WL 5289617, at \*13 (E.D.N.Y. Oct. 22, 2012); *see also Woodard v. Monticello Cent. Sch. Dist.,* No. 06 Civ. 13361, 2008 WL 5062125, at \*9 (S.D.N.Y. Dec. 1, 2008) (finding a teacher's poor performance evaluations to be a nondiscriminatory justification for terminating the plaintiff); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (holding that "an honest belief" that an employee's job performance "[does] not measure up to that required" is a legitimate, nondiscriminatory reason to discharge an employee).

**\*11** As the Defendants have articulated a nondiscriminatory reason, the burden shifts back to Plaintiff, who must establish that the Defendants' proffered reason was a mere pretext for discrimination. To do so, she "must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons presented by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Mavrommatis v. Carey Limousine Westchester, Inc.,* 476 F. App'x 462, 465 (2d Cir.2011) (internal quotation marks omitted). In addition, in an age discrimination case, the plaintiff must demonstrate that "age was the 'but-for' cause of the employer's adverse

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 186 of 321

Mace v. Marcus Whitman Cent. School Dist., Not Reported in F.Supp.3d (2015)

2015 WL 5682665

action." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). "The condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employers only consideration, but rather that the adverse employment action [ ] would not have occurred without it." *Fagan v. U.S. Carpet Installation, Inc.,* 770 F.Supp.2d 490, 496 (E.D.N.Y.2011) (citing *Gross,* 557 U.S. at 175–77).

Plaintiff argues that the Board's four purported reasons as to why they voted to deny Plaintiff tenure were pretextual because they were contradicted by her prior positive teaching evaluations during the probationary period from 2008 to 2010. Pl. Mem. at 16; Pl. Exs. A, I.

A careful review of the record reflects that over the course of three years, Plaintiff consistently received criticism regarding her teaching abilities in the areas of preparation and flexibility. Pl. Exs. A, I. She does not dispute that the criticisms were truthful and accurate, *see* Mace Dep. at 90–100, but characterizes the evaluations as "above average" and "positive" overall. Pl. Mem. at 13, 16. Also noted in the Board's list of reasons for denying Plaintiff tenure were the incidents involving Plaintiff, her teaching assistants, and a parent. Again, Plaintiff does not deny the conflicts, which resulted in one teaching assistant being re-assigned and a student being removed from her class. Mace Dep. at 53–56, 90–100. Rather, she maintains that the events were isolated and that a Teacher Improvement Plan would help in addressing those problems prior to a Board vote on tenure. Chirco Aff. ¶ 46.

Where an employer's proffered reason is that the employee's job performance was unsatisfactory, the employee's opinion to the contrary, by itself, is insufficient to raise a triable issue of fact as to pretext. *See Shabat v. Billotti,* 108 F.3d 1370, 1997 WL 138836, at *2 (2d Cir. Mar.18, 1997) (unpublished) ("[T]he fact that an employee disagrees with an employer's evaluation of him does not prove pretext."). This principle applies even where the Plaintiff previously received favorable performance reviews. *See Hines v. Hillside Children's Ctr.,* 73 F.Supp.2d 308, 315–16 (W.D.N.Y.1999) ("[P]rior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. To hold otherwise would be to hold that things never change, a proposition clearly without a basis in reality.") (citation and internal quotation marks omitted). Plaintiff's first six evaluations revealed, in addition to many positive remarks about her teaching, that her weaknesses

were repeatedly highlighted throughout the course of three years. The final observation, which occurred well before Plaintiffs tenure review, indicated that her performance had in fact diminished. Thus, Plaintiff has not established pretext by showing that the Defendants' reasons for recommending termination and/or the denial of tenure is "unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

**\*12** Even favorably viewing Supt. Chirco's sole age-related comment as reflective of discriminatory animus, no reasonable fact-finder could conclude, on the basis of the entire record, that Defendants' explanation for denying Plaintiffs tenure was a pretext for age discrimination. *See Fried v. LVI Servs., Inc.,* 500 F. App'x 39, 41 (2d Cir.2012) (in affirming district court's decision granting defense motion for summary judgment in ADEA case, court concludes that even though age-related comment to plaintiff by CEO of defendant company, six weeks before plaintiff's termination, could "bear some weight in demonstrating discriminatory bias[,]" it nevertheless was insufficient to permit reasonable jury to conclude that " 'but for' defendants' age bias, [plaintiff] would not have been terminated[,]" considering "overwhelming documentary evidence" supporting defendants' nondiscriminatory explanation); *Timbie v. Eli Lilly & Co.,* 429 F. App'x 20 (2d Cir.2011) (affirming summary judgment; facially age-based comment, by plaintiff's supervisor, even "if made in relation to the employment decision at issue as well as the decision-making process[,] ... was insufficient to allow [plaintiff] to carry her burden in showing that age-discrimination was the 'but-for' cause of defendant's decisions regarding [plaintiff's] salary and bonus"). Significantly, it was Supt. Chirco who made the recommendation in favor of Plaintiff's tenure in the first instance.

In light of the requirement that Plaintiff must show that age discrimination was the "butfor" cause of her termination, Plaintiffs ADEA claim cannot survive summary judgment. The record evinces that when Plaintiff was denied tenure, it did not occur to her to attribute the adverse employment action to age discrimination. Indeed, it was only after she requested and received the FOIL documents from the Board of Education that she discovered Supt. Chirco's remark about "fine young teachers." Mace Dep. at 79–80, 82–83, 124. There is no evidence that Plaintiff was replaced by a younger individual. Plaintiff testified that her position was not posted, did not know "for sure" whether any posted positions were for special education or were in the high school or middle school.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 187 of 321

Mace v. Marcus Whitman Cent. School Dist., Not Reported in F.Supp.3d (2015)
2015 WL 5682665

*Id.* at 87–88. Finally, the Defendants' position on Plaintiff's areas of needed improvement remained the same from her first performance evaluation through the preparation of the Tenure Review Packet and, ultimately, the Board's vote on her tenure. *See Heaphy v. Webster Central School Dist.,* 761 F.Supp.2d 89, 93 (W.D.N.Y.2011) ("Although [Plaintiff] did receive some negative performance evaluations ... and was placed on a performance improvement plan ... those actions- which were tempered by at least one positive evaluation— do not reflect a sea change in the District's assessment of plaintiff's performance."); *cf. Digilov v. JPMorgan Chase Bank, N.A.,* No. 13 Civ. 975, 2015 WL 685178 (S.D .N.Y. Feb. 18, 2015) (material issue of fact existed as to pretext where plaintiff submitted evidence in the form of a comparison of his age to the ages of others promoted, a single age- related comment by his manager, and defendant's inconsistent justifications for the denial of his promotion).

**\*13** In sum, Plaintiff has produced no evidence from which a jury could rationally find that Defendants discriminated against her on the basis of her age. The Court therefore grants Defendants' Motion for Summary Judgment in its entirety.

*CONCLUSION*

For all of the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 18) is GRANTED, and this case is dismissed with prejudice. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5682665

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3334796
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Dwayne IVERSON, Plaintiff,
v.
VERIZON COMMUNICATIONS, Defendant.

No. 08 Civ. 8873(SAS).
|
Oct. 13, 2009.

West KeySummary

**1    Civil Rights** 👉 Motive or Intent;  Pretext

A former employee failed to demonstrate that his employer's reasons for terminating the employee were a pretext for disability discrimination; thus, employee failed to state a Americans with Disabilities Act (ADA) claim upon which relief could be granted to survive dismissal. Evidence of past positive performance failed to contradict employer's substantial documentation of poor performance and customer complaints starting in 2003 and continuing until employee's termination in 2006. Furthermore, merely claiming temporal proximity between employee's disclosure of his disability and his termination did not establish that employer's reasons were pretextual. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**Attorneys and Law Firms**

Dwayne Iverson, Bronx, NY, pro se.

Martin W. Aron, Esq., Edwards Angell Palmer & Dodge, LLP, New York, NY, for Defendant.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

**\*1**  Dwayne Iverson, proceeding pro se, brings this action against his former employer, Verizon Select Services, Inc. ("Verizon"). [1]  Iverson alleges that Verizon violated federal and state anti-discrimination laws when it terminated his employment after discovering that Iverson had diabetes. Verizon now moves for summary judgment with respect to all claims against it. For the reasons stated below, Verizon's motion is granted.

[1]    Iverson erroneously sued Verizon Communications instead of Verizon Select Services, Inc. Nonetheless, Verizon has appeared and defended this action.

**II. BACKGROUND** [2]

[2]    Unless otherwise noted, the facts are drawn from Verizon's Rule 56.1 Statement ("Verizon 56.1"), to which Iverson did not respond. Nonetheless, the Court considered the evidence submitted by Iverson in determining which facts were uncontested.

**A. Facts**

**1. Iverson's Early Employment at Verizon**
Iverson began employment with Verizon as a technician on June 22, 1998. [3]  Verizon is engaged in the business of providing communication services and support to commercial clients. [4]  As a Technician, Iverson was responsible for supporting commercial telecommunication lines and equipment at the locations of Verizon customers. [5]

[3]    See 7/10/09 Letter from Iverson to Court, Motion for Trial ("7/10/09 Letter") at 1; Verizon 56.1 ¶ 2.

[4]    See Verizon 56.1 ¶ 1.

[5]    See id. ¶ 3.

Following Iverson's unsatisfactory interaction with a customer in 2003, Verizon gave Iverson at least one written warning. [6]  This warning informed Iverson of the possibility that if he failed to adhere to Verizon company policy, he could be subject to "further disciplinary action, up

to and including termination." [7] Verizon also documented concerns about Iverson in his 2003 Year–End Performance Assessment, noting specifically "several complaints by customers to remove [Iverson] from their site." [8] In this Performance Assessment, Iverson was given an overall rating of "Improvement Needed." [9] The assessment also noted that "[m]ore attention needs to be given to completing tickets in a timely fashion," that "[Iverson] must learn to maintain a professional appearance in front of the customer at all times," that "there needs to be more team work when working with [Iverson's] fellow employees," and that "[t]here have been several complaints by customers to remove [Iverson] from their site." [10]

[6]    See 7/10/09 Letter at 1; Verizon 56.1 ¶ 6; 12/16/03 Written Warning from Joseph Addamo, Verizon Branch Manager, to Dwayne Iverson ("12/16/03 Warning"), Ex. C to Declaration of Martin W. Aron, Verizon's Counsel ("Aron Decl.").

[7]    12/16/03 Warning; see also Deposition of Dwayne Iverson ("Iverson Dep."), Ex. A to Aron Deck, at 103–105.

[8]    2003 Year–End Performance Assessment ("2003 Performance Assessment"), Ex. D to Aron. Decl.

[9]    Id.

[10]    Id.

On July 14, 2004, Iverson was injured in a car accident while traveling in a Verizon vehicle. [11] As a result of this injury, Iverson did not work and was placed on workers' compensation until his return to work on January 3, 2005. [12]

[11]    See 7/10/09 Letter at 2.

[12]    See id.

### 2. Iverson's 2005 Performance

In April 2005, Iverson's supervisor, Deron Taylor, placed Iverson on a Performance Improvement Plan ("PIP") due to alleged customer dissatisfaction and poor performance. [13] The PIP documentation noted several Verizon customers that no longer wanted Iverson to service their accounts. [14] The PIP documentation notified Iverson that he was expected to maintain acceptable performance for twelve months

following completion of the PIP, lest he "be subject to further corrective action up to and including dismissal." [15] Iverson completed the PIP in September 2005. [16]

[13]    See id. at 1; Verizon 56.1 ¶ 12.

[14]    See Performance Improvement Plan with Dwayne Iverson's Comments ("Iverson PIP"), Ex. to 7/10/09 Letter; see also Performance Improvement Plan Without Comments, Ex. A to Declaration of Deron Taylor ("Taylor Decl.").

[15]    Iverson PIP.

[16]    See 2005 Performance Development Review, Ex. to 7/10/09 Letter. This document noted that while he had met most of his goals, Iverson still had some performance issues. Specifically, these issues related to the proper response to assignment tickets and better management of sick days.

On November 14, 2005, Verizon received a request from one of its clients, ABN AMRO, that Iverson be replaced by another technician. [17] ABN AMRO cited "repeated performance issues" as the reason for its request. [18] Soon after, on December 14, 2005, Verizon received a complaint about Iverson from another client, Affiliated Computer Services, Inc. ("ACS"). ACS complained that Iverson had been disgruntled about his workload and had been spreading rumors about another employee at a work site. [19]

[17]    See 11/14/05 E-mail from Dwight Edwards, employee of ABN AMRO, to Doug Welch, a Verizon supervisor ("11/14/05 E-mail"), Ex. B to Taylor Decl.

[18]    11/14/05 E-mail.

[19]    See 12/10/05 E-mail From Teddy Jones, contractor for Disney through ACS, to Deron Taylor, Ex. C to Taylor Decl.

 *2  Iverson's 2005 Performance Assessment noted that two clients, ABN AMRO and Disney, had requested that Verizon no longer assign Iverson to their accounts. [20] The 2005 Performance Assessment gave Iverson a rating of "Corrective Action Required" and stated that other customers had informed Verizon that Iverson had not arrived at their sites when scheduled. [21] In addition to customer complaints, the

2009 WL 3334796

Assessment noted that Iverson had exceeded the threshold for sick days that was outlined in his PIP. [22]

20    *See* 2005 Performance Assessment.

21    *See id.*

22    *Id.*

### 3. The 2006 Complaints and Iverson's Termination

On March 22, 2006, Taylor received a phone call from Melissa Martinez at HSBC, a Verizon account to which Iverson was assigned. [23] In this phone call, Martinez complained that Iverson responded to a request to repair a loose wire by saying, "I don't give a shit." [24] On that same day, Taylor received a voicemail from Martinez, who complained that Iverson had been found sleeping at his desk. [25] Taylor met with Iverson the next day and informed him that he was suspended with pay due to a customer complaint. [26]

23    *See* Verizon 56.1 ¶ 22; Declaration of Cliff Mosco ("Mosco Decl.") ¶ 8; Taylor Decl. ¶ 11.

24    3/22/06 E–Mail from Deron Taylor to Peter Magee ("3/22/06 E–Mail"), Ex. E to Taylor Decl. Iverson contests that this event ever occurred. *See* 8/7/09 Letter from Dwayne Iverson to Court, Reply to Deron Taylor's Documents E and F.

25    *See* 3/22/06 Transcript of Voicemail from Melissa Martinez ("Martinez Voicemail"), Ex. F to Taylor Decl. There seems to be some confusion about the date when Iverson fell asleep at work. While the Martinez Voicemail transcript is dated March 22, Verizon itself notes the date of the sleeping incident as March 23. *See* Verizon 56.1 ¶ 27. Iverson claims that he fell asleep on the job on March 23, not March 22. *See* 7/10/09 Letter at 1. In the transcript of Iverson's Unemployment Insurance Appeal, however, Iverson states that the date when he fell asleep on the job was March 22. *See* Unemployment Insurance Appeal Transcript ("Appeal Transcript"), Ex. to 7/10/09 Letter, at 14; *see also* Iverson Dep. at 141. As there is no material difference between these two dates for the purpose of this case, I use March 22.

26    *See* Verizon 56.1 ¶ 29; Appeal Transcript at 15.

On March 31, 2006, Iverson contacted Cliff Mosco, a Human Resources employee for Verizon. [27] During this conversation, Iverson informed Mosco that he had a doctor's note stating: "Mr. Iverson suffers from diabetes that is not always well controlled. At times, his symptoms ma[y] include excessive drowsiness, unless his medications are taken on a timely basis." [28] Iverson explained to Mosco that he fell asleep at work as a result of forgetting to take his diabetes medication on March 22, 2006. [29]

27    *See* Verizon 56.1 ¶ 38; Appeal Transcript at 19.

28    7/10/09 Letter at 1; *see also* Verizon 56.1 ¶ 38.

29    *See* 7/10/09 Letter at 1.

Verizon kept Iverson on paid suspension until April 10, 2006, at which time Iverson received a letter informing him of the termination of his employment, effective April 11, 2006. [30] The letter stated that Iverson was terminated for "performance that does not meet position requirements" and because he "did not meet the requirements established in [his] Performance Improvement Plan." [31]

30    *See id.;* 4/10/09 from Deron Taylor to Dwayne Iverson ("Termination Notice"), Ex. A to Mosco Decl.

31    Termination Notice.

### B. Procedural History

On June 30, 2006, Iverson's union, the Communication Workers of America, filed an unfair labor practice charge on his behalf with the National Labor Relations Board ("NLRB"), alleging that Verizon discharged Iverson because of his union affiliation. [32] At the conclusion of its investigation, the NLRB found Verizon's decision to terminate Iverson was "based upon considerations related to his work performance" and not influenced by his union affiliation. [33]

32    *See* Verizon 56.1 ¶ 46; Iverson Dep. at 48.

33    10/31/06 Letter from Celeste J. Mattina, Regional Director of the NLRB, to Jimmy Trainor, Secretary

of the Communication Workers of America, Local 1101, Ex. G to Aron Decl.

Iverson also filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). [34] The EEOC issued a Determination on May 23, 2008. [35] The EEOC found "reasonable cause to believe that [Verizon] had failed to reasonably accommodate [Iverson] and then disparately treated him on account of his disability" in violation of the Americans with Disability Act ("ADA"). [36]

[34]    *See* 5/23/08 EEOC Determination Letter, Ex. to 7/10/09 Letter.

[35]    *See id.*

[36]    *See id.* Neither the EEOC Determination nor Iverson explain what evidence was reviewed in arriving at this decision. Due to this lack of information, and the fact that the EEOC determination contradicts the conclusion reached by the NLRB, I accord the determination no weight. *See, e.g., Woodell v. United Way of Dutchess County,* 357 F.Supp.2d 761, 772 n. 15 (S.D.N.Y.2005) (according EEOC Determination no weight "because it was sparse and conclusory and provides no indication of what the EEOC's investigation actually involved" (quotation marks and citations omitted)); *Wanamaker v. Columbian Rope Co.,* 907 F.Supp. 522, 538 n. 24 (N.D.N.Y.1995) (giving no weight to EEOC Determination because there was no legal basis for its finding).

Iverson filed a complaint in federal court on October 16, 2008, alleging violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112–12117. [37] Iverson filed an Amended Complaint on April 6, 2009, adding claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). [38] Verizon now moves for summary judgment on all claims.

[37]    *See* Complaint.

[38]    *See* N.Y. Exec. Law §§ 290–297; N.Y. City Admin. Code §§ 8–101 to 131.

## III. LEGAL STANDARD

### A. Summary Judgment

**\*3** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [39] " 'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.' " [40] "[T]he burden of demonstrating that no material fact exists lies with the moving party .... " [41]

[39]    Fed.R.Civ.P. 56(c).

[40]    *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009) (quoting *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008)).

[41]    *Miner v. Clinton County, N.Y.,* 541 F.3d 464, 471 (2d Cir.2008) (citing *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007)). *Accord Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." [42] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [43] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [44] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [45]

[42]    *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at \*4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

43    *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

44    *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

45    *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor. [46] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [47] Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." [48]

46    *Sledge v. Kooi,* 564 F.3d 105, 108 (2d Cir.2009) (citing *Anderson,* 477 U.S. at 247–50, 255).

47    *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

48    *Pyke v. Cuomo,* 567 F.3d 74, 76 (2d Cir.2009).

### B. The Americans with Disabilities Act

The ADA prohibits an employer from discriminating against an employee "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees ...." [49] An employment discrimination claim under the ADA is subject to the familiar three-step burden-shifting process established in *McDonnell Douglas Corp. v. Green.* [50] "Despite the initial evidentiary burden shifting, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " [51]

49    42 U.S.C. § 12112(a) (2009).

50    411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668(1973).

51    *Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 307 (S.D.N.Y.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). *Accord Pacenza v. IBM Corp.,* No. 04 Civ. 5831, 2009 WL 890060, at *9 (S.D.N.Y. April 2, 2009) (same).

*First,* to establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability withing the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability." [52]

52    *Capobianco v. City of New York,* 422 F.3d 47, 56 (2d Cir.2005). *Accord Gaffney v. Department of Info. Tech. and Telecomm.,* 536 F.Supp.2d 445, 472 (S.D.N.Y.2008) (citing *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998)).

 **\*4** *Second,* once the plaintiff establishes a prima facie case of discrimination, "the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the termination." [53] The "factual validity of the underlying imputation against the employee is not at issue"—rather, what is important is " 'what motivated the employer.' " [54]

53    *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006).

54    *McPherson v. New York City Dept. of Educ.,* 457 F.3d 211, 216 (2d Cir.2006) (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)).

*Third,* if the defendant is able to produce admissible evidence showing a legitimate reason for terminating the employee, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." [55] To demonstrate pretext, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision,

2009 WL 3334796

but that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." [56] Summary judgment is appropriate where "the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext." [57]

[55]    *Id.*

[56]    *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008).

[57]    *Patterson v. County of Oneida,* 375 F.3d 206, 221 (2d Cir.2004).

### C. Local Law Claims

Discrimination claims brought under the NYSHRL and the NYCHRL are analyzed under the same three-step burden-shifting analysis as the ADA. [58]

[58]    *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000).

### IV. DISCUSSION

### A. ADA Claims

Verizon has met its evidentiary burden by providing multiple legitimate business reasons for its decision to terminate Iverson, including multiple customer complaints and negative performance reviews. As a result, Iverson must both establish a prima facie case of discrimination and show that Verizon's proffered reasons for his termination were merely a pretext for discrimination. Because Iverson will be unable to show that Verizon's proffered reasons were merely a pretext for discrimination, it is unnecessary to decide whether Iverson would otherwise be able to establish a prima facie case of discrimination.

### 1. Verizon Has Provided Legitimate Reasons for Iverson's Termination

Verizon has provided sufficient evidence to demonstrate a long history of problems with Iverson's work performance. This record of documentation goes back to 2003, when Verizon gave Iverson a Year–End Performance Review that clearly indicated that Iverson's performance was in need of improvement, and that Verizon had recieved several customer complaints regarding Iverson. [59] Iverson himself concedes

his involvement in at least one of these complaints, and acknowledges receiving a written warning notifying him that he might be terminated if his performance did not improve. [60] In 2005, Verizon placed Iverson on a PIP after noting a number of Verizon clients that no longer wished to utilize Iverson's services. [61] The PIP again notified Iverson that termination was possible should his performance fail to improve. [62] Iverson's 2005 Performance Assessment also documented customer complaints about Iverson. [63] These complaints continued until Iverson's suspension in 2006. [64]

[59]    *See* 2003 Performance Assessment.

[60]    *See* 12/16/03 Warning; Iverson Dep. at 103–105.

[61]    *See* Iverson PIP.

[62]    *See id.*

[63]    *See* 2005 Performance Assessment.

[64]    *See* 3/22/06 E–Mail; Martinez Voicemail.

**\*5** Verizon's documentation of Iverson's poor performance and customer complaints dating back to at least 2003 provides a legitimate reason for his termination. [65] Because Verizon has provided a legitimate reason for Iverson's termination, "the burden shifts back to [Iverson] to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." [66]

[65]    *See, e.g, Fall v. New York State United Teachers,* 289 Fed. Appx. 419, 421 (2d Cir.2008) (finding poor performance to be a legitimate reason for adverse employment action); *Winston v. Verizon Servs. Corp.,* 633 F.Supp.2d 42, 52 (S.D.N.Y.2009) (finding record of poor performance and seven customer complaints to be a legitimate, non-discriminatory basis for plaintiff's termination); *Bronzini v. Classic Sec. LLC,* No. 07 Civ. 11104, 2009 WL 102140, at \*5 (S.D.N.Y. Jan. 15, 2009) (finding clear record of client dissatisfaction with employee to be legitimate reason for adverse employment action); *Ifill v. United Parcel Serv.,* No. 04 Civ. 5963, 2008 WL 2796599, at \*7 (S.D.N.Y. July 17, 2008) (finding record of customer complaints of which employee was notified to serve as a legitimate basis for adverse

employment action); *Charneco v. Department of Educ.,* No. 04 Civ. 1848, 2006 WL 148934, at *6 (S.D.N.Y Jan. 18, 2006) (finding well-documented concerns about plaintiff's performance to be a legitimate reason for termination); *Brower v. Continental Airlines, Inc.,* 62 F.Supp.2d 896, 906 (E.D.N.Y.1999) ("Continental has advanced a credible reason for its dissatisfaction with and eventual discharge of Brower. Specifically, it points to the numerous customer complaints regarding Brower.").

66    *Patterson,* 375 F.3d at 221 (quotation marks and citations omitted).

### 2. Iverson Cannot Demonstrate that Verizon's Reasons Were a Pretext for Discrimination

Iverson has provided no evidence to show that Verizon's reasons for termination, specifically Iverson's record of poor performance and customer complaints, were merely a pretext for discrimination. Iverson claims that he repeatedly contested Verizon's allegations of customer dissatisfaction and poor performance.[67] Merely disagreeing with a supervisor's assessment of work performance, however, "is insufficient to raise a triable issue of fact regarding pretext."[68]

67    *See* 7/10/09 Letter at 1.

68    *Milano v. Astrue,* No. 05 Civ. 6527, 2008 WL 4410131, at *41 (S.D.N.Y. Sept.26, 2008). *Accord Griffin,* 103 F.Supp.2d at 309 (stating that an employee's disagreement with employer's assessment of her performance is not sufficient, by itself, to show that employer's proffered reason for an adverse action was pretextual); *Ricks v. Conde Nast Publ'ns,* 92 F.Supp.2d 388, 347 (S.D.N.Y.2000).

Iverson attempts to rebut Verizon's claims of poor performance and customer complaints by providing "letters and notes of commendation."[69] Some of these letters only indirectly refer to Iverson, while others are vague or undated.[70] Of the letters that are dated, two are from March 2004, and the remaining three are from March and April of 2005.[71] This demonstration of praise during two brief periods of time does not contradict Verizon's substantial documentation of poor performance and customer complaints starting in 2003 and continuing until Iverson's termination

in 2006. Demonstration of past positive performance is "insufficient to raise a genuine issue of disputed fact with respect to pretext."[72]

69    *See* 7/10/09 Letter at 2.

70    *See* Letters of Commendation, Ex. to 7/10/09 Letter.

71    *See id.*

72    *Milano,* 2008 WL 4410131, at *41. *Accord Pergament v. Federal Exp. Corp.,* No. 03 Civ. 01106, 2007 WL 1016993, at *12 (E.D.N.Y. Mar. 30, 2007) (stating that employee's receipt of generally positive evaluations in the past did not raise a triable issue of fact regarding pretext).

Iverson also claims that his termination must have been motivated by discrimination because it occurred near the time Verizon learned of his disability. Merely claiming temporal proximity between the disclosure of disability and termination, however, is not enough to show that Verizon's reasons for termination were a pretext for discrimination.[73]

73    *See Forde v. Beth Israel Med. Ctr.,* 546 F.Supp.2d 142, 152 (S.D.N.Y.2008) ("In light of the well-documented evidence of [defendant]'s dissatisfaction with [plaintiff]'s performance long before her announcement that she was pregnant, a trier of fact could not reasonably find from the timing and sequence of events that the reason for [plaintiff]'s dismissal was pretextual.")

Iverson's own conclusory statements are the only other evidence he provides to show that Verizon's proffered reasons were merely a pretext for discrimination. As a matter of law, such statements are insufficient to establish pretext.[74] As Iverson has failed to raise a genuine issue of material fact regarding pretext, his ADA claim must be dismissed.

74    *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) (noting that a plaintiff may not establish an inference of discrimination by offering "purely conclusory allegations of discrimination, absent any concrete particulars"); *Rollins v. New York City Dept. of Educ.,* Nos. 05 Civ. 10482, 06 Civ. 3657, 2008 WL 2736018, at *5 (S.D.N.Y. July 8, 2008) ("Plaintiff has presented no evidence of pretext except for her own beliefs that defendants

were motivated by discrimination. This fails to establish pretext as a matter of law."); *Milano,* 2008 WL 4410131, at *42 ("Plaintiff's assertions as to his supervisors" motives are conclusory and speculative, and, as such, they do not raise triable issues.").

**B. Local Law Claims**

Iverson also makes claims of disability discrimination under the NYSHRL and the NYCHRL. These claims are analyzed under the same three-step analysis as the ADA claim.[75] As discussed above, Iverson has failed to raise a triable issue of material fact regarding pretext. Iverson's NYSHRL and NYCHRL claims must therefore also be dismissed.

[75]     *See Weinstock,* 224 F.3d at 42 n. 1.

**V. CONCLUSION**

For the reasons stated above, Verizon's motion for summary judgment is granted. The Clerk of the Court is directed to close this motion [Docket No. 18] and this case.

**\*6**  SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3334796

---

**End of Document**                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1499618

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Vaughn v. Empire City Casino at Yonkers Raceway,
S.D.N.Y.,  July 14, 2017

2015 WL 1499618
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Leena VARUGHESE, M.D., Plaintiff,
v.
MOUNT SINAI MEDICAL CENTER, Patrick
Lento, M.D., Carlos Cordon–Cardo, M.D., Adolfo
Firpo, M.D., and Ira J. Bleiweiss, M.D., Defendants.

No. Civ. 8812(CM)(JCF).
|
Signed March 27, 2015.

MEMORANDUM DECISION AND
ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

**\*1**  Plaintiff Dr. Leena Varughese ("Varughese") has sued
Mount Sinai Medical Center ("Mount Sinai") and several
of its individual physicians and administrators (collectively
"Defendants") in connection with her September 21, 2011
termination from Mount Sinai's residency program. Now
before the Court is Defendants' motion for a summary
judgment of dismissal.

For the following reasons, the motion is GRANTED and all
of plaintiff's claims are dismissed with prejudice.

BACKGROUND

Mount Sinai is a large medical center located on the upper
east side of Manhattan. From July 1, 2008 until September
21, 2011, Varughese was a resident in its Department of
Pathology. Each of the individually named defendants served
as an attending physician or supervisor in that department
during Varughese's residency.

Varughese, a woman of Indian descent, alleges that Mount
Sinai subjected her to discrimination and a hostile work
environment on the basis of her gender and national
origin (Indian); retaliated against her when she complained
about discrimination and alleged unsafe practices within the
hospital; punished her for failing to confess to nonexistent
misconduct; and ruined her job prospects with other
employers. Her complaint pleads eleven counts under federal,
state, and local anti-discrimination laws; one count of
interference with business relations; one count of defamation;
one count of breach of her employment contract; one count
of breach of the covenant of good faith and fair dealing; one
count of whistleblower retaliation under a state health law;
one count alleging a violation of 42 U.S.C. § 1981; one count
of interference with her rights under the Family and Medical
Leave Act; and one count of individual liability. [1]  (Docket
# 66.) She seeks several million dollars in damages, as well
as injunctive relief that would both restrain Defendants from
disseminating an allegedly defamatory evaluation and require
them to provide her with various certifications that would
allow her continue her medical training. (*Id.*)

[1]     Varughese voluntarily dismissed another count for
        intentional infliction of emotional distress after
        Magistrate Judge Francis ordered her to submit to a
        psychiatric evaluation as a condition of maintaining
        it. *See* Docket # 45.

In Defendants' view, Varughese was an insubordinate
employee who was disciplined, counseled, and then fired
after an escalating series of unprofessional errors and
omissions she refused either to acknowledge or to correct.
Defendants accuse her of repeated absenteeism, failure
to complete assigned tasks, failure to communicate with
supervisors and colleagues, ignoring supervisors' directions,
using inappropriate language, and behaving rudely and
in a manner that called her mental health into question.
Ultimately, Mount Sinai terminated Varughese because of
what it deemed repeated, egregiously unprofessional behavior
that culminated with her being caught while surreptitiously
rifling through files in someone else's office.

Varughese admits to much of the behavior assigned her,
although she denies that some of the events underlying these
accusations occurred in the manner Defendants describe. She
also alleges that similarly situated residents who were not
members of her protected class were not disciplined in the
same way for the same conduct.

**\*2**  Varughese was originally represented by counsel-for example, her original complaint was drafted by counsel-but she has been *pro se* for some time. She is, of course, required to abide by all the rules of the Court, notwithstanding her *pro se* status. However, she has made errors in her response to Defendants' motion for summary judgment that are common among non-lawyer litigants. Her response to Defendants' Local Civil Rule 56.1 statement is conclusory and repetitive. To the extent that it relies on evidence at all, it relies in large measure on hearsay and other evidence rendered inadmissible by Federal Rules of Evidence 401, 403, 404, 802, and/or 805—even though a motion for summary judgment must be controverted by admissible evidence.

At times, her response veers into territory that has nothing to do with this lawsuit. For example, Varughese insinuates that the suicide of a colleague's relative was actually a murder for which yet another colleague is somehow responsible, and that Defendants' attorneys are involved in a criminal conspiracy. *See, e.g.,* Varughese 56.1 at ¶¶ 30.7–30.8 ("Residents ... were involved in what appeared to be the questionable suicide at best (by overdose of propofol of [one resident's] 'best friend' under the most suspicious circumstances ... The Caucasian leadership did not target ... [the resident's] rampant suspect conduct including ... not performing her duties or for suicide or homocide [sic] of her family member etc"); *id.* at ¶ 119.4 (complaining that the wife of one member of an internal appeal board "has the same surname as ... Rory McEvoy, the lawyers representing the Institution"), ¶ 123.2 ("McEvoy kept insisting ... that I had alleged a conspiracy against me by the Defendants to commit criminal acts, and to conduct an ongoing discrimination campaign, which, by the way, was obviously exactly what was happening.").

In order to give Varughese the benefit of any and every doubt, the Court has conducted a searching review of the several thousand pages of transcripts and other documents that she submitted in opposition to summary judgment. *DeRienzo v. Metro. Transp. Auth., Metro N. Commuter R.R.,* 237 F. App'x 642, 646 (2d Cir.2007) ("a district court has 'broad discretion ... to overlook a party's failure to comply with local court rules' and may 'opt to conduct an assiduous review of the record' even when one of the parties has failed to file a Rule 56.1 statement") (quoting *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)).

That record consists of: (1) deposition transcripts and several affidavits; (2) documentary evidence including e-mails, performance evaluations, letters and their attachments;

(3) transcripts of sworn testimony given in the course of Dr. Varughese's use of Mount Sinai's internal appellate process, which was subject to cross examination; and (4) audiotaped conversations between Varughese and various individual defendants and other administrators at Mount Sinai, and transcripts of these tapes prepared by certified court reporters. [2]  As part of its exhaustive review of the record, the Court has both listened to the tapes and reviewed the transcripts.

[2]     Only the transcripts were submitted with the motion. By order dated March 13, 2015 (Docket # 215), the Court ordered Varughese to produce the tapes so that I could listen to them myself, rather than merely reading the transcripts or relying on the parties' characterizations of what was said and how. *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (appropriate for a court to take judicial notice of facts regarding intangible circumstances of an encounter preserved in audio-visual recordings if court reviews said recordings).

**\*3**  The content of the lengthy Statement of Facts is drawn from any portion of a party's 56.1 Statement that relies on competent evidence, as well as the accompanying exhibits. As is customary, the facts are viewed most favorably to the non-moving party (Varughese). Unless otherwise noted, these facts are undisputed, purely conclusory assertions (there are many such) are identified and are not relied on to raise genuine issues of material fact.

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc., All* U.S. 242, 247–48 (1986); *see* Fed.R.Civ.P. 56(a), (c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett, All* U.S. 317, 323 (1986). Once such a showing

has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. "Summary judgment is designed ... to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997).

In cases involving allegations of employment discrimination, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir.2006) (internal citations omitted); *see also Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008). Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb,* 521 F.3d at 137. The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000).

**\*4** In considering the defendants' summary judgment motion, the court liberally construes all submissions by a *pro se* plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation and emphasis omitted). "This precept is especially important in the summary judgment context, where claims are subject to final adjudication." *S.E.C. v. Mattera,* No. 11 Civ. 8323,2013 WL 6485949, at \*6 (S.D.N.Y. Dec. 9, 2013). Indeed, the duty is "particularly strong when a *pro se* plaintiff alleges violation of h[er] civil rights." *Germany v.*

*N.Y.S. D.O.C.S.,* No. 03 CIV. 148, 2003 WL 22203724, at \*3 (S.D.N.Y. Sept. 22, 2003) (citing *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001)).

The application of this forgiving standard for *pro se* litigants, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003) (citation omitted); *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F.Supp.2d 441,454 (S.D.N.Y.2012) *aff'd,* 523 F. App'x 53 (2d Cir.2013). "[A]t some point in a lawsuit even *pro se* litigants must make clear to the court their claims and the facts that they believed entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case, even where a party proceeds *pro se.*" *Mattera,* 2013 WL 6485949, at \*6 (quoting *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986)).

Thus, even a *pro se* party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009)). That evidence must be admissible under the Federal Rules of Evidence, which apply equally to *pro se* litigants. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (evidence submitted in summary judgment proceedings must be admissible, as required by Fed.R.Civ.P. 56(e)).

**II. Facts**

Varughese was a resident physician in Mount Sinai's Department of Pathology ("the Department") from July 1, 2008 until September 21, 2011. (Defendants' 56.1 at ¶ 1).

During that period, there were two female residents of Indian descent (including Varughese) and three female fellows of Indian descent enrolled in the residency or fellowship program in the Department. (Johnson Decl. at ¶ 2, Defs.' Ex. 1.) All of the female residents and fellows of Indian descent in the Department graduated from the residency or fellowship program, except for Varughese. (Defendants' 56.1 at ¶ 132.)

*Job Duties and Employment Contract*

As a resident in the Pathology department, Varughese was expected to perform clinical, educational, and administrative tasks in one-month rotations focused on different sub-

disciplines of pathology. Some of these rotations occurred at Mount Sinai. Others took place under Mount Sinai's purview but at different hospitals, such as the Bronx Veterans' Affairs Hospital and the Elmhurst Hospital Center.

**\*5** A series of one-year contracts with Mount Sinai governed Varughese's employment. Each incorporated the provisions of Mount Sinai's House Staff Manual, which provided, in pertinent part, that, "The Program Director [or] the Department Chair ... may take disciplinary action, including termination for cause, against any [resident] who ... fails to demonstrate an acceptable level of ... professionalism." (Defendants' 56.1 at ¶ 148)

The Department was in a state of turmoil during Varughese's employment. (Figur Dep. at 38.) In early 2011, a period of intense activity relevant to this case, the American College of Graduate Medical Education ("ACGME"), which accredits residency programs throughout the United States, cited the Department for various problems with its residency program. The Department's head changed several times during Varughese's tenure, as did its middle management. Its laboratories appear to have struggled to achieve adequate staffing levels. By the fall of 2011, Mount Sinai's director of medical education actually called the Department of Pathology a "zoo." A new director, Defendant Carlos Cordon–Cardo, who was charged with putting it in order, arrived just as long-standing issues involving Varughese came to a head.

*The First and Second Years of Varughese's Residency*
Varughese's allegations of discrimination, hostile work environment and retaliation concern the way that she was treated beginning with her third year of residency (July 2010– June 2011). However, as background, especially to her hostile work environment claim, she cites to several comments that she testified were made during her first and second years of residency, July 1, 2008–June 30, 2009.

Varughese testified that Dr. Allan Schiller, who chaired the Department from Varughese's arrival until December 2010, (when he remained as an employee but apparently gave over his Chair duties to a female Interim Chair) would say something to the effect of "you don't know the type of things you'll find in India or the crazy things you'll find in India" every time he saw her at a conference or supervised her for an autopsy. (Varughese Dep. at 765–68.) He allegedly used that "line ... at least four, maybe more times over" for as long as he interacted with her-from the beginning of her residency

until Dr. Melissa Pessin–Minsley took over as Interim Chair of the Department in December 2010. (Defendants' 56.1 at ¶¶ 2–3.) There is no evidence that Schiller directly supervised Varughese thereafter except during individual, occasional autopsies. He is not named as a party defendant and has not been deposed.

Varughese appeared out of sorts towards the end of her first year of residency, in a way that other first-year residents were not. A "couple of months" into that first year, Dr. Patrick Lento, the director of the Department's residency program, observed a change in Varughese's demeanor: "she never seemed to smile anymore," and "seemed distracted. When [Lento] would address her to say 'Hello, Leena,' she would not respond, which [Lento] thought was odd." (Lento Dep. at 51–52,60–61.)

**\*6** Varughese got mixed reviews during her first two years. Some supervisors rated her as superior; others found her work "inconsistent." Interim Chair Dr. Melissa Pessin–Minsley recalled that, when she sat on the residency committee during Varughese's first year, there was a "perception" on the committee "that in the end of [Varughese's] first year ... she was weak ... she wasn't performing at the strongest level of a pathology resident who had finished a first year of a pathology residency." (Pessin–Minsley Dep. at 52.)

In October 2009, three months into her second year, Schiller (who was still Chair of the Department) "wanted to see me ... about my unhappiness. He said that I didn't look happy ... if you're unhappy that's part of who you are and it's sort of your DNA and so on." (Varughese Dep. at 42.) According to Varughese, Schiller went on to say, "that [when] people were unhappy like that, it's trouble ... we don't want you to be in trouble." (*Id.* at 10, 43.) He "wanted to know if [Varughese] was speaking to someone, you know, getting help. [She] said no ... [She] didn't think [she] needed help." (*Id.*) Schiller, who obviously did think she needed therapy, told Varughese to seek professional help and bring back a note attesting that she was under someone's professional care. (*Id.*)

Varughese testified at her deposition that she understood the statement about unhappiness being in her DNA to be a reference to her race/national origin, rather than to any genetic basis of depression, which is a scientific/medical issue. (*Id.*) Varughese did not testify that Schiller made any remark about India or her Indian ancestry during this conversation.

The record contains no suggestion that Varughese told Schiller that any of his comments made her uncomfortable. Nor is there any evidence that she complained about Schiller's comments to anyone else until at least December 2010, by which time he was no longer acting as Chair and Varughese had received the first of several warnings that she was having performance problems.

From October 2009 through the summer of 2010 (the beginning of her second through the beginning of her third years of residency), the record reveals little about Varughese's on-the-job performance or her experiences. So we turn to her third year of residency. That is when the problems that gave rise to this lawsuit began.

*The July 2010 Promotions of a Filipino Male and a Woman of Indian Descent*

In July 2010, the Department promoted two of Varughese's colleagues to Chief Resident: Drs. Kruti Maniar and Samuel McCash. (*See* Lento Dep. at 13.) Like Varughese, Maniar is a woman of Indian descent. Varughese consistently describes McCash as Caucasian (*see, e.g.,* Varughese 56.1 at ¶ 16.1), but he identifies himself as a Pacific Islander of Filipino descent. (Docket # 165, McCash Decl. at ¶ 2.), and there is no evidence that others in the Department (other than Varughese) perceived him as anything other than what he himself claims to be. I view his self-identification as undisputed; there is no evidence in the record that Dr. McCash is not a Pacific Islander of Filipino descent. I will not refer to him as Caucasian.

 *7  Chief Residents had the authority to assign tasks to other residents, to instruct them how to perform those tasks, to admonish them if the Chief's expectations were not met, and to control some portions of residents' scheduling. (Pessin–Minsley Dep. at 32–33.)

*Performance Issues*

Varughese began to be criticized for performance issues about this time.

Dr. Ira Bleiweiss, a named defendant and an attending pathologist at Mount Sinai, recalled having issues with her when she was assigned to him on frozen section duty, which is to say, on the shift that analyzes patient tissue samples sent down during surgery: "When you're on frozen section duty, there is an attending [physician] always and a resident who is assigned to be with you. I recall more than one occasion being

on frozen section with Leena being the resident assigned to me and she [was] not anywhere to be found." (Bleiweiss Dep. at 54–55.)

In August 2010, a less senior resident, a Caucasian woman named Adrienne Jordan, e-mailed the two Chief Residents to complain about Varughese's work ethic: "How does she function!!!!!!! I just wonder how she gets out of bed in the morning and not hurt herself she is so lazy ..." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket # 205–5 at 2.) Later that same day, Jordan complained that her team was missing a slide from one of Varughese's cases, which Lento needed, "but of course [Varughese] called out 'sick' today." (Aug. 13, 2010 e-mail from Jordan to McCash and Maniar, Docket # 205–5 at 5.)

*The September 14, 2010 Altercation with McCash*

On September 14, 2010, Varughese had the first of two notable run-ins with McCash.

There is some evidence that Varughese's relationship with McCash was strained from the beginning; Varughese alleges, for example, that McCash gave her menial tasks and overburdened her with work. (Varughese 56.1 at ¶¶ 11.4, 11.13.) But on the day in question, Varughese refused to cover for another resident who was on leave. This prompted an argument between her and McCash. Varughese alleges that McCash became irrationally angry about her refusal, and that he "screamed ... shut up, shut up, shut your mouth Leena" at her while "lurching" towards her (Docket # 205–4 at 85). He also allegedly "cursed and ranted about" her in public, insulted her professional qualifications, told her that no one liked her, and told her she was lucky to have a job. (Varughese 56.1 at ¶¶ 11.4, 11.13.)

Kruti Maniar-the woman of Indian descent who was promoted to Chief Resident at the same time as McCash-was present during McCash's alleged tirade. Interestingly, Maniar contacted Program Director Lento that same day to express her concern that *Varughese* had acted unprofessionally during this encounter. (Lento Dep. at 68, 69, 71.) Varughese contacted Lento after Maniar did, complaining that McCash had been "hostile" to her. (*Id.*) The next morning, Lento met with both women residents. (*Id.*)

 *8  Varughese repeated her version of events and said "something to the effect that she was perhaps singled out for coverage," meaning the duty to cover for an absent resident. (*Id.* at 82–84.) Lento asked whether Maniar agreed with

Varughese's account; Maniar "pointedly" said no. (Lento Dep. at 75, 77, 90, 91.)

Lento later followed up with attending physician Dr. Melissa Pessin–Minsley, whose office was near where Varughese and McCash had argued. Pessin–Minsley told Lento that she did not hear McCash yelling at Varughese. (*Id.*) In fact, no one who was present in the area of the hospital where the encounter took place corroborated Varughese's story that McCash was yelling at her. (*Id.* at 85–90.)

Varughese claims that Maniar would support her version of the facts. (Varughese 56.1 at ¶¶ 11.5, 136.2.) Her opinion about what Maniar would say is, of course, not admissible evidence. Maniar was not deposed, but Mr. Sinai has submitted a declaration from her, in which she avers that McCash "treated all residents equally and always tried to be fair. I never had any reason to believe that McCash harbored any discriminatory animus towards me or any other female resident because of our gender or, in my case, because I am a woman of Indian descent." (Docket # 163 at ¶ 7.) Maniar also attests that "throughout my tenure at Mount Sinai, both as a medical student and as a resident, I felt encouraged and supported ... I never felt discriminated against by anyone at Mount Sinai for any reason." (*Id.* at ¶ 4.)

However, the Hospital responded as though Lento had been able to corroborate Varughese's story. Lento told Varughese that he would speak with McCash, and later did speak to McCash about how to handle similar situations in the future. (Lento Dep. at 82.) Varughese was not satisfied; she asked Pessin–Minsley to obtain an apology from McCash. Pessin–Minsley did not believe Varughese was entitled to an apology. Indeed, her view was that Varughese's unspecified "behavior over the weekend was irresponsible and could have jeopardized patient care." (Docket # 205–4 at 2, e-mail of Sept. 15, 2010 from Pessin–Minsley to Lento).

By September 17, 2010, three days after the encounter, Varughese complained to her supervisors that she was being made into a "scapegoat," and that the "hostile environment" McCash was creating caused her "far too much unhealthy mental stress." (Docket # 205–5 at 62, e-mail of Sept. 17, 2010 Varughese to Drs. Schiller and Pessin–Minsley.) Varughese did not want to deal with McCash, and on September 23, 2010, she tried to switch rotations with another resident, Jaclyn Hechtman, so she could avoid working with him. (Docket # 205–5 at 72, e-mail of Sept. 23, 2010 from Maniar

to Hechtman, McCash and Varughese). She was prevented from doing so. (Varughese 56.1 at ¶ 11.6.)

But Varughese did not allege at that time that that "hostile" environment had anything to do with her membership in any protected class, or compare McCash's treatment of her to his treatment of anyone outside her protected groups (female and of Indian descent). Indeed, she did not assign either her gender or her national origin as the reason for McCash's loss of temper. The people to whom she complained about McCash (specifically Lento, Pessin–Minsley, and, at some point, attending physician and Defendant Ira J. Bleiweiss) did not interpret her complaints as complaints about discrimination or hostile work environment based on her gender, her national origin or any protected category- although none of these individuals could recall seeing or being trained in Mount Sinai's anti-discrimination policy, or its anti-harassment policy, or its anti-retaliation policy. (Lento Dep. at 24–25; Pessin–Minsley Dep. at 38–39; Bleiweiss Dep. at 15–16.) After she complained about the September 14, 2010 incident, Varughese claims that her work materials, including slides of patient tissue, started to go missing. (Varughese Dep. at 824–27.) Varughese allows that she and other residents had always had some problems with misplaced slides-whether the fault of general organizational lapses or specific failures of other departments. (Varughese Dep. at 819.) However, "in terms of it being sort of a problem for me that was in excess of other people's issues, that didn't happen until after like September 2010." (*Id.* at 823.)

*The December 8, 2010 Altercation with McCash*

**\*9** A second and more serious altercation between McCash and Varughese occurred on December 8, 2010.

In and before December 2010, pathology residents could make extra money by "moonlighting," i.e., taking extra shifts within their own department. According to the Defendants, on December 8, 2010, McCash told Varughese to examine certain specimens (the complexity of which are in dispute), but Varughese instead gave that work to Paul Azar, a white male resident who was moonlighting. (Defendants' 56.1 at ¶¶ 9–10).

Varughese admits that she gave the work to Azar. (*See* Self– Reflection Essay 1, Docket # 205–4 at 86). She contends that she was never clearly told that she had to do the work herself. (*Id* ). She also argues that any instruction would have been discriminatory, since two fellow residents-one a non-Indian female and the other a white male-"routinely assigned very

complicated patient cases to moonlighters" and were never prohibited from doing so or disciplined for it. (Varughese 56.1 at ¶ 10.2.)

Whether the work she delegated was complicated or not, the particular work that Varughese delegated to Azar should not have been delegated to a moonlighter-and McCash should not have had to explain that to plaintiff. The samples came from patients of a Dr. Goldfarb. His standing order was that the resident on duty had to examine the particular kind of sample at issue (the margins of an incision into the breast). Dr. Goldfarb did not want the moonlighters doing this work, presumably because they were working extra hours and might not be as alert as the resident on duty. (Figur Dep. at 44–45.) The record is replete with references to "Goldfarb cases" and the particular steps that were to be followed when handling "Goldfarb cases."

There was another reason why Varughese delegating her work to Azar was not appropriate. The Department was trying to cut back on moonlighters in order to achieve budgetary reductions. When Varughese assigned the work to Azar, he was about to leave; Jordan, another resident moonlighting that night, recalled that when she left, "Dr. Azar was supposed to be shortly behind [her] ... When he wasn't, [she] went back to see what was taking him so long because we were going to walk out together." (Jordan Dep. at 110.) By giving Azar extra work, Varughese increased the amount the Department would have to pay him; McCash testified that this was inappropriate "because it would have been very easy for her [Varughese] to have done that herself and not expend unnecessary resources." (McCash Dep. at 62–63.)

When McCash became aware of what had happened, he confronted Varughese. These followed a loud, profanity-laced altercation between Varughese and McCash about Varughese's having failed to follow McCash's instruction. Jordan testified that McCash raised his voice and followed Varughese around the room. (Jordan Dep. at 118–119.) Varughese characterizes McCash's behavior as a "rampage" that was physically intimidating and verbally threatening. (Varughese Dep. at 705–06.)

**\*10** However, witnesses to the altercation also described Varughese's behavior as out of line, especially after she left the room to try to fetch Dr. Bleiweiss. Bleiweiss, who was on the phone in his office, could see that Varughese was "rather upset ... she was practically in tears," but when he did not immediately end the call to speak to her (Bleiweiss Dep. at

59, 61.), Varughese returned to the lab and began yelling. (Lento Dep. at 114; *see also* Defendants' 56.1 at ¶ 11.) Some of Varughese's ire was directed at Jordan, the white female resident who had previously complained about Varughese's work ethic (*see supra* at 11); Varughese engaged Jordan in a "one-sided yelling argument where [Varughese] was yelling at [Jordan]." (Jordan Dep. at 116.) Azar advised Jordan to leave, "something to the effect of 'You can't engage with [her]. She's not being rational.' " (Jordan Dep. at 116.)

In interviews conducted after this incident, numerous witnesses to the event-Jordan. Azar, Jaffer, Bleiweiss, a medical student, a technician, and a fellow-told administrators that, while McCash may have lost his composure with Varughese, it was "not to the degree of what the other witnesses described [about] Varughese's behavior." (Figur Dep. at 48.) "They could understand what he [McCash] said. It was logical. It was coherent. Dr. Varughese was described as infantile, incoherent, unintelligible, and the wording was not making any sense to anybody else." (*Id.*) One medical student who was present became so upset that she had to leave the room.

Varughese does not dispute that she raised her voice and swore.

Late that evening, McCash e-mailed several supervisors to complain about Varughese's behavior, especially her assignment of the case to her Azar, which "ma[de him] question her work *ethnic*.") (McCash e-mail of Dec. 8, 2010 at 8:16 p.m., Docket # 205–6 at 2 (emphasis added).) The e-mail was several paragraphs long and includes no other reference to race, ethnicity, or any other protected category. (*Id.*) Shabnam Jaffer, an attending physician of Indian descent who was present, was carbon copied on the e-mail; Varughese was not. (*Id.*) There is no evidence that anyone noticed or commented on the "n" inserted into what, in the context of the email's entire text, appears to have been intended as "work ethic." At her deposition, Varughese testified that McCash never commented on her Indian background to her or to anyone else, to her knowledge. (Varughese Dep. at 175–176.) Either Varughese did not see this e-mail until after her deposition, or she did not interpret it as McCash denigrating her national origin until well into this lawsuit.

*The Department's Investigation of the December 8 Incident*
There were several administrative investigations into the December 8 altercation. Varughese alleges that hospital authorities were consistently and unfairly skeptical of her,

and consistently and unfairly trusting of white and/or male employees (including McCash, who does not self-identify as white), during those investigations. Varughese asserts that these attitudes were the proximate cause of several disciplinary actions that were to follow, up to and including her eventual termination.

**\*11** The Department of Pathology was the first to investigate. During the investigation, Varughese was told to report to Chief Resident Maniar (an Indian woman) rather than McCash. (Varughese Dep. at 179–80.)

As part of the investigation of the December 8, 2010 incident, Lento interviewed Drs. Bleiweiss, Jaffer, and Azar (the moonlighter), as well as a fellow who had been present. (Lento Dep. at 105, 113.) He also reviewed several e-mailed accounts from witnesses. (*Id.* at 105, 113.)

At least some of the people being interviewed had had doubts about Varughese before the December 8 incident. The reader will recall that Bleiweiss had found Varughese to be a no-show for several shifts, and that Jordan had previously complained that Varughese was lazy. They were not the only ones who criticized Varughese's professionalism. A departmental administrator named Eileen Hauptman assessed the December 8 incident as follows: "One person has [a work ethic] (SAM [McCash] ), the other (LEENA [Varughese] ) doesn't. Since Leena has been here, she has shown great antipathy to any work and least of all to patient care." (Docket # 205–6 at 5, e-mail of Dec. 9, 2010 from Hauptman to Pessin–Minsley *et al.* (emphasis in original).)

Prior to the December 8 incident, Varughese's formal evaluations reflected that she was "inconsistent" but were not negative. However, Bleiweiss' evaluation of Varughese for the period including December 8, 2010 (which she submitted on December 18, 2010) ranked her "below expectations" for professionalism. (Bleiweiss Evaluation, Docket # 205–7 at 14–15.) Others reviewing her for the same period marked her as satisfactory or slightly above average. (Evaluations, Docket # 204–8 at 4–23.)

During the investigation, Varughese refused to acknowledge that she had done anything wrong, that she could have handled her disagreement with McCash and Jordan differently, or that she might benefit from a different approach to conflict resolution. (Pessin–Minsley Dep. at 122.) As Dr. Pessin–Minsley testified, Varughese:

> was very angry. She was not hearing what [administrators] were saying to her and not responding to what we had asked her to do ... most situations are the fault of more than one side ... and there was no comprehension or any feeling that she might have had any responsibility or any part of it could have been her fault or she could have mitigated the situation.

(*Id.* at 123–24.) Varughese's attitude, as described by Pessin–Minsley, would surface again and again during the next nine months, as her career imploded. It is undisputed that whenever Varughese was questioned about an incident, she denied all wrongdoing and cast all blame on others, viewing her defensiveness as fully justified because of the unfairness of any and all complaints about her behavior. (*See* Varughese 56.1, *passim*.)

During the Department's investigation, Varughese went to Lento over and over again to complain about McCash's behavior on December 8. She alleges that Lento was unsympathetic to her complaints. However, Varughese did not think this was because of her gender, her national origin, or her membership in any other protected class. Instead, Varughese believed that Lento was hostile to her because she had given him a negative review in a student-to-teacher review of a rotation months earlier. Varughese testified that, during one December 2010 meeting, Lento "indicated to me that in so many words that my rights won't be protected as long as he believed that I wrote a negative evaluation" about the rotation. (Transcript of Internal Appeal at 281–82, Docket # 205–31 at 77.)

**\*12** The negative evaluation is not part of the record, but there is no evidence that it involved any complaint of discrimination, or that it otherwise constituted protected activity.

*The December 10, 2010 Alteration with Jordan*
Two days after the December 8, 2010 incident, Varughese was in trouble again, this time for ignoring an instruction to let the Department's investigation proceed without interference.

On December 10, 2010, Varughese allegedly confronted Jordan about her role in the December 8 incident. (*See* Docket # 205–5 at 10, e-mail of December 10, 2010 from Jordan to Pessin–Minsley, McCash and Lento.) The parties disagree about who started the confrontation, but Varughese agrees that it occurred at Jordan's desk.

Varughese received a written warning for interfering with the investigation; Jordan did not. Both Jordan and McCash sent e-mails to others in the department publicizing their version of what had happened on December 8. Neither was disciplined for interfering with the investigation.

At her deposition, Interim Chair Pessin–Minsley explained that Varughese alone was disciplined "because there was physical confrontation, as opposed to something put in an e-mail to senior people of a department ... [e]ven though, I would not have put all of those people in the e-mail." (Pessin–Minsley Dep. at 131–32.)

*December 21, 2010 Notice of Academic Advisement*
On December 21, 2010, the Department concluded its investigation and placed Varughese on a form of probation known as an Academic Advisement. The Department cited Varughese's behavior on both December 8, 2010 (the McCash incident) and December 10, 2010 (the confrontation at Jordan's desk) to justify the imposition of probation. (Dec. 21, 2010 Notice of Academic Advisement, Docket # 205–7 at 29.)

Academic Advisement warns a resident that she must improve her performance in accordance with certain guidelines or she will face discipline. (Defendants' 56.1 at ¶ 16.) Associate Director of Graduate Medical Education Scott Barnett testified that academic advisement

> was ... a very clever invention. Before academic advisement was available, all discipline was formal with, uhm, due process rights. And it didn't give the programs the flexibility to create remediation plans that fell short of formal discipline. So this category was created ... so as to avoid the first step being a formal discipline which could potentially be reported to regulatory bodies [such as] licensing

authorities, boards [ ... or] the Office of Professional Medical Conduct of New York State.

(Barnett Dep. at 34–35.)

The Notice given to Varughese reads as follows:

> This letter is to inform you that you are being placed on Academic Advisement. This decision is based on the investigation of your altercation(s) with other residents while on the Surgical Pathology rotation on Dec 8 th and Dec 10th, 2010.

*Brief summary of events*

> One of the chief residents had specifically discussed with you the need for you to gross specific specimen(s). Instead, you had one of the moonlighters handle the specimen(s). When confronted with this by the chief, you became loud and verbally abusive to his authority and advisement as chief. This altercation was upsetting to those present (including other residents in the gross room [i.e., the area where residents "grossed" (analyzed) patient tissue samples and slides], an attending (Dr. Jaffer) and a medical student, who felt she needed to leave the area as a direct result of the altercation) and disruptive to the Department's operations. You are also noted to have gotten into an argument with one of the moonlighting residents (Dr. Jordan) that evening and continued to harass her about it on another day. In addition, it was noted that you had failed to appropriately gross in cases that should have been taken care of that day.

*Problematic areas identified*

**\*13**   ○ Failure to demonstrate an appropriate level of professionalism

>   ○ Patient care related lapse (grossing-related responsibilities)

> These are critical areas fundamental to successful completion of your training.

*Plan of action*
After discussions with you, Dr. Pessin[-Minsley] and [nonparty] Dr. Stimmel, we hope the following plan with help you overcome these deficits:

○ Meeting with the Program Director or, as needed, interim chair/chair or others in authority within the Department of Pathology, every 3–4 weeks for continued assessment and advisement

○ Continued performance of assigned resident duties under the guidance of Pathology Chief resident(s), Pathology faculty and/or Program Director

○ Self–Reflection exercise (to be handed in to me within 4 weeks)-You are expected to write down your account of the situation and describe how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance.

○ Reading exercise-You are expected to read the book entitled *Practicing excellence: A physician's manual to exceptional healthcare* [sic] by Stephen Beeson during the 3 month period of academic advisement (we can obtain a copy for you if necessary).

*Follow up*

We will meet again in 3 months to review your progress. Your performance will be closely monitored for improvement in the areas of professionalism and patient care as outlined above. We expect that you will perform your duties in a manner that is professional, appropriate and non-threatening to others. We are hopeful that this plan of action will allow you to overcome the difficulties outlined and succeed in our training program.

We must make it clear, however, that if you are unable to improve your performance or if any future incidents involving poor professionalism recur, you may be subject to discipline up to and including termination from the Program.

(Docket # 205–7 at 29–30.)
McCash was not placed on Academic Advisement. (Varughese 56.1 at ¶ 7.1.) He was, however, disciplined. Lento testified that, as was his "standard," he applied an "individualized" and informal approach to disciplining McCash for his role in the December 8 incident. (Lento Dep. at 28–31.) McCash's informal discipline required him to accept "training" from supervisors "about how to handle situations like [this one] better in the future." (Varughese 56.1 at ¶ 14.3; Defendants' 56.1 at ¶ 144.) Further, in the months

that followed, HR "actively follow[ed] up with McCash regarding his wrongdoing, and he apologized" to several supervisors. (Varughese 56.1 at ¶ 23.1.) Lento believed, however, that he needed to use a more "formal" approach to discipline with Varughese, because her behavior had been so extreme, and because less formal reprimands had not been effective thus far at convincing her that her behavior had been inappropriate. (Lento Dep. at 28–31.)

**\*14** When Lento informed Varughese that she was being placed on Academic Advisement on December 21, it seemed to him that she "lack[ed] insight into what happens and still blames others for what occurred." (*See* Lento Notes, dated December 21, 2010, Docket # 205–7 at 30.)

And indeed, on December 23, 2010, Varughese sent a written response to the Notice of Academic Advisement contesting its version of events and identifying several "Problem areas ...:(1) Public humiliation by Dr. McCash[;] (2) Potential immediate danger[;] (3) Possible retaliatory action to this complaint ... (4) Negative consequences of this event on my health." (Docket # 205–9 at 11, e-mail and attachment of Dec. 23, 2010.) Among the recipients of this communication was Associate Director of Graduate Medical Education Scott Barnett. After reading it, he wrote to Pessin–Minsley, expressing concern that, if Varughese's "allegations regarding Sam [McCash] are true, he may need to be counseled and placed on" Academic Advisement himself. (Docket # 205–9 at 17, e-mail of Dec. 23, 2011 at 3:50 p.m.). Pessin–Minsley responded to Barnett based on her belief that none of Varughese's allegations were true:

> I have witness documentation that there was no physician intimidation or abuse by Sam [McCash] ... All accounts indicate that his response to Leena not following his direction was appropriate. He was firm, but not loud or physical. Leena's account seems to be a figment of her imagination or at the very least, a significant exaggeration.

(Docket # 205–9 at 9, e-mail of Dec. 23, 2010 at 3:56 p.m.,) Pessin–Minsley's information came from Azar (the moonlighter) and Jordan. (Pessin–Minsley Dep. at 151–53.)

2015 WL 1499618

*Varughese Complains to HR*

In addition to protesting her Academic Advisement within the Department, Varughese submitted substantially the same grievance to Human Resources. This caused Caryn Tiger–Paillex of HR to begin a second, independent investigation.

Tiger–Paillex first met with Varughese. At that meeting, Varughese expressed concern that McCash was, "going out of his way to micromanage [her]" and questioned whether it was "because he is a guy?" (Tiger–Paillex Dep. at 30–32, 38, 41.) This was the first and only indication that Varughese might have perceived McCash's behavior as motivated by her gender; even this was backhanded, though, since the statement literally indicates that Varughese correlated a negative behavior (micro-managing) with being a man.

During the meeting Varughese did not (1) allege that McCash treated other women or other people of Indian descent similarly, (2) allege that he treated men better or differently than he treated women, or (3) allege anything at all about her national origin.

Varughese testified that Lento began treating her coldly after she complained to HR. She alleges that, on January 10, 2011, Dr. Lento admonished Varughese for taking matters "outside the Department." (Varughese 56.1 at ¶ 35.1.) Varughese claims that this comment was part of a pattern of Lento's becoming progressively more "aggressive" toward her in person, but she does not identify any other acts that demonstrated this. (Varughese 56.1 at ¶ 37.2.)

*Varughese Fails to Fulfill the Requirements of the Academic Advisement*

**\*15** Varughese did not fulfill the terms of her Academic Advisement. Her self-reflection essay was due on January 18, 2011. She did not ask for an extension; she simply did not submit it. (Defendants' 56.1 at ¶ 35.)

While Varughese met with supervisors "three, four times" in the period of her Advisement (Varughese Dep. at 270–71), she did not meet with them each time she was required to do so. (Defendants' 56.1 at ¶ 37.)

At her deposition, Varughese testified that she was excused from complying with the Advisement by virtue of complaining to the Department and to HR. (Varughese Dep. at 274.) No one ever told her that complaining excused compliance, and she never bothered to ask anyone whether

the effect of her complaints was to lift the Advisement. (*Id.*) In fact, her complaint had no effect on her Advisement, which was part of the training component of her residency.

On January 19, 2011, the day after she was supposed to have submitted the self-reflection, Varughese told administrators that Lento was being hostile to her. Again, she ascribed that hostility to her negative review of Lento's rotation, not to retaliation for any protected activity. (*See* Notes entitled "LV–1/19/11–w/SB," Docket # 205–9 at 32.)

On January 21, 2011, Varughese reported that someone had broken into her locked desk at work; she found a drawer that was normally locked was open; the lock was broken. (Docket # 205–21 at 11, Jan. 21, 2011 e-mail from Varughese to Maniar.)

*Varughese Accuses McCash and Jordan of Drinking on the Job*

In a January 24, 2011 meeting with Caryn Tiger–Paillex, Varughese injected a new issue into her complaints about McCash and Jordan: she accused them of drinking alcohol at work. (*See* Tiger–Paillex Notes of Jan. 24, 2011, Docket # 205–7 at 5; *see also* Docket # 205–10 at 2, e-mail of Apr. 25, 2011 (referencing Jan. 24 meeting as her first complaint on the subject).) Specifically, she accused McCash and Jordan of drinking Captain Morgan rum at work, "right before AP [anatomic pathology] call." (Tiger–Paillex Notes of Jan. 24, 2011, Docket # 205–7 at 5.) Varughese also accused other residents of conducting happy hours on work premises in the evenings. (*Id.*)

There is some evidence that residents, including McCash, engaged in a social drinking activity called "dementia rounds," on hospital premises. (*See* Docket # 205–3 at 8–18: e-mail of Sept. 9, 2009 from McCash to Michael Mikulasovich; e-mail of Oct. 7, 2010 from McCash to fellow residents; e-mail of Nov. 4, 2010 from McCash to fellow residents; e-mail of Dec. 1, 2010 from McCash to fellow residents). In organizing what appear to be weekly or monthly "dementia rounds"-normally on a weeknight in a hospital conference room-various residents either offered to bring alcohol or asked others to do so, in the form of beer, wine, or simply "booze." (*See* Docket # 205–3 at 19, e-mail from Jessica French to other residents; *id.* at 20, e-mail of March 4, 2009; *id.* at 21, e-mail of August 3, 2010.) There is also some evidence that dementia rounds occurred during, and not merely after, residents' shifts. For example, McCash promised to come to one evening of dementia rounds as a way to

"tak[e] a *break* from grossing," meaning analyzing patients' tissue samples. (Docket # 205–3 at 16, e-mail of June 3, 2010 from McCash to other residents (emphasis added).) At his deposition, McCash denied ever having returned to work after drinking, and if McCash dropped in on a dementia round in mid-shift, that does not mean that he imbibed. Varughese testified that he did, but she did not explain how she knew this-whether she observed it personally, heard it from third parties, or simply inferred it from McCash's presence at an event. Whatever, simply having alcohol on hospital premises was at a minimum unwise and more than likely a violation of hospital protocol; it was not behavior that could or should be ignored.

*The Physician Wellness Committee*

**\*16** After Varughese had been placed on Academic Advisement, and while the HR investigation into the December 8, 2010 incident was open, Interim Chair Pessin–Minsley referred her to the Physician Wellness Committee ("PWC").

The PWC is a hospital-wide resource that assists physicians suspected of being impaired for behavioral, psychiatric or physical reasons. (Defendants' 56.1 at ¶ 30.) Significantly for our purposes, if the PWC makes a request of any physician at Mount Sinai, immediate compliance is mandatory, on pain of termination.

Pessin–Minsley told Dr. Arthur Figur, the chair of the PWC's investigative arm, that she was making the referral because Varughese was "insubordinate, loses control, and shouts and screams when confronted with issues that she needs to address." (Figur Dep. at 24–25.)

Varughese alleges that the act of referring her to the PWC was a Kafka-esque attempt to humiliate and discredit her, even as she was managing thousands of cases for the hospital, caring for patients, and covering for other residents. (Varughese 56.1 at ¶¶ 30.2–30.3, 34.1.)

When the referral was made, Figur did something he has never done before or since-he investigated whether the referral to the PWC was itself appropriate. He did this, "Because the department was in turmoil." (Figur Dep. at 38.) He wanted to be sure that Varughese's behavior was appropriate for referral to the PWC, and that Varughese was not being made a casualty of departmental dysfunction. (*Id.*)

Figur conducted his own investigation of the events of December 8, interviewing more or less the same witnesses that the Department had interviewed and that HR was interviewing. He eventually concluded that McCash was "loud" with Varughese and "pressed the issue that she should be responsible and perform her duties," but that Varughese had lost control entirely. (Figur Dep. at 43, 48.)

Figur did not investigate the earlier September incident "because having interviewed other people, they have had similar experiences with Dr. Varughese. And there were issues of lateness coming in, not calling in when she would not-was sick, at the appropriate times, not listening to other chief residents." (Figur Dep. at 48–50.) Such reports-of Varughese's lateness or absenteeism, and her failure to tell people where she was-pepper the record.

After conducting his own inquiry, Figur concluded that the referral was in fact appropriate. "We felt she had difficulties; we are here to help. And that it was not an administrative disciplinary type of issue, but something that could possibly be corrected." (Figur Dep. at 38.)

It took a long time to convince Varughese that she had no choice but to meet with the PWC; she failed to respond to messages and at first refused to cooperate with the referral. When she finally agreed, on pain of termination, she immediately gave the PWC cause for concern.

Because the PWC had reports that Varughese's behavior was erratic, Figur asked her to submit to a toxicology screen, which:

> **\*17** was negative, but she wanted to drink an excessive amount of water. When [Figur] told her no, [he] took her over and the nurse at employees health would also refuse to give her more water and she admitted that she is on [certain] medications [including a sleep aid and possibly a stimulant] ... I would then be very concerned and would mandate that she give us a prescription from her current treating [physician] who gave her these medications because I'm always

concerned about self-medicating by physicians.

(Transcript of Internal Appeal at 242–244, Docket # 205–31 at 68.) In other words, Varughese admitted that she was taking medications (which might well have been as unwise or inappropriate as participating in dementia rounds). Her desire for excessive amounts of water prior to screening is consistent with flushing any residue out of her system before the toxicology screen; the Court is familiar with this gambit from criminal cases, where drug users use water to dilute evidence of drugs in their urine. Varughese's insistence on drinking lots of water while being screened for drugs was itself of concern to the PWC, and justifiably so.

It was standard for the PWC to refer physicians to the staff psychiatrist, and Figur thought it was particularly appropriate that Varughese see someone, because her "behavior at various times during the past was inappropriate. She lost control of herself. Not being a psychiatrist," Figur "put down the pattern of behavior ... that she may have anger management issues, that she certainly does not deal [well] with authority." (Figur Dep. at 47.)

On April 11, 2011, Figur referred Varughese to a staff psychiatrist, Dr. Madeleine Fersh.

In the referral, Figur explained to Fersh that:

> most [of Varughese's] workplace behavioral issues can be summarized as inappropriate outbursts ... instead of collegial discussions ... by not accepting the hierarchy of delegated authority. The presenting behavior: shouting, screaming, incoherent rants in the hallway in response to an admonishment by a chief resident ... She did not admit to us that she was out of control although numerous unbiased witnesses agreed that she behaved in that manner ... The outbursts are 'unpredictable' and over 70% of the time she is collegial.

(Docket # 205–24 at 55.)

Varughese did eventually see Dr. Fersh, although she cancelled her first appointment, came to the second at the last second and [Redacted]

[Redacted]

[Redacted] [3] (This paragraph will be redacted from the published decision.)

[3]    Varughese herself provided this document to the Court in a public filing. *See* Docket # 205–24.

*Jordan is Promoted to Chief Resident*

By mid-February 2011, Lento had promoted Jordan to be the third acting Chief Resident. Varughese's summary judgment opposition papers allege-again, for the first time in this litigation-that Jordan's promotion over her was discriminatory, presumably because of her national origin, since Jordan, like Varughese, is a woman. (The reader will recall that one of the Chief Residents, Dr. Maniar, was a woman of Indian descent).

**\*18** Jordan's promotion *was* unusual in one sense; she was only in her second year of residency. (*See* Docket # 205–9 at 57, e-mail of Feb. 17, 2011 from attending physician Dr. Tamara Kalir to colleagues; Jordan Tr. at 14.) One professor found "the matter of bypassing seniors to be very troubling. It has hurt resident morale-significantly ... Bypassing senior housestaff [i.e., residents] gives them the message that we don't believe in them. I feel very uncomfortable, not to mention a little embarrassed about this." (*Id.*)

However, Varughese does not explain why she was as or better qualified for the position than Jordan, and the undisputed evidence. The very fact that Varughese had difficulty dealing with colleagues, which is not in any genuine dispute, would appear to disqualify her from serious consideration. So would the fact that Varughese was on Academic Advisement, as well as the fact that she was resistant to being assessed by the PWC. Jordan suffered under none of these impediments. While Varughese points to difficulties Jordan had managing certain administrative responsibilities once she became a Chief Resident, she presents no evidence that Jordan had performance issues before the promotion.

There is no evidence that either Schiller (who allegedly referred to Varughese's national background in the early years of her residency) or McCash (whose e-mail referred

to Varughese's "work ethnic") was involved in the decision-making process.

*Varughese Persists in Refusing to Fulfill the Terms of the Academic Advisement*
On March 30, 2011, Varughese finally submitted the self-reflection essay that her Academic Advisement required. It was two and a half months late.

The reflection was hardly reflective. It is in fact highly defensive. It goes on for several pages about McCash's alleged wrongs. A representative sampling, beginning with the first words that appear in the reflection:

> I was verbally intimidated by Samuel McCash in a very aggressive and confrontational manner on September 12 th 2010 ... [after meeting with Lento about the September 12 incident], I believed that the evaluations which, were to be completely anonymous were not in fact anonymous, and realized or suspected that they may pose a threat to residents if anyone were to negatively evaluate a rotation ... on December 8, 2010, there was a second incident with Samuel McCash, very much to my dismay ... Samuel McCash became verbally abusive towards me ... The next day, I sensed that there was much whispering and talking amongst the attendings and others regarding this event, and I felt humiliated and thoroughly distressed that I was in the midst of this situation ... I feel that I have attempted to remedy these situations to the best of my ability by utilizing the appropriate authoritative channels and giving Drs. Pessin and Lento the benefit of the doubt but these have only led to what seems to be additional complaints and accusations (i.e. insubordination on 12/21/2010) to be launched against me, even after several months after these incidents ... Samuel McCash

> has exhibited volatile, aggressive and dangerous behavior towards me twice already ... However I now find that I have to defend myself from not only avoiding and preventing abusive behavior from Samuel McCash but also to defend myself from complaints of unprofessionalism at how I handled a difficult situation to blatantly false aaccusations of insubordination when presented with the Notice of Academic Advisement ... Despite these incidents, I have completed my assigned rotations without taking off to deal with the traumatic and abusive nature of these incidents."

**\*19** Toward the end of the essay, Varughese wrote that, "finally," she was "apologetic that I did not find a better way to navigate [the September and December] incidents." (Self–Reflection Essay 1,

Docket # 205–4 at 88.), but she did not admit to having done anything wrong, explain what she could have done differently, or express how she could have better handled the confrontations. (Defendants' 56.1 at ¶¶ 35–36.)

Significantly for this lawsuit, Varughese's document mentions nothing about discrimination and does not suggest that her race or gender figured into the incidents she was describing.

When Pessin–Minsley read the reflection, she was not pleased. She wrote to HR that the essay "was supposed to be [Varughese's] reflection on how SHE would have handled herself differently ... Clearly she is incapable of any self-reflection." (Docket # 205–9 at 25, e-mail of Mar. 30, 2011 at 3:42 p.m.) She also wrote that Varughese had "twisted all the events and much is blatantly not true," and complained that "both Dr. McCash and Dr. Lento (as well as [her]self) [were] being harassed and slandered." (Docket # 205–9 at 25, e-mail of Mar. 30, 2011 at 2:58 p.m.)

During this time, Varughese alleges that the workplace environment was becoming unbearable for her. She alleges that Dr. Lento "was erratic and threatening" towards her (Varughese 56.1 at ¶ 18.3), and that McCash and Jordan "continued to harass" her and disrupt her work (*id.* at ¶ 18.1). She offers no evidence about specific instances or

behaviors to support those conclusory assertions. And indeed, Varughese had no contact with McCash at all from and after December 8, 2010–a fact that she admitted to Tiger–Paillex. (Varughese Dep. at 142.) So he could not possibly have been making life difficult for her during this period.

### HR Concludes its Investigation and Permanently Removes Varughese from McCash's Supervision

On April 5, 2011, Tiger–Paillex told Varughese that the investigation had concluded and that she would continue to report to Maniar, rather than to McCash. (Varughese Dep. at 131, 133.) Either at that meeting or on the phone shortly thereafter, Varughese told Tiger–Paillex that she had had no direct interaction with McCash since December 2010. (*Id.* at 142.)

On April 7, 2011, Varughese asked for a copy of Tiger–Paillex's written summary of her investigation. (Docket # 205–9 at 13, e-mail of Apr. 7, 2011.) She also asked to "move on in my life. These continued investigations and interrogations have taken a toll on my physical and mental well-being. I find that I am relieving [sic] this event [sic] over and over again with each new interview, now nearly 4 months after the incident ... Under NYC law, workplace harassment and retaliation are crimes." (*Id.*)

That same day, Varughese forwarded an e-mail regarding a proposed "dementia round" to an attending physician, Mary Fowkes, to "voice my concern" that people should not "drink and 'drive'," i.e., drink and return to work. (*See* Docket # 205–3 at 13, e-mail of Apr. 7, 2011 from Varughese to Fowkes).

 **\*20**  On April 11, 2011, HR sent Varughese a letter saying that it had been unable to substantiate her claim that McCash had engaged in inappropriate behavior on December 8, 2010. (Defendants' 56.1 at ¶ 23.) Nevertheless, HR confirmed that Varughese was to continue to report to Maniar, rather than McCash. (Defendants' 56.1 at ¶ 24.)

Of course, Maniar had been plaintiff's direct supervisor since December 8, and this had not solved any of Varughese's problems. As a supervisor, Maniar-an Indian woman, just like Varughese-was no more pleased with Varughese's professionalism than McCash had been. In her declaration, Maniar described Varughese as a problem employee who "would call out unexpectedly and for multiple days and it would be difficult for me to find coverage." (Docket # 163, Maniar Decl. at ¶ 8.) Maniar recalled one specific occasion on which Varughese said she would not be available to cover

for another resident even before she knew what date the other resident would be absent. (*Id.*)

### Varughese Explicitly Complains About Gender Discrimination

On April 25, 2011, Varughese e-mailed the HR department, and, for the first time, explicitly asserted that McCash had discriminated against her because of her gender. (Defendants' 56.1 at ¶ 26). Her

> perception was and is that I am being threatened and berated by a male resident because I am a woman. I doubt that he would yell or attempt to physically intimidate a male resident ... My complaint is that of being discriminated against by the male chief resident based on the fact that I am a woman ...

(Docket # 205–10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger–Paillex.) By the time she made this complaint, Varughese had long since ceased reporting to McCash; by her admission, she had had no dealings with McCash since December 8, 2010. [4]

[4]
> In May 2011, after she made this complaint, Varughese was on rotation at the VA Hospital in the Bronx. (Varughese Dep. at 127–128.) McCash was also there. (*Id.*) There is no evidence that he had any supervisory authority over Varughese, and it is undisputed that he and Varughese were kept apart. (*Id.*) While Varughese reports that McCash "glared" at her or "stomped" around her workplace, she did not report this to anyone. (*Id.*)

Varughese's April 25, 2011 complaint also mentioned that Schiller had "said that there is something wrong with my DNA and asked me to see a therapist." (*id.*) This appears to refer to Varughese's discussion with Schiller in the fall of 2009, discussed above. (*See supra* at 9–10). Varughese did not suggest that this comment had anything to do with her race or gender. [5]

[5]
> There is no evidence in the record that Schiller had any role in guiding the course of the Department's

investigation of the December 8 incident. The record is also devoid of evidence that Schiller had any role in placing Varughese on Academic Advisement.

Finally, Varughese reported that she "had witnessed ... McCash and ... Jordan drinking ... liquor at work at 5 pm ... while still involved in patient care related duties, this situation was relayed to Dr. Figur and [departmental administrator] Paul Johnson at the second [PWC interview]." (Docket # 205-10 at 2, e-mail of Apr. 25, 2011 from Varughese to Tiger–Paillex.)

In response to Varughese's explicit complaint of discrimination on the basis of her sex, Tiger–Paillex of HR asked to meet with Varughese to discuss the matter further. Varughese refused; she thought that it would be a "waste of time." (Varughese Dep. at 177–79.)

*Varughese is Given a Fresh Start*

On April 1, 2011, Dr. Carlos Cordon–Cardo joined Mount Sinai as Chair of the Department of Pathology, taking over from Interim Chair Pessin–Minsley. (Final Warning Letter, Docket # 205-7 at 33.) He had never before interacted with Varughese; he had no involvement in her Advisement.

**\*21** Cordon–Cardo turned his attention to Varughese one month into his tenure. He met with her on May 3, 2011 to follow up on her original Academic Advisement. He told her that he wanted to give her a fresh start with him-a chance to rewrite the self-reflection and otherwise complete the terms of the Advisement, which she had thus far failed to complete. (Defendants' 56.1 at ¶ 40.)

Varughese surreptitiously taped that meeting; she has submitted both a copy of the audiorecording and a transcript. (*See* Docket # 205-24, beginning at 13.) The conversation began with Lento asking Varughese whether she had read the book on professionalism she was required to read as part of her Academic Advisement. (*Id.* at 14–15.) She claimed to have read the book, but could not recall the name of its author or any of its content beyond its title. (Docket # 205-24 at 5.) It was obvious to Lento-and to anyone who has listened to the tape-that she was not truthful when she said she had read the book, and indeed, at her deposition, she admitted to having lost, not one, but two copies of it. (Varughese Dep. at 281–82.)

The tape reveals that Varughese evaded questions with further questions. (Docket 205-24, Transcript at 6, 8). When Lento

admonished her for rolling her eyes after Lento commented that she had "some anger issues regarding what happened," she neither apologized nor denied what she had done, but said, "Let's just ignore that." (*Id.* at 6, 8.) Even as her supervisors tried to focus her on how she would handle conflict in the future, Varughese kept rehashing the December 8, 2010 incident. (*See, e.g., id.* at 19.) She repeatedly interrupted her supervisors. (*See, e.g., id.* at 3, 14, 22, 23, 31.) To a listener, she does not come across well.

And still the hospital tried to work with her. An administrator who was present asked Varughese to rewrite her self-reflection, actually read the book and come back in two weeks. (*Id.* at 29.)

> If you can complete these processes and actually do them in the right way not just, okay, I'll read the book, you know, go through the motions. Actually do it the right way and come back to us in two weeks and say yes, I reflected, this is how I could have handled it differently. Really try and look at it from a different perspective. Not just go through the motions. I understand it's an exercise that probably nobody would want to go through, but this is where we are right now and how we're going to address it ... Give us an essay that ... to put aside all of these things and to be creative ... forward thinking.

(*Id.* at 29, 32.)

Varughese was supposed to submit the revised reflection prior to the May 24 follow-up meeting and no later than May 23, 2011. (Final Warning Letter, Docket # 205-7 at 33.)

*Varughese Again Complains about Drinking in the Hospital*

On May 5, 2011, two days after their first meeting, Varughese e-mailed Cordon–Cardo with a host of complaints. (*See* Docket # 205-24 at 47–48, e-mail of May 5, 2011 from Varughese to Cordon–Cardo.) She reiterated her complaint that McCash had discriminated against her because of her sex, and also complained for the first time about retaliation:

2015 WL 1499618

"It has become apparent to me that the [disciplinary] actions taken thus far have been in retaliation to my complaints of harassment ..." (*Id.* at 48.) Varughese also characterized Lento's treatment of her as "unfair," but in contrast to her accusation that McCash's behavior was "based on gender bias," she did not ascribe that unfair treatment to discrimination or to retaliation. (*Id.*)

**\*22** Varughese also revisited the topic of McCash and Jordan's drinking. This time, she said " 'dementia rounds' ... had never been an issue" (Docket # 205–24 at 44, e-mail of May 5, 2011 from Varughese to Cordon–Cardo.)–an odd thing for her to say, since dementia rounds was exactly what she had been complaining about. Instead, she complained that McCash and Jordan had been drinking while "involved with patient care duties on several evenings including November 23 [2010]." (*Id.*)

This allegation led to yet another internal investigation-conducted in part by Figur of the PWC. The investigation turned up a bottle of Captain Morgan rum on hospital premises. Without finally concluding who brought it, administrators immediately sent a hospital-wide e-mail forbidding anyone from bringing alcohol to work or drinking on hospital grounds. (*See* Johnson Dep. at 133–35.)

*The Second Essay*

Rather than submit her second self-reflection essay by the May 23 deadline, as instructed, Varughese submitted her second essay at the May 24 follow-up meeting. (Defendants' 56.1 at ¶¶ 44–45.)

The second essay was, if possible, less "reflective" than the first. Varughese complained that Defendants' request that she re-write the essay was itself retaliatory. She asserted that, even though she had "apologized for anything that I had done that was not perceived as positive or professional by Dr. Lento ... I had not done anything except defend myself in a difficult situation." (Self–Reflection Essay # 2, Docket # 205–10 at 8.) She continued to dispute Defendants' version of events on December 8, 2010, accused others of being "unprofessional," unreasonable and "retaliatory," and "stand by my decision[s]" thus far. (*Id.*) There is no suggestion in the essay that Varughese ever did anything inappropriate or that she could have done anything differently. (*See id.*) Rather, reflecting her refusal or inability to understand why she was on Academic Advisement, Varughese stated, "I have been professional throughout." (*Id.* at 9.)

Varughese alleges that, at the May 24, 2011 meeting, Cordon–Cordo instructed her to stop complaining about doctors drinking on the job. (Varughese 56.1 at ¶ 42.1). A verbatim transcript of that meeting and the tape show Dr. Cordon–Cardo telling her that "the best way ... to move on is not with this attitude. You can come here with another attitude and to say ... I'm going to drop all of this nonsense of people drinking ..." (Docket # 205–24 at 40.) Varughese interrupts him to say that those are important matters "that need to be addressed," and Cordon–Cardo responds

> We are addressing these people ... we are taking these matters very seriously today. We ... have a lot of work to to do ... but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems ... You can't keep going back and forth ... coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking and to be honest with you ...

**\*23** (*id.* at 40–41.) At that point Varughese interrupted her supervisor with a long rambling speech about matters far afield from her conduct in issue. (*Id.*)[6]

[6] It begins, "Well, we need some honesty and transparency then because, you know, you can't just have one person, you know, saying whatever they want and doing whatever they want, such as on the moonlighting nights-I'm the primary moonlighter, really, then why does the schedule say somebody else is the primary moonlighter? You know, these are issues like, you need to address, like if you are going to have integrity you're going to have integrity across the board, if not, you're not." (*Id.*) It goes on for another paragraph in the transcript.

The tape of the May 24, 2011 follow-up meeting is otherwise at variance with Varughese's account that she never engaged in unprofessional behavior. (*See* Docket # 205–24, beginning at 32.) The conversation begins with Varughese alternately speaking indiscernibly and swearing. (*See id.* at 33.) In

response to the question "How are you?" Varughese launches into the following:

> this is rather silly given that I've already written a reflection ... and I apologized for whatever I had done [no apology is reflected in the transcripts of the May 3, 2011 or the May 24, 2011 meetings] ... I even changed my mind as to how I feel regarding everything, but ... You're retaliating against me for making a complaint ... Yeah. I already said I apologized ... Every single time there's a meeting there's something. And I'm supposed to go back and reflect ... What's happened has happened and that's that.

(*Id.* at 32–33.)

Varughese characterized her first essay as describing what she could have done differently in that it describes what she *did*. She appeared not to comprehend that she was supposed to identify things she should not have done or things did *not* do that she could and perhaps should have done. (*Id.* at 35–36.)

The essay ends with an apology, "if I ... offended anyone else in any way, shape or form." (*Id.* at 40.)

*Varughese's Job Performance Continues to be Problematic*
During May and June 2011, Varughese alleges that she was still actively working on various rotations, analyzing patients' slides for diagnosis, teaching medical students, and otherwise doing her job. (Varughese 56.1 at ¶ 43.2.)

Her supervisors did not see it that way. In the hours following the morning meeting of May 24, 2011, Chief Resident Elizabeth Morency (an African American woman) wrote to Cordon–Cardo regarding "the ongoing problems we have been having with Leena Varughese." (Docket # 205–24 at 71–72, e-mail of May 24, 2011 from Elizabeth Morency to Cordon–Cardo.) She described Varughese's getting into arguments with Physicians' Assistants ("P.A.s"), in which she demanded that those P.A.s do more of her work in the grossing room. (*Id.*) "These disagreements have been escalating in the past couple of days and I had to stop grossing

myself to help diffuse a disagreement between [a P.A.] and Leena this afternoon ... that was witnessed by several other residents and was completely unfounded." (*Id.*) After the argument, Morency related that Varughese left early, leaving work undone. (*Id.*) At her deposition, Morency testified that Varughese, "raised her voice and w[as] disproportionally angry to the situation at hand and ... [was] not calm and it was over grossing a specimen. It just seemed over the top." (Morency Dep. at 54.)

**\*24** While Cordon–Cardo explained that Varughese had had a stressful morning (i.e. meeting with him), Morency went on that this was "just one example of an issue that has come up in the past couple of weeks." (*Id.* at 72.) She asked for a meeting "to discuss Leena's increasingly erratic behavior and her future in our program. I am becoming increasingly concerned, not only for [Varughese's] well-being, but for the well-being and morale of the other residents and PAs that are also affected by her behavior." (*Id.*)

After her outbursts, Lento asked several people to help Varughese with her work so that she could get "back on track." (*See* Docket # 205–24 at 82–83, e-mail chain of May 26, 2011.) It seemed to work; with assistance, one supervisor found Varughese to have shown "SIGNIFICANT improvement." (Docket # 205–24 at 93, e-mail of Jun. 2, 2011 from Kalir to Lento.)

Nevertheless, Varughese continued to have difficulties through June 2011. To be fair, she was not the only one; several people in Varughese's program were behind in their work. A white female resident had "about 15 cases from the middle to end of May that ha[d] yet to be signed out. Last week [a male resident of Asian descent] had 6 placentas that were 3 weeks late." (Docket # 205–11 at 17, e-mail of Jun. 10, 2011 from Jordan to Lento, Bleiweiss and Morency) Jordan was having trouble completing her responsibilities-a supervisor had to "ask[ ] her to let [the supervisor] know when she is required elsewhere, so we can try and make provisions in her absence." (Docket # 205–11 at 18, e-mail of Jun. 13, 2011 from Kalir to Lento.)

Varughese's issues, however, were more intractable than others'. (*See* Tiger–Paillex Dep. at 105–106.) At some point in June, Cordon–Cardo asked whether they could hold Varughese accountable for failing to make certain data entries. (*Id.*) Tiger–Paillex asked whether others had the same issue and were going to be held accountable as well. (*Id.*) In the end, Tiger–Paillex concluded that Varughese was in a different

situation from the othr residents, because she submitted her data entries later than everyone else. (*Id.* at 109.)

*Varughese Retains Counsel*

On June 10, 2011, Varughese's newly-retained counsel wrote a letter to Tiger–Paillex, advising her "that this firm has been retained ... to prosecute claims of sex/ gender discrimination, perceived disability discrimination, and retaliation in violation of the [sic] Title VII ... the [NYSHRL] and the [NYCHRL] ... during [Varughese's] employment ... her supervisor Samuel McCash verbally and physically intimidated her ..." and referencing Varughese's April complaint as the first time she had complained about gender discrimination. (*See* Docket # 205–10 at 12.)

It is worth noting that counsel did not advance any race discrimination claim.

Counsel demanded a response by July 6, 2011, failing which it would take legal action. (*Id.*) The record does not contain any evidence of a response directed to counsel.

*Final Warning and the Supervision of Defendant Firpo*

 **\*25**  The Department issued Varughese a Final Warning letter on July 15, 2011. (Docket # 205–7 at 32 (it is dated July 1, 2011, but Varughese actually received it on July 15).) The Warning was:

> To inform you of the Department's decision to issue this final warning to you. This decision stems from your failure to fulfill the requirements of your December 21, 2010 Academic Advisement and your behavior at the follow up meeting on May 24, 2011.

The Academic Advisement required you:

(1) To prepare a written self-reflection by January 18, 2011

(2) To meet with [Lento] periodically to assess your progress

(3) To read [the book]

Throughout the period of Academic Advisement you showed a pattern of lack of professionalism. First, you submitted your self-reflection ... long after it was due, and, once submitted, the essay did not meet the Advisement's requirements. When I asked you on March 22, 2011 when you would be submitting the essay, you responded that you were 'really swamped' that week, did not know when you would have time to write the reflection, and asked to submit it the following week. You did not hand in the essay until March 30, 2011.

Although the Academic Advisement required a self-reflection on 'how you could have approached things in a better fashion, including commentary on physician professionalism and its role in this circumstance,' your essay contains nothing resembling self-reflection. Instead, it is a lengthy recitation of the events that led to the Academic Advisement and various ways in which you feel that you were wronged. Remarkably, it ends with a wish for mediation and an apology regarding these long-past events. There is no discussion of physician professionalism or its relevance to the situation. Your essay reflects a lack of insight into your own behavior, a failure to understand the role of physician professionalism-regardless of how others behave-or the impact of your behavior on those around you. You have utterly failed this exercise.

Second, you failed to meet with me as required by the Advisement. On February 17, 2011, I emailed you that we 'need' to meet on the following day and asked that you propose potential times. Your email response to me indicated you could meet at 5:30 p.m. on February 18, 2011. On the day in question, you did not show up to the meeting or contact me to let me know that you would not be coming. When I questioned this, you said that I did not confirm the time. Despite this purported 'miscommunication,' you made no effort to contact me-your supervisor-to clarify any misunderstanding regarding whether we were meeting.

Dr. Carlos Cordon–Cardo ... was new to the Department and had not been involved in the earlier discussions with you. After reviewing the self-reflection you submitted and also determining that it did not meet expectations, Dr. Cordon–Cardo decided to give you a second chance to fulfill the requirements of the Academic Advisement. On Tuesday, May 24, 2011, you attended a scheduled follow-up meeting ... When the meeting was confirmed by email on May 9, 2011, you were instructed to submit a revised

reflection prior to the meeting and no later than May 23, 2011. The purpose of this meeting was, in part, to give you the opportunity to meet your new Department Chair and to establish that you were able to meet the Department's professionalism expectations. Despite being given this fresh opportunity, you did not provide a revised reflection before the meeting as requested. Rather, you submitted it a day late, at the start of the meeting. When Dr. Cordon–Cardo asked if you read the book assigned to you, you cavalierly tossed the book on the table at him [Varughese disputes this fact], and continued to be flippant and disrespectful throughout this meeting.

**\*26** During the Academic Advisement period and again at the follow up meeting, your behavior reflected a lack of insight and a failure to appreciate the need to function within a hierarchy. We are, therefore, compelled to issue this formal notice of disciplinary warning that any recurrence of unprofessional behavior may result in further disciplinary action, up to and including your dismissal from the Program. You are expected to act at all times in a manner appropriate to your position as a house staff officer. If you have issues of concern, you may utilize any of the many mechanisms available to house staff to bring complaints, but you must behave in a professional manner.

You will be required to meet biweekly for three months with Dr. Adolfo Firpo, Director for Educational Activities, to review your performance. The purpose of this review is to provide guidance and to assess your improvement. These meetings will include discussion of feedback received from faculty, residents, and staff.

You have a right to appeal this disciplinary action by requesting, in writing, a hearing before the House Staff Affairs Committee of the Medical Board within ten days of receiving this notice. [It provides an address to which to send the request.] If you do not appeal this action, it will become final at the end of the appeal period.

(Docket # 205–7 at 32–34.)
Varughese did not appeal the Final Warning.

Firpo, the doctor with whom she would now be required to meet, was new to the institution. Once again, Varughese had a chance to make a fresh start.

*Varughese's Performance Problems in August 2011*
When Varughese began a two-week rotation in the Cytogenetics lab in August 2011, she allegedly caused "the worst teaching experience" in the thirty-year career of her supervisor, Dr. Vesna Najfeld. (Najfeld Decl., Docket # 164 at ¶ 19). Najfeld is a woman; the record does not reveal her race or national origin.

Some of the underlying facts are contested, but Varughese does not dispute that she could not be reached when she was supposed to be available, and that she refused to provide coverage for her colleagues even when she was available to do so. (Najfeld Deck, Docket # 164 at ¶ 17; Varughese Dep. at 465.) Varughese used her blackberry while Najfeld was teaching (Varughese says she was taking notes), but when Najfeld asked that Varughese stop using the blackberry, Varughese admits that she disobeyed. (Varughese Dep. at 417.)

Varughese failed to complete some assignments in that rotation (Najfeld Deck, Docket # 164 at ¶ 16), and performed poorly on others. The straw that broke the camel's back for Najfeld was one particular assignment: Varughese was told to make a presentation to her colleagues and other physicians on a particular form of leukemia. Najfeld told plaintiff to provide her with the slides for the presentation in advance, so she could review them. Varughese waited until 4 p.m. on the day before the scheduled presentation to e-mail the slides to Najfeld. (*Id.* at ¶¶ 4–12). Najfeld e-mailed her back five minutes later that there were "major problems" with the presentation, asking that Varughese call her "a.s.a.p." (*Id.*) But Varughese did not check her e-mail before leaving campus, so she did not see Najfeld's response, until she got home (an hour away from the hospital), where she could do nothing to fix her presentation. (Varughese Dep. at 380–84.)

**\*27** When she finally called Najfeld, Varughese was directed to "Please send an e-mail that the conference will not be held." (*Id.*) Varughese took that to mean that she should e-mail Najfeld to confirm that she would not be presenting. But that was silly; Najfeld already knew the conference would not be held, because she had decided to cancel it. Najfeld obviously wanted Varughese to e-mail the attendees of the conference to ensure that no one would show up for a presentation that had been cancelled. (*Id.* at 392.) Needless to say, Varughese did not notify other conference attendees of the cancellation; as a result, people showed up for the canceled conference early the next morning when they need not have shown up at all. (Defendants' 56.1 at ¶ 62.)

At her deposition, Varughese blamed everything on Najfeld. She complained that Najfeld should have called or paged Varughese in addition to e-mailing her. (*Id.* at 384.) Varughese also claimed to be "shock[ed]" that Najfeld did not "explain herself in the first email by giving reasons as to why the presentation was inadequate, rather than asking Varughese to call her. (*Id.*)

During the same period, Varughese was insubordinate towards now-Chief Resident Jordan. On August 4, 2011, Varughese refused a coverage assignment. She claimed to be injured, but refused to provide a doctor's note. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 37.) On August 12, 2011, Varughese ignored page after page from Jordan and Lento. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) Ultimately, Lento was able to reach her only by calling Najfeld and asking Najfeld to bring Varughese to the phone so that he could speak with her. (*Id.*) Although Lento instructed Varughese to contact Jordan, she did not do so. (*Id.*)

At her deposition, Varughese admitted that, when Jordan asked her to confirm that she would provide coverage on that day, she did not respond, saying it was because she "did not have time." (Varughese Dep. at 465–66.) She also complained that asking her to confirm coverage was "outrageous," "a travesty" and "harassment." (*Id.*)

At her deposition, Varughese maintained that her behavior during the rotation with Najfeld was completely professional, and that she had done nothing untoward. (Varughese Dep. at 625–26.)

*Transfer Request*

Scheduling residents' various rotations was no small feat, requiring complex coordination among multiple departments. The schedule depended in part on residents' requests. Residents were responsible for ensuring that they had sufficiently broad and deep experience to graduate in a timely fashion.

For her October 2011 rotation, Varughese initially requested a rotation in GI Pathology. She apparently submitted this request before a July cut-off date. (The reader will recall that July was the beginning of Mount Sinai's academic year.)

The overall schedule was then finalized.

 **\*28**  After the schedule was finalized, Varughese changed her mind. She asked instead to be allowed to do a Dermatophatology rotation. She spoke to Firpo about her request, and he said he would see what he could do.

Firpo did follow up for Varughese, but the request required Firpo to go through several steps, including assessing its "possible impact on the existing schedule." (Jul. 13, 2011 e-mail from Firpo to Morency, Jordan et al., Docket # 205–17 at 19–20.) Even in July, Firpo described the request as "very late and [thus] ... in violation of the established policy." (*Id.* at 20.) Then again, Firpo described Varughese's request as having a "minor impact on the overall program" to a supervisor in the rotation that Varughese wanted to switch into, and that supervisor in return wrote to Firpo that Varughese would be welcome in the rotation. (E-mail Chain of Aug. 4, 2011 and Aug. 9, 2011, Docket # 205–28 at 3.)

Apparently, there were more problems with scheduling than Firpo anticipated in August. Varughese's scheduled roration "coincided with necessary coverage ... and alternative coverage could not be identified." (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) While Firpo apparently went to bat for Varughese and tried to get her a scheduling change, it was too late to get another resident to cover Varughese's scheduled rotation, and a first-year resident's illness and associated absence made scheduling even tighter. (*See* e-mail chain of Aug. 24, 2011, Docket # 205–27 at 171.) Moreover, while Varughese apparently told Firpo that another resident, Mabel Ko, had agreed to switch rotations with her, Ko denied that that she had agreed to the switch-she had already completed the rotation that Varughese wanted her to cover. (*See* Ko e-mail to Firpo of Sept. 7, 2011, Docket # 167–1 at 3.)

According to Firpo, when he told Varughese on September 7, 2011, that her transfer request had been denied, she became irate and accusatory, and continued to complain and seek a rotation change through late September. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38–39.) No matter what Firpo told her, Varughese went to others to renew her transfer request, fired off several e-mails, and complained to Associate Director of Graduate Medical Education Scott Barnett at a September 12, 2011 meeting. (*See* Transcript of Sept. 12, 2011 Conversation, Docket # 205–28 at 35.)

*Varughese's Poor Record of Attendance and Failures at Remediation*

In August 2011, Varughese was notified that she was failing to meet the hospital's attendance requirement for educational conferences. (Defendants' 56.1 at ¶¶ 91–92.) The hospital

required residents to be present at 80% of weekly conferences on different subjects relevant to their chosen discipline. Firpo had told Varughese that she should attend conferences that interested her. Varughese claims to have understood this to mean that she only need attend 80% of the conferences that interested her, rather than attending 80% of all conferences, with her choices of what to eliminate being guided by her interests. (Varughese Dep. at 495.)

**\*29** In keeping with the Pathology Department's policy for residents who fell behind in conference attendance, Morency told Varughese on August 29, 2011, that plaintiff would have to present a lecture at the conference scheduled for September 14, 2011. (Defendants' 56.1 at ¶ 93.)

From then on, it appeared to Morency that Varughese "just seemed increasingly agitated, and, to some degree, unstable and unpredictable." (Morency Dep. at 51.) These impressions came from Morency's observations of Varughese getting into "altercations" "in the residents' room, in the gross room[; Varughese] just didn't seem to get along with people in general." (*Id.* at 65.) By September 2011, Morency wrote to her supervisors that simply having Varughese around was "emotionally taxing." (*Id.* at 167.) At her deposition, she explained that, "having to deal with a resident who continually is unprofessional, unreliable, erratic at best, can be emotionally taxing when nothing is being done about it." (*Id.*)

On September 12, 2011, Varughese met with Scott Barnett, the Associate Director of Graduate Medical Education to complain about her treatment and ask for the same transfer that Firpo had already told her would not be granted. Varughese told Barnett, in essence, that everyone who had ever criticized her had been wrong and unfair. (*See generally* Transcript of Sept. 12, 2011 conversation, Docket # 205–28 at 35–112.) She ascribed the unfairness to petty politicking rather than to discrimination. And she continued with her fixation on the December 8 incident, which she would not view as closed until the Hospital came around to her point of view about what had occurred. For example, she complained that her relationship with Lento had deteriorated after she gave Lento a negative evaluation. Lento "wouldn't discuss the whole incident [the December 8 incident] with Sam. And [Lento]'s like, oh, I'll speak to [McCash]. And then [Lento] said, oh, well, you know, that's too bad because why would you write a diatribe of an evaluation against surgical pathology rotation here?" (*Id.* at 82.)

While they were discussing her two inadequate self-reflective essays, Varughese alleges that Barnett asked "how dare you write that shit?" (Varughese 56.1 at ¶ 34.1.) The tape of that conversation-and its transcript-reveals that her memory is not accurate. (*See* Docket # 205–28 at 35–112.) In fact, Barnett said this about Varughese's self-reflections:

> If one of my kids were to read that, I would have screamed at them, how dare you write that? How dare you write that? It was one-sided. It was not an attempt in any way to address the program's concern[ ] ... It was a rehashing of issues that they were trying to put behind you. And it was not-my mind that was not a good faith attempt to do what they were asking you to do. And, basically, you got pissed off and you just threw some shit against the wall and hoped it would stick. That's what it was.

**\*30** (Transcribed Conversation of Sept. 12, 2011 at 58, Docket # 205–28 at 64.)

On September 13, the day before her scheduled presentation, Varughese called in sick. That afternoon, she had a conversation with Jordan about the next day's scheduled presentation. When told that she really did have to present at a make-up conference, Varughese responded that she did not "feel well, won't be able to present tomorrow." Jordan, hoping to avoid a repeat of the cancelled Najfeld conference, notified others who were supposed to be in attendance that Varughese would "be out sick tomorrow." Varughese took great offense at this, emailing Jordan, "Why are you stating that I will be calling out tomorrow?" (*See* Docket # 205–29 at 30–32, e-mail chain of Sept. 13, 2011). Jordan was unnerved by Varughese's response, especially as plaintiff did in fact call in sick on September 14, 2011. (Docket # 205–29 at 80, e-mail of Sept. 14, 2011.) (Defendants' 56.1 at ¶¶ 95–96.) Jordan e-mailed Firpo to say that she was "terrified to be at work right now" and was "afraid that at any moment [Varughese] will lash out at me or worse, hurt me or the residents around me." (Docket # 205–29 at 51, e-mail of Sept. 14, 2011.)

The cancelled conference was rescheduled for September 15. The program instructed Varughese to provide proof that

she had in fact been sick on September 13 and 14, the days when she had called in sick. She failed to provide any proof. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.) Varughese does not contend otherwise, but alleges that unidentified "others" were not required to bring doctors' notes for absences. (*See* Varughese 56.1 at ¶¶ 74.1–74.3.) There appears to be some disagreement among Mount Sinai's witnesses about the hospital's policy on providing doctor's notes to confirm illness,[7] but whatever the policy in the ordinary course, it is undisputed that Varughese failed to comply with a direct order from a supervisor. Furthermore, the fact that she was still on Academic Advisement, and that she called out sick on a day when she was required to make a presentation-itself a make-up for a presentation for her previous failures to attend educational conferences-place her is a different category than a resident who had no special professional obligations on a day when she called in sick.

[7]    Jordan testified that a doctor's note was required whenever an absence prevented a resident from fulfilling a departmental requirement *or* whenever the resident is out for three or more days (Jordan Dep. at 162); Morency testified that a note was not required unless the absence was longer than three days. (*See* Transcript of Internal Appeal at 158, Docket # 205–31 at 47.) Specifically, Morency was asked whether she ever asked Varughese "for proof of illness since her absences precluded her from fulfilling a task?" She answers "No, because the policy is you have to miss three consecutive days and she only missed two, so I didn't ask her." (*Id.*)

*Varughese Fails to Make Her Presentation and Inquires About Taking FMLA Leave*

Varughese did come to work on September 15, but she arrived late to the conference and she did not make her presentation. She stayed for fifteen minutes, left without giving her lecture, and did not return until everyone else had gone. (Defendants' 56.1 at ¶ 97.)

Bleiweiss, who was at the conference that morning, could not "recall ever having a[nother] situation where someone who was scheduled to present just simply walked out without saying a word, without any explanation or apology." (Bleiweiss Dep. at 90.)

Varughese has offered two excuses for her absence at various times. At her administrative appeal following her termination from the residency program, she said that she "never agreed"

to give the lecture. (Transcript of Internal Appeal at 160–61, Docket # 205–31 at 47.) At her deposition, she claimed that she had had a stomach virus. (Varughese Dep. at 540.)

 **\*31**  On the afternoon of September 15, Firpo and Patel met with Varughese to discuss her latest vanishing act. Varughese raised the issue of taking FMLA leave. According to Firpo, Varughese told Firpo she felt overwhelmed and unable to concentrate or do any work. (Defendants' 56.1 at ¶¶ 99–101.) Patel thought Varughese "didn't seem like herself ... depressed, kind of ... out of it." (Patel Dep. at 68.) Varughese told Patel that "she didn't feel like herself, and she didn't feel like she could perform the tasks at hand." (Patel Dep. at 70.)

Varughese actually contends that this meeting did not occur, and now claims that she had no such concerns about her health or ability to work. (Varughese 56.1 at 100.4–100.5.) She admits, however, that she asked about the possibility of taking FMLA leave and that Patel discussed the issue with her. (Defendants' 56.1 at ¶¶ 102–104.)

At the end of the day on September 15, Varughese told Firpo that she wanted to continue working until she could be assessed by a doctor. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.) She said that she had a doctor's appointment the next day. (*Id.*)

In view of her behavior over the preceding few days, Varughese's suggestion was not acceptable to the Hospital. On September 16, Firpo e-mailed Varughese and directed her not return to work until the issue of FMLA leave was resolved. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 39.)

Over the next few days, administrators repeatedly tried to contact Varughese to ask about her health and also to inquire whether she would be making a formal request to take FMLA leave. Varughese did not respond to any of these inquiries.

Varughese disregarded Firpo's written directive not to come to work; she came to work on September 16 and 19. (Defendants' 56.1 at ¶ 106.) She felt free to ignore a direct order not to come in because she was dissatisfied with the Hospital's reason for telling her to stay home:

   because it was completely opposite of the day before and I did not know what the-what the issue was here. It was not really explained to me ... It seems very irregular.

Q. Whether it was irregular, whether you understood why, I take it you understood that he told you not to come back to work.

A: Well, I'm a contracted employee. He has to provide me with a logical explanation as to why.

(Varughese Dep. at 563–64.)

*Varughese Rifles Through an Administrator's Files*

On September 20, 2011, Varughese-in defiance of two direct orders from her supervisors (one to provide a doctor's note and one to remain at home until the leave issue, which she had raised, was resolved)-decided to report for work. She stopped into a Starbucks on her way to work. (*See* Termination Letter of Sept. 21, 2011, Docket # 205–7 at 40.) Administrator Shema Patel (a woman of Indian descent, like Varughese) and her husband happened to be there. Varughese alleges that Patel was stalking her on behalf of the Hospital: her Rule 56.1 Statement says, "The Defendant Institution utilized Patel to confront me and stalk me because she was a woman of Indian descent, and I cannot ascribe Patel's presence at Starbucks on 96 th and Lexington as an innocent coincidence with her husband in tow." (Varughese 56.1 at ¶ 107.1). Varughese offers no evidence to suggest that Patel had any way of knowing that Varughese would be in the Starbucks at 96 th and Lexington at that precise moment, or otherwise to support this wholly conclusory allegation; Patel was deposed when Varughese still had counsel. Not surprisingly, counsel did not raise or otherwise explore Varughese's current stalking theory, but Patel simply testified that she was at the Starbucks with her husband when Varughese approached her. (Patel Dep. at 96.)

**\*32**  Patel knew that Varughese was not supposed to be at work until she provided a doctor's note. When Varughese said she was on her way to the hospital, Patel told Varughese to come to her office. (Defendants' 56.1 at ¶¶ 107–109.)

Shortly after they arrived, Patel was called away. She left Varughese alone in her office. (Defendants' 56.1 at ¶ 113.) When Patel returned, she saw Varughese looking through a file on her desk labeled "Pathology." (Defendants' 56.1 at ¶ 114.) When the supervisor told Varughese the files were confidential and asked her to explain herself, Varughese asked, "What's the big deal?" and told her to "chill out." (Defendants' 56.1 at ¶¶ 115–116.)

At her deposition, Varughese admitted (reluctantly, and only after repeated questioning) that she had in fact looked at a file on Patel's desk while Patel was absent from the room:

Q. Were there files on Ms. Patel's desk?

A. No, there were no files.

Q. Was there anything on Ms. Patel's desk?

A. There was one folder, I believe.

Q. And while Ms. Patel was out of the office did you look through that folder?

A. I picked it up, but I didn't really look through it.

Q. Did you open it?

A. Yes.

Q. Did you look through the pages?

A. Yes.

(Varughese Dep. at 581–82.) While admitting what she did, Varughese tried to minimize her conduct at deposition and currently characterizes what she did as a "mistake." She claims to have believed that the folder was her own. (Varughese 56.1 at ¶ 113–115.)

Varughese was then shepherded into Tiger–Paillex' office. She recorded the ensuing conversation and the Court has heard the tape. After talking through the still unresolved leave issue and making sure Varughese knew she would have to see the PWC again, Tiger–Paillex asked Varughese what had happened in Patel's office. Plaintiff refused to respond, saying, "I don't have anything to say about that." Varughese then accused Patel of simply "assuming" that Varughese had snooped into her files; when Tiger–Paillex told Varughese that there was no assumption, that Patel personally observed Varughese looking through the file-"there is a witness and [Patel] is the witness-Varughese told Tiger–Paillex that Patel should not have left someone alone in her office if confidential files were in the office. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 40–41.) Once again, the problem was of someone else's making, not hers.

No other resident has been caught rifling through an administrator's confidential files. (Cordon–Cardo Dep. at 220.)

*Varughese's Termination from the Residency Program*
Varughese was summarily terminated the next day.

Varughese was handed a termination letter (Docket # 205–7, beginning at 36). It explained that the Hospital was terminating her: "because your performance and conduct have been unacceptable and your continued presence in the Program is a risk to the Hospital and its patients." (*Id.*) The letter referred to the behavior recounted in the July 1 Final Warning and then went on to say, "[S]ince the final warning was issued, you have continued to demonstrate unprofessional behavior." (*Id.*) The next four pages recount the various performance and professionalism issues that had arisen in just the previous six weeks. (*Id.* at 37–40.)

**\*33** The letter concluded by noting that Varughese had "exercised extremely poor judgment in accessing Ms. Patel's file [and] lied several times when questioned about it." (*Id.* at 40.)

*Internal Appeal to the House Staff Affairs Committee*
As was her right, Varughese appealed her termination to the Mount Sinai School of Medicine House Staff Affairs Committee (the "Staff Affairs Committee") within ten days of receiving the termination letter.

Under Hospital rules, Varughese was permitted to review which Committee members would hear her appeal and to ask that members be removed from her panel. She challenged several members and they were removed from the panel at her request. (Varughese Dep. at 639–40.)

The Staff Affairs Committee held an appeal hearing regarding Varughese's termination on November 14, 2011. (*See generally,* Transcript of Internal Appeal at 284, Docket # 205–31 at 7–94.) It heard sworn testimony from seven physicians and three administrators, including Varughese. Varughese had the opportunity to cross-examine all witnesses, to present her own witnesses, to submit exhibits, and to make opening and closing statements. She was permitted to bring a friend with her, a practicing pathologist at a different hospital. While a lawyer for the hospital was present, Dr. Firpo, not counsel, presented the Department's case.

At the hearing, Varughese steadfastly maintained that she had done nothing wrong. Regarding her self-reflection essays, she testified that, "the reflection does accurately reflect what happened" on December 8, and also said it

"accurately reflected with appropriate amount of insight [sic]." (*Id.* at 78.) She argued that her "defensive tone" was "necessitated" by "the actions taken against me instead of some acknowledgment and mediation." (*Id.*)

This defensiveness continued at the hearing. For example, Varughese cross-examined Jordan about why Jordan had forwarded Varughese's e-mail that Varughese would be out on the morning of September 13, 2011, asking: "Why did you state I was not presenting? I mean why did you state that I would not come into work?" (*Id.* at 43.) Then, in a comment addressed to the panel hearing her appeal, Varughese complained that Jordan "calls out sick for me on my behalf, how rude and obnoxious is that?" (*Id.* at 144,) and, addressing Jordan, "Do you think you're warranted to call out for me? ... To make a statement for me on my behalf, as the Chief Resident?" (*Id.* at 145.)

Regarding her decision to defy instructions to stay home until a doctor declared her fit for duty, she acknowledged that several supervisors and HR representatives "all sent me e-mails, left voice mails and so on stating that their sentiment regarding my right to be at work is that I do not have the right to be at work." (*Id.* at 84.) Nevertheless, "In this particular circumstance [she] felt the best course of action for me was to follow hospital policy and be present at work." (*Id.*)

**\*34** On the question of opening Ms. Patel's files, she alleged neither that it was a mistake (as she does in her sworn submissions to the Court, *see* Varughese 56.1 at ¶ 111.2), nor that she thought the file was her own (as she did at her deposition, *see supra),* but rather that "as I waited there, there was a folder on her desk next to where I placed my coffee which I leafed through with no ulterior motive." (Docket # 205–31 at 85.) Given the opportunity to cross-examine Patel at the hearing, Varughese asked her whether it was "appropriate" to leave people alone in her office "when you have confidential documentation or documents in your office." (*Id.* at 60.) She went on to state that, when Patel came back into the office and admonished her for looking through the file, "I was once again bewildered by the incongruency of the situation," (*Id.* at 85)—"incongruency" that she obviously did not believe was her fault.

When Varughese said that she wanted to conclude the hearing, she was asked if she had "any objection to the proceedings that took place today, anything that-the conduct of this hearing that you want to put on the record?" (*Id.* at 91.) She responded "no." (*Id.*) [8]

8    Varughese's claim that the Staff Affairs Committee
was a kangaroo court (*see* Varughese 56.1, *passim*
), must be assessed in light of her contemporaneous
refusal to put any objection to the conduct of
the proceedings when those objections could have
been addressed.

The Staff Affairs Committee issued its post-hearing decision
on December 2, 2011. (Defendants' 56.1 at ¶¶ 118–121; Letter
of Dec. 2, 2011, Docket # 205–7 at 43). It found "that there is
ample evidence to demonstrate that the [termination] ... was
not arbitrary and capricious." (Findings and Conclusions of
the Staff Affairs Committee, Docket # 205–7 at 46.)

It found that the "underlying facts" set forth in the September
21, 2011 Termination letter

were clearly established by the Department with testimony
and documentary evidence. For example, Dr. Vesna
Najfeld ... testified ... and confirmed ... facts ... including
Dr. Varughese's inadequate responses concerning her
case conference presentation, her absenteeism, and her
unprofessional interactions with faculty and staff ...
Dr. Jordan ... and Dr. Lento ... testified to the facts
set forth in the September 21, 2011 letter concerning
coverage ... Lento, in particular, described a pattern of non-
responsiveness to emails and pages that he sent to Dr.
Varughese ... ("One of the difficulties that I have had with
Leena is she virtually never responded to my pages and
infrequently responded to my e-mails.") ...

The Committee finds Dr. Varughese's presentation
unpersuasive. She took issue with virtually every witness
who testified and in some instances questioned their
authority to make the decisions they did. Yet the testimony
and evidence clearly demonstrate a continuing pattern of
unprofessional conduct in the face of a final warning that
put her on notice that further incidents of unprofessional
conduct could lead to her dismissal. It is clear to the
Committee that Dr. Varughese lacks insight into her
behavior and her role as a resident in the Department
as evidenced by the extensive testimony and documents
presented to the Committee. Indeed, at the conclusion
of the hearing, *Dr. Rocco, one of the two residents
on the Committee, asked Dr. Varughese: 'Do you take
responsibility or do you feel remorse involving any of
the things that you 've talked about ... ? Dr. Varughese's
response was argumentative and she never acknowledged*

*responsibility for any of the events as to which there was
ample testimony and evidence.*

**\*35**  It is also clear from the testimony and other
evidence that the Department gave Dr. Varughese multiple
opportunities to correct her behavior and to become a
constructive part of the Department's residency program ...
Unfortunately ... Dr. Varughese's lack of insight into her
behavior was such that she was unable to make the
constructive changes to her behavior needed to fulfill her
responsibilities ...

In sum ... based on the testimony and evidence presented,
the Committee unanimously finds and concludes that
the Department's actions to suspend and terminate Dr.
Varughese from the Pathology Residency Program were
clearly supported by the testimony and other evidence.

(*Id.* at 48–50 (emphasis added).)

*Internal Appeal to Mount Sinai's Appeal Committee*
Varughese took another appeal, to Mount Sinai's Appeal
Committee. (*See* Defendants' 56.1 at 122–124.) The Appeal
Committee was made up of three senior faculty members,
including the Chief Medical Officer and Senior Vice President
for Medical Affairs. (*Id.*)

On March 7, 2012, the Appeal Committee upheld the Staff
Affairs Committee's determination. (*See* Letter and Decision
of Mar. 7, 2012, Docket # 205–8.)

The Committee emphasized that *any* impairment of a
Pathology resident can present a significant danger to
patients. In its final determination upholding Varughese's
termination, Mount Sinai's Appeal Committee wrote that:

The Pathology Department at Mount
Sinai is the largest in any single
comparable academic institution
in New York City. Pathology
residents are given a great deal
of responsibility. Though attending
physicians supervise residents, the
need for skilled performances by
residents cannot be overemphasized ...
A physician who ... displays
physical signs of impairment to
a degree that others fear for the

physician's wellness ... clearly should not be charged with such critical responsibilities.

(Final Appeal Decision, Docket # 205–8 at 11.)

The Appeal Committee reviewed the transcript of Varughese's initial hearing and all of the exhibits submitted. On the basis of that review, it found fault with Varughese's behavior outright. For example, it found that Varughese "was argumentative with Dr. Jordan ... [and] unwilling[ ] to accept instructions from those in positions of authority;" and that she "intentionally ignored ... instructions." (Docket # 205–8 at 7.) It explained why Varughese's radio silence in response to coverage requests was so problematic, and why her refusal to acknowledge wrongdoing regarding that issue was so baffling:

> Dr. Varughese's claim that her lack of response [to a request for coverage] signified that she affirmatively agreed to cover and that she did not have to respond to emails that simply stated facts is incomprehensible. Dr. Jordan could, under no circumstances, make an assumption that Dr. Varughese would cover surgical service and patient safety and care would be preserved. Patient care could not be left to supposition. The chaos that resulted from Dr. Varughese's inaction is clear from the numerous emails.

 **\*36** (*Id.* at 8.) The Appeal Committee further found that Varughese tried to "subvert[ ] Dr.s Lento and Firpo" by repeatedly going to others to try to get a rotation change (*id.* at 8), and that these actions were "insubordinate." (*Id.*) It found Varughese's communications to Jordan and Morency regarding the remedial presentation to be "argumentative" and to have "challeng[ed] the authority of her Chief Residents." (*Id.* at 9.) Varughese's "continued insistence that Dr. Firpo exempted her from the 80% conference attendance policy, her refusal to adhere to departmental attendance policy, her failure to respond to and recognize the authority of her chief Residents, her refusal to present on a[ ] topic from a list selected by her Chief Residents, and her departure from

the September 15 conference without presenting or saying a word to anyone ... among other actions, clearly indigate that Dr. Varughese has an issue with authority and an inability to abide by the rules." (*Id.* at 9–10.) Regarding Varughese's behavior on September 15, "Varughese herself admitted at the time that she was unable to work and indicated that she may need to take a leave. The fact that she lacked and continues to lack insight that her impairment could have posed a risk to others in the work environment, including patients, is extremely problematic. (*Id.* at 11.) It found that Varughese's blaming Patel for leaving her alone with confidential files "showed that [Varughese] continued to fail to grasp the inherent wrongness of her actions." (*Id.* at 12.)

In sum, the Appeal Committee, which reviews Staff Affairs Committee findings to ensure that they have a "reasonable basis," found that there was indeed a reasonable basis for the Staff Affairs Committee's finding that firing Varughese was neither arbitrary nor capricious. (*Id.* at 13–14.)

Mount Sinai subsequently gave Varughese a final "summative evaluation," a standard document within the world of graduate medical education, which marked her as "unsatisfactory" in three of six categories (professionalism, interpersonal and communication skills, and patient care). She was assessed as not ready to practice without supervision. The document stated that Varughese had been promising in her first two years but that, in her third, her supervisors had found her performance to be "substandard" "unprofessional" and "unsatisfactory." (Docket # 162–6 at 39–40.)

There is no evidence whatever that the final summative evaluation was ever provided to anyone except Varughese herself. There is absolutely no evidence that Mount Sinai ever provided it to any potential employer. It was shown to a witness, Dr. Fyfe of Robert Wood Johnson Hospital, at a deposition in this case.

*Varughese's Job Search*

Meanwhile, Varughese-armed with support from Mount Sinai attending Tamara Kalir—had been looking for other employment. She actually secured an offer from Robert Wood Johnson Hospital ("RWJ") in New Jersey on January 31, 2012. (Varughese 56.1 at ¶ 1.4.) That offer was contingent on Mount Sinai's verification of certain records. A Dr. Fyfe of RWJ contacted Lento to request them. The administrative appeals were still pending, so Lento explained that he was unable to provide RWJ with any documentation at that time,

because Varughese had "legal proceedings" ongoing with the hospital.

**\*37** By the time Varughese's appeal concluded in March 2012, RWJ had hired another candidate. Dr. Fyfe considered the person hired to be less academically qualified than Varughese

At her deposition, Dr. Fyfe testified that she still might have offered Varughese the job, even if she received a bad report from Mount Sinai. In light of Dr. Kalir's recommendation, Dr. Fyfe thought further investigation would have been required. "In looking at [the summative evaluation for the first time at her deposition], I know that my first response would have been to try to get a little bit more information ... any specifics. These are general ... I would like ... to try to find out more of what was actually going on." (Fyfe Dep. at 48–49.)

The interim chair of RWJ's Department of Pathology and Laboratory Medicine, a Dr. Cadoff, only recalls that, "there were some kind of discussions because there was a reason that Dr. Varughese was leaving Mount Sinai that had to do with something at Mount Sinai. That's as much as I knew at the time." (Cadoff Dep. at 22.)

Varughese filed this lawsuit on December 4, 2012.

### III. The Complaint
Varughese's Second Amended Complaint (Docket # 66) includes 21 counts.

Varughese alleges that Defendants discriminated against her on account of her sex and her race and/or national origin in Counts 1, 2, 5, 6, 9, 10 and 18. These counts invoke the New York City Human Rights Law, New York State Human Rights Law, Title VII, and § 1981.

Varughese alleges that she suffered a hostile work environment on account of her race and gender in counts 3, 7, 11 and 18. They invoke Title VII, the NYSHRL, the NYCHRL, and § 1981, respectively.

Varughese alleges that Defendants subjected her to retaliation for protected complaints about discrimination in counts 4, 8, 12 and 18. Those counts invoke Title VII, the NYSHRL, the NYCHRL, and § 1981, respectively.

In count 17, Varughese alleges a violation of the New York State healthcare whistleblower law.

Counts 15 and 16 accuse the Defendants of breaching their employment contract with Varughese and also violating the implied covenant of good faith and fair dealing.

Counts 13 and 14 allege that Defendants tortiously interfered with Varughese's offer of employment from RWJ Hospital, and that the summative evaluation Defendants issued is defamatory.

Count 19 alleges violations of the Family and Medical Leave Act ("F.M.L.A.").

Count 21 pursues individual liability for all of the foregoing against individual defendants Lento, Cordon–Cardo, Firpo and Bleiweiss.

Varughese voluntarily dismissed Count 20, a claim for intentional infliction of emotional distress, after Judge Francis told her she would have to submit to a psychiatric evaluation in order to pursue it.

### IV. The Motion for a Summary Judgment is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18 (Gender and Race/National Origin Discrimination under Title VII, the NYCHRL, the NYHRL, and 42 U.S.C. § 1981).
**\*38** Varughese argues that Mount Sinai and the individual defendants-Lento, Cordon–Cardo, Firpo and Bleiweiss-subjected her to disparate treatment on the basis of her gender and Indian ancestry during the nine-month period from December 2010 to her termination on September 21, 2011.

Discrimination claims brought under Title VII, § 1981, the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") all are analyzed under the burden-shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 491 (2d Cir.2010); *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008); *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216–17 (2d Cir.2005) (applying *McDonnell Douglass* to NYSHRL and NYCHRL discrimination claims).

That framework requires a plaintiff to establish a *prima facie* case of discrimination. *Holcomb,* 521 F.3d at 138. To do so, the plaintiff must submit evidence that (1) she is a member

2015 WL 1499618

of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006) (citing *McDonnell Douglas,* 411 U.S. at 802). "The burden of establishing a *prima facie* case is not onerous, and has frequently been described as minimal." *Scoria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997).

After a *prima facie* case is established, a presumption of discrimination arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Holcomb,* 521 F.3d at 138.

Once the defendant provides such a reason, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 499 (2d Cir.2009) (internal quotation marks and citations omitted), *superseded on other grounds by* N.Y.C. Local L. No. 85.

A plaintiff who establishes both a *prima facie* discrimination case and pretext must still, in order to survive summary judgment, demonstrate that she can meet her "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her." *Schnabel v. Abramson,* 232 F.3d 83, 90–91 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

While the *McDonnell Douglass* burden-shifting framework applies to all of Varughese's claims, her discrimination claims under the NYCHRL, *i.e.* counts 9 and 10, "must be reviewed independently from and more liberally than their federal and state counterparts" in light of the local statute's "uniquely broad and remedial' purposes." *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 278 (2d Cir.2009) (quoting *Williams v. N.Y. City Hous. Auth.,* 61 A.D.3d 62, 66–69, 872 N.Y.S.2d 27 (1 st Dept 2009)). There is thus a "one way ratchet" at work, under which "interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a *floor* below which the City's Human Rights law cannot fall." *Id.*

**\*39** The NYCHRL's uniquely broad and remedial purpose requires courts to construe the statute "broadly in favor of

discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York,* 16 N.Y.3d 472, 477–478, 922 N.Y.S.2d 244, 947 N.E.2d 135 (N.Y.2011); *see also* Administrative Code § 8–130. In doing so, courts have noted two differences between the NYCHRL and its state and federal counterparts that bear mentioning at the outset.

First, to make out a *prima facie* case under state or federal law, the plaintiff must submit proof that she "endure[d] a 'materially adverse change' in the terms and conditions of her employment." *Galabya v. NYC Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quoting *Richardson v. New York State Dep't of Correctional Servs.,* 180 F.3d 426, 446 (2d Cir.1999)).

> To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady,* 993 F.2d at 136. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Id.* (internal quotations and citations omitted).

By contrast, the NYCHRL does not require that the offending employment action be "materially adverse." *See, e.g., Williams,* 872 N.Y.S.2d at 34 (holding there is no material adversity requirement for a retaliation claim under the NYCHRL); *Margherita v. FedEx Exp.,* No. 07 CV 4826, 2011 WL 5024577, at \*8 (E.D.N.Y. Oct. 20, 2011) (no material adversity requirement for a discrimination claim under the NYCHRL). Rather, "In order to make out the [adverse action] prong of a *prima facie* case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Williams v. Regus Mgmt. Group, LLC,* 836 F.Supp.2d 159, 173 (S.D.N.Y.2011) (describing development of NYCHRL case law since legislation removed the materiality requirement from the NYCHRL's adverse action prong in 2005).

Second, the NYCHRL places a burden with the defendant that rests with the plaintiff under state and federal law. Under state and federal law, a plaintiff may pursue a "mixed-motive" theory that discriminatory animus was "a motivating factor" in the adverse action, rather than its but-for cause. *See Univ. of Texas Sw. Med. Ctr. V. Nassar,* —— U.S. ——, ——, 133 S.Ct.

2517, 2526, 186 L.Ed.2d 503 (2013) (recounting the evolving jurisprudence of Title VII's causation requirement). Under a mixed-motive theory, a plaintiff may

> obtain declaratory relief, attorney's fees and costs, and some forms of injunctive relief based solely on proof that race, color, religion, sex, or nationality was a motivating factor in the employment action; but the employer's proof that it would still have taken the same employment action [in the absence of the impermissible motivating factor] would save [the employer] from monetary damages and a reinstatement order.

**\*40** *Id.*

Under federal and state law, plaintiffs pursuing this "mixed-motive" theory must show particularly strong evidence of discriminatory animus. "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 173–74 (2d Cir.2006) (internal citation omitted).

Under the NYCHRL, however, it is not plaintiffs who must show their theory of deserves a mixed-motive analysis, but defendants who must show that the proof precludes mixed motive liability. Claims under the NYCHRL should be dismissed at the summary judgment stage "only if the *defendant* demonstrates that it is entitled to summary judgment under both" the *McDonnell Douglas* analysis and also the "mixed motive" analysis. *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 113, 946 N.Y.S.2d 27 (N.Y.App. Div. 1 st Dep't 2012) (citing *Albunio,* 16 N.Y.3d at 477–78, 922 N.Y.S.2d 244, 947 N.E.2d 135) (emphasis added).

Notwithstanding these important analytical differences, the state courts have cautioned that "the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Lytle v. JPMorgan Chase,* No. 08 Civ. 9503, 2012 WL 393008, at \*19 (S.D.N.Y. Feb.8, 2012) *report and recommendation adopted sub nom. Lytle v. JP Morgan Chase,*

No. 08 CIV. 9503 DAB, 2012 WL 1079964 (S.D.N.Y. Mar.30, 2012) *aff'd,* 518 F. App'x 49 (2d Cir.2013) (quoting *Williams,* 2011 WL 6073560, at \*6 (quotation marks and citations omitted)). Thus, "The mere fact that [plaintiff] may disagree with her employer's actions or think that her behavior was justified does not raise an inference of pretext." *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 121, 946 N.Y.S.2d 27 (1st Dep't 2012). So too, for a plaintiff to raise an inference of discrimination through comparative analysis, the NYCHRL requires the plaintiff to show that she is "similarly situated in all material respects" to the coworker to whom she compares herself. *Shah v. Wilco Systems, Inc..,* 27 A.D.3d 169, 169, 806 N.Y.S.2d 553 (N.Y.App. Div. 1st Dep't 2005)

Moreover, "a plaintiff must still link the adverse employment action to a discriminatory motivation" to withstand summary judgment on her NYCHRL claim. *Sotomayor v. City of New York,* 862 F.Supp.2d 226, 258 (E.D.N.Y.2012) *aff'd,* 713 F.3d 163 (2d Cir.2013) (citing *Williams,* 872 N.Y.S.2d at 34–35). "Where a plaintiff cannot do so, her claims fail." *Id.*

That is, local law mirrors state and federal law in that "the burden of persuasion of the ultimate issue of discrimination always remains with the plaintiff," *Step hens on v. Hotel Empls. & Rest. Empls. Union Local 100 of AFL–CIO,* 6 N.Y.3d 265, 271, 811 N.Y.S.2d 633, 844 N.E.2d 1155 (N.Y.2006).

Construed liberally, Varughese's papers suggest eight separate instances of discrimination in violation of the NYCHRL, the NYSHRL, Title VII and § 1981:

**\*41** (1) The July 2010 failure to promote Varughese to Chief Resident, rather than McCash;

(2) The December 2010 altercation with McCash;

(3) The December 21, 2010 Academic Advisement;

(4) The January 2011 failure to promote Varughese to Chief Resident, rather than Jordan;

(5) The Winter 2011 Referral to the PWC

(6) The July 15, 2011 Final Warning

(7) The August–September 2011 Denial of Transfer

(8) The September 21, 2011 Termination

Varughese argues that each of these actions was individually discriminatory, and that all of them collectively contributed

2015 WL 1499618

to a hostile work environment, which is itself a form of discrimination.

Again, Title VII, the NYSHRL and § 1981 (which I shall refer to collectively as "state and federal anti-discrimination laws") are all subject to the same *McDonnell Douglas* analysis. *Ruiz, 609 F.3d at 491.*

Varughese's NYCHRL claims, however, must be analyzed under the more lenient modification of the *McDonnell Douglas* burden shifting analysis set forth above.

*Failure to Promote Varughese to Chief Resident*
Varughese argues that she has a claim for discriminatory failure to promote her to the position of Chief Resident, both when McCash took the position in July 2010 and again when Jordan was promoted in January 2011. The former implicates both sex and national origin discrimination, the latter only national origin discrimination.

This specific allegation is not asserted in the complaint-in fact, the first time it has come up during this lawsuit, at least in the court's memory, is in Varughese's response to the Defendants' motion for summary judgment. No one has provided Varughese's administrative charge to the Court, so I have no idea whether the charge was administratively exhausted. No one has analyzed this issue, so I assume that it was; otherwise, any challenge to administrative exhaustion appears to have been waived.

In any event, the hospital is entitled to summary judgment on the merits.

To make out a *prima facie* case of discriminatory failure to promote, a plaintiff

> ordinarily must demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

*Yu v. New York City Hous. Dev. Corp., 494 F. App'x 122, 124–25 (2d Cir.2012)* (citing *Estate of Hamilton v. City of New York, 627 F.3d 50, 55 (2d Cir.2010)* (applying NYCHRL) (internal citation and quotations omitted). "Of course, the fourth element is also established if the employer fills the position with 'a person outside the protected class who was similarly or less qualified than' the plaintiff." *Id.* at n. 4 (citing *Stockwell v. City of Harvey, 597 F.3d 895, 901 (7th Cir.2010).*

Varughese fails to make out a *prima facie* case, because she offers no evidence that Defendants filled the position with "a person outside the protected class *who was similarly or less qualified* than" Varughese was. *See id.* She alleges in conclusory fashion that McCash was less qualified than she was, but she provides the Court with no actual evidence to support that assertion. I have been provided no evidence whatever of McCash's evaluations, nor his performance before his July 2010 promotion to Chief Resident. It is impossible to draw an inference of discrimination in a failure to promote claim where the available evidence provides no foundation for comparison between the plaintiff and the person promoted. *See Sareen v. Port Auth. of N.Y. & N.J.,* No. 12 Civ. 2823(PAE), 2013 WL 6588435, at *9 (S.D.N.Y. Dec.16, 2013)* (granting summary judgment where plaintiff "[did] not offer any evidence on which to assess [the allegedly similarly situated employee's] qualifications"). Varughese's personal opinion about McCash's qualifications is irrelevant. [9]

[9]    I cannot fault the Hospital for failing to make records available if it did not do so, since this claim has arisen at the last possible moment, long after the close of discovery.

**\*42** Moreover, it is not clear that Varughese can make the requisite showing under the second prong of a *prima facie* case of failure to promote. Normally, a specific application is required to satisfy the second element of such a claim. *See Petrosino v. Bell Atlantic, 385 F.3d 210, 227 (2d Cir.2004).* A narrow exception to this requirement, exists, however, where a plaintiff can

> demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through

Case 6:21-cv-01207-TWD Document 86 Filed 10/25/24 Page 227 of 321
Varughese v. Mount Sinai Medical Center, Not Reported in F.Supp.3d (2015)
2015 WL 1499618

informal procedures endorsed by the employer.

*E.E.O.C. v. Bloomberg L.P.,* 967 F.Supp.2d 816, 846 (S.D.N.Y.2013) (analyzing claim brought under Title VII, the NYSHRL, and the NYCHRL) (internal quotation and citation omitted).

Varughese has made no such showing with respect to the Chief Resident position. It does not appear to have been posted; rather, it appears to have been offered at regular intervals. But

Varughese has not even alleged-let alone offered evidence-that she lacked knowledge of the position; nor has she testified that she ever expressed any interest in it. Indeed, the record suggests that one of Varughese's colleagues turned down the Chief Resident position before it was offered to Jordan. I cannot simply assume that anyone offered the job would have taken it.

Even under the NYCHRL, failure to express interest in a promotion or otherwise invoke an exception like the ones above is fatal to a failure to promote claim. *Henry v. Metro. Transp. Auth.,* No. 07 CIV. 3561 DAB, 2014 WL 4783014, at *15 (S.D.N.Y. Sept.25, 2014) (failure to submit proof of interest in the position or proof that others were promoted without expressing interest fatal to the *prima facie* case under the NYCHRL).

Finally, assuming arguendo that Varughese had made out a *prima facie* case on this point, Defendants would still prevail on their motion, because no evidence in the record suggest that the failure to promote her was occasioned by her gender or her race/national origin. Indeed, her assertion is particularly weak because McCash was not the only person promoted to Chief Resident in July 2010. Kruti Maniar, a woman of Indian descent, was also promoted; they were named co-chief residents. When a woman of Indian descent got the job instead of plaintiff, no reasonable trier of fact could possibly conclude, that Varughese lost out because of her gender or her national origin.

At the third *McDonnell Douglas* stage, it is not enough for the plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class." *Peters v. Mount Sinai Hosp.,* No. 08 Civ. 7250, 2010 WL 1372686,

at *8 (S.D.N.Y. Mar.30, 2010) (citing *Grillo v. N.Y. City Transit Auth.,* 291 F.3d 231, 235 (2d Cir.2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient." (internal quotations omitted)); *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir.2001)). That logical fallacy is also insufficient to sustain plaintiff's claim under § 1981 for national origin discrimination. *See Kantrowitz v. Uniondale Union Free Sch. Dist.,* 822 F.Supp.2d 196, 215 (E.D.N.Y.2011) ("employment discrimination claims brought pursuant to Sections 1981 and 1983 are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp.*" (internal citations omitted)). The NYCHRL must of course be interpreted as liberally as is "reasonably possible," but even under that statute, acceding to the logical fallacy *of post hoc ergo propter hoc* is not reasonable.

**\*43** Varughese's summary judgment papers also argue that Defendants' failure to promote her to Chief Resident in January 2011 was a discriminatory adverse act. Again, this claim is raised for the first time in her opposition to the motion for summary judgment.

This claim is slightly different from Varughese's other failure-to-promote claim, because we know at least one way in which Jordan's and Varughese's qualifications differed in a manner favorable to plaintiff: Jordan was only in her second year of residency, while Varughese was in her third. At least one member of Mount Sinai's Pathology staff, attending physician Tamara Kalir, questioned the propriety of promoting Jordan over more senior residents, of whom Varughese was one.

However, Varughese has again failed to make out the second prong of a *prima facie* case even under the NYCHRL. That is, she submits no testimony that she was interested in the position or would have accepted it had it been offered.

Assuming arguendo that she did make out a *prima facie* case, she also fails at the third step in the *McDonnell Douglas* analysis: there is no evidence that Jordan was promoted over Varughese in circumstances giving rise to an inference that national origin was any part of the motivation. As noted above, one of the (now) three Chief Residents was an Indian woman, so Mount Sinai had plainly established a willingness to promote someone who belonged to both of plaintiff's protected classes. There is no evidence that any person

2015 WL 1499618

involved in the decision to promote Jordan had ever expressed any bias toward Varughese or anyone else on the basis of national origin. Gender, of course, is irrelevant where Jordan's promotion is concerned. [10] Finally, at the time Jordan was promoted, Varughese was on an Academic Advisement (with which she was not cooperating), was the subject of numerous complaints and had been referred to the PWC. There is no evidence that Jordan labored under similar constraints. [11] Under those circumstances, no reasonable trier of fact could find that the promotion of Jordan ahead of Varughese was the product of discrimination, in whole or in part.

[10]  Lento appears to have been responsible for Jordan's selection as Chief Resident. Varughese submits only her own conclusory assertions of bias as against him. There is no evidence that McCash had anything to do with the decision, and Schiller was no longer acting as Chair.

[11]  These facts could also demonstrate that Varughese failed to meet her burden, at McDonnell–Douglas Stage One, of proving, as part of her prima facie case, that she was qualified for the position. It really does not matter, however, whether one analyzes this as a Stage One or a Stage Three issue: there were significant differences between Jordan and Varughese that easily overcame her lesser experience.

Defendants' motion for summary judgment dismissing Counts 1, 2, 5, 6 and 18 is GRANTED insofar as addressed to plaintiff's assertion that the failure to promote her was discriminatory.

*December 8. 2010 Incident with McCash*
Varughese's first claim of gender discrimination was her statement to HR in April 2011 that McCash would not have acted the way he did on December 8, 2010–yelling at her and moving toward her in a way she found threatening (though she makes no claim that McCash touched her)-but for her gender. She has added a claim that the December 8 incident was motivated by racism in the course of this lawsuit.

Under federal and New York State antidiscrimination laws, "yelling at an employee ... does not amount to an adverse action." *E.E.O.C. v. Bloomberg, L.P.,* 967 F.Supp.2d 816, 873 (S.D.N.Y.2013) (citing *Sekyere v. City of N.Y.,* No. 05 Civ. 7192, 2009 WL 773311, at *3 (S.D.N.Y. Mar. 18, 2009)). Therefore, Defendants are entitled to summary judgment

dismissing Counts 1, 2, 5, 6, and 18 insofar as those counts relate to the December 8, 2010 incident.

**\*44** As I have explained, the NYCHRL has a more lenient definition of what constitutes an "adverse action" for purposes of establishing *a prima facie* case of discrimination than federal law has. Judge Gleeson has explained that, "A plaintiff who is treated worse, in a nontrivial way, because of [her race or gender] is subject to an adverse employment action for purposes of the CHRL." *Forgione v. City of New York,* No. 11–CV–5248, 2012 WL 4049832, at *6 (E.D.N.Y. Sept.13, 2012). In *Williams v. New York City Rous. Auth.,* 61 A.D.3d 62, 78–79, 872 N.Y.S.2d 27 (N.Y.App. Div. 1 st Dep't 2009), the New York Appellate Division, First Department, held that "a focus on unequal treatment based on gender regardless of whether the conduct is 'tangible' (like hiring or firing) or not-is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute." Thus, many acts that would not constitute "adverse actions" under federal law have been held to suffice under the NYCHRL. *See Kellman v. Metro. Transp. Auth.,* No. 07 Civ. 3561, 2014 WL 1243698 (S.D.N.Y. Mar. 26, 2014) (denial of training constituted an adverse action under the NYCHRL even though it did not affect plaintiff's wages or chances of promotion); *Williams,* 836 F.Supp.2d at 175–76 (holding that ignoring plaintiff's opinion and communicating with him differently than Caucasian employees was adverse under NYCHRL even though it was probably not adverse under Title VII); *see also Forgione v. City of New York,* No. 11 Civ. 5248, 2012 WL 4049832, at *5–6 (E.D.N.Y. Sept.13, 2012) (holding that defendants' referral ofplaintiff for psychological evaluation, while not materially adverse under NYSHRL, was not "merely trivial" under NYCHRL); *Sotomayor v. City of New York,* 862 F.Supp.2d 226, 255, 257–58 (E.D.N.Y.2012) (holding that negative observations, evaluations, and letters to file that did not trigger negative consequences for plaintiff's employment were not adverse under Title VII or NYSHRL but were adverse under NYCHRL).

However, the NYCHRL, like Title VII, is not a "general civility code." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 113 (2d Cir.2013). Thus, one state court found that the NYCHRL's "adverse action" requirement was not met even where an employer "(i) told [plaintiff] that his "medicine was wrong"; [and] (ii) made fun of his accent." *Hanna v. New York Hotel Trades Council,* 18 Misc.3d 436, 440–41, 851 N.Y.S.2d 818 (Sup.Ct.2007). The state trial court found that, "Although making fun of an employee's accent is

offensive and inappropriate, it does not constitute an adverse employment action [under the NYCHRL]." *Id.*

Varughese has not managed to make out a *prima facie* case, even under the extremely lenient standard of the City Human Rights Law. A single instance of being addressed publicly in an inappropriate fashion (assuming that yelling at a subordinate is always inappropriate) does not rise to the level of being "treated worse in a non-trivial way"-especially in light of the hospital's immediate corrective action of removing Varughese from McCash's supservision.[12]

[12] One might ask whether the hospital's immediate corrective action is enough to save it from liability under the NYCHRL. After all, it immediately removed Varughese from McCash's supervision and separated them moving forward. The answer is no, at least in the context of sexual harassment. *See Zakrzewska v. New Sch.,* 14 N.Y.3d 469, 477, 902 N.Y.S.2d 838, 928 N.E.2d 1035, 1037–38 (2010). In *Zakrzewska,* the state high court returned to the language of the city statute to find that "the affirmative defense to employer liability articulated in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) [does not] apply to sexual harassment and retaliation claims under section 8–107 of the New York City Administrative Code." *Id.* (answering certified question from the Second Circuit in the negative). Of course, there is no Faragher–Ellerth defense under federal law to claims of discrimination, as opposed to harassment/retaliation CHECK; the pertinence of the Hospital's action is that the employer did not discriminat

**\*45** However, even if Varughese were able to make out a *prima facie* case under city law, her claim still would fail.

Defendants articulate a legitimate and non-discriminatory reason for McCash's behavior: Varughese earned his ire by disobeying a direct instruction from a supervisor. The burden thus shifts back to Varughese to prove both (1) pretext; and (2) that the real reason McCash yelled at her was her membership in a protected class.

To prove pretext, Varughese (1) claims that no clear instruction was given as to the need for her to do the work;

and (2) points to some direct evidence of McCash having a discriminatory bias against her: his December 8, 2010 complaint regarding her "work ethnic."

There is no genuine issue of fact as to the first of these issues. The slides in question came from a Dr. Goldfarb, and that doctor had a standing instruction that the resident on duty, not a moonlighter, was to examine all of his breast slides. Varughese was the duty resident; Azar was a moonlighter. Varughese, like all residents, was charged with knowing about standing orders from doctors and obeying them. She offers no evidence to the contrary. Therefore, the issue is not whether McCash was sufficiently specific; he did not need to be, because no resident, not even the Chief Resident, could countermand Dr. Goldfarb.

As to the second: rather than discussing this issue in the context of a *prima facie* case, where the plaintiff's burden is light, I will skip to the third *McDonnell Douglas* step-where I conclude that there is simply no genuine issue of fact as to the question whether discriminatory animus motivated McCash on December 8, 2010. Drawing all inferences in Varughese's favor, no reasonable trier of fact could possibly conclude that McCash yelled at Varughese because she was a woman or because she was of Indian descent.

This is not a close question.

The only evidence offered by Varughese to show that there was any discriminatory animus behind McCash's behavior on December 8, 2010 is the "n" in "work ethnic" in McCash's e-mail. I must draw all *reasonable* inferences in Varughese's favor, but the only *reasonable* inference here is that McCash made a very unfortunate typo. His lengthy e-mail is rendered offensive by the insertion of a single letter. The Court has reviewed *many* e-mails from McCash, to Varughese and to others, and this is the only one with any language that is even arguably discriminatory. There is no reference at all to Varughese's gender in the e-mail, and when she complained of McCash's behavior, she believed it to be motivated by her sex. There is no evidence in the record that McCash ever said or did anything derisivie about persons of Indian ancestry; indeed, the record reveals no instance in which he so much as commented about anyone's ancestry.

Furthermore, McCash sent this particular e-mail to numerous recipients, including Shabnam Jaffer, a woman of Indian descent who was an attending physician *and his supervisor.* Without some other evidence, there is no reason to believe

2015 WL 1499618

that McCash decided to do something that might amount to professional suicide by uttering a slur that would have tended to be offensive to someone who shared membership in Varughese's protected classes. (Incredibly, McCash was not asked about this e-mail at his deposition by either side, and Defendants did not submit any declaration from him except one explaining that he is Filipino, so we have no way of knowing what he would say about it).

**\*46** Moreover, McCash's conduct on December 8 is colored by the history he shared with Varughese: they had a difficult relationship. There had been a confrontation between them in September, and she was repeatedly insubordinate to him. "Mere personality conflicts must not be mistaken for unlawful discrimination." *Taylor v. New York Univ. Med. Ctr.,* 21 Misc.3d 23, 871 N.Y.S.2d 568, 571–72 (N.Y.App. Term 1st Dep't 2008).

There is no evidence that McCash had any problems working with other women, other people of Indian descent, or with women who were also of Indian descent. There certainly is no evidence that he had any problems with his co-Chief Resident, a woman of Indian descent; she has averred that he was never discriminatory toward anyone. The only fair inference is that McCash had a problem with Varughese-the same problem lots of other people had.

In short, no reasonable jury could find by a preponderance of the evidence that discriminatory animus, whether based on race or gender, was behind McCash's loss of temper. So even under city law, the claim that this outburst was an instance of either gender-based or national origin-based discrimination must be dismissed.

*The December 21, 2010 Academic Advisement*
Varughese alleges that Defendants placed her on Academic Advisement on account of her sex and her race.

I assume without deciding that an Academic Advisement could constitute an adverse employment action under city, state and federal law. This is not immediately apparent under federal and state law. *See Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir.2002) ("courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."); *Uddin v. City of N.Y.,* 427 F.Supp.2d 414, 429 (S.D.N.Y.2006) (quotation omitted); *see also Weeks v. New York State,* 273 F.3d 76, 86 (2d Cir.2001)

("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), *abrogated on other grounds, National R.R. Passenger Co. v. Morgan,* 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

On the question whether Defendants have offered a legitimate, non-discriminatory reason for that Advisement, Judge Cote's analysis in *Nolley v. Swiss Reinsurance Am. Corp.,* 857 F.Supp.2d 441 (S.D.N.Y.2012), *aff'd sub nom. Nolley v. Swiss Reinsurance Am. Holding Corp.,* 523 F. App'x 53 (2d Cir.2013), a case brought under the same suite of city, state and federal antidiscrimination laws at issue here, is instructive. The employer placed Nolley on a "Performance Improvement Plan" ("PIP") after customers complained that Nolley was aggressive and confrontational. The PIP required Nolley to improve his professionalism, or else. When he did not improve, but rather, reacted to the PIP with yet more hostility and aggressively confronted his superior, he was terminated. Once in court, Mr. Nolley contested the truth of the customer complaints but could not dispute that they had in fact been made-that customers had deemed his conduct offensive and unprofessional. The fact of the complaints alone was enough to constitute a legitimate, non-discriminatory justification that satisfied the employer's burden at the second stage of the *McDonnell Douglas* analysis-even if, as Nolley insisted, the complaints were entirely unwarranted.

**\*47** So too here. Defendants received multiple reports that Varughese was erratic and disruptive. Administrators received reports that Varughese lost the faculty of cogent speech on December 8, 2010, that she accosted Jordan on December 10, 2010, and that she refused to address her own role in the December 8 fracas. They also heard that she had been insubordinate to McCash, ignoring a clear instruction to do certain work herself, which instruction was grounded in a general need to cut costs and also the instructions of a particular surgeon. Varughese disagrees that her conduct was worthy of complaint, but she does not raise any genuine issue about whether complaints were in fact made.

The receipt of these complaints that Varughese was disruptive and insubordinate-from her fellow residents, her two Chief Residents, two attending physicians, a lab technician and a medical student-are enough to satisfy Defendant's burden at the second stage of the *McDonell Douglas* analysis, even if they are unfounded, and without considering in any way

2015 WL 1499618

Varughese's admission that she raised her voice and swore on December 8, 2010.

In sum, Defendants offer what the Second Circuit has found to be a legitimate and nondiscriminatory reason for adverse employment actions against an employee: "gross insubordination." *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 409 (2d Cir.1991); *see also Zambrano–Lamhaouhi v. New York City Bd. of Educ.,* 866 F.Supp.2d 147, 172 (E.D.N.Y.2011) (recognizing insubordination as a legitimate non-discriminatory reason in the NYCHRL context).

Because defendants have produced a legitimate, nondiscriminatory reason for the Advisement, the presumption of discrimination raised by her *prima facie* case simply "drops out of the picture." *Cifra v. General Electric,* 252 F.3d 205, 215 (2d Cir.2001) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see also See Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 553 (2d Cir.2010).

The question now is whether Varughese has provided sufficient evidence for a factfinder to conclude that Defendants' purported rationale for the Advisement was actually a pretext for discrimination on the basis of either her gender or her national origin. *Pearson v. Unification Theological Seminary,* 785 F.Supp.2d 141, 158–59 (S.D.N.Y.2011). The plaintiff must not simply produce "some" evidence, but "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant[s] were false, and that more likely than not [discriminatory animus] was the real reason for the employment action." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994)). Alternatively, the plaintiff may show that the defendants' non-discriminatory justifications for the adverse action "were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb,* 521 F.3d at 138 (internal quotation and citation omitted).

**\*48** In order to show pretext, a plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for [the relevant adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer" to undertake it. *Dhar v. NYC Dep't of Transp.,* No. 10–CV–5681, 2014 WL 4773965, at \*10 (E.D.N.Y. Sept. 24, 2014) (internal citations omitted).

Varughese again fails to raise any genuine issue of material fact as to whether it is more likely that a discriminatory reason motivated Defendants to place her on Academic Advisement. After the December 8 incident with McCash, witness after witness came forward to complain, not only that Varughese had completely lost control of herself, but also to voice apparently longstanding complaints about her reliability and work ethic. Varughese may and obviously does disagree with those assessments, but she cannot deny that hospital administrators had to weigh her word alone against the word of at least five witnesses (not including McCash or Jordan), all of whom attested that she was out of control. Whether those witnesses were right is not the point. The point is that the hospital had every non-discriminatory reason in the world to be concerned about Varughese's behavior, and so to place her on an Academic Advisement.

Varughese complains that Defendants took everyone else's word over her own because Lento and others "wanted to believe" that McCash, a white male (only according to Varughese—recall that he self-identifies as an Asian Pacific Islander of Filipino descent, and that this Court does not find any genuine dispute that he is correct), had done nothing wrong. But she offers no *evidence* to support that wholly conclusory assertion. None whatever.

Disparate treatment-which may serve to both raise an inference of discrimination in the first step of the *McDonnell Douglass* burden-shifting analysis and establish pretext at the third [13]—occurs where an employer "treat[s] [the plaintiff] ... less favorably than a similarly situated employee outside h[er] protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (*citing Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

[13]     *McDonnell Douglas,* 411 U.S. at 804; *see also Ellis v. Long Island Rail Road Co.,* No. 05–CV–3847, 2008 WL 838766, at \*4 (E.D.N.Y. Mar. 31, 2008) (*citing Collins v. New York City Transit Auth.,* 305 F.3d 113, 119 n. 1 (2d Cir.2002)).

To benefit from a disparate treatment analysis, however, the plaintiff needs someone to whom she can reasonably compare herself. She need not show that the person to whom she compares herself is identical to her, but she must show that she and her proposed comparator are similarly situated in "all material respects." *Id.* at 39–40; *see also Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d

Cir.1997); *Shah v. Wilco Systems, Inc.,* 27 A.D.3d 169, 169, 806 N.Y.S.2d 553 (N.Y.App. Div. 1st Dep't 2005) (applying same standard to NYCHRL claims). Where there is too much dissonance between a plaintiff's circumstances and her proposed comparator's, the employer's "treatment of th [at] [other] employee[ ] ha[s] no logical relevance to the plaintiff's claims" and thus cannot give rise to an inference of discrimination. *McGuinness v. Lincoln Hall,* 263 F.3d 49, 54 (2d Cir.2001); *see also LeBlanc v. United Parcel Service,* No. 11 Civ. 6983, 2014 WL 1407706, at *15 (S.D.N.Y. Apr. 11, 2014) (applying same standard to analysis whether plaintiff has raised triable issue regarding a "similarly situated" coworker under the NYCHRL).

**\*49** In the particular context of this motion, a court examining a discrimination claim only compares two employees' treatment when those employees are "similarly situated in all material respects." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (*citing Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). The Circuit has recognized that "[w]hat constitutes 'all material respects' [ ] varies somewhat from case to case and ... must be judged based on (1) whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40.

Varughese argues that Defendants showed their discriminatory hand by placing her on Academic Advisement while failing to place McCash on Academic Advisement. But McCash ws not similarly situated to Varughese in all material respects. McCash was Varughese's *supervisor* at that time. Leaving aside the disputed factual question of who yelled more loudly or struck more fear into coworkers' hearts on December 8, 2010, a supervisor yelling at his subordinate is something quite different from a subordinate yelling at her supervisor. Varughese admits that she yelled at McCash. She also admits to yelling at coworker Jordan-while McCash is not alleged to have yelled at anyone other than his subordinate (Varughese). Any workplace's standard regarding insubordination will inherently be more onerous toward a subordinate's behavior, because the supervisor cannot be "insubordinate" to the subordinate.

Moreover, there is no dispute that the evidence before the Hospital decision-makers did not indicate that Varughese's and McCash's conduct was of comparable seriousness. The unbiased third party witnesses all told administrators that Varughese's behavior was more seriously out of line than McCash's. Again, the issue is not whether or not that is true; it is whether the evidence to that effect was given to the Hospital.

Finally, in the fortnight between the December 8, 2010 incident and the December 21 advisement, McCash acknowledged wrongdoing and submitted to counseling. Varughese, by contrast, categorically refused to do so. During those same 12 days, Varughese interfered with the investigation by getting into a confrontation with Jordan; McCash did no such thing.

So McCash and Varughese are simply not "similarly situated in all material respects." For that reason the decision to discipline McCash more leniently (and remember, he was disciplined), while placing Varughese on Academic Advisement, does not lend itself to an inference of either gender or national origin discrimination.

There is evidence in the record of an instance when the hospital put a male resident on Academic Advisement when the male resident behaved in a manner similar to Varughese. In the summer of 2011, a male resident of Asian descent threw a temper tantrum and yelled at a technician who was trying to help him with a dictation machine. That resident was placed on Academic Advisement. He did not react to being on Advisement in the same way as Varughese, however; he apologized profusely, revised his written apology twice to make it more personal and self-reflective, and met with supervisors for months to talk about professionalism.

**\*50** Varughese also seeks to raise an inference that discrimination motivated the Academic Advisement by pointing to Schiller's comments from 2008–2009 and McCash's December 2010 "work ethnic" e-mail. Assuming arguendo that Schiller's comments can be deemed evidence of ethnic bias (I have already address why McCash's email with its obvious typo cannot), this argument gets plaintiff nowhere, because Schiller played no role in the December 8 incident and there is no evidence that he was involved in the decision to put Varughese on Academic Advisement. Melissa Pessin–Minsley had taken over as Interim Chair of the Department by that time. There is no evidence in the record that Schiller was even consulted about the Advisement. Nor is there any evidence that anyone involved in the decision to place Varughese on Advisement knew about Schiller's comments; Varughese herself had not yet complained about them.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 233 of 321
Varughese v. Mount Sinai Medical Center, Not Reported in F.Supp.3d (2015)

2015 WL 1499618

As for McCash, the Chief Resident, he too played no role in making the decision about Academic Advisement, and Varughese was removed from his supervision.

Schiller's stray remarks and McCash's email, assuming any of them to be offensive, thus have no bearing on attitudes displayed by anyone who actually made the decision to place Varughese on Academic Advisement. That means they are not evidence of pretext on the part of those decisionmakers and Mount Sinai. "Statements by nondecisionmakers or statements by decisionmakers unrelated to the decision process itself are insufficient to establish discriminatory intent, even under city law, and certainly under federal and state law. *Taylor v. New York Univ. Med. Ctr.,* 21 Misc.3d 23, 871 N.Y.S.2d 568, 572 (N.Y.App. Term 1st Dep't 2008) (quoting *Forrest v. Jewish Guild,* 3 N.Y.3d at 308, 786 N.Y.S.2d 382, 819 N.E.2d 998); *Bir v. Pfizer, Inc.,* 510 F. App'x 29, 31–32 (2d Cir.2013) (citing *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000)).

Ultimately, Varughese's attempt to prove pretext through a disparate treatment analysis fails with respect to the Academic Advisement because she relies on only on her own conclusory accusations of bias and a disparate treatment analysis that fails for lack of a real comparator. She offers nothing else, and the Court's exhaustive review of the record reveals nothing else.

By contrast, Defendants have presented voluminous evidence from multiple sources to show that Varughese was placed on Advisement for perfectly legitimate reasons having nothing whatever to do with her membership in any protected class.

No reasonable jury could find that the Advisement was imposed as a pretext for discrimination. Plaintiff fails to carry her burden at Step 3. Counts 1, 2, 5, 6, 9, 10, 16 and 18 are dismissed insofar as they are predicated on Varughese's allegation that the Academic Advisement was imposed as an act of discrimination.

*Referral to the PWC*

Varughese also suggests that she views her referral to the PWC as a distinct discriminatory act.

The referral is not cognizable under state or federal antidiscrimination law because it is not "materially" adverse. She was required to meet with Dr. Figur and Dr. Fersh, and to submit to a toxicology screen. The referral did not cause her to lose any benefits, to lose any responsibilities, to have

a lesser title, to disclose the fact of her referral to coworkers, or indeed do anything beyond meet with a few doctors whose job it was to help her. Forcing someone to seek medical or psychological help is not itself an adverse employment action where it is not accompanied by any diminution of the benefits or responsibilities of employment or some actual adverse consequence to the terms or conditions of employment. To the extent that Varughese claims that the referral itself constituted discrimination in violation of state or federal statutes, that claim is dismissed because it was not an adverse employment action.

**\*51** However, Judge Gleeson has specifically found that referring a plaintiff for psychological evaluation, while not materially adverse under federal or state law, is not "merely trivial" under the NYCHRL. *Forgione v. City of New York,* No. 11 Civ. 5248, 2012 WL 4049832, at \*5–6 (E.D.N.Y. Sept.13, 2012). I must agree.

Nevertheless, I cannot agree that Varughese's claim should proceed to trial because, in support of her claim that the referral was *discriminatory,* Varughese has presented only her own conclusory allegations. *See, e.g.,* Varughese 56.1 at ¶ 32.3 ("The PWC is paranoid about their illegal fraudulent conduct against minority women ..."). She has not presented any evidence.

In particular, on this claim Varughese has presented no testimony that anyone was similarly situated to her-i.e. any other resident or doctor who behaved in the erratic and disruptive way that multiple witnesses described to Hospital administrators-was not referred to the PWC. The hospital has submitted evidence that it referred a black female resident to the PWC when she persisted in making inappropriate advances towards another employee.

Varughese's unconvincing "comparator" analysis asks the Court to conclude that her referral to the PWC was discriminatory insofar as Dr. Najfeld was not also referred to the PWC. Varughese claims that the PWC should have been called to investigate Najfeld after Najfeld criticized Varughese for her failure to prepare an adequate presentation. It should go without saying that a supervisor reprimanding Varughese for her deficient performance does not constitute "erratic" behavior but rather, a natural consequence of Varughese's own performance problems.

Further, Varughese has not presented any direct evidence that the person who made the referral (Pessin–Minsley) or the

person who did his own research to confirm the propriety of the referral (Figur) harbored any discriminatory animus against her, based on either her gender or her national origin. Notwithstanding Varughese's unsupported assertions in her Rule 56.1 statement that Figur has been the subject of some unspecified other litigation, there is no evidence in the record of gender or ethnicity-based comments or prior actions by either of them.

No reasonable jury could find fault with the decision to refer a physician who had exhibited obvious signs of distress, and whose behavior was causing severe disruptions in her department, to an administrative body designed to assist troubled physicians,.

Varughese's claim that her referral to the PWC constituted gender or national origin discrimination is dismissed under the City Human Rights Law as well.

*The July 15, 2011 Final Warning*

Next, Varughese alleges that Defendants discriminated against her on the basis of her sex and her national origin by issuing her a Final Warning on July 1, 2011.

Defendants' reasons for issuing the Final Warning-detailed in the warning itself (*see supra* at 43–45)–are on their face perfectly legitimate and completely nondiscriminatory. They are also entirely true. The Department accused her of failing to comply with the terms of her Academic Advisement; Varughese admits that she failed to comply with the terms of her Academic Advisement. The Department accused her of missing required appointments; she admits that she missed appointments required under her advisement. The Department accused her of failing to submit her self-reflective essay; she admits that she submitted her essay on professionalism two and a half months late, and that she also submitted the revised essay after its due date. The Department accuses her of failing to respond to pages, refusing to cover for other residents, being late with assignments, and being late to work; she admits to it all. The list goes on and on.

**\*52** That she has excuses and what seem to her explanations matters not. Defendants' burden of production at this second stage of the *McDonnell Douglas* analysis is satisfied.

At Stage Three, Varughese offers no evidence that those stated reasons are pretextual. She submits a sampling of e-mails showing that other residents were sometimes late, or could not cover a shift. The most notable thing about those e-mails,

however, is that they are proof that other residents actually communicated to others about when they would be absent, when Varughese routinely failed to do so. Varughese also submits the admissions of Morency, Jordan, and others that they were not always in perfect health and sometimes took time off and were unable to cover for other residents. This is unsurprising, to say the least.

Varughese presents *no* evidence that any other resident had an extensive history of stubborn insubordination and absenteeism without notice, i.e. a history comparable to her.

Varughese also fails to come to grips with the difference between her behavior when counseled by administrators and the behavior of others. After the December 8, 2010 incident, McCash accepted counseling and apologized; Varughese did not. The male resident was placed on Academic Advisement, apologized profusely and met with supervisors for months to talk about professionalism; Varughese refused to acknowledge that she had ever exhibited unprofessional behavior.

Varughese is similar to the plaintiff in *Shekhem' El–Bey v. City of New York, et al.,* 419 F.Supp.2d 546 (S.D.N.Y.2006). In that case, Mr. Shekhem' El–Bay complained that his termination must have been the product of discrimination discriminatory because, even though he filed fraudulent tax returns, others who did so were not fired. The Court found him to be without comparators, because:

> not one of the DOC employees cited in plaintiff's complaint was even remotely similarly situated to plaintiff with respect to the disciplinary action taken by the DOC. Mr. El–Bey, in addition to having filed fraudulent tax documents, was found guilty of numerous other disciplinary violations while employed with the DOC, *e.g.,* countless sick leave violations and excessive absenteeism. Nowhere does the complaint allege that even one of the purportedly similarly situated corrections officers was guilty of committing a single act of misconduct other than filing fraudulent tax documents.

419 F.Supp.2d at 551 (internal citations omitted). Varughese has too many strikes against her to compare her to those with just a one or even a few.

It also bears noting that, according to the record, the only other resident who was persistently absent without an adequate excuse-a white male-was also put on final warning. He improved his punctuality and attendance, and successfully graduated from the residency program.

Varughese's claim that Defendants subjected her to illegal discrimination by issuing the Final Warning is dismissed.

*Fall 2011 Refusal to Transfer*

 **\*53** Varughese also alleges that Defendants discriminated against her by refusing her request to allow her to switch rotations in October 2011. This incident would not seem to be of any moment; since Varughese was kicked out of the residency program nine days prior to October 2011, so she could not have assumed a different rotation even if the switch had been authorized.

The However, the Department's refusal was communicated to her multiple times—including on September 7, 2011, and certainly before she was sent a Termination Letter, so I will analyze whether she has raised a genuine issue of fact about the reason why her rotation was not changed. She has not.

I will accept, for purposes of this analysis, that not being allowed to change rotations could be an adverse employment action-although I can think of many reasons why that might not be so. However, the Hospital has advanced a legitimate and non-discriminatory reason why it did not authorize the change in her schedule: Varughese missed the July 1, 2011 deadline to request a scheduling change (a fact that is not in dispute) and granting her request would have had a ripple effect on the schedules of others that would have been too difficult to manage, since no one could be found to cover the rotation to which Varughese was assigned-which, by the by, was the rotation she had requested during the period when requests were being accepted.

The question then becomes, at Step Three, whether Varughese has raised a genuine issue of fact going to either pretext or to the real reason for the decision's being discrimination. She has not. Varughese submits no evidence that the decision to deny her change of schedule request was a mere pretext for anything, let alone for discrimination. Defendants note, as

they did when they denied the request in in September 2011, that 8 out of 10 residents' requests for schedule changes" that came after that July 1, 2011 deadline were denied. (Termination Letter of Sept. 21, 2011, Docket # 205–7 at 38.) Varughese has not submitted any evidence that Defendants granted any transfer requests that were as untimely as hers. Her own conclusory assertion that her request must have been denied because of her gender and/or national origin is woefully insufficient.

Varughese's claim that Defendants violated federal, state, and local antidiscrimination law by refusing her belated schedule change request is dismissed.

*The September 21, 2011 Termination*

I come now to the heart of Varughese's claim: that Defendants should not have kicked her out of Mount Sinai's residency program on September 21, 2011.

I will assume that she makes out a *prima facie* case and ignore the obvious argument that her performance issues rendered her unqualified for her position.

The letter notifying her of her summary suspension reveals multiple, independent, legitimate and nondiscriminatory reasons to have terminated Varughese.

I begin with the most obvious: she rifled through an administrator's files when left alone in that administrator's office. Varughese admits (reluctantly) that she did so. There can be little dispute that this conduct would provide a legitimate, nondiscriminatory reason for termination in any workplace.

 **\*54** There is no evidence that Varughese's secret examination into the file on Patel's desk was simply seized on as pretextual cover for an action Defendants were prepared to take for reasons related to Varughese's gender or her national origin. No one else who was guilty of similar misconduct has even been identified; Cordon–Cardo has testified, without contradiction, that there is no such person. It thus stands to reason that no one has ever been allowed to get away with such serious misconduct.

Varughese offers no evidence, direct or even circumstantial, that anyone involved in the decision to fire her (a group that does not include either Schiller or McCash) had ever exhibited any sort of discriminatory attitude, toward her or anyone else. The fact that she was in Patel's office only by

accident (because Patel encountered her at Starbucks that morning) negates any notion that she might have been "set up;" the fact that she was caught in the act eliminates any possible suggestion that she was singled out. Where, as here, a plaintiff fails

> to rebut specific, credible evidence offered in support of an employer's articulated reason for their firing, [she] cannot maintain claims that [her] firing[s] w[as] discriminatory.

*Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 310 (S.D.N.Y.2000) (internal citations omitted) (analyzing case brought under Title VII, the NYSHRL, and the NYCHRL).

Varughese's argument that she should have kept her job despite her snooping relies on her own conclusory and unsubstantiated assertions that Defendants were engaged in a discriminatory "conspiracy" of some kind. But her unsubstantiated and conclusory allegations that there was discrimination "in the air," and that Defendants engage in "plantation politics," do not meet her third stage burden of producing evidence to raise any genuine issue of fact that would require a trial. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff,* 196 F.3d at 451–52 (restating principle that to defeat summary judgment, plaintiffs', "affidavits must be based upon concrete particulars, and not conclusory allegations") (citing, *inter alia, BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996)). *See also Ricks,* 92 F.Supp.2d at 346–47 (basing grant of summary judgment for defendant in Title VII case, in part, on plaintiff's reliance on conclusory allegations to rebut defendants' specific evidence); *Lytle,* 2012 WL 393008, at *19 ("the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.").

The analysis might stop there. But inquiring into the hospital's other justifications for terminating Varughese-and her rejoinders-only strengthens Defendants' case.

The termination letter cited six additional reasons why she was being fired. First, there was her disastrous performance on Najfeld's rotation. Varughese admits that, during that rotation, she disobeyed instructions to stop fiddling with her phone, failed to follow Najfeld's instructions on how to prepare a presentation, provided Najfeld with an incomplete presentation only an hour before the close of business the day before the presentation was to be made, and failed to notify others that the presentation conference was being canceled. Varughese submits no evidence that anyone else engaged in similar conduct. Nor does she submit any evidence that Najfeld, a woman, complained about Varughese because of plaintiff's gender or her national origin, rather than because of her admitted bad conduct.

**\*55** Next is Varughese's insubordinate behavior towards Jordan on August 5, 2011 and August 12, 2011. Varughese admits that, on those dates, she failed to respond to Jordan's e-mails and pages. Indeed, she admits that she failed to respond to Jordan even after Lento explicitly told her to do so. Varughese submits no evidence that anyone else was allowed to engage in a similar pattern of disobeying instructions and failing to communicate with supervisors regarding coverage. Nor does she submit any direct evidence that Jordan, Lento or Najfeld-the three persons who testified about these incidents-had any bias against her because of her gender or national origin.

Third is Varughese's "Unprofessional Response to Request for Change of Elective Rotation," referring to Varughese's refusal to accept the Department's decision not to consent to her untimely request to switch rotations. Varughese does not dispute that, when one administrator denied her request, she went to supervisor after supervisor to renew her request, failing in each instance to tell anyone that it had already been denied by others. Varughese points to no one else who engaged in similar conduct. Nor does she submit any direct evidence of discriminatory animus by any of the administrators involved, i.e. Firpo, a Dr. Harpaz, Scott Barnett, and Paul Johnson.

Fourth, the Department cited her for her poor conference attendance. When a male resident was told that he was below the 80% conference attendance requirement, he gave a make-up presentation without complaint. (*Id.* at 72–73). When Varughese was told the same thing, she procrastinated, objected, and then walked out of her scheduled presentation with neither explanation nor apology. She never made the presentation.

Fifth is Varughese's "poor communication regarding leave of absence." Varughese does not dispute that she herself asked

2015 WL 1499618

about taking F.M.L.A. leave on September 15, 2011. Nor she does dispute that Defendants encouraged her to take a leave and gave her materials so she could make such a request. In the days that followed, several hospital administrators tried to reach Varughese to inquire about whether she would in fact be making a leave request, as well as to ask about her health. She did not respond to any of these queries, although she admits that she read them. She showed up at work despite having been being told-by Lento, in writing-*not* to come to work. Varughese submits no evidence that anyone else engaged in similar behavior. Nor does she submit evidence that Lento or anyone else demonstrated animus toward women or anyone because of national origin.

Sixth, all of this behavior occurred in the brief six week period following Varughese's receipt of a Final Warning telling her that she had to start acting more professionally or she would be fired. None of this behavior is particularly professional. All of it is either petulant or insubordinate.

Varughese may take issue with what it meant to behave "professionally" at Mount Sinai, but she cannot get around the fact that, "an employer is permitted to set its own performance standards" including standards ... so long as they are not discriminatory." *Nolley,* 857 F.Supp.2d at 441 (analyzing case under federal law, state law, and the NYCHRL). As neither the Final Warning nor the Advisement was discriminatory, Defendants cannot be faulted for firing Varughese when she failed to abide by their terms.

**\*56** Whether summary judgment is appropriate always depends on ' "the strength of the plaintiff[s'] *prima facie* case, the probative value of the proof that the [defendants'] explanation is false, and any other evidence' that supports the defendants' case." *Lizardo v. Denny's, Inc.,* 270 F.3d at 103 (2d Cir.2001) (quoting *Reeves,* 530 U.S. at 148–49). Having reviewed the entire record as submitted by Varughese, I conclude that Varughese has failed to mount an evidentiary carry her burden of production at the third stage of the analysis and her ultimate burden of persuasion. On the evidence in the record, no reasonable juror could find Varughese to have overcome the overwhelming evidence that Defendants disciplined and terminated her, not because of her sex or her ethnicity, but because of her own admitted behavior-behavior that her employer found unprofessional and inappropriate.

In *Pearson v. Unification Theological Seminary,* 785 F.Supp.2d 141 (S.D.N.Y.2011), the Court dismissed a Title VII plaintiff's claims because it was not disputed that she

engaged in a loud argument with her boss and called her a "racist" and a "liar." Whatever occurred, it required the presence of building security, the NYPD, and EMS. This is not acceptable office behavior, and a complaint of racial discrimination does not shield an employee from termination when she acts inappropriately.

*Id.* at 161 (analyzing claims brought under, *inter alia,* the NYCHRL). Throughout the final year of her residency, Varughese engaged in unacceptable workplace behavior. By her own admission, she yelled, she swore, she interrupted, she rolled her eyes, she was late, absent, and-in conversations she recorded and submitted to the Court-by turns confrontational and evasive. The very tape recordings she made-and the pacing and aggressive tone of voice they reveal-confirm the testimony of others about her attitude and her behavior. This court can hardly ignore what is on the tapes for anyone to hear. *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (appropriate for a court to take judicial notice of facts regarding intangible circumstances of encounter preserved in audiovisual recordings if court reviews said recordings).

Yet despite her protracted confrontational conduct, Defendants appear to have bent over backwards to assist Varughese. She received counseling from the Department, from the hospital's overarching Office of Graduate Medical Education, from Human Resources, and from the PWC. Several administrators came in from outside Mount Sinai and were prepared to offer her a clean slate, which she promptly sullied. Even if the Department was, at times, in disarray, antidiscrimination law "does not make [defendants] liable for doing stupid or even wicked things; it makes them liable for *discriminating." Norton v. Sam's Club,* 145 F.3d 114, 120 (2d Cir.1998) (analyzing ADEA claim) (emphasis in original). There is no evidence on which a reasonable jury could conclude that Defendants *discriminated* against Varughese on the basis of her race or her gender.

**\*57** *Nolley* again proves instructive. When Mr. Nolley was given a PIP and told to improve his professionalism, he broke the standards set forth in that PIP by aggressively

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 238 of 321
Varughese v. Mount Sinai Medical Center, Not Reported in F.Supp.3d (2015)

2015 WL 1499618

confronting his superior about what he thought were lies in the customers' complaints that had prompted the PIP in the first instance. He ultimately was fired because he could not handle professionally the complaints about professionalism. It did not matter whether the initial complaints were truthful, it mattered that he was unable to resolve his differences with his employer peacefully and professionally.

Varughese's case suffers from the same defect. As in *Nolley,* "Any deceitful conduct by [Jordan or McCash] or deficiencies in [her supervisors'] performance *do not create an issue of fact regarding [Varughese's] own performance* during [the months-long disciplinary process] or [Defendants'] motives in firing [her] for [her] failure to perform as [her] employer expected and as outlined in the [Academic Advisement."(emphasis added). She has therefore failed to raise a genuine issue of material fact that her termination or any of the supposedly adverse actions preceding it were pretextual or that they were motivated, in whole or in part, by any desire to discriminate against her, on any ground. She *Nolley,* 857 F.Supp.2d at 460.

Varughese has also been unable to point to any circumstantial evidence of discriminatory animus because she has identified *no one* who was similarly situated to her in all material respects-material respects including being on Academic Advisement, having been referred to the PWC, and being on Final Warning. No one else whose existence is disclosed in the record had a similarly pockmarked record of chronic lateness, absenteeism, refusal to follow instructions, and explosive anger. No one else simply refused to comply with the terms of an Academic Advisement or made up silly excuses for not doing so, like "I complained to HR so I don't have to comply." Any mistakes made by other residents to which Varughese points are either less severe, less frequent, or more willingly remedied by their perpetrators-and in most instances, all three.

Rather than point to others outside her protected class who engaged in similar conduct and received preferential treatment, Varughese blames others for her own conduct. She failed to plan an acceptable presentation? That was Najfeld's fault, for not telling her soon enough that it was unacceptable-never mind that Varughese did not send it to her supervisor until an hour before the close of business on the day before she was scheduled to present. (Varughese Dep. at 384.) Varughese was caught going through the files on someone else's desk? That was Patel's fault, for leaving her in an office with files on the desk. (Internal Appeal Hearing, Docket # 205–

31 at 60.) Varughese failed to confirm that she could not cover for a sick resident? That was Jordan's fault, for asking her to provide coverage in the first place-the very request constituted "outrageous harassment." (Varughese Dep. at 465–66.)

**\*58** There is no evidence in the record that any other resident acted out in such a way. Moreover, even under the NYCHRL, a plaintiff cannot "establish pretext "by rationalizing her errors or by blaming others." *Melman,* 98 A.D.3d at 121, 946 N.Y.S.2d 27 (N.Y.App. Div. 1st Dep't 2012) (internal citations omitted).

There are a few instances when Varughese is able to point to other residents who engaged in single bad acts, or who had bad weeks. But the record contains no evidence that anyone else had her lengthy record of persistently bad behavior. While other residents were cited for inappropriate attitudes or isolated angry outbursts, Varughese's lapses in professionalism were chronic and cumulative. (Firpo Dep. at 43, 170–74.) Varughese submits no evidence of anything different.

As the New York Court of Appeals has found, "it matters not whether the [employer's] stated reason for [the challenged action] was a good reason, a bad reason, or a petty one. What matters is that the [employer's] stated reason for [the action] was nondiscriminatory." *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 308 n. 5, 786 N.Y.S.2d 382, 819 N.E.2d 998 (N.Y.2004). Varughese has submitted no evidence that discrimination played any part-even a small part-in the decisions to discipline or terminate her. *Kerman–Mastour v. Fin. Indus. Regulatory Auth.,* 814 F.Supp.2d 355, 367 (S.D.N.Y.2011) ("[E]ven under the more liberal NYCHRL, summary judgment will still be appropriate where a plaintiff does not adduce sufficient evidence of a link between her termination and a discriminatory motive ..."); *see also Jeune v. City of New York,* No. 11 Civ. 7424, 2014 WL 83851, at \*4 (S.D.N.Y. Jan. 9, 2014) (collecting cases). She has done little more than recount that she was subjected to adverse actions and that she was a member of two protected classes. More is required. *Dhar,* 2014 WL 4773965, at \*7.

The motion for a summary judgment of dismissal is GRANTED as to Counts 1, 2, 5, 6, 9, 10, 16, and 18.

**V. The Motion for Summary Judgment is GRANTED as to Counts 3, 7, 8, and 11 (Hostile**

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 239 of 321
Varughese v. Mount Sinai Medical Center, Not Reported in F.Supp.3d (2015)
2015 WL 1499618

#### Work Environment under Title VII, NYHRL and NYCHRL).

Varughese claims-in counts 3, 7, 8 and 11–that Defendants subjected her to a hostile work environment on the basis of her race and gender, in violation of state, local and federal law.

##### A. Varughese's State and Federal Claims

To defeat a motion for summary judgment on a claim of racially or sexually hostile work environment under federal and state law, a plaintiff must produce evidence that "the work environment both objectively was, and subjectively was perceived by the plaintiff to be," *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 604 (2d Cir.2006), "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (citation and quotation marks omitted). The Supreme Court has "made it clear that that conduct must be extreme to amount to a change in the terms and conditions of employment" and that courts must filter out complaints attacking "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Isolated incidents ordinarily will not rise to the level of a hostile work environment, but may if sufficiently severe. *See id.; Kemp v. A & J Produce Corp.,* 164 Fed. Appx. 12, 14 (2d Cir.2005); *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir.2000).

**\*59** In determining whether the alleged conduct was so severe or pervasive as to create an objectively hostile or abusive work environment, courts should consider the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Varughese's hostile work environment claims are based on an accumulation of discrete indignities. In addition to the matters she assigned as discrimination-all of which make up part of her hostile work environment claims-these include (1) Schiller's few sporadic comments during the first two years of her residency, (2) her desk was broken into (although she does not know by whom), (3) the lab slowed processing of her patient slides, (4) other people whispered about her, (5) McCash yelled at her before she was removed from his supervision, and "stomped around" afterward. For purposes

of this motion, I will presume that all of these things happened.

*Varughese Has Failed to Present Any Evidence Connecting These Any of These Events to Her Membership in a Protected Class.*

The principal reason why the Hospital is entitled to summary judgment dismissing Varughese's hostile work environment claim under federal and state law. Varughese has not presented any evidence from which a reasonable jury could infer that that any of those events-let alone all of them collectively-occurred under circumstances giving rise to an inference of discrimination.

While "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred" they must occur under circumstances in which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. Coll. of Staten Island,* No. 01–CV–7550, 2003 WL 21143076, at *2 (E.D.N.Y.Mar.23, 2003) (citing *Gregory v. Daly,* 243 F.3d 687, 694–95 (2d Cir.2001)). "Everyone can be characterized by ... race ... and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir.2002). Facially neutral incidents may be sufficient to establish a hostile work environment claim "so long as a reasonable fact finder could conclude that they were, in fact, based on [race]. But this requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Id.* at 378.

Varughese points to no evidence that would allow a jury to conclude that she was subjected to any purported indignity because of either her race or her sex. As discussed above, when analyzing Varughese's discrimination claims, there is no evidence in the record to connect any of the eight adverse actions she identified as discriminatory to Varughese's being a woman or being of Indian descent. That lack of evidence does not change when those activites are viewed through the prism of hostile work environment analysis.

**\*60** Varughese also submits no evidence connecting the other incidents described-such as the broken lock on her desk, or the lab's pace in processing her slides-to her membership in any protected class. None whatever.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 240 of 321
Varughese v. Mount Sinai Medical Center, Not Reported in F.Supp.3d (2015)

2015 WL 1499618

So her hostile work environment claim under state and federal law rises and falls on whether Schiller and McCash's comments created a hostile work environment for her. They do not. They were the quintessence of "stray remarks"-neither so many nor so frequent as to alter her workplace in any material way. This is without regard to the fact that at least two of the comments-Schiller's DNA remark and McCash's "work ethnic" e-mail-could not be understood by any reasonable trier of fact as the ethnic slurs Varughese makes them out to be.

It is not clear that these allegedly scurrilous remarks were made more than 300 days before plaintiff filed her charge with the EEOC: Schiller's remarks were made during the first two years of her residency. Nevertheless, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75 (2d Cir.2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

Schiller's alleged comments about the "crazy things you'll find in India" were perhaps impolitic but they are hardly "severe" or "pervasive" enough to create a hostile work environment, since they are alleged to have occurred four times over the course of her employment. That is by definition not "pervasive."

Schiller's DNA remark was made early in Varughese's second year of residency, in the fall of 2009. It was a one-off remark. It contained no reference to her ethnicity or national origin. In context, it was a remark about the genetic basis of depression, which was the subject under discussion-Varughese's mental health, her perceived depression. Schiller directed Varughese to obtain mental health counseling, not because of her gender or her ethnicity, but because she presented as depressed in the workplace. Many people, including doctors, believe that there is a genetic (i.e., DNA-based) component to depression. *See, e.g.,* Eileen P. Ryan, D.O., "What Psychiatry, Developmental Psychology, and Neuroscience Can Teach Us About at-Risk Students," 17 Wash. & Lee J. Civil Rts. & Soc. Just. 59, 64–65 (2010). Schiller's comment cannot reasonably be understood in any manner other than this.

As for McCash's e-mail, it was discussed extensively above. It does not refer to Varughese's status as a person of Indian descent. The insertion of the letter "n" into the phrase "work ethic" is an obvious typographical error. For that reason it does not evidence a hostile work environment on any forbidden basis.

But there is another reason why this email is not evidence of a hostile work environment. Varughese did not become aware of it until long after she stopped working for Defendants. Varughese was not carbon copied on the "work ethnic" e-mail. At her deposition (which occurred after her termination), she denied knowing about any discriminatory comments ever uttered by McCash. Only now does she allege that this, email contributed to the purportedly hostile environment she faced.

**\*61** A plaintiff need not herself be the target of discriminatory comments in order for those comments to contribute to a hostile work environment; nor does the plaintiff need to hear such comments first-hand. *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69–70 (2d Cir.2000); *see also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir.1997) ("Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant."); *Cruz,* 202 F.3d at 571 (finding that, even if plaintiff were not present when some comments were made, "a jury plausibly could find that [defendant's] persistently offensive conduct created an overall hostile or abusive environment" which "exacerbated the effect of the harassment [plaintiff] experienced individually" (internal quotation marks and citations omitted))..

But, to rely on discriminatory comments in pursuit of a hostile work environment claim, a plaintiff must at least have been generally *aware* that such comments were uttered. The *Whidbee* court examined the totality of the circumstances and found that "the plaintiffs were subjected to, *or at the very least aware of,* a stream of racially offensive comments." 223 F.3d at 70 (emphasis added). The *Whidbee* court relied on *Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir.1997). In *Schwapp,* the court explained that, "The mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim" *because* "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." 118 F.3d at 111.

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 241 of 321
Varughese v. Mount Sinai Medical Center, Not Reported in F.Supp.3d (2015)
2015 WL 1499618

Here, Varughese did not learn of the "work ethnic" comment even second-hand. She was not aware of the email at all during the period while she was a resident at Mount Sinai. It would be difficult indeed for a comment to alter the conditions of Varughese's employment if she was unaware of it until well after she stopped being employed. "A plaintiff need not be the recipient of [racially] offensive material for it to contribute to a hostile work environment. Nevertheless, if the material is not publicly displayed or disseminated, and is not something [she was] ... generally aware of, its contribution to a hostile work environment may be negligible. *Ortiz–Moss v. New York City Dep't of Transp.,* 623 F.Supp.2d 379, 401 n. 19 (S.D.N.Y.2008); *cf. Patane v. Clark,* 508 F.3d 106, 114 (2d Cir.2007) (plaintiff's regular observation of male employee watching pornographic videos, and her being required to handle pornographic material herself in opening supervisor's mail, were relevant to assessing whether her work environment was objectively hostile to women). Here, where there is literally no other evidence of ethnic slurs (as there was in *Whidbee,*) and no other evidence of compromised behavior on McCash's part, the probative value of the email is not just negligible; it is nil.

**\*62** The "work ethnic" e-mail is the *only* comment with any nexus whatsoever to the treatment she describes as hostile that occurred within the statutory period, in that it has a connection to the December 8, 2010 incident. There is no other evidence of discriminatory comments or other direct evidence of animus that relates to the treatment of which she complains. I therefore cannot consider the comment as but one instance of a general atmosphere of discriminatory hostility, particularly in view of the circumstances under which the comment was made-i.e. that it would be reasonable to consider it a scrivener's error.

Moreover, when Varughese complained about McCash's behavior in December (i.e., at the time he composed the e-mail), Defendants removed her from his supervision and ensured that they did not have to work together, even as colleagues, thus shielding her from whatever hostility she alleges. She now claims that McCash "stomped around" her desk on a subsequent rotation, but admits that she did not have to work with him and that she never notified anyone that she was still having problems with him.

Under federal and state laws, to prevail on a hostile work environment claim, plaintiffs must show not only severe or pervasive harassment but also "a specific basis ... for imputing the conduct that created the hostile environment to

the employer." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). Because the "stomping" was by a co-worker (as she no longer reported to him) and not a supervisor, Varughese must demonstrate that Defendants "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* (internal quotation marks omitted). "[A]n employer will be liable in negligence for a racially ... hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Richardson,* 180 F.3d at 446 (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633, (1998)); *see Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998).

In the end, "Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." *Cruz,* 202 F.3d at 570. Here, the totality of the circumstances do not even remotely suggest that Varughese was the victim of a hostile work environment, either because she was a woman or because she was of Indian descent. If there is any suggestion of hostility at all-a proposition very much in dispute-the entirety of the evidence points to Varughese's uncooperative, insubordinate attitude as its root cause. The statutes she invokes do not protect Varughese from the consequences of her own behavior. Varughese has failed to provide evidence from which a reasonable jury could conclude that any dislike was based on her race or her sex.

**\*63** Consideration of the totality of Varughese's employment does not yield any evidence of an environment severely or pervasively infected with discriminatory hostility on the basis of her gender and/or her race. It merely reveals that, when she acted out, there were consequences, and that she happened to be a woman of Indian descent. But again, "I am a member of a protected class; my workplace was hostile; it must have been because of my protected class," is a logical fallacy that does not insulate a plaintiff from summary judgment where the undisputed facts warrant dismissal of her claims as a matter of law.

While "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable," *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 439 (2d Cir.1999), Varughese's evidence of McCash's e-mail, Schiller's interest in India, and Schiller's concern that her depression might be DNA-based are neither "severe" nor "continuous" nor "concerted," *Cruz,* 202 F.3d at

570 (internal quotation marks omitted)-and so will not sustain a hostile work environment claim under federal or state law. There is *no* evidence in this record that Varughese was subjected to repeated indignities (or even to one particularly egregious indignity) *because of either her race or her gender.*

Not a single piece of evidence even *alludes* unfavorably to Varughese's gender. Plaintiff did not complain that she was experiencing a hostile work environment based on her gender until April 2011. But when she did so, she accused McCash of creating the hostile work environment. But the record contains evidence of only two run-ins between McCash and Varughese-in September 2010 and again in December 2010–which is too sporadic to create a hostile work environment. After that, the hospital removed Varughese from McCash's supervision-five months before she uttered her first complaint. In short, there is not a scintilla of support for her claim of a gender-based hostile work environment.

And so we turn to national origin. Schiller's comments about things one might find in India were, *at worst,* subject to interpretation-and both few in number and sporadic. They were also made well before Varughese's workplace problems began. Even if these were racially insensitive remarks, his comments cannot be attributed to others, and he ceased being chairman of the Pathology Department before the December 8 incident, the Academic Advisement or the PWC referral.

Schiller's comment about depression's being associated with DNA cannot logically be construed as a comment on Varughese's national origin except under some sort of utterly unreasonable, Oliver Stone-like "conspiracy theory" And McCash's "work ethnic" e-mail almost certainly contains a typographical error, given the complete lack of any other evidence suggesting that McCash was insensitive or worse toward anyone on the basis of their race or national origin. At worst, it is at worse a single stray remark-which, under federal and state law, is insufficient to prove hostile work environment. And of course, Varughese *never* complained that she was being subjected to a hostile work environment on the basis of her race during her tenure at Mount Sinai. Even when she retained counsel in June 2011, her lawyers claimed that the hospital was discriminating against her because of her *gender.*

**\*64** What remains are only Varughese's conclusory allegations that everyone in the hospital was a racist, a sexist, or both. That is not enough.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 3, 5, and 18, i.e. Varughese's state and federal hostile work environment claims.

### B. *Varughese's Hostile Work Environment Claim under the NYCHRL*

Having dismissed Varughese's hostile work environment claim under state and federal law, I now consider whether Varughese's city law claim of hostile work environment can survive Defendants' motion for summary judgment.

The NYCHRL has a more forgiving standard for hostile work environment claims than federal or state laws do. There is no "severe or pervasive" requirement under city law, and "while courts may still dismiss 'truly insubstantial cases,' even a single comment may be actionable in the proper context." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 113 (2d Cir.2013) (citing *Williams,* 872 N.Y.S.2d at 41 & n. 30).

Nevertheless, the NYCHRL "is not a general civility code," and "summary judgment is still appropriate in NYCHRL cases ... if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." *Id.* (internal citations omitted). In this case, the record establishes precisely that. Varughese offers no evidence connecting the incidents she now perceives as hostile to bias related either to her race or to her gender. Her wide-ranging, conclusory assertions that there was discrimination in the air do not withstand any level of scrutiny.

Count 11 is dismissed.

### VI. The Motion for Summary Judgment is GRANTED as to Counts 4, 8 and 12 (Retaliation under Title VII, NYHRL and NYCHRL).

Varughese alleges-in counts 4, 8 and 12 of her Second Amended Complaint-that she was disciplined and terminated in retaliation for engaging in the protected activity of complaining about discrimination.

Title VII provides, "It shall be an unlawful employment practice for an employer to discriminate against any ... employee [ ] ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a). Retaliation claims are cognizable under § 1981. *See Choudhury v. Polytechnic Inst. of N.Y.,* 735 F.2d 38, 43–44 (2d Cir.1984).

Varughese v. Mount Sinai Medical Center, Not Reported in F.Supp.3d (2015)

2015 WL 1499618

To survive summary judgment with respect to her claim of retaliation, Varughese must raise a genuine issue of fact whether "(1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there existed a causal connection between the protected activity and the adverse action." *Patane,* 508 F.3d at 115 (citing *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004)). The NYCHRL against has no "materiality" requirement; it forbids any form of retaliatory action.

It is well-established that a "plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (internal quotation marks omitted). The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management. *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). Moreover, as the Supreme Court has explained, any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" may constitute retaliation. *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

**\*65** In this Circuit, the analysis of a retaliation claim follows the same *McDonnell–Douglas* framework discussed in Part III, *supra. Kemp v. A & J Produce Corp.,* 164 F. App'x 12, 15–16 (2d Cir.2005). Thus, "once the plaintiff has made out a *prima facie* case of retaliation, the defendant then has the burden of pointing to evidence that there was a legitimate, non-retaliatory reason for the challenged action. If the defendant meets that burden, the plaintiff must then demonstrate that there is sufficient evidence upon which a reasonable jury could find the proffered legitimate reason merely a pretext for impermissible retaliation." *Id.* (citing *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998)).

With respect to retaliation, Varughese does not get past the first step of the inquiry.

Varughese's 56.1 Statement repeatedly claims that she complained about "discrimination" earlier than April 2011, but *nothing* in the record supports that assertion. Certainly she complained about a "hostile environment" at work as early as September 2010, and described others' behavior as "offensive," but she never gave anyone any reason to suspect that the hostile or offensive environment she was complaining about had anything to do with either her race or gender. She did not mention her sex or her ethnicity in her complaints. She did not complain about any allegedly racist or sexist comments. She did not ascribe what she perceived as mistreatment to her membership in any protected class. She did not compare the way she was being treated to the way Caucasians or males were treated. The people explicitly contradicting her versions of events were often members of one or both of the same protected categories as she-including Drs. Jaffer and Maniar, women of Indian descent, both of whom were outranked her and one of whom outranked McCash. Maniar, who Varughese believes would support her version of events, denied that Varughese had ever complained to her about discrimination or retaliation. (Docket # 163 at ¶ 10.)

When Varughese complained about "retaliation" before April 2011, she explicitly linked the alleged retaliation to non-protected activities-principally to having given Lento's rotation a negative internal review or making general allegations about unfair treatment and workplace bullying. Her first reflection explicitly declined to ascribe McCash's behavior to any motive at all: "*I will not claim to know why Samuel McCash treats me the way he does,* nor will I need to understand why ... But I feel that he is resentful of any success or well-being I may exhibit." (Self–Reflection Essay # 1, Docket # 205–10 at 19.) (emphasis added) Not until April 25, 2011 did Varughese explicitly assert that McCash's behavior toward her was based on her gender. (E-mail from Varughese to Tiger–Paillex of Apr. 25, 2011, Docket # 205–10 at 2.) The letter written by her attorney to Mt Sinai in June 2011 (*See* Docket # 205–10 at 12) identifies a December 23, 2010 email as containing an earlier complaint that she was being discriminated against on the basis of her gender and/or some perceived disability (which is not a claim asserted in this lawsuit). However, that December 23 email asserts nothing about discrimination: she complained about what she characterizes as abusive behavior and public humiliation. Neither her gender nor her national origin is mentioned; there is nothing in the email to alert the recipient (Tiger–Paillex) that these were the basis of her complaint.

**\*66** Thus, notwithstanding Varughese's conclusory assertions in her 56.1 Statement, there is no *evidence* that she engaged in any protected activity prior to being placed on Academic Advisement.

Instead, all of her statutorily protected activity began in April 2011–well after her December 21, 2010 Academic Advisement, well after McCash's and Jordan's promotions to Chief Resident, and well after Pessin–Minsley's referral of Varughese to the PWC. None of those issues can be chalked up to retaliation for any complaint about discrimination based on gender or national origin.

Of course, her Final Warning and ultimate termination occurred after Varughese engaged in protected activity. But those adverse actions cannot be chalked up to retaliation, either, because they were part and parcel of a course of conduct that began well before any protected activity took place. Under federal and state law, where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery,* 248 F.3d at 95. The same is true under the NYCHRL. *Melman v. Montefwre Med. Ctr.,* 98 A.D.3d 107, 129, 946 N.Y.S.2d 27, 42 (2012) ("an employer's continuation of a course of conduct that had begun before the employee complained does not constitute retaliation because, in that situation, there is no causal connection between the employee's protected activity and the employer's challenged conduct ...") (internal citations omitted).

Varughese thus "cannot establish a *prima facie* case of retaliation based on the temporal proximity between the adverse employment actions and her protected activity, even though some of the things about which [she] complains occurred after she engaged in protected activity" in April 2011. *Williams v. Woodhull Med. & Mental Health Ctr.,* 891 F.Supp.2d 301, 315 (E.D.N.Y.2012).

Bending over backward to try to find some way to keep Varughese's claim of retaliation alive, the Court has considered whether her off-hand question to Tiger–Paillex in late December 2010 or January 2011 whether McCash wanted to micromanage her "because he is a guy?" qualifies as protected activity. First, let us assume that this actually qualifies as a complaint of gender-based treatment, rather than evidence of Varughese's own gender bias. However, even assuming that it qualifies as protected, Varughese only raised the concern *after she had already been placed on Academic Advisement.* It does not get her out from under the rule announced above.

The totality of the evidence simply does not admit of an inference that Defendants retaliated against Varughese for engaging in any protected activity.

Defendants' motion for a summary judgment of dismissal is GRANTED as to counts 4, 8 and 12.

## VII. The Motion for Summary Judgment is GRANTED as to Count 17 (Whistleblower Retaliation).

Varughese claims that Defendants violated New York Labor Law § 740, New York's whistleblower statute, by penalizing her for reporting McCash and Jordan for drinking on the job. Presumably, Varughese invokes § 740 because it provides the only private right of action for enforcing § 741, New York's Health Care Whistleblower statute.

**\*67** Section 741 specifically protects healthcare providers who "disclose [ ] or threaten[ ] to disclose to a supervisor, or to a public body an activity, policy or practice of the employer ... that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or objects to, or refuses to participate in" any such activity, policy or practice. N.Y. Labor Law § 741(a)-(b). An employer may not take any adverse personnel action against an employee "because" she engages in protected activity. N.Y. Labor Law § 740.

Relying on a 2010 Appellate Division decision, Defendants argue that Varughese's whistleblower retaliation claim should be dismissed because she has "failed to identify a specific law, rule or regulation" that the alleged drinking purportedly violated. *See* Defs. Mem., Docket # 172 at 24–25, *citing Deshpande v. Medisys Health Network, Inc.,* 70 A.D.3d 760, 762, 896 N.Y.S.2d 103 (2d Dep't 2010).

The case on which Defendants rely is no longer good law. The New York Court of Appeals expressly directed that it not be followed two months before Defendants filed their brief. *Webb–Weber v. Cmty. Action for Human Servs., Inc.,* 23 N.Y.3d 448, 451, 992 N.Y.S.2d 163 (2014) ("there is no such [identification] requirement ... [and] Appellate Division authority ... should no longer be followed for that proposition.").

The Court of Appeals cautioned that *"recover [y]* under a Labor Law § 740 theory" requires an actual violation of law, 23 N.Y.3d at 452–53, 992 N.Y.S.2d 163, but, were Varughese's accusations true, there would have been

a violation of actual law. Undertaking the liberal review that I must for a *pro se* plaintiff, it is not difficult to find a regulation that would be violated if Defendants' physicians—the need for whose "skilled performances ... cannot be overemphasized" (Docket # 205–8 at 11)— were becoming intoxicated before assessing whether, say, someone had cancer. Specifically, New York Public Health Law § 230 *et seq.* is clear that a physician "practicing the profession while impaired by alcohol" has committed "professional misconduct" that can lead to the revocation of his or her medical license. N.Y. Pub. Health Law § 230(1) (incorporating by reference the definition of professional misconduct in N.Y. Educ. Law § 6530); *see also* N.Y. Educ. Law § 6530(7).

Defendants' better objection is that there is no evidence that Plaintiff was terminated in retaliation for engaging in conduct protected by the statute.

New York "enacted Section 741 of the Labor Law to encourage employees to report hazards to their supervisors and to protect them from retaliatory personnel actions when they make such reports." *Pal v. New York Univ.,* No. 06 CIV.5892, 2007 WL 4358463, at *7 (S.D.N.Y. Dec. 10, 2007) (citing Sponsor's Mem. (Oct. 23, 2001), N.Y. Bill Jacket, L.2002, ch. 24); *see also Collate v. St. Luke's Roosevelt Hosp.,* 132 F.Supp.2d 256, 263 (S.D.N.Y.2001) (citing *Rodgers v. Lenox Hill Hosp.,* 211 A.D.2d 248, 250–51, 626 N.Y.S.2d 137 (1st Dep't 1995)).

**\*68** However, to fall afoul of the statute, the adverse action must be taken "because" the employee engaged in protected activity. § 740. In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity.

No reasonable jury could conclude that Defendants took any adverse action to retaliate against Varughese for reporting residents' drinking. Indeed, Varughese herself has specifically disclaimed any idea that there is any causal link between her reports of drinking and any adverse action she experienced: "I don't see it as retaliation for a complaint about people drinking on the job." (Varughese Dep. at 748.)

Even if Varughese had not waived reliance on this theory, however, the record does not support it.

Every time Varughese reported Dementia rounds or other alcoholic activity, she had just been taken to task for her own behavior-not the other way around. She made the first allegation about drinking after she was placed on Academic Advisement and around the time she was referred to the PWC. Varughese brought the issue up again in April, two days after Tiger–Paillex told her that HR could not substantiate her claims regarding the December 8 incident. Her third allegation-specifically claiming that McCash and Jordan had been drinking while involved with patient-care duties-came two days after her contentious May 3, 2011 meeting with Cordon–Cardo, in which she was told to rewrite her self-reflection.

At the follow-up meeting on May 24, when Varughese submitted her self-reflection late, rolled her eyes and allegedly threw a book on the table, Cordon–Cardo said: "the best way ... to move on is not with this attitude. You can come here with another attitude and to say ... I'm going to drop all of this nonsense of people drinking ..."

> We are addressing these people ... we are taking these matters very seriously today. We ... have a lot of work to do ... but at the end of the day it's a program to teach and train people that are excited and passionate about pathology, not that are upset or that have problems ... You can't keep going back and forth ... coming back with new allegations now this person is drinking and now the other person is drinking then no one knows what it's about if you're talking ..."

(Docket # 205–24 at 40–41). When he said that they were indeed taking these matters seriously, he was not kidding. He was obviously referring to Figur's involvement, which led to finding a bottle of Captain Morgan on hospital premises. This in turn led to a hospital-wide e-mail admonishing people to stop bringing alcohol to work. Varughese was not punished for her "whistleblowing" activity; to the contrary, it was followed up on, and things improved. But as with her claims of retaliation under Title VII and the state and city human rights laws, we must look at the totality of the circumstances, as demonstrated by the admissible evidence, rather than conclusion or conjecture.

**\*69** The totality of the circumstances of this case would not permit any reasonable juror to conclude that the hospital was reacting to Varughese's complaints about alcohol with adverse actions, rather than the other way around. Before she uttered a word about alcohol, Varughese had been put on Academic Advisement, so that very serious disciplinary action cannot be attributed to her whistleblowing. The evidence is undisputed that she failed to comply with the conditions of her Advisement; that was misconduct on her part, which was in no way excused by her whistleblowing. Ample evidence of her behavior at work justifies her being referred to the PWC. And her termination was occasioned by admitted instances of misconduct, the last straw being her admitted rifling through a file on the desk of an HR employee. Engaging in whistleblowing does not insulate an employee from being disciplined or fired for misconduct, and here, there is no genuine issue of fact that misconduct warranting discipline occurred.

The motion for summary judgment is GRANTED as to Varughese's §§ 740–741 claim (Count 17).

**VIII. The Motion for Summary Judgment Dismissing Count XIX (Family and Medical Leave Act) is GRANTED.**

Varughese's FMLA claim is an unusual one.

In September 2011, Varughese herself suggested she might take a leave of absence from work. Defendants encouraged her to do so, provided her with the materials necessary to apply for

FMLA leave, and followed up to see how Varughese was doing when she failed to submit an application. Several days after her initial inquiry and (according to her Rule 56.1 Statement) before she had even made a formal request to take leave, she said she wanted to take some leave at a later date and and come back to work. Her FMLA claim is based on the hospital's refusal to allow her to come back to work until she obtained a doctor's assessment that she was fit to return, essentially forcing her to take involuntary leave. *See* Docket # 66 at ¶ 56. The undisputed facts also establish that she disobeyed her employer's orders and came to work without permission for several days.

This is not a violation of the FMLA. The claim is dismissed.

FMLA was enacted because Congress believed "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods ..." 29 U.S.C. § 2601(a)(4). FMLA therefore provides employees with certain substantive rights, with which employers cannot interfere. *Sarno v. Douglas–Elliman,* 183 F.3d 155 (2d Cir.1999). The Act provides eligible employees the right to take unpaid leave for up to twelve weeks for a serious medical condition as defined by the Act. 29 U.S.C. § 2612(a)(1). It further provides that at the end of that leave the employee is entitled to reinstatement to the former position or an equivalent position. 29 U.S.C. § 2614(a). To ensure the availability of these rights, section 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Therefore, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

**\*70** Forced leave, however, "by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 175 (2d Cir.2006). The FMLA establishes certain rights, including, inter alia, "to take leave, to restoration of position, and to maintain a civil action," but it "does not create a right to be free from suspension with or without pay, nor does the FMLA create a right against infliction of emotional distress." *Id.*

The Second Circuit has allowed that a cause of action "might" lie under the FMLA if such a forced leave "interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA." But Varughese does not allege that the requirement that she not come back without a doctor's note interfered with her ability to take leave under the FMLA, or with her ability to communicate with Defendants' HR department and submit her FMLA forms. It didn't even interfere with her ability to work; she ignored orders and reported to work anyway.

There can be no question that the Defendants wanted Varughese to exercise her rights under FMLA; they believed she was unstable and needed to take some leave. They did nothing to prevent her from taking FMLA leave; they encouraged her to take a leave.

There is no evidence in the record that would permit a reasonable juror to conclude that Defendants interfered with any right guaranteed by FMLA by requiring Varughese-

who, by her own admission, had been ill frequently to the point of absence, and was extremely anxious to provide a doctor's certification that she was fit for duty before she returned to making assessments that could affect patients' health. *See Robertson v. Amtrak/Nat'l R.R. Passenger Corp., 400 F.Supp.2d 612, 614 (S.D.N.Y.2005)* (Chin, J.)

Further, even if Varughese had exercised her right to take leave under FMLA, "an employer is entitled to a certification of fitness to return to duty for such absences up to once every 30 days if reasonable safety concerns exist regarding the employee's ability to perform his or her duties, based on the serious health condition for which the employee took" a leave. 29 C.F.R. § 825.312. For a hospital to require a doctor's note certifying the fitness of a physician who has taken, or indicated a desire to take FMLA leave, is a prudent measure for the protection of the public.

To the extent that Varughese claims that Defendants did not require doctors' certifications of fitness from persons not in her protected class, her claim does not lie under the FMLA.

The motion for a summary judgment is GRANTED as to count 19.

### IX. The Motion for Summary Judgment Dismissing Count XV and XVI (Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing) is GRANTED.

Varughese claims that her termination breached her employment contract. The Second Amended Complaint does not specify the alleged breach, but the gravamen of Varughese's contractual claim at her deposition and in her *pro se* papers has been that she was terminated without cause.

**\*71** Varughese's employment contract provided that: "The Program Director [or] the Department Chair ... may take disciplinary action, including termination for cause, against any [resident] who ... fails to demonstrate an acceptable level of ... professionalism."

Varughese has *admitted* to, *inter alia,* screaming, swearing, rolling her eyes, being absent, being late, ignoring pages, ignoring e-mails, ignoring calls, ignoring instructions, going through the files on someone else's desk, canceling a presentation without notice, and submitting an essay on professionalism two months late. The hospital concluded that the admitted behavior did not demonstrate an acceptable

level of professionalism. Two appeals boards upheld that determination.

The hospital, not Dr. Varughese and not a jury, has the right to decide which behavior in a resident physician is sufficiently unprofessional to constitute cause for termination. She was terminated for cause. Her contract was not breached.

Her breach of the covenant of good faith and fair dealing fares no better.

Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. *See 511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (N.Y.2002); *Carvel Corp. v. Diversified Mgmt. Grp.,* 930 F.2d 228, 230 (2d Cir.1991). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 80 (2d Cir.2002). While the implied covenant of good faith and fair dealing does not "imply obligations inconsistent with other terms of the contractual relationship," it does encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Manhattan Motorcars, Inc. v. Automobili Lamborghini,* 244 F.R.D. 204 (S.D.N.Y.2007) (quoting *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y.1983); *Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (N.Y.1978)).

To avoid redundancy, "Claims of breach of the implied covenant ... must be premised on a different set of facts from those underlying a claim for breach of contract." *Deutsche Bank Sec. Inc. v. Rhodes,* 578 F.Supp.2d 652, 664 (S.D.N.Y.2008). "A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim." *Id.* Accordingly, "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 2434 (S.D.N.Y.1997); *Murphy,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (holding that the implied obligation is simply "in aid and furtherance of other terms of the agreement of the parties."); *Madison*

*Capital Co., LLC v. Alasia, LLC,* 615 F.Supp.2d 233, 239 (S.D.N.Y.2009).

**\*72** Here, Varughese has not provided any separate set of facts to support her breach of covenant claim, and the Court's own review of the record suggests none.

The motion to dismiss counts 15 and 16 is GRANTED.

### X. The Motion for Summary Judgment is GRANTED as to Count 13 (Tortious Interference with Business Relations).

Varughese alleges that, by failing to provide a summative evaluation to prospective employer RWJ hospital in January of 2011, Defendants engaged in the New York common law tort of interference with business relations, also known as tortious interference with prospective economic advantage.

"To state a claim for tortious interference with prospective economic advantage, a Plaintiff must show that '(1) the Plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.' " *Doe v. White Plains Hosp. Med. Ctr. (WPHMC),* No. 10 CIV. 5405 GBD, 2011 WL 2899174, at \*4 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French,* 458 F. App'x 21 (2d Cir.2012) (quoting *Catskill Dev., LLC v. Park Place Entm't,* 547 F.3d 115, 132 (2d Cir.2008)).

Varughese's claim founders on the third element. She has provided nothing other than her own conclusory assertions to prove that Mount Sinai "acted for a wrongful purpose or used dishonest, unfair, or improper means" when it refused to provide RWJ Hospital with a summative evaluation while her appeals were pending.

The Second Circuit has explained that, under New York law, the phrase "wrongful means"

> represent[s] 'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract.' " *NBT Bancorp,* 664 N.E.2d at 497, 641 N.Y.S.2d at 586 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445, 449 (N.Y.1980)).

*Scutti Enterprises, LLC. v. Park Place Entm't Corp.,* 322 F.3d 211, 216 (2d Cir.2003)

There is neither an allegation nor any evidence that Mount Sinai used the means described in *Scutti Enterprises.* Defendants did not wish to release any summative evaluation of Varughese's employment until her internal appeals of her termination had concluded. This decision actually was to Varughese's benefit; when the request was made her status was "terminated for cause," so if her appeal had been successful in overturning that determination, the information Mount Sinai would have provided would have been incorrect. The hospital was prudent to abide the final resolution of the appeals; prudence does not amount to fraud or any of the other improper means listed above.

The motion to dismiss Count 13 is GRANTED.

### XI. The Motion for Summary Judgment is GRANTED as to Count 14 (Defamation and Defamation Per Se).

**\*73** Varughese alleges that Defendants' act of forwarding the "summative evaluation" to a potential employer would constitute defamation and defamation *per se.* She seeks an injunction preventing Defendants from sending the "summative evaluation" to anyone.

To recover for defamation in New York, Varughese must prove that the Defendants made:

> (1) a false statement about the plaintiff,
> (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher, (4) that either constitutes defamation *per se* or caused 'special damages.'

*Thorsen v. Sons of Norway,* 996 F.Supp.2d 143, 173 (E.D.N.Y.2014), *reconsideration denied* (May 14, 2014) (quoting *Thai v. Cayre Grp., Ltd.,* 726 F.Supp.2d 323, 329 (S.D.N.Y.2010) (internal citations omitted).

The claim must be dismissed because there is no evidence in the record that Defendants have actually published the

summative evaluation to anyone except plaintiff. Unless there is publication to a third party, there is no defamation. [14]

[14]    The evaluation was shown to persons who were deposed, including Dr. Fyfe of Robert Wood Johnson Hospital, but that is a privileged act, taking place in the context of a lawsuit, where the witness (who was identified by Varughese) was being questioned about whether RWJ would have been willing to employ Varughese if the evaluation had been sent (it had not even been written yet when Varughese was discussing possible employment at RWJ). It is not actionable.

Varughese's real goal is to obtain an injunction prohibiting Mount Sinai from publishing the evaluation to anyone in the future on the ground that it is defamatory. That claim fails because the statements in the summative evaluation she protests are not statements of fact. They are thus not actionable as defamation.

The "threshold issue which must be determined, as a matter of law, [in a defamation case] is whether the complained of statements constitute fact or opinion." *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986); *Cohen v. Google, Inc.,* 25 Misc.3d 945, 887 N.Y.S.2d 424 (N.Y.Sup.2009). In determining whether a statement constitutes fact or opinion, a court should consider: "(1) whether the specific language at issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. New York Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (N.Y.1993) (quoting *Steinhilber,* 68N.Y.2d at 290, 68 N.Y.2d 283, 508 N.Y.S.2d 901, 501 N.E.2d 550). A court is to consider the context of the statement as a whole. *Sandals Resorts Intern. Ltd. v. Google, Inc.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5 (N.Y.2011).

If the statements are "pure opinion," then they are not defamatory as a matter of law even if they are false and libelous. *Steinhilber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550; *Rinaldi v. Holt, Rinehart & Winston, Inc.* 42 N.Y.2d 369, 380–81, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (*Ct.App.1977* ). "A 'pure opinion' is a statement of opinion

which is accompanied by a recitation of the facts upon which it is based." *Steinhiber,* 68 N.Y.2d at 289, 508 N.Y.S.2d 901, 501 N.E.2d 550.; *see also Sandals Resorts Intern. Ltd.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 2011 WL 1885939, at *5. Such statements are not actionable because "a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Gross,* 80 N.Y.2d at 154, 589 N.Y.S.2d 833, 603 N.E.2d 938.

*\*74*  The Summative Evaluation is a two-page document consisting of checked boxes marking Varughese as "satisfactory" or "unsatisfactory" in six categories, plus two explanatory paragraphs:

Dr. Varughese's evaluations over the initial portion of her Pathology residency training at Mount Sinai demonstrated satisfactory development in the six Core Competency domains. In some rotations her performance was considered superior by individual attendings, particularly in the areas of patient care (gynecological pathology) and medical knowledge (VA hospital rotations).

However, Dr. Varughese began to exhibit unprofessional behavior and was placed on academic advisement in December 2010, in the middle of her third year of training. While the program advanced Dr. Varughese to her fourth year of training, her substandard performance led the Department Chair to issue her a final warning notice on July 1, 2011. Dr. Varughese's level of professionalism continued to be unsatisfactory and she was summarily suspended pending termination from the program on September 21, 2011. Following Mount Sinai's grievance procedures, Dr. Varughese appealed the termination, but the decision was upheld.

(Docket # 162–6 at 39–40.) The evaluation then checks "no" in response to the prompt "The resident/fellow has demonstrated sufficient competence to enter practice without direct supervision." (*Id.* at 40, 589 N.Y.S.2d 833, 603 N.E.2d 938.)

The only factual assertions in that document are ones with which Varughese does not take issue. They recount what other people thought, the dates of various actions that unquestionably took place, and the results of Varughese's appeals.

What Varughese objects to are the characterizations of her work as "unsatisfactory" "unprofessional" and "substandard." But these are matters of *opinion,* not

actionable assertions of fact. *See Tasso v. Platinum Guild Int'l,* No. 94 Civ. 8288, 1998 WL 841489, at *5 (S.D.N.Y. Dec.3, 1998) (finding statements that plaintiff was "unethical, untrustworthy, unprofessional" and "incompetent" to be non-actionable opinion) (citing *Gavenda v. Orleans County,* No. 95–CV–0215E, 1997 WL 65870, at *8, (W.D.N.Y. Feb.10, 1997) (statements that plaintiff was "incompetent," and "there had been problems with her before and she wasn't doing her job right" were non-actionable statements of opinion); *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201, 203 (App.Div.1992) (statements criticizing plaintiff's performance and comparing her unfavorably to other employees as "one of the wors[t]" nonactionable as a matter of law); *Amodei v. N.Y. State Chiropractic Ass'n,* 160 A.D.2d 279, 553 N.Y.S.2d 713, 715–16 (App.Div.1990), *aff'd, 11* N.Y.2d 891, 77 N.Y.2d 891, 568 N.Y.S.2d 900, 571 N.E.2d 70 (1991) (statement accusing chiropractor of "unprofessional conduct" fails to state an action in defamation); *Hollander v. Cayton,* 145 A.D.2d 605, 606, 536 N.Y.S.2d 790, 792 (App.Div.1988) (statements allegedly made by president of professional staff that plaintiff-physician was "immoral," "unethical," and had "mismanaged cases" were non-actionable)).

**\*75** Moreover, as Judge Daniels has explained, "New York courts have consistently held that subjective job evaluations, including those in connection with an employee's termination, are non-actionable opinion." *Doe v. White Plains Hosp. Med. Ctr. (WPHMC),* No. 10 Civ. 5405, 2011 WL 2899174, at *3 (S.D.N.Y. July 8, 2011) *aff'd sub nom. Doe v. French,* 458 F. App'x 21 (2d Cir.2012) (citing *Williams v. Varig Brazilian Airlines,* 169 A.D.2d 434, 564 N.Y.S.2d 328, 331 (1st Dep't 1991) (memorandum of one supervisor to another and a termination letter from supervisor to Plaintiff are non-actionable opinion); *Ott v. Automatic Connector, Inc.,* 193 A.D.2d 657, 598 N.Y.S.2d 10 (2d Dep't 1993) (unfavorable assessment of work performance in termination letter amounted to a non-actionable expression of opinion). Such statements are non-actionable because "[a]n employer has the right to assess an employee's performance on the job without judicial interference." *Ott,* 193 A.D.2d at 658, 598 N.Y.S.2d 10 (citing *Miller v. Richman,* 184 A.D.2d 191, 592 N.Y.S.2d 201 (4th Dep't 1992); *Williams,* 169 A.D.2d 434, 564 N.Y.S.2d 328; *Goldberg v. Coldwell Banker,* 159 A.D.2d 684, 553 N.Y.S.2d 432 (2d Dep't 1990)). While not a per se

rule, courts are reluctant to sustain a claim for defamation for statements made in the context of an employee evaluation or termination because "no workplace ... can operate effectively unless the employers and employee who work there have the ability to speak freely in evaluating the actions of their employees and co-employees." *Albert v. Locksen,* 239 F.3d 256, 268 (2d Cir.2001)).

There is no reason to depart from that rule here. Indeed, Varughese presented testimony from her prospective employer essentially discounting the importance of the Summative Evaluation as a mere opinion. Had RWJ Hospital received it earlier, it would have investigated the underlying *facts.* That testimony merely confirms the wisdom of the rule in New York: end-of-job evaluations are generally not actionable in defamation suits.

Defendants' motion for a summary judgment of dismissal is GRANTED as to Count 14.

## XII. The Motion for Summary Judgment is GRANTED as to Count 21 (Individual Liability against Defendants Cordon–Cardo, Firpo, and Lento).

As I have found that Varughese cannot withstand summary judgment on any of her claims, no individual liability can attach as to those claims.

The motion for summary judgment is GRANTED as to count 21's claim for individual liability as against defendants Cordon–Cardo, Firpo, Lento and Bleiweiss.

## CONCLUSION

For the foregoing reasons, Defendants' motion for a summary judgment of dismissal as to all counts is GRANTED and the case is dismissed.

The Clerk of the Court is directed to remove Docket No. 161 from the Court's list of pending motions and to close the file.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1499618

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 251 of 321

Emmons v. Broome County, Not Reported in Fed. Supp. (2018)
2018 WL 2364286, 2018 A.D. Cases 184,993

2018 WL 2364286
United States District Court, N.D. New York.

Lorraine EMMONS, Plaintiff,
v.
BROOME COUNTY, Defendant.

3:16-CV-1114
|
Signed 05/24/2018

**Attorneys and Law Firms**

THE BARNA LAW FIRM, OF COUNSEL: JAMES F. BARNA, ESQ., Clovernook, 9 Rippleton Road, Cazenovia, NY 13035, Attorneys for Plaintiff.

BROOME COUNTY ATTORNEY'S OFFICE, OF COUNSEL: ROBERT G. BEHNKE, ESQ., Broome County Office Building, 60 Hawley Street, P.O. Box 1766, Binghamton, NY 13902, Attorneys for Defendant.

**MEMORANDUM–DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

\*1  On September 13, 2016, plaintiff Lorraine Emmons ("Emmons" or "plaintiff") filed this civil rights action against defendant Broome County (the "County" or "defendant"), her former employer, asserting claims for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA") and New York's Human Rights Law ("NYHRL"). Plaintiff's four-count amended complaint alleges that defendant demoted her after she returned from medical leave, fired her when she complained about the mistreatment, and then retaliated against her by sending out a mass mailing that damaged her future job prospects.

On November 28, 2017, the County moved for summary judgment under Federal Rule of Civil Procedure ("Rule") 56. The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

**II. BACKGROUND** [1]

[1]  The facts recited here are drawn from a review of the parties' submissions and in particular

the County's Statement of Material Facts, ECF No. 24-15, Emmons's responsive statement of material facts, ECF No. 28-2, plaintiff's affidavit in opposition to summary judgment, ECF No. 29, and the parties' proffered exhibits.

In January of 2012, the County hired Emmons as the Executive Assistant to County Executive Debra Preston ("County Executive Preston"), a position classified as "exempt" under the state's Civil Service law. N.Y. Civ. Serv. Law § 41; see also Rusk v. N.Y. State Thruway Auth., 37 F. Supp. 3d 578, 596 (W.D.N.Y. 2014) (characterizing this classification as "terminable at will").

As Emmons explains in her affidavit, the Executive Assistant is the "top clerical position" within the County Executive's Office. In that role, plaintiff collected data, prepared reports and other documents, scheduled meetings, organized County Executive Preston's calendar, coordinated with other managers, and acted as a gatekeeper and point of contact for "stakeholders, managers, department heads, employees, or anyone who wanted access" to Preston. According to plaintiff, she was at County Executive Preston's "beck and call 24 hours per day."

On September 30, 2013, Emmons began a short medical leave of absence precipitated by an urgent medical condition. Two days prior, plaintiff had begun suffering intense and debilitating pain that later turned out to be symptoms of an acute coronary event; i.e., a heart attack. Plaintiff's husband took her to the hospital, where she underwent a procedure to place a stent in her coronary artery. Plaintiff's treating physician diagnosed her with coronary artery disease and high blood pressure and prescribed various medications to reduce her future risk of the same or similar symptoms.

On October 15, 2013, Emmons returned to her job at the County. Although she returned to work with "no restrictions," plaintiff continued to attend "cardiac rehabilitation" three times a week for a twelve-week period. Upon her return to work, plaintiff claims that County Executive Preston and Deputy County Executive Bijoy Datta ("Deputy Datta") treated her "in a cold and negative manner" that "caused [her] to become concerned that [she] would be terminated."

\*2  For instance, within the first week, County Executive Preston came into Emmons's office and stated "If you think I can provide you with a stress free environment in the office, well I can't." Plaintiff claims that she "had not requested any sort of stress accommodation from [defendant]." Later,

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 252 of 321

Emmons v. Broome County, Not Reported in Fed. Supp. (2018)
2018 WL 2364286, 2018 A.D. Cases 184,993

plaintiff approached Deputy County Executive John Bernardo ("Deputy Bernardo"), told him about her concerns, and explained "it was illegal to fire [her] because [she] had just had a heart attack." Plaintiff claims that Deputy Bernardo responded by explaining that "We do what we want" in the County Executive's office.

On October 30, 2013, Emmons contacted County Personnel Officer Thomas Behan ("Behan") about using "sick bank time" for her thrice-weekly rehabilitation appointments. The Personnel Officer approved plaintiff's request. In early December of 2013, Deputy Bernardo called plaintiff into his office [2] to ask her to "consider moving to the receptionist position for [her] health, and having the receptionist do some of [her] duties." When plaintiff asked why, Deputy Bernardo stated defendant "had concerns about phone coverage." Plaintiff concedes she had worked in the reception area on past occasions when phone coverage was needed but responded to Deputy Bernardo that she "felt targeted" and was "worried that they were trying to get rid of [her]." According to plaintiff, Deputy Bernardo replied by stating that "if they wanted to get rid of [her] they could just let [her] go." Plaintiff concedes she "was unhappy" when she left Deputy Bernardo's office.

[2]     The parties dispute several aspects of this encounter. First, defendant contends this meeting took place on December 16. Plaintiff "admits" this date in her response to defendant's statement of material facts but asserts in her own affidavit submitted in opposition that this meeting took place on December 11. Second, defendants contend Bernardo explained to plaintiff that this move was only temporary until she could complete her cardiac rehabilitation. Plaintiff denies being told the change was temporary in nature.

On December 16, 2013, Emmons came to work to discover her office had been cleaned out and her belongings had been moved to the receptionist desk. Plaintiff "considered the move to receptionist to be a demotion," but concedes in her response to the County's statement of material facts that she was not actually "demoted" at all—plaintiff's job title, salary, and benefits remained consistent with the position of Executive Assistant.

In any event, Emmons's move to the front desk did not last long. According to the County, County Executive Preston's office began receiving complaints from constituents about

plaintiff's behavior later that morning. Among other things, defendant contends that people called in to complain that plaintiff "was short with people," "spoke in a harsh tone," "had no interest in what the people were saying," and even "forcibly slam[med] down the telephone receiver." Plaintiff denies "answer[ing] the telephone rudely." That afternoon, faced with a situation that "was not working," Deputy Bernardo e-mailed plaintiff to advise her to return to her regular work location.

The next morning, County Executive Preston called a mandatory staff meeting. According to the County, the meeting was held to advise staff members that County Executive Preston "was not happy with how people acted regarding decisions made in the Executive Office" and that unhappy people "should speak to her or her Deputy County Executives" about it.

Emmons denies the particularities of this version of events. According to plaintiff, County Executive Preston "singled out every employee and told them how well they were performing their jobs, except she pointedly left [plaintiff] out from her praise." Instead, County Executive Preston looked at plaintiff and stated "I'm the County Executive and if anyone doesn't like it, they can leave." Plaintiff claims County Executive Preston then threw the employee handbook on the table, exclaimed "Merry freaking Christmas," and walked out.

**\*3** After the staff meeting, Emmons sent an e-mail in which she apologized to "each and every member of the staff" for being "upset with the move" and for her "response" to County Executive Preston's decision to move her to the front office the day before. Notably, plaintiff acknowledges she sent this e-mail but asserts she only did so in an attempt to "placate" County Executive Preston, who she feared might fire her if she did not apologize.

On December 23, 2013, Emmons took a week-long vacation. The day before her scheduled return to work, Deputy Datta called plaintiff into the office to tell her she "was being let go because [County Executive Preston's] life was complicated enough without [her] adding to it." For its part, the County asserts that County Executive Preston, Deputy Datta, and Deputy Bernardo held a meeting amongst themselves, determined plaintiff's work performance been poor, and decided to fire her on that basis. [3]

[3]     Plaintiff admits that she had been counseled about her work performance on prior occasions and

2018 WL 2364286, 2018 A.D. Cases 184,993

that she had also been responsible for "numerous scheduling errors" in County Executive Preston's schedule.

On February 6, 2014, Emmons filed a charge of disability discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

On April 14, 2014, after coming to believe that Emmons had leaked some damaging political information, Deputy Datta published a statement about plaintiff on the Broome County Republican Party website, the Broome County GOP Facebook page, and in a mass e-mail to all Broome County Republicans that read in relevant part:

Apparently, the Press & Sun Bulletin is running a sensationalized story about a political campaign that I worked on a few years ago. In it, an "anonymous" source shares private emails to assert that I coerced employees into helping on a campaign.

So, now the rest of the story.

I've been fortunate enough to have had the opportunity to supervise and manage many employees over the years. Most of them were really great. Regrettably, a few were not. When that happens, it's in the best interest of everyone involved if the relationship is terminated. One such instance was when the County had to fire Lorraine Emmons in 2013.

Sadly, when that happens, the terminated employee[ ] sometimes feels the need to strike back....

Emmons contends Deputy Datta made this statement in retaliation for her "charge of disability discrimination, and because [her] complaint of disability discrimination reflect[ed] negatively on the administrative of the County Executive." Plaintiff asserts that her name has been "tarnished" among the County's "political circles" in a way that has damaged her job prospects. Plaintiff has since secured a job as Executive Assistant to the Chief Executive Officer of Vista Hospitality, a hotel chain that hired her in early January of 2015.

### III. LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c) ); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

**\*4** When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### IV. DISCUSSION

Emmons asserts discrimination and retaliation claims under both the ADA and the NYHRL, claims which are ordinarily considered together at summary judgment. See, e.g., Boyle v. Lynch, 5 F. Supp. 3d 425, 434 (W.D.N.Y. 2014) (subjecting the plaintiff's ADA and HRL discrimination and retaliation claims "to the same analysis"). However, in this instance the County has raised as an argument in support of dismissal a state law defense that is applicable only to plaintiff's state law claims. Accordingly, the viability of plaintiff's federal claims will be addressed first.

#### A. ADA Discrimination

The County contends Emmons's disability discrimination claims must be dismissed because plaintiff has offered

2018 WL 2364286, 2018 A.D. Cases 184,993

nothing to undermine defendant's assertion that she was terminated for her poor work performance. Plaintiff responds that there is a lack of record evidence substantiating defendant's claim of poor work performance and argues that this explanation is just a poc-hoc attempt to disguise unlawful discrimination. Plaintiff urges that where, as here, the employer is a municipal entity, the lack of a written record of discipline combined with an abrupt termination gives rise to a jury question regarding defendant's true motivations.

The parties agree that ADA discrimination claims are evaluated at summary judgment using the three-part burden shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). McMillan v. City of N.Y., 711 F.3d 120, 125 (2d Cir. 2013); Kaufman v. Columbia Memorial Hosp., 2 F. Supp. 3d 265, 275-76 (N.D.N.Y. 2014) (D'Agostino, J.) (collecting cases in agreement with this principle).

"Under McDonnell Douglas and its innumerable progeny, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden the shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the McDonnell Douglas framework and its presumptions and burdens disappear, leaving the sole remaining issue of 'discrimination vel non;' and thus, (3) the burden shifts back to the plaintiff 'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " Hong Yin v. N. Shore LIJ Health Sys., 20 F. Supp. 3d 359, 371 (E.D.N.Y. 2014) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) ).

**\*5** "For a disability discrimination claim under the ADA, a plaintiff must demonstrate that her disability was at least 'a motivating factor' for the adverse employment action." Hong Yin, 20 F. Supp. 3d at 371 (citing Wesley–Dickson v. Warwick Vall. Cent. Sch. Dist., 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013) ).[4] "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " Id.

[4]     Although the appropriate causation standard for ADA claims technically remains an open question in this Circuit following recent Supreme Court decisions in Gross v. FBL Fin. Servs., Inc.,

557 U.S. 167 (2009) and Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013), most district courts have continued to adhere to the more generous causation standard for purposes of summary judgment. DeAngelo v. Yellowbook Inc., 105 F. Supp. 3d 166, 175 (D. Conn. 2015) (discussing in detail the recent in-Circuit doctrinal developments).

A plaintiff asserting a disability discrimination claim must first establish a prima facie case by showing that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." Kaufman, 2 F. Supp. 3d at 276-77 (quoting Kinneary v. City of N.Y., 601 F.3d 151, 156 (2d Cir. 2010) ); see also Payne v. PSC Indus. Outsourcing, Ltd. P'ship, 139 F. Supp. 3d 536, 546 (D. Conn. 2015).

"However, [w]here, as here, a plaintiff's argument that there are circumstances giving rise to an inference of discriminatory intent is the same as his argument for pretext, they may be analyzed together." D'Antonio v. Petro, Inc., 2017 WL 1184163 at \*5 (E.D.N.Y. Mar. 29, 2017) (collecting cases); see also Howard v. MTA Metro-North Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) ("Second Circuit case law makes clear that a court may ... skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action.").

First, however, the County disputes whether Emmons's heart condition even qualifies as a disability within the meaning of the ADA. Plaintiff responds that the ADA Amendments Act of 2008 substantially broadened the scope of coverage for disabled employees and emphasizes that her medical diagnosis comes with an extensive medication regimen and attendant lifestyle restrictions.

As amended, the ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Although the term "substantially limits" should be "construed broadly in favor of expansive coverage, ....

**Emmons v. Broome County, Not Reported in Fed. Supp. (2018)**

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 255 of 321

2018 WL 2364286, 2018 A.D. Cases 184,993

not every impairment will constitute a disability within the meaning of this section." 20 C.F.R. § 1630.2(j)(1).

Viewed in the light most favorable to Emmons, she has satisfied this threshold requirement. DeAngelo, 105 F. Supp. 3d at 175 (accepting for purposes of plaintiff's prima facie case that his cancer constituted a qualifying disability); Sherman v. Cnty. of Suffolk, 71 F. Supp. 3d 332, 345 (E.D.N.Y. 2014) (discussing broad sweep of ADA's definition of "disability" following 2008 amendments); Najjar v. Mirecki, 2013 WL 3306777 at *5 (S.D.N.Y. July 2, 2013) (accepting plaintiff's recovery from a heart attack as sufficiently disabling condition for purposes of prima facie claim of disability discrimination).

**\*6** At step two, the County has identified a legitimate, non-discriminatory reason for its decision to terminate plaintiff —her poor work performance.[5] 20 C.F.R. § 1630.2(j)(1) (iii) ("The primary object of attention in cases brought under the ADA should be ... whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity"). Accordingly, the third and final step of the McDonnell Douglas framework requires an analysis of whether Emmons can demonstrate that defendant's proffered justification was a mere pretext.

[5]    Plaintiff argues in passing that her one-day move to the reception desk might also qualify as an analytically distinct "adverse employment action." Pl.'s Mem. at 14 ("There are also issues of pretext regarding the demotion...."). That argument is rejected. "[N]ot everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State Univ., 8 F.3d 437, 441 (7th Cir. 1996). Although plaintiff may have endured some diminished job responsibilities that day, she concedes that she had covered the phones at that desk in the past and admits that she suffered no decrease in salary, title, or benefits. Regardless of the label plaintiff chooses to affix to this event, on the existing record her relocation to the reception desk on December 16 does not reach the level of "adverse." See, e.g., Granica v. Town of Hamburg, 237 F. Supp. 3d 60, 75 (W.D.N.Y. 2017) (discussing fact-specific nature of this inquiry).

"A discrimination claimant may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Musante v. Mohawk Vall. Comm. Coll., 270 F. Supp. 3d 564, 579 (N.D.N.Y. 2017) (quoting Bombero v. Warner-Lambert Co., 142 F. Supp. 2d 196, 203 n. 7 (D. Conn. 2000) ).

Emmons's claim fails at this final step. Granica, 237 F. Supp. 3d at 77 ("In short, the question becomes whether the evidence, taken as a whole, supports a rational inference of discrimination."). Even viewed in the light most favorable to her, no reasonable jury could conclude that discrimination on the basis of plaintiff's disability, or on a negative perception tied to her disability, played a motivating role in the County's decision to terminate her employment. See, e.g., McMillan, 711 F.3d at 129 ("When the reason given by the employer for the adverse employment action is unrelated to the employee's disability, the McDonnell Douglas approach can be used to weed out non-viable claims of discrimination based on circumstantial evidence.").

To be sure, a cautious approach toward summary judgment is always warranted in the fact-intensive context of discrimination cases. See, e.g., Musante, 270 F. Supp. 3d at 581 (denying summary judgment on gender and age discrimination claims even though plaintiff's theory was "far from the most compelling one ever advanced under the anti-discrimination laws"); Hulett v. City of Syracuse, 253 F. Supp. 3d 462 (N.D.N.Y. 2017) (denying summary judgment based on factual dispute over ADA "reasonable accommodation" claim).

"Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010).

**\*7** That is essentially the case here. Emmons acknowledges that she returned to work without restrictions, concedes she had been counseled about her work performance on prior occasions, and agrees that she committed "numerous" errors when setting County Executive Preston's schedule during her period of employment. And while plaintiff claims Deputy Bernardo stated that her move to the reception desk was "for her health" and denies being told that this move

Emmons v. Broome County, Not Reported in Fed. Supp. (2018)
2018 WL 2364286, 2018 A.D. Cases 184,993

would be "temporary," she acknowledges that she had been asked to cover the office's phones in the past and admits in her response to defendant's statement of material facts that her job title, salary, and benefits remained consistent with the position of Executive Assistant right up until her termination. Cf. Wesley-Dickson, 586 Fed.Appx. at 744 (concluding supervisor's inquiry into the plaintiff's health was "solicitous and not reflective of bias" and observing that "neutral inquiries about the health of an employee whose illness was well known" are generally insufficient to show pretext).

The parties dispute the precise details of Emmons's demeanor on the telephone during her one-day move to the reception desk and the nuances of County Executive Preston's behavior during the next morning's staff meeting, but plaintiff's own affidavit states that Deputy Bernardo told her "it ha[d] been obvious that [she] had been angry about the move." In addition, plaintiff admits that she sent an e-mail in which she apologized for her "behavior," which occurred as a result of her being "upset with the move" to the front office.

Under these particular circumstances, no rational jury could conclude that Emmons's heart condition played a motivating factor in the County's decision to terminate her, that defendant's explanation for her termination was pretextual, or that this explanation was a pretext for discrimination, either based on plaintiff's heart condition or on defendant's perception of plaintiff's heart condition. Graham v. Boehringer Ingelheim Pharm., Inc., 451 F. Supp. 2d 360, 371 (D. Conn. 2006) (awarding summary judgment to defendant on "regarded as" ADA claim where "all evidence suggests that [the plaintiff] was terminated for precisely the reasons stated by [the defendant]"). Accordingly, defendant's motion as to plaintiff's ADA discrimination claim will be granted.

### B. ADA Retaliation

The County contends the comments that Deputy Datta distributed to various Broome County political circles were not retaliatory. Plaintiff responds that Deputy Datta made these public statements in retaliation for her "charge of disability discrimination, and because [her] complaint of disability discrimination reflect[ed] negatively on the administrative of the County Executive." According to plaintiff, her name has been "tarnished" among the County's "political circles" in a way that has damaged her job prospects.

As with her discrimination claim, Emmons's retaliation claim under the ADA is analyzed using the McDonnell Douglas framework. See, e.g., Equal Emp't Opportunity Comm'n v. Day & Zimmerman NPS, Inc., 265 F. Supp. 3d 179, 199 (D. Conn. 2017). First, the plaintiff must establish a prima facie case by showing "(1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." Id.

Once the plaintiff meets this burden, "a presumption of retaliation arises" and the defendant must then "articulate a legitimate, not-retaliatory reason for the adverse employment action." Granica, 237 F. Supp. 3d at 80; El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932 (2d Cir. 2010) ("[T]he prima facie case establishes only a rebuttable presumption of retaliation.").

"If the [employer] provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." Carey v. Cnty. of Albany, 2016 WL 4098598 at *6 (N.D.N.Y. July 28, 2016) (Sharpe, J.) (quoting Ya–Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d Cir. 2015) ).

**\*8** There is no question that Emmons's filing of an administrative complaint with the EEOC on February 6, 2014 constitutes protected activity and that the temporal proximity between this complaint and the April political statement raises a minimal inference as to causation. Further, the parties proceed from the assumption that plaintiff's theory of retaliation—that a public, post-employment mailing to a group of people with a certain political bent made by an employee's former supervisor—constitutes a sufficient "adverse employment action" for purposes of the statute. Cf. Day & Zimmerman NPS, Inc., 265 F. Supp. 200 (accepting theory that employer's dissemination of former employee's administrative charge of discrimination is adverse employment action for ADA purposes).

And there is no question the County has carried its own minimal burden of articulating a legitimate reason for the challenged conduct. Id. at 202 (observing that any legitimate reason will rebut the presumption triggered by the plaintiff's prima facie case and explaining that "[t]he defendant is not required to prove that the articulated reason actually motivated its actions").

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 257 of 321

Emmons v. Broome County, Not Reported in Fed. Supp. (2018)

2018 WL 2364286, 2018 A.D. Cases 184,993

However, even viewing the facts and circumstances in the light most favorable to her, Emmons cannot show Deputy Datta's statement was borne of the County's desire to retaliate against her for filing the EEOC complaint. First, the mere fact of temporality is insufficient to establish pretext at this step. See, e.g., Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d 237, 262-63 (S.D.N.Y. 2015) (explaining that temporal proximity may be used to establish a plaintiff's prima facie claim but is insufficient standing alone at step three of McDonnell Douglas). Second, the only other evidence plaintiff points to in support of this claim of retaliation is language in Deputy Datta's statement itself; i.e., that the County fired plaintiff for her failure to be a "really great" employee.

As discussed above, Emmons has failed to raise a jury issue on whether this stated reason for termination was pretextual, and therefore this statement also fails to establish her retaliation claim under these circumstances as well. Hernandez v. Int'l Shoppes, LLC, 100 F. Supp. 3d 232, 268 (E.D.N.Y. 2015) (concluding same). Simply put, no fact finder could credit plaintiff's account of these events and then reasonably conclude a retaliatory motive was the but-for cause of Deputy Datta's issuance of the public statement. Accordingly, defendant's motion for summary judgment as to plaintiff's ADA retaliation claim will be granted.

### C. HRL Claims

Although Emmons has brought HRL claims based on the same theories set forth above, the County has raised a defense available to it only on these state law claims; i.e., whether plaintiff satisfied certain notice of claim requirements imposed by state law.

"Where, as here, a plaintiff's federal claims will be dismissed before trial, a district court should generally decline to exercise supplemental jurisdiction over any state law claims absent exceptional circumstances." B.A. v. City of Schenectady Sch. Dist., 209 F. Supp. 3d 515, 528 (N.D.N.Y. 2016).

Because summary judgment will be granted as to the federal ADA claims, the continued exercise of supplemental jurisdiction over Emmons's state law claims will be declined. See 28 U.S.C. § 1367(c)(3). Accordingly, plaintiff's HRL claims will be dismissed without prejudice.

### V. CONCLUSION

Emmons has failed to establish that the County terminated her because of her disability, and has failed to demonstrate that Deputy Datta's public statement was issued in retaliation for her administrative complaint. However, plaintiff remains free to test the merits of those theories in a state forum using her analogous state law claims.

*9   Therefore, it is

ORDERED that

1. The County's motion for summary judgment is GRANTED in part and DENIED in part;

2. The County's motion for summary judgment is GRANTED as to Emmons's ADA claims and DENIED as to plaintiff's HRL claims;

3. Emmons's ADA claims for discrimination and retaliation are DISMISSED; and

4. Emmons's HRL claims for discrimination and retaliation are DISMISSED without prejudice.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2364286, 2018 A.D. Cases 184,993

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)**
Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 258 of 321

2018 WL 1582429, 2018 A.D. Cases 105,080

2018 WL 1582429
United States District Court, N.D. New York.

Daryl R. PRINDLE, Plaintiff,

v.

CITY OF NORWICH; City of Norwich Fire Department;
Tracy L. Chawgo; and Deborah DeForest, Defendants.

3:15-CV-1481 (GTS/DEP)
|
Signed 03/27/2018

**Attorneys and Law Firms**

LEVINE & BLIT, PLLC, OF COUNSEL: LEWIS G.
SPICER, ESQ., 499 South Warren Street, Suite 500B,
Syracuse, NY 13202, Counsel for Plaintiff.

MACKENZIE HUGHES, LLP, OF COUNSEL:
CHRISTIAN P. JONES, ESQ., 101 South Salina Street, Suite
600, Syracuse, NY 13202, Counsel for Defendants.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1**  Currently before the Court, in this employment
discrimination action filed by Daryl R. Prindle ("Plaintiff")
against the City of Norwich, City of Norwich Fire
Department, Tracy L. Chawgo, and Deborah DeForest
("Defendants"), is Defendants' motion for summary
judgment. (Dkt. No. 33.) For the reasons set forth below,
Defendant's motion is granted in part and denied in part, and
Plaintiff's Complaint is dismissed in part.

**I. BACKGROUND**

**A. Plaintiff's Claims**
Generally, liberally construed, Plaintiff's Complaint alleges
that on or about February 2014 through November 2014,
Defendants violated the Americans with Disabilities Act, 42
U.S.C. § 12101, et seq. ("ADA") and the New York State
Human Rights Law, N.Y. Exec. Law § 291 ("NYSHRL") by,
inter alia, (1) terminating him on the basis of his disability
(post-traumatic stress disorder), (2) retaliating against him
for filing a union grievance against the city, (3) subjecting
him to a hostile work environment, and (4) failing to provide
him with a reasonable accommodation for his disability. (Dkt.

No. 1 [Plf.'s Compl.].) Further familiarity with these claims
and the factual allegations supporting them in Plaintiff's
Complaint is assumed in this Decision and Order, which
is intended primarily for the review of the parties. As
relief, the Complaint requests, inter alia, (1) an award of
back and front pay, (2) damages to compensate Plaintiff for
emotional distress and mental anguish, and (3) injunctive
relief (presumably including possible reinstatement). (Id.)

**B. Undisputed Material Facts**
Unless otherwise noted, the following facts were asserted and
supported with accurate record citations by Defendants in
their Statement of Material Facts and expressly admitted by
Plaintiff in his response thereto or denied without appropriate
record citations. (Compare Dkt. No. 33, Attach. 21 [Defs.'
Rule 7.1 Statement] with Dkt. No. 37, Attach 1 [Plf.'s Rule
7.1 Resp.].)

1. The City of Norwich Fire Department employs fifteen
full-time Firefighters on a regular basis, in addition to
approximately four to seven Fire Assistants. Both the full-
time Firefighters and the Fire Assistants are represented by
the City of Norwich Fire Fighters Association ("Union"). The
Union and the City of Norwich are parties to a Collective
Bargaining Agreement ("CBA"), which governs the terms
and conditions of employment for the full-time Firefighters
and the Fire Assistants.

2. The Firefighters work a regular, full-time schedule on a
weekly basis. The Fire Assistants are used on a per diem, as-
needed basis. As a result, they generally do not work a regular
schedule, but are primarily used to fill in on occasions where
there is an open shift or a full-time Firefighter is on vacation. [1]
This may result, and has resulted, in a Fire Assistant maxing
out on his yearly hours (1,248 hours).

[1]     In this portion of his Rule 7.1 Response, Plaintiff
        attempted to is dispute what he perceived to be
        an implication of Defendants' factual assertion.
        Plaintiff is respectfully reminded that a Rule
        7.1 Response is not the means by which to
        dispute a possibly implied fact but the means
        by which to dispute an expressly asserted fact.
        See N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's
        responses shall ... admit[ ] and/or deny[ ] each
        of the movant's assertions in matching numbered
        paragraphs.") (emphasis added); see, e.g., Yetman
        v. Capital Dis. Trans. Auth., 12-CV-1670, 2015 WL

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 259 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)
2018 WL 1582429, 2018 A.D. Cases 105,080

4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F.Supp.3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials ... improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). To the extent that a non-movant desires to set forth any additional material facts that he contends are in dispute, he or she is required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.

3. As of April 24, 2007, the City of Norwich Civil Service Job Description for the full-time Firefighter position required that all full-time Firefighters for the Fire Department possess a New York State Advanced Emergency Medical Technician, or an Advanced Life Support ("ALS"), certification.

**\*2** 4. Once an individual obtains his or her initial ALS certification, the individual must then re-certify every three years to maintain the certification.

5. An individual can complete the re-certification in one of three manners; the first manner is through participation in a re-certification course that combines "hands-on" training and testing combined with a written examination. Re-certification through this method is offered once per year in Chenango County and typically takes six to eight months to complete.

6. The second manner in which ALS re-certification can be obtained is through participation in an online Continuing Medical Education ("CME") program. This program is available to qualified employees of an agency registered in the CME program. As of March 2013, re-certification through the CME program could be completed entirely online over the course of three years. Under this method, an individual must be employed by a registered agency and remain in "continuous practice" in order to re-certify.

7. The City of Norwich Fire Department was a registered agency in the CME program in 2014.

8. The third manner in which ALS re-certification can be obtained is a "challenger course," which involves hands-on training followed by a written test and usually takes two to three months to complete.

9. Although this may not have been Plaintiff's understanding between April and July 2014, at that time there was no requirement that an individual be an "on-duty" employee to complete re-certification through the traditional "hands-on" method. In fact, there is no requirement that an individual be employed at all.

10. With respect to the second method, an individual must be employed by a registered agency to re-certify. However, under the applicable regulation, it appears possible that an employee on a medical leave of absence may be able to re-certify through the second method (depending on the opinion of the New York State Department of Health).[2]

[2]    In this portion of his Rule 7.1 Response, Plaintiff made a blanket denial of all of the facts in the corresponding paragraph of Defendants' Rule 7.1 Statement but cited a portion of the record that disputed only one of the facts asserted by Defendants, in violation of the District's Local Rules of Practice. N.D.N.Y. L.R. 7.1(a)(3). *See also Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F.Supp.2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's S.D.N.Y. Local Rule 56.1 statement but declined to provide record citations in support); *cf. N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations").

11. Plaintiff was hired by the City of Norwich as a part-time Fire Assistant on or about April 26, 2007. On or about

February 20, 2008, Plaintiff was appointed as a full-time firefighter for the Fire Department.

12. On December 7, 2008, Plaintiff participated in the rescue of a severely injured victim from a fire.

13. In late February 2014, the Union requested a meeting to discuss a safety concern involving one of the Firefighters.

14. The meeting was held on February 27, 2014. Fire Chief Tracy Chawgo, former Mayor Joseph Maiurano and Human Resources Director Deborah DeForest attended the meeting on behalf of the City.

15. At the meeting, the Union representatives explained that one of the Firefighters had been acting out of sorts, including bumping into walls, having pinpoint pupils, and engaging in odd behaviors that made them suspect that he might be using drugs. After initially refusing to name the Firefighter, the Union representatives eventually revealed that Plaintiff was the Firefighter at issue. [3]

[3]
Although Mr. Gray testified that he did not recall whether drug use was mentioned at the meeting or not, this is insufficient to support a denial. *See F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses ... do not create genuine issues of material fact."); *Genger v. Genger*, 663 Fed.Appx. 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (Suddaby, J.) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) (stating that, "[o]n a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact.... Similarly, a response contending to neither admit or deny an allegation does not create a genuine issue of fact"); *accord, Piacente v. Int'l Union of Bricklayers & Allied Craftworkers*, 11-CV-1458,

2015 WL 5730095, at *2 n.3 (S.D.N.Y. Sept. 30, 2015).

16. The next day, Plaintiff informed Ms. DeForest that he was taking a leave of absence. He simultaneously filed a Workers' Compensation claim and an application for benefits pursuant to General Municipal Law Section 207-a ("Section 207-a"), alleging that he was suffering from post-traumatic stress disorder ("PTSD") as a result of the December 7, 2008 event.

**\*3** 17. Once Mr. Plaintiff went out on his leave of absence, the City decided that he would need to be examined by a PTSD specialist before the City would return him to work. This decision was made due to the inherent dangers involved with the duties of a Firefighter, together with the safety concerns expressed by the other City Firefighters related to Plaintiff and the nature of PTSD. [4]

[4]
*See, supra*, note 1 of this Decision and Order. The Court notes further that Defendants made no assertion about precisely when the City made this determination or if it had been prompted by the decision of Plaintiff's physician.

18. Pursuant to Section 207-a, a municipality has the right to perform a medical examination of an employee to determine whether he is able to perform his job duties.

19. As required by Section 207-a, Defendants had Plaintiff sign the appropriate medical release forms in order to determine whether he was eligible for Section 207-a benefits. The release forms were forwarded to the treatment professionals with whom Plaintiff had been treating.

20. Plaintiff's treatment professionals were slow in providing Defendants with the required records. On or about March 24, 2014, Dr. Vogel advised DeForest that he had "lost" Plaintiff's medical records. In addition, Plaintiff's psychiatrist, Dr. Jerry Duvinsky, M.D., notified Defendants in April 2014 that he would not release the medical records without a waiver by Plaintiff. Dr. Duvinsky obtained the waiver from Plaintiff on or about late April 2014.

21. Pending receipt of these records, Defendants could neither schedule Plaintiff for an independent medical exam with a PTSD specialist, nor act on Plaintiff's application for Section 207-a benefits.

2018 WL 1582429, 2018 A.D. Cases 105,080

22. In or about late April 2014, Ms. DeForest received correspondence from Dr. Duvinsky stating as follows:

> Upon consultation with my patient earlier today, it is mutually agreed that he attempt to return to employment in two weeks from this date. This will give him more time to benefit from psychotherapy and changes in medication management routines. It is my recommendation that he be considered to commence on "light duty" for the first two weeks. This could, for example, consist of 12 hour shifts every other day before resuming his full workload. Such a schedule would allow full exposure to the various areas of his occupational responsibilities, while at the same time allowing for some time to assimilate the experiences.

23. Ms. DeForest forwarded the correspondence to Chief Chawgo. Following the review of Dr. Duvinsky's letter, Ms. DeForest and Chief Chawgo telephoned Dr. Duvinsky to gather more clarification on Plaintiff's status. Dr. Duvinsky explained that he was requesting that Plaintiff be provided 12-hour shifts so that he could be eased back into the job and to provide a means for assessing how Plaintiff reacted to different situations that may arise while on duty.

24. After Ms. DeForest and Chief Chawgo spoke to Dr. Duvinsky, Ms. DeForest discussed the issue with Mayor Maiurano, and they determined that Plaintiff could not be returned to work at that time.

25. The Union did not file a grievance related to this determination.

26. On or about May 9, 2014, Ms. DeForest received further correspondence from Dr. Duvinsky, this time stating that Plaintiff could return to work without restriction.

27. Ms. DeForest discussed the Duvinsky letter of May 9, 2014, with Chief Chawgo and Mayor Maiurano. At that point, Defendants were still in the process of scheduling Plaintiff

for an examination by Dr. McIntyre, who specializes in the treatment of fire personnel diagnosed with PTSD. [5]

[5]      *See*, *supra*, note 1 of this Decision and Order.

 **\*4** 28. The Union thereafter filed a grievance, asserting that Defendants should have put Plaintiff back to work once his doctor cleared him without restrictions.

29. The City informed the Union that it was requiring that Plaintiff be examined by its own PTSD specialist, wherein the examination had initially been delayed due mostly to the difficulties in obtaining Plaintiff's medical records. [6] The Union did not pursue the grievance any further.

[6]      *See*, *supra*, note 1 of this Decision and Order.

30. Sometime thereafter, Chief Chawgo became aware that the ALS certifications of two firefighters, including Plaintiff, were set to expire at the end of July. Chief Chawgo sent a text message to Plaintiff on July 16, 2014, directing him to provide the required updated certification. He followed up with a letter to Plaintiff dated July 28, 2014.

31. On July 29, 2014, Chief Chawgo was notified that Plaintiff had appeared at the fire station in a disoriented state while bleeding profusely from his right hand. He was taken to the emergency room where he received 36 stitches to close the lacerations. Chief Chawgo visited Plaintiff at the hospital and Plaintiff told him that the injuries were caused by punching a tree and mirror.

32. On or about July 29 or July 30, 2014, Chief Chawgo informed Ms. DeForest of the incident of July 29, 2014, involving Plaintiff. [7]

[7]      *See*, *supra*, note 1 of this Decision and Order. The Court notes further that, to the extent that Plaintiff intended to deny any fact in the above-stated paragraph, he neither did so expressly nor cited any supporting record evidence, in violation of Local Rule 7.1 of the District's Local Rules of Practice.

33. Plaintiff was examined by Dr. McIntyre on or about July 8, 2014. Around the first week of August 2014, Dr. McIntyre provided Defendants with his Independent Medical Evaluation ("IME") report, dated August 1, 2014, wherein he opined that Plaintiff was indeed suffering from PTSD related

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 262 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 WL 1582429, 2018 A.D. Cases 105,080

to the fire of December 7, 2008, but that he was now fit to return to duty.

34. Upon receiving that independent medical report, Defendants contacted Dr. McIntyre to advise him of Plaintiff's behavior on July 29, 2014. Dr. McIntyre advised Defendants that, before clearing Plaintiff to return to work, he would like to review the medical records regarding that incident as well as any updated records from Dr. Duvinsky.

35. On September 3, 2014, Defendants sent Plaintiff a letter stating that the updated medical records were needed. Thereafter, on or about September 8, 2014, the updated medical records from Dr. Duvinsky and a partial report from the hospital were received.

36. The medical records were forwarded to Dr. McIntyre. Thereafter, in or about late September 2014, Ms. DeForest received correspondence from Dr. McIntyre indicating that he saw no reason for further examination and remained of the opinion that Plaintiff could return to work.

37. In late September 2014, Ms. DeForest was made aware through the New York State License Event Notification System ("LENS") that Plaintiff's license had been suspended. Ms. DeForest informed Chief Chawgo of this fact.

38. On October 7, 2014, the Common Council discussed the status of Plaintiff's Section 207-a application and made the determination that the various medical reports supported the approval of the application and his return to work.

39. The next day, Defendants sent Plaintiff a letter notifying him that his Section 207-a application had been approved and advising him that Chief Chawgo would be contacting him regarding his return to work.

 *5  40. On October 9, 2014, Chief Chawgo advised Plaintiff by letter that it had come to Defendants' attention that he no longer possessed a valid New York State Driver's License or ALS certification.

41. Plaintiff was directed to appear at a meeting scheduled for October 22, 2014, at which he would have the opportunity to produce any evidence and/or information regarding the status of his Driver's License and ALS certification. He was also advised that he could have a Union representative and/or counsel of his own choosing present at the meeting.

42. Plaintiff attended the October 22, 2014, meeting with his union representative. Also in attendance were Chief Chawgo and the City's employment counsel, Brian Kremer, of the Goldberger & Kremer law firm. At the meeting, Plaintiff admitted that his New York State Driver's License had been suspended and that he did not possess a valid ALS certification.

43. Following the meeting, the Mayor and City Council were informed that Plaintiff did not possess a valid driver's license or the required ALS certification.

44. The Common Council meeting was scheduled for October 29, 2014. At the meeting, the council passed a Resolution terminating Plaintiff's employment effective November 1, 2014, for failure to maintain the minimum qualifications for the Firefighter position.

45. A letter dated October 30, 2014, was thereafter sent to Plaintiff advising him of the Common Council's decision.

46. Following his termination, Plaintiff did not obtain his ALS certification, nor did he seek any paid Firefighter or EMT positions with any other municipality. [8]

[8]      See, supra, note 1 of this Decision and Order.

47. In March 2015, Plaintiff accepted a Customer Service position at Lowe's, which paid him $12.22 per hour.

48. The Union did not file a grievance or otherwise challenge Plaintiff's termination.

49. Ms. DeForest is the Director of Human Resources for the City of Norwich. She reports to the Mayor and the Common Council. She does not possess the sole authority to hire or fire employees.

50. Throughout Plaintiff's leave of absence, Ms. DeForest regularly kept the Common Council and the Mayor informed as to Plaintiff's status. She did this primarily during executive sessions at the bi-monthly City Council meetings. [9]

[9]      See, supra, notes 1 and 3 of this Decision and Order. The Court notes further that, in response to this asserted fact, Plaintiff cites deposition testimony regarding merely Plaintiff's "return to work" and "employment," but not his "status" in particular.

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 263 of 321

2018 WL 1582429, 2018 A.D. Cases 105,080

51. Mr. Chawgo is the Fire Chief for the City of Norwich Fire Department. He reports to the Mayor and the Common Council. Although he has the authority to discipline employees, he does not have the sole authority to hire and fire employees.

### C. Parties' Briefing of Defendants' Motion

#### 1. Defendants' Memorandum of Law

**\*6** Generally, in support of their motion for summary judgment, Defendants argue as follows: (1) Plaintiff's disability discrimination claim should be dismissed because (a) the City of Norwich acted lawfully when it imposed an additional medical examination requirement before returning him to work, (b) Plaintiff fails to establish that he is "disabled" under the ADA and NYSHRL, (c) Plaintiff fails to establish that he met the minimum qualifications required for the firefighter position, and (d) Plaintiff is unable to meet his burden of proving Defendants' reasons for terminating his employment were pretextual; (2) Plaintiff's retaliation claims should be dismissed because he offers no evidence supporting a causal connection between the union grievance and Defendants' decision to terminate his employment; (3) Plaintiff's hostile work environment claims should be dismissed because he fails to offer evidence establishing severe or pervasive behavior as required under the ADA and NYSHRL; (4) Plaintiff's reasonable accommodation claim should be dismissed because no reasonable accommodations existed under the circumstances; (5) the totality of the ADA claims against Mr. Chawgo and Ms. DeForest individually should be dismissed because individual liability is not recognized under the ADA; and (6) the totality of the NYSHRL claims against Mr. Chawgo and Ms. DeForest should be dismissed because those individuals lacked the authority to make termination decisions. (*See generally* Dkt. No. 33, Attach. 22 [Defs.' Memo. of Law].)

In the alternative, Defendants argue that Plaintiff's claims for award of back pay and front pay should be precluded because he failed to mitigate his damages when he made no reasonable efforts to obtain comparable employment after his termination. (*Id.*)

#### 2. Plaintiff's Opposition Memorandum of Law

Generally, in Plaintiff's response to Defendants' motion for summary judgment, he argues as follows: (1) the record evidence is sufficient to establish a prima facie case of discrimination as required by the ADA and NYSHRL because (a) he is disabled within the scope of the ADA and NYSHRL, (b) he was qualified for the position both before and after his disability, and (c) genuine issues of material fact exist as to whether Defendants' actions were a pretext to mask discrimination as a result of disparate treatment given to other employees; (2) his failure-to-accommodation claim should proceed because Defendants did not engage in the interactive process as required by the ADA and NYSHRL; (3) sufficient evidence exists to support an inference of retaliation because Plaintiff was denied several opportunities to engage in work-related activities after being cleared for duty; (4) sufficient evidence exists to support an inference of a hostile work environment because issues between Mr. Chawgo and Plaintiff arose only after Plaintiff was diagnosed with PTSD and required a leave of absence; (5) Chief Chawgo and Ms. DeForest are subject to individual liability under the NYSHRL; and (6) a triable issue of material fact remains as to whether Plaintiff failed in his duty to mitigate damages in finding comparable employment because Defendants employ the only paid firefighters in Chenango County. (*See generally* Dkt. No. 37 [Plf.'s Opp'n Memo. of Law].)

#### 3. Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants argue as follows: (1) Plaintiff was not qualified for the firefighter position at the time of his termination because the job qualification records he has provided were out-of-date and there is no dispute that he did not possess a valid driver's license at the time of his termination; (2) in addition, Plaintiff cannot meet his burden to establish an inference of unlawful discrimination because the employees cited by Plaintiff in support of his disparate treatment argument were not similarly situated; (3) Plaintiff cannot establish that his failure to remain qualified as a basis for termination was a pretext for discrimination because he was reminded for three months prior to his lapse that his certifications were about to expire; (4) no obligation to accommodate Plaintiff existed because he had multiple opportunities and ways to re-certify that did not require his return to active status prior to his lapse; and (5) no triable issues of material fact exist as to whether Plaintiff failed to mitigate his damages because his own testimony reveals that he made no efforts to obtain substantially equivalent

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 264 of 321

2018 WL 1582429, 2018 A.D. Cases 105,080

employment. (*See generally* Dkt. No. 39 [Defs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

**\*7** Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [10] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

[10]  As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e). Although this Court recognizes some caution in awarding summary judgment in discrimination actions because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions", summary judgment nonetheless remains available in discrimination cases lacking genuine issues of

material fact. *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d. Cir. 2006), quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [11] Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F.Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

[11]  *Cusamano v. Sobek*, 604 F.Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [12]

[12]  Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

**\*8** Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [13] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 265 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 WL 1582429, 2018 A.D. Cases 105,080

that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

13    *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 WL 325378, at *8, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**B. Legal Standard Governing Plaintiff's Claims**

**1. 42 U.S.C. § 12101 (Americans with Disabilities Act)**

**a. Discrimination Claim**

The ADA prohibits covered entities from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a) (2008). In the context of discriminatory termination, a plaintiff must establish, by a preponderance of the evidence, a prima facie case showing "(1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances surrounding that action giving rise to an inference of discrimination." *Welsh v. Rome Mem'l Hosp., Inc.*, 14-CV-1423, 2016 WL 6603216, at *3, 2016 U.S. Dist. LEXIS 154635 at *7-8 (N.D.N.Y. Nov. 8, 2016) (quoting *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). In what has become known as the *McDonnell-Douglas* burden-shifting framework, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. After the employer has done so, the burden then shifts back to the

plaintiff to demonstrate that the defendant's reason for its adverse decision is in fact a pretext for discrimination. *Welsh*, 2016 WL 6603216, at *3, 2016 U.S. Dist. LEXIS 154635, at *8. "In the summary judgment context, this means plaintiff must 'establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for discharging [him] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.' " *Id.* (*citing, Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994)).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A) (2008). "Major life activities are generally those activities that are of central importance to daily life." *Cody v. Cty. of Nassau*, 577 F.Supp.2d 623, 638 (E.D.N.Y. 2008). Major life activities under the ADA include, but are not limited to, caring for oneself, eating, sleeping, concentrating, thinking, working, and neurological functions. 42 U.S.C. § 12102(2)(A)-(B). "To constitute a disability, an impairment must not merely affect a major life activity, it must substantially limit that activity." *Id.* "Thus a plaintiff who showed that ... he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible to prevail under the ADA if the limitation of the major life activity was not substantial." *Id.* (internal quotation marks omitted). The EEOC regulations provide that an impairment, whether physical or mental, 'substantially limits' a major life activity where an individual is

**\*9**    (i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* (citing 29 C.F.R. § 1630.2(j)[1] ). The definition of disability under the ADA "shall be construed in favor of broad coverage of individuals under [the] Act, to the maximum extent permitted by the terms of [the] Act." 42 U.S.C. § 12102(4)(A).

In order for an individual to be "qualified" for a position, he or she must be able to "perform the essential functions of the employment position that such individual holds or

Case 6:21-cv-01207-TWD Document 86 Filed 10/25/24 Page 266 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 WL 1582429, 2018 A.D. Cases 105,080

desires." 42 U.S.C. § 12111(8) "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

### b. Retaliation Claim

The ADA makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by this chapter." 42 U.S.C. § 12203(b). The ADA further renders it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

To defeat a motion for summary judgment in the context of a retaliation claim under the ADA, a plaintiff must establish a prima facie case showing that "(1) he engaged in protected participation or opposition under the ADA; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action." *Skinner v. City of Amsterdam*, 824 F.Supp.2d 317, 329 (N.D.N.Y. 2010). In a fashion similar to the *McDonnell-Douglas* framework, a defendant must then point to evidence of a legitimate, non-retaliatory reason for the decision. If satisfied, the burden then shifts back to the plaintiff to point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is in fact a pretext for impermissible retaliation. *Skinner*, 824 F.Supp.2d at 329.

### c. Hostile Work Environment Claim

The Second Circuit has not yet decided whether hostile work environment claims are cognizable under the ADA. *Dollinger v. N.Y. State Ins. Fund*, No. 16-4068-CV, 2018 WL 832904, at *3, 2018 U.S. App. LEXIS 3303 at *5 (2d Cir. Feb. 13, 2018). Assuming such claims are cognizable under the ADA, a plaintiff can prevail on a hostile work environment claim only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that

is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted).

**\*10** The workplace must be evaluated "on the totality of the circumstances," and the Court can consider factors including the following: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767-68 (2d Cir. 1998) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). Hostile work environment claims, however, "are meant to protect individuals from abuse and trauma that is severe" and "are not intended to promote or enforce civility, gentility, or even decency." *Curtis v. DiMaio*, 46 F.Supp.2d 206, 213-14 (E.D.N.Y. 1999), *aff'd*, 205 F.3d 1322 (2d Cir. 2000).

### d. Reasonable Accommodation Claim

The ADA imposes liability on employers for, *inter alia*, failing to make "reasonable accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5). A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009). The burden of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment lies with the plaintiff. *McBride*, 583 F.3d at 97. Although "essential functions" is not explicitly defined by the ADA, regulations promulgated by the Equal Employment Opportunity Commission ('EEOC') indicate that it encompasses "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1).

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 267 of 321

2018 WL 1582429, 2018 A.D. Cases 105,080

Under the express terms of the ADA, the term "reasonable accommodation" includes "job restructuring" and "part-time or modified work schedules." 42 U.S.C. § 12111(9). "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *McBride*, 583 F.3d at 99 (quoting *Jackan v. N.Y. State DOL*, 205 F.3d 562, 566 (2d Cir. 2000)); *see also* 29 C.F.R. § 1630.2(o) (3). Failure to engage in this interactive process does not automatically produce liability for employers if no reasonable accommodation is possible. *McBride*, 583 F.3d at 100. "[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless [he] also establishes that, at least with the aid of some identified accommodation, [he] was qualified for the position at issue." *Id.* at 101.

### 2. N.Y. Exec. Law § 291 (NYSHRL)

#### a. Discrimination Claim

The NYSHRL prohibits employers from discrimination on the basis on "age, race, creed, color, national origin, sexual orientation, military status, marital status, or disability...." N.Y. Exec. Law § 291 (2018). The NYSHRL defines a disability as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law §§ 292(21), 296(1)(a). The elements of a discrimination claim under the NYSHRL are generally the same as those under the ADA, with one key difference: the NYSHRL has a broader definition of disability than does the ADA and does not require any showing that the disability substantially limits a major life activity. *Ugactz v. UPS, Inc.*, 10-CV-1247, 2013 WL 1232355, at *52 (E.D.N.Y. Mar. 26, 2013); *see also Welch v. United Parcel Serv., Inc.*, 871 F.Supp.2d 164, 198 (E.D.N.Y. 2012) (noting that the NYSHRL is not a "carbon copy of the ADA" and that NYCHRL provisions are " 'more liberally' [construed] than their federal and state counterparts").

**\*11** Employment discrimination claims brought under the NYSHRL are also analyzed under the *McDonnell-Douglas* burden shifting framework set out by the U.S. Supreme

Court. *Sims v. Tr. of Columbia Univ. in the City of N.Y.*, No. 156566/2013, 2017 WL 5006609, at *5, 2017 N.Y. Misc. LEXIS 4204 at *11 (N.Y. Sup. Ct., Nov. 1, 2017). *See, supra*, Part II.B.1.a. of this Decision and Order for a detailed discussion of the requirements imposed by *McDonnell-Douglas*.

#### b. Retaliation Claim

The NYSHRL makes it unlawful for an employer to retaliate against any employee that engaged in a protected activity. *See generally* N.Y. Exec. Law § 296(7). On a motion for summary judgment, retaliation claims under the NYSHRL are analyzed under the same standard as the ADA. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (applying *McDonnell-Douglas* analysis to employment discrimination claims under NYSHRL). For the purpose of brevity, the Court will not recite that standard in its entirety in this Decision and Order but will respectfully direct the reader's attention to Part II.B.1.b. of this Decision and Order.

#### c. Hostile Work Environment Claim

Hostile work environment claims under the NYSHRL operate in the same fashion as those brought under federal law. *See, supra*. Part II.B.1.c. of this Decision and Order for a detailed discussion of Plaintiff's burden.

#### d. Reasonable Accommodation Claim

As does the ADA, the NYSHRL makes it unlawful for an "employer ... to refuse to provide reasonable accommodations to the known disabilities ... of an employee, prospective employee, or member in connection with a job or occupation sought or held or participation in a training program." N.Y. Exec. Law § 296(3)(a). Reasonable accommodations are defined as "actions taken which permit an employee, prospective employee or member with a disability ... to perform in a reasonable manner the activities involved in the job or occupation sought or held," provided that the requested accommodation does not "impose an undue hardship on the business, program or enterprise of the entity from which action is requested." N.Y. Exec. Law § 292(21-e).

In another departure from federal ADA standards, an employer's failure to engage in a good-faith interactive

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 268 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 WL 1582429, 2018 A.D. Cases 105,080

process regarding the reasonableness of an employee's requested accommodation generally precludes the employer from obtaining summary judgment. However, "the plaintiff still bears the burden of proving the existence of a reasonable accommodation that would have enabled the employee to perform the essential functions of his or her position." *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838, 988 N.Y.S.2d 86, 11 N.E.3d 159 (2014).

## III. ANALYSIS

### A. Claims Under the ADA

#### 1. Discriminatory Termination Claim

After carefully considering the matter, the Court denies Defendants' motion for summary judgment on Plaintiff's discriminatory termination claim. As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of this claim because (1) the City of Norwich acted lawfully when it imposed an additional medical examination requirement before returning Plaintiff to work, (2) Plaintiff fails to establish that he is "disabled" as required under the ADA, (3) Plaintiff failed to meet the minimum qualifications required for the firefighter position and was therefore not "qualified" for purposes of the ADA, and (4) Plaintiff is unable to meet his burden of proving Defendants' reasons for terminating his employment were pretextual. Based on the current record, the Court disagrees.

 **\*12**  The parties do not dispute that Plaintiff was subject to an adverse employment action, given that he was terminated by Defendants on October 30, 2014. The analysis thus centers on whether Plaintiff can establish (a) membership in a protected class by showing that he is within the meaning of "disabled" under the ADA, (b) qualification for the position, and (c) circumstances surrounding the adverse employment action giving rise to an inference of discrimination.

#### a. Whether Plaintiff Was Disabled Under the ADA

For ease of analysis, the Court will begin by addressing Defendants' second argument (described above). As stated previously, a disability under the ADA is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). In 2008, Congress amended the ADA in order to expand the definition

of "disabled" and broaden the coverage of persons under the Act. This expansion was partially in response to the Supreme Court's decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). *See also* Pub. L. 110-325, § 4(a), Sept. 25, 2008, 122 Stat. 3553; 42 U.S.C.A. §§ 12102(4)(D) & (E). As a result, a less restrictive standard was applied to what constitutes a "substantial limitation" to a major life activity.

In the present case, Plaintiff has sufficiently shown that, during the time in question, he suffered from PTSD. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) This is substantiated by the confirmation of this condition by Dr. McIntyre. (*See generally* Dkt. No. 33, Attach. 7.) Plaintiff has also sufficiently shown that his PTSD substantially limited various of his major life activities (specifically, sleeping and neurological functions), as required by 42 U.S.C. § 12102(2)(A)-(B). (Dkt. No. 33, Attach 17, at 25, ¶¶ 20-24 [Plf.'s Depo. Tr.].) Based on the findings and diagnoses of multiple doctors included in the record, the Court finds that Plaintiff has made a sufficient showing that he is "disabled" as defined under the ADA.

#### b. Whether Plaintiff Was Qualified Under the ADA

Defendants contend, and Plaintiff does not dispute, that his ALS certification had expired before his termination. Therefore, Defendants argue, Plaintiff cannot demonstrate qualification for the position as required by ADA and has failed to establish a prima facie case for discrimination. Under ordinary circumstances, this would be fatal to Plaintiff's claim. However, the Court finds that the circumstances that give rise to the inference of discriminatory intent—the fourth element of Plaintiff's prima facie case—are inextricably linked to the reasons that his ALS certification expired. Put another way, Plaintiff's lapse in certification is largely rooted in those circumstances that give rise to an inference of discriminatory animus. Plaintiff argues that, because of this fact, the Court should find that he has sufficiently established this element of a prima face case of discrimination. The Court agrees.

Plaintiff testified that his primary reason for failing to renew his ALS certification was because Ms. DeForest told him that he could not re-certify any of his requirements while he was on medical leave. (Dkt. No. 33, Attach. 17 at 63, at ¶¶ 14-20 [Plf.'s Depo. Tr.].) Ms. DeForest maintains that this

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 269 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 WL 1582429, 2018 A.D. Cases 105,080

conversation never occurred. (Dkt. No. 33, Attach. 1, at ¶ 32 [DeForest Aff.].) Defendants further argue that this issue is immaterial because Plaintiff later admitted that he did not have the aforementioned conversation with Ms. DeForest. After reviewing the record, the Court rejects Defendants' argument and finds that Plaintiff did not later admit to the nonoccurrence of this conversation. Rather, Plaintiff admitted merely that he had no conversations with Ms. DeForest regarding ALS certification specifically, but that he still discussed his training generally. (Dkt. No, 33, Attach. 17 at 87-88 [Plf.'s Depo. Tr.].) As a result, a genuine dispute of material fact exists as to whether this conversation occurred and whether Plaintiff failed to pursue re-certification on those grounds.

 **\*13**  Another factual dispute regarding whether Plaintiff was able to re-certify while on medical leave is created by the portion of the record indicating that a firefighter seeking re-certification must be in "continuous practice" (in order to register and complete the CME program). (Dkt. No. 33, Attach. 18 at 35-37 [Chawgo Dep. Tr.].) Neither party adduces evidence of the exact definition of "continuous practice." Chief Chawgo stated that he believes the term to mean in continuous employment and on active service in the department. (*Id.*) However, he expressed uncertainty about that belief and rendered it contingent upon a review by the New York State Department of Health.

To further support his argument that circumstances to a discriminatory animus are tied to his ALS certification lapse, Plaintiff points to evidence that firefighters in the past (who did not suffer from PTSD) were given the opportunity to renew their qualifications before termination. (Dkt. No. 33, Attach. 20 at 43-44 [Gray Depo. Tr.].) This evidence lends at least some credence to Plaintiff's argument that Defendants' discriminatory animus may have contributed at least in part to the cause of the lapse.

As a secondary argument for why Plaintiff was not qualified, Defendants cite Plaintiff's failure to present a valid driver's license. However, Plaintiff maintains that he received a restricted-use driver's license from New York State that allowed him to drive to and from work and as needed while on the job. (Dkt. No. 33, Attach. 17 at 80, at ¶¶ 4-23 [Plf.'s Depo. Tr.].) Defendants fail to adequately argue or address this testimony. [14] For these reasons, the Court finds Defendants' secondary argument unpersuasive.

[14]   Indeed, the Court notes that Chief Chawgo acknowledged that permitting Plaintiff a short time to resolve his insurance lapse would not have been a hardship on the Fire Department. (Dkt. No. 33, Attach. 18, at 84 [Chawgo Depo. Tr.].)

Of course, this decision is not meant to diminish the standard for qualification in a summary judgment context. Rather, this decision addresses the narrow circumstance presented in a case where the plaintiff has adduced sufficient evidence for discriminatory animus as the reason for a lapse in qualification and subsequent termination. "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's ... papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). When the Court considers the record as a whole, the Court finds Defendants' argument that Plaintiff was not qualified to be without merit.

### c. Whether Circumstances Exist that Give Rise to an Inference of Discrimination

The Court finds that Plaintiff has provided sufficient evidence to establish that circumstances existed to give rise to an inference of discrimination. In addition to the analysis provided above in Part III.A.1.b. of this Decision and Order, the Court provides the following analysis. While Plaintiff's ALS certification was still valid, he requested to return to active status in a light duty capacity after being cleared by his physician. These requests were flatly denied and Defendants have failed to provide adequate evidence for failing to engage in the interactive process. *See*, *supra*, Part III.A.4. of this Decision and Order.

Defendants' argue that there is a lack of evidence supporting an inference of discrimination at least in part because they acted lawfully when imposing the IME requirement before returning Plaintiff to work. Plaintiff offers no evidence to dispute that ordering the IME was lawful. As a result, the Court finds the IME imposition lawful. However, Plaintiff argues that the chronology surrounding these events provides an additional inference of discriminatory animus. The Court agrees.

 **\*14**  After Plaintiff had been cleared to return to light duty on April 22, 2018, by Dr. Duvinsky, Defendants then

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 270 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)
2018 WL 1582429, 2018 A.D. Cases 105,080

requested that Dr. Duvinsky provide them with Plaintiff's medical records in order to perform an IME. Although Dr. Duvinsky was initially hesitant to turn over Plaintiff's records to Defendants, he did so at the end of April at the direction of Plaintiff. (Dkt. No 37, Attach. 2, at ¶ 22 [Plf.'s Aff.].) However, Plaintiff's appointment with Dr. McIntyre was scheduled for July 8, 2014. (Dkt. No. 37 at 5 [Plf.'s Opp'n Memo. of Law].) Plaintiff's ALS certification was set to expire at the end of July, and Defendants were in charge of setting up the appointment with Dr. McIntyre. Defendants argue that they did not schedule an appointment with Dr. McIntyre sooner because of a delay in receiving the records. In response to this argument, Plaintiff asserts in his affidavit that, *after the end of April*, there was no substantial delay in furnishing Defendants with the records. (Dkt. No. 37, Attach. 2, at ¶ 22 [Plf.'s Aff.].)

Plaintiff argues that the following two-month delay in getting him an appointment with Dr. McIntyre—coupled with the denial of his request to return to light duty—was purposefully undertaken to ensure that his ALS qualification lapsed before Defendants cleared him to return to work. Plaintiff also points to evidence that (1) Defendants never notified the Union when Dr. McIntyre subsequently cleared him for duty and (2) Plaintiff would have been able to renew his ALS certification before it expired if he had returned to work in May or June. (Dkt. No. 33, Attach. 20 at 76, at ¶¶ 13-17 [Gray Depo. Tr.]; Dkt. No. 33, Attach. 18 at 60-61 [Chawgo Depo. Tr.].) When the Court considers the record as a whole, the Court finds that Plaintiff has adduced sufficient evidence to support a reasonable inference of discrimination.

For the reasons described above, the Court finds that Plaintiff has made a satisfactory prima facie showing for purposes of a motion for summary judgment.

### d. Defendants' Burden and Plaintiff's Response

The Court now moves to the second and third steps of the *McDonnell-Douglas* framework. For the reasons cited in Defendants' memorandum of law, the Court finds that Defendants have met their burden at step two of the *McDonnell-Douglas* framework. (Dkt. No. 33, Attach. 22 at 16 [Defs.' Memo. of Law].) Defendants argue that Plaintiff's failure to meet the qualifications required for the firefighter position at the time of his termination was the legitimate, non-discriminatory basis for his termination. There is no dispute that Plaintiff's ALS certification had lapsed at the time that

Plaintiff was due to return to work. Evidence produced by Defendants clearly shows that an ALS certification was a requirement for employment as a firefighter in the City of Norwich. (Dkt. No. 33, Attach. 12.)

The Court now moves to step three of *McDonnell-Douglas*. Because Defendants have met their evidentiary burden in step two, Plaintiff must now demonstrate that Defendants' reason for their adverse decision was in fact a pretext for discrimination. This may be demonstrated by reliance on the evidence that established Plaintiff's prima facie case, without any additional evidence being required, or by presentation of additional evidence to show that Defendants' reasons for his discharge were false. *Gallo*, 22 F.3d at 1226. Again, the discriminatory animus inferred in this case arises out of the circumstances surrounding Plaintiff's lapse in qualification. In sum, Plaintiff points to the following circumstances: (1) Defendants delayed for two months in scheduling Plaintiff's appointment with Dr. McIntyre; (2) Defendants never notified the Union when Dr. McIntyre subsequently cleared him for duty; (3) Plaintiff would have been able to renew his ALS certification before it expired if he had returned to work in May or June; and (4) firefighters not afflicted with PTSD were allowed to re-certify when returning from medical leave after their certifications lapsed on at least two prior occasions. For these reasons, the Court finds that Plaintiff has adduced sufficient circumstantial evidence for a rational fact-finder to conclude that Plaintiff has succeeded under this prong.

**\*15** Accordingly, the Court finds that genuine issues of material fact exist as to whether Defendants discriminated against Plaintiff when terminating him; and Defendants' motion for summary judgment on this claim is therefore denied.

### 2. Retaliation Claim

After carefully considering the matter, the Court grants Defendants' motion for summary judgment on Plaintiff's retaliation claim for the reasons stated in Defendants' memorandum of law. *See, supra*, Part I.C.1. of this Decision and Order. To those reasons, the Court adds only that Plaintiff has offered absolutely no admissible evidence supporting a causal connection between the union grievance filed as a result of Defendants' refusal to return Plaintiff to work in May and Defendants' decision to terminate his employment in October.

2018 WL 1582429, 2018 A.D. Cases 105,080

### 3. Hostile Work Environment Claim

Based on the totality of the circumstances, the Court finds Plaintiff has failed to meet his burden in showing a hostile work environment for the reasons stated in Defendants' memorandum of law. *See, supra*, Part I.C.1. of this Decision and Order. The remarks and actions that Plaintiff complains about fall well short of the conditions necessary to establish an abusive work environment. In support of his claim, Plaintiff points to a handful of isolated incidents, including the cleaning of his helmet at the direction of Chief Chawgo and the making of comments by Chief Chawgo to other firefighters outside Plaintiff's presence. In fact, the admissible record evidence does not reveal *any* comments directed at Plaintiff that occurred in his presence. Furthermore, Plaintiff failed to utilize the formal grievance procedure laid out by the collective bargaining agreement when attempting to rectify these issues. (Dkt. No. 33, Attach. 17, at 108 [Plf.'s Depo. Tr.].) Under the circumstances, these isolated incidents and the second-hand knowledge of alleged abusive acts do not meet the level of pervasiveness or severity required by hostile work environment claims. For all of these reasons, Plaintiff's hostile work environment claim under the ADA is dismissed.

### 4. Reasonable Accommodation Claim

The reasonable accommodation requested by Plaintiff was a return to light duty for a period of two weeks after being cleared to return by his medical treatment provider on April 22, 2014, followed by a return to full duty immediately thereafter. As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because it was not possible to reasonably accommodate Plaintiff. Based on the current record, the Court disagrees.

As previously discussed above in Part III.A.1. of this Decision and Order, Plaintiff meets the requirements of "disabled" under the ADA and accompanying EEOC regulations. In addition, the parties do not dispute that Defendants had notice of Plaintiff's disability. Both parties, through deposition transcripts and documentation, have adduced significant evidence that Chief Chawgo, Ms. DeForest, then-Mayor Maiurano, and the Common Council were aware of Plaintiff's condition throughout all relevant stages of his employment.

The Court notes that, in their memorandum of law, Defendants conflate Plaintiff's request for light duty on April

22, 2014, with Plaintiff's request to be allowed back on duty to complete his ALS re-certification at the meeting with city officials on October 22, 2014. (*See generally* Dkt. No. 39 [Defs.' Reply Memo. of Law].) Unlike the Court's finding above in Part III.A.1. of this Decision and Order, the Court finds that Plaintiff's ALS certification and driver's license were both valid at the time of his requested return to light duty for a period of two weeks on April 22, 2014. Plaintiff's ALS certification did not expire until July 31, 2014, and his driver's license was not suspended until September 27, 2014. The analysis thus centers on the remaining two elements of Plaintiff's prima facie showing for failure to reasonably accommodate.

#### a. Whether, with Reasonable Accommodation, Plaintiff Could Have Performed the Essential Functions of the Job at Issue

 **\*16**  After carefully considering the matter, the Court finds that Plaintiff has made a sufficient showing that, with reasonable accommodation, he could have performed the essential functions of the job at issue. Defendants argue that (1) allowing Plaintiff to return to work in a light duty status was not an available option in light of restrictions placed on manning and scheduling by the existing collective bargaining agreement (which permitted a maximum of four firefighters per 24-hour shift), and (2) other firefighters had expressed safety concerns should Plaintiff be required to respond to any emergency calls. (*See generally* Dkt. No. 33, Attach. 18 [Chawgo's Depo. Tr.].) However, the Court finds these arguments unpersuasive for two reasons.

First, the record indicates that the collective bargaining agreement in force at the time neither contains nor imposes a restriction on how many firefighters could be scheduled to work during any given shift or week. Chief Chawgo himself stated that he was not aware of any restriction keeping him from using a fifth firefighter on any given shift, and the Court likewise finds no provision in the collective bargaining agreement that explicitly or implicitly imposed a maximum of four firefighters per shift. (Dkt. No. 33, Attach. 18, at 55-56 [Chawgo's Depo. Tr.].) [15] Defendants also argue that their reasons for refusing to accommodate Plaintiff's request for a 12-hour shift were rooted in safety concerns for Plaintiff and other firefighters. However, Dr. Duvinsky made no representations to that effect in his report, and it is difficult to imagine that Dr. McIntyre would have cleared Plaintiff for

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 272 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)
2018 WL 1582429, 2018 A.D. Cases 105,080

duty in July if he harbored any concerns for Plaintiff's safety or that of the other firefighters.

15    The Court notes that Plaintiff relies, in part, on Article 9, Section 9.7 of the collective bargaining agreement, which states that "[t]he Chief, at his discretion, may assign a Fire Assistant to work as a 5th person as needed to complete extra assignments." (Dkt. No. 33, Attach 2, at 9.) However, this provision applies to Fire Assistants rather than Firefighters, and it is based on a "need[ ]."

Second, the record also indicates that, when Plaintiff was cleared for duty, Dr. Duvinsky expressed no specific concerns over any particular job functions Plaintiff may encounter while on duty. The Court recognizes that, while a light duty request necessarily suggests performance in a limited capacity, it is clear from the record that Dr. Duvinsky's request that Plaintiff perform a 12-hour shift instead of a 24-hour shift for the first two weeks was the extent of the limitation. (Dkt. No. 33, Attach 3.) In fact, Dr. Duvinsky made no request—and Defendants have not argued that he made a request—that Plaintiff refrain from the performance of any essential functions of his employment while on light duty. Mr. Gray also stated that the Fire Department has authorized light duty to returning firefighters in the past. (Dkt. No. 33, Attach 20, at 21-23 [Gray's Depo. Tr.].)

### b. Whether Defendants Have Refused to Make Such Accommodations

The record indicates that Defendants, upon receiving Plaintiff's request for return to work under limited duty for a period of two weeks, refused this request in or about late April, 2014. There is no evidence that the Chief Chawgo, Ms. DeForest, Mayor Maiurano, or the Common Council engaged in the interactive process envisioned by the EEOC. Although the interactive process is not a requirement where there is no possibility of the existence of reasonable accommodations, the Court is unable to find, based on the current record, that the requested accommodation was not possible. 16

16    The Court notes that Defendants failed to properly assert any specific facts as to why they need not engage in the interactive process after April 22, 2014. Granted, Chief Chawgo points to "financial" issues; however, nowhere does any Defendant

expound upon what those financial issues may have entailed. Moreover, Chief Chawgo points to the fact that the Department surpassed its overtime budget in 2014 (due to Plaintiff's leave); however, he does not say the Department did so before late April of 2014.

*17  As a result, genuine issues of fact remain as to whether Plaintiff's proposed accommodations after being cleared by Dr. Duvinsky for limited duty on April 22, 2014, were in fact reasonable. Defendant's motion for summary judgment on this claim is therefore denied.

### B. Claims Under the NYSHRL

#### 1. Discrimination Claim

Because the legal standard governing both the federal and state discrimination claims are substantially similar, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA. The Court denies Defendants' motion regarding this claim for the reasons stated above in Part III.A.1. of this Decision and Order.

#### 2. Retaliation Claim

Because the legal standard governing both the federal and state retaliation claims are the same, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA. The Court grants Defendants' motion regarding this claim for the reasons stated in above Part III.A.2. of this Decision and Order.

#### 3. Hostile Work Environment Claim

Because the legal standard governing both the federal and state hostile work environment claims are the same, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA. The Court grants Defendants' motion regarding this claim for the reasons stated above in Part III.A.3. of this Decision and Order.

#### 4. Reasonable Accommodation Claim

Case 6:21-cv-01207-TWD Document 86 Filed 10/25/24 Page 273 of 321

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

2018 WL 1582429, 2018 A.D. Cases 105,080

Because the legal standard governing both the federal and state reasonable accommodation claims are substantially similar, the Court need not recite its previous analysis with respect to Plaintiff's claims under the ADA. The Court denies Defendants' motion regarding this claim for the reasons stated above in Part III.A.4. of this Decision and Order.

### C. Individual-Capacity Claims

After carefully considering the matter, the Court finds that there is no individual liability pursuant to the ADA for the reasons stated in Defendant's memorandum of law. *See Spiegel v. Schulmann*, 604 F.3d 72, 79-80 (2d Cir. 2010) (holding that, in light of the remedial provisions in Title VII, an interpretation of individual liability does not comport with Congress's clearly expressed intent). Plaintiff argues, however, that Ms. DeForest and Chief Chawgo have the capacity to be held individually liable under the NYSHRL under both the ownership theory of liability and the aiding-and-abetting theory of liability. (Dkt. No. 37 at 21 [Plf.'s Opp'n Memo. of Law].)

Under the NYSHRL, individuals may be held liable if they have an ownership interest in the employer or the authority to hire or fire employees. *Magnotti v. Crossroads Healthcare Mgmt. LLC*, 14-CV-6679, 2016 WL 3080801, at *2, 2016 U.S. Dist. LEXIS 69929 at *5-6 (E.D.N.Y. May 27, 2016). "If a plaintiff proves that the 'individual had the ability to do more than carry out personnel decisions, including the power to hire and fire employees and supervise and control employee conditions of employment,' he need not prove 'that this individual actually used such powers [against] the plaintiff.'" *Magnotti*, 2016 WL 3080801, at *2, 2016 U.S. Dist. LEXIS 69929, at *5-6 (quoting *Scalera v. Electrograph Sys., Inc.*, 848 F.Supp.2d 352, 373 (E.D.N.Y. 2012)). In the present case, the record clearly indicates that complete termination authority rested with the Mayor and Common Council. (Dkt. No. 33, Attach. 10.) As a result, Chief Chawgo and Ms. DeForest cannot be held liable under this theory of liability.

**\*18** Under the aiding-and-abetting theory of liability, "an individual employee need not himself take part in the primary violation[;] [he need only] aid, abet, incite, coerce or compel, a primary violation of the HRL committed by another employee or the business itself." *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F.Supp.2d 376, 380-81 (S.D.N.Y. 1999). Plaintiff argues that Chief Chawgo and Ms. DeForest were crucial in providing information to, and advising, the Mayor and Common Council regarding the status of city employees. Based on the current record, a rational fact-finder could

conclude that these two individuals incited and/or abetted the denial of Plaintiff's request for light duty accommodation and his ultimate termination. Chief Chawgo was Plaintiff's direct supervisor, was informed about Plaintiff's condition on an on-going basis, and participated in multiple meetings and correspondence with the Mayor and Common Council regarding Plaintiff's initial request for medical leave and his requested return. In addition to the above points, Ms. Deforest was also instrumental in organizing Plaintiff's appointment with Dr. McIntyre and participated in several meetings with the Mayor and Common Council regarding Plaintiff's employment status. As a result, based on the current record, the Court finds that a rational fact-finder could conclude that Chief Chawgo and Ms. DeForest are individually liable under the NYSHRL under an aiding-and-abetting theory of liability.

### D. Plaintiff's Claims for Back Pay and Front Pay

After carefully considering the matter, the Court dismisses Plaintiff's claims for back pay and front pay. Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standard governing Plaintiff's claim in this action, the Court will not recite, in its entirety, that legal standard in this Decision and Order, which is intended primarily for review by the parties. (*See generally* Dkt. No. 33, Attach. 22 at 22-25 [Defs.' Memo. of Law]; Dkt. No. 37, at 22-23 [Plf.'s Opp'n Memo. of Law].) In the present case, Defendants correctly point out that Plaintiff, after being terminated in October 2014, made no efforts whatsoever to seek employment until April 2015. (Dkt. No. 33, Attach. 17 at 109, at ¶¶ 12-22 [Prindle Depo. Tr.].) Moreover, the Court finds that Defendants have adduced sufficient evidence that Plaintiff has made no efforts to seek comparable employment as an EMT or firefighter at any point following his termination. (Dkt. No. 33, Attach. 17 at 111, at ¶¶ 6-9 [Prindle Depo. Tr.].) As a result, Plaintiff's claims for back pay and front pay are dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 33) is **GRANTED in part** and **DENIED in part** as follows:

1. Plaintiff's discrimination claim under the ADA **SURVIVES** Defendants' motion;

2. Plaintiff's reasonable-accommodation claim under the ADA **SURVIVES** Defendants' motion;

Prindle v. City of Norwich, Not Reported in Fed. Supp. (2018)

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 274 of 321

2018 WL 1582429, 2018 A.D. Cases 105,080

3. Plaintiff's discrimination claim under the NYSHRL **SURVIVES** Defendants' motion;

4. Plaintiff's reasonable-accommodation claim under the NYSHRL **SURVIVES** Defendants' motion;

5. All of Plaintiffs individual liability claims against Defendants Chawgo and DeForest are **DISMISSED except for** those individual liability claims under the NYSHRL described above;

6. Plaintiff's retaliation claim under the ADA is **DISMISSED**;

7. Plaintiff's hostile work environment claim under the ADA is **DISMISSED**;

8. Plaintiff's retaliation claim under the NYSHRL is **DISMISSED**;

9. Plaintiff's hostile work environment claim under the NYSHRL is **DISMISSED**;

10. Plaintiff's claims for back pay and front pay are **DISMISSED**; and it is further

**ORDERED** that counsel are directed to appear on **MAY 3, 2018** at 11:00 a.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **APRIL 13, 2018**, and the parties are directed to engage in meaningful settlement negotiations prior to the conference.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1582429, 2018 A.D. Cases 105,080

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3457143
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ileen CAIN, Plaintiff,
v.
MANDL COLLEGE OF ALLIED
HEALTH and Mel Weiner, Defendants.

No. 14–CV–1729 (ER).
|
Signed May 29, 2015.

*OPINION AND ORDER*

RAMOS, District Judge.

**\*1** This case arises from claims by Ileen Cain ("Plaintiff" or "Cain"), a *pro se* litigant against Mandl College of Allied Health ("Mandl") and its president, Mel Weiner ("Weiner") [1] (collectively, "Defendants"). Plaintiff alleges that Defendants discriminated against her on the basis of her disability by improperly terminating her enrollment in Mandl's surgical technologist program. Liberally construed, the Complaint asserts claims against Defendants for violations of § 504 of the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* ("NYCHRL"), New York Civil Rights Law, §§ 40–c, 40–d ("NYCRL"), the Violence Against Women Act ("VAWA"), and the Communications Act of 1934, along with harassment, retaliation, and aiding and abetting claims. Defendants now move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Defs.' Mot. Dismiss, Doc. 14. For the reasons discussed below, Defendant's motion to dismiss is GRANTED.

---

[1]     In Plaintiff's opposition papers, she indicates that she is only bringing claims against Weiner for aiding and abetting in violation of the NYSHRL, NYCHRL, and NYCRL. Pl.'s Mem. L. Opp., Doc. 23 at 24–25. Thus, the Court will not address Defendants' argument that Weiner cannot be held individually liable under the ADA or the Rehabilitation Act. *See* Defs.' Mem. L. Mot. Dismiss, Doc. 15 at 6.

**I. Background**

The Court accepts the following allegations as true for purposes of this motion. [2]

---

[2]     Some of the allegations appear in documents attached to Plaintiff's opposition papers. "Courts have held that it may be appropriate to consider materials outside of the Complaint in the *pro se* context ... and, in particular, materials that a *pro se* plaintiff attaches to his opposition papers[.]" *Ceara v. Deacon,* No. 13–CV–6023 (KMK), 2014 WL 6674559, at \*8 (S.D.N.Y. Nov. 25, 2014) (internal citations omitted) (emphasis added); *see also Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 246–47 (S.D.N.Y.1998) ("Although material outside a complaint generally is not to be taken into consideration on a motion to dismiss, the policy reasons favoring liberal construction of *pro se* complaints permit a court to consider allegations of a *pro se* plaintiff in opposition papers on a motion where, as here, those allegations are consistent with the complaint.").

Plaintiff's son was murdered in 2005. Compl. ¶ 6. His death had a substantial effect on her daily activities, which resulted in Plaintiff's being diagnosed with post-traumatic stress disorder ("PTSD") in 2007. *Id.*

Plaintiff received "services" from an entity that she refers to as the Adult and Continuation Educational Services Vocational Rehabilitation ("ACCESS VR"), an entity which "financially funds individuals with disabilities." [3] *Id.* at ¶ 7. Plaintiff was initially denied admission in Mandl's surgical technologist program because she was receiving financial assistance from ACCESS VR. *Id.* at ¶ 1. Instead, Mandl preferred students to enroll full-time with Pell grants, New York State Tuition Assistance Program awards, or unsubsidized loans. *Id.* Plaintiff sought the assistance of an ACCESS VR representative on May 2, 2012, who intervened on her behalf and helped her gain admission. Pl.'s Mem. L. Opp., Doc. 23 at 3.

---

[3]     Presumably Plaintiff is referring to the Adult Career and Continuing Education Services–Vocational Rehabilitation.

Prior to her enrollment in Mandl in 2012, Plaintiff was interviewed by Weiner. *Id.* at 3–4, 14. During this interview, Weiner asked her why she was interested in becoming a surgical technologist. *Id.* at 4. Plaintiff responded by explaining that her son was murdered and that she was diagnosed with PTSD. *Id.* Once she was enrolled, she spoke "at length" about her son's death and her PTSD with a Mandl Resource Lab director named Allison. *Id.* at 8.

On June 12, 2012, Plaintiff informed Mandl's director of enrollment, Randi Senser ("Senser"), along with Weiner, that she was being teased, harassed, and stalked by an individual named Aisha Reid ("Ms.Reid") over the internet. *Id.* at 4, 9. Plaintiff suspects that Ms. Reid is the sister of Haaziq Reid ("Mr.Reid"), a Mandl student with whom Plaintiff had terminated a relationship. *Id.* Plaintiff also informed school officials that other students were mocking her, calling her a "kook" or "coo coo." Compl. ¶ 10. Senser never investigated Plaintiff's allegations. Doc. 23 at 5. Weiner told Plaintiff that he would address the class about her situation. *Id.* at 9. Indeed, Weiner confronted her class by reminding them that they are "tough" New Yorkers who have had to deal with racism and many types of discrimination. *Id.* He told the class that he has had to deal with subtle racist comments and that he expects the best of Mandl students. *Id.* Plaintiff interpreted his comments as indirectly instructing her to deal with the situation. *Id.* On July 24, 2012, Plaintiff approached a fellow student, identified as "Simon," and asked her if the two could discuss the harassment that was occurring. Compl. ¶ 16. Simon informed a Mandl professor, along with Weiner, that Plaintiff had attempted to speak to her regarding the harassment. *Id.* It is unclear whether Simon simply relayed Plaintiff's concerns to Mandl officials, or if she complained about any inappropriate behavior on the part of Plaintiff.

**\*2** The following day, on July 25, 2012, Plaintiff was dismissed from Mandl. Doc. 23 at 5. Weiner told Plaintiff that she was not being dismissed for academic reasons, rather, she was being terminated because she "has issues with herself." *Id.* In a letter to Plaintiff, dated a day later, she was informed that she was being administratively withdrawn from Mandl's surgical technologist program for the following reasons:

> As a first term student in Mandl for the past two and a half months, there have been numerous complaints regarding your behavior towards students and staff. As a result, there have been

discussions with you, as well as reports, on how your demeanor affects others in the Mandl Community. Although you were warned in a letter dated July 18 in which you signed and received a copy about possible termination, you continue to engage in acrimonious behavior that is unbecoming [sic] a Mandl Student, future graduate and future employee in the Allied Health field.

Doc. 23, Ex. D. The letter cited an excerpt from the College Student Handbook, which states that a student may be terminated for "unseemly behavior that tends to distract other students and disrupt routine class procedure [.]" *Id.* The dismissal letter further indicated that, if Plaintiff chose to appeal her termination, she was required to do so in writing within five days. *Id.* On July 30, 2012, Defendants faxed Plaintiff's dismissal letter to an ACCESS VR supervisor and to a physician identified as Dr. Mark Feinstein. Doc. 23 at 5. Plaintiff claims she never personally received the letter from Mandl. *Id.* at 6.

Plaintiff contacted the Center for Independence of the Disabled, N.Y. ("CIDNY") to advocate on her behalf after she was dismissed. *Id.* at 11. CIDNY requested an in-person meeting with Weiner to discuss the bullying and harassment she suffered, which Defendants ignored. *Id.* On November 1, 2012, Mandl did make an exception for Plaintiff and allowed her to submit a written appeal, despite the fact that the deadline had passed. Doc. 23, Ex. B. Nonetheless, her appeal for reinstatement was denied on January 4, 2013. *Id.* at Ex. E. The following month, on February 27, 2013, Plaintiff filed a complaint with the United States Department of Education's ("DOE") Office of Civil Rights, which was dismissed as untimely on April 29, 2014. Doc. 23 at 11; *see also id.* at Ex. A. Although Plaintiff claims that she was never granted a hearing with respect to her termination, *id.* at 5, she later states that was granted an "administrative hearing" which took place on December 9, 2012. *Id.* at 11. Given that the hearing was held *before* Plaintiff filed her complaint with DOE, together with the fact that it was not attended by any individuals affiliated with Mandl, it is unclear what type of a proceeding Plaintiff is actually referring to. *See id.*

## II. Discussion

### A. Rule 12(b)(6) Motion to Dismiss standard

**\*3** When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014). The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly,* 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570; *Iqbal,* 556 U.S. at 680.

The question in a Rule 12 motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 615 (S.D.N.Y.2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 278 (2d Cir.1995)) (internal quotation marks omitted). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,' " and without regard for the weight of the evidence that might be offered in support of Plaintiff's claims. *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir.2011) (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006)).

The same standard applies to motions to dismiss *pro se* complaints. *See Zapolski v. Fed. Republic of Germany,* 425 F. App'x 5, 6 (2d Cir.2011). The Court remains obligated to construe a *pro se* complaint liberally, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't*

*of Labor,* 709 F.Supp.2d 218, 224 (S.D.N.Y.2010) (citing *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). "However, even *pro se* plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Id.* (quoting *Twombly,* 550 U.S. at 555) (internal quotation marks omitted). A *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal,* 566 U.S. at 678. A complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks omitted); *see* also *Triestman,* 470 F.3d at 477 ("[P]ro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' ") (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). Additionally, as the Second Circuit recently noted, "[a] district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion." *Walker v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013) (emphasis added).

**\*4** In addition to confining its consideration of a Rule 12(b)(6) motion to the facts stated in the complaint and in documents appended or incorporated by reference, a court may take into account matters of which judicial notice can be taken. *Leonard F. v. Israel Disc. Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)); *see also* Fed.R.Evid. 201. In order for a court to take judicial notice of a public document on a dismissal motion, the plaintiff must have relied on the terms and effect of the document in drafting the complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). Accordingly, it is routine for courts to take judicial notice of court documents, "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

Defendants attached several documents to their reply papers, including records indicating that Plaintiff was placed on disciplinary probation by Mandl in July 2012, before she was dismissed. Defs.' Reply Mem. L., Doc. 25, Ex. 1. The first two documents include an infraction notice dated June 12, 2012 and a letter informing Plaintiff that she was being placed on disciplinary probation dated July 18, 2012. Doc. 25, Ex. 1. These records were already included in Plaintiff's opposition papers and will therefore be considered. *See* Doc.

2015 WL 3457143

23, Ex. C. However, the third document—an infraction notice dated July 10, 2012—is not attached to Plaintiff's papers, incorporated by reference, or subject to judicial notice. Defendants also submitted a Report and Recommendation written by Magistrate Judge James C. Francis IV, dated June 26, 2014, recommending that the court dismiss an action brought by Plaintiff against Atelier Esthetique and a number of individual defendants. Defs.' Reply Mem. L., Doc. 25, Ex. 2; *see also Cain v. Atelier Esthetique et al.,* 13–CV–7834, Doc. 33. The case involves a substantially similar factual predicate and set of claims, namely Plaintiff's dismissal from a vocational program for what she claimed to be discriminatory reasons. *See id.* However, it was brought against a completely different group of defendants and has no bearing on this case. Therefore, the Court will not consider Defendants' attachments for the purposes of the instant motion.

**B. Claims One and Two: Discrimination in Violation of the Rehabilitation Act and the ADA**

The Court reads the Complaint as alleging that the Defendants violated her rights under Title II of the ADA and § 504 of the Rehabilitation Act.

In order to establish a *prima facie* violation of these Acts, a plaintiff must show: (1) "that she is a qualified individual with a disability;" (2) "that the defendants are subject to one of the Acts;" and (3) "that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability." [4] *Harris v. Mills,* 572 F.3d 66, 73–74 (2d Cir.2009) (quoting *Powell v. Nat'l Bd. of Med. Examiners,* 364 F.3d 79, 85 (2d Cir.)) *opinion corrected,* 511 F.3d 238 (2d Cir.2004)). Although the elements of ADA and Rehabilitation Act claims are substantially identical, there is one notable difference: "[U]nder the Rehabilitation Act, the defendant must have discriminated against the plaintiff solely because of the plaintiff's disability, whereas under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination ." *K.H. v. Vincent Smith Sch.,* No. CV 06–0319(ERK)(JO), 2006 WL 845385, at *11 (E.D.N.Y. Mar. 29, 2006) (internal citation and quotation marks omitted). Additionally, under the Rehabilitation Act, the plaintiff must show that the defendants receive federal funding. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003) (citing *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998)); *see also Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 146 n. 6 (2d Cir.2002) ("Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach

of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same.").

[4]     Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal assistance[.]" 29 U.S.C. § 794. Correspondingly, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

**\*5** Defendants argue that Plaintiff's claims under the Rehabilitation Act and the ADA should fail because the Complaint does not allege that Defendants were aware that she was diagnosed with PTSD. Defs.' Mem. L. Mot. Dismiss, Doc. 15 at 4. In effect, they are claiming that Plaintiff has failed to show that she was discriminated against "by reason of her disability," under the third prong of the test. However, although the Complaint lacked any allegations that Defendants knew that Plaintiff suffers from PTSD, her opposition papers present additional facts which the Court is allowed to consider given Plaintiff's *pro se* status. [5] According to Plaintiff, she personally told both Weiner and "Allison," the Mandl resource lab director, that she was diagnosed with PTSD. [6] *See* Doc. 23 at 4, 8, 14. Since Plaintiff has alleged that Weiner himself knew about her PTSD, it can be reasonably inferred that the individuals responsible for Plaintiff's dismissal from Mandl were aware of her diagnosis. *See Alexiadis v. New York Coll. of Health Professions,* 891 F.Supp.2d 418, 430 (E.D.N.Y.2012) (concluding that, where the plaintiff told the Director of Student Services, the Dean of Students, and his supervisor in the Office of Admissions that he was HIV-positive, there was sufficient evidence from which a rational factfinder could infer that those responsible for the adverse actions taken against him were aware of his condition).

[5]     Defendants did not respond to Plaintiff's new allegations in their reply papers. In fact, their reply brief consists of nothing more than a two-page letter to the Court rehashing the arguments made

in their original motion, not including the two attachments which the Court will not consider in ruling on a motion to dismiss. *See* Doc. 25.

6      Plaintiff also claims that she spoke about her PTSD with an individual named Raquel Garcia. Doc. 23 at 8. However, she does not indicate whether this person was associated with Mandl.

Nonetheless, although Plaintiff has alleged facts that show Defendants were aware of her PTSD, she does not establish any causal connection between her dismissal from Mandl and her PTSD. [7] The Complaint states that Weiner informed Plaintiff that she was being dismissed due to "numerous complaints from staff and students." [8] Compl. ¶ 18. As explained in her opposition papers, Plaintiff's dismissal coincided with her conversation with Simon about the bullying that she was allegedly enduring. Doc. 23 at 10. When Weiner told Plaintiff that Mandl was dismissing her, he purportedly admonished her for speaking with another student regarding the matter. *Id.* Plaintiff reasons that, had she not spoken to Simon, Mandl would not have dismissed her the following day. *Id.* at 19. However, she does not describe her interaction with Simon, other than to say that she wanted to talk to Simon about the harassment that she was experiencing. Compl. ¶ 16, *see also* Doc. 23 at 5, 10. Nor does Plaintiff identify what it was about her conversation with her that resulted in her dismissal. Meanwhile, the dismissal letter cites Plaintiff's "acrimonious" behavior towards other students and staff as the reason for her termination. Doc. 23, Ex. D. There is no indication that Plaintiff's PTSD caused her to behave in such a way, or that it otherwise had any bearing on her dismissal.

7      Throughout her Complaint and opposition papers, Plaintiff frequently notes that she was denied enrollment in Mandl's surgical technologist program because she was receiving tuition assistance from ACCESS VR. *See* Compl. ¶ 1, Doc. 23 at 3, 7, 28. However, Plaintiff was ultimately admitted to the program. Furthermore, she does not allege any additional facts to establish that she was denied enrollment on account of her disability.

8      Weiner also allegedly told Plaintiff that she "has issues with herself." *Id.* at ¶ 17. However, without further context, this statement does not suggest that Weiner was referring to Plaintiff's PTSD.

To the extent that Plaintiff claims that Defendants discriminated against her by failing to take action in response to her allegations of harassment by other students, her claim also fails. Indeed, "deliberate indifference to pervasive, severe disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities would be actionable under Section 504 and Title II." *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.,* 381 F.Supp.2d 343, 360 (S.D.N.Y.2005). However, Plaintiff has not alleged sufficient facts to establish that the harassment she experienced was based on her disability. [9] Nor has she shown that the harassment deprived her of access to the school's resources and opportunities. For example, in *Preston v. Hilton Cent. Sch. Dist.,* 876 F.Supp.2d 235, 242 (W.D.N.Y.2012), "[t]he alleged harassing conduct included the use of insults which specifically referenced the perceived nature of [the student's] disability [Asperger's Syndrome], such as 'fucking retard' and 'autistic piece of shit,' as well as objects being thrown at him, and ridicule concerning his work in class[.]" The student was so affected by the harassment that he "discontinued attending school, became profoundly disturbed, and was so emotionally crippled that he was unable to return to class or complete final exams." *Id.* The only harassment which Plaintiff specifically identifies is being called a "kook" or "coo coo." Compl. ¶ 10. While such stray remarks are certainly unfortunate, they do not clearly implicate her disability or rise to the level necessary to impose liability on Defendants for deliberate indifference.

9      Plaintiff broadly states in the beginning of her Complaint that the harassment against her was based on her "perceived disability." Compl. at 2. However, nowhere else in the Complaint does she allege any facts that connect the harassment and stalking with her PTSD.

*6      Therefore, Plaintiff's first and second claims are dismissed without prejudice. [10]

10      Defendants do not contest whether Plaintiff is disabled under the ADA and Rehabilitation Act, nor do they maintain that they are not subject to the Acts.

## C. Claim Three: Retaliation in Violation of the ADA

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or

2015 WL 3457143

participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U .S.C. § 12203(a). To state a claim for retaliation under the ADA, a plaintiff must establish that: (1) "a plaintiff was engaged in protected activity;" (2) "the alleged retaliator knew that plaintiff was involved in protected activity;" (3) "an adverse decision or course of action was taken against plaintiff;" and (4) "a causal connection exists between the protected activity and the adverse action." [11] *Weixel,* 287 F.3d at 148 (citation and internal quotation marks omitted). "Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002). The term "protected activity" refers to an "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000), *superseded by regulation on separate grounds.* "In order to constitute protected activity, a plaintiff's complaint must be sufficiently pointed to be reasonably understood as a complaint of discrimination." *Goonewardena v. N. Shore Long Island Jewish Health Sys.,* 11 Civ. 2456(MKB), 2013 WL 1211496, at *9 (E.D.N.Y. Mar. 25, 2013) (citation and internal quotation marks omitted). Nonetheless, on a motion to dismiss, "a plaintiff need not specifically plead every element of a prima facie case. A plaintiff need only allege facts that could establish a causal nexus between a protected activity and the adverse employment action." *Pahuja v. Am. Univ. of Antigua,* No. 11 CIV. 4607(PAE), 2012 WL 6592116, at *11 (S.D.N.Y. Dec. 18, 2012) (citing *Dorsey v. Fisher,* 468 F. App'x 25, 27 (2d Cir.2012)).

[11]    The same standard applies to retaliation claims raised under § 504 of the Rehabilitation Act, *see Weixel,* 287 F.3d at 148, although Plaintiff only alleges retaliation under the ADA.

Defendants once again argue that Plaintiff's retaliation claim should be dismissed because they were unaware that she was diagnosed with a disability, nor did they regard Plaintiff as disabled. Doc. 15 at 4. However, as noted above, Plaintiff stated additional facts in her opposition papers establishing that she told individuals associated with Mandl, including its president, about her PTSD. *See* Doc. 23 at 4, 8, 14. Furthermore, the question in a retaliation claim is not whether Defendants knew that Plaintiff is disabled; it is whether Defendants knew that Plaintiff was engaged in a protected activity and took some adverse action against her because of it.

As a general matter, in cases involving complaints of bullying, a plaintiff does not state a claim for retaliation if she does not allege that she was being harassed on account of her disability. *See Eskenazi–McGibney v. Connetquot Cent. Sch. Dist.,* No. 14–CV–1591 (ADS)(GRB), 2015 WL 500871, at *11 (E.D.N.Y. Feb. 6, 2015) (finding that, although the parents complained about the bullying of their child, they failed to adequately allege a "protected activity" under the ADA and § 504 because they did not complain that the bullying was on account of his disability). Here, the Complaint broadly claims in conclusory fashion that Mandl retaliated against Plaintiff after she complained about being harassed and bullied based on her "perceived disability." Compl. at 2. [12] Later on in the Complaint, Plaintiff specifies that she was terminated for speaking with Simon, a fellow student, about being harassed and bullied. Doc. 23 at 5, 18, 10.

[12]    Given that this portion of the Complaint is unnumbered, the Court refers to the ECF page number.

*7 Yet, Plaintiff never alleges any facts that establish that her interaction with Simon had anything to do with her disability. Furthermore, Plaintiff does not allege that Defendants were aware that the harassment she suffered was connected to her PTSD. If anything, the facts alleged in the Complaint, along with Plaintiff's papers, suggest that the harassment was associated with her decision to terminate her relationship with Ms. Reid's brother. *See* Compl. ¶ 12–13. Title VII case law is instructive here. In the Title VII context, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.,* 716 F.3d 10, 15 (2d Cir.2013). "Although particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." *Id.* at 17. Putting aside the question of whether speaking to another student about disability-based harassment by her peers constitutes a "protected activity," Plaintiff has not adequately alleged that Defendants retaliated against her for engaging in a "protected activity." While Plaintiff's papers certainly establish that Defendants knew about her disability and were aware that harassment was taking place against

Plaintiff, it never claims that they knew that the conduct she was complaining about was on account of her PTSD.

Furthermore, the dismissal letter, which Plaintiff attached to her opposition papers, indicates that she was dismissed due to "numerous complaints" regarding her behavior towards other students and staff, which violated the student code of conduct. Doc. 23, Ex. D. Plaintiff also attached a separate letter which indicates that, prior to her dismissal, she had been placed on probation for her refusal to follow a professor's directions and abusive language. *Id.* at Ex. C. The probation letter states that any additional violation of the student code of conduct during her probation could lead to immediate termination. *Id.* Although Plaintiff states that she was "forced" to sign an infraction form, she does not specify whether it was in connection with being placed on probation. *See* Doc. 23 at 9. In fact, she does not make any attempt to deny or explain the contents of the probation and dismissal letters beyond claiming that she was not previously informed that there were "numerous complaints" from students and staff about her. *Id.* at 6.

The various ambiguities and inconsistencies in the Complaint are fatal to her claim. Accordingly, Plaintiff's third claim for retaliation is dismissed without prejudice.

### D. Claim Twelve: New York Civil Rights Law, the Violence Against Women Act, and the Communications Act

**\*8** Defendants further argue that Plaintiff's twelfth claim must be dismissed because it is "incomprehensible" and fails to put them on notice of the basis for the cause of action. Doc. 15 at 6. Indeed, the nature of Plaintiff's claim "and the ground upon which it rests" cannot be determined from the Complaint as currently pleaded. *See Twombly,* 550 U.S. at 555. Without any further explanation, Plaintiff's twelfth claim alleges violations of the NYCRL, § 113 of the VAWA, and "the telecommunications harassment statute that is rooted in the Communications Act of 1934." *See* Compl. 8. Plaintiff does not provide a factual basis for the claims brought under the Communications Act and VAWA, nor does she specify whether her twelfth claim under the NYCRL is separate from the discrimination claim she brings under the same statute in her eleventh claim. Since Plaintiff has failed to give Defendants "fair notice of what the ... claim is and the grounds upon which it rests," her twelfth claim must also be dismissed. *See Twombly,* 550 U.S. at 555 (internal citation and quotation marks omitted).

### E. State Law Claims

In addition to her claims under the Rehabilitation Act, ADA, VAWA, and the Communication Act, Plaintiff's Complaint may be liberally construed as alleging state law claims for violations of the NYSHRL, NYCHRL, and NYCRL in her Fourth through Eleventh claims. [13] Under 28 U.S.C. § 1367(c)(3), if the Court has dismissed all of the claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any non-federal claims over which it could have exercised supplemental jurisdiction.

[13]   In her opposition papers, Plaintiff additionally claims that Defendants committed defamation. *See* Doc. 23 at 2526. However, the Complaint does not present any such claim.

Subject matter jurisdiction in the instant action is based on federal question jurisdiction. 28 U.S.C. § 1331. All of the Complaint's federal claims must be dismissed. *See* supra Part II .B–D. Because no federal claims remain that are subject to a merits determination by this court, it would be inappropriate to adjudicate Plaintiff's state law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well."); *McGugan v. Aldana–Bernier,* No. 11–CV–00342 (TLM), 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) *aff'd,* 752 F.3d 224 (2d Cir.2014) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice."). Therefore, all non-federal claims contained in Plaintiff's Second Amended Complaint are hereby dismissed as well.

### F. Leave to Amend

The Second Circuit has instructed Courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio,* 511 F. App'x 28, 31 (2d Cir.2013) (quoting *Shomo v. City of New York,* 579 F.3d 176, 183 (2d Cir.2009)) (internal quotation marks omitted). Given her *pro se* status, the Court is granting Plaintiff an opportunity to amend her Complaint within thirty (30) days of the date of this order. The amended complaint must be captioned as an "Amended Complaint," and bear the same docket number as this Order.

2015 WL 3457143

### III. Conclusion

**\*9** For the reasons set forth above, Defendants' motion to dismiss is GRANTED. Plaintiff is granted leave to amend the Complaint. No summons shall issue at this time and all further proceedings shall be stayed for 30 days. If Plaintiff fails to file an amended complaint within thirty days pursuant to this order, the Court shall dismiss this complaint.

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 14, and to mail a copy of this Opinion and Order to Plaintiff.

Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3457143

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1029022, 2020 A.D. Cases 78,670

2020 WL 1029022
United States District Court, N.D. New York.

McKenzie GRAY, Plaintiff,

v.

ONONDAGA-CORTLAND-
MADISON BOCES, Defendant.

5:16-CV-973 (NAM/TWD)
|
Signed 03/03/2020

**Attorneys and Law Firms**

James D. Hartt, Esq., 6 N. Main Street, Suite 200F, Fairport, New York 14450, Attorney for Plaintiff.

Charles C. Spagnoli, Esq., 6575 Kirkville Road, East Syracuse, New York 13057, Attorney for Defendant.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior United States District Court Judge

**I. INTRODUCTION**

 *1  Plaintiff McKenzie Gray brings this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, asserting claims against Defendant Onondaga-Cortland-Madison Board of Cooperative Education Services ("BOCES") for disability discrimination, failure to accommodate, and retaliation. (Dkt. No. 1). Now before the Court is Defendant's motion for summary judgment, (Dkt. Nos. 56, 65), and Plaintiff's papers in opposition, (Dkt. No. 64). For the reasons that follow, Defendant's motion is granted.

**II. BACKGROUND** [1]

[1]  The facts have been drawn from Defendant's statement of material facts, (Dkt. No. 56-25), Plaintiff's response and counterstatement of material facts, (Dkt. Nos. 64-18, 64-19), and the parties' attached exhibits, depositions, and declarations (see generally Dkt. Nos. 56, 64, 65).

**A. Plaintiff's Employment at BOCES**

BOCES provides shared educational programs and services to students from school districts within a three-county region of Central New York. (Dkt. No. 1, ¶ 7). Plaintiff was hired by BOCES as a part-time teaching assistant in 2012. (Dkt. Nos. 56-25, ¶ 7; 64-19, ¶ 7). Plaintiff remained in that position throughout her employment at BOCES. (Dkt. No. 56-5, p. 3). Plaintiff's job duties required her to interact with students with emotional and behavioral disabilities. (Dkt. Nos. 56-25, ¶ 11; 64-19, ¶ 11). She was responsible for helping manage students' behavior, assisting with classroom lessons, and otherwise following the classroom teacher's direction and instructions. (Dkt. No. 56-5, p. 4). Plaintiff was typically assigned to certain classrooms on a yearly basis. (Id., p. 5). Her work hours were 8:00 a.m. to 3:00 p.m. (Id., p. 8).

**B. Plaintiff's Disabilities**

Plaintiff has Hashimoto's disease, an autoimmune disorder that affects the thyroid gland. (Dkt. Nos. 56-25, ¶ 12; 64-19, ¶ 12). Plaintiff testified that her condition can cause exhaustion and muscle pain, and can affect her mood, metabolism, and her ability to regulate her body temperature. (Dkt. No. 56-5, p. 12). She stated that her condition can cause pain in her back and neck when she becomes stressed. (Id., p. 13). Plaintiff testified that she was able to perform her job duties as a teaching assistant despite her Hashimoto's disease. (Id., p. 14). She also claimed that her medical condition could require accommodation for the physical parts of the job, such as lifting or restraining destructive, violent, or aggressive students. (Id.).

Plaintiff informed BOCES of her Hashimoto's disease in 2013 on an application for a summer school position, and again in an e-mail about a medical appointment in February 2015. (Dkt. No. 56-5, pp. 16–17). Plaintiff took medical leave for her Hashimoto's disease from October 22, 2014 to November 5, 2014. (Dkt. No. 56-8). Plaintiff was not disciplined or terminated for taking that leave. (Dkt. No. 56-5, p. 19). [2]

[2]  In addition to Hashimoto's disease, Plaintiff also suffers from Post-Traumatic Stress Disorder ("PTSD"). (Dkt. No. 56-5, p. 15). Plaintiff never informed BOCES about her PTSD diagnosis. (Dkt. Nos. 56-25, ¶ 20; 64-19, ¶ 20; see also Dkt. No. 56-5, p. 76).

**C. Misconduct Investigation**

 *2  On March 27, 2015, J.M., a minor student in the classroom where Plaintiff was assigned, reported to the

2020 WL 1029022, 2020 A.D. Cases 78,670

classroom social worker, Timothy Hummel, that he and another student, J.C., recently had problems with Plaintiff. (*See generally* Dkt. No. 56-17). During one incident, J.M. alleged that he and J.C. were sitting together on a school bus when Plaintiff attempted to sit in the same seat with them. (*Id.*, p. 1). J.M. reported that when he and J.C. did not allow Plaintiff to sit with them, she called them "little assholes." (*Id.*). During a separate incident, J.M. reported that he was alone in Mr. Hummel's office when Plaintiff "came in and shut the door." (Dkt. No. 56-21, ¶ 6; *see also* Dkt. No. 56-17, p. 2). J.M. claimed that Plaintiff asked him why he didn't like her, and then she blocked him from exiting the office when he tried to leave. (*Id.*).

That same day, Mr. Hummel reported these incidents to the BOCES Principal, Beth Cooper, the other classroom social worker, Renee Fragale, and the classroom teacher, Courtney Tianello. (Dkt. No. 56-17, pp. 2, 4). Ms. Tianello told Mr. Hummel that she had received text messages from Plaintiff stating "that [Plaintiff] was feeling uncomfortable being alone" with J.M. and J.C. (*Id.*, p. 3). Mr. Hummel met with Plaintiff to discuss the incidents, at which time Plaintiff reported that she had received inappropriate notes from J.M. of a sexual nature. (*Id.*, p. 2). J.M. later admitted to Mr. Hummel that he wrote the notes. (*Id.*, p. 3). Mr. Hummel "informed [Plaintiff] that she should avoid being around [J.M. and J.C.]" and met with Plaintiff to "debrief about her interactions" and "discuss appropriate boundaries." (*Id.*).

Also on March 27, 2015, Ms. Fragale notified the BOCES Assistant Director of Special Education, Karen Koch, about certain comments that were made to Plaintiff by J.M. and J.C. (Dkt. No. 56-22, ¶ 4). Assistant Director Koch then met with Plaintiff and BOCES Principal, Beth Cooper, to investigate the issues raised by Ms. Fragale's report. (*Id.*, ¶ 5). During that meeting, Plaintiff described the comments that were made by students in the classroom. (*Id.*). Assistant Director Koch recalled that Plaintiff reported that she had spoken with Ms. Fragale about her concerns, that Ms. Fragale had addressed the comments with the students, and that she felt comfortable returning to the classroom. (*Id.*). Assistant Director Koch told Plaintiff that the comments were not acceptable, and that Plaintiff should bring further concerns directly to her or Principal Cooper. (*Id.*, ¶ 6).

Assistant Director Koch told Plaintiff that she would ensure that "the students received appropriate consequences," and informed Plaintiff that she would be assigned to a new classroom "for her own protection from any inappropriate comments." (*Id.*). She reported that Plaintiff then "raised strong objections to being removed to another classroom and began downplaying the issues" with the students. (*Id.*, ¶ 7). According to Plaintiff, she informed Assistant Director Koch and Principal Cooper that she "enjoyed being in that classroom," and that she did not want to be reassigned. (Dkt. No. 56-5, pp. 57–58). Plaintiff claimed that "if [the students'] comments and actions were addressed, [ ] in a meeting with [her] and the two boys [about] what's appropriate and what's not, this whole thing could have been avoided." (*Id.*).

Assistant Director Koch recalled that "Plaintiff's sudden reversal of her position when told she would be moved to another classroom for her own protection heightened [her] concerns, [because] it appeared Plaintiff was trying to remain in the classroom with J.M. and J.C. and opposing any suggestion that she was uncomfortable with the students' comments." (Dkt. No. 56-22, ¶ 19). Assistant Director Koch also brought up other performance issues with Plaintiff, including Plaintiff's text messages to Ms. Tianello about Mr. Hummel in which she claimed he was a "terrible" social worker. (*Id.*, ¶ 8). She also told Plaintiff that she had to report to work on time, and that she had received reports and noticed herself that Plaintiff reported to work "late on virtually a daily basis by thirty to forty-five minutes, even though Principal Cooper had spoken to her about the problem." (*Id.*, ¶ 9). According to Assistant Director Koch, Plaintiff claimed she was "having personal problems" that were preventing her from getting to work on time, but "Plaintiff did not say anything suggesting the problems were medical in nature or related to any disability." (Dkt. No. 56-22, ¶ 9; Dkt. No. 56-5, pp. 61–62). Assistant Director Koch encouraged Plaintiff to utilize the employee assistance program if necessary, and reminded Plaintiff that she was expected to arrive to work on time, and that she was not permitted to text colleagues during school hours. (Dkt. No. 56-22, ¶¶ 9–10; Dkt. No. 56-5, pp. 60–61, 63).

**\*3** Assistant Director Koch recalled that Plaintiff "continued to act extremely upset," so she told Plaintiff that she "could sit in [her] office until she felt calm, or that she could go home if she felt she was too upset to return to the classroom." (Dkt. No. 56-22, ¶ 10). She instructed Plaintiff "not to return to the classroom while emotional as it would be upsetting for the students to see her." (*Id.*). Shortly afterward, Assistant Director Koch received a call informing her that Plaintiff had "gone into the classroom crying and upset the students, that she was repeatedly texting the classroom teacher, and that she had returned to [Assistant Director Koch's] office." (*Id.*, ¶ 12).

Case 6:21-cv-01207-TWD    Document 86    Filed 10/25/24    Page 285 of 321

Gray v. Onondaga-Cortland-Madison BOCES, Not Reported in Fed. Supp. (2020)
2020 WL 1029022, 2020 A.D. Cases 78,670

Assistant Director Koch then returned to her office with a union representative and told Plaintiff that she needed to go home. (*Id.*, ¶ 15). Plaintiff admits that she was told to go home but insists that she was not upset at the time she returned to the classroom. (Dkt. No. 56-5, pp. 66–67).

At the end of the school day on March 27, 2015, Assistant Director Koch met with Principal Cooper, Ms. Fragale, Mr. Hummel, and Ms. Tianello to evaluate the ongoing issues with Plaintiff. (Dkt. No. 56-22, ¶ 16). She was "greatly concerned" by the reports she received "as it appeared that Plaintiff was not maintaining appropriate boundaries with the two students, that she was directing inappropriate comments at them, that she was undermining the classroom social workers, and that the management of the classroom in general was a serious problem." (*Id.*, ¶ 18). After the meeting, Assistant Director Koch investigated further and received additional reports from J.C., Mr. Hummel, and Christina Gonzalez, the other teaching assistant in the classroom. (*Id.*, ¶¶ 21–23).

On the morning of March 30, 2015, Assistant Director Koch met with several other school administrators, including BOCES District Superintendent, Jody Manning, and Director of Labor Relations, Mark Pettitt. (*Id.*, ¶ 24). According to Assistant Director Koch, it was at that point that "[w]e decided we were not going to have Plaintiff continue in employment due to her poor judgment, unprofessional behavior, insubordination, and other misconduct." (*Id.*).

### D. Plaintiff's Notice of Medical Leave

On March 30, 2015, Plaintiff delivered a doctor's note to Principal Cooper's office indicating that she had a "medical" illness and would need to be out of work from March 31, 2015 through May 4, 2015. (Dkt. Nos. 56-5, p. 71; 64-15, p. 2). Plaintiff testified that she needed medical leave because of the recent work-related "emotional triggers" and "stress" that could exacerbate the symptoms of her disabilities. (Dkt. No. 56-5, pp. 69, 72).

According to Mr. Pettitt, BOCES administrators made the decision to terminate Plaintiff's employment during a meeting on the morning of March 30, 2015, and the meeting "was finished and the decision was made before Plaintiff presented to [ ] BOCES any doctor's note requesting time off for medical reasons, which occurred after lunch." (Dkt. No. 56-24, ¶ 3). Mr. Pettitt was responsible for setting up a personnel meeting between Plaintiff and administrators, which he had not done before Plaintiff delivered her notice for medical leave. (Dkt. No. 65-2, ¶¶ 2, 5). According to Mr. Pettitt, once

the administrators decided to terminate Plaintiff, he "had no authority to refrain from terminating Plaintiff, regardless of whether she requested medical leave of finite or indefinite duration." (*Id.*, ¶ 8).

On March 31, 2015, Mr. Pettitt called Plaintiff and asked her to attend a personnel meeting on April 1, 2015, where he intended to offer Plaintiff an opportunity to respond to the allegations and to resign in lieu of termination if she preferred. (Dkt. No. 56-24, ¶ 5). According to Mr. Pettitt, Plaintiff asked him to arrange for union representation to be present at the meeting. (*Id.*, ¶ 6; *see also* Dkt. No. 56-5, p. 74).

Plaintiff testified that, after speaking with Mr. Pettitt, she "reached out to the union," who "advised [her] that [she] didn't need to attend the meeting if [she] was on leave." (Dkt. No. 56-5, pp. 73–74). She also contacted her doctor, who told her that she was approved to be out of work, including for "work-related meetings." (*Id.*, p. 75).

**\*4** At 8:30 a.m. on April 1, 2015, Plaintiff e-mailed Mr. Pettitt informing him that she was unable to attend "work or work related meetings." (Dkt. No. 56-12). She informed Mr. Pettitt that her doctor would be sending a follow-up note clarifying her work limitations. (*Id.*). Plaintiff's doctor then faxed a new note to BOCES stating that he had "taken Ms. Gray out of work pending further evaluation," and adding, "I do not want her attending any disciplinary meetings." (Dkt. No. 56-14). Plaintiff did not attend the meeting. (Dkt. No. 56-5, p. 79).

### E. Plaintiff's Termination

On April 2, 2015, District Superintendent Jody Manning sent Plaintiff a letter stating that her employment at BOCES was "terminated effective Wednesday, April 1, 2015." (Dkt. No. 64-9, p. 2). The termination letter further states that "we attempted to review the reasons for this action with you at a meeting that had been scheduled for April 1. You declined to attend this meeting due to medical reasons." (*Id.*).

BOCES had already terminated the classroom teacher, Ms. Tianello, on March 27, 2015 for her own involvement in the inappropriate texting with Plaintiff during school hours. (Dkt. Nos. 56-22, ¶ 20; 56-5, p. 81; 64-3, p. 14).

### F. NYSDHR Determination

On June 30, 2015, Plaintiff filed a complaint against Defendant with the New York State Division of Human

Case 6:21-cv-01207-TWD Document 86 Filed 10/25/24 Page 286 of 321

Gray v. Onondaga-Cortland-Madison BOCES, Not Reported in Fed. Supp. (2020)

2020 WL 1029022, 2020 A.D. Cases 78,670

Rights ("NYSDHR") claiming that she was subjected to unlawful discriminatory practices because of her disability, sex, and her opposition to discrimination and retaliation in the workplace. (Dkt. Nos. 64-3, pp. 1–2). On December 5, 2015, a NYSDHR evaluator issued a determination finding that there was "probable cause to support the allegations of the complaint." (*Id.*, p. 6). Plaintiff then commenced this action.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to " 'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim") (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. DISCUSSION

**\*5** Following the Court's order on Defendant's motion for judgment on the pleadings, (Dkt. No. 21), the parties agree that Plaintiff has four remaining claims: (1) disability discrimination; (2) failure to accommodate her disability; (3) retaliation for taking disability-related medical leave; and (4) retaliation for her complaints of sexual harassment. (Dkt. Nos. 56-26, pp. 9–10; 64, p. 4). The first three fall under the ADA, the fourth under Title VII.

In moving for summary judgment, Defendant argues that: (1) Plaintiff cannot make out a prima facie case of disability discrimination or retaliation under the ADA, or retaliation under Title VII; (2) even if she did, Defendant has advanced a legitimate, non-discriminatory and non-retaliatory reason for Plaintiff's termination; and (3) Defendant did not fail to accommodate Plaintiff because she never sought any accommodations due to her disability. (*See generally* Dkt. No. 56-26). The Court will assess each claim in turn.

### A. ADA Discrimination

Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In general, a plaintiff can allege disability discrimination under one of three theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation. *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

Claims alleging intentional discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas*

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 287 of 321

Gray v. Onondaga-Cortland-Madison BOCES, Not Reported in Fed. Supp. (2020)

2020 WL 1029022, 2020 A.D. Cases 78,670

*Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). First, Plaintiff must establish a prima facie case of discrimination under the ADA. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). Second, if an employee establishes a prima facie case, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and [third] the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.*

### 1. Prima Facie Case

Defendant argues that Plaintiff cannot establish a prima facie case because she has offered no evidence to raise an inference of discriminatory intent. (Dkt. No. 56-26, pp. 15–16). In support of this argument, Defendant notes that: (1) it had notice of Plaintiff's Hashimoto's disease since the summer of 2013; (2) it had previously allowed Plaintiff medical leave for her disability; (3) BOCES "believed in good faith that Plaintiff had engaged in substantial misconduct justifying her termination"; and (4) Plaintiff was treated the same as a non-disabled employee, who was discharged at approximately the same time for less misconduct. (*Id.*).

In response, Plaintiff contends that she has established a "strong inference of a causal connection between her disability, and related medical leave ..., and [her] termination that Defendant issued a short time later." (Dkt. No. 64, p. 12). Specifically, she claims that she informed BOCES of her disability on February 27, 2015, and then was "terminated very shortly after Defendant learned her doctor had taken her out, showing temporal proximity ... and a causal nexus between her need for time off (a reasonable accommodation) and her termination." (*Id.*).

**\*6** In order to establish a prima facie case of intentional discrimination under the ADA, a plaintiff must show that: (1) the defendant is subject to the ADA; (2) plaintiff suffers from a disability within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability. *McMillan*, 711 F.3d at 125 (citing *Sista*, 445 F.3d at 169). Plaintiff's burden at the prima facie stage is *de minimis*. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

There is no dispute as to the first three elements: that BOCES is subject to the ADA, that Plaintiff suffers from Hashimoto's disease—a disability within the meaning of the ADA, and that Plaintiff was generally capable of performing essential functions of the job. (Dkt. Nos. 56-26, pp. 15–16; 64, pp. 11–13). Therefore, the only remaining question as to the prima facie case is whether Plaintiff suffered an adverse employment action because of her disability.

To make this connection, a plaintiff must demonstrate that she "suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015) (citation omitted). A plaintiff can establish an inference of discrimination in various ways, such as direct proof of "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). Without any direct proof, the "timing or sequence of events leading to the plaintiff's termination" can be a circumstance that gives rise to an inference of discrimination. *Id.*

Here, Plaintiff relies on evidence of temporal proximity. She has shown that she presented a doctor's note to BOCES on March 30, 2015, which called for a month-long medical leave. (Dkt. No. 56-13). It is undisputed that BOCES terminated Plaintiff's employment just two days after she submitted notice of medical leave. (Dkt. No. 56-15). Defendant argues that the decision to terminate Plaintiff's employment was made before she submitted the doctor's note. (Dkt. No. 56-26, p. 16). However, given the *de minimis* burden at the prima facie stage, Plaintiff's evidence of temporal proximity is enough to permit an inference of discriminatory intent. *See, e.g.*, *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 251 (D. Conn. 2019) (finding that the plaintiff's termination less than two weeks after a medical emergency was sufficient to establish a prima facie case of discrimination); *Trent v. Town of Brookhaven*, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) (holding that "temporal proximity may be sufficient to show a prima facie case") (collecting cases); *Pellegrino v. Cnty. of Orange*, 313 F. Supp. 2d 303, 315 (S.D.N.Y. 2004) (finding that temporal proximity between the plaintiff's announcement of her pregnancy and the process of her termination was sufficient to establish a prima facie case of employment discrimination).

### 2. Legitimate, Non-Discriminatory Reason

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 288 of 321

Gray v. Onondaga-Cortland-Madison BOCES, Not Reported in Fed. Supp. (2020)

2020 WL 1029022, 2020 A.D. Cases 78,670

Since Plaintiff has established a prima facie case of disability discrimination with respect to Defendant's decision to terminate her employment, the burden now shifts to Defendant to demonstrate a legitimate, non-discriminatory reason for the adverse action. *United States v. Brennan,* 650 F.3d 65, 93 (2d Cir. 2011). Defendant points to evidence that the decision was based on legitimate, non-discriminatory reasons, including: (1) Plaintiff's exchange of text messages with the classroom teacher throughout the school day, including messages that criticized and mocked the classroom social worker and students in the class (Dkt. Nos. 56-11; 56-22, ¶¶ 16–17); (2) corroborated reports from the classroom social workers that Plaintiff had not maintained appropriate boundaries with students (Dkt. Nos. 56-17; 56-18); and (3) failure to comply with Assistant Director Koch's directives not to return to the classroom in an upset and emotional state (Dkt. No. 56-22, ¶¶ 10, 12–15). This evidence supports Defendant's contention that Plaintiff was terminated for misconduct and acting unprofessionally in the classroom—a legitimate, non-discriminatory reason for termination. Therefore, Defendant has satisfied its burden at the second step, and the burden now shifts back to Plaintiff to show that these reasons were pretextual and that disability discrimination was the but-for cause of her termination.

### 3. Pretext & Causation

**\*7** A plaintiff's burden at the third step of the *McDonnell Douglas* analysis is to "show that the [defendant's] proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Sista,* 445 F.3d at 173 (citation omitted). Generally, to demonstrate pretext, "plaintiff[s] may rely on evidence comprising [their] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 847 (2d Cir. 2013). In addition, to survive summary judgment the plaintiff must show a genuine issue of fact that her disability was the *but-for* cause of the adverse action. *See Natofsky v. City of New York,* 921 F.3d 337, 348 (2d Cir. 2019) ("the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action").

Here, Plaintiff argues that the "temporal proximity between Plaintiff's submission to Defendant of her Doctor's note and her subsequent termination from employment [is] such that a nexus between her medical leave and her termination has been shown." (Dkt. No. 64, p. 10). She further claims that "the absence of any prior concerns or discipline as against Plaintiff speaks volumes," and adds that "[i]t is telling that the Defendant did not seek [to] discipline Plaintiff for her alleged transgression that it now claims led to her termination prior to finding out about her need for a medical leave prescribed by her doctor." (*Id.*). Plaintiff also suggests that Defendant's unlawful motive is demonstrated by Principal Cooper's alleged questioning about whether Plaintiff was suffering from Hashimoto's Disease and "whether [she] was being honest about a medical appointment" on February 27, 2015." (*Id.,* p. 15).

In response, Defendant asserts that its decision to terminate Plaintiff was made prior to her leave request, and furthermore, that Plaintiff may not rely solely on temporal proximity between her leave and her termination to establish pretext. (Dkt. No. 65-4, pp. 6–9). Defendant contends that since it has "offered significant and, indeed, not-validly-disputed evidence that Plaintiff engaged in substantial misconduct prompting her termination, Plaintiff's reliance on temporal proximity is inadequate to withstand summary judgment." (*Id.,* p. 9).

After careful review of the record, the Court finds that Plaintiff has failed to meet her burden at the third stage of the analysis. Although the temporal proximity between Plaintiff's doctor's note and termination provides an inference of potential discrimination, it is not enough on its own to overcome Defendant's well-documented non-discriminatory reasons for the decision in this case. *See El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 932–33 (2d Cir. 2010) (stating that "temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext"); *see also Trent v. Town of Brookhaven,* 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) ("Temporal proximity may be sufficient to show a prima facie case, but it is insufficient to demonstrate pretext.").

As evidence of causation, the close temporal proximity is also undermined and all but negated by the undisputed evidence that BOCES administrators started the investigation into Plaintiff's alleged inappropriate and unprofessional conduct *before* she submitted notice of her medical leave. (Dkt. No. 56-22, ¶¶ 4–20). BOCES administrators testified that

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 289 of 321

Gray v. Onondaga-Cortland-Madison BOCES, Not Reported in Fed. Supp. (2020)
2020 WL 1029022, 2020 A.D. Cases 78,670

the investigation began on March 27th and the decision to terminate Plaintiff's employment was made on the morning of March 30th, which was *before* she submitted notice of medical leave. (*Id.*, ¶¶ 4–27; Dkt. No. 56-24, ¶¶ 2–4). Mr. Pettitt, who was responsible for scheduling a meeting for administrators to notify Plaintiff of her termination, had not yet reached out to Plaintiff to set up that meeting when she delivered the doctor's note. (Dkt. No. 65-2, ¶ 5). Plaintiff has offered no evidence to rebut Defendant's timeline of events. And contrary to Plaintiff's claims, the fact that Defendant investigated the allegations of misconduct against her does not permit an inference of a discriminatory motive.[3]

[3]    Indeed, Defendant would have a duty to investigate allegations of misconduct by any of its employees. Plaintiff's claim about Principal Cooper's supposed "skepticism" about Plaintiff's disability and February 27th medical appointment is also unavailing. Plaintiff's deposition testimony shows that Principal Cooper did not express doubt about whether Plaintiff had a disability, but rather she questioned whether Plaintiff had an appointment on that specific day. (Dkt. No. 56-5, p. 67). Plaintiff admitted that she did not inform BOCES of the appointment until the morning of, and even then, she informed BOCES about the appointment 48 minutes after the school day began. (*Id.*, p. 21). Plaintiff was neither disciplined nor terminated for her medical absence that day. (*Id.*, p. 22). Principal Cooper denies that she ever expressed doubt about Plaintiff's Hashimoto's disease. (Dkt. Nos. 56-22, ¶ 11; 56-20, ¶ 2). Accordingly, Plaintiff's claim that Principal Cooper questioned whether Plaintiff had a disability is belied by her own testimony and the undisputed facts, and therefore, does not provide any evidence of a discriminatory motive.

**\*8** Aside from temporal proximity, Plaintiff has not presented any evidence to connect her disability to the decision to terminate her employment. To the contrary, the record shows that BOCES was aware of Plaintiff's Hashimoto's disease as early as 2013 (Dkt. Nos. 56-25, ¶ 13; 64-19, ¶ 13; 56-5, p. 17), and she had previously taken medical leave for her disability without objection or consequence, (Dkt. No. 56-5, pp. 18–19). It is also notable that Plaintiff received the exact *same* treatment as Ms. Tianello (the classroom teacher), who engaged in inappropriate texting throughout the workday. Importantly,

Ms. Tianello, who does not suffer from a disability, was terminated as part of the same investigation and at approximately the same time as Plaintiff. (*See* Dkt. No. 56-22, ¶¶ 17–20; Dkt. No. 64-3, p. 14). Thus, there is no evidence that Plaintiff was treated differently than co-workers that did not have disabilities, and any possible causal connection between Plaintiff's disability and her termination is refuted by the fact that Ms. Tianello received the same treatment. *See Mancini*, 411 F. Supp. 3d at 255 (granting summary judgment on discrimination claim where the plaintiff failed to "point to any evidence that she was treated differently from other similarly situated, non-disabled persons"); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 575 (S.D.N.Y. 2010) (granting summary judgment on discrimination claim where, *inter alia*, the plaintiff provided "no evidence that any other employees who were consistently cited for ongoing issues of poor performance did not suffer the same treatment as that directed towards him"); *see also Lopez v. Hollisco Owners' Corp.*, 147 F. Supp. 3d 71, 78–79 (E.D.N.Y. 2015) (finding the plaintiff could not show pretext where, *inter alia*, there was "no evidence that any other employee would be, or was, treated differently"), *aff'd*, 669 F. App'x 590 (2d Cir. 2016).

In sum, Plaintiff has failed to adduce evidence that reasonably supports a finding of discriminatory intent based on her disability. Defendant's explanation that Plaintiff was terminated because of her misconduct is consistent throughout the record and supported by sworn statements from numerous BOCES employees. (*See generally* Dkt. Nos. 56-20; 56-22; 56-23; 56-24). Plaintiff has failed to counter this explanation, particularly since the record demonstrates that the decision to terminate her employment was made before her doctor's note, and Ms. Tianello was terminated for the same misconduct. Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Defendant's reasons were pretextual and that Plaintiff's disability was the but-for cause of her termination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA discrimination claim. *See El Sayed*, 627 F.3d at 932–33 (affirming the dismissal of the plaintiff's discrimination claim where "[the plaintiff] produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual"); *see also Graham v. Three Village C. Sch. Dist.*, No. 11-CV-5182, 2013 WL 5445736, at \*26, 2013 U.S. Dist. LEXIS 143264, at \*87 (E.D.N.Y. Sept. 30, 2013) (granting summary judgment on discriminatory discharge claim where the plaintiff "point[ed] to nothing in the record from which

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 290 of 321

Gray v. Onondaga-Cortland-Madison BOCES, Not Reported in Fed. Supp. (2020)

2020 WL 1029022, 2020 A.D. Cases 78,670

a rational jury could find her termination was 'because of' her hip impairment, or that the District's underlying motive to terminate her was attributable to a discriminatory intent, and not to her job performance," and there was "uncontroverted evidence that plaintiff was not the only employee who was denied tenure at the conclusion of her probationary period").

### B. ADA Failure to Accommodate

Plaintiff alleges that she was denied access to requested lunch breaks "as an accommodation for her qualified disability so as to attend to the symptoms of her Hashimoto's disease." (Dkt. No. 1, ¶ 18). Plaintiff also claims that Defendant denied her disability-related accommodations by terminating her employment rather than permitting her to take the medical leave directed by her doctor. (Dkt. No. 64, p. 16).

Defendant argues that Plaintiff's failure to accommodate claims "fail because she did not indicate she needed lunch breaks due to disability, she did not seek leave because of disability and the leave would not allow her to perform her job." (Dkt. No. 56-26, pp. 18–22). Defendant also asserts that Plaintiff's misconduct and termination "had nothing to do with her alleged disability or disabilities." (*Id.*, pp. 19–22).

**\*9** In response, Plaintiff claims that her accommodation requests for lunch breaks and medical leave were "reasonable" and necessary due to "ongoing stresses at work which were worsening [her] symptoms." (Dkt. No. 64, p. 15). Plaintiff further argues that, rather than working with her to establish acceptable accommodations, "Defendant terminated [her] pre-textually [sic] for 'performance issues', when that in fact [sic], Defendant fired Plaintiff to avoid paying her while she was out on leave." (*Id.*, p. 16).

Under the ADA, employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie failure to accommodate claim, a plaintiff must demonstrate that: (1) [the] plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his [or her] disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan*, 711 F.3d at 125–26. Here, the parties only dispute the last element. (*See* Dkt. Nos. 56-26, pp. 18–22; 64, pp. 13–16).

An accommodation request "contemplate[s] an ongoing, informal, and interactive process that 'should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.' " *Quadir v. New York State Dep't of Labor*, 39 F. Supp. 3d 528, 539–40 (S.D.N.Y. 2014) (quoting 29 C.F.R. § 1630.2). "[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Gingold v. Bon Secours Charity Health Sys.*, 768 F. Supp. 2d 537, 543 (S.D.N.Y. 2011) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006)). While a formal written request is not required, the request "must be sufficiently direct and specific to give the employer notice of the needed accommodation." *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 18–19 (2d Cir. 2015) (citation omitted). In other words, an employer cannot be said to have refused an accommodation if no request was ever made. *Id.* So, "[w]hat matters ... are not formalisms about the manner of the request, but whether the [requestor or his representative] provides the [requestee] with enough information that, under the circumstances, the [requestee] can be fairly said to know of both the disability and desire for an accommodation." *Quandir*, 39 F. Supp. 3d at 540 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).

Here, with regard to the requested lunch breaks, Plaintiff has failed to adduce evidence that she ever informed her supervisors that those requests were related to her disability and necessary for her to perform her job. (*See* Dkt. No. 64, pp. 13–16). Indeed, Plaintiff does not identify when or to whom she directed her requests. (*Id.*). [4] Principal Cooper testified that she did not remember Plaintiff ever asking for breaks or lunch breaks. (Dkt. No. 56-6, p. 7). Moreover, Plaintiff testified that the only disability-related accommodations she needs for Hashimoto's disease is help with physical aspects of the job, including restraining and lifting aggressive or violent students. (Dkt. No. 56-5, p. 14). Plaintiff has not claimed that Defendant ever denied any accommodation related to the physical aspects of her work at BOCES.

[4]     Plaintiff offers no evidence whatsoever that she informed BOCES that the requested breaks were necessary to accommodate her disability. (*See* Dkt. No. 64-2, ¶¶ 16–18). Further, Defendant inquired about Plaintiff's alleged request for breaks in an interrogatory, but Plaintiff failed to provide any

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 291 of 321

Gray v. Onondaga-Cortland-Madison BOCES, Not Reported in Fed. Supp. (2020)

2020 WL 1029022, 2020 A.D. Cases 78,670

details as to when and to whom the breaks were allegedly requested. (Dkt. No. 56-4, pp. 5–6).

**\*10**  In sum, even if Plaintiff did request breaks and Defendant denied them, there is no evidence that BOCES knew or should have known that the request was necessary to accommodate Plaintiff's disability. Thus, Plaintiff has failed to establish a prima facie case as to the alleged break accommodations. *See Blundell v. Nihon Kohden America, No. 15-CV-1503, 2018 WL 4609125, at \*10–12, 2018 U.S. Dist. LEXIS 163948, at \*26–32 (N.D.N.Y. Sept. 25, 2018)* (dismissing the plaintiff's accommodation claims where he failed to present evidence that "he ever actually made a request for these accommodations based on his disability to the appropriate people").

Plaintiff has also failed to make a prima facie showing that she was wrongfully denied an accommodation with respect to medical leave. (*See* Dkt. No. 64, pp. 13–16). Notably, the March 30th note from Plaintiff's doctor vaguely describes the "nature of the illness/injury" as "medical," without any further explanation or reference to her disability. (Dkt. No. 56-13). There is no evidence whatsoever that Plaintiff ever told anyone at BOCES that the medical leave was disability-related or a necessary accommodation, either before or any time after she submitted the notice. Further, there is no evidence that she was denied the medical leave; rather the record shows that Plaintiff submitted notice of her medical leave *after* the process for the termination of her employment had already begun. As discussed above, Plaintiff's termination was supported by well-documented evidence that she engaged in workplace misconduct and insubordination. She has not pointed to any authority that BOCES was required to grant her medical leave while in the process of terminating her employment for these reasons.

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff was denied an accommodation for her disability based on her vague request for medical leave while BOCES was in the process of terminating her employment. *See Kho v. New York and Presbyterian Hosp.*, 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018) (finding that the plaintiff failed to establish a prima facie case where there was no evidence that she ever requested an accommodation for her disability); *Clark v. New York State Elec. & Gas Corp.*, 67 F. Supp. 2d 63, 73–75 (N.D.N.Y. 1999) (granting summary judgment on the plaintiff's accommodation claims where she failed to show that her termination for her poor work performance was not a legitimate reason for her firing). Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim.

## C. ADA Retaliation

Plaintiff also appears to allege a retaliation claim under the ADA, with her doctor's note being the protected activity. (*See* Dkt. Nos. 1, ¶ 9; 64, pp. 11–13). Defendant argues that "Plaintiff cannot make out a prima facie claim of retaliation under the ADA because the decision to terminate was made before her first doctor's note." (Dkt. No. 56-26, p. 16). In response, Plaintiff asserts that she can establish a prima facie case because she was "terminated shortly after Defendant learned her doctor had taken her out," and "Defendant fired Plaintiff to avoid paying her while she was out on leave." (Dkt. No. 64, pp. 12–13).

Retaliation claims brought under the ADA are examined under the three-step *McDonnell Douglas* burden-shifting framework. *Treglia*, 313 F.3d at 719. At the first step, Plaintiff must establish a prima facie case, which requires her to show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Wright v. City of Syracuse*, 611 F. App'x 8, 11 (2d Cir. 2015). Again, the prima facie showing is *de minimis*. *Treglia*, 313 F.3d at 719. "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Id.* at 721. "If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.' " *Id.* (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)).

**\*11**  The first two steps are met for the reasons discussed above. In short, the close temporal proximity between Plaintiff's notice of medical leave and termination is sufficient to make out a prima facie case of retaliation. Defendant's proffered reason for terminating Plaintiff's employment, namely her alleged workplace misconduct and insubordination, is well-documented, legitimate, and non-retaliatory.

Plaintiff's retaliation claim fails at step three of the analysis, for the same reasons discussed above. In particular, the record shows that the decision was made to terminate Plaintiff's employment before her protected activity, and her co-worker Ms. Tianello was also terminated for misconduct, and without

2020 WL 1029022, 2020 A.D. Cases 78,670

any evidence that she engaged in protected activity. (*See* Dkt. Nos. 56-22, ¶¶ 4, 16, 20–25; 64-15, p. 2; 56-24, ¶¶ 2–4; 56-20; 56-22; 56-23).

In sum, Plaintiff has presented no evidence, aside from temporal proximity, to draw a connection between her notice of medical leave and Defendant's decision to terminate her employment. This alone is not enough to rebut Defendant's well-documented reasons for the decision to terminate her employment, particularly given the attenuating evidence noted above. Viewing the evidence in the light most favorable to Plaintiff, a jury could not reasonably find that Defendant's stated reasons for the adverse action were a pretext for unlawful retaliation. Accordingly, Defendant is entitled to summary judgment on Plaintiff's ADA retaliation claim. *See Widomski v. State Univ. of New* York, 933 F. Supp. 2d 534, 553 (S.D.N.Y. 2013) (dismissing the plaintiff's ADA retaliation claim where her claim relied solely on temporal proximity and the plaintiff otherwise failed to rebut the defendant's legitimate, non-discriminatory justification for the plaintiff's termination).

### D. Title VII Retaliation

Finally, Plaintiff alleges that Defendant unlawfully retaliated against her for reporting alleged sexual harassment that she experienced in the classroom. (Dkt. No. 1, ¶¶ 11, 30). Defendant argues that Plaintiff cannot make out a prima facie Title VII retaliation claim because she cannot show any causal connection between her complaints and the termination of her employment. (Dkt. No. 56-26, p. 17). Defendant points out that Assistant Director Koch and Principal Cooper told Plaintiff that she should not be subjected to the comments of the two minor students," and then "move[d] her to a new classroom for her own protection – an action that contemplated her remaining in employment." (*Id.*). Defendant adds that, "[o]ther than temporal proximity, Plaintiff advances no other evidence to show Defendant's rationale for her termination was a pretext for retaliation based on her complaints of purported sexual harassment." (Dkt. No. 65-4, pp. 9–10).

Title VII prohibits discriminatory retaliation against an employee who complains of a purportedly unlawful practice. 42 U.S.C. § 2000e–3. Like Plaintiff's ADA retaliation claim, her Title VII retaliation claim is also subject to the *McDonnell Douglas* burden-shifting analysis. *See Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015). To make out a prima facie case, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of this

activity; (3) the employer took adverse action against her; and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive was the but-for cause of the adverse employment action. *Sista*, 445 F.3d at 177; *see also Miller, v. City of Ithaca, New York*, 758 F. App'x 101, 104 (2d Cir. 2018).

**\*12** Here, Plaintiff has satisfied her *de minimis* burden to demonstrate a prima facie case. Specifically, Plaintiff has established that she reported the sexual comments she received from students to BOCES administrators on March 27, 2015, and Defendant terminated her employment four days later. As explained above, this evidence of close temporal proximity is sufficient to infer causation at the prima facie stage. *See St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 329–31 (E.D.N.Y. 2014) (finding that the plaintiff satisfied her burden to make out a prima facie case for Title VII retaliation by showing temporal proximity between her allegations of sexual harassment and her termination).

At step two, Defendant has adduced evidence that it had legitimate, non-retaliatory reasons for terminating Plaintiff's employment based on misconduct and insubordination. (*See generally* Dkt. No. 56-22). As discussed above, this evidence is sufficient to demonstrate legitimate, non-retaliatory reasons for Plaintiff's termination.

At step three, with the burden shifted back to Plaintiff, she has failed to bridge any connection between her complaints and the termination of her employment. Once again, Plaintiff mainly relies on evidence of temporal proximity, adding conclusory speculation that BOCES did not want to pay her while she was out on medical leave. (Dkt. No. 64, pp. 8–11). As discussed above, temporal proximity alone is not enough at this stage. Plaintiff also argues that her lack of disciplinary history is evidence of retaliatory motive. (*See* Dkt. No. 64, p. 10). However, the lack of any previous disciplinary history does not refute the well-documented evidence of her misconduct and insubordination cited for her termination.

Further, any inference of retaliatory intent is undermined by the record as whole. The undisputed evidence shows that immediately after learning of the students' alleged misconduct, Assistant Director Koch interviewed staff and students with knowledge of what was going on. (Dkt. No. 56-22, ¶¶ 4–6, 16–24). BOCES administrators informed Plaintiff that the students' conduct was inappropriate and should have been reported directly to them. (Dkt. No. 56-22, ¶ 6). They then offered to reassign Plaintiff to a new

2020 WL 1029022, 2020 A.D. Cases 78,670

classroom, "for her own protection from any inappropriate comments." (*Id.*). According to Assistant Director Koch, Plaintiff resisted their decision to reassign her to a new classroom. (*Id.*, ¶¶ 7, 10). The investigation later revealed that Plaintiff and the classroom teacher had been text messaging throughout the school day, including inappropriate and unprofessional discussion about other classroom staff and students. (*See generally* Dkt. No. 56-11). According to Defendant, it was the culmination of events during the investigation and the administrators' conclusions after the investigation that led to their decision to terminate Plaintiff's employment, not because she reported complaints to them. (Dkt. Nos. 56-22, ¶ 24; 56-24, ¶¶ 2–4). And as discussed above, Plaintiff's co-worker Ms. Tianello was also terminated for mostly the same conduct.

In sum, viewing the facts in the light most favorable to Plaintiff, a jury could not reasonably find that Defendant's stated reasons were pretextual and that unlawful retaliation was the but-for cause of her termination. *See Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272–74 (E.D.N.Y. 2019) (dismissing the plaintiff's Title VII retaliation claim where she failed to present sufficient evidence of causation, other than temporal proximity and speculation, to rebut the defendant's legitimate reason for the alleged adverse action); *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 249–52 (N.D.N.Y. 2010) (same). Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim under Title VII.

## V. CONCLUSION

**\*13** For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 56) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and finally, it is

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2020 WL 1029022, 2020 A.D. Cases 78,670

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 5028621
United States District Court, S.D. New York.

Jamie MARTIN and Daneisha Singleton, on behalf
of themselves and all others similarly situated, and
the Proposed New York Rule 23 Class, Plaintiffs,
v.
SPRINT UNITED MANAGEMENT CO., Credico
(USA), LLC, and Wallace Morgan, Inc., Defendants.

15 Civ. 5237 (PAE)
|
Signed 10/31/2017

**Attorneys and Law Firms**

Anna Purna Prakash, Brittany Bachman Skemp, Rachhana
T. Srey, Nichols Kasters, L.L.P., Minneapolis, MN, Frank
Joseph Mazzaferro, Brian Scott Schaffer, Joseph A. Fitapelli,
Fitapelli & Schaffer LLP, New York, NY, for Plaintiffs.

Nickey Huntley, pro se

William Fuger Cusack, III, Wilson Elser Moskowitz Edelman
& Dicker LLP, Florham Park, NJ, Joseph Ferdinand
Tremiti, Tremiti LLC, Valerie Lorraine Hooker, Venturini
& Associates, Elise Michelle Bloom, Patrick Kramer Rice,
Rachel S. Philion, Proskauer Rose LLP, Gabrielle Frances
Levin, Jennifer H. Rearden, Gibson, Dunn & Crutcher,
LLP, New York, NY, Mark W. Batten, Proskauer Rose
LLP, Boston, MA, Nicole A. Eichberger, Proskauer Rose
LLP, New Orleans, LA, Greta Bradlee Williams, Jason C.
Schwartz, Ryan Carlton Stewart, Gibson, Dunn & Crutcher,
LLP, Washington, DC, Theodore J. Boutrous, Jr., Gibson,
Dunn & Crutcher, LLP, Los Angeles, CA, for Defendants.

OPINION & ORDER

Paul A. Engelmayer, United States District Judge

**\*1** Plaintiffs Jamie Martin and Daneisha Singleton brought
this action on behalf of themselves and similarly situated
persons, alleging violations of the Fair Labor Standards
Act, 29 U.S.C. § 201, *et. seq.* ("FLSA"), and the New
York Labor Law, N.Y. Lab. Law § 650, *et. seq.* ("NYLL").
Plaintiffs served as field agents securing low-income
customers to acquire wireless telephones of defendant Sprint/
United Management Company ("Sprint") pursuant to a

federal subsidy program. They claimed primarily that they
were misclassified as independent contractors rather than
employees and that, as a result, they were denied statutorily
required minimum wage and overtime compensation. They
sought to hold Sprint and co-defendants Credico (USA), LLC
("Credico") and Wallace Morgan, Inc. ("Wallace Morgan")
jointly responsible for this willful misclassification.

On September 27, 2017, this Court issued an opinion and
order summary judgment in favor of defendants
and denying partial summary judgment to plaintiffs. *See
Martin v. Sprint United Mgmt. Co.*, 15 Civ. 5237 (PAE), 2017
WL 4326109 (S.D.N.Y. Sept. 27, 2017). Without deciding
whether plaintiffs were properly classified as employees
or independent contractors, the Court held that (1) Sprint
and Credico were not plaintiffs' joint employers, and (2)
plaintiffs fell within the outside sales exemptions to the
FLSA and NYLL. *See id.* That ruling precluded liability
altogether for Sprint and Credico, and precluded liability for
Wallace Morgan on all claims against it save two: plaintiffs'
wage-notice claims under NYLL sections 195(1)(a) and
(3). Because the parties' briefing at summary judgment did
not directly address those claims, the Court commissioned
letter memoranda from plaintiffs and Wallace Morgan as
to (1) whether an employer is bound to comply with the
NYLL wage-notice provisions where New York's outside
sales exemption applies, and (2), if so, how the Court ought
to proceed with respect to these claims. *See Martin,* 2017 WL
4326109, at \*34.

The Court is now in receipt of those submissions. For
the reasons that follow, the Court declines to exercise
supplemental jurisdiction over these pendent state-law
claims.

**I. Background**

The Court assumes the parties' familiarity with the facts and
procedural history of this case, as set forth in the Court's
summary judgment opinion. *See Martin,* 2017 WL 4326109,
at \*2-11. The Court nevertheless briefly recites certain facts
relevant to the issue at hand. [1]

---

[1]    The Court draws this account from the parties'
       submissions in support of and in opposition to
       the motions for summary judgment, including:
       plaintiffs' Local Rule 56.1 statement, Dkt. 265 ("Pl.
       56.1"); the declaration of Rachhana Srey in support
       of plaintiffs' motion for partial summary judgment,

Martin v. Sprint United Management Co., Not Reported in Fed. Supp. (2017)

2017 WL 5028621, 2017 Wage & Hour Cas.2d (BNA) 390,464

Dkt. 266 ("First Srey Decl."); Wallace Morgan's Local Rule 56.1 statement, Dkt. 293 ("Wallace Morgan 56.1"); and the parties' joint statement of undisputed facts, Dkt. 259 ("JSF").

Plaintiffs worked as field agents for Wallace Morgan on Sprint's Assurance Wireless campaign. JSF ¶ 52. Martin worked for Wallace Morgan from approximately March 29, 2015 through May 7, 2015. *Id.* ¶ 2. Singleton worked for Wallace Morgan from approximately April 3, 2015 through May 7, 2015. *Id.* ¶ 4. Each signed an "Independent Sales Representative Agreement," and each was paid by Wallace Morgan as an independent contractor. *Id.* ¶¶ 49-50, 56.

**\*2** Upon hire, field agents completed "Agent Acknowledgment Forms" listing their "Outreach Agency," "Agent Name," "Agent Code," "Agent Start Date," and the geographical areas in which they would work. Pl. 56.1 ¶¶ 206, 208. In connection with the Assurance Wireless campaign, Credico used a database system it referred to as "ARC." Wallace Morgan 56.1 ¶ 75. That system generated "Office Payment Summaries" containing each field agent's badge number, name, and commissions, with the latter listing "full pay," "advance," "remain," "recover," and "total" amounts. *Id.* ¶ 83. Further, ARC generated "Agent Commission Statements" for each agent containing the agent's name, the agent's total compensation, the current sales week, and the pay date, as well as entries for the following categories: "Client ID," "Signed Date," "Customer Name," "Client Status/Reason," "Product," "Pay Action," "Amount," and "Total For [Field Agent]." *Id.* ¶¶ 85-87. Wallace Morgan also maintained payroll records, Pl. 56.1 ¶ 83, which included the following information: "Company," "Check Date," "Name," "Hours," "Total Paid," "Tax Withheld," "Deductions," "Net Pay," "Check No," "Employer Liability," "Total Expense," "Pay Frequency," "Department," "Total Net Pays," "Pay Frequency Totals," and "Company Totals." First Srey Decl., Exs. 30, 31.

The parties' statements of undisputed fact otherwise lack information related to whether plaintiffs received wage notices at hiring and/or regular pay statements.

## II. Applicable Legal Standards

### A. Supplemental Jurisdiction

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, "such jurisdiction is discretionary," *Vuona v. Merrill Lynch & Co.,* 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (citing *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173 (1997)), and "a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.' " *Id.* (quoting 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Sefovic v. Mem'l Sloan Kettering Cancer Ctr.,* No. 15 Civ. 5792 (PAC), 2017 WL 3668845, at \*8 (S.D.N.Y. Aug. 23, 2017) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988)); *see also Marcus v. AT&T Corp.,* 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

### B. NYLL Wage-Notice Provisions

NYLL section 195(1)(a) requires "[e]very employer" to provide his or her employees, "in writing ... at the time of hiring," a notice containing the following information:

> [T]he rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

Case 6:21-cv-01207-TWD Document 86 Filed 10/25/24 Page 296 of 321

Martin v. Sprint United Management Co., Not Reported in Fed. Supp. (2017)

2017 WL 5028621, 2017 Wage & Hour Cas.2d (BNA) 390,464

NYLL § 195(1)(a). The employer must then "obtain from the employee a signed and dated written acknowledgement ... of receipt of this notice." *Id.* "For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the notice must state the regular hourly rate and overtime rate of pay." *Id.*

NYLL section 195(3) requires every employer to "furnish each employee with a statement with every payment of wages" listing the following:

> [T]he dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages.

**\*3** NYLL § 195(3). "For all employees who are not exempt from overtime compensation as established in the commissioner's minimum wage orders or otherwise provided by New York state law or regulation, the statement shall include the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked." *Id.*

NYLL section 198 offers affirmative defenses to employers who fail to provide the notice or statements required under section 195. Section 198(1-b) provides:

> In any action ... to recover damages for violation of [section 195(1)(a) ] it shall be an affirmative defense that (i) the employer made complete and timely payment of all wages due pursuant to this article or article nineteen or article nineteen-A of this chapter to the employee who was not provided notice as required by [section 195(1) ] of this article or (ii) the employer reasonably

> believed in good faith that it was not required to provide the employee with notice pursuant to [section 195(1) ].

NYLL §§ 198(1-b). Section 198(1-d), meanwhile, provides:

> In any action ... to recover damages for violation of [section 195(3) ] it shall be an affirmative defense that (i) the employer made complete and timely payment of all wages due pursuant to this article or articles nineteen or nineteen-A of this chapter to the employee who was not provided statements as required by [section 195(3) ] of this article or (ii) the employer reasonably believed in good faith that it was not required to provide the employee with statements pursuant to [section 195(1)(e) ].

NYLL §§ 198(1-d).

## III. Discussion

The parties' recent letter memoranda clarify that whether Wallace Morgan is liable to plaintiffs on their NYLL section 195 claims would entail resolving a sequence of questions. It initially appeared to be common ground, as the Court noted in its summary judgment decision, that section 195 covers only non-exempt employees. *See* 2017 WL 4326109, at \*34. Had this been so, the Court's holding that the outside sales exemption applied would have disposed of plaintiffs' section 195 claims. However, in their letter memoranda, the parties dispute this point. Resolution of liability on this question would thus require determining both whether plaintiffs were properly classified as employees or independent contractors (the question reserved in the Court's summary judgment decision), and if the former, whether section 195 applies to exempt employees. Assuming plaintiffs cleared these bars, the Court (or in the event of a dispute of material fact, a jury) would then have to resolve the factual question whether Wallace Morgan actually failed to provide the legally required wage notices and/or statements. To resolve these claims, the Court or jury would, finally, have to determine whether any affirmative defenses applied under section

Case 6:21-cv-01207-TWD  Document 86  Filed 10/25/24  Page 297 of 321

Martin v. Sprint United Management Co., Not Reported in Fed. Supp. (2017)

2017 WL 5028621, 2017 Wage & Hour Cas.2d (BNA) 390,464

198. Notwithstanding this potential gauntlet of unresolved questions on state-law claims that the parties have heretofore treated as secondary at best to core (and largely federal) questions in this case, the parties urge the Court to exercise supplemental jurisdiction and take up plaintiffs' wage-notice claims. The Court declines the invitation.

Plaintiffs have invoked this Court's jurisdiction solely on the bases of federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367. *See* Second Am. Compl. ¶ 25, Dkt. 146. With the Court having entered judgment for Wallace Morgan on the plaintiffs' federal claims, the only basis for this Court's jurisdiction over the NYLL wage-notice claims is supplemental jurisdiction. As noted, such jurisdiction is discretionary where, as here, the court has dismissed all federal claims over which it had original jurisdiction. *See Vuona,* 919 F. Supp. 2d at 393. And courts commonly decline to exercise supplemental jurisdiction after awarding defendants summary judgment on plaintiffs' federal claims. *See, e.g., Hsueh v. N.Y.S. Dep't of Fin. Servs.,* 15 Civ. 3401 (PAC), 2017 WL 3671179, at *8 (S.D.N.Y. Aug. 25, 2017) ("Because the Court grants the [defendant's] motion for summary judgment on Hsueh's sole federal-law claim, the Court declines to exercise supplemental jurisdiction over Hsueh's state-law claims."); *Thomas v. Ariel West,* 242 F. Supp. 3d 293, 306 (S.D.N.Y. 2017) (granting summary judgment dismissing plaintiff's federal claims and "declin[ing] to exercise supplemental jurisdiction [over the] Plaintiff's state– and city-law claims relating to those alleged violations"); *Johnson v. City of New York,* 09 Civ. 4685 (PGG), 2011 WL 1044852, at *13 (S.D.N.Y. Mar. 18, 2011) ("Defendants' motion for summary judgment will be granted as to all of Plaintiff's federal claims, and the Court declines to exercise supplemental jurisdiction over the remaining pend[e]nt state law claims."); *236 Cannon Realty, LLC v. Ziss,* No. 02 Civ.6683(WHP), 2005 WL 289752, at *10 (S.D.N.Y. Feb. 8, 2005) ("Having granted summary judgment dismissing all of Cannon's federal claims, this Court declines to exercise supplemental jurisdiction over Cannon's pendent state law claims pursuant to 28 U.S.C. § 1367.").

 *4  In deciding whether to exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience, fairness, and comity." *Lundy v. Catholic Health Sys. of Long Island, Inc.,* 711 F.3d 106, 117-18 (2d Cir. 2013) (quoting *Cohill,* 484 U.S. at 350). In the typical case, however, once all federal claims have been dismissed, "the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill,* 484 U.S. at 350 n.7.

Here, interests of judicial economy, convenience, and comity weigh strongly in favor of declination.

First, though the issue has been briefed, the Court has not had occasion to consider the threshold question raised by the parties: whether plaintiffs are employees or independent contractors under New York law. Retaining jurisdiction in order to decide an as-yet unresolved question involving the application of a multi-factor New York law standard to the facts here would not promote judicial economy. *See Dudley v. N.Y.C. Hous. Auth.,* 14 Civ. 5116 (PGG), 2017 WL 4315010, at *23 (S.D.N.Y. Sept. 25, 2017) (exercising supplemental jurisdiction over state– and city-law claims where the federal analysis dictated state-law results, but declining to review issues that "require[d] separate consideration"). Nor would it implicate federal policy concerns: The employee-versus-independent-contractor question under state law is technically distinct from the related analysis under federal law. *See Thomas v. TXX Servs., Inc.,* 663 Fed.Appx. 86, 89 (2d Cir. 2016) (citing different standards); *Kolari v. N.Y.-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir. 2006). And, because discovery is complete and the parties have already briefed that state-law question, the parties are equipped to present that question to a state court expeditiously. *See Vuona,* 919 F. Supp. 2d at 394 ("The extensive discovery already taken is likely sufficient to enable Plaintiffs' NYCHRL claims to be evaluated in state court without any additional discovery."); *Murray v. Visiting Nurse Servs.,* 528 F. Supp. 2d 257, 280-81 (S.D.N.Y. 2006) ("While discovery has been completed and the instant case has proceeded to the summary judgment stage, it does not appear that any discovery would need to be repeated if plaintiff's pendent claims were brought in state court.").

Second, even if this Court were to determine that plaintiffs were exempt employees, that would not resolve this dispute. Rather, determinations would need to be made, based on the factual record, whether Wallace Morgan complied with the requirements of section 195, and/or whether any affirmative defenses under section 198 applied. Even assuming that discovery—which appears to have focused instead on the core issues in this case as briefed in the parties' summary judgment motions—was taken on these questions relating to wage notices and statements, no party has briefed whether the facts support or dictate liability on those claims.

Case 6:21-cv-01207-TWD   Document 86   Filed 10/25/24   Page 298 of 321

Martin v. Sprint United Management Co., Not Reported in Fed. Supp. (2017)

2017 WL 5028621, 2017 Wage & Hour Cas.2d (BNA) 390,464

Exercise of supplemental jurisdiction would thus appear to require additional summary judgment briefing on these fact-dependent questions, and, in the event of material disputes of fact on such questions as whether Wallace Morgan "reasonably believed in good faith that it was not required to provide [plaintiffs] with notice," *see* NYLL §§ 198(1-b), trial on them. The federal courts have no special interest in resolving such fact-laden disputes involving the application of state law. And there is no reason to regard a federal court as a uniquely convenient forum in which to resolve these questions.

 **\*5**  Finally, there appears to be a dearth of federal and New York State authority on the section 198 affirmative defenses. The parties have not drawn to the Court's attention any appellate decisions on these standards. This, too, disfavors exercise of supplemental jurisdiction. "[O]ur circuit takes a very strong position that state issues should be decided by state courts." *Cohen v. Postal Holdings, LLC,* No. 16-2657, 2017 WL 4527081, at \*9 (2d Cir. Oct. 11, 2017) (Calabresi,

*J.,* concurring). Without significant state-court guidance, and absent mandatory federal jurisdiction, comity is best served by allowing a state court to address these matters of state law in the first instance.

## CONCLUSION

For the foregoing reasons, the Court declines to exercise supplemental jurisdiction over plaintiffs' NYLL wage-notice claims. These claims are therefore dismissed without prejudice. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 5028621, 2017 Wage & Hour Cas.2d (BNA) 390,464

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   Lawton v. Success Academy Charter Schools, Inc.,
E.D.N.Y.,   August 1, 2018

2013 WL 5445736
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Joanne GRAHAM, Plaintiff,

v.

THREE VILLAGE CENTRAL
SCHOOL DISTRICT, Defendant.

No. 11–CV–5182.
|
Sept. 30, 2013.

**Attorneys and Law Firms**

Rick Ostrove, Brandon David Okano, David H. Rosenberg,
and Thomas Ricotta of Leeds Brown Law, P.C., Carle Place,
NY, Gregory Nicholas Filosa of The Ottinger Firm, P.C., New
York, NY, for Plaintiff.

Jeltje DeJong, Kelly, E. Wright, and David S. Shteierman of
Devitt Spellman Barrett, LLP, Smithtown, NY, for Defendant.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

**\*1**   Plaintiff Joanne Graham ("plaintiff" or "Graham")
brings this action against defendant Three Village
Central School District ("defendant" or the "District")
alleging employment discrimination in violation of the
Americans with Disabilities Act, 42 U.S.C. §§ 12101
*et seq.* ("ADA"). Specifically, plaintiff alleges that: (1)
defendant discriminated against plaintiff on account of
her disability, by failing to accommodate plaintiff's requests for
reasonable accommodation, namely, the reinstatement of the
handicapped parking spaces that were moved during a period
of construction; and (2) defendant retaliated against plaintiff
after she engaged in the protected activity of requesting
reinstatement of the former locations of the handicapped
parking spaces. [1]

[1]   As discussed *infra,* although it is not entirely
clear whether plaintiff is continuing to assert a
disability discrimination claim in connection with
the termination (rather than simply a retaliatory
termination claim), the Court will address that
claim in an abundance of caution and concludes
that it also cannot survive summary judgment.

Defendant moves for summary judgment, arguing, *inter alia,*
that (1) plaintiff's ADA claim must be dismissed because
plaintiff cannot establish an ADAqualifying disability; (2)
plaintiff failed to make any requests for a reasonable
accommodation, and, with respect to any issues raised by
plaintiff, the District engaged in an interactive process with
her and responded to all of her requests; and (3) plaintiff
cannot establish a retaliation claim because she can neither set
forth a prima facie case of retaliation, nor can she show that
defendant's decision to terminate plaintiff was pretextual.

For the reasons that follow, the Court concludes that
defendant's summary judgment motion should be granted in
its entirety. Specifically, the Court concludes that plaintiff's
ADA failure to accommodate claim fails because plaintiff
has not set forth evidence from which a rational jury could
find that she has satisfied the first element of an ADA
disability discrimination claim: namely, that she has an
ADA-qualifying disability. The uncontroverted evidence in
the record, including plaintiff's own deposition testimony,
shows that plaintiff's alleged disability does not substantially
limit a major life activity as compared to most people
in the general population. Similarly, there is no evidence
from which a rational jury could find that plaintiff had a
record of impairment (and, under the amendments to the
ADA, no "regarded as" claim can exist for an alleged
failure to accommodate). Moreover, even assuming *arguendo*
that plaintiff can satisfy the first prong, her failure-to-
accommodate claim still cannot survive summary judgment
because the uncontroverted evidence in the record, including
plaintiff's own testimony, shows that the District was
responsive to any of plaintiff's requests, both engaging in
an interactive process with her and investigating and acting
upon her requests, where possible. To the extent that plaintiff
asserts that the District should have allowed her to park in an
active construction site where no employees could park due
to the safety hazards presented, no rational jury could find
such a request to be reasonable. With respect to the retaliation
claim, even assuming *arguendo* that plaintiff has set forth a
prima facie case, defendant has proffered a legitimate, non-
discriminatory reason for its termination decision—namely,
a complaint from St. Charles Hospital that plaintiff had been

2013 WL 5445736

rude and forceful with one of their autistic students. There is nothing in the record to rebut that articulated reason; stated differently, plaintiff offers no evidence from which a rational jury could find that her requests for handicapped parking were the but-for cause of her termination. Finally, to the extent plaintiff is also asserting that her termination was due to her disability (and not just alleged retaliation), that claim fails for the same reason. In particular, even assuming *arguendo* that plaintiff can establish a prima facie case, there is insufficient evidence from which a rational jury could find that the District's articulated reason for her termination was a pretext for disability discrimination. For these reasons, the Court concludes that defendant's motion for summary judgment is granted in its entirety.

# I. BACKGROUND

## A. Facts

**\*2** The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts. [2] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmoving party. *See Capobianco v. City of N.Y.,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). For this reason, the Court construes the facts in favor of plaintiff.

[2]     Although the parties' respective Rule 56.1 Statements contain specific citations to the record, the Court cites to the Rule 56.1 Statement instead of to the underlying citation to the record.

### 1. Plaintiff's Employment in the District

Plaintiff Joanne Graham began her employment with defendant in 1987 as a Monitor in Nassakeag Elementary School. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) She subsequently was promoted to the position of Tutor, a position that she held until 2008. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) That year, plaintiff's title, along with that of approximately ninety other tutors in the District, was changed to Certified Teaching Assistant, or "CTA." (Def.'s 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) This change in title placed plaintiff (along with the other CTAs) on a tenure track; it also gave her a three-year probationary period of employment. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Plaintiff had not been eligible for tenure prior to her change in title. (Def.'s 56.1

¶ 3; Pl.'s 56.1 ¶ 3.) Plaintiff understood the significance of being placed on a tenure track: she would have to be observed, and at the end of her probationary period (and based on those observations), she would either receive or be denied tenure. (Def.'s 56.1 ¶ 4.) Plaintiff had the choice of starting her new position either on February 1, 2008 or on September 1, 2008. (*Id.* ¶ 5.) She chose the February 1, 2008 date, making her officially eligible for tenure as of February 1, 2011, assuming all expectations were met. (*Id.*)

In her role as a CTA, plaintiff worked one-on-one with special education students. (*Id.* ¶ 6.) She also had job coaching responsibilities, which included taking students off school premises and into the community to learn job skills at certain accepted locations. (*Id.* ¶ 7.)

### 2. Plaintiff's Alleged Disability

Plaintiff describes herself as being disabled as of 1983, prior to her time of employment with the District. (*Id.* ¶ 9.) She broke her hip after falling during a roller skating accident. (*Id .*) Plaintiff had surgeries on her hip and subsequently was cleared for rehabilitation, and therefore, for other exercises with no limitations on her activity abilities. (*Id.* ¶ 9; Pl.'s 56.1 ¶ 9.) Four years later, plaintiff began her employment with the District. (Def.'s 56.1 ¶ 10.) Although defendant describes plaintiff's condition at the commencement of her employment as "fine" and "healed" (Def.'s 56.1 ¶ 10), plaintiff claims that she had "limited mobility" at that time, given that compression screws had been inserted into her hip (Pl.'s 56.1 ¶ 10).

Although it is not clear what the exact extent of plaintiff's alleged disability was at the time her employment with the District began, what is clear is that plaintiff had a handicapped-parking sticker. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) On commencing her employment, plaintiff did not explicitly inform anyone that she was disabled. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) She also made no accommodation requests at that time; plaintiff contends this was so because a handicapped-parking spot was available to her then. (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.)

**\*3** Thus, plaintiff began her employment with the District. From the inception of her employment, plaintiff's hip injury did not impede or affect her abilities to perform her job with the District, provided that—as plaintiff notes—she had access to a handicapped-parking spot. (Def.'s 56.1 ¶ 13; Pl.'s 56.1

¶ 13.) From approximately 1987 until 1999, plaintiff had no health conditions or injuries that affected her ability to perform her job. (Def.'s 56.1 ¶ 14.) Moreover, plaintiff did not request any accommodations during this time or make any job-related requests for assistance. (*Id.*)

During the 1998–1999 school year, plaintiff sustained an injury at work that caused her to miss approximately two months of work: she was knocked down by a student running in the halls. (*Id.* ¶ 15.) She thereafter returned to work, as well as to her prior normal job activities and functions. (*Id.* ¶ 16.) Although defendant claims that plaintiff did not make any requests for accommodations after the hallway incident, plaintiff notes that this was due to the fact that she still had access to her handicapped parking spot during this time, and that without such an accommodation, her work environment might have become "extremely hazardous to her health." (Pl.'s 56.1 ¶¶ 13; 16; *see also* Def.'s 56.1 ¶ 16.)

In 2009, plaintiff suffered another injury: she "bounced off a rather large woman" in a crowded hallway and fell down. (Def.'s 56 .1 ¶ 17; Pl.'s 56.1 ¶ 17.) Plaintiff was taken to the hospital and deemed to have suffered contusions and abrasions; she missed approximately a day or so of school. (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) On returning to work, plaintiff also returned to her previous job responsibilities and was able to participate in her normal activities and functions. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.) Plaintiff notes, however, that this was all subject to the fact that she had no need to request an accommodation, given that she still had access to a handicapped-parking spot during this time. (Pl.'s 56.1 ¶¶ 12, 13, 18.)

In approximately the fall of 2010, plaintiff sustained another injury. (*Id.* ¶ 19; Def.'s 56.1 ¶ 19.) She tripped on a piece of lumber in the school parking lot and was taken to the hospital. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) Plaintiff was diagnosed with contusions and "whatever" to her head. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) Approximately a day or two later, she was back at school, having returned to her normal work functions and activities. (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.) Defendant notes that plaintiff made no requests for accommodations at this time. (Def.'s 56.1 ¶ 20.)

### 3. Construction at the School

In March 2009, construction began to expand the school's (already large) size,[3] which made a section of the parking lot inaccessible. (Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 23.) Indeed, the school building was so large that it did not have a single entrance; instead, it had approximately ten entrances to the building. (Def.'s 56.1 ¶ 24; Pl.'s 56.1 In addition to multiple entrances, the school also had multiple parking lots. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) Parking was located on both the north and south side of the building, as well as by the front office; there also was a large parking lot at the rear of the building, where the senior students holding driving privileges typically parked their vehicles. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25, 27.) The closer spots, generally located on the north and south side of the building, were designated for faculty and staff. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.)

[3]    The high school—Ward Melville, specifically— is estimated by the parties to have between approximately 1,000 to 2,000 students. (Def.'s 56.1 ¶ 24.)

**\*4** Before construction began, plaintiff generally parked in the handicapped spots located on the south side of the school. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) These spots were particularly convenient for plaintiff because her first class was located near that area. (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) Pre-construction, plaintiff did not have any problems obtaining a parking spot in the morning on arriving at work. (Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.) Things changed, though, when construction began. With the entire campus being renovated, space in and around the building changed, including the construction of a new science building on the south side of campus, as well as an entire reconstruction of the south parking lot area. (Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) The impact of this was noted in the parking arrangements available at the school; the new buildings required a relocation of parking areas, as well as a redirection of traffic flow. (Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Part of the parking affected by this rearrangement of spaces was the handicapped parking spots. (Def.'s 56.1 ¶¶ 29, 30; Pl.'s 56.1 ¶¶ 29, 30.)

John Grillo ("Grillo") was the architect hired to oversee the construction at the school. (Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) His responsibilities included determining where the handicapped parking would be relocated to, as well as how many handicapped parking spaces would be available to drivers. (Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ 30.) It was determined that the handicapped spaces located on the south side of the building (*i.e.,* in plaintiff's preferred parking location) needed to be moved as the new building was to be constructed where the old spaces were located. (Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.)

2013 WL 5445736

The spaces were moved to just outside the construction fence. (Def.'s 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.)

On the first day of construction, plaintiff arrived at school and asked a security guard where the handicapped parking spaces were located. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 ¶ 32.) The guard informed her that he did not know and instructed her to park in the first available spot that she saw. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 ¶ 32.) Plaintiff did so; she did not try parking in one of the designated handicapped spots located on the other side of the building, supposedly because of their far distance from the building's entrance. (Def.'s 56.1 ¶¶ 32, 33; Pl.'s 56.1 ¶¶ 32, 33.) Although it is unclear whether plaintiff complained that first day that the changes to the handicapped spot parking locations were implemented, it seems that sometime during that first week, she raised complaints concerning the parking situation. (Def.'s 56.1 ¶ 32; Pl.'s 56.1 ¶ 32.)

Soon thereafter, plaintiff approached school principal Alan Baum ("Baum"), informing him that there were no handicapped spaces on the south side of the building. (Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.) Baum referred plaintiff to Mike Owen ("Owen"), the then Assistant Principal, who also was in charge of the construction project. (Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.) Plaintiff claims that she specifically informed Owen that she needed access to a parking spot closer to the building entrance because if she fell, she might sustain a serious injury. (Def.'s 56.1 ¶¶ 35, 42; Pl.'s 56.1 ¶¶ 35, 42.)

**\*5** Plaintiff continued to approach Baum with concerns as to the handicapped parking situation, like the number of spaces available and their proximity to the building, during the construction period. (*See* Def.'s Summ. J. Mot. Ex. C at 79–81; *id.* Ex. E at 23–24.) Plaintiff also subsequently complained of persons parking in the handicapped spots because the spaces' lines were obscured by snow, and of signs being needed in order to clearly designate those spots that were for handicapped parking. (Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) The same day in which plaintiff complained as to the lack of signage, the District had signs put up. (*See* Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) Plaintiff also complained to Baum that a security guard had asked her to move her car, which was parked in a handicapped space, during this time period. (*See* Def.'s 56.1 ¶ 41; Pl.'s 56.1 ¶ 41.)

According to plaintiff, she had "perhaps a couple" of conversations with Assistant Principal Baum concerning the parking situation. (*See* Def.'s 56.1 ¶ 42; Pl.'s 56.1 ¶ 42.) Whenever she did, plaintiff claims that Baum would refer the particular matter to another individual, typically, Owen or Grillo. (Def.'s 56.1 ¶ 36; Pl.'s 56.1 ¶¶ 36.) Plaintiff describes these referrals a bit more colorfully: her complaints were "always [being] shoved off to somebody else." (Pl.'s 56.1 ¶ 36.) According to plaintiff, tensions arose between Baum and herself. In particular, in the summer of 2010, plaintiff alleges that Baum screamed at her and made an obscene arm gesture when she came to him expressing her handicapped parking concerns. (*Id.* ¶ 36.)

Sometime during the time frame in which plaintiff was complaining about the parking spaces, Baum had a conversation with Grillo. (Def .'s 56.1 ¶ 38; Pl.'s 56.1 ¶ 38.) This conversation confirmed that the parking lot during the construction period met the requirements for handicapped parking spaces, and also, that there were no other alternatives for placement of the spaces, given the construction operation and the need to try and place the spaces as close to the entrance ways as possible. (Def.'s 56.1 ¶ 38.) Owen similarly checked in with the construction management firm on a near daily basis to ensure that the construction project was impacting the school's day-today operations as little as possible. (*See id.*)

Defendant claims that plaintiff did not inform Baum or Owen that she needed a handicapped parking spot so that she could perform her job. (*See* Def.'s 56.1 ¶ 35.) Additionally, plaintiff does not dispute that she never put any of her complaints concerning the parking situation into writing. (*Id.;* Pl.'s 56.1 ¶ 43.) Although she did not put her complaints into writing, it seems that at least on one occasion, plaintiff took matters into her own hands, cutting the ribbons blocking off the handicapped spaces in the construction area, or making her own space next to the handicapped spots. (Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.) Plaintiff was not formally disciplined for this practice, although Owen allegedly chastised her on one occasion for creating her own space. (Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.)

**\*6** Mary Castiglie ("Castiglie"), the other Assistant Principal (who was not working at the school at that time), was not made aware of any issues concerning the handicapped parking spaces during the 2009 construction period. (Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 45.) She was never advised as to plaintiff's complaints, and by the time she returned to the school for the 2010–2011 school year, the construction was complete. (Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 45.)

#### 4. Complaints Concerning Plaintiff's
Performance and the District's Tenure Decision

On approximately October 28, 2010, the District removed plaintiff from her job coaching responsibilities on account of a complaint from St. Charles' Hospital, one of the locations in which plaintiff worked with students. (*See* Def.'s 56.1 ¶¶ 46, 48; Def.'s Summ. J. Mot. at 6–7.) The complainant had no affiliation with the District, nor did she have any knowledge of plaintiff's alleged disabilities. (*See* Def.'s 56.1 ¶ 46.) According to the complaint, plaintiff had been "rude and forceful in giving directions to the student that she was working with." (*Id.* ¶ 48.) Plaintiff allegedly had contended that the student needed to be spoken to in this way because they were on a time limit; the student was "low-functioning and possibly autistic." (*Id.* ¶ 49.) The staff was not pleased with plaintiff's handling of the matter and reported the incident to their supervisor, who in turn reported the incident to Carol Nickerson ("Nickerson"), one of plaintiff's supervisors at the District and the job coach coordinator. (*Id.* ¶¶ 47–48.) Although plaintiff asserts that Nickerson "laughed at the absurdity of the complaint" (Pl.'s 56.1 ¶ 48), whatever her reaction might have been, it seems clear that Nickerson reported the complaint to Patricia Fore ("Fore"), the special education chairperson, who then reported it to Assistant Principal Castiglie. (*Id.* ¶ 48.) Castiglie investigated the complaint, speaking with the supervisor from St. Charles, who essentially gave Castiglie the same information concerning plaintiff's handling of the incident, as well as staff members' reactions to plaintiff's alleged mistreatment of the student. (Def.'s 56.1 ¶ 50.) Castiglie also was informed that plaintiff had been rude to the supervisor when she was asked why she was not wearing a hair net or apron while working in the kitchen. (*Id.*)

On acquiring this information, Castiglie went to Baum, who also performed an investigation concerning the complaint. (*Id.* ¶ 51.) Meanwhile, Castiglie spoke with plaintiff, who explained—as she had to the St. Charles Hospital supervisor—that this was the manner in which that particular student needed to be spoken to. (*Id.*) Plaintiff's framing of this incident echoes a similar sentiment, as she states that her "directness towards the autistic student was necessary and proper" (Pl.'s 56.1 ¶ 48), and that she "was direct with this student because he was autistic, and this was the proper approach to take with a student with autism" (*id.* ¶ 49). On completing its investigation, the District determined that inappropriate conduct had taken place, and it removed

plaintiff from her job coaching responsibilities. (Def.'s 56.1 ¶ 51.) On being removed from her job coaching responsibilities, plaintiff was reassigned to the library, where she continued to receive her same salary and benefits. (*Id.* ¶ 52.) According to plaintiff, the prestige associated with her library responsibilities was not "comparable to her prior duties." (Pl.'s 56.1 ¶ 52.)

**\*7** According to defendant, Baum treated this complaint concerning plaintiff and the autistic student very seriously, particularly given that it occurred right around the time in which plaintiff was up for tenure. (Def.'s 56.1 ¶ 53.) As previously set forth, plaintiff was working on a three-year probationary period. During this time, the probationary employee is observed by immediate supervisors and given annual evaluations. (*Id.* ¶ 54.)[4] When the three-year period comes to an end, recommendations are sent to the human resources office regarding those employees who should— or should not, as the case may be—receive tenure. (*Id.*) The human resources department will then share these recommendations with the school superintendent, who will then review the recommendations and discuss them with his or her cabinet. (*Id* .) Following this consideration period, the superintendent may then decide to recommend tenure, deny tenure, or recommend an extension of a given employee's probationary period to the Board of Education. (*Id.*)

4    According to plaintiff, on September 17, 2010, she received a memorandum indicating that two tenure observations would be conducted before the rendering of any CTA tenure decisions. (Compl.¶ 28.) These observations were to be performed by Castiglie and Fore. (*Id.* ¶ 29.) Plaintiff claims that she did not undergo the type of tenure observations as were represented in the September 2010 letter. In particular, plaintiff claims that one of her observations occurred on School Spirit Day, when regular course work was not conducted; thus, Castiglie's observation consisted of nothing more than watching plaintiff grade papers. (*Id.*) Plaintiff claims that no other observations of her were ever done. (*Id.*)

As plaintiff's three-year probationary period drew to a close, her candidacy for tenure was presented to the superintendent and his cabinet. (*Id.* ¶ 55; *see also* Pl.'s 56.1 ¶ 55.) In reviewing plaintiff's file, the superintendent and cabinet considered the St. Charles Hospital complaint, as well as another incident in plaintiff's file concerning a classroom teacher, which occurred

sometime in 2005. (Def.'s 56.1 ¶ 55; *see also* Def.'s Summ. J. Mot. Ex. E at 52–53; *id.* Ex. N.) On considering plaintiff's work history, record, recommendations, evaluations, as well as the aforementioned complaints, the superintendent—as well as Baum—were of the position that plaintiff should not be awarded tenure. (Def.'s 56.1 ¶ 56.) The decision being made, Baum decided to personally give plaintiff the news. (*Id.* ¶ 57.) In November 2010, Baum had plaintiff attend a meeting in his office, which was also attended by Assistant Principal Castiglie, a union representative, and "possibly the special education chairperson Patti Fore." (*Id.*) Subsequent to the meeting, plaintiff received a letter—also in November 2010—informing her that the superintendent did not plan to recommend her for tenure. (*Id.* ¶ 58.) She similarly was informed that her termination date would be effective January 28, 2011. (*Id.*) Plaintiff was not alone—other CTAs, who also had been on a probationary period—were advised that they would not be receiving tenure, either. (Def.'s 56.1 ¶ 59; Pl.'s 56.1 ¶ 59.)

On November 17, 2010, plaintiff asked the District for an explanation as to its proposed action. (Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) On November 22, 2010, the District sent plaintiff a letter citing excessive absences, a failure to work well with staff, and an improper execution of job coaching responsibilities in support of its decision to deny tenure. (Def.'s 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) Unsatisfied with this explanation, plaintiff requested a meeting with the superintendent; although she was unable to meet with the superintendent, plaintiff was able to meet with then Assistant Superintendent Cheryl Pedisich ("Pedisich"). (Def.'s 56.1 ¶ 61; Pl.'s 56.1 ¶ 61.) At this meeting, plaintiff and Pedisich discussed all that had transpired, including plaintiff's complaints concerning the lack of handicapped parking. (Def.'s 56.1 ¶ 61; Pl.'s 56.1 ¶ 61.) Although defendant contends that plaintiff did not inform Pedisich that she thought she was being discriminated against on account of her disability (Def.'s 56.1 ¶ 61), plaintiff claims that she "explicitly told Pedisich that she felt she was being terminated because she had complained about the lack of handicapped parking" (Pl.'s 56.1 ¶ 61). Sometime following this meeting, plaintiff was given the option of resigning from her position, instead of being terminated; she declined this option. (*Id.* ¶ 62.) On December 14, 2010, the Board of Education approved the superintendent's recommendation to terminate plaintiff's employment at the end of her probationary period. (Def.'s 56.1 ¶ 63.) Ten other CTAs at the District also were terminated at the end of their respective probationary periods. (*Id.* ¶ 64.)

### 5. The District's Awareness of Plaintiff's Disability and the EEOC Complaint

**\*8** It is undisputed that plaintiff did not file any internal complaints about any alleged discrimination she suffered during her employment. (Def.'s 56.1 ¶ 71; Pl.'s 56.1 ¶ 71.) Although the District had a policy, which included a complaint procedure, prohibiting discrimination based on impermissible considerations (like a disability), plaintiff claims that she was unaware of this policy at all times prior to this dispute. (Def.'s 56.1. ¶ 70; Pl .'s 56.1 ¶ 70.)

Multiple District employees contend that they were unaware of plaintiff's alleged disability until the filing of this lawsuit. (*See* Def.'s 56.1 ¶¶ 65–68 (stating that Castiglie, Baum, Owen, and Fore lacked any knowledge concerning plaintiff's disability, but that they were aware that she parked in handicapped parking spaces).)

On approximately March 25, 2011, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), receiving a notice of right to sue on July 28, 2011. (Def.'s 56.1 ¶ 74; Pl.'s 56.1 ¶ 74.) This action followed.

### B. Procedural History

Plaintiff filed her complaint in this action on October 25, 2011. Defendant answered her complaint on December 15, 2011. On November 16, 2012, defendant submitted a letter requesting a pre-motion conference in anticipation of moving for summary judgment. The Court granted defendant's request and held a pre-motion conference on December 5, 2012. During the conference, the Court set a briefing schedule for defendant's summary judgment motion. On January 22, 2013, defendant submitted its motion for summary judgment. Plaintiff filed her opposition papers on April 10, 2013, and defendant submitted its reply on May 3, 2013. Oral argument was held on June 19, 2013. This matter is fully submitted.

### II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LCC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (citation and internal quotation marks omitted); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**\*9** Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d. Cir.2002) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.,* 751 F .2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F .3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

## III. DISCUSSION

Defendant raises the following challenges to plaintiff's allegations. First, defendant contends that plaintiff does not have an ADA-qualifying disability. Second, defendant asserts that plaintiff cannot establish a failure-to-accommodate claim. In particular, defendant argues that plaintiff never requested accommodations, but when she raised various concerns, defendant always engaged in an interactive process with her, fully addressing her respective issues. Lastly, defendant contends that plaintiff cannot establish a prima facie case of retaliation, and even if she can, that defendant has set forth a legitimate, nondiscriminatory reason for its termination decision, which plaintiff cannot show was pretextual. The Court considers each claim in turn, after first summarizing the applicable law.

### A. ADA Failure to Accommodate Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). It is the plaintiff who "bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Heyman v. Queen Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.,* 198 F.3d 68, 72 (2d Cir.1999); *see also Wernick v. Fed. Reserve Bank of N.Y.,* 91 F.3d 379, 383 (2d Cir.1996) ( "A plaintiff who raises a disability discrimination claim bears the initial burden of establishing a prima facie case.").

**\*10** With respect to a claim under the ADA for failure to accommodate, an employer may be liable if it "fails to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is ... an employee.' " *Cody v. Cnty. of Nassau,* 577 F.Supp.2d 623, 643 (E.D.N.Y.2008) (quoting *Sussle v. Sirina Protection Sys. Corp.,* 269 F.Supp.2d 285, 312 (S.D.N.Y.2003)). "A plaintiff can state a claim for discrimination based upon an employer's failure to accommodate her disability by alleging facts showing: (1) that she has a disability within the meaning of the [ADA]; (2) that the defendants, who are covered by the ADA, had notice of her disability; (3) that with reasonable accommodations she could perform the essential functions of the position sought; and (4) that defendant refused to make such accommodations." *Feeley v. N.Y.C. Police Dep't,* No. 97–CV–02891–RJD, 2001 WL 34835239, at \*9 (E.D.N.Y. Sept. 4, 2001). Once a plaintiff has set forth a prima facie case, "the burden shifts to the employer to demonstrate

that the employee's proposed accommodation would result in an undue hardship." *Scalera v. Electrograph Sys., Inc.,* 848 F.Supp.2d 352, 360 (E.D.N.Y.2012). For the following reasons, plaintiff's accommodation claim cannot survive summary judgment.

In this case, the parties do not dispute that the District constitutes an employer subject to the ADA. Instead, defendant argues that plaintiff's failure to accommodate claim cannot survive summary judgment because there is no evidence that the plaintiff was disabled within the meaning of the ADA and further, there is no evidence that defendant failed to make a reasonable accommodation for any alleged disability. As set forth below, the Court agrees and concludes that, even construing the evidence most favorably to defendant, no rational jury could find that plaintiff was disabled or had a record of disability for purposes of this claim. The Court also concludes, even assuming *arguendo* that plaintiff could meet that requirement, that no rational jury could find that defendant failed to make a reasonable accommodation, given the uncontroverted facts in this case.

### 1. Whether Plaintiff Has an ADA–Qualifying Disability

The ADA Amendment Act of 2008 ("ADAAA"), effective January 1, 2009, altered the analysis for assessing ADAdisability claims, "substantially broaden[ing] the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines,* 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams,* 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Green v. DGG Properties Co., Inc.,* No. 11–CV–1989 (VLB), 2013 WL 395484, at *9 (D.Conn. Jan. 31, 2013) (citation and internal quotation marks omitted); *see also Kravtsov v. Town of Greenburgh,* No. 10–CV–3142(CS), 2012 WL 2719663, at * 10 (S.D.N.Y. July 9, 2012) ("In enacting the ADA, Congress intended to provide broad coverage for individuals with disabilities, and in enacting the ADAAA in 2008, rejected Supreme Court precedent in *Toyota Motor Mfg. v. Williams,* 534 U.S. 184 (2002), as interpreting the term 'substantially limits' to require a greater degree of limitation than was intended." (alteration, citation, and internal quotation marks omitted)). Thus, "[w]hile the terms of the statute were not changed, the interpretation of those terms was modified." *Brtalik v. S. Huntington Union Free Sch. Dist.,* No. CV–10–0010, 2010 WL 3958430, at *7 (E.D.N.Y. Oct. 6, 2010). Pursuant to this definition, an asserted "disability" will "be construed in favor of broad coverage of individuals under this

chapter, to the maximum extent permitted by the terms of the chapter." 42 U.S.C. § 12102(4).

**\*11** Because the contested events at issue occurred subsequent to the effective date of the ADAAA, the statute governs here. *Cf. McCowan v. HSBC Bank USA, N.A.,* 689 F.Supp.2d 390, 398 (E.D.N.Y.2010) ("[T]his Court and other courts have stated that the ADAAA does not apply to conduct that occurred prior to the effective date of the statute."). Accordingly, although the parties brief their arguments under the previous standard for disability claims, the Court applies the newer standard. [5]

5      Although the Court applies the post-ADAAA standard, it cites some pre-ADAAA cases where the analysis contained therein is illustrative, even under the more liberal ADAAA standard.

The ADAAA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).

In this case, plaintiff claims that she has a disability as defined under each of the ADA's three prongs. (*See* Pl.'s Opp'n at 7.) [6] However, the ADAAA now makes clear that no failure to accommodate claim can be made, as a matter of law, for an individual who was "regarded as" disabled, rather than who was actually disabled. In other words, the "regarded as" theory of disability is no longer actionable in the context of a failure to accommodate claim. *See* 42 U.S.C. § 12201(h) ("A covered entity under subchapter I, a public entity under subchapter II, and any person who owns, leases (or leases to), or operates a place of public accommodation under subchapter III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of this title solely under subparagraph (C) of such section."); *see also Powers v. USF Holland, Inc.,* 667 F.3d 815, 823 n. 7 (7th Cir.2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation." (quoting 42 U.S.C. § 12201(h))). Thus, this

Court only addresses, for purposes of plaintiff's failure to accommodate claim, whether there is evidence from which a rational jury could find that plaintiff was disabled or had a record of disability.

6 As noted previously, the parties' arguments appear to have been briefed under the previous ADA standard. For simplicity's sake, the Court refers to the newer standard in its discussion of the applicable law and parties' positions.

### a. Whether Plaintiff Has a Physical Impairment that Affects a Major Life Activity

For a plaintiff to establish that she has a disability under the statute's first subsection, she must "(1) show that [she] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity, and (3) show that [her] impairment substantially limits the major life activity previously identified." *Green,* 2013 WL 395484, at *9 (quoting *Kravtsov,* 2012 WL 2719663, at *10) (internal quotation marks omitted).

Significantly, the ADAAA enlarged the three-category definition of "disability," clarifying (and broadening) that which constitutes a "major life activity" under the amended legal framework. *See* Pub.L. No. 110–325, § 4(a), 122 Stat. 3553 (2008); *see also Wilkins v. J.C. Penney Corp., Inc.,* No. 11–CV–989(VLB), 2013 WL 3816588, at *6 n. 1 (D.Conn. July 22, 2013) (noting the ADAAA's expansion of the ADA's three-category disability definition); *Shah v. Eclipsys Corp.,* No. 08–CV–2528 (JFB)(WDW), 2010 WL 2710618, at *6 & n. 5 (E.D.N.Y. July 7, 2010). Thus, post-ADAAA, major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). Major life activities also may include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* Notably, post-ADAAA, "major life activities no longer need to be of 'central importance.'" *D'Entremont v. Atlas Health Care Linen Servs., Co.,* No. 12–CV–0060 (LEK/ RFT), 2013 WL 998040, at *6 (N.D.N.Y. Mar. 13, 2013) (quoting *SamSekur v.. Whitmore Grp., Ltd.,* No. 11–CV–

4938, 2012 WL 2244325, at *6 (E.D.N.Y. June 15, 2012)); *see also* 42 U.S.C. § 12102(2)(A).

**\*12** The ADA does not set forth a definition for what constitutes a substantial limitation. *See Kravtsov,* 2012 WL 2719663, at * 10 (stating that "[t]he ADA does not define the term 'substantially limited,' but postADAAA regulations" clarify the term). However, post-enactment of the ADAAA, it is clear that the standard "is not meant to be [ ] demanding," 29 C.F.R. § 1630.2(j)(1)(i), and, "should not demand extensive analysis," *id.* 1630.2(j)(1) (iii). Thus, an impairment will be considered a disability under the statute "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Risco v. McHugh,* 868 F.Supp.2d 75, 108 (S.D.N.Y.2012) (quoting 29 C.F.R. § 1630.2(j)(1) (ii)) (internal quotation marks omitted). An impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Kravtsov,* 2012 WL 2719663, at * 10 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)) (internal quotation marks omitted); *see also Brandon v. O'Mara,* No. 10–CV– 5174(RJH), 2011 WL 4478492, at *7 (S.D.N.Y. Sept. 28, 2011) ("[T]he revised EEOC regulations provide that '[a]n impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population[; t]hat is, while [a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting, ... the substantially limits analysis is comparative." (second and fourth alterations in original) (citation and internal quotation marks omitted)).

Plaintiff's claimed disability here is the injury to her hip, which she first sustained in 1983 and which she claims limited her mobility. Defendant argues that there is no evidence that plaintiff's alleged impairment substantially limits a major life activity. (*See* Def.'s Mot. for Summ. J. at 13 (noting that simply having an impairment does not make one disabled for purposes of the ADA, but rather, if that impairment substantially limits a major life activity, and arguing that plaintiff has not shown that she has an impairment "that substantially limits one or more of her major life activity")); *see also id.* at 14–16 (limiting argument to whether plaintiff's alleged impairment substantially prevents her from engaging in major life activities).)

The alleged major life activities that plaintiff contends her claimed disability interfered with include "performing manual tasks, walking, standing, lifting, and bending." (Def.'s Mot. for Summ. J. Ex. A ¶ 53.) However, plaintiff has failed to show that her alleged physical impairment *substantially limits* this activity when compared to most people in the general population. For instance, although plaintiff claims to have had difficulty walking or performing tasks at work, both her deposition testimony, as well as the uncontroverted evidence in the record, indicates to the contrary:

**\*13** Q: [In 1987] [w]ere you able to walk?

A: Yes ...

Q: Did your job include walking or moving about the school building?

A: Yes, it did.

Q: Were you able to do that without difficulty?

A: Yes.

(Pl.'s Opp'n Ex. 1, at 50.)

* * *

Q: Did you recall if you returned to school during that 1998/1999 school year?

A: Yes, I did.

Q: At the time you returned, were you able to walk?

A: Yes.

(*Id.* at 55.)

Moreover, after each of plaintiff's onthe-job injuries, she was able to walk without difficulty and perform all of her normal job function upon her return to work:

Q: How, if at all, did the prior injury to your hip affect your ability to do your job in 1987?

A: I don't think it hampered my ability whatsoever.

(Pl.'s Opp'n Ex. 1, at 49.)

* * *

Q: From 1987 up until 1999, did you have any conditions or injuries that affected your ability to do your job at Three Village?

A: No.

(*Id.* at 51.)

* * *

Q: Were there any functions of your job that you had done before you were injured [during the 1998–1999 school year] that you weren't able to do after you were injured?

A: No.

(*Id.* at 55.)

* * *

Q: When you returned to work following [the 2009] incident, was there any aspect of your job that you were not able to perform without modification or change to it?

A: No.

(*Id.* at 62.)

Q: When you returned to work [after the third school injury in fall 2010] were you able to resume all your normal job responsibilities?

A: I was ...

(*Id.* at 66–67.)

* * *

Q: Were there any times during your time with Three Village that you weren't able to do your job because of your disabilities?

A: Only the times that I was hurt and they took me away by ambulance. I couldn't finish out the days.

Q: Other than those times, the times that you reported to work and completed the workdays, were there any times during those times that you weren't able to do your job because of your disabilities?

A: No.

(*Id.* at 124–25.)

Additionally, plaintiff testified that she did not need any accommodations in order to perform her normal job functions, whether pre or post the alleged injuries. (*See, e.g.,* Pl.'s Opp'n Ex. 1, at 50 ("Q: Upon starting at Three Village in 1987, did you request any special accommodations for your workplace? A: I didn't need to, so no."); *id.* at 52 ("Q: During that 12 or 13 year period from the time you started, up until [the] 1999 incident, did you make any special requests from the District for accommodations or advise them in any way you needed certain things to do your job? A: No.); *id.* at 55 (Q: [Post 1999 accident] [d]id you make any special requests for consideration or accommodation from the District when you returned to work? A: None that I can think about."); *id.* at 62 (referring to 2009 incident and stating: "Q: Did you request any accommodations from the District as a result of this incident? A: No.); *id.* at 67 (referring to fall 2010 injury and stating: "Q: Did you request any accommodations as a result of your injuries? A: I did not.").)

**\*14** Thus, plaintiff's own testimony confirms that her alleged physical impairment did not substantially limit the asserted major life activities of walking, standing, bending, lifting, or performing manual tasks; it did not affect her ability to perform her normal job functions; and it did not require plaintiff to make any accommodation requests. Although plaintiff contends this is not so in her opposition motion, asserting that she "needed a handicapped parking space providing a safe pathway from the parking lot to her building entrance" at all times relevant to this dispute, this is not sufficient for purposes of establishing an impairment that substantially limits her abilities as compared to most people in the general population, particularly given that plaintiff concedes she was able to walk around the school building throughout the day without difficulty or hindrance to her abilities to perform her work functions. (*See* Pl.'s Opp'n at 9.) The most plaintiff's testimony shows is that she could not perform such tasks as horseback riding, skiing, ice skating, running, or rollerskating. (*See* Pl.'s Opp'n Ex. 1, at 49.) These, however, do not constitute major life activities under the ADAAA, nor were these activities ones in which she had to engage as part of her job responsibilities as a CTA. Those major life activities that plaintiff claims were substantially impaired by her alleged disability—namely, walking, standing, bending, and performing manual tasks—are directly countered by her own testimony, which confirms that she was able to walk, do normal work functions, and even drive to school without any assistance required.

When comparing her alleged condition to that of most members of the general population, the Court finds it difficult to decipher a distinguishable limitation here. That is, plaintiff seems to have been able to perform all of her alleged major life activities with little to no restriction. While the revised ADAAA standard broadens the definition of a disability, it does not relinquish plaintiff of having to show a limitation of some sort; *i.e.,* while the alleged impairment "need not prevent, or significantly or severely restrict," an individual's ability to perform a major life activity, a plaintiff still must show that the alleged impairment substantially limits a major life activity when compared to others. *See Brandon,* 2011 WL 4478492, at \*7 ("While Congress undoubtedly intended to broaden the scope of the ADA beyond the boundaries recognized in *Toyota,* it remains the case that 'not every impairment will constitute a disability ....' " (quoting 29 C.F.R. § 1630.2(j)(1)(ii))). Here, by her own words, plaintiff acknowledges that she has been able to perform the identified major life activities without issue; therefore, it is difficult—if not impossible—for the Court to determine whether or how plaintiff's alleged impairment limited her abilities to perform these acts "as compared to most people in the general population." *See id.* (quoting 29 C.F.R. § 1630.2(j)(1)(ii)).

**\*15** Finally, not only does plaintiff's own testimony contradict her assertion that she suffers from a disability under the ADAAA definition, but plaintiff has not provided any other evidence—medical or otherwise—that without a handicapped parking spot, she would not be able to perform the identified impacted major life activities, or suggesting—at the least—that her ability to perform such functions was "substantially limited" when compared to the general population. For these reasons, the Court concludes that plaintiff has failed to produce evidence from which a rational jury could conclude that her alleged impairment with respect to a major life activity was substantially limiting. Accordingly, even construing the evidence most favorably to plaintiff, she cannot demonstrate a disability under subsection one of the ADAAA. *See generally Colwell v. Suffolk Cnty. Police Dep't,* 158 F.3d 635, 645 (2d Cir.1998); *see also Curtis v. Humana Military Healthcare Servs., Inc.,* No. 10–5614, 448 F. App'x 578, 581 (6th Cir.2011) (affirming summary judgment on claim that employer's refusal to provide a closer parking space was a failure to provide a reasonable accommodation; noting that "[t]he record here shows that [plaintiff] walked from his car to work almost every day.... [Plaintiff] fell only once while walking to his workplace and, on that occasion, he fell while attempting to avoid being struck by a vehicle [; f]inally, as the district court noted,

[plaintiff] has not presented any medical opinions supporting a disability under the Act[, and w]e agree with the district court's analysis that [plaintiff] has not presented sufficient evidence to allow a reasonable juror to find a 'substantial limitation' on [plaintiff's] ability to walk"); *Moore v. J.B. Hunt Transport, Inc.,* 221 F.3d 944, 951–52 (7th Cir.2000) (finding that physical ailment of arthritis, which limited plaintiff's rate and pace of walking, was insufficient to rise to the level of an ADA-qualifying disability); *Weber v. Strippit,* 186 F.3d 907, 914 (8th Cir.1999) (stating that a plaintiff who had "difficulty walking long distances or climbing stairs without getting fatigued" only suffered from "moderate limitations on major life activities [which] d[id] not suffice to constitute a 'disability' under the ADA"); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir.1999) (fact that plaintiff walked with a limp, walked slower than the average person, and had difficulty walking in extreme cold, was not sufficient to satisfy the first subsection of an ADA disability claim); *Kelly v. Drexel Univ.,* 94 F.3d 102, 106 (3d Cir.1996) (finding physical ailment of a limp, which required plaintiff to walk slowly and prevented her from walking more than one mile, was not sufficient for purposes of establishing an ADA-qualifying disability under first subsection); *Sussle v. Sirina Prot. Sys. Corp.,* 269 F.Supp.2d 285, 312 (S.D.N.Y.2003) (stating that "[t]he 'inability to walk long distances or to climb stairs does not in itself substantially limit' an individual's ability to perform a major life activity (quoting *Stewart v. Weast,* 228 F.Supp.2d 660, 662 (D.Md.2002))).

b. The "Record" of a Disability Prong

**\*16** Even if a plaintiff cannot show a substantial limitation of a major life activity, she still may be able to establish an ADAqualifying disability if she can show "a record" of such an impairment. *See* 42 U.S.C. § 12102(1)(B). The EEOC previously stated that this "part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." *Colwell,* 158 F.3d at 645 (quoting 29 C.F.R. pt. 1630 App., § 1630.2(k)) (emphasis added). In other words, "a record reflecting a plaintiff's classification as disabled for other purposes or other standards is not enough." *Id.*[7]

[7] Most recently, "the EEOC has expressed its view that the 'record' of a disability does not depend on whether an employer *relied on* a record in making an employment decision," but instead, better relates to the employer's "knowledge of an individual's past substantially limiting impairment" and "whether the employer engaged in discrimination." *Behringer v. Lavelle Sch. For Blind,* No. 08–CV–4899(JGK), 2010 WL 5158644, at \*10 & n. 10 (S.D.N.Y. Dec. 17, 2010) (emphasis added).

Plaintiff contends that she satisfies this subsection of the statute's definition of a disability because she suffered three on-thejob injuries, which required medical treatment and hospitalization, as well as the filing of internal accident reports with defendant. (*See* Pl.'s Opp'n at 9.) Additionally, plaintiff asserts that she filed worker's compensation claims for each injury. (*Id.*) Lastly, plaintiff states that she held a handicapped parking permit throughout her period of employment with defendant, and that defendant knew of this permit. For these reasons, plaintiff asserts that her "disability and surrounding frailty has been well documented." (*Id.*)

To begin with, the fact that plaintiff had a handicapped parking permit is not sufficient, in and of itself, to establish that plaintiff has a record of an impairment that qualifies as an ADA-disability. *See Cody,* 577 F.Supp.2d at 642; *see also Howard v. Wal–Mart Stores, Inc.,* No. 05–CV–250, 2005 WL 2861107, at \*2 (N.D.Ohio Nov. 1, 2005) ("The fact [ ] that Plaintiff drives a car with ... a [handicapped] sticker ... does not reveal that he suffers from an ADA protected disability...."); *Robinson v. Hoover Enters. LLC,* 03–CV–2565 (TWT), 2004 WL 2792057, at \*5 (N.D.Ga. Oct. 20, 2004) ("Certification or diagnosis of a disability for purposes of a [handicapped] parking permit falls short of the exacting standards of qualifying as disabled under the ADA.").

Additionally, the Court notes that plaintiff cites to no documentation in the record confirming her alleged filing of accident reports or worker's compensation claims, other than her own testimony. (*See* Pl.'s Opp'n at 9 (citing to 56.1 Statement and own deposition testimony)); *see also Jeffries v. Verizon,* No. 10–CV–2686(JFB)(AKT), 2012 WL 4344197, at \*10 (stating that "[d]istrict courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA" (alteration in original) (quoting *Sussle,* 269 F.Supp.2d

at 301) (internal quotation marks omitted)); *Cody,* 577 F.Supp.2d at 642 (concluding that plaintiff's "record of impairment" claim fails, in part, because plaintiff "offers no evidence to support a finding that she has a record of an impairment that substantially limits a major life activity," and that "the only statement offered by plaintiff that even addresses this argument is contained in the affidavit of her counsel").

**\*17** In any event, even if plaintiff had provided such materials, records of hospitalization or other medical treatment do not *per se* establish a record of an ADAqualifying disability; rather, the evidence must establish a physical impairment that substantially impaired a major life activity. *See, e.g., Colwell,* 158 F.3d at 645 (record of previous hospital stay did not, by itself, constitute a record of impairment); *see also Dupre v. Charter Behavioral Health Sys. of Lafayette, Inc.,* 242 F.3d 610, 615 (5th Cir.2001) (health screening form, which indicated that new employee was under the care of physician and had undergone surgery, did not show that plaintiff's impairment substantially limited any major life activity, and therefore, was insufficient as a record of disability); *Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1229–30 (11th Cir.1999) (employer record that employee missed work following a heart attack and in the following years did not establish that the employee had a record of disability); *Dicara v. Conn. Rivers Council,* 663 F.Supp.2d 85, 93 (D.Conn.2009) (noting that the fact that employee underwent surgery and was hospitalized was insufficient to create a record of a substantially limiting impairment).

In this case, even construing the record in plaintiff's favor and crediting her description of these alleged records of impairment, her claim still cannot survive summary judgment. Again, her alleged impairment involves no greater degree of limitation on major life activities than those impairments previously considered and rejected *supra.* Stated differently, accepting plaintiff's description of these documents' contents as true, these records simply reflect a physical impairment, in and of itself; they do not show that the impairment substantially limited her in major life activities, which is the key component to establishing a disability. *See Schapiro v. N.Y.C. Dep't of Health,* 25 F. App'x 57, 61 n. 2 (2d Cir.2001) (considering plaintiff's argument that "the documents contained in his employee file, including the complaints, grievances, records, and Worker's Compensation Board findings, constitute a record of impairment sufficient to meet the definition of disability"; noting that "[i]n order to

establish a substantial limitation, [the court] must conduct the same analysis of the effect of the impairment on [plaintiff's alleged physical impairments] as reflected in those records"; and concluding that "[w]hile these may establish a record of the physical impairment, they do not establish a record that the physical impairment created a substantial limitation"). That is, plaintiff's asserted records of impairment—which the Court has been unable to review, but of which the Court accepts plaintiff's description—simply confirm that she was injured three times on the job, which caused her to miss work, but that she had no other limitations on her ability to perform major life activities prior or subsequent to her alleged injuries. Indeed, according to her own testimony, plaintiff confirms that she was able to return to work and perform her same normal job functions, including walking, without having to request any accommodations from the District following her on-the-job injuries and filing of workers compensation claims. This is insufficient for purposes of establishing a record of impairment. *See Sam–Sekur,* 2012 WL 2244325, at \*7 n. 4 (applying post-ADAAA disability standard and concluding that plaintiff had not established a record of an impairment because she did "not sufficiently allege an impairment that substantially limited a major life activity under 42 U.S.C. § 12102(1)(A), and plaintiff does not allege that there were records relied on by her employer indicating a greater degree of limitation than she alleged in her complaint"). Accordingly, even construing the evidence most favorably to plaintiff, no rational jury could find that plaintiff had a record of impairment, particularly where the alleged records demonstrate no greater degree of impairment than that already considered and rejected.

\* \* \*

**\*18** In sum, plaintiff has failed to set forth any evidence from which a rational jury could find that she has a physical impairment that substantially limits a major life activity as compared to the general population, or a record of such an impairment. Accordingly, plaintiff's ADA reasonable accommodation claim fails as a matter of law.

### 2. Alleged Failure to Accommodate [8]

[8] Although the overwhelming majority of plaintiff's referenced accommodation requests sound more of a complaint regarding parking inconveniences than of an accommodation request, the Court views the

record in plaintiff's favor and construes her parking space requests as requests for accommodation.

The Court's analysis of plaintiff's failure to accommodate claim may properly end here, as plaintiff has failed the first requirement of such a claim. *See Cody,* 577 F.Supp.2d at 643 (concluding that because plaintiff had failed to show she had an ADA-qualifying disability under her disability discrimination claim, her reasonable accommodation claim could not prevail). However, the Court, in an abundance of caution, will address the parties' other arguments concerning her reasonable accommodation claim. In particular, even assuming *arguendo* that there was sufficient evidence from which plaintiff could establish that she has a disability within the meaning of the ADA, no rational jury could find that defendant failed to provide plaintiff with a reasonable accommodation.

Pursuant to the second requirement of a reasonable accommodation claim, plaintiff must show that defendant had notice of plaintiff's disability. The most notice that plaintiff points to here consists of the following: she had a handicapped parking sticker, she commonly parked in a handicapped parking spot, and at least one District employee noticed that she walked with a limp. Regarding the handicapped parking sticker and parking space, as previously set forth, the law is clear that a handicapped parking permit is not sufficient, standing alone, to give an entity knowledge of an ADA-qualifying disability. *See Cody,* 577 F.Supp.2d at 642 (citing *Howard,* 2005 WL 2861107, at *2); *Robinson,* 2004 WL 279205, at *5. Similarly, the fact that an individual has a visible limp or type of walking impairment does not *per se* establish an ADA-qualifying disability. *See, e.g., Kelly,* 94 F.3d at 105 (plaintiff with severe post-traumatic hip impairment, who was unable to walk more than a mile, could not jog, and who had to use a hand rail to ascend stairs, did not have an ADA-qualifying disability by virtue of such evidence); *Penny v. United Parcel Serv.,* 128 F.3d 408, 416 (6th Cir.1997) (plaintiff who had an impairment of less than 20% of his body and who had difficulty walking did not have an ADA-disability); *Ricardson v. William Powell Co.,* No. C–1–93–528, 1994 WL 760695, at *7 (S.D.Ohio Nov. 10, 1994) (a severe arthritis that caused a noticeable limp and difficulty climbing stairs did not constitute an ADA-qualifying disability).

Although the fact that plaintiff walked with a limp and parked in a handicapped parking space certainly might have alerted the District that plaintiff had some form of an ailment that was not shared by others, there is absolutely no evidence that the District was on notice of a *disability.* This is particularly so in light of the fact that whenever plaintiff complained to the District concerning the handicapped spaces, she did not refer to herself as disabled, describe her condition as one that prevented or impeded her from performing or completing her job functions, or otherwise make clear to the District the alleged severity of her physical impairment. (*See* Pl.'s Opp'n. Ex. 1, at 104 ("Q: Did you discuss with [the Assistant Principal] your particular disabilities and how this impacted you? A: Yes. I told him that I needed the closest accessible entrance. Q: What did you tell him about your disability or disabilities? A: That I needed a safe pathway from where I parked my car to the doorway. Q: Did you ever tell Mr. Owen the particular disabilities that you were suffering from? A: Yes. I told him that if I should fall just the right way, I could lose my leg.").) The most plaintiff seems to have established in her complaints and requests to the District is that she needed a safe pathway between her parking space and the building, and that should she fall a certain way, she might severely injure herself. The Court fails to see how this situation, however, is unique to plaintiff—the same concern might be said of any school employee who might be walking to and from the parking area, and who, for whatever reason, might take a bad tumble and fall. The Court disagrees with plaintiff's contention that such requests for a handicapped spot or raising of concerns regarding clear, safe pathways were sufficient for purposes of providing the District with notice of a disability.

**\*19** Even if the Court were to conclude, however, that plaintiff had shown that the District had notice of her alleged disability, plaintiff's reasonable accommodation claim still fails because plaintiff does not show that, even if reasonable accommodations were needed in order for her to complete her essential job functions (which, based on plaintiff's own testimony, seems clear was not, in fact, the case),[9] defendant did not provide her with such.

9
    It is well established that in order for a plaintiff to state a failure to reasonably accommodate claim, she must show that she could perform the essential functions of her job with or without reasonable accommodation. *Scalera,* 848 F.Supp.2d at 363 ("A plaintiff who brings an action under the ADA for failure to make reasonable accommodations must establish that he or she can perform the essential functions of the job, either unaided or with the assistance of a reasonable accommodation."); *see also* 42 U.S.C. § 12111(8). Regarding this

argument, defendant does not appear to dispute that plaintiff was able to perform her essential job functions at all times relevant to this dispute. Indeed, if anything, defendant takes the opposite position, contending that plaintiff, with or without her handicapped parking spot, was able to effectively perform her normal job functions. Moreover, plaintiff repeatedly testified that her abilities to perform her job functions were not affected or impaired by her alleged disability or onthe-job injuries. (*See, e.g.,* Pl.'s Opp'n Ex. 1 at 49, 51, 55, 62, 67, 124–25.) Additionally, plaintiff testified that she did not need any accommodations in order to perform her normal job functions, whether pre or post her alleged on-the-job injuries. (*See, e.g., id.* at 50; *id.* at 52; *id.* at 55; *id.* at 62; *id.* at 67.) Thus, the Court, construing the allegations in plaintiff's favor, accepts that plaintiff could perform her essential job functions with her alleged physical impairment for purposes of her failure to reasonably accommodate claim.

Specifically, plaintiff testified that any requests she ever made to the District concerning her alleged disability were, in fact, honored. (*See Id.* at 126 ("Q: Were there any requests that you made to the District for assistance or accommodation with respect to disabilities that were not honored? A: No.").) A review of the record reveals the same.

For instance, when plaintiff asked Baum (during construction) about the absence of handicapped parking spaces on the building's south side, he directed her to Owen, who was in charge of the construction project. Owen took steps to address plaintiff's inquiries. In particular, Owen's conversations with Grillo, the District's architect (which plaintiff does not dispute occurred on an almost daily basis (*see* Pl.'s 56.1 ¶ 37)), confirmed that the parking lot met the requirements for handicapped spaces during the construction, that there was no alternative in terms of the handicapped spots' location, and that the spots were located as close to the entrance doors as possible. (*See* Def.'s 56.1 ¶¶ 34–38.) On a subsequent occasion, when plaintiff complained to Baum about persons improperly parking in handicapped spots because the spaces' lines had become obscured by snow and bore no other designations, the District had signs put up that same day identifying the spaces as handicapped parking. (*See* Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) Regarding the sign postings, plaintiff testified that she possibly recalled sending Baum a thank you letter for his prompt attention to her request. (*See* Pl.'s Opp'n Ex. 1 at 86.) Where plaintiff took actions into

her own hands, attempting to create a handicapped parking spot in its former location by either cutting the ribbons to the cordoned off spots or making her own spot next to the handicapped ones, the District did not discipline plaintiff or prevent her from doing so. (*See* Def.'s 56.1 ¶ 44.)

A review of the uncontroverted evidence in the record, including plaintiff's testimony, shows that defendant engaged in an interactive process with her when trying to provide her with the requested accommodations. *See Jackan v. N.Y. State Dep't of Labor,* 205 F.3d 562, 566 (2d Cir.2000) ("The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated.") At least one circuit court has described possible actions that might reflect an interactive process: "meet[ing] with the employee who requests an accommodation request, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome." *Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 162 (3d Cir.1999). The aforementioned evidence shows just this: defendant meeting with plaintiff, listening to her concerns, and taking actions that reflected its having considered her request, whether by having Owen speak with Grillo concerning the location of the handicapped spots, or by having signs immediately erected to clearly identify those spots reserved for handicapped parking permitted individuals. Moreover, it is not as though defendant denied plaintiff a handicapped parking space—it was made clear to her that she was free to park in the moved handicapped parking spaces at all times during construction. Plaintiff chose not to avail herself of these parking spaces. Although plaintiff contends that no accommodation was made because her former handicapped parking space was not restored to her during that time, the Court fails to see how the District reasonably could have taken such action, given that the entire section of the building in which plaintiff's prior parking space was located was under construction at the time. Had defendant chosen to accommodate plaintiff in the manner she requested, it would have been exposing her to a hazardous situation—namely, an active construction site with a potentially unsafe pathway to the school. These are the precise concerns plaintiff claims to have voiced to the District on several occasions for purposes of giving it notice of her disability; she cannot now contend that it was unreasonable of the District to have failed to have taken these considerations and needs into account when she requested a parking space amidst a construction site.

In fact, other than parking within the hazardous construction site (which was not an option for obvious reasons), plaintiff has failed to identify any other accommodation that she did request (or even could have requested) of the District. Thus, summary judgment on this claim is warranted.

 **\*20**  In *Trepka v. Board of Education,* the Sixth Circuit reached the same conclusion in analogous circumstances. 28 F. App'x 455 (6th Cir.2002). Specifically, the plaintiff school teacher claimed that the school board had failed to make a reasonable accommodation to her alleged permanent disability—which caused permanent pain to her back and neck and made it difficult to climb stairs and carry oversized loads—by denying her a room closer to where she parked her car. *Id.* at 460. However, the Sixth Circuit found summary judgment on that claim was proper because, *inter alia,* "[t]he only relevant difference between the requested Room 108 and her assigned Room 104 is the distance that [plaintiff] would be required to navigate inside the building from her car" and plaintiff "presented no evidence that her condition limited her ability to walk." *Id.* The Sixth Circuit also rejected the related claim that she was not provided with adequate handicapped parking. *Id.* In particular, the court noted that "[a]bsent any evidence of more profound physical limitations arising from her condition, we hold that [plaintiff] has not demonstrated a genuine issue of material fact as to whether her parking needs were reasonably accommodated." *Id.*

In sum, even construing the evidence most favorably to plaintiff, no rational jury could find that the District failed to reasonably accommodate plaintiff or to engage in an interactive process with her concerning her requests. Instead, based on the uncontroverted evidence, including plaintiff's own testimony, the Court concludes that summary judgment is warranted on the question of whether defendants reasonably accommodated plaintiff's accommodation requests.

### B. Retaliation Claim [10]

[10]    Although this Court has determined that plaintiff cannot demonstrate that she was disabled during the relevant period because of a lack of evidence, that conclusion does not preclude a claim of retaliation. "[C]ourts generally have recognized that nondisabled individuals who request reasonable accommodation are protected

against retaliation, provided the request was made in good faith." *Keating v. Gaffney,* 182 F.Supp.2d 278, 288 (E.D.N.Y.2001) (citing *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 233 (2d Cir.2000)).

Plaintiff also claims that defendant retaliated against her repeated requests for accommodation (*i.e.,* replacement of her former handicapped parking space) when it decided to terminate her in November 2010. (*See* Pl.'s Opp'n at 12–20.) In particular, plaintiff claims that she (1) engaged in protected activity, namely, repeated complaints, (2) of which the District was aware, (3) and suffered an adverse employment action (specifically, termination) which (4) had a causal connection with her protected activity. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 159 (2d Cir.1999) (setting forth the prima facie standard for retaliation). Defendant counters that plaintiff cannot show engagement in a protected activity, and even if she can, she cannot establish a causal connection between the alleged protected activity and the adverse action. (*See* Def.'s Summ. J. Mot. at 20–23.) Generally, a plaintiff's burden at the summary judgment stage is " 'minimal' and *'de minimis' "*; thus, "the court's role ... is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005). The Court begins its analysis with the applicable legal framework.

 **\*21**  Retaliation claims brought under the ADA are examined under the *McDonnell Douglas* burden-shifting test. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *see also Heyman,* 198 F.3d at 72. Pursuant to this test, a plaintiff first must set forth a prima facie case of retaliation. *See Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir.2010). That is, the plaintiff must show "[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003) (quoting *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998)) (internal quotation marks omitted). If the plaintiff is able to establish a prima facie case of discrimination, the burden then shifts to the defendant to set forth "some legitimate, nondiscriminatory reason" for the complained-of conduct. *McDonnell Douglas,* 411 U.S. at 802; *see also Fincher,* 604 F .3d at 720 (stating that where the plaintiff succeeds in establishing a prima facie case, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason

2013 WL 5445736

for the action that the plaintiff alleges was retaliatory"). Where the defendant articulates such a reason, the burden shifts back to plaintiff to establish that "but for the protected activity, [she] would not have been terminated." *Moore v. Kingsbrook Jewish Med. Ctr.,* No. 11–CV–3625(MKB), 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013) (stating that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").

Subsequent to briefing in this case, the Supreme Court modified the standard for employment discrimination in *University of Texas Southwestern Med. Ctr. v. Nassar,* 133 S.Ct. 1517 (2013). In this decision, the Supreme Court set forth a higher standard for plaintiffs seeking to establish a retaliation claim under Title VII. In particular, the Supreme Court held that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)" of Title VII. *Id.* at 2533; *see also Brooks v. D.C. 9 Painters Union,* No. 10–CV–7800 (JPO), 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) ("If the defendant [articulates a legitimate, nonretaliatory reason], the plaintiff must offer 'proof that the unlawful retaliation would have occurred in the absence of the alleged wrongful action or actions of the employer.' " (quoting *Nassar,* 133 S.Ct. at 2534)).

For the reasons set forth below, the Court concludes that, even if plaintiff can establish a prima facie case of retaliation, her claim must fail because no rational jury could find that her termination was a pretext for retaliation. In other words, even accepting all of plaintiff's evidence as true and construing it in her favor, no rational jury could find that but for her handicapped parking requests, she would not have been terminated.

### 1. Prima Facie Case

#### a. Protected Activity

**\*22** Plaintiff asserts that she engaged in protected activity when she complained about the "remov[al]" of her handicapped parking space, requesting that it be returned. (Pl.'s Opp'n at 12.) Defendant disagrees, arguing that plaintiff's handicapped parking requests do not constitute protected activity as she "has produced no evidence of any complaint, formal or informal, sufficient to place the

defendant on notice that she was referring to discriminatory activity." (Def.'s Summ. J. Mot. at 20.) In particular, defendant challenges the notion that plaintiff's "generalized complaints about the inconvenience caused by disruption of the parking lot during construction" were sufficient to have alerted the District to a disability, "particularly given the fact that plaintiff [ ] never advised anyone at the district that she had a disability." (*Id.* at 21.) In responding to defendant's arguments, plaintiff notes that she "did not specifically complain of discrimination" when raising her complaints. (Pl.'s Opp'n at 13.)

The Court is not persuaded that plaintiff's complaints concerning the handicapped parking spaces were a clear-cut protected activity of which the District was aware. *See Cook v. CBS, Inc.,* 47 F. App'x 594, 596 (2d Cir.2002) (concluding that plaintiff did not engage in protected activity where plaintiff sent a letter "request[ing] additional training and reassignment without ever mentioning, or even alluding to, [plaintiff's] belief that [defendant's] failure to comply with his requests would constitute unlawful discrimination"); *Foster v. Humane Soc. of Rochester & Monroe Cnty., Inc.,* 724 F.Supp.2d 382, 395 (W.D.N.Y.2010) (concluding that plaintiff's allegations and supporting documents did not show that plaintiff engaged in protected activity, but instead showed "that while [plaintiff] did complain about certain problems she was having at work, she did not complain that she was being discriminated against").

However, the Court need not resolve this issue. In particular, even if plaintiff's complaints, concerning the movement of handicapped parking spaces due to construction, may be construed as participation in protected activity of which defendant was aware, plaintiff's retaliation claim still fails for the reasons set forth *infra.*

#### b. Adverse Employment Action

Plaintiff satisfies the adverse employment action prong of her prima facie case. The uncontroverted evidence in the record shows that plaintiff was, in fact, terminated. "Being fired is an adverse employment action." *Moore,* 2013 WL 3968748, at *18; *see also Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004) ("[Plaintiff] suffered an adverse employment action when he was fired."). The evidence also shows that, prior to her termination, plaintiff's job responsibilities changed; that is, she lost her job coaching privileges and was reassigned to the library. (*See* Def .'s 56.1 ¶ 52.) According to plaintiff,

this constituted a less prestigious position, although she did receive the same benefits and salary. The Court need not conclude whether the library reassignment, standing alone, constituted an adverse employment action, as plaintiff's termination is sufficient here for purposes of satisfying the adverse action prong of her retaliation claim. *See Miller v. Praxair, Inc.,* 408 F. App'x 408, 410 (2d Cir.2010) (noting that "typical examples of actionable adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities' " (quoting *Galabya v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)); *Reynoso v. All Foods, Inc.,* 908 F.Supp.2d 330, 342 (E.D.N.Y.2012) (stating that plaintiff's "termination clearly constitutes an adverse employment action").

c. Causal Connection

**\*23** Assuming *arguendo* that plaintiff can show that she engaged in protected activity, and further, that defendant was aware of such protected-activity-participation, plaintiff cannot establish a causal connection between her alleged protected activity and her termination. "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110 (2d Cir.2010)) (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 554 (2d Cir.2001); *see also Treglia v. Town of Manlius,* 313 F.3d 713, 720 (2d Cir.2002) ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman–Bakos,* 252 F.3d at 554, some district courts have generally concluded that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line," *Cunningham v. Consol. Edison, Inc.,* No. 03–CV–3522 (CPS), 2006 WL 842914, at \* 19 (E.D.N .Y. Mar. 28, 2006) (collecting cases); *see also Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990) (concluding that a three-anda-half month interview was too much time to establish causation without other

probative evidence); *Browne v. City of N.Y .,* 419 F.Supp.2d 315, 336 (E.D.N.Y.2005) (concluding that there was no causal connection where challenged adverse action occurred nearly six months after plaintiff filed internal complaint). However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g., Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir.1980) (eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y.S. Dep't of Corr. Servs.,* 180 F.3d 426, 446–47 (2d Cir.1999), *abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) (abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier).

Here, plaintiff alleges that she first complained in March 2009 about the inaccessibility of the handicapped parking spaces in March 2009 due to the construction at the school. (*See* Compl. ¶¶ 18–22.) Plaintiff does generally assert that she continued to complain about the parking throughout the 2009–10 academic year. (See Compl. ¶¶ 24–27.) Therefore, in the instant case, because her termination was not recommended until November 2010—which was over eighteen months after her first complaint in March 2009, and at least four months after her last complaint at the end of the 2009–10 academic year—no causal connection can be inferred based upon temporal proximity. [11] The Court recognizes that, if the adverse action had been taken at the first opportunity after the protected activity, an inference of causation could have been drawn, notwithstanding the passage of a longer period of time between the protected activity and the adverse action. *See Bucalo v. Shelter Island Union Free Sch. Dist.,* 691 F.3d 119, 125–26 (2d Cir.2012). However, that is not the case here. It is undisputed that plaintiff was a probationary employee and, thus, defendant could have terminated her employment at any time, including at the end of the 2009–2010 academic year. Thus, the fact that she was not terminated before the commencement of the 2010–2011 academic year negates any inference of causation from the timing of the relevant events. In any event, even assuming *arguendo* that plaintiff can establish temporal proximity and can satisfy the elements of a prima facie case, her claim still cannot survive summary judgment because, as discussed below, in the wake of defendant's articulated nondiscriminatory reason, plaintiff has no evidence from which a rational jury could find such reason to be a pretext for retaliation.

2013 WL 5445736

[11] Plaintiff also notes—for the first time, in her opposition papers—that she complained in summer 2010, without providing any additional information, details, or context concerning the complaint. (*See* Pl.'s Opp'n at 14.) In response, defendant argues: "The federal complaint, which goes on for paragraphs about plaintiff's complaints to the District, does not reference a complaint in summer 2010; the last complaint referenced is during the 2009–2010 academic year when plaintiff alleges Dr. Baum screamed and gestured at her (Ex. A ¶ 27). Similarly, when questioned at length at her deposition about the contents of any and all complaints she made, Graham did not note any complaints beyond the 2009–10 school year. Now, however, in an attempt to stave off summary judgment, plaintiff makes reference to a complaint in the summer of 2010, without providing any further information about the content of the complaint, who she complained to, the date of the complaint, or how the complaint was made." (Def.'s Reply at 9 n. 2.) The Court agrees with defendant that plaintiff is not permitted to introduce evidence for the first time in her opposition for summary judgment, especially where such evidence is inconsistent with her detailed allegations in the complaint. *See Morritt v. Stryker Corp.,* No. 07–CV–2319, 2011 WL 3876960, at \*5–8 (E.D.N.Y. Sept. 1, 2011) (holding that a party may not submit evidence for the first time in connection with their opposition to a summary judgment motion). In any event, as discussed *infra,* even if such evidence is considered and could be used to establish temporal proximity, such evidence alone is insufficient for plaintiff's claim to survive summary judgment.

### 2. Legitimate, Non–Discriminatory Reason for Retaliatory Act

**\*24** As previously set forth, "[o]nce a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa v. Hofstra Univ.,* 708 F.3d 115, 125 (2d Cir.2013) (quoting *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001)) (internal quotation marks omitted). Defendant here has satisfied that burden.

Defendant's proffered reasons for terminating plaintiff were that plaintiff was a probationary employee; she was therefore subject to observation and evaluation before any change in a position title could occur; the superintendent had clearly articulated that if any concerns arose concerning an employee, he would not support a tenure recommendation; and concerns did arise concerning plaintiff's performance. (*See* Def.'s Summ. J. Mot. at 23.) Specifically, complaints surfaced concerning plaintiff's treatment of both a student and staff members at St. Charles Hospital, where plaintiff held job coaching responsibilities. (*Id.* at 23–24.) While it seems that the complaints concerning plaintiff's treatment of an autistic child at the hospital largely underlay defendant's termination decision, defendant also states that there was a prior complaint concerning plaintiff's conduct dating from the 2005–2006 school year. (*Id.* at 24.) Additionally, defendant notes that plaintiff was not the only CTA to be denied tenure; instead, approximately eleven other CTAs were recommended for termination. (*Id.* at 23 (citing Def.'s Summ. J. Mot. Ex. L).)

Here, plaintiff was a probationary employee who could have been fired at any point in time and for no stated reason during her period of employment. *See Matter of Rossetti–Boerner v. Hampton Bays Union Free Sch. Dist.,* 1 A.D.3d 367, 368 (2d Dep't 2003) ("It is well settled that a probationary employee may be discharged without a hearing and without a statement of reason in the absence of any demonstration that dismissal was for a constitutionallyimpermissible purpose or in violation of statutory or decisional law."). Moreover, plaintiff had at least two recent complaints against her around the time she was up for tenure. The superintendent had notified District employees that he would not support a tenure recommendation for an employee with concerns surrounding his or her performance. This is precisely what plaintiff had on her record at the time she was being considered for tenure. Additionally, the uncontroverted evidence in the record shows that defendant was terminated soon after the complaint from St. Charles Hospital was received, as the St. Charles Hospital complaint is from October 28, 2010, and plaintiff received notice of the termination recommendation in November 2010. For these reasons, the Court concludes that defendant has set forth a legitimate, nondiscriminatory reason for its actions, and the burden, accordingly, shifts back to plaintiff to provide evidence from which a rational jury could find pretext.

### 3. Pretext

**\*25** As previously set forth, under the Supreme Court's revised standard for retaliation claims, plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar,* 133 S.Ct. at 2533. Thus, plaintiff here "must show that retaliation was a but-for cause of the adverse employment action." *Moore,* 2013 WL 3968748, at \*19; *see also Brooks,* 2013 WL 3328044, at \*3 (stating that plaintiff had to show that alleged age discrimination "was the 'but-for' cause of the adverse action and not merely one of the motivating factors"). To satisfy this but-for causation element, plaintiff must "prove that [her] termination would not have occurred in the absence of a retaliatory motive." *Moore,* 2013 WL 3968748, at \*20.

Plaintiff cannot show, nor does the uncontroverted evidence in the record support the conclusion, that plaintiff would not otherwise have been terminated in the absence of her handicapped parking complaints and defendant's denial of the same. The record shows that plaintiff was terminated soon after a serious complaint came to the District's attention concerning plaintiff's inappropriate treatment of an autistic student while on-the-job. The uncontroverted evidence also reflects the seriousness with which the District treated the complaint, passing it up the chain of command while investigations were ongoing until it reached the superintendent himself. The record also shows that plaintiff's record prior to termination included an additional complaint concerning her treatment of staff at the St. Charles Hospital. Lastly, it is undisputed that plaintiff was a probationary employee prior to her termination, giving the District the freedom to terminate her at any point in time and for no stated reason. In the face of these uncontroverted facts, plaintiff has failed to provide any evidence from which a rational jury could find that, but for her alleged acts of protected activity—in the form of complaining about the movement of the handicapped spaces during construction and requesting restoration of her same parking spot—plaintiff would not have been fired. Indeed, as noted above, the uncontroverted evidence suggests the exact opposite, especially given that plaintiff seems to have first begun complaining about the parking spaces in fall 2009, and she was terminated well over a year following the complaints' commencement. For these reasons, the Court concludes that plaintiff has failed to establish that defendant's decision to terminate her was a pretext for retaliation. Accordingly, the Court grants defendant's motion for summary judgment in its entirety.

### C. ADA Disability Claim Regarding Termination

Although plaintiff made a conclusory claim in the complaint that the termination (in addition to being retaliatory) was on account of her disability, it is unclear from the opposition papers whether plaintiff is continuing to make that assertion. Specifically, in her brief, plaintiff submits that the issues are: "(1) whether Plaintiff is disabled under the ADA; (2) whether Defendant was aware of Plaintiff's disability; (3) whether Plaintiff requested reasonable accommodations from Defendant; and (4) whether Plaintiff was retaliated against by Defendant for engaging in protected activities." (Pl.'s Opp. at 1.) There is no mention of a disputed issue as to whether plaintiff's termination was because of her alleged disability (as opposed to in retaliation for her alleged requests for accommodation). In fact, although there is a detailed analysis in plaintiff's opposition as to why she contends that her termination was retaliatory (*see* Pl.'s Opp'n at 12–20), there is no such analysis for any separate claim of termination because of the disability. In fact, aside from a cursory citation to the legal standard for a discriminatory discharge claim (*see id.* at 7), the only conclusory reference at all to such a contention is in the retaliation section (*see id.* at 15), which cites a paragraph of Plaintiff's 56.1 Statement that only makes reference to the termination being a pretext for retaliation (*see* Pl.'s 56.1 ¶ 53 ("Thus, it is apparent the District used the complaint against Plaintiff as a pretext to terminate her employment.")). Thus, any separate ADA claim for termination based upon the disability (as opposed to retaliation) could be deemed to have been abandoned. However, in an abundance of caution, the Court has separately examined any such claim and concludes that, even assuming *arguendo* that plaintiff has evidence to satisfy a prima facie case, the claim would still fail for the reasons discussed below.

**\*26** For purposes of a discriminatory discharge claim, an employee must show that: "(1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998). Of course, this claim is also subject to analysis under the three-step, burdenshifting framework established by the Supreme Court in *McDonnell Douglas. See McBride v. BIC Consumer Prods. Mfg. Co.,* 583 F.3d 92, 96 (2d Cir.2009) (applying *McDonnell Douglas* standard to disability discrimination claim brought under the ADA). The Court assumes, for purposes of this

motion, that plaintiff can establish a prima facie case. [12] As discussed in detail in connection with the retaliation claim, defendant has articulated a nondiscriminatory reason for the termination—namely, job performance—and, based on the Court's review of the uncontroverted evidence in the record, no rational jury could find that the reason given for plaintiff's termination was a pretext for her alleged disability. *See Primmer v. CBS Studios, Inc.,* 667 F.Supp.2d 248, 259 ("To satisfy [plaintiff's] burden on the fourth prong of her prima facie claim, [plaintiff] must show that she was terminated under circumstances that give rise to an inference of discriminatory intent." (emphasis omitted)).

[12] The Court notes that, for a disability discrimination claim, the "regarded as" theory of disability would be available to plaintiff (unlike for her reasonable accommodation claim). The Court briefly addresses this third definition of a disability. The ADAAA has dramatically expanded the definition of "regarded as" disabled. In particular, pre-ADAAA, a plaintiff who alleged that she was "regarded as" having a disability had to show that the perceived disability was one that "substantially limited a major life activity." *Joseph,* 2011 WL 573582, at *9; *see also Cody,* 577 F.Supp.2d at 643 (setting forth pre-ADAAA standard, stating that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action," but "[r]ather, [p]laintiff must demonstrate that defendants perceived [her] impairment as substantially limiting the exercise of a major life activity" (alteration in original) (internal citations and quotation marks omitted)).

First, as noted *supra,* it is undisputed that plaintiff was a probationary employee during the period of employment relative to the Court's analysis. She, therefore, could have been fired at any time and for any reason, as long as it was not for an impermissible purpose. *See Matter of Rossetti–Boerner,* 1 A.D.3d at 368 ("It is well settled that a probationary employee may be discharged without a hearing and without a statement of reason in the absence of any demonstration that dismissal was for a constitutionally-impermissible purpose or in violation of statutory or decisional law.").

Additionally, at the time of plaintiff's consideration for tenure, it is uncontroverted that she had at least two complaints against her. The superintendent had notified District employees that he would not support a tenure recommendation for an employee with concerns surrounding his or her performance. Unfortunately for plaintiff, this is precisely what she had on her record—and more than once—at the time she was being considered for tenure.

Moreover, plaintiff points to nothing in the record from which a rational jury could find her termination was "because of" her hip impairment, or that the District's underlying motive to terminate her was attributable to a discriminatory intent, and not to her job performance. Instead, plaintiff only offers conclusory allegations that are devoid of any factual support. A review of the record shows that there is no evidence that the District harbored any type of discriminatory intent against her. In fact, there is uncontroverted evidence that defendant made efforts to accommodate plaintiff's requests, to tend to her complaints, to overlook where she took matters into her own hands (*e.g.,* cutting the ribbons roping off the construction site), and to explain why—if a request were made that could not be granted—it was being denied. [13] Indeed, it was not until significant concerns arose (and quickly went up the relevant chain of command to the superintendent) concerning plaintiff's performance abilities that plaintiff began to experience the alleged adverse employment actions at issue, including her termination.

[13] Regarding this last point, it is clear that, contrary to plaintiff's framing of the facts, the District never denied her a handicapped parking space during the construction period. Instead, it allowed her to continue using her handicapped parking pass; it simply required her to park in the new handicapped spaces, which had been located in a different area to ensure employee safety and minimize the risk of employee injury during the construction period, issues which were clearly of import to plaintiff, given the substance of her complaints.

**\*27** In addition, there is uncontroverted evidence that plaintiff was not the only employee who was denied tenure at the conclusion of her probationary period. (*See* Def.'s Summ. J. Mot. at 23 (citing *id.* Ex. L.) In fact, approximately ten other certified teaching assistants were terminated, and a number of non-disabled CTAs (thirty-two in total) were given JUUL agreements, having their probationary period extended (but their tenure determination delayed) (*see id.* at 23). While not

a dispositive factor, this evidence also supports defendant's position.

Finally, although there is no dispute that an administrator at St. Charles contacted defendant to complain that plaintiff was very demeaning to a special education student, plaintiff attempts to attack the merits of the complaint by the St. Charles administrator. However, plaintiff's arguments raise issue only as to the accuracy or the wisdom of defendants' decision to terminate plaintiff, but fail to create a triable issue of fact as to whether the proffered reasons for plaintiff's termination were a pretext for discrimination. The question in any discrimination case is not whether defendant's decision to fire plaintiff was correct, but whether it was discriminatory. *See, e.g., McPherson v. N.Y.C. Dep't. of Educ.,* 457 F.3d 211, 216 (2d Cir.2006) ("In a discrimination case ... we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer ....' " (emphasis omitted) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983))); *Kolesnikow v. Hudson Valley Hosp. Ctr.,* 622 F.Supp.2d 98, 111 (S.D.N.Y.2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the employer reached a correct conclusion in attributing fault [to the plaintiff] ..., but whether the employer made a good-faith business determination.' " (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff,* No. 07–CV–8835 (GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008))); *Agugliaro v. Brooks Bros., Inc.,* 927 F.Supp. 741, 747 (S.D.N.Y.1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").

In sum, even construing the evidence most favorably to plaintiff, there is no evidence from which a rational jury could find that the District's actions here were motivated by a discriminatory intent against plaintiff and her alleged disability. Accordingly, to the extent this claim was not abandoned, summary judgment as to this claim is also granted.

## IV. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

F NPost–ADAAA, however, there is ere is "a new, more lenient, standard for determining whether an individual is 'regarded as disabled': [a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental or impairment *whether or not the impairment limits or is perceived to limit a major life activity." Davis v. N.Y.C. Dep't of Educ.,* No. 10–CV–3812 (KAM) (LB), 2012 WL 139255, at *5 (E.D.N.Y. Jan. 18, 2012) (quoting *Laurent v. G & G Bus Serv., Inc.,* No. 10–cv–4055, 2011 WL 2683201, at *5 (S.D.N.Y. May 17, 2011)) (internal quotation marks omitted); *see also Nelson v. City of N.Y.,* No. 11–CV–2732(JPO), 2013 WL 4437224, at *7 (Aug. 19, 2013) (same); *George v. TJX Cos., Inc.,* No. 08–CV–275(ARR) (LB), 2009 WL 4718840, at *8 (E.D.N.Y. Dec. 9, 2009) ("[T]he ADAAA dramatically expanded the reach of the ADA by protecting individuals who are 'regarded as' having a disabling impairment even when the impairment neither is, nor is perceived to be, substantially limiting."). Under this more relaxed standard, an employee need not "show that the disability [s]he is perceived as suffering from is one that actually limits, or is perceived to limit, a major life activity." *Darcy v. City of N.Y.,* No. 06–CV–2246 (RJD), 2011 WL 841375, at *4 (E.D.N.Y. Mar. 8, 2011).

F NAdditionally, a plaintiff also is not required to "show that the employer had a reasonable basis for perceiving [her] as suffering from a disability; [the statute] merely requires [her] to show that the employer did so perceive [her]." *Davis,* 2012 WL 139255, at *5; *see also Jordan v. Forfeiture Support Assocs.,* No. 11–CV–3001, 2013 WL 828496, at *16 (E.D.N.Y. Mar. 5, 2013). Lastly, the ADAAA makes clear that the "regarded as" definition of disability "does not apply to impairments that are both transitory and minor." *Davis,* 2012 WL 139255, at *5 (citing 42 U.S.C. § 12102(3)(B)).

F NHowever, the Court need not address this issue in this case because, as discussed below, even if plaintiff were disabled or regarded as disabled, this claim cannot survive summary judgment because no rational jury could find that the termination was a pretext for disability discrimination given the uncontroverted evidence in the record.

2013 WL 5445736

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5445736

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.